## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| New Hampshire Youth Movement,<br><br>        *Plaintiff*,<br><br>v.<br><br>David M. Scanlan, in his official capacity as New Hampshire Secretary of State,<br><br>        *Defendant*. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff the New Hampshire Youth Movement ("Youth Movement") files this Complaint for Declaratory and Injunctive Relief against Defendant David M. Scanlan, in his official capacity as New Hampshire Secretary of State. Plaintiff alleges as follows:

### NATURE OF THE CASE

1.      Last week, Governor Sununu signed HB 1569, a bill that will make it substantially harder—and in some cases impossible—for many New Hampshire citizens to register and vote. **The bill will not take effect until after the November 2024 election.** But when it does take effect, it will require new New Hampshire voters to show documentary proof of their citizenship—a birth certificate, passport,

naturalization papers, or other unspecified documentation—before they may cast a ballot. Under existing law, voters without such documentation may still vote by signing an affidavit attesting that they are citizens; under HB 1569 they will simply be out of luck.

2.     HB 1569's documentary proof of citizenship requirement is both unnecessary and unconstitutional. Governor Sununu has explained that New Hampshire's elections—before HB 1569—were "secure, safe and reliable," and that the state has "done it right 100% of the time for 100 years." And Secretary of State David Scanlan has repeatedly boasted that New Hampshire's "election process" is "time-tested," "convenient, secure and easily observable." The evidence backs up their assertions: voter fraud is exceedingly rare, with only a handful of cases over the last few decades, and just one conviction for noncitizen voting.

3.     Moreover, there is no evidence that the affidavit voters used to prove citizenship, in particular, has been a vector for fraudulent voting, or that eliminating it will do anything to make New Hampshire elections more secure. Thousands of New Hampshire voters have properly used affidavits to prove their identity or citizenship. The only recent conviction for noncitizen voting in New Hampshire was of someone who had not even used the affidavit option to prove his citizenship.

4.     That's for good reason. Existing law was more than adequate to deter noncitizens from voting. Noncitizens who register or vote face civil and criminal

liability under New Hampshire law, RSA 659:34, and federal law, 18 U.S.C. § 611. They also render themselves permanently "inadmissible" under federal immigration law, 8 U.S.C. § 1182(a)(6)(C)(ii), (a)(10)(D), which can lead to deportation and will prevent them from ever renewing a visa, becoming a naturalized citizen, or returning to the United States if they leave. These are extremely serious consequences, and there is no evidence that any meaningful number of noncitizens have voted anywhere in the United States, much less in New Hampshire specifically. And if noncitizens were voting in New Hampshire, it would be easy to tell, because even under existing law the state can readily identify which voters attest to their citizenship by affidavit instead of providing documentary proof.

5.    The General Court nevertheless passed, and Governor Sununu signed, HB 1569, which will make voting dramatically harder for many New Hampshire citizens by eliminating the option to prove their citizenship by affidavit. In doing so, HB 1569 erects severe and needless barriers for voters in New Hampshire to register to vote and cast their ballots. It will prevent any individuals who are unable to produce compliant documents on election day from voting altogether—and, as the state knows from experience, this circumstance presents regularly at the polls. That is why thousands of voters have relied on the affidavit process in recent years.

6.    The resulting disenfranchisement and other burdens, moreover, are certain to fall disproportionately on identifiable groups—including, but not limited

to students and young people—who are less likely to have ready access to the limited set of documents with which they must now prove their citizenship.

7.    Because the proof-of-citizenship requirement severely and disproportionately restricts the ability of New Hampshire voters to exercise their right to vote, without any adequate interests to justify those burdens, the law violates the U.S. Constitution's First and Fourteenth Amendments. *See Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (explaining that, to determine whether a law unconstitutionally burdens the right to vote, courts "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed'" (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983))). The U.S. Court of Appeals for the Tenth Circuit invalidated Kansas's similar attempt to require proof of citizenship for exactly that reason: the burden it imposed on voters outweighed the same state interests that purportedly underlie HB 1569. *Fish v. Schwab*, 957 F.3d 1105, 1136 (10th Cir. 2020).

8.    Plaintiff therefore brings this lawsuit for a declaratory judgment that HB 1569's proof-of-citizenship requirement is unconstitutional, and for permanent injunctive relief against its enforcement.

## JURISDICTION AND VENUE

9.      Plaintiff brings this action under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution.

10.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and the laws of the United States.

11.     This Court has personal jurisdiction over Defendant, who is sued in his official capacity.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant is a resident of New Hampshire. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to Plaintiff's claims occurred and will occur in this judicial district.

13.     This Court has the authority to provide declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65, as well as 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14.     Plaintiff the New Hampshire Youth Movement is a nonpartisan, nonprofit membership organization composed of young people and others in New Hampshire who are motivated to effectuate political change through civic action and

democratic participation. The Youth Movement advocates on behalf of young people and others in New Hampshire who seek to advance policy goals such as increasing wages, decreasing the costs of education, housing and medical care, and combatting the growing effects of climate change. The Youth Movement further works to strengthen the influence of young people, marginalized individuals, and others who share their common values by helping them navigate the political system and rise to positions of power and governance.

15.     The Youth Movement has 129 dues-paying members who contribute to the organization. Additionally, more than 3,500 people have participated in actions led by the Youth Movement.

16.     In furtherance of its mission, the Youth Movement creates "hubs" across New Hampshire that work under a shared set of principles to build collective power. These hubs plan, organize, and execute events aimed at uplifting the voice and influence of their constituency in their communities and all throughout New Hampshire, especially on major days of action and during key elections. In addition to such direct engagement in the community, the Youth Movement further invests in reaching their constituents in New Hampshire by running social media campaigns, text banking, and pledge-to-vote campaigns. It further conducts other outreach to provide education on policy issues that are central to its mission and inform people

of ways to participate in state and local elections as well as other civic engagement activities.

17. In light of HB 1569, the Youth Movement will need to divert resources away from direct voter contact, including its pledge-to-vote campaign in which people sign pledge-to-vote cards, and towards voter education specific to HB 1569. These efforts will include using staff time and resources to organize events in which town clerks come to campuses to register students to vote; drafting and running letters to the editor to inform people of the new requirement; and reconfiguring and running a new social media campaign concerning the requirement.

18. The proof-of-citizenship requirement inflicts direct harm on the Youth Movement as well as its members and constituents by directly undermining the efficacy of its educational and get out the vote efforts: no matter how persuasive those efforts are, they will come to naught if the targeted voters are disenfranchised by the new requirement. As a result, rather than conduct its planned voter engagement and outreach activities, the organization will be forced to direct efforts toward educating voters on the harms and risks associated with the proof-of-citizenship requirement. The Youth Movement will further be forced to provide direct assistance to those who are qualified to vote but who lack the documents necessary to register and vote under HB 1569.

19.     Especially because the Youth Movement has limited resources, these diversions of resources toward combatting the harms to the Youth Movement of the proof-of-citizenship requirement come at a direct cost to its other priorities. Further, the young, low-income, and other marginalized people who make up the Youth Movement's membership and constituency are at a particular risk of disenfranchisement and other burdens under the new requirement. These populations are less likely to possess or have ready access to their birth certificates, passports, or naturalization papers—if they have them at all. These groups are likewise less likely to have the time and resources to invest in obtaining the documents necessary to register to vote under HB 1569. The Youth Movement thus brings this litigation on behalf of itself, as well as on behalf of its members and constituents across New Hampshire.

20.     Defendant David Scanlan is the Secretary of State of New Hampshire and the state's chief election officer. RSA 652:23. Secretary Scanlan is responsible for overseeing, implementing, and harmonizing the State's entire election administration process. Specifically, he is responsible for preparing an up-to-date manual on New Hampshire election law and procedure for local officials to use to conduct elections. RSA 652:22.[1] The Secretary is further directed to "prescribe the

---

[1] The Secretary's Election Procedure Manual ("EPM") is published on the Secretary's website. *See* N.H. Sec'y of State, New Hampshire Election Procedure

- 8 -

form of the voter registration form to be used for voter registrations," RSA 654:7, and is required to provide instructions and guidance related to voter registration and voter identification requirements. For example, he must provide a "regularly updated set of instructions and best use practices for the use of electronic poll books." RSA 652:27. He is also responsible for preparing an explanation of identification requirements for voters that directs voters to the Department of State's website for more information, which is displayed in every town and city clerk's office for at least 14 days prior to each election. RSA 652:25.

### STATEMENT OF FACTS AND LAW

I.   **Same-day registration is fundamental to New Hampshire's rich history of in-person voting.**

21.   New Hampshire has a longstanding tradition of active civic engagement, which can be traced to the state's centuries-old tradition of holding town meetings and gatherings at which residents come together to discuss and vote on issues facing their communities.

22.   Consistent with this tradition, New Hampshire voters have maintained a robust and continuing interest in voting in-person. In the 2022 general election, for example, more than 85% of New Hampshire voters voted in person. Charles Stewart

---

Manual       (August       2024)       ("2024-25       EPM"),
https://www.sos.nh.gov/sites/g/files/ehbemt561/files/documents/2024-08/epm-2024-2025-final-ada-for-web.pdf.

III, *How We Voted in 2022*, MIT ELECTION DATA & SCIENCE LAB 9,

https://electionlab.mit.edu/sites/default/files/2023-05/How-We-Voted-In-2022.pdf

(last accessed Sept. 13, 2024).

23.　New Hampshire consistently boasts some of the highest levels of voter

participation in the country. In the 2020 general election, for example, more than

76% of the citizen voting age population turned out, compared to 68% nationally.

*See* U.S. Election Assistance Commission, *Election Administration and Voting

Survey, Comprehensive Report* 27 (2020),

https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report

_Final_508c.pdf.

24.　To enfranchise as many qualified voters as possible, the General Court

acted in 1994 to guarantee an easily navigable and accessible system for same-day

voter registration and voting on election day. *See* Act of May 23, 1994, Ch. 154:1,

I, 1994 N.H. Laws (HB 1506). Because New Hampshire enacted same-day

registration, it obtained an exemption from the requirements of the National Voter

Registration Act ("NVRA").

25.　Since then, New Hampshire's same-day registration provision has

provided that a voter who is not registered but who is "otherwise a qualified voter

shall be entitled to vote by requesting to be registered to vote at the polling place on

election day," so long as the voter satisfies the state's voter qualification requirements. *See* RSA 654:7-a.

## II. New Hampshire's statutory scheme long permitted voters to prove their citizenship status either by producing documents or by signing an affidavit.

26.    Chapter 654 of the Revised Statutes governs voter eligibility and registration requirements. To be qualified to vote, a voter must be (a) 18 years of age, (b) domiciled in the town or city where the individual is registering, and (c) a citizen of the United States. *See* RSA 654:7, I.

27.    In 2003, the election day registration provision was amended to provide that voters would be *required* to produce proof of qualifications, including citizenship, when registering to vote. Act of July 18, 2003, Ch. 289, 2003 N.H. Laws (HB 627) (replacing "may" with "shall" in RSA 654:7-a and RSA 654:12). Under this provision, however, a "citizenship affidavit" was satisfactory proof of citizenship—documentary proof was not required. *See id.* In 2009, the General Court later renamed the "citizenship affidavit" the "qualified voter affidavit," and allowed voters to attest to other qualifications using the form as well. Act of July 29, 2009, Ch. 278, 2009 N.H. Laws (HB 265); *see* Act of June 27, 2012, Ch. 285, 2012 N.H. Laws (SB 318).

28.    More recently, however, the General Court has taken steps to restrict voter registration in New Hampshire. In 2017, the General Court enacted SB 3 to

modify the term "domicile" and amend the procedures and forms used by voters who register to vote using an affidavit. Specifically, SB 3 changed the definition of domicile by requiring anyone seeking to register to present documentary evidence of "a verifiable act or acts carrying out" their intent to be domiciled in the state. In response, pro-voting groups sued, alleging that the bill unconstitutionally burdened the right to vote under the state constitution. The Supreme Court of New Hampshire agreed, striking down the law in its entirety. As a result, voter registration requirements returned to the state's pre-SB 3 system. *N.H. Democratic Party v. Sec'y of State*, 262 A.3d 366, 382 (N.H. 2021).[2]

29.     At all relevant times prior to HB 1569's passage, New Hampshire voter registration law has required election officials to accept an affidavit in lieu of the other documents deemed sufficient to demonstrate citizenship.

---

[2] And in 2022, the General Court enacted SB 418, creating an "affidavit ballot" system for election day voters who are unable to produce photo identification. *See* RSA 659:23-a, I ("[I]f a voter on election day is registering to vote for the first time in New Hampshire and does not have a valid photo identification establishing such voter's identification, or does not meet the identity requirements of RSA 659:13, then such voter shall vote by affidavit ballot pursuant to this section"). Under the system, ballots submitted by voters who are unable to provide such proof were only counted on a provisional basis, subject to the voter's ability to cure the ballot through a post-election verification process. *See* RSA 659:23-a, II–V. This process, which has been repealed by HB 1569, did not apply to individuals who were unable to satisfy the proof-of-citizenship requirement on election day. *See id.*

**III.     The ability to prove citizenship via affidavit is a critical component of New Hampshire's election day registration scheme that prevents disenfranchisement.**

30.     The ability to use the qualified voter affidavit in lieu of other citizenship documents has long been a critical means for voters to register and vote, serving as a necessary backstop for those who are unable to produce other compliant documents on election day.

31.     The ability to register to vote in this manner, in fact, is heavily touted in the Secretary's voter registration guidance as a critical means by which voters are able to register and vote, especially on election day. N.H. Sec'y of State, *Registering to Vote in New Hampshire* 1 (updated Nov. 28, 2023), https://www.sos.nh.gov/sites/g/files/ehbemt561/files/inline-documents/sonh/registering-to-vote-in-new-hampshire-november-2023.pdf ("You need to provide proof of your identity, age, citizenship, and domicile to register. Proof can be either by documents or by affidavit if you do not have documents with you."); *id.* ("You can prove your identity, age, and/or citizenship by signing a Qualified Voter Affidavit, under oath, in front of an election official if you do not have documents."); *see also* N.H. Sec'y of State, *At the Polls on Election Day* (last accessed Sept. 13, 2024), https://www.sos.nh.gov/elections/register-vote/polls-election-day ("If you do not have documents with you to prove a qualification, you may prove your identity, age, citizenship, or domicile by completing an affidavit.

- 13 -

Your local election officials will provide the forms needed, and are happy to answer any questions you may have.").

32.     Thousands of New Hampshire voters have relied on qualified voter affidavits to prove their citizenship in recent elections. Testimony submitted to the General Court, as well as statements by legislators during debate over HB 1569, for example, show that more than 700 voters were able to register to vote in 2022 by relying on the qualified voter affidavit option to prove their citizenship (with hundreds more using it to prove other qualifications), and that more than 1,400 people used a qualified voter affidavit to prove either their citizenship or identity in 2020.

33.     The qualified voter affidavit has served as a critical means for thousands of voters to register and exercise their right to vote in New Hampshire, and there is no evidence that it has enabled fraudulent voting.

**IV.     HB 1569 fundamentally changed voter registration in New Hampshire by eliminating the qualified voter affidavit.**

34.     Despite New Hampshire's successful track record with respect to voter registration and maintaining the integrity of its elections, a deeply divided General Court made a fundamental change to the state's qualification provision by enacting HB 1569, which entirely eliminates the ability of voters to use an affidavit to show their citizenship in lieu of documentary proof. By doing so, HB 1569 requires any voter seeking to register in the state for the first time to produce a birth certificate,

passport, naturalization papers, or other documentation deemed "reasonable" by an election official.

35.     Neither the law nor the Secretary's EPM provides guidance on what constitutes "reasonable" documentation. The Secretary's EPM includes examples of documents that constitute proof of citizenship, but that guidance simply restates that a passport or a birth certificate qualifies and explains what naturalization papers are (*i.e.*, certificates issued by the federal government or a Consular Report of Birth Abroad). 2024-25 EPM at 33. Whether a voter has satisfied the proof of citizenship Requirement is judged by a local election official. *Id.* at 34.

36.     Thus, under HB 1569, unlike ever before in New Hampshire's same-day voter registration regime, if a voter is unable to produce any of these documents on election day, the voter will be turned away and unable to vote.

**V.     The proof-of-citizenship requirement is unconstitutional.**

37.     As the Secretary's EPM itself recognizes, especially in New Hampshire's same-day voter registration system, allowing a voter to attest to a qualification in lieu of documentary proof is often *necessary* to ensure that voters are not unconstitutionally disenfranchised:

> [T]he state and federal constitutions still require that everyone be allowed to vote somewhere, unless disqualified. . . . *It is inherent in this requirement that an individual whose circumstances do not allow or who chooses not to have a driver's license, not to register a vehicle, not to purchase utility services, etc., must have some method available by*

- 15 -

*which to prove his or her domicile. The Qualified Voter and Domicile Affidavits satisfy this requirement.*

2024-25 EPM at 179 (emphasis added).

38. By eliminating that option without any adequate alternative means to ensure that all voters have a means to register to vote, New Hampshire has imposed an unconstitutional burden on voters' fundamental right to vote in the state. *See Common Cause*, 970 F.3d at 14 (to determine whether a law unconstitutionally burdens the right to vote, courts "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed'" (quoting *Anderson*, 460 U.S. at 788–89); *Fish*, 957 F.3d at 1136 (holding that Kansas's asserted interests in protecting election integrity, ensuring voter roll accuracy, safeguarding voter confidence, and preventing voter fraud were insufficient to "justify the burdens that [Kansas's documentary proof of citizenship] law impose[d]").

### A. The proof-of-citizenship requirement severely burdens the right to vote.

39. The proof of citizenship requirement imposes severe burdens on the right to vote of all voters who register to vote for the first time in New Hampshire, especially those who do so on election day.

40. For various reasons, many voters will come to the polls without the necessary documents to prove their citizenship. For example, some people who are

otherwise qualified to vote in New Hampshire simply do not have a passport, birth certificate, naturalization papers, or other documents that would affirmatively prove their citizenship. When those individuals arrive at the polls to register to vote on election day, they will not be able to prove their qualifications. As a result, the proof-of-citizenship requirement completely disenfranchises these individuals.

41.    Other people in New Hampshire may have these documents but do not have them in their possession or access to them because they have moved to attend school or for other reasons. The proof-of-citizenship requirement also completely disenfranchises these individuals.

42.    Other circumstances beyond the control of voters further prevent access to the documents deemed permissible by the requirement. For example, some voters in New Hampshire will find themselves in emergency or exigent circumstances, such as a home fire or other disaster, that destroys their documentation. The requirement completely disenfranchises these individuals as well.

43.    Other registrants will come to the polls on election day prepared to take advantage of New Hampshire's same-day registration without knowing that they need to prove their citizenship with documents. As a result, they will not bring their passports, birth certificates, or naturalization papers with them. These individuals either need to return home to retrieve this proof or they are completely disenfranchised. Returning home to find these documents constitutes its own

substantial burden on these voters just to be able to vote—and many will not have the time or ability to do so at all.

44.    Any voters who currently lack the documents deemed acceptable by the requirement, moreover, will be forced to take the time and expend money and other resources to obtain them in time to vote on election day. Passports can take multiple months to obtain and cost more than $110. The amount of time and money required to obtain copies of birth certificates can vary, but likewise impose significant costs on voters. Naturalization papers, for those citizens born outside of the United States, can cost more than $500. Thus, for any voters who lack existing documents to prove their citizenship, the requirement imposes these and other significant burdens just to enable them to exercise the right to vote.

45.    Repeated testimony throughout the General Court's consideration of HB 1569 put legislators on notice of these severe burdens resulting from the proof-of-citizenship requirement—especially for students, young people, the elderly, low-income people, and houseless individuals, as well as other marginalized and transient populations. Yet, despite the extensive legislative record documenting these problems, the General Court narrowly passed HB 1569.

**B. The proof-of-citizenship requirement does not advance legitimate state interests.**

    **1. The legislative history shows that the requirement's proponents were motivated only by vague specters of fraud.**

46.    In the General Court, proponents of the proof-of-citizenship requirement pointed only to vague concerns about voter fraud as the reason to enact the legislation and did not claim that the requirement advanced any other legitimate interest that could make the burdens it imposes necessary.

47.    The original sponsor of the requirement, Representative Lynn, "candidly" admitted that the bill was not directed toward any existing fraudulent voting when introducing the bill to his colleagues in the Senate: "Do I think there's a huge issue of voter fraud in New Hampshire? No, I don't, because I think if there was, we would know it."

48.    Throughout HB 1569's discussion in the General Court, legislators continued to acknowledge that fraudulent voting is not a problem in New Hampshire.

49.    Senator Gray, in defending the legislation on the floor of the Senate, repeatedly stated that New Hampshire has no problem with fraudulent voting. He further acknowledged that the requirement makes it "more onerous in some people's opinion," but asserted that it is the "obligation of that person" who wants to vote to prove their qualifications.

50.     Senator Gray pointed to a concern that he suggested the Attorney General had with the office's inability to locate and confirm the identification of roughly 230 voters who had been able to vote only by signing an affidavit in recent elections. However, each time that he mentioned this concern, Senator Gray immediately thereafter acknowledged that it is exceedingly unlikely that any of those voters were unqualified to vote (and may just be, for example, students or others who had since moved out of New Hampshire). In fact, data from the Attorney General's Office shows that such investigations have identified virtually no fraudulent voting.

51.     Far from working to ensure that all qualified voters can register and vote on election day, statements by the requirement's proponents also express a desire to ensure that only voters who, in their opinion, have spent a sufficient amount of time "thinking" about and planning how to vote are able to do so.

52.     During the conference committee for HB 1370, a similar bill that failed in the House, proponents came up with only vague justifications related to voter fraud and bolstering voter confidence in support of HB 1370's proof-of-citizenship requirement, which was akin to HB 1569's. They also repeatedly emphasized that the burden is on the voter to prove their citizenship. Senator Gray stated that "[i]t is the voter's responsibility to provide the documentation. It is not the State's responsibility."

53.     Although the Secretary did not formally take a position on the legislation, he echoed this justification when questioned by legislators about the requirement. When asked how many impacted citizens were "too many" to suffer the consequences of the requirement, the Secretary explained, "I don't think it is voter suppression or too much to ask voters to be able to give that confidence that they're qualified to vote." N.H. House of Representatives Committee Streaming, *Committee of Conference on HB 1370* at 1:26:30, YOUTUBE (June 5, 2024), https://www.youtube.com/watch?v=IMmYv-I1Uo8.

54.     Proponents pointed to no other meaningful justifications for the proof-of-citizenship requirement.

### 2. Existing law prevents fraudulent noncitizen voting, which is exceedingly rare.

55.     The proof-of-citizenship requirement is also unnecessary and fails to advance state interests because existing law prevents fraud and especially noncitizen voting.

56.     Legislators' repeated recognition that voter fraud is not a problem in New Hampshire is borne out by the data. The Attorney General of New Hampshire's Election Law Unit actively investigates allegations and potential instances of fraud and maintains a regularly updated database of such cases. Between 2015 and today, the Attorney General's Election Law Unit has investigated only seven people for unlawfully voting as noncitizens. *See* Exhibit A, Attorney General's Response to

Steven J. Dutton's Right-to-Know Request. Only one of those people was criminally convicted. *See id.* at 34. None of those people relied on a qualified voter affidavit to prove their citizenship.

57. The qualified voter affidavit prescribed by statute prior to HB 1569's enactment required voters to provide their name, place of birth, date of birth, domicile address, mailing address, and additional contact information. RSA 654:12, I(a). The affidavit form further contained the following affirmation and admonishments:

> I hereby swear and affirm, under the penalties for voting fraud set forth below, that I am not in possession of some or all of the documents necessary to prove my identity, citizenship, and age and that I am the identical person whom I represent myself to be, that I am a duly qualified voter of this town (or ward), that I am a United States citizen, that I am at least 18 years of age as of this date or will be at the next election, and that to the best of my knowledge and belief the information above is true and correct. . . .

> In accordance with RSA 659:34, the penalty for knowingly or purposely providing false information when registering to vote or voting is a class A misdemeanor with a maximum sentence of imprisonment not to exceed one year and a fine not to exceed $2,000. Fraudulently registering to vote or voting is subject to a civil penalty not to exceed $5,000.

*Id.*

58. Any such crime that "involve[s] the use of false proof of identity" carries a "mandatory sentence in [a] county correctional facility." RSA 659:34, II.

59.     Additionally, any person who "purposely or knowingly" "[v]otes for any office or measure at an election if such person is not qualified" is subject to felony prosecution, *id.*, with penalties of up to seven years of prison time and additional fines, *see* RSA 651:2. A felony conviction also results in the loss of voting rights and the right to run for office. *See* RSA 654:5; RSA 607-A:2.

60.     Voters seeking to register to vote on election day are also subject to scrutiny by election officials, the public, and public interest groups. *See* RSA 659:27 ("A voter offering to vote at any state election may be challenged by any other voter registered in the town or ward in which the election is held, an election official, a challenger appointed by a political committee pursuant to RSA 666:4, or a challenger appointed by the attorney general pursuant to RSA 666:5.").

61.     Given all these safeguards built into New Hampshire's voting system, it is unsurprising that voters have relied on affidavits to prove their citizenship for decades without any meaningful problems emerging. As the Secretary explains in a letter published in the EPM, New Hampshire has a "long track record of successful elections." 2024-25 EPM at ii.

62.     In short, because the proof-of-citizenship requirement severely burdens the right to vote with no state interest to justify the requirement, it is unconstitutional.

## CLAIMS FOR RELIEF

### COUNT I

### Undue Burden on the Fundamental Right to Vote
### U.S. Const. amends. I & XIV, 42 U.S.C. § 1983

63.     Plaintiff realleges and reincorporates by reference paragraphs 1-62 of this Complaint as though fully set forth herein.

64.     A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson*, 460 U.S. at 789; *Common Cause*, 970 F.3d at 14.

65.     "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted); *accord Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019) ("[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." (citations omitted)).

66.     In conceptualizing the burden that a state electoral regulation places on constitutional rights, courts are not limited to considering only the effort needed to comply with the regulation; they also may consider the law's broader ramifications, including the consequences of noncompliance. *See, e.g.*, *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319 (stating burdens of absentee ballot signature matching requirement included increased risk of disenfranchisement from perceived signature mismatch); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016) ("Requiring boards of elections to reject the ballots of absentee and provisional voters who fail to accurately complete birthdate and address fields directly and measurably disenfranchises some voters.").

67.     The proof-of-citizenship requirement inflicts severe burdens, including total disenfranchisement, on otherwise qualified New Hampshire citizens. It also imposes disproportionately severe burdens on young, elderly, and low-income voters, as well as students, the homeless, and other particularly transient populations.

68.     The proof-of-citizenship requirement does not advance any valid state interests. Even if New Hampshire were able to identify interests that are legitimate in the "abstract," those interests are insufficient to justify the severe burdens the requirement imposes on the fundamental right to vote in "this case." *Fish*, 957 F.3d at 1133.

69.     The proof-of-citizenship requirement is unconstitutional.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment:

A. Declaring that the proof-of-citizenship requirement violates the First and Fourteenth Amendments to the U.S. Constitution;

B. Enjoining Defendant, his respective agents, officers, employees, and successors, and all persons acting in concert with him, from enforcing the challenged requirement;

C. Declaring HB 1569 unconstitutional to the extent it repealed the qualified voter affidavit provisions of RSA 654:12;

D. Enjoin Defendant, his respective agents, officers, employees, and successors, and all persons acting in concert with him, from giving effect to HB 1569 to the extent it repealed the state's qualified voter affidavit provisions of RSA 654:12;

E. Awarding Plaintiff its costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

F. Granting such other and further relief as the Court deems just and proper.

Dated: September 17, 2024               Respectfully submitted,

/s/ Steven J. Dutton
Steven J. Dutton, NH Bar No. 17101
Connor W. Harding, NH Bar No. 276438
**McLANE MIDDLETON, P.A.**
900 Elm Street Manchester,
New Hampshire 03101
Telephone: (603) 628-1377
steven.dutton@mclane.com
connor.harding@mclane.com

and

David R. Fox*
Renata O'Donnell*
Samuel T. Ward-Packard*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
rodonnell@elias.law
swardpackard@elias.law

Tyler L. Bishop*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(202) 985-0628
tbishop@elias.law

*Counsel for Plaintiff*

*\* Pro Hac Vice Application Forthcoming*