**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

New Hampshire Youth Movement,

     *Plaintiff*,

v.

David M. Scanlan, in his official
capacity as New Hampshire Secretary
of State,

     *Defendant*.

Case No. 1:24-cv-00291-SE-TSM

## PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff New Hampshire Youth Movement ("Youth Movement") files this First Amended Complaint for Declaratory and Injunctive Relief against Defendant David M. Scanlan, in his official capacity as New Hampshire Secretary of State. Plaintiff alleges as follows:

### NATURE OF THE CASE

1.    This case challenges the constitutionality of HB 1569 (2024), a bill enacted by the New Hampshire General Court last fall that made it substantially harder—and in some cases impossible—for U.S. citizens to register and vote in this state. It requires voters to show documentary proof of their citizenship—a birth certificate, passport, naturalization papers, or other unspecified documentation—

before they can cast a ballot, without exception. Under prior law, a citizen without such documentation could vote by signing an affidavit attesting that they are a citizen. Now, those citizens are out of luck.

2.     HB 1569 took effect days after the November 2024 election. In the single election held since then—the local elections on March 11, 2025—HB 1569 has already disenfranchised and substantially burdened many citizens attempting to vote. Unless enjoined, HB 1569's proof of citizenship requirement will continue to threaten these consequences for more and more New Hampshire voters, including the Youth Movement members named in this Amended Complaint.

3.     HB 1569's proof of citizenship requirement is extremely burdensome and unnecessary; it is therefore unconstitutional. Before signing the bill, Governor Chris Sununu repeatedly boasted that New Hampshire's elections were "secure, safe and reliable," and that the state had "done it right 100% of the time for 100 years." The 2024 election was no different. Defendant Secretary of State David Scanlan similarly confirmed that New Hampshire's "election process" is "time-tested," "convenient, secure and easily observable." The evidence backs up all these assertions: voter fraud is exceedingly rare, with only a handful of cases over the last few decades, and just one conviction for noncitizen voting—which was caught and prosecuted under existing law.

4.    There is no evidence that the affidavit that voters in New Hampshire used to attest to their citizenship before HB 1569 was ever a vector for fraudulent voting, or that eliminating it has done anything to make New Hampshire elections more secure. To the contrary, the affidavit option served as a critical backstop for thousands of New Hampshire voters, including Youth Movement members, who did not have or lacked easy access to documents that might satisfy HB 1569. And if noncitizens *were* voting using the affidavit option, it would be easy to tell, because the Secretary and other officials could readily identify and investigate the eligibility of voters who had attested to their citizenship by affidavit instead of providing documentary proof.

5.    Prior law was more than adequate to deter noncitizens from voting. Noncitizens who register or vote face civil and criminal liability under New Hampshire law, RSA 659:34, and federal law, 18 U.S.C. § 611. They also render themselves permanently "inadmissible" under federal immigration law, 8 U.S.C. § 1182(a)(6)(C)(ii), (a)(10)(D), which can lead to deportation and will prevent them from ever renewing a visa, becoming a naturalized citizen, or returning to the United States. These are extremely serious consequences, and there is no evidence that any meaningful number of noncitizens have voted anywhere in the country, much less in New Hampshire.

6.    The sole election held under HB 1569—the March 11, 2025 town elections—confirms the troubling new reality for New Hampshire voters. Press reports from multiple New Hampshire towns show that dozens of voters were turned away at the polls in those towns because they could not produce satisfactory documentation to prove their citizenship. Many were young aspiring voters, and many others were married women whose last names do not match their citizenship documents. Unfortunately, several of these citizens were unable to return to the polls with qualifying documentation and were therefore disenfranchised. And problems like this during traditionally low-turnout town elections foreshadow much larger problems in future state and federal elections.

7.    Because HB 1569's proof of citizenship requirement severely and disproportionately restricts the ability of New Hampshire voters to exercise their right to vote without sufficiently advancing any interests to justify the burdens imposed by the law, it violates the U.S. Constitution's First and Fourteenth Amendments. *See Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (explaining that, to determine whether a law unconstitutionally burdens the right to vote, courts "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed'" (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983))). The U.S. Court of Appeals for the Tenth Circuit invalidated

Kansas's similar attempt to require proof of citizenship for exactly that reason: the burden it imposed on voters outweighed the same state interests that purportedly underlie HB 1569. *Fish v. Schwab*, 957 F.3d 1105, 1136 (10th Cir. 2020).

8.    Plaintiff brings this lawsuit on behalf of itself, to protect its investments in its critical voter registration and get-out-the-vote programs, and on behalf of its members and constituents who have and who will face burdens under HB 1569's proof of citizenship requirement. Plaintiff seeks a declaratory judgment that the law is unconstitutional as well as injunctive relief against its enforcement.

## JURISDICTION AND VENUE

9.    Plaintiff brings this action under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the U.S. Constitution.

10.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the U.S. Constitution and the laws of the United States.

11.    This Court has personal jurisdiction over Defendant, who is sued in his official capacity.

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant is a resident of New Hampshire. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to Plaintiff's claims occurred and will occur in this judicial district.

13.    This Court has the authority to provide declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65, and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14.    Plaintiff New Hampshire Youth Movement is a nonpartisan, nonprofit membership organization composed of students and other young people in New Hampshire who are motivated to effectuate political change through civic action and democratic participation. Youth Movement's mission is to strengthen the influence of its members and constituents who share common values by helping them navigate the political system and rise to positions of political power and governance. Youth Movement achieves its mission through its core pledge-to-vote ("PTV"), voter-registration ("VR"), and get-out-the-vote ("GOTV") programs—all of which help to ensure its members and constituents are able to exercise their right to vote. Youth Movement also supports its members and constituents who seek to advance individual policy goals (which, by way of example, include increasing wages, decreasing costs of education, housing and medical care, and combatting climate change).

15.    Youth Movement has 129 dues-paying members who contribute to the organization. Additionally, more than 3,500 people have participated in actions led by Youth Movement.

16.    Youth Movement's PTV, VR, and GOTV programs are largely executed by the organization's "hubs,"  which are led by Youth Movement members and staff throughout New Hampshire, and which work under shared principles to build collective local power among students and other young people. Youth Movement's hubs plan, organize, and execute events aimed at uplifting the voice and influence of its constituency in their communities—especially on major days of action and during key elections, including but not limited to the 2024 primary and general elections as well as the upcoming 2026 mid-term elections.

17.    In 2024, Youth Movement ran the most comprehensive program in its history. In that election year alone, Youth Movement signed up 9,036 people, most of whom were students and first-time voters who pledged to vote through the PTV program. The GOTV program provided rides to the polls for more than 1,233 voters, many of whom were students who did not have a car on their college campus or lacked transportation altogether. And the VR program provided education and direct support to voters in completing the voter registration process. Youth Movement also invests heavily in reaching its members, constituents, and others in New Hampshire through voter education, including by running in-person, social media, text banking, and other digital messaging campaigns. As part of these efforts, it provides education on policy issues central to its mission of ensuring that as many students and other young people as possible are able to vote and participate in government. In 2024,

Youth Movement's voter education programs reached more than 115,000 people in the state.

18.     HB 1569 is already harming Youth Movement's core, mission-critical PTV, VR, GOTV, and voter education programs. Youth Movement must change those programs to account for the onerous new documentation requirements that HB 1569 imposes. Youth Movement must add steps to ensure that the voters who pledge to vote in the PTV program have the documentation that they need to register, or a plan to get it, and that the voters whom Youth Movement transports to the polls in the GOTV program have the required documentation with them. Youth Movement's voter registration program is more difficult because it must account for HB 1569's new documentation requirements and help would-be voters meet them. And Youth Movement's voter education program must be revised to cover the new requirements. If Youth Movement did not take these steps, its core programs would be fatally undermined, as the voters that Youth Movement seeks to enfranchise would be unable to comply with HB 1569. But taking these steps will require Youth Movement to divert resources away from its existing PTV, VR, GOTV and voter education efforts towards new efforts to combat the harms caused by the law.

19.     Youth Movement also brings this lawsuit on behalf of its members and the constituents who participate in its programming. The young, low-income, and other marginalized people who make up Youth Movement's membership and

constituency are at a particular risk of disenfranchisement and other significant burdens under HB 1569. These populations are less likely to possess or have ready access to their birth certificates, passports, or naturalization papers—if they have them at all. Additionally, they are less likely to have time and resources to invest in obtaining the documents necessary to register to vote under the law.

20.    One of Youth Movement's members is Kara Montagano, a 21-year-old U.S. citizen resident of Keene, New Hampshire. Montagano is a senior at Keene State College and serves as a Youth Movement hub coordinator. In that role, Montagano creates campus-based campaigns and organizes events aimed at increasing civic engagement among students and registering them to vote.

21.    Montagano has previously relied on a qualified voter affidavit to register to vote. Montagano does not have a passport, and her birth certificate is kept in her family home in Lee, New Hampshire, two hours away from Keene, as she did not feel comfortable bringing this important document with her to school. In the November 2024 general election, Montagano registered to vote in Keene. Although Montagano previously had registered in Lee, the election worker still required proof of citizenship, and Montagano did not have proof of citizenship with her, so she was able to register and vote only by submitting a qualified voter affidavit. After graduating from college this spring, Montagano plans to move out of Keene to somewhere else in the state. She will need to re-register to vote in her new

municipality, and HB 1569 means that to do so, she will need to retrieve her birth certificate from her family home, which she would not otherwise need or plan to do.

22.    Another Youth Movement member is Tess Sumner, an 18-year-old U.S. citizen high school student in Danbury, New Hampshire. Sumner joined Youth Movement's advocacy team in 2023 at 16, and she has engaged in activities like drafting letters to the editor and testifying about legislation in the state legislature. Sumner started the Youth Movement's "hub" at her high school and works with ten other students to increase civic engagement among students there.

23.    Sumner turned 18 in December 2024 and proudly voted for the first time in the Danbury town elections on March 11. But Sumner was injured by HB 1569 in doing so—and she was nearly disenfranchised entirely. Sumner's passport and birth certificate are kept in a safe at home, and only Sumner's mom knows the code. Sumner learned about HB 1569's requirements at the last minute, but she works until 5:30 p.m. on Tuesdays, and the polls close at 7:00 p.m. In order to vote, Sumner had to rush home immediately after work to retrieve proof of citizenship before going to the polls, and she was able to do so only with the assistance of her mom, who was luckily at home. Although Sumner was able to vote, the need to take an unnecessary trip home was an injury caused by HB 1569. And Sumner will face such an injury again when re-registering to vote the next time she moves.

24.    A third Youth Movement member is Taylor Barry, a U.S. citizen resident of Durham, New Hampshire and a freshman at the University of New Hampshire. Barry has worked on various initiatives for the organization, including its GOTV campaign. Barry's passport and birth certificate are kept at home with her parents in Nashua, as she did not feel comfortable bringing these important documents with her to school. Barry registered to vote in Durham on the day of the September 2024 primary election and used a qualified voter affidavit to do so. Barry would not have been able to register under HB 1569 without taking an otherwise unnecessary trip to retrieve her passport or birth certificate from her parents' home—a trip that would be difficult, because Barry does not have a car on campus. Barry plans to stay in New Hampshire but will move after she graduates and will need to re-register to vote when she does so. HB 1569 will require her to first retrieve her passport or birth certificate from her family home, which she would not otherwise need or plan to do.

25.    A fourth Youth Movement member is Ty Wyman, a U.S. citizen resident of Durham, New Hampshire and a freshman at the University of New Hampshire. Wyman was born and raised in Rochester, New Hampshire, and his birth certificate is kept at home with his family in Rochester, as he did not feel comfortable bringing this important document with him to school. Wyman registered to vote in Durham on the day of the September 2024 primary election and used a qualified

voter affidavit to do so. Wyman would not have been able to register under HB 1569 without taking an otherwise unnecessary trip to Rochester. Wyman plans to stay in New Hampshire but will move after he graduates and will need to re-register to vote when he does so. HB 1569 will require him to first retrieve his birth certificate from his family home, which he would not otherwise need or plan to do.

26.    Finally, a fifth Youth Movement member is Kai Musick, a 17-year-old U.S. citizen resident of Dover, New Hampshire. Musick leads Youth Movement's hub at Dover High School, where they work with other members to raise awareness about state and local policy issues among their peers and organize school events aimed at increasing civic engagement. Musick will become eligible to vote ahead of the 2026 primary and general elections, and they intend to vote in those elections in New Hampshire. In order to do so, Musick will need to satisfy HB 1569's proof of citizenship requirement by locating and bringing with them documents proving their citizenship that they would not otherwise be required to provide. Musick is just one of Youth Movement's members who will become eligible to vote for the first time this year.

27.    The experiences of Montagano, Barry, and Wyman—three Youth Movement members who relied on a qualified voter affidavit to register to vote in 2024, and could not have done so under HB 1569—show concretely how many Youth Movement members depend on the qualified voter affidavit that HB 1569

eliminated to register and vote, and confirm that individual Youth Movement members are injured by the elimination of the qualified voter affidavit. The burden of having to retrieve one's passport or birth certificate is higher for younger voters than for older voters, because it is more common for younger voters to keep these incredibly sensitive and important documents in a place other than where they currently live.

28.    Defendant David Scanlan is the Secretary of State of New Hampshire and the state's chief election officer. RSA 652:23. Secretary Scanlan is responsible for overseeing, implementing, and harmonizing the State's entire election administration process. Specifically, he is responsible for preparing an up-to-date manual on New Hampshire election law and procedure for local officials to use to conduct elections. RSA 652:22.[1] The Secretary is further directed to "prescribe the form of the voter registration form to be used for voter registrations," RSA 654:7, and is required to provide instructions and guidance related to voter registration and voter identification requirements. For example, he must provide a "regularly updated set of instructions and best use practices for the use of electronic poll books." RSA 652:27. He is also responsible for preparing an explanation of identification

---

[1] The Secretary's Election Procedure Manual ("EPM") is published on the Secretary's website. *See* N.H. Sec'y of State, New Hampshire Election Procedure Manual (August 2024) ("2024-25 EPM"), https://www.sos.nh.gov/sites/g/files/ehbemt561/files/documents/2024-08/epm-2024-2025-final-ada-for-web.pdf.

requirements for voters that directs voters to the Department of State's website for more information, which is displayed in every town and city clerk's office for at least 14 days prior to each election. RSA 652:25.

## STATEMENT OF FACTS AND LAW

**I. Same-day registration is fundamental to New Hampshire's rich history of in-person voting.**

29.    New Hampshire has a longstanding tradition of active civic engagement, which can be traced to the state's centuries-old tradition of holding town meetings and gatherings at which residents come together to discuss and vote on issues facing their communities.

30.    Consistent with this tradition, New Hampshire voters have maintained a robust and continuing interest in voting in-person. In the 2022 general election, for example, more than 85% of New Hampshire voters voted in person. Charles Stewart III, *How We Voted in 2022*, MIT ELECTION DATA & SCIENCE LAB 9, https://electionlab.mit.edu/sites/default/files/2023-05/How-We-Voted-In-2022.pdf (last accessed Sept. 13, 2024).

31.    New Hampshire consistently boasts some of the highest levels of voter participation in the country. In the 2020 general election, for example, more than 76% of the citizen voting age population turned out, compared to 68% nationally. *See* U.S. Election Assistance Commission, *Election Administration and Voting Survey,      Comprehensive      Report      27      (2020)*,

https://www.eac.gov/sites/default/files/document_library/files/2020_EAVS_Report_Final_508c.pdf.

32.    To enfranchise as many qualified voters as possible, the General Court acted in 1994 to guarantee an easily navigable and accessible system for same-day voter registration and voting on election day. *See* Act of May 23, 1994, Ch. 154:1, I, 1994 N.H. Laws (HB 1506). Because New Hampshire enacted same-day registration, it obtained an exemption from the requirements of the National Voter Registration Act ("NVRA").

33.    Since then, New Hampshire's same-day registration provision has provided that a voter who is not registered but who is "otherwise a qualified voter shall be entitled to vote by requesting to be registered to vote at the polling place on election day," so long as the voter satisfies the state's voter qualification requirements. *See* RSA 654:7-a.

## II.    New Hampshire's statutory scheme long permitted voters to prove their citizenship status either by producing documents or by signing an affidavit.

34.    Chapter 654 of the Revised Statutes governs voter eligibility and registration requirements. To be qualified to vote, a voter must be (a) 18 years of age, (b) domiciled in the town or city where the individual is registering, and (c) a citizen of the United States. *See* RSA 654:7, I.

35.     In 2003, the election day registration provision was amended to provide that voters would be *required* to produce proof of qualifications, including citizenship, when registering to vote. Act of July 18, 2003, Ch. 289, 2003 N.H. Laws (HB 627) (replacing "may" with "shall" in RSA 654:7-a and RSA 654:12). Under this provision, however, a "citizenship affidavit" was satisfactory proof of citizenship—documentary proof was not required. *See id.* In 2009, the General Court later renamed the "citizenship affidavit" the "qualified voter affidavit," and allowed voters to attest to other qualifications using the form as well. Act of July 29, 2009, Ch. 278, 2009 N.H. Laws (HB 265); *see* Act of June 27, 2012, Ch. 285, 2012 N.H. Laws (SB 318).

36.     More recently, however, the General Court has taken steps to restrict voter registration in New Hampshire. In 2017, the General Court enacted SB 3 to modify the term "domicile" and amend the procedures and forms used by voters who register to vote using an affidavit. Specifically, SB 3 changed the definition of domicile by requiring anyone seeking to register to present documentary evidence of "a verifiable act or acts carrying out" their intent to be domiciled in the state. In response, pro-voting groups sued, alleging that the bill unconstitutionally burdened the right to vote under the state constitution. The Supreme Court of New Hampshire agreed, striking down the law in its entirety. As a result, voter registration

requirements returned to the state's pre-SB 3 system. *N.H. Democratic Party v. Sec'y of State*, 262 A.3d 366, 382 (N.H. 2021).[2]

37.    At all relevant times prior to HB 1569's passage, New Hampshire voter registration law has required election officials to accept an affidavit in lieu of the other documents deemed sufficient to demonstrate citizenship.

**III.    The ability to prove citizenship via affidavit is a critical component of New Hampshire's election day registration scheme that prevents disenfranchisement.**

38.    The ability to use the qualified voter affidavit in lieu of other citizenship documents was long a critical means for voters to register and vote, serving as a necessary backstop for those who were unable to produce other compliant documents on election day.

39.    The ability to register to vote in this manner, in fact, was heavily touted in the Secretary's voter registration guidance as a critical means by which voters are able to register and vote, especially on election day. N.H. Sec'y of State, *Registering*

---

[2] And in 2022, the General Court enacted SB 418, creating an "affidavit ballot" system for election day voters who are unable to produce photo identification. *See* RSA 659:23-a, I ("[I]f a voter on election day is registering to vote for the first time in New Hampshire and does not have a valid photo identification establishing such voter's identification, or does not meet the identity requirements of RSA 659:13, then such voter shall vote by affidavit ballot pursuant to this section"). Under the system, ballots submitted by voters who are unable to provide such proof were only counted on a provisional basis, subject to the voter's ability to cure the ballot through a post-election verification process. *See* RSA 659:23-a, II–V. This process, which has been repealed by HB 1569, did not apply to individuals who were unable to satisfy the proof-of-citizenship requirement on election day. *See id.*

*to Vote in New Hampshire* 1 (updated Nov. 28, 2023) ("You need to provide proof of your identity, age, citizenship, and domicile to register. Proof can be either by documents or by affidavit if you do not have documents with you."); *id.* ("You can prove your identity, age, and/or citizenship by signing a Qualified Voter Affidavit, under oath, in front of an election official if you do not have documents."); *see also* N.H. Sec'y of State, *At the Polls on Election Day* (last accessed Sept. 13, 2024), https://www.sos.nh.gov/elections/register-vote/polls-election-day ("If you do not have documents with you to prove a qualification, you may prove your identity, age, citizenship, or domicile by completing an affidavit. Your local election officials will provide the forms needed, and are happy to answer any questions you may have.").

40.    Thousands of New Hampshire voters relied on qualified voter affidavits to prove their citizenship in recent elections. Testimony submitted to the General Court, as well as statements by legislators during debate over HB 1569, for example, show that more than 700 voters were able to register to vote in 2022 by relying on the qualified voter affidavit option to prove their citizenship (with hundreds more using it to prove other qualifications), and that more than 1,400 people used a qualified voter affidavit to prove either their citizenship or identity in 2020.

41.    The qualified voter affidavit served as a critical means for thousands of voters to register and exercise their right to vote in New Hampshire, and there is no evidence that it has enabled fraudulent voting.

**IV.  HB 1569 fundamentally changed voter registration in New Hampshire by eliminating the qualified voter affidavit.**

42.    Despite New Hampshire's successful track record with respect to voter registration and maintaining the integrity of its elections, a deeply divided General Court made a fundamental change to the state's qualification provision by enacting HB 1569, which entirely eliminates the ability of voters to use an affidavit to show their citizenship in lieu of documentary proof. By doing so, HB 1569 requires any voter seeking to register in the state for the first time to produce a birth certificate, passport, naturalization papers, or other documentation deemed "reasonable" by an election official.

43.    Neither the law nor the Secretary's EPM provides guidance on what constitutes "reasonable" documentation. The Secretary's EPM includes examples of documents that constitute proof of citizenship, but that guidance simply restates that a passport or a birth certificate qualifies and explains what naturalization papers are (*i.e.*, certificates issued by the federal government or a Consular Report of Birth Abroad). 2024-25 EPM at 33. Whether a voter has satisfied the proof of citizenship Requirement is judged by a local election official. *Id.* at 34.

44.    Thus, under HB 1569, unlike ever before in New Hampshire's same-day voter registration regime, if a voter is unable to produce any of these documents on election day, the voter will be turned away and unable to vote.

**V.  The proof-of-citizenship requirement is unconstitutional.**

45.    As the Secretary's EPM itself recognizes, especially in New Hampshire's same-day voter registration system, allowing a voter to attest to a qualification in lieu of documentary proof is often *necessary* to ensure that voters are not unconstitutionally disenfranchised:

> [T]he state and federal constitutions still require that everyone be allowed to vote somewhere, unless disqualified. . . . *It is inherent in this requirement that an individual whose circumstances do not allow or who chooses not to have a driver's license, not to register a vehicle, not to purchase utility services, etc., must have some method available by which to prove his or her domicile. The Qualified Voter and Domicile Affidavits satisfy this requirement.*

2024-25 EPM at 179 (emphasis added).

46.    By eliminating that option without any adequate alternative means to ensure that all voters have a means to register to vote, New Hampshire has imposed an unconstitutional burden on voters' fundamental right to vote in the state. *See Common Cause*, 970 F.3d at 14 (to determine whether a law unconstitutionally burdens the right to vote, courts "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed'") (quoting *Anderson*, 460 U.S. at 788–89); *Fish*, 957 F.3d at 1136 (holding that Kansas's asserted interests in protecting election integrity, ensuring voter roll accuracy, safeguarding voter confidence, and preventing voter fraud were insufficient to "justify the burdens that [Kansas's documentary proof of citizenship] law impose[d]").

## A. The proof-of-citizenship requirement severely burdens the right to vote.

47.    The proof of citizenship requirement imposes severe burdens on the right to vote of all voters who register to vote in New Hampshire, especially those who do so on election day.

48.    For various reasons, many voters come to the polls without the necessary documents to prove their citizenship. For example, some people who are otherwise qualified to vote in New Hampshire simply do not have a passport, birth certificate, naturalization papers, or other documents that would affirmatively prove their citizenship. When those individuals arrive at the polls to register to vote on election day, they are not able to prove their qualifications. As a result, the proof of citizenship requirement completely disenfranchises these individuals.

49.    Other people in New Hampshire may have these documents but do not have them in their possession or access to them because they have moved to attend school or for other reasons. This is true of many Youth Movement members, including those named above. Where such voters are unable to overcome the burdens of obtaining their documents, the proof-of-citizenship requirement also completely disenfranchises these individuals.

50.    Other circumstances beyond the control of voters further prevent access to the documents deemed permissible by the requirement. For example, some voters in New Hampshire will find themselves in emergency or exigent circumstances, such

as a home fire or other disaster, that destroys their documentation. The requirement completely disenfranchises these individuals as well.

51.    Other registrants will come to the polls on election day prepared to take advantage of New Hampshire's same-day registration without knowing that they need to prove their citizenship with documents. As a result, they will not bring their passports, birth certificates, or naturalization papers with them. These individuals either need to return home to retrieve this proof or they are completely disenfranchised. Returning home to find these documents constitutes its own substantial burden on these voters just to be able to vote—and many will not have the time or ability to do so at all.

52.    Press reports about the March 11 town elections confirm these facts. According to Kristin Grages, the chair of the supervisors of the checklist in Londonderry, five out of the twenty-five voters who sought to register in Londonderry on March 11—a whopping 20% of new voters there—did not have proof of citizenship when they arrived at the polls. A similar number of voters did not have proof of citizenship in Amherst, according to Sydney Irving, the supervisor of the checklist there. These individuals were disproportionately young citizens. Some were able to return with proof of citizenship in time to vote, but the rest were disenfranchised.

53.    Press reports also confirm that HB 1569 is imposing particularly significant burdens on voters whose name does not match their birth certificate, including married women who adopted their spouse's last name. HB 1569 does not directly address this problem. Some such voters may be able to produce a marriage certificate or other legal documents to accompany their citizenship documents, others may not have the required documentation, and given HB 1569's silence on the matter, there is no guarantee that election officials will accept the documentation that the voter offers. According to press reports, in the March 11 town elections, in Amherst alone, two women who had changed their birth name were turned away because their citizenship documents did not match their legal name. Only one was able to return with a marriage certificate in time to confirm the name change and register to vote.

54.    Further, any voters who currently lack documents deemed acceptable by the requirement will be forced to take the time and expend money and other resources to obtain them in time to vote on election day. Passports can take multiple months to obtain and cost more than $110. The amount of time and money required to obtain copies of birth certificates can vary, but likewise impose significant costs on voters. Naturalization papers, for those citizens born outside of the United States, can cost more than $500. Thus, for any voters who lack existing documents to prove

their citizenship, the requirement imposes these and other significant burdens just to enable them to exercise the right to vote.

55.    Even voters who are already registered to vote in New Hampshire will face significant burdens and likely disenfranchisement under HB 1569. In Youth Movement's experience, when a voter moves counties within the state, election officials often do not or cannot confirm a voter's prior registration, forcing the voter to prove their citizenship again. Even people who have registered to vote in New Hampshire, but who are registering to vote in a new municipality, are therefore likely to need to prove their citizenship under HB 1569—and at a minimum, will need to bring proof of citizenship with them in case it is demanded. According to press reports, in the March 11 town election, several voters did not bring citizenship documents precisely because they believed they were previously registered.

56.    HB 1569's proof of citizenship requirement also increases wait times at the polls on Election Day because already-burdened election officials now have to review, confirm, and process citizenship documents of all new registrants, even though the bill did not increase funding for this time-consuming process. Longer wait times to cast a ballot are known to discourage citizens from voting—especially busy people like college students who often lack reliable access to transportation, further ratcheting up the magnitude of HB 1569's burden on voting rights.

57.    Repeated testimony throughout the General Court's consideration of HB 1569 put legislators on notice of the severe burdens and likely disenfranchisement resulting from the proof-of-citizenship requirement—especially for students, young people, married women and others who change their name, as well as other marginalized and transient populations. Despite the extensive legislative record documenting these problems, the General Court narrowly passed HB 1569.

**B. The proof-of-citizenship requirement does not advance legitimate state interests.**

      **1. The legislative history shows that the requirement's proponents were motivated only by vague specters of fraud.**

58.    In the General Court, proponents of the proof-of-citizenship requirement pointed only to vague concerns about voter fraud as the reason to enact the legislation and did not claim that the requirement advanced any other legitimate interest that could make the burdens it imposes necessary.

59.    The original sponsor of the requirement, Representative Lynn, "candidly" admitted that the bill was not directed toward any existing fraudulent voting when introducing the bill to his colleagues in the Senate: "Do I think there's a huge issue of voter fraud in New Hampshire? No, I don't, because I think if there was, we would know it."

60.    Throughout HB 1569's discussion in the General Court, legislators continued to acknowledge that fraudulent voting is not a problem in New Hampshire.

61.    Senator Gray, in defending the legislation on the floor of the Senate, repeatedly stated that New Hampshire has no problem with fraudulent voting. He further acknowledged that the requirement makes it "more onerous in some people's opinion," but asserted that it is the "obligation of that person" who wants to vote to prove their qualifications.

62.    Senator Gray pointed to a concern that he suggested the Attorney General had with the office's inability to locate and confirm the identification of roughly 230 voters who had been able to vote only by signing an affidavit in recent elections. However, the extent of the efforts to reach the voters was unclear, and each time that Senator Gray mentioned this concern, he immediately thereafter acknowledged that it is exceedingly unlikely that any of them were unqualified to vote (and may just be, for example, students or others who had since moved out of New Hampshire). In fact, data from the Attorney General's Office shows that such investigations have identified virtually no fraudulent voting.

63.    Far from working to ensure that all qualified voters can register and vote on election day, statements by the requirement's proponents also express a

desire to ensure that only voters who, in their opinion, have spent a sufficient amount of time "thinking" about and planning how to vote are able to do so.

64.    During the conference committee for HB 1370, a similar bill that failed in the House, proponents came up with only vague justifications related to voter fraud and bolstering voter confidence in support of HB 1370's proof-of-citizenship requirement, which was akin to HB 1569's. They also repeatedly emphasized that the burden is on the voter to prove their citizenship. Senator Gray stated that "[i]t is the voter's responsibility to provide the documentation. It is not the State's responsibility."

65.    Although the Secretary did not formally take a position on the legislation, he echoed this justification when questioned by legislators about the requirement. When asked how many impacted citizens were "too many" to suffer the consequences of the requirement, the Secretary explained, "I don't think it is voter suppression or too much to ask voters to be able to give that confidence that they're qualified to vote." N.H. House of Representatives Committee Streaming, *Committee of Conference on HB 1370* at 1:26:30, YOUTUBE (June 5, 2024), https://www.youtube.com/watch?v=IMmYv-I1Uo8.

66.    Proponents pointed to no other meaningful justifications for the proof-of-citizenship requirement.

**2. Existing law prevents fraudulent noncitizen voting, which is exceedingly rare.**

67.    The proof-of-citizenship requirement is also unnecessary and fails to advance state interests because existing law prevents fraud and especially noncitizen voting.

68.    Legislators' repeated recognition that voter fraud is not a problem in New Hampshire is borne out by the data. The Attorney General of New Hampshire's Election Law Unit actively investigates allegations and potential instances of fraud and maintains a regularly updated database of such cases. Between 2015 and the time of Plaintiff's original Complaint, the Attorney General's Election Law Unit investigated only seven people for unlawfully voting as noncitizens. *See* Exhibit A, Attorney General's Response to Steven J. Dutton's Right-to-Know Request. Only one of those people was criminally convicted. *See id.* at 34. None of those people relied on a qualified voter affidavit to prove their citizenship.

69.    A non-citizen who attempts to vote is guilty of a federal crime and renders themself permanently "inadmissible" under federal immigration law. 8 U.S.C. § 1182(a)(6)(C)(ii), (a)(10)(D); *see* 18 U.S.C. § 611.

70.    The qualified voter affidavit prescribed by statute prior to HB 1569's enactment required voters to provide their name, place of birth, date of birth, domicile address, mailing address, and additional contact information. RSA 654:12,

I(a). The affidavit form further contained the following affirmation and admonishments:

> I hereby swear and affirm, under the penalties for voting fraud set forth below, that I am not in possession of some or all of the documents necessary to prove my identity, citizenship, and age and that I am the identical person whom I represent myself to be, that I am a duly qualified voter of this town (or ward), that I am a United States citizen, that I am at least 18 years of age as of this date or will be at the next election, and that to the best of my knowledge and belief the information above is true and correct. . . .

> In accordance with RSA 659:34, the penalty for knowingly or purposely providing false information when registering to vote or voting is a class A misdemeanor with a maximum sentence of imprisonment not to exceed one year and a fine not to exceed $2,000. Fraudulently registering to vote or voting is subject to a civil penalty not to exceed $5,000.

*Id.*

71.    Any such crime that "involve[s] the use of false proof of identity" carries a "mandatory sentence in [a] county correctional facility." RSA 659:34, II.

72.    Additionally, any person who "purposely or knowingly" "[v]otes for any office or measure at an election if such person is not qualified" is subject to felony prosecution, *id.*, with penalties of up to seven years of prison time and additional fines, *see* RSA 651:2. A felony conviction also results in the loss of voting rights and the right to run for office. *See* RSA 654:5; RSA 607-A:2.

73.    Voters seeking to register to vote on election day are also subject to scrutiny by election officials, the public, and public interest groups. *See* RSA 659:27

("A voter offering to vote at any state election may be challenged by any other voter registered in the town or ward in which the election is held, an election official, a challenger appointed by a political committee pursuant to RSA 666:4, or a challenger appointed by the attorney general pursuant to RSA 666:5.").

74.    Given all these safeguards built into New Hampshire's voting system, it is unsurprising that voters have relied on affidavits to prove their citizenship for decades without any meaningful problems emerging. As the Secretary explains in a letter published in the EPM, New Hampshire has a "long track record of successful elections." 2024-25 EPM at ii.

75.    In short, because the proof-of-citizenship requirement severely burdens the right to vote with no state interest to justify the requirement, it is unconstitutional.

## CLAIMS FOR RELIEF

### COUNT I

**Undue Burden on the Fundamental Right to Vote
U.S. Const. amends. I & XIV, 42 U.S.C. § 1983**

76.    Plaintiff realleges and reincorporates by reference paragraphs 1-62 of this Complaint as though fully set forth herein.

77.    A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*,

504 U.S. 428, 434 (1992); *Anderson*, 460 U.S. at 789; *Common Cause*, 970 F.3d at 14.

78.    "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted); *accord Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019) ("[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." (citations omitted)).

79.    In conceptualizing the burden that a state electoral regulation places on constitutional rights, courts are not limited to considering only the effort needed to comply with the regulation; they also may consider the law's broader ramifications, including the consequences of noncompliance. *See, e.g.*, *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319 (stating burdens of absentee ballot signature matching requirement included increased risk of disenfranchisement from perceived signature mismatch); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016) ("Requiring boards of elections to reject the ballots of absentee and provisional voters who fail to accurately complete birthdate and address fields directly and measurably disenfranchises some voters.").

80.    The proof-of-citizenship requirement inflicts severe burdens, including total disenfranchisement, on otherwise qualified New Hampshire citizens. It also imposes disproportionately severe burdens on married women, young, elderly, and low-income voters, as well as students, the homeless, and other particularly transient populations.

81.    The proof-of-citizenship requirement does not advance any valid state interests. Even if New Hampshire were able to identify interests that are legitimate in the "abstract," those interests are insufficient to justify the severe burdens the requirement imposes on the fundamental right to vote in "this case." *Fish*, 957 F.3d at 1133.

82.    The proof-of-citizenship requirement is unconstitutional.

**WHEREFORE**, Plaintiff requests that this Court enter judgment:

A.    Declaring that the proof-of-citizenship requirement violates the First and Fourteenth Amendments to the U.S. Constitution;

B.    Enjoining Defendant, his respective agents, officers, employees, and successors, and all persons acting in concert with him, from enforcing the challenged requirement;

C.    Declaring HB 1569 unconstitutional to the extent it repealed the qualified voter affidavit provisions of RSA 654:12;

D.    Enjoining Defendant, his respective agents, officers, employees, and successors, and all persons acting in concert with him, from giving effect to HB 1569 to the extent it repealed the state's qualified voter affidavit provisions of RSA 654:12;

E.  Awarding Plaintiff its costs, expenses, and reasonable attorneys' fees pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

F.  Granting such other and further relief as the Court deems just and proper.

Dated: March 18, 2025

Respectfully submitted,

/s/ *Steven J. Dutton*
Steven J. Dutton, NH Bar No. 17101
Connor W. Harding, NH Bar No. 276438
**McLANE MIDDLETON, P.A.**
900 Elm Street Manchester,
New Hampshire 03101
Telephone: (603) 628-1377
steven.dutton@mclane.com
connor.harding@mclane.com

David R. Fox*
Marcos Mocine-McQueen*
Mark R. Haidar*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
mmcqueen@elias.law
mhaidar@elias.law

Tyler L. Bishop*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, Washington 98101
(202) 985-0628
tbishop@elias.law

*Counsel for Plaintiff*

*\* Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 18th day of March 2025 on all parties of record via the Court's electronic filing system.

/s/ *Steven J. Dutton*
Steven J. Dutton

- 35 -