UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NEW HAMPSHIRE YOUTH MOVEMENT,<br><br>                            *Plaintiff,*<br>    v.<br><br>DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State,<br><br>                            *Defendant.* | Case No. 1:24-cv-00291-SE-TSM |

**AMICUS BRIEF IN SUPPORT OF
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

    The Republican National Committee and the New Hampshire Republican State Committee file this amicus brief in support of the State's motion to dismiss the first amended complaint. *See* Doc. 54. Given the State's primary focus on New Hampshire Youth Movement's standing, Amici address the complaint's merits, raising similar arguments to those made in the related *Coalition for Open Democracy* case. *See* Doc. 56, No. 1:24-cv-312. The Court granted Amici leave to file this brief within 14 days of the motion. *See* Doc. 48. The brief is timely and complies with the Court's March 13 order.

**INTRODUCTION**

    Every State must balance ease of voter registration with the security and efficiency of administering elections. Some States strike that balance by setting their registration deadline days or weeks before the election. That extra time permits their election officials to review applications, catch errors, and prepare for the election.

    New Hampshire has chosen a different course. Its residents can register to vote year round—including on Election Day at their polling place. But this registration system necessarily comes with potential tradeoffs in election security and efficiency.

HB 1569 addresses those tradeoffs by requiring clearer evidence of U.S. citizenship. New Hampshire voters have always been required to prove their citizenship. Before HB 1569, an applicant could do so simply by submitting an affidavit saying that he was a citizen. Documentary proof of citizenship was not required. Relying on an applicant's word raises obvious concerns ranging from simple mistakes to outright fraud. The legislature addressed those concerns by requiring applicants to provide documentary proof of citizenship in the form of a birth certificate or passport, for example. N.H. Rev. Stat. 654:12.

Plaintiff Youth Movement argues that by eliminating the affidavit option, HB 1569 infringes on the right to vote. But eliminating limited accommodations for certain voters does not "completely disenfranchise[]" voters. Am. Compl. (Doc. 50) ¶¶48-51. Every resident still has plenty of opportunity to register and vote. Youth Movement imagines various hypothetical situations that might cause some challenges. *See id.* But speculation that some voters might not want to "return home to retrieve" documents, lose their documents in a home fire, or experience other hypothetical issues does not mean that HB 1569 unconstitutionally burdens the right to vote. *Id.* Besides being speculative, none of those difficulties are caused by New Hampshire's law. The Court should dismiss Youth Movement's undue-burden claims for three reasons.

***First***, removing a limited accommodation does not unconstitutionally burden the right to vote. To start, Youth Movement hasn't identified a cognizable burden on that right. The Constitution doesn't require New Hampshire to accommodate voters by allowing them to prove their qualifications via affidavits instead of evidence. And the evidence isn't burdensome; most voters have qualifying documents at the ready. If they don't, they can get them quickly and easily. And the ease of this system must

be evaluated as a whole. Youth Movement imagines hypothetical situations where registration could be easier. *E.g.*, Am. Compl. ¶¶48-51. But when viewed in its totality, New Hampshire's registration system is easy and accessible. It does not deny— or even impair—the right of any eligible person to vote.

***Second***, Youth Movement relies on idiosyncratic burdens, particularly for voters trying to register on Election Day. But election-day registration is a privilege, not a right. Most States don't offer it. And the Constitution doesn't require it. "[A] person does not have a federal constitutional right to walk up to a voting place on election day and demand a ballot." *Marston v. Lewis*, 410 U.S. 679, 680 (1973). So Youth Movement can't sustain its constitutional claims by arguing that HB 1569 burdens election-day registration. Each of its member-voters still has the "right to vote." Relatedly, under binding precedent, Youth Movement's members can't rely on the idiosyncratic burdens faced by only some voters. Precedent requires evaluating the burdens on voters generally, not on specific subgroups in unique circumstances.

***Third***, HB 1569 is supported by compelling state interests. At a minimum, those interests include conducting orderly elections, enhancing public confidence in election integrity, and guarding against voter fraud. These interests "obviously are compelling" as a matter of law. *Burson v. Freeman*, 504 U.S. 191, 199 (1992). The State need not present record evidence of its interests, which makes judgment against Youth Movement appropriate at the pleading stage.

## INTERESTS OF AMICI

The Republican National Committee is a national committee under 52 U.S.C. §30101. It manages the Republican Party's business, coordinates election strategy, and supports Republican candidates nationwide. The New Hampshire Republican

State Committee is a recognized political party that works to promote Republican values and assist Republican candidates in federal, state, and local races in New Hampshire. The RNC and the NHGOP have extensive expertise in election law, election administration, and voting rights. And their members, candidates, and voters are among those affected by lawsuits challenging election rules.

## ARGUMENT

### I. Removing limited accommodations does not unconstitutionally burden the right to vote.

According to Youth Movement, once a State accommodates voters, it can't remove that accommodation without burdening the right to vote. But "imposing such a one-way ratchet is incompatible with the 'flexible' *Anderson-Burdick* framework." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016). The *Anderson-Burdick* test requires the Court to "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed.'" *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Only laws that impose "severe" burdens must be "narrowly drawn to advance a state interest of compelling importance." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). But as is most often the case, election rules that are "reasonable, nondiscriminatory restrictions" and impose minimal burdens are readily justified by "the State's important regulatory interests." *Anderson*, 460 U.S. at 788.

Youth Movement fails to state an *Anderson-Burdick* claim for at least three reasons: it hasn't identified any burdens on the right to vote; it relies on idiosyncratic burdens on voters who wait until election day to register; and any alleged burdens are outweighed by the State's compelling interests in election integrity and security.

4

### A. Youth Movement has not identified any burden on the right to vote.

New Hampshire has long required applicants to establish that they are U.S. citizens when registering to vote. Youth Movement doesn't challenge that requirement. And it acknowledges that proof of citizenship for registration is part of longstanding New Hampshire law. Am. Compl. ¶35. What Youth Movement really challenges is HB 1569's elimination of the option to register to vote using a qualified voter affidavit. Am. Compl. ¶¶27, 38. Its sole claim for relief targets the feature of the law eliminating "the qualified voter affidavit provisions." Am. Compl. p.32. But Youth Movement's amended complaint is unclear about whether it seeks a remedy reinstating the affidavit option or a remedy eliminating documentary proof entirely.

Youth Movement's confusion stems from a false assumption at the heart of its claims. An accommodation such as the qualified voter affidavit is an option that States can employ—or not. The Constitution doesn't require it. So removing it doesn't violate the Constitution. *See Ohio Democratic Party*, 834 F.3d at 635 ("[S]tates would have little incentive to pass bills expanding voting access if, once in place, they could never be modified in a way that might arguably burden some segment of the voting population's right to vote."). Because there's no constitutional right to establish citizenship by a qualified-voter affidavit, New Hampshire is free to condition or eliminate that "measure of grace." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021).

Even if this Court were to evaluate the burden of documentary proof of citizenship on its own, HB 1569 provides numerous options available to all citizens. To prove citizenship, applicants can present their "birth certificate, passport, naturalization papers if the applicant is a naturalized citizen, or any other reasonable

5

documentation which indicates the applicant is a United States citizen." N.H. Rev. Stat. §654:12(I)(a). Youth Movement claims that "some people" may not have any documents that "would affirmatively prove their citizenship." Am. Compl. ¶48. It claims that "some voters" may lose their documents in a "home fire or other disaster." *Id.* ¶50. And it claims that "[o]ther people"—including Youth Movement's members—may not "feel comfortable" maintaining their citizenship documents. *Id.* ¶¶21, 24-25, 49. But Youth Movement doesn't—or can't—identify how many of those voters exist; how many are trying to register to vote; or how many would be unable to access citizenship documents if they tried. Though Youth Movement need not provide comprehensive data at this stage, it is telling that Youth Movement doesn't even try to quantify those who may be inconvenienced, let alone disenfranchised, by the proof of citizenship requirement.

Even if Youth Movement could show that obtaining documentary proof of citizenship inconveniences "some people," the "time" and "money" required to obtain proof of citizenship are minimal. *Contra* Am. Compl. ¶54. Indeed, the "inconvenience of making a trip" home or to the DMV or of "gathering the required documents" do not "even represent a significant increase over the usual burdens of voting." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality op.). As for costs, Youth Movement alleges a passport can cost $110 and naturalization papers can cost $500. Am. Compl. ¶54. It implies that the costs are prohibitive, but it fails to acknowledge that a majority of New Hampshire citizens already have a passport[1] and that a birth certificate in New Hampshire costs $15.[2] The Supreme Court noted in

---

[1] *See Passport Possession, By State*, Ctr. For Am. Progress, https://shorturl.at/VbndU.
[2] *See Request for Certificates*, N.H. Sec. of State, https://shorturl.at/qw15B.

2008 that a fee "between $3 and $12" to obtain "the required documents" for voter identification "surely does not qualify as a substantial burden on the right to vote." *Crawford*, 553 U.S. at 198 & n.17 (plurality op.). Youth Movement's alleged costs are far from prohibitive, let alone a "significant increase over the usual burdens of voting." *Id.*

As for time, New Hampshire voters have an abundance of it. They can register year round, on or before Election Day. The Supreme Court upheld Georgia's fifty-day registration cutoff as constitutional. *See Burns v. Fortson*, 410 U.S. 686, 686 (1973) (per curiam). It endorsed Arizona's similar fifty-day deadline. *Marston v. Lewis*, 410 U.S. 679, 680 (1973). And it upheld New York's thirty-day deadline to enroll in closed primaries. *Rosario v. Rockefeller*, 410 U.S. 752, 762 (1973). New Hampshire doesn't truly have a registration deadline; the cutoff is the election itself. Every resident has plenty of time to register, and "a voter's interest in deciding late rather than early whether to participate in an election is not a weighty interest." *ACORN v. Bysiewicz*, 413 F. Supp. 2d 119, 149 (D. Conn. 2005). That some voters might experience unforeseen issues "on the way to the polls" is a problem "arising from life's vagaries," not a problem with HB 1569. *Crawford*, 553 U.S. at 197 (plurality op.). If an applicant fails to register by Election Day, it is only because they "chose to disregard" their opportunity to register throughout the rest of the year. *Rosario*, 410 U.S. at 762. Indeed, if there was any burden, the vast amount of time a voter has to register "mitigate[s] it." *Crawford*, 553 U.S. at 199 (plurality op.).

Aside from being "reasonable," HB 1569 is also "nondiscriminatory." *Anderson*, 460 U.S. at 788. Youth Movement alleges that obtaining proof of citizenship disproportionately burdens "married women, young, elderly, and low-income voters," along

7

with "students, the homeless, and other particularly transient populations." Am. Compl. ¶80. But it doesn't allege that HB 1569 violates any law that prohibits discrimination based on age, sex, or any other protected characteristic. Presumably, Youth Movement includes these allegations to try to get around the rule that "[r]easonable, nondiscriminatory restrictions … need be justified only by legitimate regulatory interests." *Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010). At most, Youth Movement's allegations hint at disparate impact. The *Anderson-Burdick* test, however, considers whether "[t]he law is *facially* neutral and nondiscriminatory." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 717 (4th Cir. 2016) (emphasis added). So where plaintiffs allege only "evidence of some differences in treatment," but "no evidence of discriminatory intent," the law cannot be labeled discriminatory. *Harlan v. Scholz*, 866 F.3d 754, 761 (7th Cir. 2017). And when—as here—"[a]ll parties are subject to the same requirements," no party "faces a disproportionate burden." *Libertarian Party of Va.*, 826 F.3d at 717. HB 1569 itself "draws no classifications, let alone discriminatory ones." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment). Because Youth Movement doesn't allege that the law is "discriminatory" under *Anderson-Burdick*, HB 1569 must be "justified only by legitimate regulatory interests." *Barr*, 626 F.3d at 109.

The Amended Complaint thus demonstrates that New Hampshire's registration system does not impose undue burdens on the right to vote. Youth Movement can't satisfy Rule 8 with conclusory statements that HB 1569 burdens voters, or that the burden is "severe." Am. Compl. ¶¶47, 80. That's because the "characterization of the resultant burden … is not a factual finding, but a legal determination subject to *de novo* review." *Ohio Democratic Party*, 834 F.3d at 628. Courts "have not shied away

from disposing of *Anderson-Burdick* claims at the motion-to-dismiss stage where a plaintiff's allegations 'failed as a matter of law.'" *Daunt v. Benson*, 999 F.3d 299, 313 (6th Cir. 2021) (collecting cases); *id.* at 310 (noting that "[e]ven without the law-of-the case doctrine in place, we would reach the same conclusion"). "Where … the alleged severity of the burdens imposed can be gleaned from the face of the challenged law and they can be weighed against the asserted state interests, dismissal on the pleadings is warranted." *Id.*; *see also Libertarian Party of Va.*, 826 F.3d at 719 (affirming dismissal of *Anderson-Burdick* claim, noting "we have no need to conduct the kind of empirical analysis into burdens that would essentially displace the authority of state legislatures with the views of expert witnesses").

Whatever the difficulties of obtaining documentary proof of citizenship, they are a far cry from the "heavy burden[s]" the First Circuit has recognized under the *Anderson-Burdick* test. *See Common Cause R.I.*, 970 F.3d at 15 (discussing the "heavy burden" of in-person voting during the COVID-19 pandemic, which required an "unusual and in fact unnecessary chance with your life … simply to vote"). And those difficulties must be assessed "in light of the adequate" measures under the State's "election code" to facilitate voting. *Burdick*, 504 U.S. at 438-39. "Election laws will invariably impose some burden upon individual voters," but that doesn't make every burden constitutionally suspect. *Id.* at 433. New Hampshire makes it easy for its residents to register and to vote. The Court should thus dismiss Youth Movement's sole Count.

  **B.**  **Idiosyncratic burdens on same-day registration don't state an *Anderson-Burdick* claim.**

Youth Movement's *Anderson-Burdick* claim fails for another reason: it focuses on idiosyncratic burdens of voters who wait until Election Day to register to vote. But

9

election-day registration is a privilege that States can condition or remove entirely. That HB 1569 might make election-day registration more difficult does not mean that it burdens "the right to vote." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1262 (11th Cir. 2020). Even if the Constitution prohibited burdens on election-day registration, Youth Movement can't rely on "special burden[s]" that "may be placed on a limited number of persons." *Crawford*, 553 U.S. at 199 (plurality op.). Both are independent reasons to dismiss Youth Movement's *Anderson-Burdick* claim.

**1.** Same-day registration is a privilege, not a right. "[A] person does not have a federal constitutional right to walk up to a voting place on election day and demand a ballot." *Marston v. Lewis*, 410 U.S. 679, 680 (1973). The Constitution is not concerned with burdens on statutory privileges. It prohibits only unjustified "burdens" on "the right to vote." *Burdick*, 504 U.S. at 438. If "the statute does not burden the right to vote, [the Court] cannot engage in that kind of review" under the *Anderson-Burdick* test. *Jacobson*, 974 F.3d at 1262. For that reason, the Supreme Court has rejected claims that certain conditions on absentee voting are unconstitutional. *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969). When States impose limits on absentee voting, but not in-person voting, "[i]t is … not the right to vote that is at stake … but a claimed right to receive absentee ballots"—which is not a constitutional right. *Id.* Youth Movement's allegations that HB 1569 burdens election-day registration fail for a similar reason. New Hampshire need not provide same-day registration at all, let alone provide further accommodations for voters who wait until the last day to register.

Indeed, New Hampshire's election-day registration rules are generous compared to other States. Over half of the States don't permit *any* voter to register on

election day.³ Most of those States close registration well before Election Day. Oregon, for example, closes registration twenty-one days before the election. *See* Or. Rev. Stat. §247.025. Massachusetts closes registration ten days before the election. *See* Mass. Gen. Laws ch. 51, §26. Other States such as New York permit voters to register on the day they vote, but only during the early voting period. *See* N.Y. Election Law §8-604. That New Hampshire accommodates voters with election-day registration makes the State's elections *less* burdensome, not more. *See New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020) (describing how the "numerous avenues" available to voters undercut claims that the system is burdensome).

The minority of States that do provide election-day registration have similar or even stricter requirements than New Hampshire. Idaho, Iowa, Nevada, and New Mexico, for example, all require photo identification for applicants seeking to register on election day, with no accommodation for provisional ballots if a voter lacks the required documents. *See* Idaho Code §34-408A; Iowa Code §48A.7A; Nev. Rev. Stat. §293.5847; N.M. Stats. §1-4-5.7. Minnesota requires identification and documentary proof of residence for applicants attempting to register on Election Day, with no provisional-ballot opportunity if the applicant doesn't have the proper evidence. *See* Minn. Stat. §201.061. Connecticut permits same-day registration only at locations specifically designated for the purpose. *See* Conn. Gen. Stat. §9-19j(c). That "the laws and experience of other states" require similar or stricter election-day registration practices is good evidence that New Hampshire's rules do not violate the Constitution. *Ohio Democratic Party*, 834 F.3d at 629; *see also Common Cause R.I.*, 970 F.3d

---

³ *Same-Day Voter Registration*, Nat'l Conf. of State Legislatures (Updated Oct. 25, 2024), www.ncsl.org/elections-and-campaigns/same-day-voter-registration.

at 15 (comparing Rhode Island's witness-signature requirement to "other states" that "have such a rule").

Far from being evidence that HB 1569 burdens the right to vote, New Hampshire's choice to "afford" its residents "privileged voting opportunities" such as election-day registration favors upholding the law. *Ohio Democratic Party*, 834 F.3d at 629. New Hampshire would be well within constitutional bounds if it eliminated election-day registration entirely, as evidenced by the majority of States that don't offer that privilege. HB 1569 doesn't do that. New Hampshire also wouldn't violate the constitution by imposing conditions on election-day registration. *See McDonald*, 394 U.S. at 807. HB 1569 doesn't even do that. Rather, HB 1569 sets the same rules for all voters, "whether the applicant seeks to register before election day or on election day." N.H. Rev. Stat. §654:12(I). Youth Movement demands more. It claims that New Hampshire should *further* accommodate applicants who wait "to register to vote on election day," because some voters might "need to return home to retrieve" their documents. Am. Compl. ¶51. But "the inability of a small proportion of otherwise eligible individuals to meet the registration deadline" cannot "transform[] that deadline into a severe burden on First and Fourteenth Amendment rights." *ACORN*, 413 F. Supp. 2d at 148. That New Hampshire provides registration through election day undercuts Youth Movement's claims that applicants lack sufficient time to register to vote.

**2.** Even if Youth Movement could sustain its *Anderson-Burdick* claim based on burdening the privilege of same-day registration, it can't rely on the idiosyncratic burdens faced by only some voters. As the Eleventh Circuit recently explained—quoting Justice Scalia's concurrence in *Crawford*—courts "'have to identify a burden before [they] can weigh it.'" *Jacobson*, 974 F.3d at 1261 (quoting *Crawford*, 553 U.S. at

205 (Scalia, J., concurring in the judgment)). Youth Movement focuses on burdens that are legally "irrelevant" because they are "special burden[s] on some voters," not categorical burdens on "*voters generally*." *Crawford*, 553 U.S. at 204, 206 (Scalia, J., concurring in the judgment) (cleaned up).

When plaintiffs challenge "generally applicable, nondiscriminatory voting regulation[s]," the burdens arising from "the peculiar circumstances of individual voters" are legally "irrelevant." *Id.* at 204-06. The *Anderson-Burdick* test is concerned only with burdens that affect voters "categorically." *Id.* at 206. This categorical approach is required by "adherence to precedent." *Id.* at 204. For example, in holding that Hawaii's ban on write-in voting "impose[d] only a limited burden on voters' rights," the Supreme Court looked at the ban's effect on voters generally, rather than on the plaintiff specifically. *Burdick*, 504 U.S. at 436-39. In fact, it was the dissent in *Burdick* that focused on the law's impact on "some individual voters." *Id.* at 448 (Kennedy, J., dissenting). And in rejecting a challenge to Oklahoma's primary election, the Court emphasized that "Oklahoma's semiclosed primary system does not severely burden the associational rights of the state's citizenry" generally—irrespective of its specific effect on the individual plaintiffs. *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). *Storer v. Brown* likewise held that the "sever[ity]" of California's ballot-access requirements must be assessed based on "the nature, extent, and *likely* impact" of those requirements—not the known impact on the specific candidates who were plaintiffs. 415 U.S. 724, 738 (1974) (emphasis added).

Claims that Justice Scalia's *Crawford* opinion is only a concurrence prove too much. That opinion accurately describes the governing law. As he explained, the categorical approach comes from several Supreme Court precedents—all good law, all

13

binding. *See Crawford*, 553 U.S. at 206-07 (Scalia, J., concurring in the judgment). The plurality opinion "neither reject[ed] nor embrace[d]" the categorical approach. *Id.* at 208. It didn't need to because the plaintiff there failed to "provide any concrete evidence of the burden" that the law imposed "on any class of voters." *Id.* at 201-02 (plurality op.). Several courts have thus followed Justice Scalia's concurrence as an accurate statement of the law. *See, e.g., Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 236 (5th Cir. 2020); *Jacobson*, 974 F.3d at 1261; *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1327 (11th Cir. 2021); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 663 (6th Cir. 2016) (Keith, J., concurring in part, dissenting in part) ("The Majority relies in part on Justice Scalia's concurrence in *Crawford*"). Reliance on a single outlier case does not undermine this proposition. *See* Am. Compl. ¶14 (citing *Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020)).

The correct, categorical approach to *Anderson-Burdick* is fatal to Youth Movement's claims. Nothing in its Amended Complaint alleges in "non-conclusory" terms that HB 1569 imposes meaningful burdens on "voters generally." *League of Women Voters of Minn. Educ. Fund v. Simon*, 2021 WL 1175234, at *9 (D. Minn. Mar. 29, 2021). Youth Movement focuses entirely on the peculiar burdens allegedly imposed on certain subclasses of voters. *E.g.*, Am. Compl. ¶¶53, 57, 80. That some applicants might "adopt their spouse's last name" or wait "to register to vote on election day" does not mean that New Hampshire's registration rules are to blame. Compl. ¶¶48, 53. "Burdens of that sort arising from life's vagaries … are neither so serious nor so frequent as to raise any question about the constitutionality" of identification requirements. *Crawford*, 553 U.S. at 197 (plurality op.). This "[z]eroing in on the abnormal

14

burden experienced by a small group of voters is problematic at best, and prohibited at worst." *Ne. Ohio Coal.*, 837 F.3d at 631. The better view is that it's prohibited.

### C. The State has strong interests in ensuring that only eligible voters are registering to vote.

Even if Youth Movement had identified a burden on the right to vote, the State has numerous weighty interests in "seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Youth Movement challenges "neutral, nondiscriminatory regulation[s]" of the voting process, *Crawford*, 553 U.S. at 203 (plurality op.), under which "[v]oters must simply take reasonable steps and exert some effort," *New Ga. Project*, 976 F.3d at 1282. Youth Movement cannot show that the minimal effort required during the registration process is unjustified by the State's interests.

At a minimum, New Hampshire's interests include conducting orderly elections, enhancing public confidence in election integrity, and guarding against voter fraud. These interests "need not be 'compelling.'" *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009) (quoting *Burdick*, 504 U.S. at 439). But they are anyway. *See Green v. Mortham*, 155 F.3d 1332, 1335 (11th Cir. 1998) ("The states' compelling interests include maintaining fairness, honesty, and order, minimizing frivolous candidacies, and 'avoiding confusion, deception, and even frustration of the democratic process.'" (citations omitted)). Youth Movement claims that there's "no state interest" justifying the laws. Am. Compl. pp. 25-30. But they focus on the State's interest in preventing voter fraud, ignoring its other compelling interests. *See* Memo. of Law in Support of Mot. to Dismiss, Doc. 54-1 at 22 (asserting the State's "regulatory interest" in "enhancing election integrity"). These are "weighty reasons that warrant

15

judicial respect." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 34 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay).

To start, HB 1569 promotes the orderly administration of New Hampshire elections. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). Ensuring election integrity requires "running an orderly, efficient election and … giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *Id.* Adopting clear, facially nondiscriminatory registration steps is the most obvious method of ensuring orderliness and efficiency for election officials. And "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Id.* at 196. Affidavits are a fundamentally different form of evidence from documentary proof. So the "interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process." *Id.*

Public confidence is another independent interest. Although the State's interest in public confidence "is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford*, 553 U.S. at 197 (plurality op.). When courts issue "orders affecting elections," particularly by invalidating democratically enacted election procedures, they necessarily interfere with legislatively enacted election rules, which can "result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). And the Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion." *Munro v.*

16

*Socialist Workers Party*, 479 U.S. 189, 194 (1986). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," *Purcell*, 549 U.S. at 4, and courts should defer to legislatures on how best to assure voters and encourage democratic participation, *see Crawford*, 553 U.S. at 196 (plurality op.). These interests are compelling as a matter of law, but Youth Movement doesn't allege they aren't present here.

The State also has a compelling interest in preventing fraud, the only interest Youth Movement addresses in its Amended Complaint. "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Id.* Indeed, "[t]he State's interest is particularly strong with respect to efforts to root out fraud." *Doe v. Reed*, 561 U.S. 186, 197 (2010) (emphasis added). That's because "fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021).

Youth Movement incorrectly suggests that because "existing law prevents fraud," the State may not enact other regulations. Am. Compl. ¶67. In doing so, it implies that the State must show evidence of widespread voter fraud to justify election regulations. Am. Compl. pp. 25-30. The Supreme Court has rejected that notion. State legislatures have legitimate interests in guarding against fraud even when the "record contains no evidence of any such fraud." *Crawford*, 553 U.S. at 194 (plurality op.). In part that's because "the long, uninterrupted and prevalent use of these statutes makes it difficult for States to come forward with the sort of proof" Youth Movement demands. *Burson v. Freeman*, 504 U.S. 191, 208 (1992) (plurality op.). By its very nature, "election fraud [is] successful precisely because" it is "difficult to detect." *Id.* Requiring evidence also puts States in a Catch-22, because it "would necessitate

that a State's political system sustain some level of damage before the legislature could take corrective action." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986). "States have thus never been required to justify their prophylactic measures to decrease occasions for vote fraud." *Richardson*, 978 F.3d at 240 (cleaned up). In any event, courts acknowledge as a matter of historical fact that "[v]oting fraud is a serious problem in U.S. elections generally." *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) (collecting sources).

Michigan's experience this past election cycle highlights some of the tangible problems that HB 1569 solves. Like New Hampshire, Michigan allows residents to register on election day. *See* Mich. Comp. Laws §168.497. And like New Hampshire before HB 1569, Michigan permits voters to satisfy the citizenship requirement with an affidavit. *See id.* §168.495(f), (g). During early voting last year, a Chinese citizen attending the University of Michigan allegedly registered while early voting and cast a ballot.[4] The Secretary of State issued a public statement acknowledging felony charges filed against the student.[5] Michigan officials have since reported they have credible evidence of 15 noncitizens voting in the 2024 General Election.[6] As a result, the Michigan legislature is now considering proof-of-citizenship requirements for voters.[7] And just last month, Wyoming passed a proof-of-citizenship requirement.[8] New

---

[4] Steve Carmody, *Non-US Citizen Faces Felony Charges After Allegedly Voting in Ann Arbor*, WDET (Nov. 1, 2024), perma.cc/LW45-A8RB.

[5] *Joint Statement of Secretary Benson and Washtenaw County Prosecutor Savit on Charges Filed in Noncitizen Voting Case*, Mich. Dep't of State (Oct. 30, 2024), perma.cc/DRJ7-UEYW.

[6] *Michigan Department of State review confirms instances of noncitizen voting are extremely rare* (April 3, 2025), https://shorturl.at/GmV9T.

[7] Hayley Harding, *Michigan House Committee Advances Proof-of-Citizenship Requirement for Voters*, Votebeat Mich. (Mar. 11, 2025), perma.cc/6M7Q-86E8.

[8] *See* Jasime Hall, *Trump's Election Order Mirrors Wyoming, Requires Proof of Citizenship*, Wyoming Tribune Eagle (Mar. 28, 2025), shorturl.at/vn7dE.

Hampshire is thus in good company in closing the loophole presented by an affidavit-based honor system. And it's entitled to rely on "flagrant examples of such fraud in other parts of the country [that] have been documented throughout this Nation's history." *Crawford*, 553 U.S. at 195 (plurality op.).

New Hampshire must be particularly vigilant of these loopholes. "Fraud can affect the outcome of a close election," *Brnovich*, 594 U.S. at 672, and New Hampshire often has close elections. As outlined by the General Court in earlier legislation on voter affidavits, "over the past 45 years, New Hampshire has had 44 state elections that ended in a tie or in a one-vote victory." Act of June 17, 2022, 2022 N.H. Laws, ch. 239 (S.B. 418). "On average, that is almost once per year, not including the 1974 U.S. Senate race that was won by 2 votes—the closest U.S. Senate race in history." *Id.* Prophylactic measures are particularly appropriate given New Hampshire's unique experience with close elections. Just one or two voters exploiting the loopholes closed by HB 1569 could flip an election. The "Legislature [is] not obligated to wait" for that "to happen" before acting to deter fraud. *Brnovich*, 594 U.S. at 686.

Relatedly, the lack of criminal prosecutions for voter fraud does not prevent the State from bolstering election integrity. *Contra* Am. Compl. ¶68. The Eleventh Circuit recently reversed a district court that cited "high voter confidence in Florida's 2020 election" as undercutting the State's interest in deterring and detecting fraud. *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023). "Even if there were no evidence of voter fraud in Florida, our precedents would not require it before [an election-integrity] bill … could be adopted." *Id.* (citing *Crawford*, 553 U.S. at 194-96; *Brnovich*, 594 U.S. at 686).

In the end, "the striking of the balance between discouraging fraud and other abuses and encouraging turnout is quintessentially a legislative judgment." *Griffin*, 385 F.3d at 1131. "*Anderson* does not require any evidentiary showing or burden of proof to be satisfied by the state government." *Common Cause/Ga.*, 554 F.3d at 1353 (citing *Anderson*, 460 U.S. at 796-806). That's particularly true when the State asserts a "legitimate interest" that "is settled beyond hope of contradiction." *Barr*, 626 F.3d at 111. New Hampshire's interests in election orderliness, confidence, and integrity "obviously are compelling." *Burson*, 504 U.S. at 199. This case is thus "one of the 'usual' variety in which the 'State's important regulatory interests justify reasonable, nondiscriminatory restrictions.'" *Libertarian Party*, 826 F.3d at 721 (cleaned up) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

## CONCLUSION

For these reasons, the Court should dismiss Youth Movement's complaint.

This 29th day of April, 2025.

Respectfully submitted,

/s/ *Richard J. Lehmann*

Thomas R. McCarthy*
Gilbert C. Dickey*
Conor D. Woodfin*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com

Richard J. Lehmann
(Bar No. 9339)
6 Garvins Falls Road
CONCORD, N.H. 03301
(603) 731-5435
rick@nhlawyer.com

**pro hac vice* forthcoming

*Counsel for amici*

20