UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| New Hampshire Youth Movement,<br><br>*Plaintiff*,<br>v.<br><br>David M. Scanlan, in his official capacity as New Hampshire Secretary of State,<br><br>*Defendant*. | Consolidated Cases<br>Case No. 1:24-cv-291-SE-TSM |
| Coalition for Open Democracy, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>David M. Scanlan, in his official capacity as New Hampshire Secretary of State, *et al.*,<br><br>*Defendants*. | Case No. 1:24-cv-312-SE-TSM |

## **AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1.      Plaintiffs League of Women Voters of New Hampshire, Coalition for Open Democracy, and The Forward Foundation (together the "Organizational Plaintiffs"), and McKenzie Nykamp Taylor, December Rust, Miles Borne, Alexander Muirhead, by his next friend Russell Muirhead, and Lila Muirhead, by her next friend Russell Muirhead (together the "Individual Plaintiffs"), by and through counsel, bring this Complaint seeking a declaratory judgment that 2024 New Hampshire House Bill 1569's ("HB 1569") provisions—specifically, its requirement of documentary proof citizenship to register to vote and its removal of the affidavit permitting voters challenged at the polls to cast a ballot—unconstitutionally burden the

fundamental right to vote under the United States Constitution and for injunctive relief barring state officials from implementing these provisions.

2.     New Hampshire has secure, high-turnout elections.   In the past two general presidential elections in 2016 and 2020, New Hampshire had the third highest turn-out in the country, which the state achieved with virtually no voter fraud despite over 1.5 million ballots cast in the 2016 and 2020 general elections.   N.H. SEC'Y OF STATE, VOTER TURNOUT RANKING OF STATES: 1996 – 2020 (April 19, 2021), https://www.sos.nh.gov/sites/g/files/ ehbemt561/files/documents/2022-04/voter-turnout-charts-4-19-21.pdf.       New Hampshire Governor Christopher Sununu stated shortly after the last presidential election that, "[h]ere in New Hampshire our elections are secure, accurate, and reliable—there is no question about it."   Press Release, Governor Chris Sununu, Governor Chris Sununu Statement Following Certification of 2020 Election Results (Dec. 20, 2020), https://www.governor.nh.gov/news-and-media/governor-chris-sununu-statement-following-certification-2020-election-results.

3.     Despite the state's success in administering secure elections, in recent years New Hampshire's legislature has persistently attempted to introduce new barriers to exercising the right to vote.   Courts have repeatedly enjoined such attempts when they improperly burden and disenfranchise New Hampshire voters.   *See, e.g.*, *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 214 (D.N.H. 2018) (striking down signature-match requirement as violative of the Fourteenth Amendment's Due Process Clause); *N.H. Democratic Party v. Sec'y of State*, 174 N.H. 312, 332 (2021) (affirming conclusion that new requirements for proving a would-be voter's domicile unconstitutionally burdened the fundamental right to vote); *Guare v. New Hampshire*, 167 N.H. 658, 669 (2015) (affirming an injunction to remove confusing language added to the standard

voter-registration form by SB 318 because it unconstitutionally burdened the fundamental right to vote).

4.    HB 1569, the state law at issue in this action, represents the latest attempt to erect barriers to enfranchisement.  After repeatedly voicing concerns about the law's necessity, Governor Sununu ultimately signed HB 1569 into law on September 12, 2024.  Ethan DeWitt, *Secretary of state predicts 'challenges,' litigation if voter ID bill becomes law,* N.H. BULLETIN (June 10, 2024), https://newhampshirebulletin.com/2024/06/10/secretary-of-state-predicts-challenges-litigation-if-voter-id-bill-becomes-law; *see also* Adam Sexton, *Chris Sununu faces closely watched choice on controversial voting bill*, WMUR (June 16, 2024), https://www.wmur.com/article/closeup-sununu-bill-voting/61128108 ("On Closeup, Gov. Chris Sununu said he's 'not looking to make any significant changes in voting laws' in New Hampshire.").  The full text of HB 1569 is attached as Exhibit 1.

5.    HB 1569 constitutes a wholesale rewrite of New Hampshire's longstanding voter registration laws.  Its provisions would go into effect on November 11, 2024, and would thus apply in advance of town elections to be held in March 2025.

6.    Out of all of New Hampshire's recent efforts to make voting more difficult over the past decade—several of which have been enjoined—HB 1569 is the most restrictive.  Under longstanding New Hampshire law, prospective voters could register by establishing citizenship, domicile, identity, and age either by presenting adequate documentary evidence or by executing a so-called Qualified Voter Affidavit or Domicile Affidavit attesting to their qualifications under the penalty of voter fraud and perjury.  HB 1569 eliminates the option of registering to vote via a Qualified Voter Affidavit or Domicile Affidavit.

7.    Rather, under HB 1569, registrants would be required to present documentary proof of citizenship, domicile, identity, and age to register—without any safety valve to assure that qualified individuals are not denied the opportunity to participate in an election.

8.    Additionally, New Hampshire's decennial voter purges, the last of which occurred in 2021, exacerbate the likelihood that qualified voters are denied the ability to cast a ballot under HB 1569.  Under New Hampshire's voter purge statute, a person who has already registered can be removed from the checklist solely because they have not voted within the preceding four years—even if there has been no change in the voter's qualifications.  *See* RSA 653:39.  Because of the operation of that statute, which is not widely understood by voters, there are likely to be qualified voters who believe they are registered, but who have been unknowingly removed from the rolls.  Many of these otherwise qualified voters are likely to show up to vote without bringing a U.S. passport or other documentary proof of citizenship, under the impression that they are already registered, and would be turned away by some election officials because of HB 1569.

9.    This lawsuit challenges HB 1569's requirement of documentary proof of citizenship for registrants.  Such documentary proof under the text of HB 1569 would require a birth certificate, a passport, or naturalization papers.  However, not all qualified individuals possess these types of documents or keep them readily available, and obtaining them can be expensive and time consuming.  A married person, for example, may have changed their legal name, but not have this name change reflected on a birth certificate or passport.

10.    HB 1569's vague terms are likely to lead to arbitrary and unequal enforcement by local elections officials and confusion among prospective voters.  The text of HB 1569 provides that, other than a passport or birth or naturalization certificate, "any other reasonable documentation which indicates the applicant is a United States citizen" can be used to prove

citizenship to register to vote. But what else could qualify as "reasonable documentation" proving citizenship is undefined in HB 1569, and Defendants have provided no guidance as to what this language could possibly mean. Thus, what could constitute "reasonable documentation" to prove citizenship is open to inconsistent or arbitrary application by clerks and supervisors of the checklist who are granted discretion to decide what additional documents count.

11.    Because many New Hampshire would-be voters lack ready access to documents to prove citizenship, Qualified Voter Affidavits have historically been a vital tool for those registering to vote, enabling hundreds, if not thousands, of citizens to vote in the most recent presidential elections, without any actual or meaningful instances of fraudulent use. The elimination of the affidavit option for New Hampshire registrants would have serious and irremediable impacts on qualified would-be New Hampshire voters seeking to participate in democratic elections. Accordingly, the law poses an improper and unconstitutional burden on the right to vote unsupported by any legitimate or relevant state interest. For this reason, and as outlined below, HB 1569's unjustified removal of the Qualified Voter Affidavit with respect to proof of citizenship violates the First and Fourteenth Amendments of the U. S. Constitution.

12.    HB 1569's limitation on the availability of voter registration to only voters who can immediately produce documentary proof of citizenship would make this law among the most restrictive in the United States. No state has successfully done what New Hampshire attempts here in imposing a documentary proof of citizenship requirement to register to vote for federal elections without an affidavit option as a safety valve. This likely is because, at least in part, Congress has decided through the National Voter Registration Act of 1993 ("NVRA")—which does not apply in New Hampshire—that 44 states (and the District of Columbia) should not be permitted to

require documentary proof of citizenship for federal elections.[1]  When one state that is subject to the NVRA recently sought to impose such a documentary proof of citizenship requirement for both state and federal elections, federal courts struck down the law as both unconstitutional and violative of the NVRA.  *See Fish v. Schwab*, 957 F.3d 1105, 1110 (10th Cir. 2020) *cert. denied*, No. 20-109, 2020 WL 7327906 (holding that Kansas' documentary proof of citizenship requirement unconstitutionally burdened the right to vote and was preempted by the NVRA).[2]

13.    HB 1569 also violates the Constitution in another important way.  Under current law before HB 1569, a prospective voter *who is already registered* (and, thus, has already established eligibility to vote) but whose eligibility is nevertheless challenged by a peer voter (or political-party appointed challenger) on election day is permitted to cast an eligible ballot through

---

[1] Congress enacted the NVRA to increase voter registration and did so, by among other things, requiring states to provide voter registration opportunities in at least three specific ways: as part of driver's license transactions through motor vehicles departments, through use and acceptance of the national mail voter registration form, and via public agency voter registration.  *See* 52 U.S.C. § 20501 *et seq.*  The NVRA requires that in "the administration of voter registration for elections for Federal office, each State shall (1) ensure that any eligible applicant is registered to vote in an election" where such registration is completed through a valid voter registration form pursuant to §§ 20504 (simultaneous with motor vehicle application), 20505 (registration by mail), 20506 (by voter registration agency) or in any other case not later than the lesser of 30 days, or the period provided by State law, before the date of the election. 52 U.S.C.A. § 20507(a)(1).  Each "State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application." 52 U.S.C.A. § 20504(a)(1).  However, the NVRA exempts from its "motor voter" requirements states that either (i) had no voter-registration requirements or (ii) had allowed "continuously" since August 1, 1994 "*all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office.*"  *See* 52 U.S.C. § 20501(b)(1)-(2) (emphasis added).  Under this latter exemption to the NVRA, New Hampshire, at least prior to HB 1569, has not been obligated to comply with the NVRA because it has Election-Day voter registration.  Five other states (Idaho, Minnesota, North Dakota, Wisconsin, and Wyoming) are exempt from the NVRA.

[2] *See also* Ethan Dewitt, "Opponents of New Hampshire voter registration law see a blueprint in Kansas," N.H. BULLETIN (Sept. 23, 2024), https://newhampshirebulletin.com/2024/09/23/opponents-of-new-hampshire-voter-registration-law-see-a-blueprint-in-kansas/?emci=fb4a9e4a-7b77-ef11-991a-6045bdee6681&emdi=8efd263f-8a79-ef11-991a-6045bdee6681&ceid=149041 ("To some analysts, that difference is one reason Kansas' law might have imposed less of a burden than New Hampshire's; Kansas residents could potentially find out earlier in the year if they needed more documents to register and take steps to acquire them, whereas some New Hampshire voters might find out about the documentary requirements on Election Day, when it could be too late.  'The Kansas law, in many ways, presents more ways for election officials to help voters out in the way that the New Hampshire law just doesn't allow for,' said Alex Tischenko, senior policy adviser for the Institute for Responsive Government, and a former attorney for the U.S. Justice Department.").

a Challenged Voter Affidavit, sworn under the penalties of voter fraud and perjury. HB 1569 entirely removes the right to vote by Challenged Voter Affidavit for these voters who have already registered and established their eligibility, many of whom would *not* have documentary proof of citizenship with them on election day to rebut a surprise challenge to their qualifications because they registered *before* election day. Without the availability of this affidavit, any otherwise eligible voter can be disenfranchised if a moderator decides a voter challenge is "more likely than not" to be "well grounded," a vague standard that is undefined in HB 1569, without any articulated standard of review or meaningful, readily available right of appeal. As further described below, this change to the voter challenge scheme in HB 1569 violates of the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the U.S. Constitution. *See Saucedo*, 335 F. Supp. 3d at 221 (holding that New Hampshire's signature mismatch regime violated procedural due process because it provided neither prior notice nor an opportunity to cure a rejected absentee ballot due to a signature mismatch).

14.     For these reasons and those set out herein, the Court must safeguard the constitutional rights of New Hampshire voters, declare HB 1569 unconstitutional, and enjoin its enforcement.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under the color of state law of their rights under the First and Fourteenth Amendments to the U.S. Constitution.

16.     This Court has subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331.

17.     This Court has jurisdiction over the Secretary of State, as he is sued in his official capacity as a public official in New Hampshire.  Further, the Secretary works and resides in the State of New Hampshire.

18.     This Court has jurisdiction over the Attorney General, as he is sued in his official capacity as a public official in New Hampshire.  Further, the Attorney General works and resides in the State of New Hampshire.

19.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

20.     Venue in the District of New Hampshire is based on 28 U.S.C. § 1391(b).

## PLAINTIFFS

### I.    Open Democracy

21.     Plaintiff Coalition for Open Democracy ("Open Democracy") is a non-profit, non-partisan organization formed under section 501(c)(3) of the Internal Revenue Code and headquartered at 4 Park Street, Suite 301, Concord, New Hampshire 03301.  Open Democracy engages in activities across New Hampshire.

22.     Open Democracy's mission is to bring about and safeguard political equality for the people of New Hampshire.  Open Democracy believes that an open, accountable, and trusted democratic government "of, by, and for the people," with an electoral system that allows eligible citizens to vote and have their vote counted, is essential to the organization's mission.

23.     Open Democracy pursues its mission through a variety of services that aim to assist prospective voters with exercising their voting rights and educate them about registration requirements and how to vote either through absentee ballots or in person.  Open Democracy focuses its efforts on groups who historically have lower voter turnout, including young voters, new citizens, and low-income voters.  The pursuit of Open Democracy's mission requires the organization to engage with prospective voters across New Hampshire, plan and host events and

programming for its constituencies, develop and print voter educational materials describing how citizens can participate in upcoming elections, and train its volunteers on New Hampshire's voting rules.

24.    One of Open Democracy's core services is providing assistance to eligible young people in exercising their voting rights.  Only an estimated 9 percent of 18-year-olds were registered to vote in New Hampshire as of December 31, 2023, which is substantially lower than in peer states.

25.    Each year, Open Democracy works with students to operate voter registration drives in approximately two dozen high schools across New Hampshire.  Open Democracy arranges to bring local registrars to these schools to register eligible high school students.  In advance of these registration events, Open Democracy and its student partners remind eligible students that they should bring a birth certificate or passport as proof of citizenship, yet students nevertheless are regularly unable to bring such documentation.  Prior to HB 1569, this issue would not pose a barrier to Open Democracy's services.  For example, a few years ago when several students at a registration drive at Franklin High School informed Open Democracy staffers that they did not have documentary proof of citizenship, the staffers were able to assist them to proceed by registering using a Qualified Voter Affidavit.  Under HB 1569's new regime, Open Democracy's core registration assistance services to young voters who lack immediate access to documentary proof of citizenship would be less effective.  In fact, the harm to Open Democracy's core services has already begun; at a recent Exeter High School registration drive after HB 1569 was introduced but before it was signed into law, a supervisor of the checklist turned away students who lacked documentary proof of citizenship without offering the option to sign a Qualified Voter Affidavit because of her belief that HB 1569's strict regime would take effect soon.

26.    Open Democracy would be forced to redirect and expend significant resources to address the law's effect on this core service.  For example, they are planning to develop folders that can be provided to eligible high school students in advance of a registration drive that includes specific instructions to bring approved forms of documentation required by HB 1569.  However, that approach would have no effect on students who simply lack access to documentary proof.  Open Democracy also plans to redirect staff time and resources toward assisting such individuals to obtain new documentary proof of citizenship.  Yet, many of Open Democracy's registration drives occur in close proximity to elections, when there would not be sufficient time for these students to obtain the necessary documentation.  And mitigating the harm of HB 1569 on the provision of these services would necessarily draw resources away from Open Democracy's work involving other organizational priorities, including its advocacy for campaign finance reforms and efforts to secure fair districting maps.

27.    Accordingly, despite expenditures and diversion of resources to mitigate the effect of HB 1569, the law would make it effectively impossible for Open Democracy to successfully assist many eligible young voters in registering to vote.

28.    Open Democracy also provides an array of services that aim to help a broader array of eligible New Hampshirites in registering and exercising their voting rights.  Open Democracy attends community events across the state, communicating with constituents about voting and providing information and assistance.  In some but not all elections, Open Democracy conducts phone banks to reach and identify eligible voters and help them exercise their voting rights.  In the 2020 election, Open Democracy phone bank volunteers dialed nearly a quarter of a million New Hampshire phone numbers, in part, seeking to reach unregistered and low-income voters to inform them about the availability of election-day registration in New Hampshire.  Open Democracy has

even hosted virtual Zoom sessions in prisons to inform individuals with convictions of their voting rights and educate them on how to register.

29.     Through this wide variety of services, Open Democracy staff routinely encounter and aid unregistered, eligible individuals.  Open Democracy has provided services to people who have lost critical documentation in home fires, unhoused individuals who lacked access to documentary proof of citizenship, citizens who had recently moved to a new town and could not access or locate the necessary documents, and more.  Before HB 1569, Open Democracy could provide registration assistance to such people by encouraging them to use the Qualified Voter Affidavit.  HB 1569 directly harms Open Democracy's ability to provide services to assist these types of eligible individuals with registering to vote or casting a ballot.

30.     The primary constituencies of Open Democracy's work—young voters, first time voters, and low-income voters—are among those most likely to be harmed by HB 1569's removal of the Qualified Voter Affidavit.  HB 1569 would require Open Democracy to expend significant resources to mitigate the law's harmful effects on its core services, and particularly those services directed toward the constituencies served by Open Democracy.  The law would require the organization to revise, reprint, and redistribute its voter education materials and retool its programming to explain the law's new requirements to voters.  HB 1569 would also force Open Democracy to create programming to educate the most vulnerable populations, such as first-time voters, new residents, and students, about HB 1569's documentary proof of citizenship requirements and how to obtain the necessary documentation to register to vote.  But even these efforts will only partially mitigate the harm caused to Open Democracy's services by HB 1569.  And implementing these efforts to reduce harms of HB 1569 on the organization's services would

necessarily draw resources away from Open Democracy's work on its other priorities, such as its advocacy for campaign finance reforms and efforts to secure fair districting maps.

31.     Another of Open Democracy's core services is protecting qualified voters from unnecessary burdens on election day by recruiting and training poll observers.  The organization has six regional volunteer "Open Democracy teams" that provide outreach and education in their communities.  Part of their duties include recruiting, training, and serving as poll workers and poll observers.  Open Democracy conducts several training courses for its poll observers in conjunction with the New Hampshire Campaign for Voting Rights.  Those trainings include instruction on how to assist voters whose eligibility is challenged at the polls, and they include instruction on the Challenged Voter Affidavit.

32.     If HB 1569 takes effect, Open Democracy would need to change these trainings and re-educate poll observers.  Due to HB 1569 removing the Challenged Voter Affidavit, voters could be entirely disenfranchised by unexpected challenge, and Open Democracy would need to field more observers for future elections in order continue providing services that protect qualified voters on election day.  Open Democracy's goal for the 2024 general election is to recruit 100 poll observers, mainly focusing on college towns where challenges to disenfranchise young voters are common.  For future elections, the organization will strive to ensure that there is a trained observer in every polling location in the state. That will require redirecting time and resources away from other organizational priorities in order to recruit more volunteers, and shifting volunteers who would otherwise serve as poll workers and training them to serve as poll observers.  Even with these additional efforts, Open Democracy's poll observing services would be substantially less effective at safeguarding voters' rights because HB 1569 would make it immeasurably harder for

any number of poll observers to protect voters from disenfranchisement in the event of an eligibility challenge.

## II.     League of Women Voters of New Hampshire

33.     Plaintiff League of Women Voters of New Hampshire ("LWV-NH") is a non-profit, non-partisan organization formed under section 501(c)(4) of the Internal Revenue Code and incorporated under the laws of New Hampshire.  LWV-NH has over 350 members across three local chapters.  LWV-NH's principal place of business is 4 Park Street, Suite 200, Concord, New Hampshire 03301; it engages in activities and has members throughout the state.

34.     LWV-NH's mission is to encourage informed and active participation in government, increase understanding of major public policy issues, and influence public policy through education and advocacy.  This mission is reflected in LWV-NH's slogan "Empowering Voters and Defending Democracy."

35.     As part of its mission to increase civic engagement, LWV-NH provides members and other New Hampshire residents with unbiased, nonpartisan voter services and citizen education.  HB 1569 would directly affect and interfere with LWV-NH's core activities.  For example, HB 1569 would significantly burden LWV-NH's provision of voter education services. The organization distributes information about elections and the voting process through printed materials, information on its website, and trained volunteers.  After its November 11, 2024 effective date, if HB 1569 is not enjoined, LWV-NH would be forced to devote significant time and resources toward redesigning its informative printed and online materials to reflect the new documentary proof requirements under the law.  Because of the many changes to the law and the lack of clarity surrounding what precisely would qualify as sufficient documentary proof, LWV-NH anticipates needing longer educational materials that cost more to print.  LWV-NH would also

have to spend time and money to retrain their staff and volunteers to ensure they are prepared to inform LVW-NH members about the new requirements and to refocus their outreach efforts to educate first time New Hampshire voters who may not possess the necessary documentation required by HB 1569.

36.    Undertaking those additional steps would only partially mitigate the harms HB 1569 causes to LWV-NH's voter education services.  To begin, LVW-NH's volunteers routinely encounter individuals who do not possess or cannot find documentary proof of citizenship.  For example, LWV-NH has encountered several New Hampshire senior citizens whose births were never recorded on an acceptable birth certificate.  Under the provisions of HB 1569, LWV-NH would be unable to assist such individuals.

37.    Presently, when LWV-NH volunteers communicate with unregistered, eligible voters, they inform them of how to register but do not typically discuss proof of citizenship in detail because of the ease and frequency of signing the Qualified Voter Affidavit.  Under HB 1569, LWV-NH volunteers would need to attempt to explain the kinds of documents that can be used to prove citizenship.  But the answers to those questions are not clear.  For one, LWV-NH does not know what the law means by "other reasonable documentation which indicates the applicant is a United States citizen."  Moreover, name changes are exceptionally common, for example, after marriage, which means that many individuals could only possess birth certificates or naturalization papers that do not match the name on their voter registration.  For example, LWV-NH's president recently spoke with an eligible individual who had naturalization papers which only had her premarital name.  LWV-NH was not able to advise that prospective voter on whether her naturalization papers would suffice to show proof citizenship.  Accordingly, the ambiguities, complexities, and broad discretion introduced by HB 1569 directly harm LWV-NH's ability to

-14-

provide clear information on how to register to vote as part of its preexisting core voter education services.

38.      HB 1569 also directly threatens the voting rights of LWV-NH members.  Although the vast majority of LWV-NH members are registered to vote, members often move to new locations in the state.  Under the law, election officials should not require documentary proof of citizenship for a change of residence within New Hampshire.  However, on information and belief, this is not the case in practice, as registrars frequently ask individuals to reprove their citizenship upon moving from town to town.  LWV-NH estimates that 95 percent of its members are women, and that likely more than half of its members use a name other than their birth name (i.e., a married surname).  Accordingly, LWV-NH's membership includes qualified voters who would be substantially burdened by HB 1569's removal of the Qualified Voter Affidavit.

**III.    The Forward Foundation**

39.      Plaintiff The Forward Foundation is a non-profit, non-partisan organization incorporated under the laws of New Hampshire and formed under section 501(c)(3) of the Internal Revenue Code.  The Forward Foundation's principal place of business is 66 Hanover Street #200 Manchester NH 03101, and it engages in activities throughout the state.

40.      Founded in 2022, The Forward Foundation's mission is to increase the participation of working-age people in democracy, enabling the next generation to thrive.  The Forward Foundation works towards this goal through a variety of priorities, ranging from voter education programs, to advocacy on a range of issues affecting those under 50, to services empowering its constituents to serve their communities in public office, and more.  The Forward Foundation is supported by thousands of New Hampshire citizens who actively volunteer in the civic life of the state through their affiliation with the organization.

41.    Some of The Forward Foundation's core services are its sophisticated nonpartisan voter education and outreach programs, which focus on empowering communities with lower voter engagement, including new U.S. citizens, communities of color, and working-age people who have recently moved to New Hampshire.  The Forward Foundation engages in direct outreach to prospective voters in the general public, often by providing their services at events geared toward communities that are underrepresented in New Hampshire.  The Forward Foundation conducts outreach at multicultural and pride events across the state, in the North Country and other under-served areas, and at community colleges.  The Forward Foundation develops, produces, and distributes voter education materials—including materials focused on voter registration assistance—in order to help individuals exercise their right to vote.  Through its direct outreach, The Forward Foundation speaks to prospective voters about how to register to vote and informs individuals that the state does not require a passport or birth certificate to prove citizenship so long as a Qualified Voter Affidavit is completed.  The Forward Foundation's voter education services also include paid advertisements and mailings that target its core constituencies and aim to simplify complex election laws and registration requirements, making it easier for constituents to understand and navigate the voting and registration process.

42.    HB 1569 would directly harm the voter education services that The Forward Foundation provides in furtherance of its mission to protect and promote a healthy democracy. The Forward Foundation would need to expend significant resources to modify and recreate all of its educational materials, mailings, TV and digital ads, and website to reflect HB 1569's changes and to combat the confusion that it would cause.  The organization would also need to develop and conduct new volunteer training programs and in-person education sessions.  As a result of these increased expenditures and activities, Forward Foundation would need to narrow the scope of their

outreach to a smaller number of people, which directly harms the organization's ability to provide its voter education and assistance services effectively to its priority communities.

43.    But even with these redirected expenditures and updated materials, HB 1569's harm to The Forward Foundation's services can only be partially mitigated.  HB 1569 would make it substantially harder for The Forward Foundation to accurately educate New Hampshire residents on how to register to vote, and it harms The Forward Foundation's ability to provide effective assistance services to its key constituencies.  Previously, the organization could inform individuals without access to documentary proof of citizenship that could register using the affidavit.  Under HB 1569, The Forward Foundation is unsure how to clearly educate or effectively assist such voters.  For example, without further guidance from state election officials, there is no way for The Forward Foundation to educate voters about what could qualify as "other reasonable documentation which indicates the applicant is a United States citizen."

44.    Moreover, The Forward Foundation's core constituencies—including new U.S. citizens, residents who have newly moved to New Hampshire, young people, and communities of color—are among those most likely to be disenfranchised by HB 1569 if they are not offered effective education and assistance services.  New citizens and newly arrived state residents are also particularly difficult to identify and target, and because of HB 1569, The Forward Foundation would need to redirect resources toward reaching members of those communities to provide critical services, at the expense of the organization's ability to serve the general public.

45.    Other key aspects of The Forward Foundation's operations are its poll worker recruitment and training programs.  To ensure that every election runs smoothly and that all eligible voters' ballots are counted, The Forward Foundation uses paid advertisements and community outreach to recruit volunteer poll workers.  The Forward Foundation educates these volunteers on

the responsibilities of working as election administrators, connects them with town clerks for assignment to election day duties, and also directs some volunteers toward organizations that train them to serve as poll observers.

46.    HB 1569 harms The Forward Foundation's poll worker recruitment and training services.  For one, The Forward Foundation recruits poll workers, in part, by emphasizing that volunteering to work on election day gives civic-minded individuals the opportunity to ensure that elections run smoothly and that all eligible voters' ballots are counted.  Under the chaotic regime of HB 1569, poll workers would be forced to turn away eligible registrants who otherwise would have relied on the Qualified Voter Affidavit, and they would be required to reject the votes of challenged voters who would have otherwise cast ballots using a Challenged Voter Affidavit.  Put simply, it would be substantially harder for The Forward Foundation to recruit volunteer poll workers because its constituencies do not want to serve in a role that makes them complicit in the disenfranchisement of their fellow eligible citizens.

47.    Further, due to HB 1569's removal of the Challenged Voter Affidavit, it would be substantially more important to recruit poll *observers* who can aid voters threatened with disenfranchisement from unexpected eligibility challenges.  Thus, even if The Forward Foundation is able to recruit volunteers, because of HB 1569, the organization would need to divert substantially more volunteers toward partner organizations that train poll observers, which harms The Forward Foundation's core poll worker recruitment services.

## IV.    The Individual Plaintiffs

48.    Plaintiff McKenzie Nykamp Taylor is a U.S. citizen and lifelong resident of New Hampshire.  She currently resides in Manchester, is registered to vote in Ward 1, and regularly votes in local, state, and national elections.  Ms. Taylor was married in August 2024 to Nicholas

Taylor and indicated on her marriage license that she would change her surname from St. Germain to Taylor.  She has not yet formally updated her U.S. passport, New Hampshire driver's license, or other identifying documents to reflect her desired surname change, and she does not intend to do so until after the completion of an upcoming international trip due to uncertainty as to whether she could obtain new documents in time.  Ms. Taylor intends to cast a ballot in the election on November 5, 2024, and she understands that she will need to register in the future under her new name.  Ms. Taylor also plans to move to another location in New Hampshire in the near future as her and her husband plan to grow their family, and if her new residence is in a different ward in Manchester or in a different municipality, Ms. Taylor understands that she would be required to re-register there under RSA 654:12, III, and would be subject to the limitations of that process explained in more detail in Paragraphs 83-84.  For these reasons, there is a substantial risk that Ms. Taylor's rights will be injured by HB 1569.  Ms. Taylor is the New Hampshire State Director at America Votes, but she brings this action solely in her individual capacity.

49.    December Rust is a U.S. citizen and an outdoor resident of Littleton, New Hampshire.  He was born in Portland, Maine and grew up in the town of Cumberland, Maine.  Mr. Rust currently lacks a physical address due to being presently unhoused for approximately one year.  Mr. Rust is currently registered to vote in Littleton, but because he does not have a U.S. passport, access to his birth certificate, or proof of domicile, he would have likely registered with a Qualified Voter Affidavit in approximately June 2024.  Mr. Rust also expects to be required to move to another location within the state in the next year, especially given increased tensions in the town seeking to have law enforcement restrict camping by unhoused individuals.  *See* "Chief-Interim Manager Says Camping Ban Must Be Enforced," *Caledonian Record* (Mar. 28, 2024), https://www.caledonianrecord.com/news/local/chief-interim-manager-says-camping-ban-must-

be-enforced/article_1721a707-0334-5068-821a-f322b7d5dc14.html.    Mr. Rust moved to his current location in Littleton in April 2024, and he has already lived in three locations in Littleton during the past year, demonstrating how being unhoused often comes with the misfortune of having to live "place to place."  If he moves outside his current ward, while re-registering under RSA 654:12, III, he would be subject to the limitations of that process, as explained in more detail in Paragraphs 83-84.  He does not have the necessary proof of citizenship nor domicile, and his ability to re-register would be burdened, and more likely completely hindered, without the availability of affidavits.

50.    Mr. Rust also is at substantial risk of being impacted by HB 1569's removal of Challenge Voter Affidavits.  As an unhoused individual and someone with an outdated Non Driver ID Card indicating his prior domicile in Whitefield (not Littleton), Mr. Rust faces an increased likelihood of facing a voter challenge due to stigma against unhoused individuals, and doubts and confusion amongst community members about whether he is a resident of Littleton.  Mr. Rust has had repeated conversations with other residents of Littleton who routinely question whether he has sufficient connections to the town.  Unfortunately, he has had to continuously reassert that he belongs in the town and in New Hampshire.  Mr. Rust would lack the documentation to rebut such a voter challenge at the polls, and without the availability of a Challenged Voter Affidavit, is substantially likely to be subject to outright denial of his right to vote.  For these reasons, there is a substantial and imminent risk that Mr. Rust's rights would be injured by HB 1569.

51.    Miles Borne is a U.S. citizen and resident of Rye, New Hampshire, residing at 431 Willis Road, Rye, New Hampshire 03870.  At the time of initial filing. Mr. Borne was not presently registered to vote as he was not yet old enough to be qualified, but planned to register to vote in

Rye, New Hampshire when he turns 18 years of age in 2025[3], and to exercise his right to vote thereafter. He has subsequently registered to vote. HB 1569 burdened his ability to register to vote as it required him to locate and present either his birth certificate or U.S. passport upon registering. Mr. Borne also partnered with Plaintiff Open Democracy to bring registrars to his former high school, Portsmouth Regional High School, to register eligible seniors to vote during Senior Week when imminent graduates pick up and their cap and gown. During 2024's drive, many students relied on Qualified Voter Affidavits to register due to their lack of documentary proof of citizenship. If HB 1569 is implemented, based on his experience, he would have been unable to assist the many students who would be turned away from registering during the upcoming registration drive this year. For these reasons, there is a substantial risk that Mr. Borne's rights will be injured by HB 1569.

52.    Plaintiff Alexander Muirhead is a United States citizen and resident of Hanover, New Hampshire, residing at 11 Lyme Road, Hanover, New Hampshire 03755. Mr. Muirhead is not presently registered to vote as he is not yet old enough to be qualified, but plans to register to vote in Hanover, New Hampshire when he turns 18 years of age in 2026, and to exercise his right to vote thereafter. HB 1569 would burden his ability to register to vote as it requires him to locate and present either his birth certificate or passport upon registering. For these reasons, there is a substantial risk that Mr. Muirhead's rights would be injured by HB 1569. He brings this action through his father and next friend Russell Muirhead. Russell Muirhead is a New Hampshire Representative for Grafton District 12 and member of the House Election Law Committee but appears only in his capacity as a next friend.

---

[3] Pursuant to F. R. Civ. P. 5.2(a), only the birthyear is included for minor plaintiffs. If necessary, their full birthdates can be provided to the Parties or the Court under seal.

53.     Plaintiff Lila Muirhead is a United States citizen and resident of Hanover, New Hampshire, residing at 11 Lyme Road, Hanover, New Hampshire 03755.  Ms. Muirhead is not presently registered to vote as she is not yet old enough to be qualified, but plans to register to vote in Hanover, New Hampshire when she turns in 2026, and to exercise her right to vote thereafter. HB 1569 would burden her ability to register to vote as it requires her to locate and present either her birth certificate or U.S. passport upon registering.  For these reasons, there is a substantial risk that Ms. Muirhead's rights would be injured by HB 1569.  She brings this action through his father and next friend Russell Muirhead.  Russell Muirhead is a New Hampshire Representative for Grafton District 12 and member of the House Election Law Committee but appears only in his capacity as a next friend.

## **DEFENDANTS**

54.     Defendant David M. Scanlan is the New Hampshire Secretary of State, with an office located at 25 Capital Street, Concord, New Hampshire 03301.  The Secretary of State is the chief elections officer for New Hampshire and is in charge of administering New Hampshire's election laws.  RSA 652:23.  Mr. Scanlan is named as a Defendant in his official capacity.  The Secretary, personally and through the conduct of his agents and employees, acted under the color of state law during all times relevant to this action.

55.     Defendant John Formella is the New Hampshire Attorney General, with an office located at 1 Granite Place, Concord, New Hampshire 03301.  The Attorney General is the chief legal officer and enforcement officer in the State of New Hampshire.  RSA 7:6, 7:11.  The Attorney General is required to provide advice and approval to the Secretary of State's biennial manual of election laws and procedures.  RSA 652:22.  Attorney General Formella is named as a Defendant

in his official capacity.  The Attorney General, personally and through the conduct of his agents and employees, acted under the color of state law during all times relevant to this action.

## STATEMENT OF FACTS

**I.    New Hampshire's Current Voter Registration System Successfully Relies on Qualified Voter Affidavits**

56.    Prior to the passage of HB 1569, New Hampshire's voter registration laws have allowed new registrants to participate in elections even if they did not have all the paperwork necessary to establish their qualifications with documentary proof.  This regime has operated without any actual or meaningful risk of voter fraud.

57.    To register to vote in the State of New Hampshire, an applicant is required to complete a registration form and prove their (1) identity (that the applicant is the person whom they represent themselves to be); (2) domicile (that the applicant established a physical presence a New Hampshire address and intends to maintain that place their domicile); (3) age (that the applicant will be at least 18 years of age at the next election); and (4) citizenship (that the applicant is a United States citizen).  RSA 654:12, I.

58.    Prospective voters in New Hampshire have long been permitted to register to vote on election day.  A voter who wishes to register on election day, but who does not have in their possession the necessary registration documentation may complete a sworn affidavit, under the penalties of voter fraud and perjury, that they meet the qualifications to vote in the state.

59.    For example, under RSA 654:12, I(a)-(b), before the provisions of HB 1569 take effect, an applicant would be permitted to fill out and present a Qualified Voter Affidavit in lieu of presenting documents which prove citizenship, identity, and/or age.  The Qualified Voter Affidavit requires an applicant to swear under penalties of voting fraud and perjury that they are

not presently in possession of the necessary documents to prove identity, age, or citizenship but nonetheless still meet those qualifications.

60.    The Qualified Voter Affidavit is an important resource for those voting in New Hampshire's elections to establish citizenship, identity, and age.  In the 2020 presidential election year, over 950 of New Hampshire voters registered to vote using a Qualified Voter Affidavit to attest to citizenship, age, or identity.  N.H. DEP'T. OF STATE, RE: REPORT TO LEGISLATURE: VOTER AFFIDAVITS, at 14-15 (Sept. 8, 2022), https://npr.brightspotcdn.com/ 60/56/2016b7ca45349f2a4f64700d0292/report-to-legislature-2019-2021-affidavits-and-attachments-002.pdf.

## II.    New Hampshire's Electorate Relies Heavily on Election Day Voter Registration

61.    In the last presidential election, despite occurring in November 2020 at the peak of the COVID-19 pandemic, 75,611 New Hampshire voters registered to vote on election day, nearly 10 percent of the state's electorate.  *America Goes to the Polls 2020*, NONPROFIT VOTE at 6 (Mar. 18, 2021), https://www.nonprofitvote.org/wp-content/uploads/2021/03/america-goes-polls-2020-7.pdf.

62.    The current voter registration regime has succeeded in achieving high voter turn-out in recent presidential elections.  In 2020, 72 percent of eligible New Hampshire voters participated in the November presidential election.  *Id.*; *see also* N.H. SEC'Y OF STATE, VOTER TURNOUT RANKING OF STATES: 1996 – 2020 (April 19, 2021).  In 2016, almost 70 percent of eligible Granite Staters turned out to vote for president.  *Id.*  For both elections, only two other states, Minnesota and Maine, experienced greater voter turnout.  *Id.*  Nonpartisan observers credit New Hampshire's high turnout to the availability of election-day voter registration.  *America Goes to the Polls 2016*, NONPROFIT VOTE at 6 (Mar. 16, 2017) at 11,

https://www.nonprofitvote.org/wp-content/uploads/2017/03/america-goes-polls-2016-7.pdf.

During this time, credible claims of voter fraud have been few and far between, despite over 1.5

million general election ballots cast in 2016 and 2020.

### III.    HB 1569 was Enacted Despite Broad Skepticism About its Utility and Constitutionality.

63.    In December 2023, New Hampshire State Representative Robert Lynn introduced

HB 1569.   When introducing the bill to the Senate on April 23, 2024, Representative Lynn

admitted that it was not addressing a present problem with voter fraud in New Hampshire, stating:

"Do I think there's a huge issue of voter fraud in New Hampshire?  No, I don't, because I think if

there was we would know it."   N.H. Senate Livestream, Senate Election Law and Municipal

Affairs, YOUTUBE at 38:33 (Apr. 23, 2024), https://www.youtube.com/watch?v=3F8qNA5Tvtk.

64.    On April 30, 2024, Chair of the New Hampshire Senate Election Law Committee

Senator James Gray expressed doubts about the constitutionality of HB 1569, stating that he told

the bill's sponsor that "I don't think that we can withstand the court challenge the way the bill was

written."   N.H. Senate Livestream, Senate Election Law and Municipal Affairs, YOUTUBE at

2:59:57 (Apr. 30, 2024).  Senator Gray even attempted to introduce a similar bill, House Bill 1370,

to remedy his concerns about HB 1569's unconstitutionality, but that alternative bill was ultimately

tabled by the House of Representatives.  At a hearing on his proposed alternative bill, Senator Gray

conceded that New Hampshire has "not had a lot of people who have been prosecuted" for voter

fraud.  N.H. House of Representatives Livestream, Committee of Conference on HB 463, HB

1091, HB 1313, HB 1369, 1370, HB 1596, YOUTUBE at 1:13:38 (June 5, 2024),

https://www.youtube.com/watch?v=IMmYv-I1Uo8.

65.    While HB 1569 was pending with the Legislature, neither the Governor nor the

Secretary State took a position on the bill, but both expressed skepticism as to the necessity and

the timing of its proposed changes to New Hampshire's election laws. When asked about the possibility of signing HB 1569 in June 2024, Governor Sununu responded that he was "not looking to make any significant changes in voting laws" in New Hampshire and particularly noted concerns about implementation so close to a major election. Sexton, *supra* ¶ 4. Secretary Scanlan acknowledged concerns raised about the constitutionality of the legislation, noting to a Special Committee on Voting that he "I fully expect [HB 1569] is going to be litigated." Dewitt, *supra* ¶ 4.

66.    At a June 5, 2024 committee of conference hearing on a similar alternate bill, Secretary Scanlan recognized the burdens of removing the Qualified Voter Affidavit for citizenship. He conceded that "a high number" of citizens in New Hampshire were not born in the state, and thus would need to obtain a birth certificate from another state. N.H. House of Representatives Livestream, Committee of Conference on HB 463, HB 1091, HB 1313, HB 1369, 1370, HB 1596, YOUTUBE (June 5, 2024) at 1:13:38, https://www.youtube.com/watch?v=IMmYv-I1Uo8. Further, he testified that there were "about 45,000 voters [in New Hampshire] that were born in different countries, and of those, about 7,000 used a qualified voter affidavit to prove their citizenship qualifications." *Id.* at 1:17:35. He also conceded that getting a passport could cost up to $150 dollars. *Id.* at 1:28:10. Ultimately, Secretary Scanlan estimated that—even assuming voters who have previously been registered in New Hampshire are not forced to reprove their citizenship, as is often the case in practice for the reasons explained in Paragraphs 83-84 – removing the Qualified Voter Affidavit for citizenship still would affect "tens of thousands" of New Hampshire voters who could not otherwise be quickly verified as being previously registered through the centralized voter database. *Id.* at 1:23:52-1:25:55.

67.    Despite these concerns, HB 1569 passed both chambers in May 2024.  However, in a largely unprecedented move, the Senate President did not send the bill to the Governor's desk for signature until months later, in September, a delay that ensured HB 1569 would not be effective until after the November 2024 general election, while creating substantial confusion around what election rules would be in place for the 2024 state primary and general elections.

## IV.    HB 1569 is the Latest Attempt to Disenfranchise Eligible New Hampshire Voters.

68.    HB 1569 is the latest attempt to curtail access to voting in New Hampshire under the guise of fighting unproven "voter fraud."

69.    For example, in 2013, New Hampshire enacted legislation intended to limit the access of young voters to the franchise with the passage of Senate Bill ("SB 318"), which required residents to acknowledge on voter registration forms that they were bound by New Hampshire residency requirements to register vehicles and apply for state driver's licenses.  SB 318 was challenged in court and the New Hampshire Supreme Court permanently enjoined SB 318 as unconstitutional in *Guare v. New Hampshire*, 167 N.H. 658, 669 (2015).  The Court concluded that "as a matter of law, the burden [SB 318] imposes upon the fundamental right to vote is unreasonable." *Id.* at 665.

70.    In 2017, the legislature enacted Senate Bill 3 ("SB 3"), which attempted to create new restrictions on voter registration.  Proponents again justified the burdens of the statute with meritless claims that New Hampshire's elections had been tainted by voter fraud.  SB 3 drastically changed the definition of domicile by requiring that everyone registering to vote present documentary evidence of "a verifiable act or acts carrying out" their intent to be domiciled in New Hampshire.  SB 3 was permanently enjoined as unconstitutional by the New Hampshire Supreme Court in 2021, which concluded that SB 3 "imposes unreasonable burdens on the right to vote"

without being "substantially related to an important governmental objective." *N.H. Democratic Party v. Sec'y of State*, 262 A.3d 366, 382 (N.H. 2021).

### III.    HB 1569 Unconstitutionally Erects New Barriers to Registration.

71.    Despite the proven success of New Hampshire's elections, HB 1569 introduces fundamental changes to the state's election law that would make it materially harder, if not impossible, for thousands of New Hampshire citizens to exercise their right to vote.

72.    HB 1569, 2024 Laws Chapter 378, is codified at RSA 654:12, RSA 654:7, RSA 654:7-a, RSA 659:27, RSA 659:27-a, RSA 659:13, I(c), RSA 659:13, II(b)-(d), RSA 659:32 and RSA5:6-d, III and would take effect on November 11, 2024.  *See* Exhibit 1.  After that date, absent intervention from this Court, HB 1569 would govern the registration of those who apply to register to vote in New Hampshire or seek to transfer their registration within the state.

### 1.    The removal of the Qualified Voter Affidavit for establishing citizenship poses a significant burden to qualified New Hampshire registrants.

73.    HB 1569 would eliminate the ability of would-be voters to meet the requirements of demonstrating citizenship, identity, and age through a sworn Qualified Voter Affidavit.

74.    As a result, if HB 1569 goes into effect, every registrant would need to provide documentary proof of citizenship in the form of a birth certificate, passport, or naturalization papers[4] when registering to vote in New Hampshire for the first time, including those registering on Election Day.  Those prospective registrants unable to present one of these documents would be stripped of the right to vote.

---

[4] HB 1569 also provides that registrants may provide "any other reasonable documentation which indicates the applicant is a United States citizen," but it is unclear what type of documentation would demonstrate an applicant is a U.S. citizen besides a passport, birth certificate, or naturalization papers.  Further, the acceptance of that documentation is in entirely subject to the arbitrary discretion of election officials.

75.    The burdens imposed by this new regime are severe.  Many eligible New Hampshire voters lack or cannot readily access the documents necessary to prove citizenship under HB 1569.  In fact, on information and belief, citizens routinely opt to sign the Qualified Voter Affidavit to register to vote in lieu of presenting citizenship documentation.

76.    For example, nationwide there were only 143,116,633 valid U.S. passports in circulation in 2020, which represents only about 59 percent of the Census' estimate of the eligible citizen, voting-age population.  A recent study indicates that more than 21.3 million voting age citizens nationwide lack access to *any* proof of citizenship, including a passport, birth certificate, or naturalization papers. *21.3 Million American Citizens of Voting Age Don't Have Ready Access to Citizenship Documents*, BRENNAN CENTER FOR JUSTICE (June 11, 2024), https://www.brennancenter.org/our-work/analysis-opinion/213-million-american-citizens-voting-age-dont-have-ready-access.  Further, nationally, persons of color disproportionately lack access to the documentary proof of citizenship that would be required to register to vote. *Id.*  For example, a recent survey found that Black Americans were less likely than other groups to have a current U.S. passport.  Jamie Ballard, *Adults under 30 are more likely than older Americans to have a current U.S. passport*, YOUGOV (Aug. 31, 2023), https://today.yougov.com/travel/articles/46028-adults-under-30-more-likely-have-us-passport.

77.    People often also misplace or lose important documents such as birth certificates, for example, while moving or experiencing a tragedy such as a fire or flood. Dewitt, *supra* note 2. One can also easily imagine a married person, for example, having changed their legal name, but not having this name change reflected on a birth certificate or passport.

78.    The documents required to prove citizenship may also be expensive and time consuming to acquire.  The application and execution fees for a new passport book can cost $165,

and it currently takes up to two weeks for the passport application to be received by the passport agency, about six to eight weeks for the application to be processed, and up to another two weeks for the passport to be received after it has been printed—meaning the total wait-time may be as long as ten to twelve weeks. *See Passport Fees*, U.S. DEP'T OF STATE – BUREAU OF CONSULAR AFFAIRS, https://travel.state.gov/content/travel/en/passports/how-apply/fees.html; *Processing Times for U.S. Passports*, U.S. DEP'T OF STATE – BUREAU OF CONSULAR AFFAIRS, https://travel.state.gov/content/travel/en/passports/how-apply/processing-times.html. Expedited service for a passport costs an extra $60 on top of the application and execution fees, and the time to process an expedited request varies depending on demand, at one point taking up to twelve weeks to process a request, and that is *after* the application is received by the passport agency. *See, e.g.,* Congressman Jim McGovern, *District Update*, https://mcgovern.house.gov/news/email/show.aspx?ID=S4GTPSKFBP6BSN243T5UX67PBI.

79. The costs and time to acquire a birth certificate vary depending on where the individual was born. For example, a birth certificate for a person born in New Hampshire costs $15, but those born in Michigan would be required to pay $34. States can also vary in processing times, and some individuals may have to wait to receive the birth certificate through the mail if they cannot obtain the record in person or online. A birth record for an American born abroad costs $50 and requires a notarized request to the State Department. *How to Amend or Replace a Consular Report of Birth Abroad (CRBA)*, U.S. DEP'T OF STATE – BUREAU OF CONSULAR AFFAIRS, https://travel.state.gov/content/travel/en/replace-certify-docs/requesting-a-record/replace-amend-CRBA.html#:~:text=A%20Consular%20Report%20of%20Birth%20Abroad%20(CRBA%2C%20or%20Form%20FS,will%20issue%20you%20a%20CRBA. Moreover, some individuals entirely lack a birth certificate and would only be able to obtain a Letter of No Record from their

birth state, which would not prove their citizenship. *Born in the U.S. with no birth certificate*, USA.GOV, https://www.usa.gov/citizenship-no-birth-certificate.

80. The time and expense associated with replacing a certificate of naturalization are even more onerous. The filing fee is over $500 ($505 for online or $555 for paper), and the current processing time is 8.5 months. *Check Case Processing Times*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, https://egov.uscis.gov/processing-times/ (last visited Sep. 27, 2024) (processing time for N-565 | Application for Replacement Naturalization/Citizenship Document).

81. A person attempting to register to vote on election day—as a substantial proportion of the New Hampshire electorate does—who did not already possess or could not immediately locate documentary proof of citizenship would find it nearly impossible to obtain the documents in time to vote, especially if they were born out-of-state or if they were attempting to register and vote later in the day when jobholders typically head to the polls, at an hour near or after the close of most government offices. As a result, HB 1569 would effectively eliminate same-day voter registration for these eligible voters.

82. Given the time and expense necessary to obtain or replace citizenship documents, New Hampshirites who undergo a legal name change, including due to marriage, in the weeks or months leading up to each election will be unable to obtain updated documentation that may be required for voter registration under HB 1569.

83. Although HB 1569's documentary proof of citizenship requirement should not, by its terms, apply to those already registered in New Hampshire who are transferring their registration to a different municipality within the state, *see* RSA 654:12, III, in practice, the law is just as likely—and perhaps even more likely—to disenfranchise previously registered voters who relocate and attempt to re-register within the state. For a polling place to confirm a voter's prior

registration, the election day workers must access the state's voter registration database, which is a non-public database with access granted by the Secretary of State's office to clerks and election list supervisors. On information and belief, the Secretary of State does not currently grant access to all election day workers, and those with access are not permitted to share their access to the database with others.

84.    On information and belief, because polling locations on election day only have a limited number of officials on hand that could possibly confirm a voter's registration in another municipality, relocated voters are routinely required to prove or attest to their citizenship, despite not being required by law. Indeed, on information and belief, prior to HB 1569, some polling locations required *all* election-day registrants to provide proof of citizenship (typically through the signed Qualified Voter Affidavit), and registration transfers were then implemented after the election. Accordingly, many qualified voters who relocate are likely to be required to present all documentation necessary to satisfy HB 1569, including documentary proof of citizenship.

## 2.    The removal of the Challenged Voter Affidavit permits election workers to arbitrarily disenfranchise voters without an opportunity for due process.

85.    An already-registered voter attempting to vote in any New Hampshire election may have their qualifications to vote challenged by any other voter registered in the town or ward in which the election is held. RSA 666:4. Under current law, when a voter is challenged, the supervisor or moderator of the checklist must rule upon the challenge. If the challenge is ruled to be "well grounded" by the local election administrator, the challenged voter can still cast a ballot and have that vote counted upon executing a sworn Challenged Voter Affidavit affirming under the penalties of voter fraud and perjury that they are the person they claim to be and are qualified to vote in the designated ward. To reiterate, these challenged voters have *already been registered*, and thus already have established eligibility to vote through that registration process.

86.    If enacted, HB 1569 would radically alter this scheme for voters who have already registered and are simply seeking to vote.

87.    Under HB 1569, if the voter challenge is deemed "well grounded," a standard which is undefined in the statute and left to the discretion of an election official, the challenged voter is not provided a Challenged Voter Affidavit.  The voter simply may not vote and is entirely disenfranchised.  This removal of the Challenged Voter Affidavit is especially concerning where many of these challenged voters would *not* have documentary proof of citizenship on them on election day to rebut any challenge to their qualifications because they registered *before* election day.

88.    In removing the availability of the Challenged Voter Affidavit, HB 1569 strips the voter challenge process of procedural protections that are necessary to ensure that an eligible voter doe not have their right to vote erroneously deprived on election day.  HB 1569 does not provide a challenged voter with any meaningful opportunity to be heard, present evidence of witnesses and evidence in their favor, or request additional review.  While the law provides that "[a] person aggrieved by the moderator's decision on a voter challenge may obtain immediate review of the decision in the superior court," this purported remedy is illusory since it is impractical to expect judicial review to be completed by the "close of the polls on election day" as envisioned by the statute, particularly for election day registrations.  Polling places in the vast majority of New Hampshire municipalities close at 7 or 8 p.m., while the Superior Court closes hours earlier at 4 p.m.  Moreover, the process would be unfamiliar and daunting to most prospective voters, and filing a claim in a New Hampshire Superior Court requires payment of a significant fee of $280. *See* New Hampshire Superior Court Fee Schedule (effective Dec. 12, 2020),

https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-06/filing_fees_
superior.pdf.

89.    As a result, HB 1569 would effectively grant supervisors of the checklist or
moderators with unchecked and arbitrary discretion to disenfranchise a voter without meaningful
recourse provided to that voter. *See Saucedo*, 335 F. Supp. 3d at 221. Nothing in the law provides
any specific (let alone rational) standard for administrators to use in implementing the provisions
of the law. If the supervisor or moderator finds a challenge "well grounded," a finding which is
undefined in the legislation, the voter simply loses their right to vote in that election.

## IV.    There is no State Interest Justifying the Burdens Imposed Voters by HB 1569.

90.    There is no credible evidence, much less proof, that New Hampshire has
experienced widespread voter fraud under the existing regime that allows for Qualified Voter
Affidavits and Challenged Voter Affidavits.

91.    Even Governor Chris Sununu has touted New Hampshire's successful elections as
reliable and well administered, noting that he has "never seen a bit of actual evidence" of
widespread voter fraud. Casey McDermott, *Sununu Affirms Reality of President-Elect Biden,
Vouches for New Hampshire's Voting Procedures*, N.H. PUBLIC RADIO (Nov. 12, 2020, 7:55 PM),
https://www.nhpr.org/nhnews/2020-11-12/sununu-affirms-reality-of-president-elect-biden-
vouches-for-new-hampshiresvoting-procedures. In fact, Governor Sununu previously disputed
former President Trump's claims of fraud in the New Hampshire 2020 elections, countering that
"folks [in New Hampshire] voted at [an] unbelievable rate," but that "in New Hampshire there is
no evidence of widespread voter fraud." Andrew Solender, *GOP N.H. Governor Calls Biden
President-Elect, Says 'No Evidence' of Voter Fraud There*, FORBES (Nov. 12, 2020),
https://www.forbes.com/sites/andrewsolender/2020/11/12/gop-nh-governor-calls-biden-
president-elect-says-no-evidence-of-voter-fraud-there/?sh=4a59855b2bb9.    Indeed, Governor

Sununu previously expressed his doubts about the necessity of HB 1569, noting in June 2024 that he did not see a need for more changes to election laws this year.  Sexton, *supra* ¶ 4.

## CLAIMS FOR RELIEF

### COUNT I

**Unjustifiable Burden on the Right to Vote (in Eliminating the Qualified Voter Affidavit for Citizenship)**
**U.S. Const. Amend. I, XIV, 42 U.S.C. § 1983**
**(As to all Defendants)**

92.     Plaintiffs reallege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

93.     A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the Plaintiffs seek to vindicate against the justifications put forward by the state for the burdens imposed by the rule.  *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

94.     "However slight [the] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation."  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted).

95.     HB 1569 would impose a disparate and unjustifiable burden on the right to vote in imposing a documentary proof of citizenship requirement when registering to vote.

96.     As detailed above, HB 1569 would strip eligible voters of their constitutional right to vote by eliminating the Qualified Voter Affidavit.  Thousands of voters in New Hampshire have relied on Qualified Voter Affidavits to attest to their citizenship, identity, and age when registering to vote in past elections.

97.    For example, without the availability of a Qualified Voter Affidavit, many eligible voters who lack ready and timely access to documentary proof of citizenship would be denied the right to register and vote in elections. Other New Hampshire residents would have to incur substantial new costs to obtain the documents necessary to access the franchise under HB 1569. These changes introduce significant new burdens on the right to vote in New Hampshire.

98.    HB 1569 would also harm Organizational Plaintiffs because it would disproportionately impact their members and constituents, directly harm their ability to provide their core services, and will require Organizational Plaintiffs to dedicate more resources toward efforts to assist voters who are forced to navigate the burdensome restrictions imposed by the requirement to present documentary proof of citizenship.

99.    These burdens are not justified by any legitimate or sufficient state interest.

## <u>COUNT II</u>

**Unjustifiable Burden on the Right to Vote (in Eliminating the Challenged Voter Affidavit)**
**U.S. Const. Amend. I, XIV, 42 U.S.C. § 1983**
**(As to all Defendants)**

100.    Plaintiffs reallege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

101.    A court considering a challenge to a state election law must balance the character and magnitude of injury against the justifications put forward by the state. *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. Any burden to the right to vote must be justified a legitimate state interest. *Crawford*, 553 U.S. at 191.

102.    HB 1569 would impose a disparate and unjustifiable burden on the right to vote. As detailed above, HB 1569 would strip voters of the right to vote based on ad hoc challenges from other voters and the subjective determinations of supervisors and moderators, adding further

barriers and confusion to a convoluted registration process that has led to disenfranchisement. These harms pose a significant burden on the right to vote.  While the Challenged Voter Affidavit exception had once mitigated the potential harm of baseless voter challenges, this safeguard has since been removed.  Under HB 1569, voters who find their qualifications challenged at a polling place would now need to ensure they can demonstrate to a supervisor or moderator that the grounds for the challenge are not "more likely than not" to be "well grounded" according to the subjective interpretation of that particular official, or else lose the ability to vote.

103.    HB 1569 would also harm Organizational Plaintiffs because it disproportionately impacts their members and constituents, and would require Organizational Plaintiffs dedicate more resources toward efforts to ensure that voters can navigate the restrictions imposed by the threat of a voter challenge to their qualifications to vote.

104.    These burdens are not justified by any legitimate or sufficient state interest.

## **COUNT III**

**Denial of Procedural Due Process (in Eliminating the Challenged Voter Affidavit)**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**(As to all Defendants)**

105.    Plaintiffs reallege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

106.    "The basic guarantee of procedural due process is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner."  *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011) (internal quotation marks omitted).

107.    To determine whether a plaintiff has been denied procedural due process in violation of the Due Process Clause of the Fourteenth Amendment, courts examine the claim in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir. 2010) (quoting *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)) "Determining what process is due requires balancing three factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interests." *Saucedo*, 335 F. Supp. 3d at 214 (quoting *Collins v. Univ. of N.H.*, 664 F.3d 8, 17 (1st Cir. 2011)).

108.    The right to vote is a fundamental constitutional right. *See, e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

109.    While states are constitutionally entitled to set legitimate voter qualifications through laws of general application, due process also requires that they provide adequate procedures to challenge individual determinations of ineligibility. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1049 (11th Cir. 2020). As a result, Defendants may not deprive voters of the right to vote through individual determinations of ineligibility without providing adequate procedural safeguards.

110.    Under HB 1569, upon a challenge to a voter's qualifications, the challenge is brought before a moderator who determines whether it is "more likely than not that the challenge is well grounded, [such that] the moderator shall not receive the vote of the person so challenged."

RSA 659:27, II. This subjective standard is not sufficiently defined and does not afford an adequate process, subjecting voters to the varying determinations by poll workers in the thrust of election day, based on an ad hoc challenge by another voter.

111.    New Hampshire's contemplated adjudication of voter eligibility, pursuant to HB 1569, also does not provide adequate procedures in the likely case of erroneous determinations of ineligibility.

112.    While ostensibly the law provides that "[a] person aggrieved by the moderator's decision on a voter challenge may obtain immediate review of the decision in the superior court," such a review is not likely to meaningfully occur before the voter is ultimately deprived of the right to vote on election day. RSA 659:27-a, II(b). The likelihood of getting a same-day hearing based on a full record of evidence is small, as the process for filing an action in court can be difficult for a lay person to access quickly, efficiently, or effectively within the time allotted for voting.

113.    In addition, filing a claim in a New Hampshire Superior Court requires payment of a significant fee of $280 as required upon entry of a civil action.

114.    Further, HB 1569 removes the ability of challenged voters to vote with a sworn Challenged Voter Affidavit, a procedure that previously ensured that the constitutional right to vote was not deprived without adequate due process.

115.    Subjective determinations by moderators, the removal of the Challenged Voter Affidavit, and the inability to readily access the supposed remedy in the superior court create a high likelihood of erroneous deprivation of the right to vote under HB 1569. There is accordingly substantial value in affording additional procedural safeguards, and the State's interest in not

providing these safeguards is minimal.  As such, HB 1569 does not provide constitutionally adequate process for the removal of the fundamental right to vote.

116.    Further, the deprivation of adequate due process, through the elimination of the Challenged Voter Affidavit, is not motivated by a legitimate government interest.

### COUNT IV

**Disparate Treatment in Violation of the Right to Equal Protection (in Eliminating the Challenged Voter Affidavit)**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**(As to all Defendants)**

117.    Plaintiffs reallege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

118.    The Equal Protection Clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.

119.    "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."  *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). The Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburn Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (holding that the Equal Protection Clause applies to "the manner of [the] exercise [of the right to vote]" and that "once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another").

120.    Equal protection concerns regarding elections laws are also properly evaluated under the *Anderson-Burdick* framework described above, where "a court must identify and

evaluate the interests put forward by the State as justifications for the burden imposed by its rule." *Crawford*, 553 U.S. at 190.

121.    HB 1569 arbitrarily treats New Hampshire voters differently solely based on the subjective and variable determinations of moderators on election day.    HB 1569 requires moderators to determine whether it is "more likely than not that the challenge is well grounded, the moderator shall not receive the vote of the person so challenged."  HB 1569 § 3(II).  The bill also allows moderators to determine what is considered "reasonable documentation" for the purpose of establishing voter registration requirements.  HB 1569 § 1(I).  Without more definite standardization, these determinations by various moderators in the thrust of election day would be disparate across polling places, arbitrarily discriminating against New Hampshire voters through inconsistent application of the law.  This creates arbitrary and disparate treatment among New Hampshire voters.

122.    These burdens are not justified by any legitimate or sufficient state interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

123.    Declare that HB 1569 violates the First and Fourteenth Amendments to the United States Constitution;

124.    Issue preliminary and permanent injunctions as necessary and appropriate to prohibit Defendants from implementing or enforcing HB 1569;

125.    Award Plaintiffs attorneys' fees and costs of suit in this action pursuant to 42 U.S.C. § 1988; and

126.    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

COALITION FOR OPEN DEMOCRACY,
LEAGUE OF WOMEN VOTERS OF NEW
HAMPSHIRE, THE FORWARD FOUNDATION,
MCKENZIE NYKAMP TAYLOR, DECEMBER
RUST, MILES BORNE, BY HIS NEXT FRIEND
STEVEN BORNE, ALEXANDER MUIRHEAD,
BY HIS NEXT FRIEND RUSSELL MUIRHEAD,
AND LILA MUIRHEAD, BY HER NEXT FRIEND
RUSSELL MUIRHEAD

By and through their attorneys,

*/s/ Henry R. Klementowicz*
Henry R. Klementowicz (N.H. Bar No. 21177)
Gilles R. Bissonnette (N.H. Bar No. 265393)
AMERICAN CIVIL LIBERTIES UNION OF NEW
HAMPSHIRE FOUNDATION
18 Low Avenue
Concord, NH  03301
(603) 333-2201
henry@aclu-nh.org
gilles@aclu-nh.org

Jacob van Leer*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, D.C. 20005
(202) 715-0815
jvanleer@aclu.org

Ming Cheung*
Clayton Pierce*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2500
mcheung@aclu.org
cpierce@aclu.org
slakin@aclu.org

Geoffrey M. Atkins*
John T. Montgomery*
Desiree M. Pelletier*
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street

Boston, MA 02199
(617) 951-7000
Geoffrey.Atkins@ropesgray.com
John.Montgomery@ropesgray.com
Desiree.Pelletier@ropesgray.com

*Counsel for Plaintiffs*

*\*Admitted pro hac vice*

October 6, 2025