## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW HAMPSHIRE

NEW HAMPSHIRE YOUTH MOVEMENT,

    *Plaintiff*,

    v.

DAVID M. SCANLAN, in his official capacity
as New Hampshire Secretary of State,

    *Defendant*.

Consolidated Cases
Case No. 1:24-cv-00291-SE-TSM

COALITION FOR OPEN DEMOCRACY,
LEAGUE OF WOMEN VOTERS OF NEW
HAMPSHIRE, THE FORWARD
FOUNDATION, McKENZIE NYKAMP
TAYLOR, DECEMBER RUST, MILES
BORNE, A.M., by his next friend Russell
Muirhead, and L.M., by her next friend Russell
Muirhead,

    *Plaintiffs*,

    v.

DAVID M. SCANLAN, in his official capacity
as New Hampshire Secretary of State, and
JOHN M. FORMELLA, in his official capacity
as New Hampshire Attorney General,

    *Defendants*.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

New Hampshire's election system encourages every eligible voter register to vote, while simultaneously safeguarding the franchise by ensuring that only eligible voters cast ballots. There are minimal boundaries on participation—New Hampshire is one of a handful of states whose procedures allow for election day registrations. New Hampshire pairs that open access with commonsense eligibility checks so only the votes of eligible voters are counted. Striking this balance is essential to guarantee an election system that is both welcoming and vigilant in protecting the integrity of the ballot.

House Bill 1569 ("HB 1569") advances that balanced design. HB 1569 replaced affidavit-based attestations with flexible documentation requirements to confirm registering voters' qualifications. House Bill 464 ("HB 464") refined the framework by providing additional resources from which voter eligibility may be determined quickly and easily—in some instances, without the voter lifting a finger. Together, these reforms ensure that New Hampshire maintains an accessible yet secure voter registration process

The active Plaintiffs in this lawsuit are New Hampshire Youth Movement, Coalition for Open Democracy, League of Women Voters of New Hampshire, The Forward Foundation, (collectively, the "Organizational Plaintiffs") and Miles Borne, A.M., and L.M. (the "Individual Plaintiffs"). They challenge the constitutionality of HB 1569's repeal of the Qualified Voter Affidavit ("QVA") and the Challenged Voter Affidavit ("CVA"). But the summary judgment record confirms what the pleadings presaged. As to the Organizational Plaintiffs, HB 1569 does not require anything of them, it does not impede their core activities, and does not impose constitutionally cognizable injuries upon them. Similarly, and although HB 1569's reforms govern the Individual Plaintiffs who are not yet eligible to vote, the Individual Plaintiffs have not offered competent evidence of cognizable injuries.

It is Plaintiffs' burden to come forward with definite, competent evidence of injury, causation, and redressability, but they have not. Accordingly, the Court should grant summary judgment for Defendants on all counts because there is no genuine dispute of material fact surrounding the Plaintiffs' standing. Alternatively, the Court should grant summary judgment for Defendants on the counts challenging repeal of the CVA, because Plaintiff Open Democracy failed to present any triable issue of fact in support of its claim.

## BACKGROUND & PROCEDURAL POSTURE

This consolidated action combines two cases involving similar claims challenging the constitutionality of HB 1569: *N.H. Youth Movement v. Scanlan*, No. 1:24-cv-00291-SE-TSM, and *Coalition for Open Democracy, et al. v. Scanlan, et al.*, No. 1:24-cv-00312-SE-TSM. *See* End. Order (D.N.H. Aug. 27, 2025). Youth Movement and the *Open Democracy* Plaintiffs have one substantively identical count. They allege that HB 1569's repeal of the QVA violates the First and Fourteenth Amendments to the United States Constitution by imposing an undue or unjustifiable burden on the right to vote. First Am. Compl., *N.H. Youth Movement v. Scanlan*, No. 1:24-cv-00291-SE-TSM, ECF No. 50, ¶¶ 76-81 (Mar. 18, 2025) ("*YM* Compl."); First Am. Compl., *Coalition for Open Democracy, et al. v. Scanlan, et al.*, No. 1:24-cv-00312-SE-TSM, ECF No. 85, ¶¶ 92-99 (Oct. 6, 2025) ("*OD* Compl."). They also seek identical remedies: declaratory and injunctive relief, and fees and costs under 42 U.S.C. § 1988. *YM* Compl. at 32-33; *OD* Compl. ¶¶ 92-99.

The *Open Democracy* Plaintiffs assert three additional counts in their Amended Complaint. Count II alleges that HB 1569's repeal of the CVA violates the First and Fourteenth Amendments by imposing an unjustifiable burden on the right to vote. *OD* Compl. ¶¶ 100-104. Count III alleges that HB 1569's repeal of the CVA violates the Fourteenth Amendment by denying procedural due process to eligible voters. *Id.* ¶¶ 105-116. Lastly, Count IV alleges that

HB 1569's repeal of the CVA violates the Fourteenth Amendment by denying equal protection under the law to eligible voters. *Id.* ¶¶ 117-122. Granting in part and denying in part Defendants' January 16, 2025 Motion to Dismiss (ECF No. 93), the Court held that the *Open Democracy* Plaintiffs do not have standing to assert Count IV. Order, *Coalition for Open Democracy, et al. v. Scanlan, et al.*, No. 1:24-cv-00312-SE-TSM, ECF No. 93 at 23 (July 29, 2025) ("*OD* Order"). The Court also held that only Plaintiff Open Democracy plausibly alleged that it has standing to assert Counts II and III. *Id.* at 13. Trial is scheduled to begin February 9, 2026.

## STANDARD OF REVIEW

Pursuant to the Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are material when they have the potential to affect the outcome of the suit under the applicable law." *Quintana-Dieppa v. Dep't of Army*, 130 F.4th 1, 7 (1st Cir. 2025) (quotes omitted). A dispute is genuine where a factfinder could reasonably resolve the dispute in favor of either party. *See id.*

Accordingly, Defendants must demonstrate that Plaintiffs cannot genuinely dispute the material facts that support Defendants' Motion. *Id.* Upon such a showing, the burden shifts to Plaintiffs. *Id.* As the nonmoving parties, Plaintiffs must produce specific, competent evidence to show that a reasonable factfinder could rule in their favor on all issues that Plaintiffs must prove to prevail on their claims. *Id.*; *see also Ortiz v. Sig Sauer, Inc.*, 596 F. Supp. 3d 339, 342 (D.N.H. 2022) ("The party opposing summary judgment must present definite, competent evidence to rebut the motion.") (quoting *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994)) (quotes omitted). When ultimately deciding Defendants' Summary Judgment Motion, this Court must view all evidence in the light most favorable to the

nonmoving party and draw reasonable inferences in Plaintiffs' favor.  *Quintana-Dieppa*, 130 F.4th at 7.  But the Court cannot draw reasonable inferences from Plaintiffs' "conclusory allegations, improbable inferences, [or] unsupported speculation."  *Id.*  If no reasonable factfinder could find for Plaintiffs, the Court must grant summary judgment to Defendants.  *Id.*

## STATEMENT OF MATERIAL FACTS

### A.    Material Facts Regarding the Operation of House Bill 1569, as Amended by House Bill 464

#### 1.    Current New Hampshire Election Law Regarding Proof of Voter Eligibility

The parties have used "HB 1569" as shorthand to identify the changes to New Hampshire election law that went into effect on November 11, 2024.  The enacted version contained 11 sections amending New Hampshire election law: Ch. 378:1 (RSA 654:12 repealed and reenacted); Ch. 378:2 (RSA 654:7 repealed and reenacted); Ch. 378:3 (RSA 654:7-a (repealed and reenacted); Ch. 378:4 (RSA 659:27 repealed and reenacted); Ch. 378:5 (RSA 659 27-a repealed and reenacted); Ch. 378:6 (RSA 659:13, I(c) repealed and reenacted); Ch. 378:7 (RSA 659:13, II(b) – (e) amended); Ch. 378:8 (RSA 659:32 repealed and reenacted); Ch. 378:9 (RSA 5:6-d, III (deleted reference to repealed RSA 659:13, V); Ch. 378:10 (repealed RSA 659:30; 659:31; 660:17-a; 659:23-a; 659:13, II(a)(6) – (7); 659:13, III, IV & V).[1]  2024 Laws Ch. 378, HB 1569-FN;[2] Ch. 378:11 (establishing a 60-day effective date).

Neither HB 1569 nor the parties' pleadings accurately reflect current New Hampshire election law, however.  On August 1, 2025, Governor Ayotte signed House Bill 464.  2025 Laws

---

[1]  HB 1569's eleventh section established a 60-day effective date.  2024 Laws Ch. 378, HB 1569-FN.
[2]  A true and accurate copy of the final version of HB 1569 is attached as Exhibit 2.

Ch. 277, HB 464.[3]  Chapter 3 modifies the proof-of-citizenship requirement that HB 1569

repealed and reenacted:

> (a) CITIZENSHIP. The supervisors of the checklist, or the town or city clerk, shall accept from the applicant any one of the following as proof of citizenship: the applicant's birth certificate, passport, naturalization papers if the applicant is a naturalized citizen, ***proof that the applicant was previously or is currently registered to vote in a different town or ward in New Hampshire***, or any other reasonable documentation which indicates the applicant is a United States citizen.

Ch. 277:3 (amending RSA 654:12, I(a)) (emphasis in original).  HB 464 amends two additional

provisions that HB 1569 enacted or amended: Ch. 277:4 (amended RSA 654:12, III) and

Ch. 277:5 (amended RSA 654:12, VI).  *Id.*  The new law also enhances the resources available to

voter registrants to prove their eligibility.  It authorizes local election officials' access to

databases including the Statewide Voter Registration System ("SVRS"), Department of Motor

Vehicles ("DMV"), and New Hampshire Vital Records, "to assist voters in providing proof of

citizenship, age, domicile, and identity to the city and town clerks."  *Id.* (enacting RSA 654:12,

VI).[4]  Moreover, state law now provides that "[t]he secretary of state shall work with the city and

town clerks to ensure access [to these resources] on election day at the polling location."  *Id.*

(enacting RSA 654:12, VI).

### 2.    House Bill 1569's Repeal of the Qualified Voter Affidavit and Challenged Voter Affidavit

For almost 50 years, New Hampshire has required voter applicants provide documentary

proof of their eligibility to vote.  RSA 654:12.  Prior to HB 1569, however, an applicant could

choose to prove identity, age, or citizenship by executing a QVA.  *Id.* (repealed Nov. 11, 2024).

---

[3]  A true and accurate copy of the final version of HB 464 is attached as Exhibit 3.

[4]  *See also* HB 464 Chs. 277:2 (Voter Database; Components for Voter Eligibility Determination); 277:9 (New Paragraph; Social Security Numbers; Driver's License Records); 277:10 (New Paragraph; Disclosure of Information from Vital Records). HB 464 also amends state law in Chs. 277:1, 6, 7, 8, and 11, but these changes are not relevant to these lawsuits. HB 464 establishes incremental effective dates, the last concerning Chapter 277:5, which will be implemented February 1, 2026. HB 464 Chs. 277:12.

For almost 15 years, New Hampshire law has required registered voters to present photo identification to obtain a ballot.  RSA 659:13.  Prior to HB 1569, however, a voter could choose to prove his or her identity, or overcome a challenge to his or her eligibility after obtaining a ballot, by executing a CVA.  *Id.* (repealed Nov. 11, 2024).

Before HB 1569 repealed these affidavits, local election officials were required to offer applicants, voters, and challenged voters the applicable affidavit forms.  *See, e.g.*, N.H. Election Procedure Man. at 1, 84 (EPM-V.2024.0).[5]  Executing a QVA required the affiant to attest to truthfulness with a signature and, in most instances, sit for a photograph.  *See, e.g.*, *id.* at 30-33.  An affiant could refuse to sit for a photograph if he or she executed an Affidavit of Religious Objection.  *See, e.g.*, *id.* at 31.

A voter who checks in to vote without photo identification had to execute a CVA, subject to the same attestation and photograph requirements.  *See, e.g.*, *id.* at 31-32.  If any voter's age, citizenship, or domicile eligibility was challenged after receiving a ballot, and if the supervisors of the checklist or moderator ruled that the challenge was "well-grounded," the challenged person may only vote upon executing a CVA.  *See, e.g.*, *id.* at 79-80.  As with identity CVAs and registration QVAs, a challenged voter had to attest to the truthfulness of his or her affidavit.  *See, e.g.*, *id.* at 31-32.

### 3.     Defendants' Roles and Responsibilities in Executing New Hampshire Election Laws Regarding Proof of Voter Eligibility

David M. Scanlan is a defendant in both cases, in his official capacity as New Hampshire Secretary of State.  *OD* Compl. ¶ 54; *YM* Compl. ¶ 28.  John M. Formella is a defendant in the *Open Democracy* case only, in his official capacity as New Hampshire Attorney General.  *OD* Compl. ¶ 55.  The Secretary is a constitutional officer and the state's chief elections officer.

---

[5]  A true and accurate copy of the 2024 Manual (Bates SOS-482423) is attached as Exhibit 39.

N.H. Const. pt. II, art. 67; RSA 652:23. Attorney General Formella is the state's chief legal officer and responsible for enforcing state election laws. RSA 7:6; RSA 7:6-c.

The Secretary provides guidance to local election officials regarding implementation and execution of the provisions of HB 1569 and HB 464. In addition to providing legal advice to the Secretary regarding interpreting and executing state election law, the Attorney General provides guidance to local election officials and the public through the Election Hotline. The Attorney General also investigates allegations of wrongful voting. If his investigation substantiates wrongful voting, the Attorney General has authority to issue cease and desist letters, levy civil fines, or prosecute criminal conduct.

### 4.    House Bill 1569 Does Not Regulate the Organizational Plaintiffs or Require Anything of Them

HB 1569 regulates voter registration and voter qualification challenges. It does not require the Organizational Plaintiffs to engage in conduct of any kind, nor does it prohibit or restrict the Organizational Plaintiffs' conduct of their core activities, as they see fit.

### B.    Material Facts Regarding the Organizational Plaintiffs

None of the four Organizational Plaintiffs have standing to challenge HB 1569's repeal of the QVA and CVA. Standing requires an individualized analysis. Each Organizational Plaintiff is an entity distinct from the others. Each responded to discovery separately because they have unique sources of evidence, experience, and leadership. In the interest of clarity and brevity, material facts unique to each Organizational Plaintiff are identified herein where they apply to Defendants' arguments for summary judgment.

### C.    Material Facts Regarding the Individual Plaintiffs

As with the Organizational Plaintiffs, the three remaining individual plaintiffs are unique people with unique experiences and perspectives. In the interest of clarity and brevity, material

facts unique to each Individual Plaintiff are identified herein where they apply to Defendants' arguments for summary judgment.

## ARGUMENT

Defendants are entitled to judgment as a matter of law because HB 1569 has not directly caused Plaintiffs injury-in-fact; nor would a favorable decision afford them relief. "[S]tanding is a prerequisite to a federal court's subject matter jurisdiction." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016). Accordingly, federal courts presume that causes of action lie outside their limited Article III constitutional authority. *Spencer v. Doran*, 560 F. Supp. 3d 648, 651 (D.N.H. 2021) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). The burden to demonstrate otherwise, lies with Plaintiffs because they are invoking the court's jurisdiction. *See Reddy v. Foster*, No. 14-cv-299-JL, 2016 U.S. Dist. LEXIS 44965, at *11 (D.N.H. Apr. 1, 2016) (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 70 (1st Cir. 2012).

To establish standing, it is axiomatic that "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Because "standing is 'an indispensable part of the plaintiff's case, each element must be supported … with the manner and degree of evidence required at the successive stages of the litigation.'" *People to End Homelessness, Inc. v. Develco Singles Apts. Assocs.*, 339 F.3d 1, 8 (1st Cir. 2003) (quoting *Lujan*, 504 U.S. at 560). So, "[t]o establish constitutional standing at the summary judgment stage, 'a plaintiff cannot rest on mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true.'" *CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 106 (1st Cir. 2008) (quoting *Libertad v. Welch*, 53 F.3d 428, 436 (1st Cir. 1995)).

Not a single Plaintiff can satisfy these constitutional requirements. The Organizational Plaintiffs cannot offer definite or competent evidence of direct injury, causation, or redressability to challenge HB 1569's repeal of the QVA or CVA. Plaintiff Youth Movement's claim to associational standing also fails, because its members' compliance with the law is not injury-in-fact, QVAs are not germane to its purpose, and its members likely must participate individually. And regarding Open Democracy's challenge to the repeal of the CVA, even were its claim not barred by standing doctrine, Defendants should be awarded judgment as a matter of law because Open Democracy's factual basis is wildly speculative.

The Individual Plaintiffs suffer from similar jurisdictional deficiencies. One individual registered to vote while this case was pending, so the Court cannot remedy his purported injuries. The other two individuals assert a pre-enforcement challenge to QVA-repeal, but they fail to show that there is a "realistic danger of sustaining a direct injury" from the law's enforcement. *See Freeman v. City of Keene*, 561 F. Supp. 3d 22, 31 (D.N.H. 2021). At bottom, none of the Plaintiffs satisfy their burdens to present definite, competent evidence of a remediable concrete and particularized injury.

## I.     The Organizational Plaintiffs Do Not Have Direct Standing to Challenge House Bill 1569's Repeal of the Qualified Voter Affidavit

Organizations may assert their own direct standing to sue in federal court, but a plaintiff-organization must "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U. S. 363, 378-79 (1982)). To do so, organizational standing doctrine requires definite, competent proof of three things: (1) diverted resources; (2) a causal nexus between HB 1569 and the diverted resources; and (3) redressability. *See id.* at 384. The Organizational Plaintiffs have not offered evidence to meet their burden. Indeed, the

Organizational Plaintiffs' standing theory and the evidence that they claim supports their theory, are indistinguishable from that rejected by a unanimous Supreme Court in *Alliance for Hippocratic Medicine*.

### A. House Bill 1569 Does Not Perceptibly Impair Plaintiffs' Conduct of Their Core Activities

An organization may assert direct standing where it can demonstrate that a challenged law perceptibly impairs the organization's ability to provide core services to achieve its mission. *See Havens Realty Corp.*, 455 U.S. at 379. The Supreme Court's perceptible impairment framework requires a showing of: (1) a concrete and demonstrable injury; (2) to an established core activity; (3) resulting in a drain on resources; (4) that was involuntary due to the challenged law's operational interference with the core activity. *See id.*; *All. for Hippocratic Med.*, 602 U.S. at 395-96; *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 173-74 (2d Cir. 2021); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).

> Moreover, the consequent "drain" on resources must go beyond normal operating costs—that is, an organization does not suffer an injury in fact where it "expend[s] resources to educate its members and others" unless doing so subjects the organization to "operational costs beyond those normally expended."

*Military-Veterans Advocacy v. Sec'y of Veterans Affairs*, 7 F.4th 1110, 1129 (Fed. Cir. 2021) (quoting *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). The Organizational Plaintiffs have made no such showing.

Even were the Organizational Plaintiffs able to provide evidence that they diverted resources in response to HB 1569, they certainly have not shown that they have been "'subjected … to operational costs beyond those normally expended' to fulfill [their] core aims." *Coal. for Humane Immigrant Rights v. Dep't of Homeland Sec.*, 780 F. Supp. 3d 79, 88 (D.D.C. 2025) (quoting *All. for Hippocratic Med.*, 602 U.S. at 395); *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (explaining that resource diversion must reflect differences from routine

activities); *Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001) ("[O]rdinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing."); *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 320 (5th Cir. 2025) (holding that normal operating costs are voluntary expenditures which cannot serve as evidence of a perceptible impairment).

An organization that regularly and ordinarily expends its resources to educates supporters and the public regarding the current status of election law does not have to divert resources "from routine activities" when those laws change. Put differently, an organization cannot gain Article III standing to challenge any election law it dislikes simply because the organization chooses to provide information to the public about election laws and therefore needs to update that information in the ordinary course as election laws change. To hold that this is "a cognizable injury would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'" *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

1.    **As the Following Material Facts Show, Youth Movement Offers No Proof that House Bill 1569 Interfered with an Established Core Activity Causing a Drain on Youth Movements's Resources**

Youth Movement alleges that it has diverted resources from its core services, but there is no evidence to support that contention. Youth Movement engages in three core services to achieve its organizational mission: pledge-to-vote ("PTV"), voter-registration ("VR"), and get-out-the-vote ("GOTV") programs. *YM* Compl. ¶ 14. In support of its voter education and registration assistance core activities, Youth Movement partners with local election officials at college campus registration days, and runs PTV drives and phone banks, among other things. *See* Sayles Kasten Dep. Tr. 27:17-28:6; 58:17-59:14; 62:21-63:1 (Youth Movement R. 30(b)(6)

Dep., Oct. 20, 2025) (Exhibit 4).  It claims that the organization "has taken steps to adjust its core programs to ensure that they account for the proof of citizenship requirement."  Youth Movement's Resps. Interrog. No. 8 (Sept. 25, 2025) (Exhibit 28) ("YM Interog. Resps.").  It asserts that prior to HB 1569, "it was easier to ensure that its constituents could register to vote because constituents who lacked qualifying citizenship documents could execute a qualified voter affidavit under penalty of perjury to register."  *Id.*  It also asserts that it "update[d] its outreach material to reflect the new proof of citizenship requirement and remove references to the qualified voter affidavit option[.]"  *Id.*  But Youth Movement redacted and withheld all budgeting information and disclaimed financial diversion of resources, asserting that the only resources it has diverted are staff and volunteer time.  *See* Youth Movement's Resps. Reqs. Prod. Docs. No. 5 (Sept. 25, 2025) ("[W]hile Plaintiff alleges that it has been forced to devote staff and volunteer time to ensuring its members and constituents are not harmed by the proof of citizenship requirement, it does not allege a loss of revenue or other financial injury.") (Exhibit 35) ("YM RFP Resps.").  Youth Movement has not produced any documents, however, that reflect staff or volunteer resource diversion, and its redactions make it impossible to distill human resource diversion.  For example, it redacted metric goals from its 2025 Plan. NHYM_000233 (*e.g.*, leaders trained, doors knocked, new sign-ups, *etc.*) (Exhibit 18  It provided its 2024 "Impact – by the Numbers," but there is nothing with which to compare those numbers post-HB 1569.  NHYM_000957 (Exhibit 17).

　　In sum, Youth Movement cannot carry its burden to prove that it has standing under a diversion of resources theory.  HB 1569 does not prevent Youth Movement from engaging in any of its core activities, and the mere fact that Youth Movement's staff and volunteers had to ensure its voter outreach activities accurately reflect current law is not an abnormal operational

cost or a deviation from routine activities.  *See Coal. for Humane Immigrant Rights*, 780 F.

Supp. 3d at 88; *NAACP*, 626 F.3d at 238; *Plotkin*, 239 F.3d at 886.

> ## 2.    As the Following Material Facts Show, Open Democracy Offers No Proof that House Bill 1569 Interfered with an Established Core Activity Causing a Drain on Open Democracy's Resources

Open Democracy alleges that it has diverted resources from its core services, but there is

no evidence to support that contention.  Open Democracy engages in four core services to

achieve its organizational mission: high school registration drives, a program called "Age

Strong," campaign finance reform, and fair redistricting efforts.[6]  *See* Olivia Zink Dep. Tr. 27:8-

25, 28:1-4 (Open Democracy R. 30(b)(6) Dep., Oct. 15, 2025) (Exhibit 5).  In support of its high

school voter registration services, "Open Democracy works with students to operate voter

registration drives in approximately two dozen high schools across New Hampshire" annually.

Open Democracy's Resps. Interrogs. No. 9 (Sept. 15, 2025) (Exhibit 29) ("OD Interrog.

Resps.").  The documentary evidence reflects no material resource allocation changes to Open

Democracy's voter registration and education core activity in response to HB 1569.  *See* Open

Democracy's Resps. Reqs. Prod. Docs. No. 12 (Aug. 20, 2025) (Exhibit 36) ("OD RFP Resps.").

The testimonial evidence confirms this.  Executive Director Olivia Zink testified that

Open Democracy's high school registration drive funding has not changed since HB 1569.  *See*

Zink Dep. 80:23-81:11.  A grant funded 100% of its registration drive activities in 2024

($90,000), and this grant was renewed for 2025 in the same amount.  *Id.*  And the high school

registration program continues, unabated by HB 1569.  *See id.* 80:1-5.  Open Democracy's other

activities or tools have continued without interruption as well, including phone banks (*id.* 33:12-

---

[6] HB 1569 does not impact Open Democracy's campaign finance or redistricting core activities. *Cf.* Zink Dep. 28:19-24 (identifying research and analysis of campaign reports and advocating for reform of campaign finance laws); 30:1-11 (identifying work done at the last N.H. census).

19), prison or jail Zoom sessions (*id.* 34:18-35:19), New Hampshire Rebellion walking project (*id.* 35:20-36:9), book club (*id.* 36:17-23), and future voter scorecards in partnership with the Civics Center (*id.* 36:24-37:17).

Open Democracy's expenses relating to voter registration drives and education include postcards and mailers to high schools, but these expenses have not changed. *Id.* 42:14-22. Mailers can contain posters, a how-to guide for holding a registration drive, and a letter explaining the program. *Id.* 42:23-24. Open Democracy also sends e-mails and calls high schools and local election officials to coordinate drives. *See id.* 44:2-6. At the drives, Open Democracy offers students stickers and third party handouts, including official state voter information flyers and the Civics Center's "Democracy in a Box." *Id.* 46:8-23. But Open Democracy does not have a budget line item for high school voter registration—it is subsumed into the mailing, postage, and printing line items. *Id.* 45:17-46:2; 48:15-22. Although it is not entirely clear what Open Democracy's "Postage & Delivery" and "Printing & Copying" line items include, its budget has not changed between 2023 when high school voter registration was just a pilot program, and 2025 when the first HB 1569 elections occurred. *See id.* 82:1-5; *compare* budgets NH_ORGS_00000124 (Exhibit 19), NH_ORGS_00000114 (Exhibit 20), *and* NH_ORGS_00000122 (Exhibit 21); *and see* expenses NH_ORGS_00000146 (Exhibit 22), NH_ORGS_00000133 (Exhibit 23), *and* NH_ORGS_00000148 (Exhibit 24).

Open Democracy's pre-HB 1569 educational materials "encouraged" registering voters to bring a birth certificate, passport, or naturalization papers when registering to vote, though a QVA was an option. *See* Zink Dep. 59:24-60:6. The only post-HB 1569 change to its educational materials was removing references to the QVA option for proving citizenship and domicile. *Id.* 51:4-13. Open Democracy spent 56 hours of staff time to: update how-to-register

15

on the website; update two or three videos on the website; update a dozen or more social media graphics; update the high school registration drive poster, letter to parents, and "communications with supervisors" of the checklist; update three TikTok videos; update phone scripts for volunteers calling schools; and update PowerPoint slides (eliminating the asterisk indicating that affidavits can serve as proof of voter eligibility).  *See id.* 51:24-25; 60:22-62:23.  It does not have a record of resources expended to adapt to the new law, except for the 56 staff hours.  *See id.* 51:24-52:2 (56 hours of staff time); 45:1-46:4 (high school voter registration staff time is broken out, but not printing or other expenses).

Voter election laws change on a regular basis, so Open Democracy always updates its materials to reflect amendments to public-facing election laws.  *See id.* 100:15-19.  For example, Open Democracy updated its materials in 2016 to reflect accurate photo identification law.  *See id.* at 100:21-25.  Also, it updated its educational and voter support materials to reflect the COVID election law changes in 2020.  *See id.* 100:1-23.  The COVID changes necessitated: website updates; social media graphics updates; phone scripts for volunteers updates; and PowerPoint slide updates.  *Id.* 100:24-102:15.  These updates are nearly identical to the post-HB 1569 updates except for videos, high school handouts, and TikTok videos, because Open Democracy did not produce those in 2020.  *Id.* 101:5-15.

Open Democracy cannot carry its burden of proving that is has standing under a diversion of resources theory to challenge either the repeal of the QVA or the CVA.  These are all normal operating costs and voluntary expenditures related to routine activities, which cannot serve as evidence of a perceptible impairment.  *See, e.g.*, *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 320 (5th Cir. 2025).

**3.**    **As the Following Material Facts Show, League of Women Voters Offers No Proof that House Bill 1569 Interfered with an Established Core Activity Causing a Drain on the League's Resources**

The League of Women Voters of New Hampshire likewise has not diverted resources from its core activities.  The League of Women Voters identifies its core activities as: "Voter Services which includes voter information, candidate forums, answering voter's questions via social media, via e-mail, via phone calls or in person" and "testify[ing] in the legislature on appropriate legislation on which [it] ha[s] national or state positions."  Elizabeth Tentarelli Dep. Tr. 27:13-19 (League of Women Voters R. 30(b)(6) Dep., Oct. 15, 2025) (Exhibit 6).  As part of its voter services, the League "distribut[es] information in print and social media."  *Id.* 27:21-22. It provides information to voters regarding voter registration, "how to get a ballot, what documents [voters] need, finding [voters'] local town clerk's office," and "try[ing] to provide" information on "anything that people need information on."  *Id.* 27:23-28:10.  It will "sometimes hold issue-based forums" with "speakers on a topic of current interest."  *Id.* 28:20-29:8.  And, "in addition to testifying [before the legislature], [it] alert[s] the public through [its] legislative alerts to legislation that is being heard in committee or that is about to be voted on in the legislature or that the Governor is either going to . . . veto or sign onto."  *Id.* 29:13-21.

The League continues to engage in all these activities, and the enactment of HB 1569 has not interfered with its ability to do so.  *Id.* 47:11-14.  President Elizabeth Tentarelli testified that HB 1569 does not regulate the League of Women Voters' actions.  *Id.* 47:7-14.  She testified that the League is "constantly testifying either for or against bills."  *Id.* 49:9-11.  HB 1568 did not stop the League from continuing to educate voters through print, social media, and in-person events.  *Id.* 51:18-66:8.  It updated its print and online resources following the enactment of HB 1569, *id.* 52:20-53:8, but Ms. Tentarelli acknowledged that it does this any time there is a

"major" change in an election law, *id.* 54:21-55:3, that its print resources had previously updated in 2022 and 2024, *id.* 58:14-60:11, and that the 2025 changes also addressed a different amendment to an election law that is not subject to this litigation, *id.* 60:19-62:14.  She testified that updating the website did not cost any money at all, that updating the print resources did not cost "a huge amount of money," and that "boosting" social media posts cost around $150 for five days.  *Id.* 50:7-10; 94:4-97:15.  She testified that these are common actions that the League undertakes in other contexts as part of its core activities.  *See, e.g.*, *id.* 37:14-22 (discussing updating website); 37:23-38:15 (discussing updating Facebook); 50:7-10 (discussing boosting Facebook posts); 58:14-60:11 (discussing updating print materials).

The League cannot carry its burden of proving that is has standing under a diversion of resources theory.  These are all normal operating costs and voluntary expenditures related to routine activities, which cannot serve as evidence of a perceptible impairment.  *See, e.g.*, *Deep S. Ctr. for Env't Just.*, 138 F.4th at 320.

> **4.    As the Following Material Facts Show, Forward Foundation Offers No Proof that House Bill 1569 Interfered with an Established Core Activity Causing a Drain on the League's Resources**

Like the other Organizational Plaintiffs, Forward Foundation alleges that, "[a]s a result of HB 1569, The Forward Foundation has spent more resources targeting individuals who are unregistered, recently moved to the state, and ages 18–24, and as a result diverted resources away from targeting its other core constituencies."  *See* Forward Foundations' Interrog. Resps. No. 14 (Sept. 25, 2025) (Exhibit 31) ("FF Interrog. Resps.").  There is no evidence to support that contention.  The Forward Foundation engages in the following core activities: voter education around voting rights, running a governance program that educates elected officials, operating a legislative reform program that shares information about the barriers to serving in

Hampshire for working age people.  Forward Found. Dep. Tr. 49:4-13; 51:22-52:13 (R. 30(b)(6) Dep., Oct. 16, 2025) (Exhibit 7) ("F.F. Dep."). *Id.*.  The documentary evidence reflects no material resource allocation changes to Forward Foundation's core activities in response to HB 1569.  *See* Forward Foundations' Resps. Reqs. Prod. Docs. No. 12 (Aug. 20, 2025) (Exhibit 36) ("FF RFP Resps.").

With respect to voter education efforts, "our goal is to always inform voters on how they can vote in elections." *Id.* 50:12-14.  This has been the same goal for every year it was founded in 2022. *Id.* 50:12-20.  Their voter education efforts entail "producing materials around what is required to vote in the state of New Hampshire" such as "flyers, printed materials, videos, electronic communications. *Id.* 52:20-53:4.  They also conduct trainings on voter education and produce training materials. *Id.* 53:11-17.  It claims to have "expended significant additional resources to revise its trainings and include more information on the new requirements imposed by HB 1569." *See* FF Interrog. Resps. No. 8.  But there is no evidence of this.  Defendants could only distill that in 2024, the Forward Foundation budgeted income was projected to be $394,000, but it actually ended up generating approximately $509,000 in income.  F.F. Dep. Tr. 158:10-13. The organization is also roughly on track to collect its anticipated 2025 budget of $525,000. *Id.* 158:15-159:2.

### B.    Even if House Bill 1569 Frustrated Plaintiffs' Organizational Missions— Which It Did Not—a Setback to Abstract Social Interests Is Not a Perceptible Impairment to Core Business Activities

A setback to an organization's abstract social interests is not sufficient to establish injury-in-fact. *Havens Realty Corp.*, 455 U.S. at 379.  The Organization Plaintiffs' missions are relevant to standing, but the intensity of their interests and opposition to HB 1569 are not. *See All. for Hippocratic Med.*, 602 U.S. at 394.  The First Circuit has rejected a frustration-of-mission basis for organizational standing. *See Equal Means Equal v. Ferriero*, 3 F.4th 24, 30-31

(1st Cir. 2021); *see also La Asociacion De Trabajadores De Lake v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (explaining that direct standing requires "***both*** a diversion of its resources and a frustration of its mission") (emphasis added).

The pivotal issue is whether HB 1569 "directly affected and interfered with [the Organization Plaintiffs'] core business activities[.]" *All. for Hippocratic Med.*, 602 U.S. at 395. Where an organization cannot produce evidence that it expended resources in a manner that would preclude pursuing the organization's true preexisting purposes, that a law may frustrate the organization's mission is irrelevant. *See Coal. for Humane Immigrant Rights*, 780 F. Supp. 3d at 88 (citing *Nat'l Taxpayers Union*, 68 F.3d at 1428; *All. for Hippocratic Med.*, 602 U.S. at 395). "[C]onflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing. Frustration of an organization's objectives is the type of abstract concern that does not impart standing." *Nat'l Treasury Emples. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quotations and citations omitted).

### 1.    As the Following Material Facts Show, Youth Movement Merely Alleges a Setback to Its Abstract Social Interests

"Youth Movement's mission is to strengthen the influence of its members and constituents who share common values by helping them navigate the political system and rise to positions of political power and governance." *YM* Compl. ¶ 14; *see also* Kasten Dep. 51:3-6. Youth Movement's principal goal is to get out the vote to encourage high rates of young people voting to "build[] the power of young people[.]" *See* Kasten Dep. 58:12-59:5; 52:21-53:5. It pursues policies related to housing, reproduction, LGBTQ+, cannabis legalization, climate change, and racial, gender, and economic equality. *See id.* 54:22-55:16. Under current and prior state law, only local election officials can register voters. Youth Movement, therefore, cannot

register voters, it can only facilitate education and registration in partnership with local election officials. *See id.* 27:17-28:6.

The organization asserts that "HB 1569 significantly, seriously makes it harder for us to do that [core activity] work because it requires -- it makes it harder for everyone, but especially young people to register to vote." *Id.* 89:15-23. Accepting that HB 1569 makes it harder for young people to register as true for the purposes of this Motion, HB 1569 does not make it harder to run PTV, VR, or GOTV programs. Indeed, election officials are interested in working with Youth Movement to do more voter registrations, and Youth Movement has not made any programmatic changes since HB 1569. *Id.* 100:3-18. At best, Youth Movement has offered evidence of a setback to abstract social interests, which is not sufficient to confer standing. *See Equal Means Equal*, 3 F.4th at 30-31.

2.    **As the Following Material Facts Show, Open Democracy Merely Alleges a Setback to Its Abstract Social Interests**

"Open Democracy's mission is to bring about and safeguard political equality for the people of New Hampshire." *OD* Compl. ¶ 22; *see also* Zink Dep. 20:19-24. Open Democracy has three main goals: ensuring transparency in campaign donations, securing fair districting maps, and safeguarding the freedom to vote.[7] *See* Zink Dep. 20:19-24. HB 1569 does not regulate Open Democracy's mission or goals. As Ms. Zink testified, "Open Democracy can't register voters. We have to invite the town clerk or the supervisors of the checklist to register voters. So we are facilitating the town clerk or the supervisor of the checklist to come to the high school to sort of complete the forms with the young voters." Zink Dep. 38:9-14. The organization asserts that "HB 1569 renders these services less effective. Students wishing to register have been turned away from Open Democracy drives for lacking qualifying

---

[7] HB 1569 does not impact Open Democracy's campaign finance or redistricting core activities.

documentary proof." OD Interrog. Resps. No. 9. Accepting this statement as true for the limited purpose of this Motion, it fails to show more than a setback to abstract social interests, which is not sufficient to confer standing. *See Equal Means Equal*, 3 F.4th at 30-31.

> ### 3. As the Following Material Facts Show, League of Women Voters Merely Alleges a Setback to Its Abstract Social Interests

The League of Women Voters' mission is "to empower voters and defend democracy." Tentarelli Dep. 26:15-16. As Ms. Tentarelli testified, "in New Hampshire there is no third party voter registration so the league cannot hold its own voter registration drive." Tentarelli Dep. 43:14-17. Instead, it assists voters "in the sense that we try to answer their questions." Tentarelli Dep. 33:18-21. HB 1569 does not regulate the League's mission or goals. Tentarelli Dep. 47:11-14. After passage of HB 1569, the League continued its operations as usual, "inform[ing] voters of what they needed to do, of what the change was. We also had to reassure many voters that if they were already registered this did not affect them and I think that was the hardest thing." *See id.* 51:18-22. The League's principal concern is that HB 1569 "can affect [its] members when the process doesn't go as smoothly as it should such as the person who was dropped from the voting rolls now thought she needed citizenship to get back on the voting rolls."[8] *See id.* 77:17-21. Ms. Tentarelli is concerned for all voters when the annual purge comes in April 2026. *See id.* 78:4-9. This concern is unfounded as a matter of law, but even accepting this statement as a viable concern for the limited purpose of this Motion, it fails to show more than a setback to abstract social interests.

---

[8] This is a misunderstanding of the law. The record of someone's prior registration to vote in New Hampshire—even if removed from the active voter checklist—is proof of citizenship under HB 1569, as amended by HB 464. 654:12, I(a).

**4.    As the Following Material Facts Show, Forward Foundation Merely Alleges a Setback to Its Abstract Social Interests**

The mission of the Forward Foundation "is to have more working aged people in the state of New Hampshire to be civically engaged." F.F. Dep. Tr. 49:4-6.  According to its founding documents, the Forward Foundation was established to "increase the participation of young people (those under the age of 45) in democracy by expanding their knowledge, supporting their leadership growth, and researching and developing public policy that will encourage such participation." Ex. 27; F.F. Dep. Ex. 4.  Before HB 1569 was enacted, the Forward Foundation claims that approximately 75% of its voting rights efforts were dedicated to opposing the bill. F.F. Dep. Tr. 69:9-21.  After the passage of the bill, they transitioned these efforts to "voter education as well as our efforts in poll observer – recruitment[.]" *Id.* 69:22-70:8.

After the passage of HB 1569, the organization also "updated" its website and one-page materials "to reflect the change in the law." *Id.* 75:16-21.  It pushed out graphics on social media and sent out mailers educating voters about the registrations requirements. *Id.* 76:1-15. However, by its own admission, the Forward Foundation "continuously, every year, app[lies] for funding and fundraising around our programs" for efforts "regarding voting right protection and voting education." *Id.* 76:20-77:2.  After HB 1569 passed, the Forward Foundation continued to run its "general education effort" and "normal activities" in the manner in which it conducted voter education prior to the passage of the bill. *Id.* 77:20-17.  In other words, since 2022, the Forward Foundation's normal activities have always included election worker outreach (*id.* 78:9), hosting events (*id.* 78:11), participating in events (*id.* 78:13), engaging in voter education (*id.* 78:15), and applied for funding for these activities (*id.* 78:18).  All of these activities would have occurred regardless of whether or not HB 1569 was enacted. *Id.* 78:23.  Forward Foundation engaged in this same effort every year prior to HB 1569, and it did not change after

its passage.  *Id.* 80:4-81:9.  These facts fail to show more than a setback to abstract social interests, which is not sufficient to confer standing.  *See Equal Means Equal*, 3 F.4th at 30-31.

C.     **Even if Plaintiffs Diverted Resources in *Response* to House Bill 1569, the Material Facts Demonstrate that as a Matter of Law, House Bill 1569 Did Not *Cause* Plaintiffs' Resource Diversion**

The causation element of Article III standing is closely related to injury-in-fact.  A plaintiff must prove that a defendant caused the concrete and particularized harm of which the plaintiff complains.  *See Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731-32 (1st Cir. 2016) ("The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct.").  Like injury-in-fact, "the causation requirement screens out plaintiffs who were not injured by the defendant's action."  *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024).  "Without the causation requirement, courts would be 'virtually continuing monitors of the wisdom and soundness' of government action."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383-84 (2024) (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)).  "A plaintiff must adduce facts demonstrating that he himself is adversely affected[.]"  *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 732 (1st Cir. 2016).  The Organizational Plaintiffs have not adduced such facts.

The Organizational Plaintiffs' voluntary expenditures to continue regular voter education, registration assistance, and advocacy activities does not constitute r a perceptible impairment to those activities.  *Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021) (citing *Havens Realty Corp. v. Coleman*, 455 U. S. 363, 378-79 (1982)).  But even had Plaintiffs made a showing that HB 1569 perceptibly impaired their core activities, which they did not, they still have not identified precisely ***from*** which activities they diverted resources ***to*** preexisting core activities.  *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020).  Put

differently, the Organizational Plaintiffs cannot "divert" resources that had been intended for voter education and registration assistance to those very same activities.

Similarly, Plaintiffs cannot rely on their voluntary choices to create new programs or services without demonstrating causation: "an organization's decision to embark on categorically new activities in response to action by a putative defendant will not ordinarily suffice to show an injury for standing purposes, even if the organization's own clients request the change." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 174 (2d Cir. 2021).

1.     **As the Following Material Facts Show, Youth Movement Has Not Offered Evidence that House Bill 1569 Caused It Any Alleged Harms**

Youth Movement cannot identify any core activity or service from which it diverted or redirected resources, or activities that have been curtailed due to HB 1569.  Mr. Kasten testified that Youth Movement is "at a place where we could have a limited amount of staff time and we're going to need to repurpose some of that staff time to go towards building stronger relationships with college administrations so that they are putting on their packing lists proof of citizenship."  Kasten Dep. 69:20-2.  He discusses the need to "to add an additional layer of programming" to its GOTV activities.  *Id.* 69:3-11.  But he candidly explains that Youth Movement is in the "planning phase."  *Id.* 71:2-12.  "We have had conversations internally about how our work needs to change because of this legislation. We're in a planning phase, preparing for how this bill change is going to impact our ability to do our core mission."  *Id.* 98:19-22. There cannot be causation where an organization cannot offer demonstrable evidence of injury.

2.     **As the Following Material Facts Show, Open Democracy Has Not Offered Evidence that House Bill 1569 Caused It Any Alleged Harms**

Open Democracy cannot identify any core activity or service from which it diverted or redirected resources, or activities that have been curtailed due to HB 1569.  OD Interrog. Resps.

No. 11; Zink Dep. 131:2-132:3.  Open Democracy freely admits that HB 1569 "did not say 'Open Democracy must, you know, educate voters.'  We -- we have educated voters, and we had to change how we educate voters because it's now more difficult in order for you to register to vote."  Zink 66:10-14.  So, Open Democracy's claim that HB 1569 caused it to create new programming with Job Corps, college, and food pantry outreach initiatives, falls flat.  *Contra* Zink Dep. 63:14-23.  At best, Open Democracy made unspecified, voluntary changes to *how* they educate voters, but that doesn't change that Open Democracy continued to educate voters even after the enactment of HB 1569.  *See id.* 63:23-64:5 (reached out to some colleges but not Keene State, specifically); 64:6-8 ("may have" reached out to food pantries); 64:17-65:2 & 68:14-16 (speaking to 700 students about how to register to vote but not creating any new materials).  There is no causal nexus between HB 1569 and Open Democracy's purported injuries.

### 3.    As the Following Material Facts Show, League of Women Voters Has Not Offered Evidence that House Bill 1569 Caused It Any Alleged Harms

The League of Women Voters alleges that "it has and will continue to be forced to redirect and expend significant resources to address HB 1569's effect on its core services, to the detriment of its other priorities[,]" but it offers no evidence of that.  League of Women Voters' Resps. Interrogs. No. 11 (Sept. 15, 2025) (Exhibit 30) ("LWV Interrog. Resps.").  The documentary evidence reflects no material resource allocation changes to the League's voter assistance core activity in response to HB 1569.  It updated its written and electronic communications to reflect the change in the law, but it has not created new written materials or programs.  *See* Tentarelli Dep. 52:20-53:8; 55:12-19.  The League routinely updates to materials when election laws change that require the voters' attention.  See id. 54:19-55:3.  There is no

evidence that these minor and routine updates diverted resources from any other program.  See id. 55:4-11 (explaining that printing and webpage update costs are "not broken down on our budget").  According to the League's line item that would reflect printing and web costs, the applicable line item identified by Ms. Tentarelli, Voter Service, indicates that when compared to expenses in the July 2023 to June 2024 period, the League spent less in the July 2024 to June 2025 period, despite passage and implementation of HB 1569 in that period.  *Compare* NH_ORGS_00001437 (Exhibit 25) *with* NH_ORGS_00000094 (Exhibit 26).  Even were the League able to prove injury-in-fact, there can be no causal nexus between HB 1569 and the League's purported injuries.

### 4.    As the Following Material Facts Show, Forward Foundation Has Not Offered Evidence that House Bill 1569 Caused It Any Alleged Harms

Forward Foundation cannot identify any core activity or service from which it diverted or redirected resources, or activities that have been curtailed due to HB 1569.  It claims to have "overhauled some of its educational materials and is in the process of updating others; plans to hold additional and different poll worker trainings as a result of HB 1569 to attempt to dispel confusion[,]" among other things.  FF Interrog. No. 5.  Its written discovery responses and testimony are replete with allegations of expenses and diversions to finance those expenses, but Forward Foundation's budgets and other documents produced in discovery do not show resources diverted from one core activity to fund one hindered by HB 1569.

Quite the opposite is true.  Its income increased.  F.F. Dep. 158:15-159:2.  It may have shifted internal resources to adapt to new priorities, but there is no indication that Forward Foundation has abandoned core activities to save core activities threatened by HB 1569.  For example, it claims to have hosted and attended more events after the passage of HB 1569, but they could not identify how many events they attended or hosted in 2024.  *Id.* 84:20-86:10.

Moreover, they claim to have shifted internal resources to attend and host more events, but they do not identify a corresponding reduction of spending in a core service. *Id.* 87:9-17. Even were Forward Foundation able to prove injury-in-fact, there can be no causal nexus between HB 1569 and its purported injuries without documentary evidence of diversion.

### D. Plaintiffs Seek Prospective Remedies that Do Not Redress the Harms of Which They Complain

Assuming for the limited purpose of this Summary Judgment Motion that the Organizational Plaintiffs' alleged diversion of resources and frustration of missions are injuries-in-fact that are fairly traceable to HB 1569, they have not shown that the relief Plaintiffs seek would redress those purported harms. "To satisfy the redressability requirement, 'the plaintiff [must] allege that a favorable resolution of [its] claim would likely redress the professed injury.'" *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 319 (1st Cir. 2024) (quoting *Dantzler, Inc. v. Empresas Berríos Inventory & Ops., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020)) (quotations omitted). Redressability may not require certainty or comprehensiveness, but it requires more than mere speculation and a court must have the authority to award the requested relief. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 319 (1st Cir. 2024). A "plaintiff need not demonstrate that its entire injury will be redressed by a favorable judgment, [but] it must show that the court can fashion a remedy that will at least lessen its injury." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 319 (1st Cir. 2024) (quoting *Dantzler, Inc. v. Empresas Berríos Inventory & Ops., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020)) (quotations omitted).

The Organizational Plaintiffs seek declaratory judgment and an injunction, but they do not explain how the Court could fashion an injunction to mitigate their professed injuries. *See YM* Compl. at 32; *OD* Compl. ¶¶ 123-24. As demonstrated by the foregoing statements of material facts, Plaintiffs offer no proof whatsoever that reenacting QVAs would result in more

voter registrations or how that would mitigate their purported resource diversion.  *See, e.g.*, Zink
Dep. 89:22-90:20 (including objection).  Plaintiffs have not met their evidentiary burden to prove
redressability.

Additionally, while this Court may declare a state law unconstitutional and enjoin an
unconstitutional law's enforcement, the Court cannot use a prospective injunction to rewrite the
law.  *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006).  Although the Organizational
Plaintiffs style their requested relief as prospective, it is not.  Youth Movement asks this Court to
reinstate a repealed statute.  *See* YM Compl. at 32-33 ("Wherefore" clause).  This relief is
fundamentally retrospective—it seeks to invalidate a duly enacted state law and revive a
statutory scheme that is no longer in force.  *See id.*  The *Open Democracy* Plaintiffs have not
articulated whether this Court should enjoin enforcement of all provisions of HB 1569 or how
that relief would impact the amendments to state law, enacted by HB 464.  As the Supreme
Court has explained, "a court cannot use its remedial powers to circumvent the intent of the
legislature."  *Ayotte v. Planned Parenthood*, 546 U.S. 320 (2006) (citation omitted).

## II.    New Hampshire Youth Movement Does Not Have Associational Standing to Challenge House Bill 1569's Repeal of the Qualified Voter Affidavit as a Representative of Its Members

Youth Movement does not have Article III standing to represent its members in this
lawsuit.  To proceed in a representational capacity, Youth Movement must demonstrate that
(a) at least one of its members would otherwise have standing to sue in his or her own right; (b)
its claim is germane to its purpose; and (c) neither its claim nor the relief it seeks requires its
members to participate individually.  *Equal Means Equal v. Ferriero*, 3 F.4th 24, 27-28 (1st Cir.
2021) (citing *Hunt* v. *Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)) (citations
omitted); *Housatonic River Initiative v. United States EPA*, 175 F.4th 248, 265 (1st Cir. 2023).

Youth Movement has not offered definite, competent evidence of these associational standing prerequisites.

### A.    Youth Movement's Members Do Not Have Standing to Challenge House Bill 1569 in Their Own Right Because House Bill 1569 Has Not Caused Them Injury-in-Fact

Youth Movement members must have concrete and particularized injuries that are actual or imminent—not speculative—"meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 3981 (2024) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  The United States Supreme Court has "repeatedly reiterated that 'threatened injury must be ***certainly impending*** to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) and collecting cases)) (emphasis in original).  Imminence "cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 n.2 (1992)) (quotations omitted).  No named member of Youth Movement faces a concrete, particularized injury that is certainly impending.

### 1.    As the Following Material Facts Show, Youth Movement's Named Members Are  Merely Alleges a Setback to Its Abstract Social Interests

Members Ms. Montagano, Ms. Sumner, Ms. Barry, Mr. Wyman, and Ms. Musick are already registered voters in New Hampshire.  *See* ECF No. 50, ¶¶ 20-25; Montagano Dep. Tr. 22:6-8 (Oct. 20, 2025) (registered 2023); Sumner Dep. Tr. 41:14-18 (Oct. 17, 2025) (registered 2025); Barry Dep. Tr. 26:23-27:3 (Oct. 20, 2025) (registered 2024); Wyman Dep. Tr. 22:19-20 (Oct. 20, 2025) (registered 2024); YM Suppl. Interrog. Resps. No. 11 (forthcoming) (Ms. Musick

registered to vote and voted in Dover's November 4, 2025 municipal election). The Amended Complaint asserts that each registered voter will move to another New Hampshire jurisdiction in the future, but the summary judgment record does not support that assertion. *See contra* ECF No. 50, ¶¶ 20-25. Neither Ms. Montagano nor Ms. Barry currently plan to move. Montagano 22:1 ("We move quite frequently."), 30:1-4 ("but there are no concrete plans to move currently."); Barry 29:1-6 ("Q. Do you have any plans to move after you graduate? A. I don't know because that depends on how things shake out, but I'll probably like live in Durham or somewhere in the New Hampshire seacoast after I graduate."). Mr. Wyman has vague plans to move in 2026 or 2027—he does not know to what state he will move. Wyman Dep. Tr. 28:2-4 ("After I graduate from UNH, I plan on attending law school. So I will live wherever I get in from there."), 28:22-29:1 (explaining he has not yet applied to law school). Ms. Musick lives with her mother and her mother does not have any plans to move. *Id.* 29:2-5. And Ms. Sumner does not intend to move at all. Sumner 48:10-12 ("Q. Or do you have any plans to move out of Danbury? A. No."). These facts do not suffice as plausible, non-speculative allegations of injury-in-fact—much less direct and competent evidence of injury—because HB 1569 does not apply to them. RSA 654:12, I. So, there can be no causal nexus to HB 1569.

The material facts surrounding the most recent voter registration warrants additional attention. Youth Movement member Musick was deposed on Sunday, October 19, 2025 from 12:55 PM to 1:40PM. Musick 1:24-25; 35:12. They live in Dover, New Hampshire. Musick 7:16. Musick had already turned eighteen (18) by that date, but had not yet registered to vote at that time. Musick 5:23; 26:1-2. At the time of their deposition Musick stated that they "was not sure yet" when Musick would register to vote and "had not made any specific plans." Musick 26:3-17. At the time of the deposition, Musick had a clear understanding of HB 1565's

requirements, expressing concern that its provisions would impact "first-gen immigrants"

because "I don't know how much of the stuff their parents have, if they have a passport or birth

certificate," (Musick 23:1-23) and expressed concern that it may impact their ability to register to

vote.  Musick 24:8-13.  Musick knew at the time of the deposition that either a passport or birth

certificate were required in order to register to vote:

> Q.  You mentioned passport, birth certificate as being required to present in order to register to vote; right?
> A.  Yes.
> Q.  And do you -- do you know where your passport is?
> A.  Yes.
> Q.  Where is it?
> A.  It is in a safe, a fire lock safe in my mother's closet in our house.
> Q.  Do you know -- does the safe lock?
> A.  It does.
> Q.  Is it typically locked?
> A.  No.
> Q.  If it was locked, would you know the code?
> A.  It's a key.
> Q.  Do you know where the key is?
> A.  Yes.
> Q.  I'm not asking you to tell me. And your birth certificate, is it also in the safe?
> A.  Yes.
> Q.  Do you have any reason to believe that your -- your mom would prevent you from accessing your birth certificate or passport if you asked for it?
> A.  No. She would want a reason, but she would not be, like, no, I'm not letting you take it.
> Q.  If you asked to use your passport in order to register to vote, do you think she'd give it to you?
> A.  Yeah.
> Q.  And if you asked for your birth certificate in order to register to vote, do you think she'd give it to you?
> A.  Yes. They both have to be, you know, under a requirement that I need them, not just be, like, oh, I'm going to take them to go vote.
> Q.  That's because they're important; right?
> A.  Yes.
> Q.  It's important to keep those documents in a place that you know where they are; right?
> A.  Right.
> Q.  And to make sure that they're safe.
> A.  Yes.

Musick even knew that their birth certificate was in a plastic bag inside the safe. Musick 28:23-24. Even under questioning by the Youth Movement's own legal counsel, Musick confirmed their understanding of the current law: "as of now I believe that [a person is required to bring] a document that proves US citizen[ship], which could be a passport, a birth certificate, and then there was a paper for not-US-born citizens that proves they are- they have US citizenship." Musick 31:12-18. Musick understood that there was "previously" an option to register by a "document" you could "sign[] kind of confirming that you were a US citizen." Musick 31:19-24.

Dover held a municipal election on November 4, 2025, during which Musick registered to vote and voted. Exhibit 40. The State's Summary Judgment was due to be filed three days later on November 7, 2025 and the Court ordered that no further extensions of this deadline would be granted. Nevertheless, Plaintiff Youth Movement, despite knowing this, did not supplement the deponent's interrogatories or deposition testimony until 4:40 PM on November 7, 2025. It was not until this moment that Youth Movement provided Exhibit 40 to Defendants indicating that Musick somehow incomprehensively "forgot to bring documentary proof of citizenship to the polling place and was thus initially turned away by election officials." Exhibit 40. The Defendants respectfully will seek to recall the witness for a supplemental deposition to find out the circumstances that lead to this. Youth Movement asserts that Musick "lived only a couple of minutes away from their polling location and was able to return home to retrieve their passport before polls closed." Exhibit 40. Forgetfulness cannot form the basis of injury-in-fact, and it likely severs any possible causal nexus since the forgetful plaintiff's actions—not the defendant's—caused the harm of which the plaintiff complains.

### 2. Youth Movement's Misunderstands that Which House Bill 1569, as Amended by House Bill 464, Requires of Its Members

There are at least two fundamental problems with Youth Movement's interpretation of voter registration.  First, registering to vote in a new New Hampshire municipality does not require a registered voter to bring documentary proof of citizenship.  Under New Hampshire law, "that the applicant was previously or is currently registered to vote in a different town or ward in New Hampshire" *is* proof of citizenship.  RSA 654:12, I(a); RSA 654:12, III.  There is no temporal limit to this provision.  *See* RSA 654:12, I(a).  Moreover, the Department of State must provide access to the Statewide Voter Registration System ("SVRS") to local election officials to assist voters with proving citizenship, age, domicile, and identity, including at polling places on election day.  RSA 654:12, VI (eff. Feb. 1, 2026).  So, even *if* they move out of state, HB 1569 will not require the Youth Movement members to produce birth certificates, passports, or other reasonable documentation of their citizenship if they should move back to New Hampshire.

Second, suggesting that the members *may* move someday and register elsewhere in New Hampshire is impermissibly conjectural and hypothetical.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).  A plaintiff's "few words of general intent" are not sufficient to establish injury-in-fact.  *Carney v. Adams*, 592 U.S. 53, 64 (2020).  Absent evidence of injury-in-fact, injury cannot be fairly traced to HB 1569 and there is no harm for the Court to redress.  *See Dantzler, Inc. v. Empresas Berríos Inventory & Ops., Inc.*, 958 F.3d 38, 47 (1st Cir. 2020).  Accordingly, Ms. Montagano, Ms. Sumner, Ms. Barry, and Mr. Wyman do not have individual standing to challenge HB 1569, so Youth Movement cannot establish associational standing on behalf of its members who are already registered voters.

34

### B.    Youth Movement's Organizational Purpose Is Not Germane to House Bill 1569's Proof-of-Citizenship Voter Registration Requirement

An organization engaged in a case that is not germane to its organizational purpose does not have standing to represent its members in the lawsuit.  *See Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 108 (1st Cir. 2006) (citing *Hunt* v. *Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  The lawsuit's objective must align with the organization's core purpose.  *See Me. People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Germaneness is an inquiry into whether a lawsuit reasonably tends "to further the general interests that individual members sought to vindicate in joining the association and … bears a reasonable connection to the association's knowledge and experience."  *Saget v. Trump*, 375 F. Supp. 3d 280, 336 (E.D.N.Y. 2019) (quoting *Bldg. & Constr. at Trades Council & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006)) (internal quotations omitted).  So, Youth Movement must offer evidence that this lawsuit's goals serve the *ex ante* aims that its members understood they would advance by joining.  *See Housatonic River*, 75 F.4th at 265 (citing *Hunt*, 432 U.S. at 343).  It cannot do so.

"Youth Movement's mission is to strengthen the influence of its members and constituents who share common values by helping them navigate the political system and rise to positions of political power and governance."  *YM* Compl. ¶ 14; Kasten Dep. 51:3-6 ("Q What's the mission of New Hampshire Youth Movement? A To build the power of young people of New Hampshire.").  Their members joined to "build[] the political power of young people to transform the state into a state where no one's left behind[.]"  *See* Kasten 52:8-10.  It measures organizational success in

> the number of voters reached through any means, voters pledged to vote, rides to the polls executed, and voters supported in the voter-registration process. Plaintiff

> also measures its impact through metrics regarding the output of the services it
> provides for its hubs, such as the number of young New Hampshire leaders trained,
> the number of volunteers placed in mission-centric programs, and the number of
> community events supported.

Pl.'s Resps. Interrog. No. 7 (Sept. 25, 2025).  This is not an organization with expertise in

election administration—its board of directors has not considered *any* resolutions "relating to

elections, voter registration, or voting, including but not limited to, all board resolutions

concerning the subject matters of this action."  Pl.'s RFP Resps. No. 2 ("After conducting a

reasonable search, Plaintiff has identified no documents responsive to Request No. 2.").  It has

not engaged in research or conducted surveys regarding election integrity, nor is it even aware

that individuals have cast ballots in New Hampshire elections, despite that the individuals were

ineligible.  *See* Kasten 130:14-131:10.

That is not to say that Youth Movement is disinterested in voting laws, but its members

joined to increase their political voice and influence.  *See* Kasten Dep. Tr. 51:3-6.  The evidence

shows that neither its mission nor its members are engaged in election administration mechanics.

For nearly 50 years, New Hampshire has required a person registering to vote to provide

documentary proof of citizenship, whether through producing a birth certificate or signing an

affidavit subject to the penalties of voter fraud.  Youth Movement's facial challenge to a law

eliminating QVAs as one accepted proof of citizenship is too remote from the members' interests

to be germane.

### C.    Youth Movement's Challenge to House Bill 1569 Is Inherently Retrospective and Would Require Its Members' Individual Participation

Associational standing does not extend to an organization where its challenge to a state

law requires member-participation.  *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443

F.3d 103, 108 (1st Cir. 2006) (citing *Hunt* v. *Wash. State Apple Adver. Comm'n*, 432 U.S. 333,

343 (1977)). This is a prudential test. *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 306 (1st Cir. 2005). Youth Movement fails the test.

Youth Movement asks the Court to enjoin HB 1569's elimination of QVAs as one accepted proof of citizenship when registering to vote. *YM* Compl. at 32 ("Enjoining Defendant … from giving effect to HB 1569 to the extent it repealed the state's qualified voter affidavit provisions of RSA 654:12[.]"). Typically, individual member participation is not required in cases that seek only prospective relief. *See, e.g.*, *Coll. of Dental Surgs. of P.R. v. Conn. Gen. Life Ins. Co.*, 585 F.3d 33, 41 (1st Cir. 2009). Although Youth Movement styles its requested relief as prospective, it is not. Youth Movement asks this Court to ***reinstate*** a repealed statute. *See YM* Compl. at 32-33 ("Wherefore" clause). This relief is fundamentally ***retro***spective—it seeks to invalidate a duly enacted state law and revive a statutory scheme that is no longer in force. *See id.*

The circumstances of members Montagano, Sumner, Barry, Wyman, and Musick vary greatly. *See supra* Sec. II(A) (describing facts of registration status, registration dates, intentions, and eligibility documentation access). To determine whether Youth Movement's members suffered cognizable injuries by the QVA repeal—and whether reinstatement would redress those injuries—the Court must evaluate individualized factual circumstances for each allegedly affected member. *Cf. Warth v. Seldin*, 422 U.S. 490, 516 (1975) (explaining that a prospective associational remedy must be "common to the entire membership" or "shared by all in equal degree"). Like the organizational plaintiff seeking damages in *Warth v. Seldin*, individual members must participate because "whatever injury may have been suffered is peculiar to the individual member concerned." *See Warth v. Seldin*, 422 U.S. 490, 515 (1975).

37

Moreover, as even the *Warth* plaintiff's prospective relief "failed to show the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 516 (1975). Such is the case here. All five members are already registered to vote in New Hampshire, so they will never have to provide documentary proof of citizenship if they have to re-register to vote in New Hampshire. Youth Movement's members' participation is required to challenge repeal of HB 1569 and to seek reinstatement of the prior affidavit statutory scheme.

**III.    Open Democracy's Failure to Prove Standing Aside, Defendants Are Entitled to Judgment as a Matter of Law Regarding Open Democracy's Wildly Speculative Challenge to House Bill 1569's Repeal of the Challenged Voter Affidavit**

Open Democracy is the only Plaintiff who plausibly alleged standing to assert Counts II and III in its Complaint at the pleading stage of this case. *See OD* Order at 12-22. Count II alleges that HB 1569's repeal of the CVA imposes an unjustifiable burden on the right to vote because a challenge to a voter's eligibility leaves determination of whether the voter is qualified to the determinations of supervisors and moderators, without the possibility of the challenged voter casting a ballot as an affiant. *See* OD Compl. ¶ 102. Count III alleges that HB 1569's repeal of the CVA denies voters procedural due process. *See id.*

The challenged voter procedures provide ample safeguards to ensure no voter is erroneously prevented from voting based on a voter challenge. First, only certain people are allowed to challenge a voter. RSA 659:27, I (challenges may only be made by "any other voter registered in the town or ward in which the election is held, an election official, a challenger appointed by a political committee pursuant to RSA 666:4, or a challenger appointed by the attorney general pursuant to RSA 666:5"). Second, a person may only assert a challenge "upon personal knowledge or other basis of probable cause that the challenged voter is ineligible to vote." RSA 659:27-a, II. Third, the person must be willing to assert the challenge through a

written affidavit, on which the person must state the basis for the challenge, offer "specific facts" in support, and swear subject to the penalties of perjury that the information is true and correct. RSA 659:27-a.  Fourth, for challenges related to voter qualifications, the supervisors of the checklist (the elected board that previously determined a voter was qualified and which has access to the SVRS) is responsible for deciding the challenge by ruling whether the voter is qualified.  RSA 659:27-a, I.  Fifth, the supervisors must give the challenged voter an opportunity to be heard before ruling on the challenge.  RSA 659:27-a, II(b).  Sixth, the supervisors may only rule that a challenge to a voter's qualifications is well grounded if they find that it is "more likely than not" that the voter is not qualified.  And seventh, any voter aggrieved by such a decision has a right to obtain immediate review of the decision in the superior court.  RSA 659:27-a, II(b).

There are no facts in dispute regarding Counts II or III.  That is because there are no facts whatsoever—Plaintiff offers only hypotheticals and rank speculation.  Plaintiff speculates that HB 1569's repeal of the CVA will unjustifiably burden the right to vote of: (1) a hypothetical person on the voter checklist who offers to vote (RSA 659:27, I); at which time she (2) is challenged by an eligible challenger (RSA 659:27, I); (3) who has personal knowledge or probable cause to assert that the voter is ineligible (RSA 659:27-a, II(a)); *and* (4) the challenger is willing to execute an affidavit detailing the basis for the challenge and doing so under the penalty of perjury (659:27-a, I); *and* (5) the challenger is mistaken about the voter's eligibility or perjures himself, undaunted by the penalty; *and* (6) there is no readily available information with which to dispense of the challenge; *and* (7) hypothetical supervisors fail to properly apply the "more likely than not that the challenge is well grounded" evidentiary standard; *so* (8) the hypothetical supervisors find that the challenge is well grounded (RSA 659:27, II); *and lastly* (9)

a New Hampshire superior court cannot satisfy its statutory obligation to afford the hypothetical

voter "immediate review of the decision" pursuant to RSA 654:12, V (RSA 659:27-a, II(b)).

Plaintiff does not offer any evidence that such a parade of horribles has ever occurred or

will ever occur.  It merely speculates that "[c]hallenged voters are especially unlikely to be able

to rebut a surprise challenge because they have already proven their qualifications when

registering and therefore have no expectation of needing to carry proof rebutting each of the ten

statutory grounds for challenge on Election Day."  OD Interrog. Resps. No. 3.  Plaintiff also

characterizes the "more likely than not" and "well grounded" standards as confusing, but it

simply means that a moderator or supervisor cannot find a challenge well grounded if it is based

on the mere possibility that a voter may not be qualified.  Moreover, Plaintiff provide evidence

that a successfully challenged voter has not been able to access superior court in time to cast a

ballot.  Instead, the Plaintiff speculates that a hypothetical voter may be harmed by a voter

challenge if state courts do not stay open past 4:00 p.m. on election day and that the voter may

not qualify for a waiver of court filing fees.  *See* OD Interrog. Resps. No. 3.  In sum, the Plaintiff

tries to make out a triable claim based on a long chain of hypothetical errors, none of which has a

basis in fact.

Counts II and III are impermissibly conjectural and hypothetical.  *See Spokeo, Inc.*, 578

U.S. at 340.  Discovery has closed in this case, but Open Democracy does not have any facts to

support its claims.  At the summary judgment stage such "improbable inferences" and

"unsupported speculation" do not suffice to establish triable issues of fact.  *Rodriguez v.

Piedmont Airlines, Inc.*, No. 19-cv-11-AJ, 2020 U.S. Dist. LEXIS 269942, at *2 (D.N.H. June 1,

2020) (citing *Fanning v. Fed. Trade Comm'n*, 821 F.3d 164, 170 (1st Cir. 2016).  Accordingly,

Defendants are entitled to summary judgment on Counts II and III.

## IV.  The Individual Plaintiffs Do Not Have Standing to Challenge House Bill 1569's Repeal of the Qualified Voter Affidavit Because They Cannot Offer Definite and Competent Evidence of Injury, Causation, or Redressability

As it relates to Miles Borne, A.M, and L.M. (the "Individual Plaintiffs"), it bears repeating that their claims must be dismissed if they cannot satisfy all three elements of standing: (i) that they each suffered a concrete, particularized, actual or imminent injury in fact, (ii) that their injuries were caused by the defendants; and (iii) the injury can be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). When a case, like this one, is in a pre-enforcement posture, a plaintiff must allege that its harm is "certainly impending" or that it faces a "substantial risk" of injury. *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (citations omitted). Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023) (citation omitted).

> The burden of proof to establish standing is consistent with the manner and degree of evidence required at the successive stages of the litigation. Where, as here, the case progresses to the summary judgment stage, the moving party . . . must initially support its challenge to standing by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish . . . a genuine dispute [of material fact]. The nonmoving party . . . must then counter with specific facts supported by affidavits or other affirmative evidence.

*Suárez-Torres v. Panaderia y Reposteria España, Inc.*, 988 F.3d 542, 549–50 (1st Cir. 2021) (quotations omitted).

> Standing in the jurisdictional sense is based on the facts as they existed at the time the complaint was filed. But a plaintiff's stake in a case is not frozen at the moment the lawsuit is filed. She must maintain a personal interest in the outcome throughout the litigation or the controversy becomes moot and unjusticiable despite the court's retention of subject matter jurisdiction.

*Steir v. Girl Scouts of the USA*, 383 F.3d 7, 15 (1st Cir. 2004).  The Individual Plaintiffs cannot satisfy these requirements here.

**A.    The Material Facts Show that Plaintiff Miles Borne's Claim Is Moot**

Plaintiff Miles Borne was born in 2007.  Borne Dep. Tr. 7:9.  He was born in Portsmouth, New Hampshire.  Borne Dep. Tr. 8:16.  He graduated high school on June 6, 2025, and now attends Middlebury College in Vermont; and he lives at his parent's house in Rye, New Hampshire.  Borne Dep. Tr. 8:1-10:16.  Borne currently possesses both a U.S. passport and a birth certificate.  They are both kept in a fireproof box where he lives in Rye. Borne Dep. Tr. 15:15-16:19.  Borne's birth certificate was issued on January 26, 2009 and he and his parents have maintained possession of this document since that time, approximately sixteen (16) years.  Borne Dep. Tr. 29:9-23.  Borne's passport was issued on June 21, 2022 and expires on June 20, 2027.  Borne Dep. Tr. 30:15-22.  He also holds a New Hampshire driver's license that expires when he turns twenty-one (in the year 2028).  Borne Dep. Tr.18:2, 18:14-17.  Borne's driver's license is a New Hampshire Real ID.  Borne Dep. Tr. 21:10-11; 23:6-8.  Although he does not specifically recall what documents he brought to the DMV to obtain a Real ID driver's license (Borne Dep. Tr. 22:13-15), he likely brought his birth certificate, passport, or both (Borne Dep. Tr. 26:20-23).

Borne registered to vote in 2025, on the day of his 18th birthday, which was a day in which high school was in session and was not on an election day.  Borne Dep. Tr. 33:1-2.  He did not recall needing to do anything to prepare to register to vote the night before, because he "knew where my driver's license was, and I knew where my passport was…[a]nd because I registered other people, I knew that's what I needed."  Borne Dep. Tr. 34:11-16.  Before school on the morning of his 18th birthday, Borne woke up early and on the way out of the house "grabbed my passport and driver's license and drove down the road to town hall."  Borne Dep. Tr. 33:12-18; 35:2-4.  Borne lives in Rye just minutes from the town hall where he registered to

vote.  Borne Dep. Tr. 34:21-35:4.  He registered to vote sometime between 8:00 AM and 8:35

AM, before arriving at school a minute or two late.  Borne Dep. Tr. 34:2-12.

He does not intend to register to vote anywhere else.  Borne Dep. Tr. 17:22-18:1.  It takes

him about three hours to drive between Rye and Middlebury College.  Borne Dep. Tr. 7:23-8:1.

He plans to vote in the November 2026 election in New Hampshire by absentee ballot.  Borne

Dep. Tr. 17:4-16.

Borne cannot establish that he has standing to assert his claims.  In particular, he has

failed to show that he suffered a concrete, particularized, actual or imminent injury in fact.

TransUnion LLC, 594 U.S. at 423.  Rather, since this case began, he has already registered to

vote and had no difficulty in doing so.  Before registering to vote, Borne was already in

possession of his driver's license, passport, and birth certificate, and he knew what he needed to

bring to register to vote.  Moreover, he does not plan to register to vote anywhere else.  Thus, he

is not subject to any impending harm and does not face a substantial risk of injury.  See Reddy,

845 F.3d at 500.  Defendants, therefore, did not cause Borne any injuries, and it follows that

there is no injury to be redressed by judicial relief.

Furthermore, as a currently registered voter without plans to register anywhere else,

Borne has not maintained a personal interest in the outcome of the case.  Accordingly, his claims

are "moot and unjusticiable."  *Steir*, 383 F.3d at 15.  As a result, Borne lacks standing.

> **B.    The Material Facts Show that Plaintiffs "A.M." and "L.M." Face Neither an Impending Harm, Nor Do They Face a Substantial Risk of Injury**

Both L.M. and A.M. were born in 2008 in Austin, Texas and are presently seventeen (17)

years old.  A.M. Dep. Tr. 5:21-6:1; L.M. Dep. Tr. 4:17.  They live in Hanover, New Hampshire

with their mother and father (next friend, Russell Muirhead).  A.M. Dep. Tr. 6:8-9; L.M. Dep.

Tr. 6:6-11.  Since 2020, Russell Muirhead has been a State Representative in the New Hampshire

House of Representatives.  R.M. Dep. Tr. 13:11-17.  He serves on the House Election Law

Committee and voted against the passage of HB 1569 in both the committee and floor votes on

the bill. R.M. Dep. Tr. 13:20-22; 15:2-15.  Before filing this lawsuit, Russell spoke with L.M.

and A.M. about the concept of "standing to contest a law and make an argument to a judge that a

law violates the constitutional rights of citizens[.]"  R.M. Dep. Tr. 51:3-8.  Russell "invited

[L.M. and A.M] to consider serving as a plaintiff [in this matter]."  R.M. Dep. Tr. 51:13-52:5.

Both A.M. and L.M. currently attend Hanover High School; A.M. anticipates graduating

in June of 2026, while L.M. anticipates graduating early in January of 2026.  A.M. Dep. Tr.

6:10-19; L.M. 6:12-15.  A.M. does not have any summer plans after graduation and anticipates

attending Wesleyan University in Middletown, Connecticut.  A.M. Dep. Tr. 7:13-21.  Wesleyan

is about a three-hour drive from his home in Hanover, New Hampshire.  A.M. Dep. Tr. 8:4-10.

After graduating in January, L.M. plans on working in Hanover and taking time off to travel to

Spain and Jackson Hole, Wyoming.  L.M. Dep. Tr. 6:22-8:19.  L.M. does not have any summer

plans, and she plans to attend Colorado College in Colorado Springs in the fall of 2026.  L.M.

Dep. Tr. 9:14-20.  Both A.M. and L.M. will turn eighteen (18) in 2026, months before the state

primary and election.  A.M. Dep. Tr. 6:20-21; L.M. Dep. Tr. 4:17.

A.M. was issued a New Hampshire driver's license.  He brought his birth certificate on

the day he obtained it.  A.M. Dep. Tr. 18:16-21.  It took three-and-a-half hours for A.M. to fulfill

all of the obligations associated with obtaining his Real ID driver's license.  A.M. Dep. Tr.

17:19-18:12.  As for L.M, she missed an entire day of school to obtain her driver's license –

travelling to both Concord and Manchester from Hanover – an experience that lasted well over

three hours.  L.M. Dep. Tr. 19:18-20:11.  She cannot specifically recall what she brought with

her that day, but she does recall gathering documents beforehand and bringing them with her. L.M. Dep. Tr. 20:15-22.

Both L.M. and A.M know what documents they need to bring in order to register to vote. A.M. and L.M. possess and have located both their passports and their birth certificates. A.M. Dep. Tr. 27:16-28:10; L.M. Dep. Tr. 19:8-12. Both of their passports and birth certificates are kept in a safe in their basement and are accessible upon request. A.M. Dep. Tr. 22:16-19; L.M. Dep. Tr. 24:5-15.

When he registers to vote, A.M. plans on asking his parents for assistance and expects that they will help. A.M. Dep. Tr. 14:18-15:1. He has no reason to believe that his parents would discourage or prevent him from voting or registering to vote. A.M. Dep. Tr. 15:22-16:15. In connection with this litigation, both L.M. and A.M. were able to locate and produce copies of their birth certificate and passport. A.M. Dep. Tr. 17:7-15; L.M. Dep. Tr. 30:5-20. A.M. located his birth certificate by asking his parents and they were able to provide it to him; and, in the future, if he needed it again, he expects to be able to ask for it and receive it. A.M. Dep. Tr. 21:12-22 (reference to "page 140" is his birth certificate, see A.M. Dep. Tr. 17:14-15). He expresses some vague worry that his father may somehow lose his passport or birth certificate, yet he has taken no precautions to prevent that, stating that he "trust[s] my dad and my mom" to protect it. A.M. Dep. Tr. 24:3-7. He has had his same passport since it was issued in 2023 and his same birth certificate since 2008 without either of them being permanently lost, and he could offer no specific reason why they might be lost in the next few months before he turns 18. A.M. Dep. Tr. 24:8-25:3.

A.M. plans to register to vote in person when he turns eighteen (18), but he has not thought about where he will register. A.M. Dep. Tr. 9:14-21. He expects to be living in Hanover

when he graduates high school and will turn eighteen (18) before then.  A.M. Dep. Tr. 15:2-6.

When asked what elections he plans to vote in, he only stated that he only has vague plans "to

vote in the ones that I am able to."  A.M. Dep. Tr. 10:14-19.  He does not presently have a plan

to register to vote, he expects to make a plan when he turns eighteen (18).  A.M. Dep. Tr. 22:9-

15. In September 2026, although he expects he will be living in Middletown, Connecticut, he

anticipates maintaining his domicile in New Hampshire for voting purposes and has no plans to

vote in any other place.  A.M. Dep. Tr. 15:7-21.  He believes he will need assistance from his

parents in finding his forms of identification in order to register to vote, "because those

[documents] are kept with my parents who are often kind of in charge of that sort of stuff."  A.M.

Dep. Tr. 14:13-17.

  L.M. plans to register to vote primarily to enable her to vote in the federal elections.

L.M. Dep. Tr. 12:9-16.  She plans to register in Hanover in "late spring or early summer," before

the fall national election in 2026.  L.M. Dep. Tr. 12:17-13:1; 15:3-18 (she will register to vote

before attending college in September).  Other than this, she has no precise plan on when and

where she will actually register to vote.  L.M. believes that, in order to register to vote, she will

need help from her mom to obtain the necessary documents and ask for help from her dad to go

over the procedural aspect of registering.  L.M. Dep. Tr. 15:23-16:3.  She plans to bring her birth

certificate with her when she registers to vote.  L.M. Dep. Tr. 23:15-17.  L.M. plans to keep her

birth certificate safe by "[n]ot touching it or moving it in when I don't need to" and she knows of

no reason why either her dad or mom would need to use it before she turns 18.  L.M. Dep. Tr.

23:20-24:2.  Having located her birth certificate and passport, she was asked "all that's left now

is to turn 18 and present either one or both when you go to register to vote, correct?" and she

responded "correct."  L.M. Dep. Tr. 30:21-31:1.

L.M. and A.M.'s father, Russell has had multiple conversations with L.M. and A.M. about this lawsuit, HB 1569, and registering to vote. R.M. Dep. Tr. 16:3-21:6. If either of his children asked him to help them vote, he is willing to help them with what they need, including help locating documents, if necessary. R.M. Dep. Tr. 18:22-23:13. He knows that the birth certificates for his children are kept in a fireproof safe in the basement of his house to protect them in the event of a fire. R.M. Dep. Tr. 32:4-23. He has successfully maintained possession of these documents for over 17 years. R.M. Dep. Tr. 34:3-6. He plans to keep them safe until his children turn 18 by "do[ing] nothing and trust my wife will keep them safe." R.M. Dep. Tr. 34:17-22. He has no specific plans to use the birth certificates for anything between now and November 2026 and has no reason to believe either will be removed from the safe. R.M. Dep. Tr. 35:8-19.

L.M. and A.M. cannot establish that they have standing to assert their claims. In particular, they have failed to show a concrete, particularized, actual or imminent injury in fact. *See TransUnion LLC*, 594 U.S. at 423. Rather, they both know what documents they need to bring in order to register to vote. They also both possess and have located their passports and their birth certificates, which are being kept safe. Accordingly, they are in possession of everything they need to register to vote and just need to turn 18. Thus, they are not subject to any impending harm and they do not face a substantial risk of injury. *See* Reddy, 845 F.3d 493, 500 (1st Cir. 2017). As a result, A.M. and L.M. lack standing. In sum, they fail to show a "realistic danger of sustaining a direct injury" from the law's enforcement. *See Freeman*, 561 F. Supp. 3d at 31.

## CONCLUSION

For the reasons stated above, the Organizational Plaintiffs and Individual Plaintiffs lack standing to pursue their challenges to HB 1569's repeal of the Qualified Voter and Challenged

Voter Affidavits.  Alternatively, Plaintiff Open Democracy has not presented a triable issue of fact in its challenges to HB 1569's repeal of the Challenged Voter Affidavit.  Defendants respectfully request summary judgment in their favor.  Defendants further request oral argument if that would assist the Court in ruling on this Motion.

Respectfully submitted,

DEFENDANTS DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date:  November 7, 2025

/s/ Michael P. DeGrandis
Michael P. DeGrandis, N.H. Bar  No. 277332
Assistant Attorney General
Matthew T. Broadhead, N.H. Bar No. 19808
Associate Attorney General
Catherine A. Denny, N.H. Bar No. 275344
Assistant Attorney General
Office of the Attorney General, Civil Bureau
1 Granite Place South
Concord, NH 03301
(603) 271-3650
michael.p.degrandis@doj.nh.gov
matthew.t.broadhead@doj.nh.gov
catherine.a.denny@doj.nh.gov

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all parties of record in the consolidated cases, *New Hampshire Youth Movement v. Scanlan* (1:24-cv-00291-SE-TSM) and *Coalition for Open Democracy, et al. v. Scanlan, et al.* (1:24-cv-00312-SE-TSM), through the Court's e-filing system.

/s/ Michael P. DeGrandis
Michael P. DeGrandis