UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| NEW HAMPSHIRE YOUTH MOVEMENT,<br><br>    *Plaintiff*,<br><br>v.<br><br>DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State,<br><br>    *Defendant*.<br><br>COALITION FOR OPEN DEMOCRACY, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of State, *et al.*,<br><br>    *Defendants*. | Consolidated Cases<br>Case No. 1:24-cv-00291-SE-TSM |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
***DAUBERT* MOTION TO EXCLUDE KENNETH R. MAYER, PH.D.,**
**PROFFERED EXPERT TESTIMONY**

## INTRODUCTION

Plaintiffs retained Dr. Kenneth R. Mayer, a political scientist, to opine on the effects of New Hampshire's House Bill 1569's repeal of the Qualified Voter Affidavit and the Challenged Voter Affidavit, but his work does not meet Rule 702 of the Federal Rules of Evidence's standards of relevance or reliability. In substance, Dr. Mayer simply aggregates information from public records and other sources and then speculates about their implications. He employs no discernible expert methodology, and his conclusions amount to advocacy and conjecture rather than an objective, technical analysis.

None of Dr. Mayer's opinions will assist the trier of fact, because he provides no insight beyond that which a layperson could determine from the basic pertinent facts. Many of his assertions are irrelevant to the issues in this case. For example, his broad comparisons of New Hampshire's election laws to other states, his generalization of voter confidence factors, and his characterizations such as "vanishingly rare" fraud, have little or no bearing on Plaintiffs' specific claims of their own purported particularized injuries. The balance of his opinions suffer from a lack of reliable foundation and glaring analytical gaps. He makes sweeping predictions (such as it is a "certainty" that House Bill 1569 will cause tens of thousands of voters to be prevented from voting) without using tested methodology or supporting data specific to New Hampshire.

Dr. Mayer did not conduct any original research or statistical analysis, instead relying on surveys and numbers compiled by others, and he fails to justify the critical assumptions underlying his projections. Moreover, Dr. Mayer repeatedly strays beyond his expertise—opining on subjects like voter psychology, the prevalence of voter fraud, the interpretation of election statutes, and even whether the state's interests are "rational." These are not matters for a political scientist, and his *ipse dixit* pronouncements are inadmissible. His supplemental report (addressing the later-enacted House Bill 464) only underscores these problems, offering yet more conjecture about how a newly implemented procedure *might* work, without any factual basis or reliable method.

In short, Dr. Mayer's testimony fails every prong of the *Daubert* analysis. It is not helpful to the Court, not relevant to the actual disputes, and not reliable in its methodology. Allowing his speculative and conclusory opinions would defeat the Court's gatekeeping role under Rule 702. Accordingly, Defendants respectfully request that the Court exclude Dr. Mayer's proffered expert testimony in its entirety.

**STANDARD OF REVIEW**

Under Rule 702 of the Federal Rules of Evidence, an expert witness may provide opinion testimony in limited circumstances. *See* Fed. R. Evid. 702. Expert opinion testimony requires that the witness be "qualified as an expert by knowledge, skill, experience, training, or education[.]" *Id.* The proponent of the expert's testimony must demonstrate that it is "more likely than not" that the proffered testimony has four characteristics:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.*; *see also Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 473 (1st Cir. 2016).

"In applying Rule 702, a district court must principally determine whether the 'expert's proffered testimony both rests on a reliable foundation and is relevant to the task at hand.'" *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 111 F.4th 125, 140 (1st Cir. 2024) (quoting *Carrozza v. CVS Pharm., Inc.*, 992 F.3d 44, 56 (1st Cir. 2021)); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). As the gatekeeper, "[t]he focus of the inquiry into the admissibility of expert testimony under Rule 702 must be solely on principles and methodology, not on the conclusions that they generate." *Rodriguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70 (1st Cir. 2024) (quoting *Daubert*, 509 U.S. at 595) (quotations omitted).

"A district court is well-justified in striking opinion testimony that depends upon 'the *ipse dixit* of the expert' or that evinces significant 'analytical gap[s] between the data and the opinion proffered.'" *Doucette v. Jacobs*, 106 F.4th 156, 169 (1st Cir. 2024) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997)). For example, an expert must address the material factual elements that form the basis of the expert's proffered testimony. *See id.* (citing *Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 15 (1st Cir. 2022)). Also, an expert

3

must explain conclusory findings by referencing facts or by connecting facts to relevant insights drawn from the expert's applied methodology. *Id.* (citing *López-Ramírez v. Toledo-González*, 32 F.4th 87, 95 (1st Cir. 2022) (internal quotation marks omitted). Accordingly, the Court possesses broad discretion to exclude expert testimony that fails to satisfy these reliability and relevance standards. *See Hollyer v. Trs. of Dartmouth Coll.*, No. 20-cv-954-SE, 2022 U.S. Dist. LEXIS 142141, *7-8 (Aug. 10, 2022) (citing *Joiner*, 522 U.S. at 146).

## BACKGROUND

Kenneth R. Mayer, Ph.D., is a retired political scientist who currently holds the title of Emeritus Professor at the University of Wisconsin-Madison, where he previously served as a professor for 35 years. Kenneth R. Mayer Dep. Tr. 7:8-16 (Oct. 17, 2025).[1] Plaintiffs Coalition for Open Democracy, League of Women Voters of New Hampshire, The Forward Foundation, Miles Borne, A.M., and L.M. (the "Plaintiffs") have retained Dr. Mayer to provide opinion testimony regarding two effects of House Bill 1569. Expert Report of Kenneth R. Mayer, Ph.D. at 1 (July 23, 2025) ("Mayer Rep.").[2] First, Plaintiffs proffer Dr. Mayer's opinions on HB 1569's repeal of the Qualified Voter Affidavit ("QVA"), which previously allowed a registering voter to attest to his or her citizenship if the registering voter chose not to produce documentary proof. *Id.* Second, Plaintiffs proffer Dr. Mayer's opinions on HB 1569's repeal of the Challenged Voter Affidavit ("CVA"), which previously allowed a voter whose eligibility to cast a ballot was challenged at the polls. *Id.* Dr. Mayer supplemented his report after enactment of House Bill 464 ("HB 464"), to consider the implications of RSA 654:12, VI (added to the

---

[1] Dr. Mayer's deposition transcript is attached hereto as Exhibit A and incorporated by reference.
[2] Dr. Mayer's Report is attached hereto as Exhibit B and incorporated by reference.

RSA by HB 464) on the opinions Dr. Mayer expressed in his original report. Suppl. Expert Report of Kenneth R. Mayer, Ph.D. at 1 (Sept. 26, 2025) ("Mayer Suppl.").[3]

Dr. Mayer asserts that he is qualified to provide opinions on these matters. Mayer Rep. at 4. He has a Ph.D. in political science and graduate training in econometrics and statistics. *Id.* at 3. Regarding election administration, he has published articles in scholarly journals, participated on the Wisconsin Government Accountability Board and served on the Steering Committee of the Wisconsin Elections Research Center. *Id.* In 2012, he worked for the U.S. Justice Department reviewing Florida's efforts to update registry of voters, and in 2022, he chaired the Dane County Election Security Review Committee. *Id.*

Dr. Mayer summarizes his proffered opinion testimony as two-fold. *See* Mayer Suppl. at 1. First, he concludes that DPOC "requirements and the elimination of the Qualified Voter Affidavit in HB 1569 dramatically increased the cost of voting in New Hampshire." *Id.* Second, he concludes that the DPOC "requirements would affect tens of thousands of eligible residents, and potentially more than 100,000 eligible residents, who either do not possess DPOC, lack ready access to it, or have DPOC that does not reflect their current legal name." *Id.* But Dr. Mayer also asserts several additional opinions in support of these two principal perspectives. *See, e.g.*, Mayer Rep. at 1, 7 (opining that New Hampshire had "one of the most restrictive voting regimes in the country" and HB 1569 made even more restrictive); 1-2, 33 (predicting that HB 1569 will prevent qualified voters from registering or voting, and that this effect will be greater in future general elections than in the March 2025 local elections); 2-3, 7-8, 33 (opining that, assuming that DPOC increases the cost of voting, the increased cost will reduce voter turnout); 1, 18 (hypothesizing that even registered voters may have to carry citizenship

---

[3] Dr. Mayer's Supplemental Report is attached hereto as Exhibit C and incorporated by reference.

documentation with them when voting, should their eligibility be challenged when they offer to cast a ballot); 1-2, 13, 33 (opining that "other reasonable documentation" is ambiguous, it will be unevenly applied across jurisdictions, will likely cause voter-confusion, and may impact voters who have already provided DPOC); 2, 31-32 (characterizing New Hampshire voters as having higher than average confidence in the integrity of the state's elections compared to registered voters in other states); 2, 31 (characterizing instances of voter fraud as "vanishingly rare" and instances of New Hampshire "noncitizen voting" as "virtually nonexistent"); 2 (expressing the understanding that there is no evidence that any voter who used a QVA or a CVA to attest to their citizenship was not in fact eligible to vote); 24 (claiming that no one registering to vote on election day who does not already possess a birth certificate, passport, or naturalization papers, will be able to vote); 2 (declaring that "will do nothing to make elections more secure or advance election integrity" and "[t]here is no rational justification for the requirements imposed by HB 1569.").

## ARGUMENT

The Court should exclude the entirety of Dr. Mayer's testimony because it is not helpful to the Court, it is not relevant, and it is not reliable. At best, Dr. Mayer aggregates information—he employs no discernable methodology to his opinions. Many of the opinions he offers are irrelevant to the ultimate facts to be weighed because comparisons to other states are wholly inapt, and the balance of his opinions are irrelevant to the injuries alleged by these Plaintiffs. Dr. Mayer's opinions are unreliable because even if he were able to articulate a methodology, he does not justify his assumptions where he applied his methods. Moreover, he lacks qualifications to opine on many matters, such as voter psychology, voter fraud, statutory interpretation, and whether the state can justify the requirements of HB 1569 or repealing QVAs and CVAs. His Supplemental Report suffers from the same deficiencies. Accordingly, the

6

Court should exclude Dr. Mayer's opinions regarding HB 1569's QVA-repeal and CVA-repeal and their speculative effects in New Hampshire.

I.  **Dr. Mayer's Opinions Will Not Help the Trier of Fact Understand the Evidence or Determine Any Facts in Dispute**

Dr. Mayer does not provide meaningful insights that are outside the ordinary understanding of laypersons.  "The fundamental question that a court must answer in determining whether a proposed expert's testimony will assist the trier of fact is 'whether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved.'"  *United States v. Shay*, 57 F.3d 126, 132 (1st Cir. 1995) (quoting *United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994)).

Dr. Mayer relied on 18 sources to formulate his opinions.  Mayer Rep. at 2-3.  Seven of the sources are documents disclosed by the Secretary in this litigation that do not require expert analysis.  *Id.* ([2] SVRS files; [12] FAQ guidance to local election officials; [13] the 2024 N.H. Election Procedure Manual; [14] the Secretary's Reports to the Legislature on Voters Registering or Voting on Election Day Without Presenting Photo Identification; [15] Report of the Special Committee on Voter Confidence and related documents; [16] N.H. election results data; and [17] e-mails with local election officials and poll workers and the N.H. State Department).  Six sources are publicly available documents that speak for themselves.  *Id.* ([3] Concord, Lebanon, and Manchester QVAs; [4] Hanover June 2024 to Nov. 2024 QVAs; [6] U.S. census data; [7] Election Administration & Voting Survey (EAVES) data; [9] publicly available state and federal information regarding "the cost of obtaining or replacing a passport, certificate of naturalization, consular report, or birth abroad, or birth certificate[;]" and [10] "data from other state and local governments on how to obtain a birth certificate").  Three sources are surveys that Dr. Mayer did

7

not conduct. *Id.* ([5] Dr. Herron's expert report for N.H. Youth Movement; [8] an MIT Survey of the Performance of American Elections; and [11] survey data "on the percentage of U.S. citizens who possess a passport or birth certificate, and on the percentage of individuals who have changed their surname"). Lastly, the sources include the final Chapter 378 version of HB 1569 and various articles and government documents. *Id.* ([1] HB 1569; and [18] the Sources listed at 33-38).

There is nothing in Dr. Mayer's Report that requires expertise that would help the Court weigh the evidence these sources purport to demonstrate. For example, Figure 1 of Dr. Mayer's report, "Qualified Voter Affidavits for Citizenship" is not the product of Dr. Mayer's research or analysis—this data was produced in spreadsheets to Plaintiffs in May. SOS-000001 - SOS-000003.[4] Even if Dr. Mayer later confirmed its accuracy with his independent review of SVRS data, he is merely regurgitating objective numbers that do not require explanation or characterization. *United States v. Navedo-Ramirez*, 781 F.3d 563, 568 (1st Cir. 2015) ("If a layperson is capable of understanding an issue without the aid of an expert, a district court may properly decline to admit expert testimony on that issue on the ground that it would not be helpful to the jury.") (citation omitted). Dr. Mayer's tables and figures are simply demonstrable exhibits—they do not shed light on complex issues outside the understanding of a layperson.

These foundational deficiencies render Dr. Mayer's testimony inadmissible under *Daubert* because much of the basis for his opinions could be the subject of judicial notice or an untrained layperson could easily understand the information's application to the facts of this case. *See Shay*, 57 F.3d at 132. This evidence does not require Dr. Mayer's specialized understanding.

---

[4] The accompanying production memo is attached hereto as Exhibit D. Please note that it includes a placeholder for the native file spreadsheet that was produced to Plaintiffs.

## II. Dr. Mayer's Opinions Are Not Based on Sufficient Facts or Data

There are numerous instances of Dr. Mayer failing to provide sufficient facts or data in his Reports. For example, Dr. Mayer opines that New Hampshire had "one of the most restrictive voting regimes in the country" and HB 1569 made it even more restrictive. Mayer Rep. at 1, 7. As he testified in his deposition, the model he employed did not consider New Hampshire's election day registration when assessing more-versus-less restrictive regimes. *See* Mayer Dep. 68:17-70:1. He ultimately disclaimed making a comparison of New Hampshire to other states. *Id.* Also, Dr. Mayer declares that HB 1569 "will do nothing to make elections more secure or advance election integrity." Mayer Rep. at 2. But Dr. Mayer testified that he has not been engaged to opine on the frequency of voter fraud. *See* Mayer Dep. 123:9-15. His "analysis [of voter confidence] is informed by what [he] know[s] about the literature and the connection between voter confidence and the frequency of voter fraud." *Id.* 123:15-18. This leads him to impermissibly conclude that "[t]here is no rational justification for the requirements imposed by HB 1569." *Id.* 2. It lacks sufficient data because even if he is correct about the correlation between voter confidence and fraud, he employs no methodology to make the future prediction that HB 1569 will not increase voter confidence or achieve any other state interest.

The lack of sufficient facts are foundational deficiencies in Dr. Mayer's proffered testimony that render Dr. Mayer's testimony inadmissible under *Daubert*. A trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered[.]" *See Joiner*, 522 U.S. at 146.

## III. Dr. Mayer's Opinions Are Not Grounded in Reliable Principles and Methods

There are numerous instances of Dr. Mayer failing to ground his opinions in reliable principles and methods. For example, he estimates that "over 100,000" or "hundreds of

thousands" of eligible New Hampshire voters lack birth certificates, passports, naturalization papers, or have a name-mismatch challenge across their verifying documents. *Id.* at 2, 10, 33. But he does not distinguish how many of these eligible voters are already registered to vote. Dr. Mayer projects that HB 1569 will prevent qualified voters from registering or voting, and that this effect will be greater in future general elections than in the March 2025 local elections. *Id.* at 1-2, 25, 33. He estimates that it will be "tens of thousands" but that is based on a projection from Kansas and Arizona, with materially different election regimes. *Id.* He claims that this is a "certainty" even considering HB 464's amendments to the RSA and acknowledging the differences in state laws. *See* Mayer Dep. 148:18-149:10. He uses rudimentary arithmetic to assert that there have been only eight instances of unlawful voter registration since 2016 and 10 million votes cast in that time to characterize unlawful registration as "one in a million frequency." *See* Mayer Dep. 149:11-18. This is not a discernable research methodology. He admits that he cannot know the number of undiscovered unlawful registrations and Dr. Mayer acknowledges that even one ineligible ballot counted, dilutes the ballots cast by eligible voters. *See id.* 150:17-151:22; 147:7-148:17 (explaining that if a law prevents voters from casting ballots, however, the effect could be greater "vote dilution").

Also, Dr. Mayer asserts that HB 1569's DPOC is "extremely burdensome" in terms of voters' costs and he theorizes that these costs will reduce voter turnout. Mayer Rep. at 2-3, 7-8, 33. He also suggests that even registered voters may have to carry citizenship documentation with them when voting, should their eligibility be challenged when they offer to cast a ballot. *Id.* at 1, 18. These are not sufficiently anchored to Plaintiffs or to any individual's experience—they are mere averages of averages without reliable principles or methods. He does not explain what

10

method he employed to determine that, post-HB 464, a registered voter "may" have to carry citizenship documentation.

Dr. Mayer also opines that HB 1569's "other reasonable documentation" provision is ambiguous, it will be unevenly applied across jurisdictions, will likely cause voter-confusion, and may impact voters who have already provided DPOC. *Id.* at 1-2, 13, 33. He has no basis for making this claim. He engages in inadmissible legal analysis on what the statute "does not say" and he presumes ambiguity and inconsistent administration without identifying his method beyond lay opinion and observation. *See id.* at 27-29. The Court should not permit Dr. Mayer to testify on these subjects because his conclusions lack methodological support. *See Joiner*, 522 U.S. at 146.

### IV. Dr. Mayer's Opinions Do Not Reliably Apply Principles and Methods to the Facts of this Case

Even if Dr. Mayer grounded his opinions in reliable principles and methods, he did not reliably apply those principles and methods. The Cost of Voting Index is a perfect example of Dr. Mayer's flawed approach. Dr. Mayer's methodology does not account for benefits of New Hampshire's liberal election day registration scheme. Mayer Dep. 69:10-13. Even under Dr. Mayer's rubric, election day registration reduces voter costs, but the Cost of Voting Index is not a model into which numerical values are processed. *See id.* 44:9-45:7. It is merely a conceptual paradigm based on rational choice theory. *See id.* It does not identify or predict individual behavior or individual values. *See id.*

Moreover, Dr. Mayer does not employ any confidence interval or other means of evaluating his probabilistic opinions or future projections. *See id.* 67:9-16. He explains that he does not believe a confidence interval is necessary because he is only using arithmetic informed by his observations of New Hampshire's prior election experiences with QVAs and CVAs. *See*

*id.* So, all he can say regarding the number of people who will not be able to vote due to HB 1569, is: "I don't know exactly how many, but I can express with a very high degree of confidence and even a degree of certainty that the numbers will be -- the number will be greater than zero." *Id.* 68:13-16. If it is so self-evident that the number will be "probably a lot higher than zero," it begs the question why expert testimony is necessary. *See id.* 68:8-13. Notwithstanding, this demonstrates Dr. Mayer's failure to reliably apply the principles and methods he purports to use in his work.

Another example of Dr. Mayer's methodologically flawed opinions is his conclusion that no one registering to vote on election day who does not already possess a birth certificate, passport, or naturalization papers, will be able to vote. Mayer Rep. at 24. Dr. Mayer cites news reports of March 2025 election day registrations, but he does not include facts disclosed in discovery regarding registrants who did not have these documents with them at the polls, but nevertheless registered to vote because they had other reasonable documentation. The Court should exclude Dr. Mayer's opinions because he does not reliably apply a methodology to these and other conclusions Dr. Mayer draws in his reports. *See Joiner*, 522 U.S. at 146.

**V.    Dr. Mayer's Supplemental Report Suffers from the Same Foundational Defects as His Report**

Dr. Mayer's Supplemental Report "analyze[s] the potential effects of the following provision of HB 464 (RSA 654:12)[.]" Mayer Suppl. at 1. He only analyzes HB 464's addition of RSA 654:12, VI regarding the assistance registering voters will receive from New Hampshire state databases in proving their qualifications to vote. *See id.* HB 464 does much more than just that. *See* 2025 Laws Ch. 277, HB 464.[5] Dr. Mayer admits that "[i]t is difficult to fully assess the effects of these changes, as I am not aware of any information about the specifics of the process

---

[5] HB 464 is attached hereto as Exhibit E.

12

or how it will operate[.]" Mayer Suppl. at 2. Undaunted, he proceeds to explain why he believes "that these changes do not significantly reduce the burdens on voters or potential registrants who may lack DPOC; rather, they merely shift those burdens to other points and contacts with state administrative structures, and that the DPOC requirements imposed by HB 1569 will continue to prevent eligible New Hampshire residents from registering to vote." *Id.*

Dr. Mayer engages in pure conjecture which cannot help the trier of fact understand the evidence. That is because Dr. Mayer is engaging in legal analysis and statutory interpretation of a newly enacted law that is still being implemented. So, he lacks facts or data upon which to base his opinions. He employs no reliable principles or methods—Dr. Mayer merely collects information and makes a speculative argument. He has no basis to assert that a "voter assistance center" would operate as he characterizes it, with overwhelmed staff and long queues. *See id.* at 5. And to the extent that there is a methodology here, Dr. Mayer certainly does not reliably apply that methodology. For example, no methodology would support his assertion that "there is not evidence that laws like HB 1569 and HB 464 will improve voter confidence or election integrity." See id. at 6. His citations are not to New Hampshire studies that account for the change in the law or New Hampshire demographics. *See id.* He cannot opine on the N.H. State Department's "technical or administrative infrastructures" without providing supporting data, either. These foundational deficiencies render Dr. Mayer's testimony inadmissible under *Daubert* because his opinions do not satisfy the requirements of relevance and reliability.

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Mayer's testimony.

    Respectfully submitted,

    DEFENDANTS DAVID M. SCANLAN, in his official capacity as New Hampshire Secretary of

13

State and JOHN M. FORMELLA, in his official capacity as New Hampshire Attorney General

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Date:  November 17, 2025  /s/ Michael P. DeGrandis
Michael P. DeGrandis, N.H. Bar  No. 277332
Assistant Attorney General
Matthew T. Broadhead, N.H. Bar No. 19808
Associate Attorney General
Catherine A. Denny, N.H. Bar No. 275344
Assistant Attorney General
Office of the Attorney General, Civil Bureau
1 Granite Place South
Concord, NH 03301
(603) 271-3650
michael.p.degrandis@doj.nh.gov
matthew.t.broadhead@doj.nh.gov
catherine.a.denny@doj.nh.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served on all parties of record in the consolidated cases, *New Hampshire Youth Movement v. Scanlan* (1:24-cv-00291-SE-TSM) and *Coalition for Open Democracy, et al. v. Scanlan, et al.* (1:24-cv-00312-SE-TSM), through the Court's e-filing system.

 /s/ Michael P. DeGrandis
Michael P. DeGrandis