## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW HAMPSHIRE

NEW HAMPSHIRE YOUTH MOVEMENT,

    *Plaintiff*,

    v.

DAVID M. SCANLAN, in his official capacity
as New Hampshire Secretary of State,

    *Defendant*.

Consolidated Cases
Case No. 1:24-cv-00291-SE-TSM

COALITION FOR OPEN DEMOCRACY,
*et al.*,

    *Plaintiffs*,

    v.

DAVID M. SCANLAN, in his official capacity
as New Hampshire Secretary of State, *et al.*,

    *Defendants*.

## OPEN DEMOCRACY PLAINTIFFS' RECONSTRUCTION OF DEFENDANTS' STATEMENT OF MATERIAL FACTS, RESPONSES THERETO, AND ADDITIONAL STATEMENTS OF UNDISPUTED FACTS

Plaintiffs Coalition for Open Democracy, League of Women Voters of New Hampshire, The Forward Foundation, Miles Borne, and Alexander Muirhead and Lila Muirhead, by their next friend Russell Muirhead (together, the "Open Democracy Plaintiffs" or "Plaintiffs") submit this Statement of Material Facts in opposition to Defendants' Motion for Summary Judgment.

### PREFATORY STATEMENT

Local Rule 56(a) requires a party seeking summary judgment to file "a short and concise statement of material facts, supported by appropriate record citations, as to which the moving party contends there is no genuine issue to be tried." A party "fails to comply" with this Court's local

rule when "summary judgment briefs go directly to arguing their positions, referring to certain facts as they pertain to each section of argument, rather than following the more customary (and helpful) format of prefacing argument with a statement of all the underlying facts of the case." *Evans v. Taco Bell Corp.*, No. CIV. 04CV103JD, 2005 WL 2333841, at *1 (D.N.H. Sept. 23, 2005) (cleaned up); *see Collins v. Dartmouth-Hitchcock Med. Ctr.*, No. 13-CV-352-JD, 2015 WL 268842, at *1 (D.N.H. Jan. 21, 2015) ("The plaintiffs' failure to follow the applicable local rule both unnecessarily complicated the process of assessing their objection to summary judgment and, to some extent, undermined the effectiveness of their arguments.").

While Defendants' motion purports to include a section titled "Statement of Material Facts," it only states the legislative history and roles of the Defendants—facts that are largely irrelevant to their standing-based arguments. In lieu of itemizing relevant facts regarding the Plaintiffs and their standing, Defendants leave a placeholder directing the Court to facts "identified herein where they apply to Defendants' arguments for summary judgment." Defs.' Mem. at 8–9; *see Auritt v. Auritt*, No. 2:18-CV-00471-DBH, 2020 WL 1956810, at *2 (D. Me. Apr. 23, 2020), *R. & R. adopted*, No. 2:18-CV-471-DBH, 2020 WL 2310898 (D. Me. May 8, 2020) ("[Defendant's] fail[ure] to comply with the requirement of [the rule] that a party seeking summary judgment file a statement of material facts citing record evidence in support thereof . . . in itself, is fatal to her bid for summary judgment"); *Evans*, 2005 WL 2333841, at *1 (concluding under this Court's Local Rules that "all of the properly supported material facts set forth in [the compliant party's] memorandum in support of the motion are deemed admitted for purposes of this order"). To assist the Court, the Open Democracy Plaintiffs have recreated the lengthy statement of facts proffered by Defendants, to which Plaintiffs provide responses and append their own concise statements of additional undisputed material facts.

**PLAINTIFFS' RESPONSES TO DEFENDANTS' STATEMENT OF MATERIAL FACTS & PLAINTIFFS' ADDITIONAL STATEMENTS OF UNDISPUTED MATERIAL FACTS**

**I.    Plaintiffs' Responses to Defendants' Background Facts**

1.    **Asserted Fact**: The parties have used "HB 1569" as shorthand to identify the changes to New Hampshire election law that went into effect on November 11, 2024. The enacted version contained 11 sections amending New Hampshire election law.

**Record Cite:** Ch. 378:1 (RSA 654:12 repealed and reenacted); Ch. 378:2 (RSA 654:7 repealed and reenacted); Ch. 378:3 (RSA 654:7-a (repealed and reenacted); Ch. 378:4 (RSA 659:27 repealed and reenacted); Ch. 378:5 (RSA 659 27-a repealed and reenacted); Ch. 378:6 (RSA 659:13, I(c) repealed and reenacted); Ch. 378:7 (RSA 659:13, II(b) – (e) amended); Ch. 378:8 (RSA 659:32 repealed and reenacted); Ch. 378:9 (RSA 5:6-d, III (deleted reference to repealed RSA 659:13, V); Ch. 378:10 (repealed RSA 659:30; 659:31; 660:17-a; 659:23-a; 659:13, II(a)(6) – (7); 659:13, III, IV & V).1 2024 Laws Ch. 378, HB 1569-FN; 2 Ch. 378:11 (establishing a 60-day effective date).

**Response:** Undisputed.

2.    **Asserted Fact:** Neither HB 1569 nor the parties' pleadings accurately reflect New Hampshire election law, however.

**Record Cite:** None

**Response:** Disputed. Sections 9 and 10 of HB 464 do not take effect until December 31, 2025, and RSA 654:12, VI as inserted by Section 5 does not take effect until February 1, 2026. Further, Defendants have not offered any nonspeculative evidence that the state will successfully operationalize any programs under HB 464 by these dates or any other date.

3.    **Asserted Fact:** On August 1, 2025, Governor Ayotte signed House Bill 464.

**Record Cite:** 2025 Laws Ch. 277, HB 464.

**Response:** Undisputed.

4.    **Asserted Fact:** Chapter 3 modifies the proof-of-citizenship requirement that HB 1569 repealed and reenacted [*block quote*].

**Record Cite:** Ch. 277:3.

**Response:** Disputed in part. While HB 464 amended the language of the proof of citizenship requirement to clarify that "proof that the applicant was previously or is currently registered to vote in a different town or ward in New Hampshire," that is not a substantive change. HB 1569 already clarified that previously registered applicants should not be required to prove citizenship. *See* RSA 654:12, III–IV.

5.    **Asserted Fact:** HB 464 amends two additional provisions that HB 1569 enacted or amended: Ch. 277:4 (amended RSA 654:12, III) and Ch. 277:5 (amended RSA 654:12, VI).

**Response:** Undisputed, but amendments to RSA 654:12 do not take effect until February.

6.    **Asserted Fact:** The new law also enhances the resources available to voter registrants to prove their eligibility.

**Record Cite:** None.

**Response:** Disputed. Defendants failed to provide a record citation.

7.    **Asserted Fact:** It authorizes local election officials' access to databases including the Statewide Voter Registration System ("SVRS"), Department of Motor Vehicles ("DMV"), and New Hampshire Vital Records, "to assist voters in providing proof of citizenship, age, domicile, and identity to the city and town clerks."

**Record Cite:** *Id.* (enacting RSA 654:12, VI).

**Response:** Disputed in part. Undisputed to the extent that the law speaks for itself. Disputed to the extent that Defendants have provided no evidence of whether or how such a system will be implemented. Instead, the record reflects undisputed expert opinions that "these changes do not significantly reduce the burdens on voters or potential registrants who may lack DPOC," and that "[a]ny such system is likely to be stressed on election day," such that "[e]ven conservative assumptions about processing times and administrative capacity show that voters will likely have to wait for hours for the system to process their data, and even a scaled up system is likely to be overwhelmed." Ex. A Ken Mayer Suppl. Report at 2, 5, 7.

8.      **Asserted Fact:** Moreover, state law now provides that "[t]he secretary of state shall work with the city and town clerks to ensure access [to these resources] on election day at the polling location."

**Record Cite:** *Id.* (enacting RSA 654:12, VI).

**Response:** Disputed in part. Undisputed to the extent that the law speaks for itself. However, Defendants have provided no evidence of whether or how this access to this system will be ensured. Instead, undisputed record shows that "many local officials do not have on-site SVRS access" or any access to the internet. Ex. B, Defs.' First Suppl. & Am. Resps. & Objs. To Pls.' Interrogs. at 18; Ex. C, Ken Mayer Report at 30. Moreover, the amendments to RSA 654:12, VI do not take effect until February.

9.      **Asserted Fact:** For almost 50 years, New Hampshire has required voter applicants provide documentary proof of their eligibility to vote [sic].

**Record Cite:** RSA 654:12.

**Response:** Disputed. Applicants could, until HB 1569, aver to their qualifications. *See* RSA 654:12, I (2024) (describing the "qualified voter affidavit").

10.     **Asserted Fact:** Prior to HB 1569, however, an applicant could choose to prove identity, age, or citizenship by executing a QVA.

**Record Cite:** *Id.* (repealed Nov. 11, 2024).

**Response:** Undisputed.

11.     **Asserted Fact:** For almost 15 years, New Hampshire law has required registered voters to present photo identification to obtain a ballot.

**Record Cite:** RSA 659:13.

**Response:** Disputed. Prior to HB 1569, a voter could sign a challenged voter affidavit if they did not have proof of identity when receiving a ballot. RSA 659:13 (2024).

12.     **Asserted Fact:** Prior to HB 1569, however, a voter could choose to prove his or her identity, or overcome a challenge to his or her eligibility after obtaining a ballot, by executing a CVA.

**Record Cite:** *Id.* (repealed Nov. 11, 2024)

**Response:** Undisputed.

13.     **Asserted Fact:** Before HB 1569 repealed these affidavits, local election officials were required to offer applicants, voters, and challenged voters the applicable affidavit forms.

**Record Cite:** *See, e.g.*, N.H. Election Procedure Man. at 1, 84 (EPM-V.2024.0)

**Response:** Undisputed.

14.     **Asserted Fact:** Executing a QVA required the affiant to attest to truthfulness with a signature and, in most instances, sit for a photograph.

**Record Cite:** *See, e.g., id.* at 30-33.

**Response:** Disputed as incomplete. More than just a signature, a registrant using the QVA had to swear and affirm their qualifications under penalty of voter fraud, subjecting them to imprisonment and thousands of dollars in fines. RSA 654:12, I (2024).

15.    **Asserted Fact:** An affiant could refuse to sit for a photograph if he or she executed an Affidavit of Religious Objection

**Record Cite:** *See, e.g., id.* at 31.

**Response:** Undisputed.

16.    **Asserted Fact:** A voter who checks in to vote without photo identification had to execute a CVA, subject to the same attestation and photograph requirements.

**Record Cite:** *See, e.g., id.* at 31-32.

**Response:** Disputed as unclear. Defendants' verb tenses are ambiguous. A "voter who checks in to vote" can no longer avail herself of a CVA under any circumstances.

17.    **Asserted Fact:** If any voter's age, citizenship, or domicile eligibility was challenged after receiving a ballot, and if the supervisors of the checklist or moderator ruled that the challenge was "well-grounded," the challenged person may only vote upon executing a CVA.

**Record Cite:** *See, e.g.*, *id.* at 79-80.

**Response:** Disputed as unclear. Defendants' verb tenses are ambiguous. This statement was true of challenged voters prior to HB 1569, but a successfully challenged voter can no longer execute a CVA. Further, prior to HB 1569, the standard moderators applied was whether "the challenge [wa]s well grounded." RSA 659:27, II (2024). The Election Procedures Manual defines that term in the negative: "not well grounded" means that "the available evidence makes it more likely than not that the voter is qualified to vote." Defs.' Ex. 39, SOS-482423, N.H. Election Procedure Man. at 80 (EPM-V.2024.0). HB 1569 modified the statutory standard moderators must

apply to voter challenges. It now asks whether "it is *more likely than not* that the challenge is well grounded," RSA 659:27 (emphasis added), which—applying the Election Procedure Manual's definition—must be interpreted to mean that it is "*more likely than not* that the available evidence *does not* make it *more likely than not* that the voter is qualified to vote."

18.     **Asserted Fact:** As with identity CVAs and registration QVAs, a challenged voter had to attest to the truthfulness of his or her affidavit.

**Record Cite:** *See, e.g.*, *id.* at 31-32.

**Response:** Disputed as incomplete. More than just a signature, a registrant using the CVA had to swear and affirm their qualifications under penalty of voter fraud, subjecting them to imprisonment and thousands of dollars in fines.  Defs.' Ex. 39, N.H. Election Procedure Man. at 315 (EPM-V.2024.0).

19.     **Asserted Fact:** David M. Scanlan is a defendant in both cases, in his official capacity as New Hampshire Secretary of State.

**Record Cite:** *OD* Compl. ¶ 54; *YM* Compl. ¶ 28.

**Response:** Undisputed.

20.     **Asserted Fact:** John M. Formella is a defendant in the *Open Democracy* case only, in his official capacity as New Hampshire Attorney General

**Record Cite:** *OD* Compl. ¶ 55.

**Response:** Undisputed.

21.     **Asserted Fact:** The Secretary is a constitutional officer and the state's chief elections officer.

**Record Cite:** N.H. Const. pt. II, art. 67; RSA 652:23.

**Response:** Undisputed.

22.    **Asserted Fact:** Attorney General Formella is the state's chief legal officer and responsible for enforcing state election laws.

**Record Cite:** RSA 7:6; RSA 7:6-c.

**Response:** Undisputed.

23.    **Asserted Fact:** The Secretary provides guidance to local election officials regarding implementation and execution of the provisions of HB 1569 and HB 464.

**Record Cite:** None.

**Response:** Disputed to the extent Defendants fail to provide a record citation. Further disputed because there is no evidence in the record of guidance from the Secretary of State on relevant provisions of HB 464.

24.    **Asserted Fact:** In addition to providing legal advice to the Secretary regarding interpreting and executing state election law, the Attorney General provides guidance to local election officials and the public through the Election Hotline.

**Record Cite:** None.

**Response:** Disputed to the extent Defendants fail to provide a record citation.

25.    **Asserted Fact:** The Attorney General also investigates allegations of wrongful voting.

**Record Cite:** None.

**Response:** Disputed to the extent Defendants fail to provide a record citation.

26.    **Asserted Fact:** If his investigation substantiates wrongful voting, the Attorney General has authority to issue cease and desist letters, levy civil fines, or prosecute criminal conduct.

**Record Cite:** None.

**Response:** Disputed to the extent Defendants fail to provide a record citation.

## II.     Plaintiffs' Additional Statement of Undisputed Background Facts

27.     HB 1569's imposition of documentary proof-of-citizenship ("DPOC") requirements for all registrants without exception, for federal, state and local elections makes New Hampshire's voting regime one of the most, if not the most, restrictive in the United States.  Ex. C, Mayer Report at 1, 7.

28.     An estimated more than 100,000 eligible New Hampshire residents either do not possess, or lack ready access to, the required documentation to prove citizenship. Ex. C, Mayer Report at 1, 7–10, 32.

29.     Even someone who possesses the underlying documents will have to present additional documentation such as a marriage certificate, divorce decree, or a court order if the name on their DPOC does not match their current legal name. By a more than a 10-1 ratio, this will affect women more than men. *Id.* at 1, 8–9, 32.

30.     Similar DPOC requirements in other states, including Kansas and Arizona, resulted in tens of thousands of eligible prospective registrants having their applications blocked. *Id.* at 1, 25, 32.

31.     New Hampshire's DPOC requirements will require many New Hampshire residents to spend time and what can amount to large amounts of money to obtain the necessary documentation. *Id.* at 1, 7–18, 32.

32.     HB 1569 has only been implemented in a small set of off-cycle municipal elections—low turnout local contests that bring out only the most reliable and active voters. Nevertheless, as of November, poll observers have been able to identify at least 244 voters who were prevented from registering and voting or had to make multiple trips to the polling place to

overcome HB 1569's burdens. This includes voters who lacked access to qualifying documentary proof of citizenship, dozens of already registered voters who were turned away despite their prior registration, and voters who possessed documentary proof but were turned away due to missing name change documentation. Ex. D, NHCVR Memo, April 14, 2025; Ex. E, NHCVR Memo, Nov. 14, 2025; Ex. C, Mayer Report at 26–27, 32. According to the Chief Investigator of the New Hampshire Attorney General's Office, there are many possible reasons why prospective voters who are turned away may not return to cast a ballot. Ex. F, Richard Tracy Dep. Tr. 44:22–45:13 (Oct. 23, 2025).

III.    **Plaintiffs' Response to Defendants' Facts Regarding Coalition for Open Democracy**

33.    **Asserted Fact:** Open Democracy engages in four core services to achieve its organizational mission: high school registration drives, a program called "Age Strong," campaign finance reform, and fair redistricting efforts.

**Record Cite:** Olivia Zink Dep. Tr. 27:8-25, 28:1-4 (Open Democracy R. 30(b)(6) Dep., Oct. 15, 2025).

**Response:** Disputed to the extent Defendants suggest those are Open Democracy's only core services. Open Democracy's core services also include recruiting, training, and deploying poll observers. Defs.' Ex. 29, Open Democracy Resps. to Defs.' First Interrogs. ("OD Interrog. Resps.") at 18, 24–25, 28 ; Defs.' Ex. 5, Olivia Zink Dep. Tr. 94:16–98:25 (Oct. 15, 2025). They also include educating voters about exercising their voting rights and registration requirements. Defs.' Ex. 29, OD Interrog. Resps. at 23; *see* Defs.' Ex. 5, Zink Dep. Tr. 33:1–19. Indeed, "voter education is something that [Open Democracy] do[es] throughout all of [its] core activities." Defs.' Ex. 5, Zink Dep. Tr. 31:12–14.

34.    **Asserted Fact:** In support of its high school voter registration services, "Open Democracy works with students to operate voter registration drives in approximately two dozen high schools across New Hampshire" annually.

**Record Cite:** Open Democracy's Resps. Interrogs. No. 9 (Sept. 15, 2025).

**Response:** Undisputed.

35.    **Asserted Fact:** The documentary evidence reflects no material resource allocation changes to Open Democracy's voter registration and education core activity in response to HB 1569.

**Record Cite:** *See* Open Democracy's Resps. Reqs. Prod. Docs. No. 12 (Aug. 20, 2025).

**Response:** Disputed. As a result of HB 1569, Open Democracy has diverted monetary and nonmonetary resources "to revise, reprint, and redistribute its voter education materials and retool its programming to explain the law's new requirements to voters." Defs.' Ex. 29, OD Interrog. Resps. at 28. HB 1569 required changing all Open Democracy's voter education documents, training materials, website, and social media content by removing references to the QVA and attempting to explain what documents are now required to register. Defs.' Ex. 5, Zink Dep. Tr. 50:25–51:17. Those edits, at the time of the deposition of Open Democracy's Executive Director Olivia Zink, required "about 56 hours" of staff time, which does not account for "the cost of reprinting" updated materials. *Id.* 51:23–52:3. Due to HB 1569, Open Democracy engaged in new outreach at a Job Corps program, food pantries, and college campuses, to reach populations likely to lack ready access to qualifying DPOC. *Id.* 63:14–23. This included developing new materials about "how to get a voucher from your town clerk in order to get a driver's license" because many students at the Job Corps program lack a driver's license. *Id.* 64:22–65:2. Open Democracy's first-time outreach at the Job Corps program, food pantries, and college campuses because of HB 1569

12

required "[a]dditional staff time" and expenditures for "additional materials" not encompassed in the 56 staff hours required to update materials. *Id.* 67:19–68:3.

36.    **Asserted Fact:** Executive Director Olivia Zink testified that Open Democracy's high school registration drive funding has not changed since HB 1569.

**Record Cite:** Zink Dep. 80:23-81:11.

**Response:** Undisputed.

37.    **Asserted Fact**: A grant funded 100% of its registration drive activities in 2024 ($90,000), and this grant was renewed for 2025 in the same amount.

**Record Cite:** *Id.*

**Response:** Undisputed.

38.    **Asserted Fact:** And the high school registration program continues, unabated by HB 1569.

**Record Cite:** *Id*. 80:1-5.

**Response:** Disputed. Open Democracy's high school voter registration drives are impeded in myriad ways by HB 1569. Defendants' claim is wholly unsupported by their record cite, Defs.' Ex. 5, Zink Dep. 80:1–5 ("Q. How does Open Democracy go about measuring whether it is successful in assisting eligible young people in exercising their voting rights? A. The scorecards that we spoke of before is one metric. Another metric is how many drives we've held . . ."). *See also* Resps. to ¶¶ 35, 40, 50, 59.

39.    **Asserted Fact:** Open Democracy's other activities or tools have continued without interruption as well, including phone banks, prison or jail Zoom sessions, New Hampshire Rebellion walking project, book club, and future voter scorecards in partnership with the Civics Center.

**Record Cite:** *Id.* 33:12- 19; 34:18-35:19; 35:20-36:9; 36:17-23; 36:24-37:17.

**Response:** Disputed to the extent that "without interruption" implies Open Democracy's voter education and other core services have not been impacted by HB 1569. *See* Resps. to ¶¶ 35, 49, 59.

40.     **Asserted Fact:** Open Democracy's expenses relating to voter registration drives and education include postcards and mailers to high schools, but these expenses have not changed.

**Record Cite:** *Id*. 42:14-22.

**Response:** Disputed. Open Democracy has allocated monetary and nonmonetary resources to revamp flyers, stickers, and other educational resources for high school voter registration drives and its voter education at the Jobs Corps program, food pantries, and college campuses. *See* Resps. to ¶¶ 35, 49, 59. As one example, Open Democracy spent $159.73 just to print new stickers with updated guidance on how to register to vote after HB 1569. *See* Ex. G, Open Democracy Order Invoice.

41.     **Asserted Fact:** Mailers can contain posters, a how-to guide for holding a registration drive, and a letter explaining the program.

**Record Cite:** *Id*. 42:23-24.

**Response:** Undisputed.

42.     **Asserted Fact:** Open Democracy also sends e-mails and calls high schools and local election officials to coordinate drives.

**Record Cite:** *Id*. 44:2-6.

**Response:** Undisputed.

43.     **Asserted Fact:** At the drives, Open Democracy offers students stickers and third party handouts, including official state voter information flyers and the Civics Center's "Democracy in a Box."

**Record Cite:** *Id*. 46:8-23.

**Response:** Undisputed.

44.     **Asserted Fact:** But Open Democracy does not have a budget line item for high school voter registration—it is subsumed into the mailing, postage, and printing line items.

**Record Cite:** *Id.* 45:17-46:2; 48:15-22.

**Response:** Undisputed.

45.     **Asserted Fact**: Although it is not entirely clear what Open Democracy's "Postage & Delivery" and "Printing & Copying" line items include, its budget has not changed between 2023 when high school voter registration was just a pilot program, and 2025 when the first HB 1569 elections occurred.

**Record Cite:** *See id.* 82:1-5; *compare* budgets NH_ORGS_00000124, NH_ORGS_00000114, *and* NH_ORGS_00000122; *and see* expenses NH_ORGS_00000146, NH_ORGS_00000133, *and* NH_ORGS_00000148.

**Response:** Disputed. Open Democracy's "Postage & Delivery" line item includes costs related to shipping materials to high schools for voter registration events. *See* Defs.' Ex. 5, Zink Dep. 45:20–23. The "Printing & Copying" line item encompasses, unsurprisingly, costs to print and copy materials for high school voter registration events, as well as other voter education programming. *See, e.g.*, *id.* 45:5–11 (explaining that "[s]ome high schools need us to print materials"); *id.* 46:5–47:23 (describing how Open Democracy prints and distributes materials at voter registration drives, including the Secretary of State's handout, a disability rights toolkit, the

Civics Center's "Democracy in [a] Box" kit, and its own handouts); *id.* 47:14–23 (for Open Democracy's high school voter registration handout, it "develop[s] the materials, produce[s] it, cop[ies] it, [and] get[s] it to the high school to be distributed").

46.     **Asserted Fact:** Open Democracy's pre-HB 1569 educational materials "encouraged" registering voters to bring a birth certificate, passport, or naturalization papers when registering to vote, though a QVA was an option.

**Record Cite:** *See* Zink Dep. 59:24-60:6.

**Response:** Undisputed.

47.     **Asserted Fact:** The only post-HB 1569 change to its educational materials was removing references to the QVA option for proving citizenship and domicile.

**Record Cite:** *Id.* 51:4-13.

**Response:** Disputed. Open Democracy spent resources "creat[ing] new materials that can be provided to eligible high school students in advance of a registration drive" including "specific instructions to bring approved forms of documentation required by HB 1569." Defs.' Ex. 29, OD Interrog. Resps. at 28. Open Democracy had to overhaul "almost all of [its] documents, not just the high school voter registration documents." Defs.' Ex. 5, Zink Dep. Tr. 51:10–13.

48.     **Asserted Fact:** Open Democracy spent 56 hours of staff time to: update how-to-register on the website; update two or three videos on the website; update a dozen or more social media graphics; update the high school registration drive poster, letter to parents, and "communications with supervisors" of the checklist; update three TikTok videos; update phone scripts for volunteers calling schools; and update PowerPoint slides (eliminating the asterisk indicating that affidavits can serve as proof of voter eligibility).

**Record Cite:** *See id.* 51:24-25; 60:22-62:23.

**Response:** Disputed to the extent Defendants suggest this is the only staff time Open Democracy has spent to address the impacts of HB 1569. As Ms. Zink explained at her deposition, the 56 hours were "just the hours it took to update materials" prior to the deposition, and did not include staff time preparing for additional voter education outreach at the Job Corps program, food pantries, or college campuses. Defs.' Ex. 5, Zink Dep. Tr. 67:19–68:3.

49. **Asserted Fact:** It does not have a record of resources expended to adapt to the new law, except for the 56 staff hours.

**Record Cite:** *See id.* 51:24-52:2 (56 hours of staff time); 45:1-46:4 (high school voter registration staff time is broken out, but not printing or other expenses).

**Response:** Disputed. As disclosed to Defendants, it cost Open Democracy nearly $160, so far, to print new stickers in response to HB 1569. *See* Ex. G, Open Democracy Order Invoice. Moreover, Open Democracy offered to provide more granular accounting of its resources expended to address the impact of HB 1569, but Defendants' Counsel declined that offer. When Counsel asked Ms. Zink about the cost to produce each high school handout package, Ms. Zink offered to "pull . . . records" about the cost to materials for high school voter registration drives. Defs.' Ex. 5, Zink Dep. Tr. 48:2–10. Counsel for Defendants stated: "*I don't think that's going to be necessary*. Thank you. I'm just trying to get a broad picture of, you know, Open Democracy's operations and what these sorts of operations cost." *Id.* 48:11–14 (emphasis added).

50. **Asserted Fact:** Voter election laws change on a regular basis, so Open Democracy always updates its materials to reflect amendments to public-facing election laws.

**Record Cite:** *See id.* 100:15-19.

**Response:** Disputed to the extent Defendants suggest HB 1569 did not impact Open Democracy's core services because it was a change to election laws. As Ms. Zink explained,

"election laws change on a regular basis, but this was the most dramatic change that we have seen." Defs.' Ex. 5, Zink Dep. 100:15–17. Crucially, past election law changes, including a bill that changed how affidavit ballots were cast "didn't prevent everyone from casting a ballot." *Id.* 103:9–19. HB 1569's passage, by contrast, means that "now voters are unable to cast a ballot on election day." *Id.* In other words, HB 1569—and its impact on Open Democracy—is different in scope and kind from previous election law changes.

51.    **Asserted Fact:** For example, Open Democracy updated its materials in 2016 to reflect accurate photo identification law.

**Record Cite:** *See id.* at 100:21-25.

**Response:** Undisputed.

52.    **Asserted Fact:** Also, it updated its educational and voter support materials to reflect the COVID election law changes in 2020.

**Record Cite:** *See id.* 100:1-23.

**Response:** Undisputed.

53.    **Asserted Fact:** The COVID changes necessitated: website updates; social media graphics updates; phone scripts for volunteers updates; and PowerPoint slide updates.

**Record Cite:** *Id.* 100:24-102:15.

**Response:** Undisputed.

54.    **Asserted Fact:** These updates are nearly identical to the post-HB 1569 updates except for videos, high school handouts, and TikTok videos, because Open Democracy did not produce those in 2020.

**Record Cite:** *Id.* 101:5-15.

**Response:** Disputed. HB 1569 was different in scope and kind from previous election laws that required Open Democracy to change its educational materials. *See* Resp. to ¶ 50.

55. **Asserted Fact:** "Open Democracy's mission is to bring about and safeguard political equality for the people of New Hampshire."

**Record Cite:** *OD* Compl. ¶ 22; *see also* Zink Dep. 20:19-24.

**Response:** Undisputed.

56. **Asserted Fact:** Open Democracy has three main goals: ensuring transparency in campaign donations, securing fair districting maps, and safeguarding the freedom to vote.

**Record Cite:** *See* Zink Dep. 20:19-24.

**Response:** Disputed to the extent this suggests Open Democracy only has three main goals. *See* Resp. to ¶ 34.

57. **Asserted Fact:** HB 1569 does not regulate Open Democracy's mission or goals. As Ms. Zink testified, "Open Democracy can't register voters. We have to invite the town clerk or the supervisors of the checklist to register voters. So we are facilitating the town clerk or the supervisor of the checklist to come to the high school to sort of complete the forms with the young voters."

**Record Cite:** Zink Dep. 38:9-14.

**Response:** Disputed. Ms. Zink answered that HB 1569 does not *legally require* it to "educate voters" or engage in other core services. Defs.' Ex. 5, Zink Dep. Tr. 66:10–14. HB 1569 does, however, impose legal restrictions that necessarily impede Open Democracy's pursuit of its core activities. For instance, as the Department of Justice's 30(b)(6) witness, Election Law Unit Chief Brendan O'Donnell, explained: "[I]f they are going to continue to provide materials to the public about voter registration requirements, they should make sure that they are correct and

accurately reflect current New Hampshire law." Ex. H, Brendan O'Donnell Dep. Tr. 324:12–17 (Oct. 24, 2025). "I know that they . . . ultimately need the right information, but it may be that they show up and there's another way for them to do something, but I agree that if anyone is providing information about voter registration procedures, they need to be correct as to current law." *Id.* 326:12–18. Other impediments are described *passim*.

58.     **Asserted Fact:** The organization asserts that "HB 1569 renders these services less effective. Students wishing to register have been turned away from Open Democracy drives for lacking qualifying documentary proof."

**Record Cite:** OD Interrog. Resps. No. 9.

**Response:** Undisputed.

59.     **Asserted Fact:** Open Democracy cannot identify any core activity or service from which it diverted or redirected resources, or activities that have been curtailed due to HB 1569.

**Record Cite:** OD Interrog. Resps. No. 11; Zink Dep. 131:2-132:3.

**Response:** Disputed. Open Democracy had planned work on campaign finance reform— another core activity—which it wasn't able to accomplish because Open Democracy instead "spent time and energy educating voters on the new law and how they can cast a ballot at town meetings." Defs.' Ex. 5, Zink Dep. 71:15–21. Open Democracy had to forego this work due to the burden of HB 1569 because "there's only so many hours in the day." *Id.* 69:21–24. Because of HB 1569, Open Democracy also had to "draw[] resources away from [its] work on [] other priorities, such as . . . efforts to secure fair districting maps." Defs.' Ex. 29, OD Interrog. Resps. at 28.

60.     **Asserted Fact:** Open Democracy freely admits that HB 1569 "did not say 'Open Democracy must, you know, educate voters.' We -- we have educated voters, and we had to change how we educate voters because it's now more difficult in order for you to register to vote."

20

**Record Cite:** Zink 66:10-14.

**Response:** Undisputed.

61.    **Asserted Fact:** So, Open Democracy's claim that HB 1569 caused it to create new programming with Job Corps, college, and food pantry outreach initiatives, falls flat.

**Record Cite:** *Contra* Zink Dep. 63:14-23.

**Response:** Disputed as a legal argument. Open Democracy did create these new programs. *See* Defs.' Ex. 5, Zink Dep. 63:16–64:5.

62.    **Asserted Fact:** At best, Open Democracy made unspecified, voluntary changes to *how* they educate voters, but that doesn't change that Open Democracy continued to educate voters even after the enactment of HB 1569.

**Record Cite:** *See id.* 63:23-64:5; 64:17-65:2 & 68:14-16.

**Response:** Disputed to the extent Defendants make a legal argument. Open Democracy's voter education programming was impacted by HB 1569; some of the changes to its programming because of HB 1569 include going to the Job Corps program for the first time, sending volunteers to food pantries, and doing voter education outreach at colleges. *See* Defs.' Ex. 5, Zink Dep. 63:16–64:5. These reflect how Open Democracy has "changed some of [its] programming to try to capture more young voters or first-time voters" who are likely to be disenfranchised by HB 1569. *Id.* 64:1–5.

63.    **Asserted Fact:** It merely speculates that "[c]hallenged voters are especially unlikely to be able to rebut a surprise challenge because they have already proven their qualifications when registering and therefore have no expectation of needing to carry proof rebutting each of the ten statutory grounds for challenge on Election Day."

**Record Cite:** OD Interrog. Resps. No. 3.

64.    **Response:** Disputed to the extent Defendants describe this inevitability as speculation. Voters typically do not know prior to going to their polling place that their eligibility may be challenged. Ex. F, Tracy Dep. Tr. 73:20–74:7; Ex. I, David Scanlan Vol. II Dep. Tr. 463:6–9 (Oct. 22, 2025).  Most registered voters will not be carrying documents proving their eligibility, other than their ID, when they are attempting to vote, because they will have already proven their qualifications when they previously registered to vote. Defs.' Ex. 29, OD Interrog. Resps. at 10–11; Ex. F Tracy Dep. Tr. 74:8–75:2; Ex. I, Scanlan Vol. II Dep. Tr. 463:10–13.

65.    **Asserted Fact:** Moreover, Plaintiff provide evidence that a successfully challenged voter has not been able to access superior court in time to cast a ballot. Instead, the Plaintiff speculates that a hypothetical voter may be harmed by a voter challenge if state courts do not stay open past 4:00 p.m. on election day and that the voter may not qualify for a waiver of court filing fees.

**Record Cite:** *See* OD Interrog. Resps. No. 3.

**Response:** Disputed. Chief Investigator Tracy conceded that meaningful judicial relief is a critical part of the process because some local election officials will make mistakes on election day, Ex. F, Tracy Dep. Tr. 108:20–109:9, that requiring a voter to obtain judicial relief on election day "could deter some" voters, *id.* 105:7–13, that "it may be difficult" for some voters to find an attorney, *id.* 106:6–10, that attorneys in New Hampshire charge "in the hundreds [of dollars] per hour," *id.* 106:21–107:1, that asking an attorney to file a challenge to a moderator's decision would take at least a few hours, *id.* 107:2–6, and that it "unfortunately may cost" some lawful voters at least a $325 filing fee to obtain necessary judicial relief, *id.* 107:16–108:10.

## IV.    Plaintiffs' Additional Statement of Undisputed Facts Regarding Coalition for Open Democracy

66.    Prior to the enactment of HB 1569, Open Democracy could assist and educate prospective voters who lacked ready access to qualifying DPOC, including by directing high schoolers to use the QVA if they lacked access to qualifying proof of citizenship at high school voter registration drives. Defs.' Ex. 29, OD Interrog. Resps. at 23.

67.    "HB 1569 renders these services less effective" because they can no longer rely on the QVA. *Id.*

68.    Following HB 1569, "the number of registrations processed through Open Democracy's High School registration drives has fallen noticeably compared to past years." Defs.' Ex. 29, OD Interrog. Resps. at 23.

69.    As a result of HB 1569, "Students wishing to register have been turned away from Open Democracy drives for lacking qualifying proof" of citizenship. *Id.*

70.    In fact, "this spring," at one of Open Democracy's drives, "more students were turned away [and] not able to register to vote at the high school voter registration drive, than actually registered the day of the voter registration drive." Defs.' Ex. 5, Zink Dep. Tr. 89:1–8. "[T]hese were students that were excited, came up to the Manchester election worker, wanted to come register, and were told they were unable to register because they didn't bring all of the documents needed, despite educational efforts in the school to let students know what they needed to bring in order to register to vote." *Id.* 89:9–15. Specifically, "at Manchester high school, three students were able to register to vote, and in one other high school one student was able to register to vote. And many more were turned away." *Id.* 92:15–19.

71.    In addition to high school voter registration drives, "Open Democracy also provides an array of services that aim to help a broader range of eligible New Hampshirites in registering and exercising their voting rights." Defs.' Ex. 29, OD Interrog. Resps. at 24. These include

attending community events, conducting phone banks and hosting Zoom sessions to educate prospective voters in a variety of forums. *Id.*

72.    As part of its core voter education services, "Open Democracy has provided services to people who have lost critical documentation in home fires, unhoused individuals who lack access to documentary proof of citizenship, citizens who have recently moved to a new town and could not access or locate the necessary documents, and more." *Id.*

73.    "Before HB 1569, Open Democracy could provide registration assistance to such people by encouraging them to use the Qualified Voter Affidavit. HB 1569 directly harms Open Democracy's ability to provide services to assist these types of eligible individuals with registering to vote or casting a ballot." *Id.*

74.    At the time of Ms. Zink's deposition (prior to the November municipal elections), Open Democracy identified over 100 voters who were turned away from registering or voting because of HB 1569's removal of the QVA. Defs.' Ex. 5, Zink Dep. Tr. 88:4–13; *see id.* 94:6–95:4. These included individuals who Open Democracy staff or volunteers personally witnessed turned away in the spring town elections. *Id.* at 72:9–74:20; *see also id.* 138:16–25.

75.    Prior to HB 1569, Open Democracy's Poll observers could help challenged voters cast a ballot using a CVA. Defs.' Ex. 29, OD Interrog Resps. at 10. As a result of HB 1569's removal of the CVA, "eligible voters face the threat of disenfranchisement by unexpected challenges; accordingly, Open Democracy needs to field more observers for future elections in order [to] continue providing services that protect qualified voters on election day." *Id.* at 25.

76.    Before HB 1569, Open Democracy would "run the poll observing program in even years, but this year, [Open Democracy] had to do it in an odd year" because of HB 1569's changes to the law. Defs.' Ex. 5, Zink Dep. Tr. 71:24–72:4.

77.    Because of HB 1569, Open Democracy has been forced to "change its poll observer trainings and re-educate those who have already been trained as poll observers." Defs.' Ex. 29, OD Interrog. Resps. at 28.

78.    For its "poll observer services to be effective after HB 1569, Open Democracy needs to recruit and train more observers in all elections to ensure that there is a trained observer in every polling location in the state," *id.*, whereas it previously focused poll observer efforts on college towns alone, *id.* at 25.

79.    These changes to poll observer trainings and vastly increased breadth of its poll observer deployment have required Open Democracy "to redirect scarce staff time and financial resources away from other organizational priorities in order to recruit more volunteers." *Id.* at 28. It also "harms Open Democracy's poll worker recruitment efforts, as the organization must re-assign volunteers who would otherwise serve as poll workers, instead training them to serve as poll observers." *Id.*

80.    Even with these changes to its poll observer program, "Open Democracy's poll observing services are substantially less effective at safeguarding voters' rights because HB 1569 makes it immeasurably harder for any number of poll observers to protect voters from disenfranchisement in the event of an eligibility challenge." Defs.' Ex. 29, OD Interrog. Resps. at 25.

## V.    Plaintiffs' Response to Defendants' Fact Regarding the League of Women Voters New Hampshire (the "LWV-NH")

81.    **Asserted Fact:** The League of Women Voters identifies its core activities as: "Voter Services which includes voter information, candidate forums, answering voter's questions via social media, via e-mail, via phone calls or in person" and "testify[ing] in the legislature on appropriate legislation on which [it] ha[s] national or state positions."

**Record Cite:** Elizabeth Tentarelli Dep. Tr. 27:13-19 (League of Women Voters R. 30(b)(6) Dep., Oct. 15, 2025).

**Response:** Disputed to the extent Defendants suggest that those are LWV-NH's only core services. LWV-NH performs several services and activities in support of its mission to encourage informed and active participation in government. For example, LWV-NH also conducts educational events aimed at increasing democratic participation, including for example, presentations about recent election law changes led by LWV-NH's President at the Ossippee Library on September 15, 2025. Ex K, LWV-NH Talks & Tabling Events 2024. The LWV-NH also participates in tabling at community events across the state, where LWV-NH's members and volunteers talk to New Hampshire residents about voting and registering, answer questions from the general population, and hand out materials. Defs.' Ex. 30, LWV-NH Responses to Interrogs. ("LWV-NH Interrog. Resps.") at 16–18.

82.     **Asserted Fact:** As part of its voter services, the League "distribut[es] information in print and social media."

**Record Cite:** *Id.* 27:21-22.

**Response:** Disputed to the extent Defendants suggest print and social media are the only means by which LWV-NH distributes voter information. LWV-NH also sends out newsletters and alerts with information relevant to elections, voting, and policy changes. Ex. L, August 2024 "NH Voter" Newsletter; Ex. M, March 2024 Legislative Alert; Defs.' Ex. 6, Tentarelli Dep. Tr. 42:13–18; 46:9–16. The LWV-NH also provides information via its website. Defs.' Ex. 6, Tentarelli Dep. Tr. 32:6–11; 42:20–22; 53:6–8.

83.    **Asserted Fact:** It provides information to voters regarding voter registration, "how to get a ballot, what documents [voters] need, finding [voters'] local town clerk's office," and "try[ing] to provide" information on "anything that people need information on."

**Record Cite:** *Id.* 27:23-28:10.

**Response:** Undisputed.

84.    **Asserted Fact:** It will "sometimes hold issue-based forums" with "speakers on a topic of current interest."

**Record Cite:** *Id.* 28:20-29:8.

**Response:** Undisputed.

85.    **Asserted Fact:** And, "in addition to testifying [before the legislature], [it] alert[s] the public through [its] legislative alerts to legislation that is being heard in committee or that is about to be voted on in the legislature or that the Governor is either going to . . . veto or sign onto."

**Record Cite:** *Id.* 29:13-21.

**Response:** Undisputed.

86.    **Asserted Fact:** The League continues to engage in all these activities, and the enactment of HB 1569 has not interfered with its ability to do so.

**Record Cite:** *Id.* 47:11-14.

**Response:** Disputed. HB 1569 has interfered in the activities of the LWV-NH in numerous ways. HB 1569 has required LWV-NH to revise, reprint, and redistribute its voter education materials, create new social media and newsletter content, and retool its programming to attempt to explain the law's new requirements to voters. Defs.' Ex. 30, LWV-NH Interrog. Resps.  at 20–21; Defs.' Ex. 6, Tentarelli Dep. Tr. 60:14–18. LWV-NH also had to test and redesign its materials after HB 1569 to remedy ineffectiveness. Defs.' Ex. 30, LWV-NH Interrog. Resps. at 20–21;

Defs.' Ex. 6, Tentarelli Dep. Tr. 62:16–20. Further, HB 1569's elimination of the QVA prevents LWV-NH from assisting individuals who cannot access documentary proof of citizenship. Defs.' Ex. 30, LWV-NH Interrog. Resps. at 16–18. HB 1569 also introduces ambiguities, complexities, and the possibility for disparate application of laws from town to town and election official to election official that directly harm LWV-NH's ability to provide clear information to voters. *Id.*

87.     **Asserted Fact:** President Elizabeth Tentarelli testified that HB 1569 does not regulate the League of Women Voters' actions.

**Record Cite:** *Id.* 47:7-14.

**Response:** Undisputed to the extent Defendants mean direct legal regulation.

88.     **Asserted Fact:** She testified that the League is "constantly testifying either for or against bills."

**Record Cite:** *Id.* 49:9-11.

**Response:** Undisputed.

89.     **Asserted Fact:** HB 1568 did not stop the League from continuing to educate voters through print, social media, and in-person events.

**Record Cite:** *Id.* 51:18-66:8.

**Response:** Disputed. *See* Resp. to ¶ 86.

90.     **Asserted Fact:** It updated its print and online resources following the enactment of HB 1569, but Ms. Tentarelli acknowledged that it does this any time there is a "major" change in an election law, that its print resources had previously updated in 2022 and 2024, and that the 2025 changes also addressed a different amendment to an election law that is not subject to this litigation.

**Record Cite:** *Id.* 52:20-53:8; *id.* 54:21-55:3; *id.* 58:14-60:11; *id.* 60:19-62:14.

**Response:** Undisputed.

91.     **Asserted Fact:** She testified that updating the website did not cost any money at all, that updating the print resources did not cost "a huge amount of money," and that "boosting" social media posts cost around $150 for five days.

**Record Cite:** *Id.* 50:7-10; 94:4-97:15.

**Response:** Disputed in part, to the extent that this does not account for the costs of the time Ms. Tentarelli spent on updating the website, print materials, and social media posts.  Ex. N, Tentarelli Time Sheet.

92.     **Asserted Fact:** She testified that these are common actions that the League undertakes in other contexts as part of its core activities.

**Record Cite:** *See, e.g.*, *id.* 37:14-22; 37:23-38:15; 50:7-10; 58:14-60:11.

**Response:** Disputed. Ms. Tentarelli did not testify as to the frequency or common nature of any of these actions. Ms. Tentarelli testified that she "know[s] how to" update the website and "mostly I do this now by myself," Defs.' Ex. 6, Tentarelli Dep. Tr. 37:18–22, that LWV-NH has boosted Facebook posts "for advocacy efforts," *id*. at 50:7–12, and explained changes to the voter information flyers in 2024 and 2025, *id.* at 58:14–60:11.

93.     **Asserted Fact:** The League of Women Voters' mission is "to empower voters and defend democracy."

**Record Cite:** Tentarelli Dep. 26:15-16.

**Response:** Undisputed.

94.     **Asserted Fact:** As Ms. Tentarelli testified, "in New Hampshire there is no third party voter registration so the league cannot hold its own voter registration drive."

**Record Cite:** Tentarelli Dep. 43:14-17.

**Response:** Undisputed.

95.    **Asserted Fact:** Instead, it assists voters "in the sense that we try to answer their questions."

**Record Cite:** Tentarelli Dep. 33:18-21.

**Response:** Disputed to the extent it implies that answering questions is all LWV-NH does in regard to voter registration. *See* Resps. to ¶¶ 81–82.

96.    **Asserted Fact:** HB 1569 does not regulate the League's mission or goals

**Record Cite:** Tentarelli Dep. 47:11-14.

**Response:** Undisputed.

97.    **Asserted Fact:** After passage of HB 1569, the League continued its operations as usual, "inform[ing] voters of what they needed to do, of what the change was. We also had to reassure many voters that if they were already registered this did not affect them and I think that was the hardest thing."

**Record Cite:** *See id.* 51:18-22.

**Response:** Disputed as to the assertion that "the League continued its operations as usual" after HB 1569. *See* Resp. to ¶ 86.

98.    **Asserted Fact:** The League's principal concern is that HB 1569 "can affect [its] members when the process doesn't go as smoothly as it should such as the person who was dropped from the voting rolls now thought she needed citizenship to get back on the voting rolls."

**Record Cite:** *See id.* 77:17-21.

**Response:** Disputed as to the assertion that this is LWV-NH's "principal" concern. Ms. Tentarelli testified, "I believe it can affect our members when the process doesn't go as smoothly

as it should such as the person who was dropped from the voting rolls [who] now thought she needed citizenship to get back on the voting rolls." Defs.' Ex. 6, Tentarelli Dep. Tr. 77:17–23.

99.    **Asserted Fact:** Ms. Tentarelli is concerned for all voters when the annual purge comes in April 2026.

**Record Cite:** *See id.* 78:4-9.

**Response:** Undisputed.

100.    **Asserted Fact:** The League of Women Voters alleges that "it has and will continue to be forced to redirect and expend significant resources to address HB 1569's effect on its core services, to the detriment of its other priorities[,]" but it offers no evidence of that.

**Record Cite:** League of Women Voters' Resps. Interrogs. No. 11 (Sept. 15, 2025).

**Response:** Disputed. As an example, LWV-NH produced expenses showing it spent more on voter services in May and June 2025 ($813.5) than it did in October and November 2024 leading into a major Presidential Election ($681.55), Defs.' Ex. 25, NH_ORGS_00001437, and a timesheet showing how much time Ms. Tentarelli spent on activities responding to HB 1569, Ex. N, Tentarelli Time Sheet. Such time and resource allocations draw away from work on other priorities. Defs.' Ex. 30, LWV-NH Interrog. Resps.  at 20–21.

101.    **Asserted Fact:** The documentary evidence reflects no material resource allocation changes to the League's voter assistance core activity in response to HB 1569. It updated its written and electronic communications to reflect the change in the law, but it has not created new written materials or programs.

**Record Cite:** *See* Tentarelli Dep. 52:20-53:8; 55:12-19

**Response:** Disputed. *See* Resp. to ¶ 100.   LWV-NH created new voter registration information flyers to reflect the state of the law after HB 1569. Ex. O, LWV-NH "Voting in New

Hampshire" 2025, Defs.' Ex. 6, Tentarelli Dep Tr. 52:20–53:8; 55:12–19. LWV-NH also created a Facebook campaign to inform citizens about the requirements of HB 1569 and began initiatives to encourage already-registered voters to take materials and share them with neighbors and community members who are impacted. Defs.' Ex. 30, LWV-NH Interrog. Resps. at 20–21.

102.  **Asserted Fact:** The League routinely updates to materials when election laws change that require the voters' attention.

**Record Cite:** *See id.* 54:19-55:3.

**Response:** Disputed. Ms. Tentarelli testified that they update the handout on registering "only if a major election law has changed, an election law that affects the voter." Defs.' Ex. 6, Tentarelli Dep. Tr. 54:19–23.

103.  **Asserted Fact:** There is no evidence that these minor and routine updates diverted resources from any other program.

**Record Cite:** *See id.* 55:4-11.

**Response:** Disputed. *See* Resp. to ¶ 86.

104.  **Asserted Fact:** According to the League's line item that would reflect printing and web costs, the applicable line item identified by Ms. Tentarelli, Voter Service, indicates that when compared to expenses in the July 2023 to June 2024 period, the League spent less in the July 2024 to June 2025 period, despite passage and implementation of HB 1569 in that period.

**Record Cite:** *Compare* NH_ORGS_00001437 *with* NH_ORGS_00000094.

**Response:** Disputed. Defendants appear to mislabel their Exhibit 25, which the Defendants titled "LWV 2023-2024 Expenses - NH_ORGS_00001437" but actually reflects the LWV-NH's expenses for July 1, 2024 through June 30, 2025, and Exhibit 26, which the Defendants titled "LWV 2024-2025 Expenses NH_ORGS00000094" but actually reflects expenses for July 1, 2023

through June 28, 2024. Defs.' Ex. 26, NH_ORGS_00000094. For the period of July 1, 2023 through June 28, 2024, the LWV-NH spent $1,524.00 on voter service and education. For the period of July 1, 2024 through June 30, 2025, the LWV-NH spent $1,569.60 on voter services and education. Defs.' Ex. 25, NH_ORGS_00001437. Further, the LWV-NH spent more on voter services in May and June 2025 ($813.5) responding to HB 1569 than it did in October and November 2024 leading into a major Presidential Election ($681.55). *Id*.

## VI.     **Plaintiffs' Additional Statement of Undisputed Facts Regarding LWV-NH**

105.    To achieve its mission, the LWV-NH provides "unbiased, nonpartisan voter services and citizen education. The organization creates and distributes a wide array of information about elections and the voting process through printed materials, postings on its website and social media, trained volunteers, and tabling at community events across the state." Defs.' Ex. 30, LWV-NH Interrog. Resps. at 16–18; Defs.' Ex. 6, Tentarelli Dep. Tr. at 27:13–17.

106.    Prior to HB 1569, LWV-NH was routinely able to assist individuals who do not possess or cannot access documentary proof of citizenship by informing them they were still able to register to vote, thanks to the availability of the QVA. Defs.' Ex. 30, LWV-NH Interrog. Resps. at 13–14, 16–18, 25; Ex. P, LWV-NH "Voting in New Hampshire" 2024.

107.    HB 1569's elimination of the Qualified Voter Affidavit directly impedes LWV-NH's ability to provide services to assist individuals without documentary proof of citizenship, as for individuals that lack access to qualifying documentation, no amount of voter services or education will help them—they will be disenfranchised. Defs.' Ex. 30, LWV-NH Interrog. Resps. at 13–14, 16–18, 25; Ex. J, Piecuch Dep. Tr. 233:20–234:3 (acknowledging that there is no exception to the documentary proof of citizenship requirement for a new registrant); Ex. Q, SOS Guidance, HB 1569 – Frequently Asked Questions at #4. Since the passage of HB 1569, LWV-

NH has witnessed widespread confusion about the requirements of HB 1569 when tabling in person and from members and the public in comments on their social media posts and by email. Defs.'Ex. 6, Tentarelli Dep. Tr. 26:15–16 91:18–92:2; Defs.' Ex. 30, LWV Resp. to Interrogs. at 8–9, 10.

108.    LWV-NH has spoken with citizens, particularly women who changed their name upon marriage, who are concerned that the name on their birth certificate does not match their current identification. Defs.'Ex. 6, Tentarelli Dep. Tr. 63:8–19; Defs.' Ex. 30, LWV Resp. to Interrogs. at  4.

109.    A married woman who took her husband's last name upon marriage, if relying on their birth certificate or passport in their maiden name to prove citizenship, now needs to show evidence of her name change, such as a marriage license, to register to vote. Ex. J, Piecuch Dep. Tran. at 241:11–242:25; Ex Q, SOS Guidance, HB 1569 – Frequently Asked Question at #8. Without evidence of their name change, through a copy of their marriage license or divorce decree, or a passport in their married name, they will not be able to register to vote. *Id.*; *see also* Defs.' Ex. 30, LWV Resp. to Interrogs. at 1.

110.    LWV-NH has encountered citizens who were never issued a birth certificate, such as Bob Davies, who never had a birth certificate due to issues with closed adoption records in the state of New York.  Ex. R, Tentarelli Letter to the NH Senate Election Law and Municipal Affairs Committee.

111.    Due to ambiguity in the law and a lack of guidance, LWV-NH does not know what the law means by "other reasonable documentation which indicates the applicant is a United States citizen," which hinders LWV-NH's ability to provide to clear voter information. Defs.' Ex. 30, LWV Resp. to Interrogs. at 13–14.

112.    The state has not been able to define what documents satisfy the "other reasonable documentation" standard to prove citizenship. ECF No. 72 at 101–03 (hearing transcript which reflects the Defendants' counsel unable to describe what documentation he could present to register to vote outside of a passport or birth certificate); Ex. S, Fitch Dep. Tr. 97:4–102:9 (Oct. 27, 2025) (testifying state had not made any decision on what guidance to provide about "other reasonable documentation" by the time Mr. Fitch retired from his role in May 2025).

113.    Due to the lack of clarity or effective public guidance, LWV-NH has changed its educational communications and materials to encourage voters who cannot access enumerated documentary proof to contact the Secretary of State directly for assistance. For instance, it's "How to Register to Vote" webpage instructs individuals who "don't have papers to prove . . . citizenship" to "[c]onsult the Secretary of State for guidance" because "HB 1569, passed in 2024, gives little option to people without these documents." Defs.' Ex. 30, LWV Resp. to Interrogs. at 20.

114.    LWV-NH has also created additional social media posts seeking to combat confusion around HB 1569's documentary proof requirements, and has spent money, to have those posts "boosted" by Facebook, which allows the posts to be designated to reach a statewide audience. Defs.' Ex. 30, LWV Resp. to Interrogs. at 11; Defs. Ex.6, Tentarelli Dep. Tr. 50:7–10; 94:4–97:15; Ex. T, LWV-NH Boosted Facebook Summary.

115.    Ms. Tentarelli is the only paid staff member of the LWV-NH.  Defs. Ex.6, Tentarelli Dep. Tr. 23:4–6.

116.    Ms. Tentarelli is the one to perform most actions taken in response to HB 1569, such as updating the website, updating and redistributing materials, posting on social media, and providing updated information to volunteers. Defs.' Ex. 6, Tentarelli Dep. Tr. 37:14–22

(discussing process to update website); *id.* 37:23–38:15 (discussing social media); *id.* 58:14–60:11 (discussing process to update voter information flyers).

117.    Tentarelli has devoted significant time to making changes to LWV-NH's voter information handouts, posting to social media, attending events explaining the changes, and performing other actions necessary for LWV-NH to respond to the impact of HB 1569. Defs.' Ex. 30,  LWV Resp. to Interrogs. at 20–21; Ex. N, Tentarelli Timesheet.

118.    Ms. Tentarelli expects to continue to devote substantial time to these efforts, particularly as more high-participation elections approach, and any time she spends on efforts relating to HB 1569 detracts from time she can spend on other LWV-NH priorities. Defs.' Ex. 30, LWV Resp. to Interrogs. at 20–21.

## VII.    Plaintiffs' Response to Defendants' Facts Regarding The Forward Foundation

119.    **Asserted Fact:** Like the other Organizational Plaintiffs, Forward Foundation alleges that, "[a]s a result of HB 1569, The Forward Foundation has spent more resources targeting individuals who are unregistered, recently moved to the state, and ages 18–24, and as a result diverted resources away from targeting its other core constituencies."

**Record Cite:** *See* Forward Foundations' Interrog. Resps. No. 14 (Sept. 25, 2025).

**Response:** Undisputed.

120.    **Asserted Fact:** The Forward Foundation engages in the following core activities: voter education around voting rights, running a governance program that educates elected officials, operating a legislative reform program that shares information about the barriers to serving in [New] Hampshire for working age people.

**Record Cite:** Forward Found. Dep. Tr. 49:4-13; 51:22-52:13 (R. 30(b)(6) Dep., Oct. 16, 2025).

**Response:** Disputed to the extent Defendants assert these are The Forward Foundation's only core activities or services. The Forward Foundation's core services also include poll worker education. *See, e.g.*, Defs.' Ex. 7, Forward Foundation Rule 30(b)(6) Dep. Tr. (Oct. 16, 2025) ("FF Dep. Tr.") 54:11–23; Defs.' Ex. 31, FF Interrog. Resps. at 13.

121.    **Asserted Fact:** The documentary evidence reflects no material resource allocation changes to Forward Foundation's core activities in response to HB 1569.

**Record Cite:** *See* Forward Foundations' Resps. Reqs. Prod. Docs. No. 12 (Aug. 20, 2025).

**Response:** Disputed. The record evidence shows The Forward Foundation "has expended significant additional resources to revise its trainings and include more information on the new requirements imposed by HB 1569," as well as "paid for organizers to lead outreach efforts to engage the public and provide education on the changes imposed by HB 1569." Defs.' Ex. 31, FF Interrog. Resps. at 17. These material outlays have included "press releases, click to email campaigns, and paid advertisements on social media platforms." *Id.*

The Forward Foundation has reallocated staff time too. For example, "the percentage of [staff time] having to do outreach as a result of [HB 1569] certainly increased, which meant that [The Forward Foundation] w[asn't] dedicating as much time to" other core activities including its "governance program [and] leg[islative] reform." Defs.' Ex. 7, FF Dep. Tr. 83:11–20. As a result of HB 1569, The Forward Foundation "spent more resources targeting individuals who are unregistered, recently moved to the state, and ages 18-24, and as a result diverted resources away from targeting its other core constituencies." Defs.' Ex. 31, FF Interrog. Resps. at 26. The Forward Foundation contracted with a different vendor "to mail information to voters who The Forward Foundation expects are less likely to possess qualifying proof of citizenship" and is "expending additional resources and working with this new vendor to specifically target unregistered

individuals, people who have recently moved to New Hampshire, and people ages 18-24." Defs.'
Ex. 31, FF Interrog. Resps. at 18. "Prior to the passage of HB 1569, The Forward Foundation
would typically spend resources on one mailer per targeted voter prior to a non-federal election.
This year, because of HB 1569, The Forward Foundation invested additional resources to send out
two mailers per targeted voter." *Id.* at 20. "The Forward Foundation also pursued a text campaign
this year because of HB 1569, which it does not normally do for non-federal elections." *Id.*

Other expenditures include staff time "to develop and administer new volunteer training
programs focused on the documentary proof-of-citizenship requirement imposed by HB 1569." *Id.*
at 25. These diversions are reflected, in part, by its increased budget for voter education allocated
in 2025 and 2026 compared to 2023 and 2024, respectively. *See* Exs. U, The Forward Foundation's
Healthy Democracy Program Summary (describing some of The Forward Foundation's
expenditures, including in response to HB 1569); Ex. V, The Forward Foundation 2023-2026
Budget (showing how The Forward Foundation spent nearly $50,000 more on voter education in
2024 than it had planned). Responding to HB 1569 has also caused the Forward Foundation to
divert scarce staff time away from other priorities such as its governance program. *See* Defs.' Ex.
7, FF Dep. Tr. 83:11–17, 87:2–17.

122.    **Asserted Fact:** With respect to voter education efforts, "our goal is to always
inform voters on how they can vote in elections."

**Record Cite:** *Id.* 50:12-14.

**Response:** Undisputed.

123.    **Asserted Fact:** This has been the same goal for every year it was founded in 2022.

**Record Cite:** *Id.* 50:12-20.

**Response:** Undisputed.

124.    **Asserted Fact:** Their voter education efforts entail "producing materials around what is required to vote in the state of New Hampshire" such as "flyers, printed materials, videos, electronic communications.

**Record Cite:** *Id.* 52:20-53:4.

**Response:** Disputed to the extent Defendants suggest these are The Forward Foundation's only voter education efforts. The Forward Foundation's efforts also include in-person outreach at events across the state: "the core of its work consists of direct outreach to prospective voters about engaging in the democratic process and occurs on a nearly daily basis." Defs.' Ex. 31, FF Interrog. Resps. at 32.

125.    **Asserted Fact:** They also conduct trainings on voter education and produce training materials.

**Record Cite:** *Id.* 53:11-17.

**Response:** Undisputed.

126.    **Asserted Fact:** It claims to have "expended significant additional resources to revise its trainings and include more information on the new requirements imposed by HB 1569."

**Record Cite:** *See* FF Interrog. Resps. No. 8.

**Response:** Undisputed.

127.    **Asserted Fact:** Defendants could only distill that in 2024, the Forward Foundation budgeted income was projected to be $394,000, but it actually ended up generating approximately $509,000 in income.

**Record Cite:** F.F. Dep. Tr. 158:10-13.

**Response:** Disputed as to Defendants' characterization of the record evidence. The record evidence—including The Forward Foundation's detailed budgets produced to Defendants, which

they inquired about at the deposition and did not cite in their Motion—shows that The Forward Foundation has allocated monetary resources towards its voter education and outreach programming as a result of HB 1569. *See* Resp. to ¶ 121.  The passage of HB 1569 has required The Forward Foundation to expend funds to "fulfill its mission" in part through additional, targeted "voter education." *Id.* 72:9–18. For instance, in an effort to combat the effects of HB 1569, The Forward Foundation has pursued additional text and mailer campaigns and hired a different vendor to target voters less likely to possess documentary proof of citizenship. *See* Defs.' Ex. 31, FF Interrog. Resps. at 11–12, 18–19; Defs.' Ex. 7, FF Dep. Tr. 142:22–23 ("Q. So was this change [in who The Forward Foundation targets for voter education and outreach] in response to HB 1569? A. Yes.").

128.    **Asserted Fact:** The organization is also roughly on track to collect its anticipated 2025 budget of $525,000

**Record Cite:** *Id.* 158:15-159:2.

**Response:** Undisputed.

129.    **Asserted Fact:** The mission of the Forward Foundation "is to have more working aged people in the state of New Hampshire to be civically engaged."

**Record Cite:** F.F. Dep. Tr. 49:4-6.

**Response:** Undisputed.

130.    **Asserted Fact:** According to its founding documents, the Forward Foundation was established to "increase the participation of young people (those under the age of 45) in democracy by expanding their knowledge, supporting their leadership growth, and researching and developing public policy that will encourage such participation."

**Record Cite:** Ex. 27; F.F. Dep. Ex. 4.

**Response:** Undisputed.

131.    **Asserted Fact:** Before HB 1569 was enacted, the Forward Foundation claims that approximately 75% of its voting rights efforts were dedicated to opposing the bill.

**Record Cite:** F.F. Dep. Tr. 69:9-21.

**Response:** Undisputed.

132.    **Asserted Fact:** After the passage of the bill, they transitioned these efforts to "voter education as well as our efforts in poll observer – recruitment[.]"

**Record Cite:** *Id.* 69:22-70:8.

**Response:** Undisputed, except for minor misquoting of the transcript.

133.    **Asserted Fact:** After the passage of HB 1569, the organization also "updated" its website and one-page materials "to reflect the change in the law."

**Record Cite:** *Id.* 75:16-21.

**Response:** Undisputed.

134.    **Asserted Fact:** It pushed out graphics on social media and sent out mailers educating voters about the registrations requirements [sic].

**Record Cite:** *Id.* 76:1-15.

**Response:** Undisputed.

135.    **Asserted Fact:** However, by its own admission, the Forward Foundation "continuously, every year, app[lies] for funding and fundraising around our programs" for efforts "regarding voting right protection and voting education."

**Record Cite:** *Id.* 76:20-77:2.

**Response:** Undisputed. The Forward Foundation has to continuously apply for funding for its programs, including for voter education and outreach efforts in response to HB 1569.

136.     **Asserted Fact:** After HB 1569 passed, the Forward Foundation continued to run its "general education effort" and "normal activities" in the manner in which it conducted voter education prior to the passage of the bill.

**Record Cite:** *Id.* 77:20-17.

**Response:** Disputed. The Forward Foundation changed aspects of its voter education and poll worker training in response to HB 1569. For example, The Forward Foundation has changed its approach to now "focus[] on informing voters of new requirements for proof of citizenship." Defs.' Ex. 31, FF Interrog. Resps. at 20. The events The Forward Foundation has hosted now focus "specifically around educating folks around . . . the impact HB 1569 could have on them." Defs.' Ex. 7, FF Dep. Tr. 79:12–14. Far from continuing its activities as usual, The Forward Foundation is "required to re-train its volunteers to make clear to potential voters that the Qualified Voter Affidavit is not available to them, and that they should be prepared to bring documentation satisfying one of a limited number of categories of proof of citizenship required by law." Defs.' Ex. 31, FF Interrog. Resps. at 25. Because the Town Meetings held in Spring 2025 had a much smaller turnout than statewide and federal elections, "The Forward Foundation expects that the resources required to reach out to and educate voters will only increase in upcoming elections." Defs.' Ex. 31, FF Interrog. Resps. at 18. The Forward Foundation has also targeted different populations with its efforts in response to HB 1569. Defs.' Ex. 7, FF Dep. Tr. 142:16–23. Most fundamentally, the passage of HB 1569 means that The Forward Foundation can no longer assist "voters without ready access to qualifying proof of citizenship." Defs.' Ex. 31, FF Interrog. Resps. at 29. The changes in how The Forward Foundation pursues its core services are also reflected in material reallocation of staff and monetary resources. *See* Resp. to ¶ 121.

137.    **Asserted Fact:** In other words, since 2022, the Forward Foundation's normal activities have always included election worker outreach, hosting events, participating in events, engaging in voter education, and applied for funding for these activities.

**Record Cite:** *id.* 78:9; *id.* 78:11; *id.* 78:13; *id.* 78:15; *id.* 78:18.

**Response:** Undisputed.

138.    **Asserted Fact:** All of these activities would have occurred regardless of whether or not HB 1569 was enacted.

**Record Cite:** *Id.* 78:23.

**Response:** Disputed. Some of The Forward Foundation's voter outreach and education and poll worker trainings would not have taken place but for the passage of HB 1569. For example, The Forward Foundation hired a new vendor specifically to reach populations less likely to possess qualifying proof of citizenship, engaged in text and mail campaigns it would not have but-for HB 1569, and implemented more poll worker information sessions as a result of the bill. Defs.' Ex. 31, FF Interrog. Resps. at 17–18, 20; Defs.' Ex. 7, FF Dep. Tr. 112–13; *see also* Resp. to ¶ 121. It has also had to "administer new volunteer training programs focused on the documentary proof-of-citizenship requirement." Defs.' Ex. 31, FF Interrog. Resps. at 17, 25.

139.    **Asserted Fact:** Forward Foundation engaged in this same effort every year prior to HB 1569, and it did not change after its passage.

**Record Cite:** *Id.* 80:4-81:9.

**Response:** Disputed. The Forward Foundation's core services did change as a consequence of HB 1569's requirements. *See* Resps. to ¶¶ 121, 136, 138.

140.    **Asserted Fact:** Forward Foundation cannot identify any core activity or service from which it diverted or redirected resources, or activities that have been curtailed due to HB

1569. It claims to have "overhauled some of its educational materials and is in the process of updating others; plans to hold additional and different poll worker trainings as a result of HB 1569 to attempt to dispel confusion[,]" among other things.

**Record Cite:** FF Interrog. No. 5.

**Response:** Disputed. The Forward Foundation has diverted monetary and nonmonetary resources from other core resources, such as its governance program and legislative reform, to voter education and outreach and poll worker training. *See, e.g.,* Defs.' Ex. 7, FF Dep. Tr. 83:11–20; Resps. to ¶¶ 121, 136, 138; *see also* Defs.' Mem. at 27 (conceding The Forward Foundation has "shifted internal resources to adapt to priorities" because of HB 1569). The Forward Foundation has diverted additional staff time and resources to "educate additional poll observers who might otherwise serve as poll workers," so that they can instead "document the reasons why would-be voters are turned away from the polls" and potentially help those who are "turned away . . . track down qualifying proof of citizenship, if the voter possesses it." Defs.' Ex. 31, FF Interrog. Resps. at 13; see also *id.* at 17–18; Defs.' Ex. 7, FF Dep. Tr. 75:6–10, 83:11–17.

141.    **Asserted Fact:** Its written discovery responses and testimony are replete with allegations of expenses and diversions to finance those expenses, but Forward Foundation's budgets and other documents produced in discovery do not show resources diverted from one core activity to fund one hindered by HB 1569.

**Record Cite:** None.

**Response:** Disputed to the extent Defendants fail to provide a record citation.. In any event, The Forward Foundation's budgets and other productions—which Defendants did not cite—show how The Forward Foundation has allocated more monetary resources to voter education and outreach as a result of HB 1569. *See, e.g.*, Exs. U–V; *see also* Resp. to ¶ 121.

142.    **Asserted Fact:** Its income increased.

**Record Cite:** F.F. Dep. 158:15-159:2.

**Response:** Undisputed.

143.    **Asserted Fact:** It may have shifted internal resources to adapt to new priorities, but there is no indication that Forward Foundation has abandoned core activities to save core activities threatened by HB 1569.

**Record Cite:** None.

**Response:** Disputed to the extent Defendants fail to provide a record citation. Further disputed to the extent that Defendants characterization of the significance of "abandon[ment]" of core activities is a legal argument.

144.    **Asserted Fact:** For example, it claims to have hosted and attended more events after the passage of HB 1569, but they could not identify how many events they attended or hosted in 2024.

**Record Cite:** *Id.* 84:20-86:10.

**Response:** Disputed. The Forward Foundation attended or hosted at least 33 events in 2024. *See* Ex. W, FF 2024 Event List.

145.    **Asserted Fact:** Moreover, they claim to have shifted internal resources to attend and host more events, but they do not identify a corresponding reduction of spending in a core service.

**Record Cite:** *Id.* 87:9-17.

**Response:** Disputed as a legal argument. Further disputed as stated above. Resp. to ¶ 140.

**VIII.    <u>Plaintiffs' Additional Statement of Undisputed Facts Regarding The Forward Foundation</u>**

146.    The removal of the QVA prevents The Forward Foundation from helping facilitate
. . . participation in the democratic process for individuals without ready access to documentary
proof of citizenship. Defs.' Ex. 31, FF Interrog. Resps. at 29; *see also* Defs.' Ex. 7, FF Dep. Tr.
137:23–138:5. The Forward Foundation could previously assist such individuals with successfully
registering by providing education on the QVA, but voters now risk disenfranchisement regardless
of the amount of voter services they receive. Defs.' Ex. 31, FF Interrog. Resps. at 29.

147.    "HB 1569 introduces ambiguities, complexities, and the possibility for disparate
application of laws from town to town and election official to election official that directly harms
The Forward Foundation's ability to provide clear information on how to register to vote through
its core voter education services." Defs.' Ex. 31, FF Interrog. Resps. at 30.

148.    Because of HB 1569, "it is entirely unclear what materials could qualify as 'other
reasonable documentation which indicates the applicant is a United States citizen,' and the law
creates substantial uncertainties for how individuals who have undergone a name change can prove
their eligibility." *Id.*

149.    The Forward Foundation has updated its website, mailers, one-pagers, and other
materials to seek to address the confusion caused by HB 1569's ambiguous requirements and
Defendants' implementation of the law. *See* Defs.' Ex. 7, FF Dep. Tr. 75:19–21, 88:14–89:7,
108:22–109:5. Additionally, The Forward Foundation must now "explain[] the new requirements
imposed by HB 1569" which "takes up more space on its mailers, causing the mailers to become
overcrowded and potentially less impactful." Defs.' Ex. 31, FF Interrog. Resps. at 18; *see id*. at
23.

150.    After the implementation of HB 1569, when asked what satisfies "other reasonable
documentation," The Forward Foundation is "left to speculate." *Id*. at 25. As The Forward

Foundation's Program Director Matthew Mooshian, stated, "I don't think the Secretary of State ever clarified what exactly was acceptable as other reasonable documentation." Defs.' Ex. 7, FF Dep. Tr. 138:17–20.

## IX.    Plaintiffs' Response to Defendants' Facts Regarding Individual Voters

151.    **Asserted Fact:** Plaintiff Miles Borne was born in 2007.

**Record Cite:** Borne Dep. Tr. 7:9.

**Response:** Undisputed.

152.    **Asserted Fact:** He was born in Portsmouth, New Hampshire.

**Record Cite:** Borne Dep. Tr. 8:16.

**Response:** Undisputed.

153.    **Asserted Fact:** He graduated high school on June 6, 2025, and now attends Middlebury College in Vermont; and he lives at his parent's house in Rye, New Hampshire.

**Record Cite:** Borne Dep. Tr. 8:1-10:16.

**Response:** Undisputed.

154.    **Asserted Fact:** Borne currently possesses both a U.S. passport and a birth certificate. They are both kept in a fireproof box where he lives in Rye.

**Record Cite:** Borne Dep. Tr. 15:15-16:19

**Response:** Undisputed.

155.    **Asserted Fact:** Borne's birth certificate was issued on January 26, 2009 and he and his parents have maintained possession of this document since that time, approximately sixteen (16) years.

**Record Cite:** Borne Dep. Tr. 29:9-23.

**Response:** Undisputed.

156.    **Asserted Fact:** Borne's passport was issued on June 21, 2022 and expires on June 20, 2027.

**Record Cite:** Borne Dep. Tr. 30:15-22.

**Response:** Undisputed.

157.    **Asserted Fact:** He also holds a New Hampshire driver's license that expires when he turns twenty-one (in the year 2028).

**Record Cite:** Borne Dep. Tr.18:2, 18:14-17.

**Response:** Undisputed.

158.    **Asserted Fact:** Borne's driver's license is a New Hampshire Real ID.

**Record Cite:** Borne Dep. Tr. 21:10-11; 23:6-8.

**Response:** Undisputed.

159.    **Asserted Fact:** Although he does not specifically recall what documents he brought to the DMV to obtain a Real ID driver's license, he likely brought his birth certificate, passport, or both.

**Record Cite:** Borne Dep. Tr. 22:13-15; Borne Dep. Tr. 26:20-23.

**Response:** Undisputed.

160.    **Asserted Fact:** Borne registered to vote in 2025, on the day of his 18th birthday, which was a day in which high school was in session and was not on an election day.

**Record Cite:** Borne Dep. Tr. 33:1-2.

**Response:** Undisputed.

161.    **Asserted Fact:** He did not recall needing to do anything to prepare to register to vote the night before, because he "knew where my driver's license was, and I knew where my passport was…[a]nd because I registered other people, I knew that's what I needed."

**Record Cite:** Borne Dep. Tr. 34:11-16.

**Response:** Undisputed.

162.    **Asserted Fact:** Before school on the morning of his 18th birthday, Borne woke up early and on the way out of the house "grabbed my passport and driver's license and drove down the road to town hall."

**Record Cite:** Borne Dep. Tr. 33:12-18; 35:2-4.

**Response:** Undisputed.

163.    **Asserted Fact:** Borne lives in Rye just minutes from the town hall where he registered to vote.

**Record Cite:** Borne Dep. Tr. 34:21-35:4.

**Response:** Undisputed, though he attends college out of state.

164.    **Asserted Fact:** He registered to vote sometime between 8:00 AM and 8:35 AM, before arriving at school a minute or two late.

**Record Cite:** Borne Dep. Tr. 34:2-12.

**Response:** Undisputed.

165.    **Asserted Fact:** He does not intend to register to vote anywhere else.

**Record Cite:** Borne Dep. Tr. 17:22-18:1.

**Response:** Disputed in part, to the extent that Borne testified, "[w]ho knows what the future will hold," when asked about his plans. *Id.* 17:15–16.

166.    **Asserted Fact:** It takes him about three hours to drive between Rye and Middlebury College.

**Record Cite:** Borne Dep. Tr. 7:23-8:1.

**Response:** Undisputed.

49

167.    **Asserted Fact:** He plans to vote in the November 2026 election in New Hampshire by absentee ballot

**Record Cite:** Borne Dep. Tr. 17:4-16.

**Response:** Disputed in part, to the extent that Borne testified, "[w]ho knows what the future will hold," when asked about his plans. *Id.* 17:15–6.

168.    **Asserted Fact:** Both L.M. and A.M. were born in 2008 in Austin, Texas and are presently seventeen (17) years old.

**Record Cite:** A.M. Dep. Tr. 5:21-6:1; L.M. Dep. Tr. 4:17

**Response:** Undisputed.

169.    **Asserted Fact:** They live in Hanover, New Hampshire with their mother and father (next friend, Russell Muirhead).

**Record Cite:** A.M. Dep. Tr. 6:8-9; L.M. Dep. Tr. 6:6-11.

**Response:** Undisputed.

170.    **Asserted Fact:** Since 2020, Russell Muirhead has been a State Representative in the New Hampshire House of Representatives.

**Record Cite:** R.M. Dep. Tr. 13:11-17.

**Response:** Undisputed.

171.    **Asserted Fact:** He serves on the House Election Law Committee and voted against the passage of HB 1569 in both the committee and floor votes on the bill.

**Record Cite:** R.M. Dep. Tr. 13:20-22; 15:2-15.

**Response:** Undisputed.

172.     **Asserted Fact:** Before filing this lawsuit, Russell spoke with L.M. and A.M. about the concept of "standing to contest a law and make an argument to a judge that a law violates the constitutional rights of citizens[.]"

**Record Cite:** R.M. Dep. Tr. 51:3-8.

**Response:** Undisputed.

173.     **Asserted Fact:** Russell "invited [L.M. and A.M] to consider serving as a plaintiff [in this matter]."

**Record Cite:** R.M. Dep. Tr. 51:13-52:5.

**Response:** Undisputed.

174.     **Asserted Fact:** Both A.M. and L.M. currently attend Hanover High School; A.M. anticipates graduating in June of 2026, while L.M. anticipates graduating early in January of 2026.

**Record Cite:** A.M. Dep. Tr. 6:10-19; L.M. 6:12-15.

**Response:** Undisputed.

175.     **Asserted Fact:** A.M. does not have any summer plans after graduation and anticipates attending Wesleyan University in Middletown, Connecticut.

**Record Cite:** A.M. Dep. Tr. 7:13-21.

**Response:** Undisputed.

176.     **Asserted Fact:** Wesleyan is about a three-hour drive from his home in Hanover, New Hampshire.

**Record Cite:** A.M. Dep. Tr. 8:4-10.

**Response:** Undisputed.

177.     **Asserted Fact:** After graduating in January, L.M. plans on working in Hanover and taking time off to travel to Spain and Jackson Hole, Wyoming.

**Record Cite:** L.M. Dep. Tr. 6:22-8:19.

**Response:** Undisputed.

178.    **Asserted Fact:** L.M. does not have any summer plans, and she plans to attend Colorado College in Colorado Springs in the fall of 2026.

**Record Cite:** L.M. Dep. Tr. 9:14-20.

**Response:** Undisputed.

179.    **Asserted Fact:** Both A.M. and L.M. will turn eighteen (18) in 2026, months before the state primary and election.

**Record Cite:** A.M. Dep. Tr. 6:20-21; L.M. Dep. Tr. 4:17.

**Response:** Undisputed.

180.    **Asserted Fact:** A.M. was issued a New Hampshire driver's license. He brought his birth certificate on the day he obtained it.

**Record Cite:** A.M. Dep. Tr. 18:16-21.

**Response:** Undisputed.

181.    **Asserted Fact:** It took three-and-a-half hours for A.M. to fulfill all of the obligations associated with obtaining his Real ID driver's license

**Record Cite:** A.M. Dep. Tr. 17:19-18:12.

**Response:** Undisputed.

182.    **Asserted Fact:** As for L.M, she missed an entire day of school to obtain her driver's license – travelling to both Concord and Manchester from Hanover – an experience that lasted well over three hours.

**Record Cite:** L.M. Dep. Tr. 19:18-20:11.

**Response:** Disputed in part. L.M. travelled to the DMV in Newport rather than the DMV in Concord. *See* Defs.' Ex. 12 L. Muirhead. Dep. Tr.; Ex. X, L. Muirhead Errata.

183.    **Asserted Fact:** She cannot specifically recall what she brought with her that day, but she does recall gathering documents beforehand and bringing them with her.

**Record Cite:** L.M. Dep. Tr. 20:15-22.

**Response:** Undisputed.

184.    **Asserted Fact:** Both L.M. and A.M know what documents they need to bring in order to register to vote. A.M. and L.M. possess and have located both their passports and their birth certificates.

**Record Cite:** A.M. Dep. Tr. 27:16-28:10; L.M. Dep. Tr. 19:8-12.

**Response:** Disputed in part, to the extent "possess" is a legal characterization.

185.    **Asserted Fact:** Both of their passports and birth certificates are kept in a safe in their basement and are accessible upon request.

**Record Cite:** A.M. Dep. Tr. 22:16-19; L.M. Dep. Tr. 24:5-15.

**Response:** Undisputed.

186.    **Asserted Fact:** When he registers to vote, A.M. plans on asking his parents for assistance and expects that they will help.

**Record Cite:** A.M. Dep. Tr. 14:18-15:1.

**Response:** Undisputed.

187.    **Asserted Fact:** He has no reason to believe that his parents would discourage or prevent him from voting or registering to vote

**Record Cite:** A.M. Dep. Tr. 15:22-16:15.

**Response:** Undisputed.

188.    **Asserted Fact:** In connection with this litigation, both L.M. and A.M. were able to locate and produce copies of their birth certificate and passport.

**Record Cite:** A.M. Dep. Tr. 17:7-15; L.M. Dep. Tr. 30:5-20

**Response:** Undisputed.

189.    **Asserted Fact:** A.M. located his birth certificate by asking his parents and they were able to provide it to him; and, in the future, if he needed it again, he expects to be able to ask for it and receive it.

**Record Cite:** A.M. Dep. Tr. 21:12-22 (reference to "page 140" is his birth certificate, see A.M. Dep. Tr. 17:14-15).

**Response:** Undisputed.

190.    **Asserted Fact:** He expresses some vague worry that his father may somehow lose his passport or birth certificate, yet he has taken no precautions to prevent that, stating that he "trust[s] my dad and my mom" to protect it.

**Record Cite:** A.M. Dep. Tr. 24:3-7.

**Response:** Disputed. His worry his father may lose a document is not "vague." As he explained, "My father is very forgetful and loses things all the time. He loses his wallet, his keys, his class notes. His study looks like a meteor hit it. He loses our stuff too. I won't let him near my baseball glove. I am concerned that he may lose or misplace my passport and birth certificate. In fact I try to make sure they are not in his possession, because my mother is far more reliable. I am concerned that if he even temporarily misplaces my birth certificate and passport, I will not be able to register to vote." Defs.' Ex. 33, A. Muirhead Resp. to Interrogs. at 10.

191.    **Asserted Fact:** He has had his same passport since it was issued in 2023 and his same birth certificate since 2008 without either of them being permanently lost, and he could offer no specific reason why they might be lost in the next few months before he turns 18.

**Record Cite:** A.M. Dep. Tr. 24:8-25:3.

**Response:** Undisputed.

192.    **Asserted Fact:** A.M. plans to register to vote in person when he turns eighteen (18), but he has not thought about where he will register.

**Record Cite:** A.M. Dep. Tr. 9:14-21.

**Response:** Undisputed.

193.    **Asserted Fact:** He expects to be living in Hanover when he graduates high school and will turn eighteen (18) before then.

**Record Cite:** A.M. Dep. Tr. 15:2-6.

**Response:** Undisputed.

194.    **Asserted Fact:** When asked what elections he plans to vote in, he only stated that he only has vague plans "to vote in the ones that I am able to."

**Record Cite:** A.M. Dep. Tr. 10:14-19.

**Response:** Disputed that this response is vague.

195.    **Asserted Fact:** He does not presently have a plan to register to vote, he expects to make a plan when he turns eighteen (18).

**Record Cite:** A.M. Dep. Tr. 22:9-15.

**Response:** Undisputed.

196.    **Asserted Fact:** In September 2026, although he expects he will be living in Middletown, Connecticut, he anticipates maintaining his domicile in New Hampshire for voting purposes and has no plans to vote in any other place.

**Record Cite:** A.M. Dep. Tr. 15:7-21.

**Response:** Undisputed.

197.    **Asserted Fact:** He believes he will need assistance from his parents in finding his forms of identification in order to register to vote, "because those [documents] are kept with my parents who are often kind of in charge of that sort of stuff."

**Record Cite:** A.M. Dep. Tr. 14:13-17.

**Response:** Undisputed.

198.    **Asserted Fact:** L.M. plans to register to vote primarily to enable her to vote in the federal elections.

**Record Cite:** L.M. Dep. Tr. 12:9-16.

**Response:** Undisputed.

199.    **Asserted Fact:** She plans to register in Hanover in "late spring or early summer," before the fall national election in 2026.

**Record Cite:** L.M. Dep. Tr. 12:17-13:1; 15:3-18.

**Response:** Undisputed.

200.    **Asserted Fact:** Other than this, she has no precise plan on when and where she will actually register to vote. L.M. believes that, in order to register to vote, she will need help from her mom to obtain the necessary documents and ask for help from her dad to go over the procedural aspect of registering.

**Record Cite:** L.M. Dep. Tr. 15:23-16:3.

**Response:** Undisputed.

201.    **Asserted Fact:** She plans to bring her birth certificate with her when she registers to vote.

**Record Cite:** L.M. Dep. Tr. 23:15-17.

**Response:** Undisputed.

202.    **Asserted Fact:** L.M. plans to keep her birth certificate safe by "[n]ot touching it or moving it in when I don't need to" and she knows of no reason why either her dad or mom would need to use it before she turns 18.

**Record Cite:** L.M. Dep. Tr. 23:20-24:2.

**Response:** Undisputed.

203.    **Asserted Fact:** Having located her birth certificate and passport, she was asked "all that's left now is to turn 18 and present either one or both when you go to register to vote, correct?" and she responded "correct."

**Record Cite:** L.M. Dep. Tr. 30:21-31:1.

**Response:** Undisputed, subject to the condition that the documents are not lost in the interim.

204.    **Asserted Fact:** L.M. and A.M.'s father, Russell has had multiple conversations with L.M. and A.M. about this lawsuit, HB 1569, and registering to vote.

**Record Cite:** R.M. Dep. Tr. 16:3-21:6.

**Response:** Undisputed.

205.    **Asserted Fact:** If either of his children asked him to help them vote, he is willing to help them with what they need, including help locating documents, if necessary.

**Record Cite:** R.M. Dep. Tr. 18:22-23:13.

**Response:** Undisputed.

206.    **Asserted Fact:** He knows that the birth certificates for his children are kept in a fireproof safe in the basement of his house to protect them in the event of a fire.

**Record Cite:** R.M. Dep. Tr. 32:4-23.

**Response:** Undisputed.

207.    **Asserted Fact:** He has successfully maintained possession of these documents for over 17 years.

**Record Cite:** R.M. Dep. Tr. 34:3-6.

**Response:** Undisputed.

208.    **Asserted Fact:** He plans to keep them safe until his children turn 18 by "do[ing] nothing and trust my wife will keep them safe."

**Record Cite:** R.M. Dep. Tr. 34:17-22.

**Response:** Undisputed.

209.    **Asserted Fact:** He has no specific plans to use the birth certificates for anything between now and November 2026 and has no reason to believe either will be removed from the safe.

**Record Cite:** R.M. Dep. Tr. 35:8-19.

**Response:** Undisputed.

## X.    Plaintiffs' Additional Statement of Undisputed Facts Regarding Individual Plaintiffs

210.    On the date of his deposition, A.M. had lost his wallet and license for about a week. Defs.' Ex. 11, A. Muirhead Dep. Tr. 19:10–11; 19:21–23.

211.    Russell Muirhead lost his own birth certificate shortly before his deposition. Defs.' Ex. 13, R. Muirhead Dep. Tr. 38:5–12.

212.    Russell Muirhead's missing birth certificate was supposed to be in the same box as his children's birth certificates. Defs.' Ex. 13, R. Muirhead Dep. Tr. 59:20–60:5.

## XI.    Plaintiffs' Additional Statement of Undisputed Facts Regarding Challenged Voter Affidavits

213.    In New Hampshire, a registered voter's eligibility to vote may be challenged when the voter is attempting to vote at a polling place. RSA §§ 659:27, 659:27-a; Ex. F, Tracy Dep. Tr. 73:6–14; Ex. I, Scanlan Vol. II Dep. Tr. 462:14–463:5.

214.    Voters typically do not know prior to going to their polling place that their eligibility may be challenged.  Ex. F, Tracy Dep. Tr. 73:20–74:7; Ex. I, Scanlan Vol. II Dep. Tr. 463:6–9.

215.    Most registered voters will not be carrying documents proving their eligibility, other than their ID, when they are attempting to vote, because they will have already proven their qualifications when they previously registered to vote.  Ex. F, Tracy Dep. Tr. 74:8–75:2; Ex. I, Scanlan Vol. II Dep. Tr. 463:10–13.

216.    Databases that election officials could potentially access to verify a voter's citizenship status have significant flaws and limitations.  Ex. A, Mayer Suppl. Report at 1–6. For instance, to the extent Defendants use birth certificates from New Hampshire's Department of Vital Records to establish citizenship, those records would not exist for the more than 50% of New Hampshire residents who were born outside of the state.  Ex. A, Mayer Suppl. Report at 3; Ex. J, Piecuch Dep. Tr. 282:9–12 (confirming that the system contemplated by HB 464 would not have access to records of birth from out of the state).

217.    Defendants have not yet determined how database verification of citizenship will be implemented and utilized by local election officials. Ex. J, Piecuch Dep. Tr. 283:4–17.

218.    Not every local election official has access to SVRS or other databases that could be used to verify certain voter information, and not every polling location has cell, landline, or internet service needed to access such databases remotely.  Ex. J, Piecuch Dep. Tr. 255:4–25; Ex. F, Tracy Dep. Tr. 127:8–129:13.

219.    A challenge may be made by another voter in the town or ward, an election official, a person designated by a political party to make such challenges, or a person designated by the New Hampshire Attorney General. RSA § 659:27; Ex. F, Tracy Dep. Tr. 70:21–72:12.

220.    If a moderator determines that a challenge is more likely than not to be well-grounded, the voter is not allowed to cast a ballot, unless they appeal to New Hampshire Superior Court and obtain a court order before the polls close. Ex. J, Scanlan Vol. I Dep. Tr. 220:6–12, 221:2–8; RSA § 659:27-a.

221.    The challenge process has been misused in New Hampshire by individuals seeking to make it more difficult for some voters to cast a ballot. Ex. F, Tracy Dep. Tr. 83:14–84:18.

222.    One such example involved individuals aggressively targeting students from Hesser College and challenging their eligibility to vote. Ex. F, Tracy Dep. Tr. 80:16–83:20.

223.    New Hampshire has seen multiple other attempts to misuse the challenges process en masse to disqualify voters, including college students at Dartmouth and absentee voters.  Ex. J, Scanlan Vol. I Dep. Tr. 390:9–18; Ex. H, O'Donnell Dep. Tr. 300:11–301:9; Ex. F, Tracy Dep. Tr. 83:14–84:18.

224.    Because the CVA is no longer available, political parties may have an incentive to challenge voters on a wider scale. Ex. J, Scanlan Vol. I Dep. Tr. 390:2–8.

225.    Prior to HB 1569, a voter could cast a ballot, regardless of any challenge to their eligibility, by swearing to their eligibility using a CVA. Ex. F, Tracy Dep. Tr. 85:1–10, 86:15–24; Ex. J, Scanlan Vol. I Dep. Tr. 219:24–220:5.

226.    Prior to HB 1569, the CVA operated as a safeguard against the erroneous deprivation of a voter's rights. Ex. H, O'Donnell Dep. Tr. 302:2–8; Ex. F, Tracy Dep. Tr. 86:1–9.

227.    HB 1569 has eliminated that safeguard against the misuse of voter challenges. Ex. H, O'Donnell Dep. Tr. 302:10–16.

228.    Under HB 1569, voters whose eligibility is challenged cannot submit an affidavit attesting to their eligibility. Ex. J, Scanlan Vol. I Dep. Tr. 388:21–24; Ex. F, Tracy Dep. Tr. 86:1–9.

229.    Under HB 1569, voters who are challenged do not receive a provisional ballot. Ex. J, Scanlan Vol. I Dep. Tr. 346:11–347:15.

230.    Mistakes during election administration are inevitable, and election moderators may make mistakes when determining a voter's eligibility. Ex. I, Scanlan Vol. II Dep. Tr. 513:22–25; Ex. F, Tracy Dep. Tr. 108:20–25.

231.    Judicial review of moderator decisions helps correct any mistakes about voter eligibility. Ex. F, Tracy Dep. Tr. 109:1–4.

232.    The process of judicial review should be accessible to voters so that their eligibility to vote is not wrongfully denied. Ex. F, Tracy Dep. Tr. 109:5–9.

233.    Voters should not have to pay in order to access the right vote. Ex. F, Tracy Dep. Tr. 107:16–108:3; Ex. H, O'Donnell Dep. Tr. 53:19–54:8.

234.    The filing fee in New Hampshire Superior Court to commence a civil action is $325, as of July 1, 2025. Exhibit Y, Superior Court Filing Fees.

235.    Defendants are unaware of the New Hampshire Judiciary instituting a waiver of filing fees for appeals of a moderator's decision on a voter challenge. Ex. I, Scanlan Vol. II Dep. Tr. 464:21–465:2; Ex. H, O'Donnell Dep. Tr. 295:2–14, 299:20–300:5.

236.    Retaining an attorney to file an appeal of a moderator's decision in New Hampshire will cost on average about $300 an hour, for about two hours of work. Ex. H, O'Donnell Dep. Tr. 299:6–18.

237.    The existence of the CVA for voter challenges has not been a contributing factor to any declining voter confidence in New Hampshire. Ex. I, Scanlan Vol. II Dep. Tr. 465:11–16.

238.    The removal of the CVA does not advance any state interests. Ex. I, Scanlan Vol. II Dep. Tr. 465:7–10 ("Q. . . . What state interests are advanced by the removal of the challenge voter affidavit in this context?  A. I -- I cannot think of one."); Ex F, Tracy Dep. Tr. 88:9–20 (agreeing that there is no reason to eliminate the challenged voter affidavit while allowing challengers to submit affidavits attacking the voter's qualifications).

Respectfully submitted,

COALITION FOR OPEN DEMOCRACY, LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE, THE FORWARD FOUNDATION, MILES BORNE, ALEXANDER MUIRHEAD, BY HIS NEXT FRIEND RUSSELL MUIRHEAD, AND LILA MUIRHEAD, BY HER NEXT FRIEND RUSSELL MUIRHEAD

By and through their attorneys,

*/s/ Gilles R. Bissonette*
Henry R. Klementowicz (N.H. Bar No. 21177)
Gilles R. Bissonnette (N.H. Bar No. 265393)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE FOUNDATION
18 Low Avenue

Concord, NH  03301
(603) 333-2201
henry@aclu-nh.org
gilles@aclu-nh.org

Jacob van Leer*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, D.C. 20005
(202) 715-0815
jvanleer@aclu.org


Ming Cheung*
Clayton Pierce*
Ethan Herenstein*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2500
mcheung@aclu.org
cpierce@aclu.org
eherenstein@aclu.org
slakin@aclu.org

Geoffrey M. Atkins*
John T. Montgomery*
Desiree M. Pelletier*
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
Geoffrey.Atkins@ropesgray.com
John.Montgomery@ropesgray.com
Desiree.Pelletier@ropesgray.com

* Admitted *pro hac vice*