# EXHIBIT I



# Transcript of David Scanlan - Volume 2 - Corporate Designee and Individually

**Date:** October 22, 2025
**Case:** New Hampshire Youth Movement, et al. -v- Scanlan, et al.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

395

```
1        UNITED STATES DISTRICT COURT
2         DISTRICT OF NEW HAMPSHIRE
3
4  New Hampshire Youth Movement,   )
5        Plaintiff,          )   Case No.
6        V.                  )1:24-cv-00291-SE-TSM
7  David M. Scanlan, in his official)
8  capacity as New Hampshire        )
9  Secretary of State,              )
10       Defendant.          )
11 --------------------------------
12
13   AUDIO TRANSCRIPTION OF RECORDED DEPOSITION
14         TESTIMONY OF DAVID SCANLAN
15       Volume 2, 30(b)6 and Individually
16
17
18
19
20 October 22, 2025, 9:09 a.m.
21 Job No. 605849
22 Pages: 395-558
23 Transcribed by: Cynthia Bauerle, CSR
24 Court Reporter: Raechel Meyerowich
25
```

396

```
1  (Continued)
2  Coalition for Open Democracy,   )
3  et al.,                         )   Case No.
4        Plaintiffs,         )1:24-cv-00312-SE-TSM
5        V.                  )
6  David M. Scanlan, in his official)
7  capacity as New Hampshire        )
8  Secretary of State, and John     )
9  Formella, in his official        )
10 capacity as New Hampshire        )
11 Attorney General,                )
12       Defendants.         )
13
14
15
16
17
18
19
20
21
22
23
24
25
```

397

```
1  Deposition testimony of DAVID SCANLAN,
2  held at:
3        1 Granite Place
4        South 4th Floor
5        Concord NH 03301
6        (603) 271-3658
7
8  Pursuant to agreement, before Raechel
9  Meyerowich, Notary Public in and for
10 Massachusetts.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

398

```
1  APPEARANCES:
2  ON BEHALF OF THE PLAINTIFFS COALITION FOR OPEN
3  DEMOCRACY, LEAGUE OF WOMEN VOTERS OF NEW
4  HAMPSHIRE, THE FORWARD FOUNDATION, AND MILES
5  BORNE, BY HIS NEXT FRIEND STEVEN BORNE,
6  ALEXANDER MUIRHEAD, BY HIS NEXT FRIEND RUSSELL
7  MUIRHEAD, AND LILA MUIRHEAD, BY HER NEXT
8  FRIEND RUSSELL MUIRHEAD:
9        JOHN T. MONTGOMERY, ESQUIRE
10       Ropes & Gray LLP
11       Prudential Tower
12       800 Boylston Street
13       Boston, MA 02199
14       (617) 951-7000
15 ON BEHALF OF PLAINTIFF NEW HAMPSHIRE YOUTH
16 MOVEMENT:
17       TYLER BISHOP, ESQUIRE
18       DAVID FOX, ESQUIRE
19       Elias Law Group LLP
20       1700 7th Avenue
21       Suite 2100
22       Seattle, WA 98101
23       (202) 985-0628
24       Tbishop@elias.law
25
```

399

1  ON BEHALF OF THE PLAINTIFFS COALITION FOR OPEN
2  DEMOCRACY, LEAGUE OF WOMEN VOTERS OF NEW
3  HAMPSHIRE, THE FORWARD FOUNDATION, AND MILES
4  BORNE, BY HIS NEXT FRIEND STEVEN BORNE,
5  ALEXANDER MUIRHEAD, BY HIS NEXT FRIEND RUSSELL
6  MUIRHEAD, AND LILA MUIRHEAD, BY HER NEXT
7  FRIEND RUSSELL MUIRHEAD
8        HENRY KLEMENTOWICZ, ESQUIRE
9        GILLES R. BISSONNETTE, ESQUIRE
10       American Civil Liberties Union
11       (New Hampshire)
12       18 Low Avenue
13       Concord, NH 03301
14       (603) 227-6678
15       Henry@aclu-nh.org
16       Gilles@aclu-nh.org
17
18  ON BEHALF OF THE DEFENDANT DAVID M. SCANLAN:
19       MATTHEW T. BROADHEAD, ESQUIRE
20       Department of Justice
21       1 Granite Place
22       Concord, NH 03301
23       (603) 271-2521
24       Matthew.T.Broadhead@DOJ.nh.gov
25

400

1  PRESENT: Laura Young, Esquire-with Department
2        of Justice and Notary
3        Ming Cheung, Esquire with ACLU
4        Nile Debebe with ACLU
5        Renata Shammonad with ACLU
6        Geoffrey Atkins, Esquire-Ropes & Gray
7        Desiree M. Pelletier, Esquire with
8        Ropes and Gray
9        Clayton Pierce, Esquire with ACLU
10       Jill Tekin-Assistant
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

401

1                    INDEX
2  WITNESS                          PAGE
3  DAVID SCANLAN
4  Examination by Mr. Klementowicz      402, 496
5  Examination by Mr. Fox              475, 538
6  Examination by Mr. Broadhead        495
7
8        E X H I B I T S
9  SCANLAN EXHIBIT    DESCRIPTION        PAGE
10 Exhibit 12 Defendant's Third Supplemental
11        and Amended Responses and
12        Objections                   403
13 Exhibit 13 Election Procedure Manual    410
14 Exhibit 14 Voter Education and Assistance
15        Slides                       428
16 Exhibit 15 Granite Memo Article         446
17 Exhibit 16 Granite State Poll           449
18 Exhibit 17 Email Thread Subject RE:
19        Registering to Vote Question  460
20 Exhibit 18 CONFIDENTIAL Global Entry Card  484
21 Exhibit 19 Expert Report by Lorraine Minnite 497
22 Exhibit 20 Supplemental Expert Report   499
23 Exhibit 21 Defendant's Expert Disclosure  500
24 Exhibit 22 Defendant Supplemental       501
25

402

1        THE REPORTER:  We are on the
2  record.
3        DAVID SCANLAN,
4  Previously sworn.
5        EXAMINATION
6  BY MR. KLEMENTOWICZ:
7      Q.   Good morning, Mr. Secretary.
8      A.   Good morning.
9      Q.   We are back on the record, and
10 you are still under oath.  Do you understand
11 that?
12     A.   Yes.
13     Q.   Okay.  So we're just going to
14 jump into it.  Thank you for accommodating us.
15 I'm going to move on to topics five and six of
16 the 30(b)(6) notice related to actual alleged
17 citizen registration -- noncitizen
18 registration, or voting.
19     Do you agree that New Hampshire has
20 experienced only isolated instances of voter
21 fraud or wrongful voting?
22     A.   The inappropriate voting occurs,
23 but at -- at low levels.
24     Q.   Low levels?
25     A.   Infrequent.

403

1    Q.   Isolated?
2    **A.   Yeah.  They're isolated.  Yes.**
3  **Yeah.  They occur in every election, but**
4  **they're -- they are isolated.**
5    Q.   You've said that there's usually
6  two or three individuals that violate the law
7  every year.  Is that your understanding?
8    **A.   That are charged by the attorney**
9  **general's office, yes.**
10    Q.   Okay.  As to unlawful voting by
11 non-US citizens, do you know how many
12 confirmed instances there have been in New
13 Hampshire?
14    **A.   I know that there have been**
15 **some.  The number is low.  I don't know what**
16 **the exact number is.**
17    MR. KLEMENTOWICZ:  Gill, can we
18 have tab 4, please?
19    MR. BISSONNETTE:  Yep.
20    (Scanlan Exhibit 12, Defendant's
21 Third Supplemental and Amended Responses and
22 Objections, marked for identification.)
23    MR. BROADHEAD:  The link has
24 gone live for people to join remotely.
25 BY MR. KLEMENTOWICZ:

404

1    Q.   So this is Scanlan Exhibit 12.
2  Do you know what this is or if you could just
3  read the underlined caption?
4    **A.   Sure.  Defendant's Third**
5  **Supplemental and Amended Responses and**
6  **Objections to Plaintiff's Interrogatories.**
7    Q.   If you could please flip to page
8  11.  Interrogatory No. 11.  Do you see that?
9  It says, Office of the Attorney General's
10 Response.
11    **A.   Okay.**
12    Q.   It says, from September 1, 2016
13 through December 31, 2024, the Attorney
14 General's Office election law unit opened 205
15 wrongful voting investigatory matters after
16 receiving complaints alleging any type of
17 potential wrongful voting.  These
18 investigations resulted in eight confirmed
19 instances of people who were not United States
20 citizens registering to vote or voting in a
21 New Hampshire election.  Did I read that
22 right?
23    **A.   Yes.**
24    Q.   As secretary of state, do you
25 believe that the state has confirmed eight

405

1  instances in the last, I guess, now, nine
2  years of noncitizens voting in New Hampshire
3  elections?
4    **A.   That's consistent with my**
5  **understanding.**
6    Q.   Okay.  Do you recall in May of
7  2025 speaking on a panel with Secretary of
8  State Fontes by a -- hosted by an organization
9  called Votebeat?
10    **A.   Yes.**
11    Q.   Do you remember saying that
12 there is no widespread or organized effort by
13 ineligible noncitizens to cast votes in New
14 Hampshire?
15    **A.   I would have said that, yes.**
16    Q.   And that's true?
17    **A.   Yes.**
18    Q.   Do you remember saying, we do
19 know that there are individuals who have
20 gotten on the voter rolls with green cards
21 because the official that was registering that
22 individual just doesn't understand what that
23 card means?
24    **A.   Yes.**
25    Q.   Do you remember saying that the

406

1  voter registration process is intimate and it
2  is direct between the voter and their local
3  election official who, in many cases, they
4  already know?
5    **A.   That's true in New Hampshire,**
6  **yes.**
7    Q.   Yes.  Given that the process is
8  intimate and in many cases, the voter and the
9  election official know each other, do you
10 think that if there had been other cases of
11 voter fraud by noncitizens, they would have
12 been discovered?
13    **A.   I think that that intimate**
14 **interaction between the local election**
15 **official and the new voter cuts down on the**
16 **opportunity to have noncitizens get on the**
17 **checklist.**
18    Q.   In other words, beyond
19 documentary proof of citizenship or the
20 qualified voter affidavit, the way that New
21 Hampshire's elections are set up and locally
22 administered by small communities sometimes is
23 itself a check against voter fraud?
24    **A.   Yes.**
25    Q.   Of the eight noncitizens who

407

1  voted or registered to vote in New Hampshire,
2  do you know what percentage of the New
3  Hampshire electorate that represents?
4      A.   Well, it would be miniscule.
5      Q.   Miniscule.  Do you have any idea
6  of how many votes were cast in New Hampshire
7  in 2024?
8      A.   In which election?
9      Q.   Total.
10     A.   Well, between the -- the primary
11 and the -- and the state general election, it
12 would have been well over a million.
13     Q.   Yeah.  Same thing for 2016?
14     A.   Yes.
15     Q.   Okay.  More common than
16 noncitizen voting in New Hampshire is double
17 voting; is that right?
18     A.   I don't know the answer to that.
19 I mean, I just -- I -- I would say they're
20 probably on par.
21     Q.   And by double voting, I should
22 say -- I mean a person voting twice in the
23 same election?
24     A.   Right.
25     Q.   The documentary proof of

408

1  citizenship requirement from HB 1569 is not
2  going to do anything to reduce double voting,
3  is it?
4      A.   Yeah.  So 1569 deals with voter
5  registration.  The, you know, the only way
6  that would happen would be if a voter decides
7  -- an individual decides that they want to try
8  and register in two different locations in the
9  same election.  I -- I want to think about
10 that a little bit more to think about, you
11 know, whether that's possible or not.  You
12 know, given potential lag times and having
13 that information put into the voter
14 registration database.
15     Q.   Okay.  Of the eight noncitizens
16 who voted, do you know how many of them used
17 the qualified voter affidavit to prove
18 citizenship?
19     A.   I don't know.
20     Q.   Do you know how many of them
21 used the challenged voter affidavit?
22     A.   I don't know.
23     Q.   In some of those cases of
24 noncitizens voting, it could be a
25 misunderstanding on behalf of either the voter

409

1  and/or the election official about the
2  eligibility of noncitizens to vote more than a
3  malicious intent to wrongfully vote; is that
4  right?
5      A.   It could be.
6      Q.   Do you know?  No, I'm going to
7  withdraw that.  That issue of election
8  officials mistakenly believing that
9  noncitizens are eligible to vote could be
10 addressed by more training?
11     A.   Certainly.
12     Q.   There are ways to address that
13 issue short of documentary proof of
14 citizenship?
15     A.   Yes.  The -- yeah, we have
16 several thousand local election officials that
17 -- so some are brand new, some are, you know,
18 are veterans at the job.  And so the training
19 process is constant.
20     Q.   Is it your understanding that
21 the qualified voter affidavits were created as
22 a way to deter possible voter fraud?
23     A.   The qualified voter affidavits
24 were created -- had to give voters who did not
25 have documentation for three areas an

410

1  opportunity to prove those qualifications with
2  an affidavit pre-HB 1569.
3          MR. KLEMENTOWICZ:  Let me have
4  tab 20, please.
5          MR. BISSONNETTE:  You marking
6  it?
7          MR. KLEMENTOWICZ:  Yes, please.
8          (Scanlan Exhibit 13, Election
9  Procedure Manual, marked for identification.)
10 BY MR. KLEMENTOWICZ:
11     Q.   So you've been handed what I
12 believe is Scanlan Exhibit 13, which is an
13 excerpt of the New Hampshire Election
14 Procedure Manual.  You're familiar with this
15 document?
16     A.   I am familiar with the election
17 procedure manual, yeah.  And this is an
18 abbreviated version of that.
19     Q.   We were trying to save trees.
20 If you could, turn -- so in the bottom corner
21 is what's called a Bates stamp, which is the
22 number that starts with SOS.  If you could
23 turn to page SOS 482613.  The bottom half of
24 the -- are you there?
25     A.   Yes.

411

1  Q.  The bottom half of the first
2 column reads, quote, in an effort to deter
3 voting fraud and to make prosecution of voting
4 fa- --- fraud more feasible, the affidavits
5 explicitly require that the applicant to swear
6 or affirm the truth of his or her written
7 statements in front of an election officer or
8 other official qualified to take oaths.  Did I
9 read that right?
10  **A.  Yes.**
11  Q.  And your office publishes this
12 manual; is that right?
13  **A.  Yes.**
14  Q.  So fair to say this manual says
15 that the affidavits are part of an effort to
16 def- --- deter voting fraud and to make
17 prosecution of voter fraud more feasible?
18  **A.  Yeah.  It's --- it's an attempt**
19 **to make sure that the voter registration**
20 **process is done in a way that there's**
21 **confidence that the voters are qualified.**
22  Q.  One of the affidavits that's
23 being referred to in that section is the
24 qualified voter affidavit; is that right?
25  **A.  Yes.**

412

1  Q.  So would the removal of the
2 qualified voter affidavit make it harder to
3 deter and prosecute alleged voter fraud?
4  **A.  Well, the removal of the**
5 **qualified voter affidavit by itself would**
6 **depend on what the requirements would be, that**
7 **would be replaced with.**
8  Q.  Well, in this case where it was
9 removed and replaced with documentary proof of
10 citizenship?
11  **A.  Just repeat the first question.**
12  Q.  With the removal of the
13 qualified --- the manual states that part of ---
14 and I'm paraphrasing, that the affidavits are
15 part of an effort to make prosecution of
16 voting fraud more feasible.  And so would ---
17 would the removal of the affidavits and
18 replacement with a documentary proof of
19 citizenship requirement make it harder or less
20 feasible to prosecute voter fraud?
21  **A.  I --- I think that if the**
22 **documentation is required, it would make it**
23 **easier to prosecute voter fraud.**
24  Q.  Why is that?
25  **A.  Because the --- the potential**

413

1  **voter would have to show affirmative**
2 **documentation of their qualifications as --- as**
3 **opposed to simply attesting to those**
4 **qualifications.**
5  Q.  Okay.  Are you aware of any
6 cases of a noncitizen casting and deciding
7 vote in any election in the history of New
8 Hampshire?
9  **A.  I'm not aware, no.**
10  MR. KLEMENTOWICZ:  I should have
11 said this.  My apologies, but this is a
12 continuation of the 30(b)(6) portion of the
13 deposition.
14  MR. BROADHEAD:  Yes.
15  MR. KLEMENTOWICZ:  Okay.
16  MR. BROADHEAD:  Thank you.
17 BY MR. KLEMENTOWICZ:
18  Q.  I'm going to move on now to
19 voter education efforts.
20  **A.  Are we done with this section or**
21 **are we still ---**
22  Q.  We are done with this section
23 for now.  Thank you.
24  What voter education efforts has your
25 effort --- your office engaged in or planned to

414

1 engage in regarding the documentary proof of
2 citizenship for voter challenges changes to
3 the law as a result of HB 1569?
4  **A.  We have a --- a pretty robust and**
5 **ongoing election official training program**
6 **that's a requirement under the Help America**
7 **Vote Act that passed in 2002.  That training**
8 **involves election law changes, generally, that**
9 **occurred since the last round of training took**
10 **place.  And these trainings really ramp up**
11 **before an election cycle.  So when there's a**
12 **significant change, such as House Bill 1569,**
13 **we focus on the implementation of the --- of**
14 **the new law and making local election**
15 **officials aware of what the law requires and**
16 **any guidance that the secretary of state or**
17 **the attorney general have on how that**
18 **implementation should take place.**
19  Q.  And are those trainings
20 mandatory or voluntary?
21  **A.  They're voluntary.**
22  Q.  Voluntary.  Can you do mandatory
23 trainings?
24  **A.  No.**
25  Q.  What about efforts to inform the

415

1  public of these changes? What has your office
2  done or is planning to do?
3      **A.  So in -- since I have become**
4  **secretary of state, we have hired a**
5  **communications person in the office. We've**
6  **also hired an individual who's responsible for**
7  **civic outreach and voter education. And those**
8  **two individuals have been very active using**
9  **social media generally and it -- it includes,**
10  **you know, a lot of information related to**
11  **1569, specifically. And then we have been**
12  **doing a lot of outreach to groups -- organized**
13  **groups in New Hampshire, whether they be**
14  **veterans or seniors or the disabled community,**
15  **minorities, about the new law and how to**
16  **comply with it.**
17      Q.    What social media platforms has
18  your office posted about what -- I'm sorry.
19  Let me try that again.
20      On which social media platforms has
21  your office posted about 1569 or its
22  requirements?
23      **A.  Facebook, X, Instagram. There**
24  **may be others I'm -- I'm not aware of.**
25      Q.    Do you know about how many posts

416

1  your office has done?
2      **A.  On the new requirements of 1569,**
3  **I believe around 100 social media posts.**
4      Q.    Why is it important to educate
5  the public about 1569?
6      **A.  Because we want voters to -- we**
7  **want potentially new voters who want to**
8  **participate in the next election cycle to be**
9  **able to, you know, exercise that right if**
10  **they're qualified. And so we are, number one,**
11  **trying to alert the voters to the fact that if**
12  **they are going to register, they need**
13  **documentation to prove their qualifications.**
14  **And in addition to that, we're encouraging**
15  **them to participate in the voter registration**
16  **process before Election Day, if they can, so**
17  **that if there are issues, they can be**
18  **addressed.**
19      Q.    If registrants are unaware of
20  the new requirements, fair to say they're more
21  likely to not bring the documents they need
22  and, therefore, may not be able to register
23  and vote?
24      **A.  That's quite possible.**
25      Q.    Do you remember saying, going

417

1  back to the Votebeat event, quote, we know
2  that there's a population out there that are
3  going to need some help, and that help has to
4  come in two ways. Number one is, we have to
5  go way above and beyond in the education
6  process, the voter education process, so that
7  they understand the new law?
8      **A.  Yes.**
9      Q.    Has the office gone way above
10  and beyond in the education process?
11      **A.  I believe so. And -- and that**
12  **process is still in progress. As we get**
13  **closer to the state elections, the effort on**
14  **our end will increase.**
15      Q.    Did your office educate voters
16  about the new requirements in advance of the
17  spring town elections?
18      **A.  Yes.**
19      Q.    Do you think it's fair to say
20  your office still has more education to do to
21  make sure voters understand the new
22  requirements?
23      **A.  Yes. That's fair. We're**
24  **actively exercising that effort prior to the**
25  **city elections that are coming up in a couple**

418

1  of weeks.
2      Q.    And how are you doing that?
3      **A.  Through social media,**
4  **traditional media, working with those groups**
5  **that I had mentioned earlier.**
6          MR. KLEMENTOWICZ:  That if those
7  social media posts have not been produced,
8  we'd like them produced.
9          MR. BROADHEAD:  I'll check on
10  it.
11          MR. KLEMENTOWICZ:  Thank you.
12  I'm not saying that they haven't been, but if
13  they haven't been.
14          MR. BROADHEAD:  Yeah.
15  BY MR. KLEMENTOWICZ:
16      Q.    Okay. I want to talk about the
17  actual and anticipated impacts of the
18  elimination of the affidavits, which is topic
19  10. Do you know how many people used the
20  challenge voter affidavit in 2024?
21      **A.  I don't recall that number**
22  **exactly. I know that it's on the reports that**
23  **we provide to the legislature.**
24      Q.    Do you know how many people used
25  the qualified voter affidavit in 2024?

419

1   A.   Again, I don't know that exact
2   number.
3   Q.   How -- prior to their
4   elimination, were the usage of the CVA and the
5   QVA tracked by your office?
6   A.   Yes.
7   Q.   How?
8   A.   In the reports that we get from
9   the local election officials, entered into the
10  statewide voter registration database so that
11  we can then generate the report that's
12  required by statute to be provided to the
13  legislative leaders.
14  Q.   Going back to -- prior to the
15  SVRS, your office used a system called
16  ElectionNet; is that right?
17  A.   Yes.
18  Q.   Were you aware that during the
19  time period when ElectionNet was the operative
20  system, if a registrant indicated that they
21  were born in the United States, ElectionNet
22  did not let the local election officials
23  record that that voter used a qualified voter
24  affidavit for citizenship?
25  A.   I didn't know that, but I -- I

420

1   would not be surprised.
2   Q.   Most people who register to vote
3   in New Hampshire were born in the United
4   States; is that right?
5   A.   Yes.  Yes.
6   Q.   So if you couldn't capture QVA
7   usage for citizenship for people who are born
8   in the United States, the data gathered under
9   ElectionNet is going to be an undercount of
10  the actual amount of QVAs used to prove
11  citizenship; is that right?
12  A.   Just repeat that question again.
13  Q.   Let me try that again.  Yeah.
14  If ElectionNet did not allow the
15  recording of QVA usage for citizenship for
16  people who are born in the United States,
17  there will be an undercount of total QVA usage
18  for approving citizenship; is that right?
19  A.   I'm just trying to understand
20  how that would be the case.
21  Q.   Okay.  So in 2020, if I
22  registered to vote, and this was during the
23  election, that time period, yes?
24  A.   Yeah.
25  Q.   Yes?  If I registered to vote

421

1   and I did not bring a passport or birth
2   certificate with me, I would have executed the
3   QVA for citizenship?
4   A.   Yes.
5   Q.   And the election official would
6   have asked me where I was born, and I would
7   have said New York.  And so when they entered
8   my information into ElectionNet, because I was
9   born in the United States, they would not be
10  able to record that I used the QVA to prove
11  citizenship.  Did you know that?
12  A.   No.  I'm -- I'm -- I'm just
13  struggling to -- to understand, you know, what
14  the question is.
15  I mean, you know, the QVA was in
16  existence in 2020.  If a voter did not have
17  the documentation of their citizenship
18  qualifications, then they should have filled
19  out the qualified voter affidavit.
20  Q.   Yes.  I'm concern -- I'm
21  inquiring about your office's tracking of the
22  numbers of QVAs used.
23  A.   Okay.
24  Q.   Under ElectionNet, in the
25  example that I gave of me registering to vote

422

1   hypothetically in 2020, even though I had used
2   the QVA to prove citizenship, because I was
3   born in the United States, the local election
4   officials could not record that I used the QVA
5   to prove citizenship.  Did you know that?
6   A.   I -- I didn't know that.
7   Q.   Okay.  Do you believe that?  I
8   can represent to you that Tricia Piecuch
9   testified to that at her deposition yesterday.
10  But assuming that's the case, that -- that
11  ElectionNet could not log QVA usage for
12  citizenship for people who were born in the
13  United States, that means that during the
14  period that ElectionNet was operative, there's
15  going to be an undercount of QVA usage?
16  MR. BROADHEAD:  Objection to
17  form.
18  THE WITNESS:  If -- if that was
19  the case, then that would be true.
20  BY MR. KLEMENTOWICZ:
21  Q.   And it would be a significant
22  undercount?
23  A.   Could be.
24  Q.   Okay.  Do you remember telling
25  the legislature that there could be this

423

1  significant undercount in QVA usage during the
2  ElectionNet period?
3  **A.   No, I don't recall saying that**
4  **to the legislature.**
5  Q.   People can get removed from the
6  voter rolls in New Hampshire; is that right?
7  **A.   Yes.  Only by the supervisors of**
8  **the checklist and only for a valid reason.**
9  Q.   One of those reasons is
10  inactivity?
11  **A.   Yes.  New Hampshire has what we**
12  **call a -- a verification of the checklist**
13  **required in the statute.  It had been every 10**
14  **years.  Now it's more frequent.  If voters**
15  **have not participated in two complete election**
16  **cycles, four years, then their name is dropped**
17  **from the checklist.**
18  Q.   They're notified if that's going
19  to happen to them, right?
20  **A.   Yes.**
21  Q.   By mail?
22  **A.   I believe so, yes.**
23  Q.   Not everybody reads every piece
24  of mail that they get; is that right?
25  **A.   I think that's correct.**

424

1  Q.   So there could be people who
2  were removed from the rolls and didn't know
3  it?
4  **A.   That -- that's possible, yes.**
5  Q.   Are people ever erroneously
6  removed from the rolls?
7  **A.   I would say that's a**
8  **possibility, yes.**
9  Q.   In either of those
10  circumstances, a person erroneously removed
11  from the rolls or a person removed from the
12  rolls but without actual knowledge that
13  they've been removed, they could show up to
14  vote on Election Day thinking that they're
15  still registered; is that right?
16  **A.   Yes.**
17  Q.   And those people, would you
18  expect them to bring documentary proof of
19  citizenship with them when they regis- -- when
20  they go to vote?
21  **A.   If they believe that they were**
22  **on the checklist on the day of that election,**
23  **I -- I would guess they would not bring their**
24  **documentation.**
25  Q.   Okay.  The spring town

425

1  elections --
2  MR. BROADHEAD:  Can you just
3  clarify which documentation they wouldn't
4  bring?
5  THE WITNESS:  To prove their
6  qualifications to register to vote.
7  MR. KLEMENTOWICZ:  Thank you.
8  BY MR. KLEMENTOWICZ:
9  Q.   Those spring town elections are
10  low turnout; fair to say?
11  **A.   Generally, yes.**
12  Q.   And is it fair to say that the
13  electorate in the town elections tends to be
14  more engaged than the electorate in state
15  elections?
16  **A.   Participants in town elections**
17  **tend to be engaged, yes.**
18  Q.   And more likely to already been
19  registered to vote than people who are voting
20  in the state elections?
21  **A.   Yes.**
22  Q.   And more likely to be familiar
23  with election law requirements?
24  **A.   I don't know if they're more**
25  **likely to be familiar with election law**

426

1  **requirements, but they are more likely to have**
2  **been regular participants in elections.**
3  Q.   Where I'm going with this is
4  that we can expect that the number of people
5  who -- let me try this again.
6  Are more people going to be turned away
7  if they don't have documentary proof of
8  citizenship at a state election than at the
9  town election?
10  **A.   I would expect that more people**
11  **will show up without documentation to prove**
12  **their qualifications in a state election than**
13  **a local one.**
14  Q.   More people in the absolute
15  sense, but also perhaps a higher percentage of
16  the electorate?
17  **A.   I think that's fair.**
18  Q.   Okay.  How many people want --
19  went to register to vote at the town elections
20  but were turned away because they did not have
21  documentary proof of citizenship?
22  **A.   I don't know what that number**
23  **is.**
24  Q.   What has your office done to
25  track that?

427

1    A.    We have not tracked it.  We have
2 heard antidotal reports of -- of the
3 registration activity in a -- local elections,
4 but we have not done any tracking on our own
5 of what those numbers actually are.
6    Q.    And why is that?
7    A.    There local elections.
8    Q.    Are you going to do that
9 tracking for the state elections?
10    A.    I expect we will.
11    Q.    And how will you do that?
12    A.    We'll have a program put in
13 place.  Yeah, to make sure that either through
14 the SVRS or asking local election officials to
15 keep track of that information.
16    Q.    If your office had tracked the
17 number of people who were turned away because
18 they presented without the requisite documents
19 to prove their qualifications, would that have
20 been helpful for your office to know whether
21 it was doing a good job in the voter education
22 department?
23    A.    No.  I think that -- that we are
24 aware of what the issues are and the education
25 effort that we need to undertake.  I certainly

428

1 didn't feel a need to track that at -- at the
2 local level to get a better handle on what
3 that number might be.
4    Q.    You said that you are aware of
5 what the issues are.  Do you feel like your
6 office is aware of the magnitude of the
7 issues?
8    A.    I believe so, yeah.  Okay.
9         MR. KLEMENTOWICZ:  Could I have
10 tab 26, please?
11         THE WITNESS:  Can we just take a
12 brief break?
13         MR. KLEMENTOWICZ:  Of course,
14 yes.
15         (Off the record 9:42 a.m.)
16         (On the record 9:49 a.m.)
17         THE REPORTER:  Back on the
18 record.
19         MR. KLEMENTOWICZ:  Thank you.
20 And tab 27 -- 26, if we could have that
21 marked.  Thank you.
22         (Scanlan Exhibit 14, Voter
23 Education and Assistance Slides, marked for
24 identification.)
25 BY MR. KLEMENTOWICZ:

429

1    Q.    So you've been handed Scanlan
2 Exhibit 14.  Do you recognize this?
3    A.    Yes.
4    Q.    Could you turn to slide seven,
5 please?  I'm going to read you a portion that
6 says, despite good media coverage, some voters
7 needing to register lack documentation.  Most,
8 but not all, return to the polling place with
9 their documentation.  Did I read that
10 correctly?
11    A.    Yes.
12    Q.    How do you know that most, but
13 not all, return to the polling place with
14 their documentation?
15    A.    The -- again, antidotal reports
16 from local communities on how that part of the
17 process went.
18    Q.    But your office did not track
19 this?
20    A.    That's correct.
21    Q.    And so it's possible that the
22 statement, most but not all, returned to the
23 polling place with their documentation is
24 wrong if your anecdotal information is wrong?
25    A.    If the anecdotal information was

430

1 wrong, then you'd be right.
2    Q.    But you could have been certain
3 of this if your office had tracked?
4    A.    I'm sorry.  I didn't hear the
5 question.
6    Q.    Had your office tracked people
7 who were turned away, you could have been
8 certain about whether they returned or not?
9    A.    Sure.  Yeah.
10    Q.    Okay.  Has your office done
11 anything to measure the effect of HB 1569
12 since it came into effect?
13    A.    Not to measure the effect, no.
14    Q.    And why is that?
15    A.    Our focus has been on
16 implementation and making sure that we get the
17 information, the resources out to help the
18 voters that we believe are going to need it
19 during the next round of state elections.
20    Q.    Is anything preventing you from
21 measuring the effect of HB 1569?
22    A.    There is nothing to prevent us
23 from doing it other than just resources that
24 we have.  You know, our focus has been on the
25 implementation and getting the proper

431

1  messaging out.
2      Q.   Does your office have enough
3  resources to implement 1569 and get the proper
4  messaging out?
5      A.   I believe we do, yes.
6      Q.   Okay.  Has HB 1569 caused longer
7  lines at polling places?
8      A.   I'm not aware that has happened
9  as a result of 1569.
10     Q.   Have you inquired?
11     A.   I have personally not inquired,
12 no, but typically, lines are not issues at --
13 at local elections, which is what we've
14 experienced so far.
15     Q.   Could HB 1569 cause longer lines
16 at state elections?
17     A.   It -- it is possible if, you
18 know, the process of providing documentation
19 of -- of qualifications on the day of the
20 election it bogs down.
21     Q.   Does your office have a plan to
22 address increased lines due to HB 1569?
23     A.   We are right now working on
24 trying to educate the voters on the
25 requirements so that they have the

432

1  documentation that they need when they do show
2  up to register.  And the other part of that is
3  we're doing everything we can to encourage
4  those individuals that have to prove their
5  qualifications to get that job done before
6  Election Day.
7      Q.   Has your office done any polling
8  or surveying of the New Hampshire electorate
9  to see what percentage is aware of the new
10 requirements?
11     A.   No.
12     Q.   Do you intend to?
13     A.   No.
14     Q.   And why is that?
15     A.   Again, just utilizing the
16 resources that we have to engage in a major
17 education effort.
18     Q.   Do people sometimes not vote
19 because the lines are long?
20     A.   I mean, antidotally I have heard
21 some people say that.  But am I aware of
22 anybody that did not vote because a line was
23 too long?  I don't have a -- an example of
24 that that I can point to.
25     Q.   Does your office have any

433

1  suggestions on how -- on what the maximum
2  length of a line should be in a New Hampshire
3  election?
4      A.   I believe the last time frame
5  that we suggested -- suggest is reasonable as
6  about 20 minutes.  We engage in training and
7  guidance on line management.  We've done that
8  in the past.  And if we become aware of lines
9  becoming excessively long, that we communicate
10 with the Attorney General's Office on the day
11 of the election to attempt to put measures in
12 place to alleviate that.
13     Q.   And what type of measures are
14 those?
15     A.   Number one, it -- conversation
16 with the moderator to find out what the issues
17 are.  It could be sending an individual out to
18 the polling place to assess what is going on.
19 Trying to determine where the choke points are
20 and loosen them up.
21     Q.   There was some discussion in an
22 earlier deposition about the implementation of
23 464, which is -- we've discussed, which is
24 the -- the new law this year.  And you were
25 not designated to speak on that issue, but a

434

1  couple of questions were deferred to you that
2  I'm just going to ask.  One of the things that
3  your office is considering is implementing an
4  Election Day call center; is that right?
5      A.   Yes.
6      Q.   How many calls would you expect
7  that call center to get?
8      A.   We really don't have an idea of
9  how many calls we would get.  We -- typically,
10 we get many, many, many calls on the day of an
11 election.  I know the Attorney General's
12 Office does, as well.
13     Q.   Do you expect that people will
14 have to wait on the line to reach a person at
15 the call center?
16     A.   I mean, at this point, that's
17 speculative.  We will do everything that we
18 can to make sure that the -- the calls are
19 answered expeditiously as they come in.
20     Q.   Do you have a sense of how many
21 people will have to staff that call center?
22     A.   Right now, I would say three or
23 four.
24     Q.   Does your office have sufficient
25 resources, both money and personnel, to manage

435

1 that call center?
2    A.   We may have to bring some
3 part-time individuals in.  We have the funds
4 to do that, if necessary.
5    Q.   If you need more funds, how
6 would you go about getting those?
7    A.   We have a generous budget for
8 the purpose of conducting elections.  We also
9 have funds in the -- in the election fund,
10 which are basically federal funds from the
11 Help America Vote Act.  That could be utilized
12 for something like that.
13    Q.   So you're not expecting that you
14 would have to go to the fiscal committee for
15 more funds?
16    A.   No.
17    Q.   Okay.  Turning now to topic 13,
18 which is burdens imposed by and state
19 interests advanced by HB 1569 and HB 464.
20 What state interests are advanced by HB 1569?
21    A.   It would help build confidence
22 with a sizable segment of our voting
23 population by having measures in place that --
24 that show that the persons that are
25 participating in the election process are --

436

1 are, in fact, qualified.
2    Q.   Any other state interests?
3    A.   No.  That's -- that's the big
4 one is --
5    Q.   The big one.  What -- is HB 1569
6 going to advance a state interest of reducing
7 voter fraud?
8    A.   I mean, it could.
9    Q.   But voter fraud in New Hampshire
10 is miniscule, I think you said?
11    A.   It -- it --
12       MR. BROADHEAD:  Objection to
13 form.
14       THE WITNESS:  As I've said
15 before, the instances of isolated voting
16 are -- are low and -- and not widespread, not
17 organized.
18 BY MR. KLEMENTOWICZ:
19    Q.   Not organized.  And I think we
20 established there were eight cases of
21 citizenship of noncitizens voting in the last
22 nine years in New Hampshire out of millions of
23 ballots cast?
24    A.   That were prosecuted by the
25 Attorney General's Office.

437

1    Q.   Right.  How do you measure voter
2 confidence?
3    A.   Well, the measurement that --
4 that we have been using, in real terms,
5 polling, that has been done by Andy Smith at
6 UNH.  And he has been, for a number of years,
7 gauging attitudes on how easy is it to vote
8 and do you have confidence that your vote is
9 being properly counted.  And New Hampshire
10 consistently had really high marks in that
11 regard.  I believe it's been up in the 90
12 percentile of voters that -- especially after
13 the election is over, I believe that they were
14 well run.
15       Over the last 10-year period, there has
16 been a -- slight drop.  A kind of a trending
17 drop.  Still high -- high confidence, but
18 slipping.  I think if you looked at national
19 polls, you'd see a much greater drop in -- in
20 how voters in other states you'll view their
21 process.  I think the last round of polling
22 that Andy Smith did, New Hampshire is kinda
23 leveled off, and hopefully, we've -- we've
24 turned the corner.
25    Q.   How slight of a decrease in

438

1 voter confidence was it?
2    A.   A couple of percentage points.
3    Q.   Do you know what the most recent
4 percentage of New Hampshire poll respondents
5 is that said they had confidence in New
6 Hampshire elections?
7    A.   I'd have to look at the polling
8 for the accurate number, but I believe is --
9 it was 90 percent, give or take.
10    Q.   So if 90 percent of New
11 Hampshire voters had confidence in New
12 Hampshire elections, why is HB 1569 necessary
13 to increase voter confidence?
14       MR. BROADHEAD:  Objection to
15 form.
16       THE WITNESS:  There have been
17 concerns among a sizable part of our voting
18 population that -- that the elections are --
19 are -- that there iss- -- issues with the
20 election process.  And knowing that, when I
21 became Secretary of State, I created a
22 Committee on Voter Confidence.  That was a --
23 a really interesting exercise because we --
24 that the committee went around the state, held
25 quite a few hearings.  The sessions began

439

1  with -- with a presentation of individuals
2  that were close to the election process. They
3  may have been the leaders of the political
4  parties, academics, pollsters, and, you know,
5  the presentations were -- were quite good.
6  But after that was done, the second half of
7  the -- of the hearing was just opened up to
8  the general public. And we had the full
9  spectrum of -- of voters and voting
10 philosophies there that were able to speak
11 their mind. And, you know, we heard about a
12 lot of concerns that were out there. The
13 takeaway that -- that I had was that we had to
14 make the election process as transparent as
15 possible, and we had to educate the voting
16 population on just exactly how elections were
17 run. And the committee made a -- a, you know,
18 quite a few recommendations, and I think that
19 we have been following through on, I -- I
20 believe, all of them. And so, 1569, in my
21 opinion, is a way to find that balance that we
22 talked about, you know, when we started this
23 deposition -- that, you know, that it's
24 important that people are able to exercise
25 their right to vote as easily as possible.

440

1  But at the same time, we have to provide the
2  confidence to the voters that the people
3  participating in that process are, in fact,
4  qualified. And the trick is to find that
5  balance point where everybody's satisfied.
6  And there has been a lot done on the ease of
7  voting to the point that there was some
8  confusion about, you know, who could
9  participate in terms of, you know, the
10 definition of domicile, I think, was -- was in
11 question for some time, and the legislature
12 cleaned that up. The court -- the Supreme
13 Court gave a ruling that clarified what
14 domicile means. And this bill, 1569 is just
15 the other side of that equation that is being
16 addressed by the legislature at the moment.
17 BY MR. KLEMENTOWICZ:
18     Q.   I'd like to break that up into a
19 few pieces.
20     A.   Okay.
21     Q.   So you said that there is a
22 sizable portion of the electorate, I think I'm
23 paraphrasing, that had concerns about the
24 election integrity process; is that right?
25     A.   Yes.

441

1      Q.   How sizable?
2      A.   You know, if we're -- if we're
3  breaking it down by party, you know, I would
4  say that the -- that there is a major
5  percentage of Republican voters that feel that
6  way. When you get into the sizable portion of
7  undeclared voters, there's a -- there's a
8  sizable portion of that group, as well.
9      Q.   Do you know how sizable?
10     A.   I don't know how sizable, but if
11 you -- you know, if -- if-- yeah. I mean, I
12 -- I don't know how sizable, but it's sizable
13 enough that, in my opinion, it's -- it's a --
14 an area that needs to be addressed. Even if
15 the concerns are only perceptions, it's still
16 something that needs to be addressed to give
17 confidence to voters that, you know, the
18 elections are running properly.
19     Q.   You talked about how the
20 confidence of the electorate and the integrity
21 of the process needs to be balanced against
22 the burdens placed on voters, right?
23     A.   Yeah. There -- there needs to
24 be that sweet spot. Ideally, it would be
25 great to find that sweet spot, but -- but it's

442

1  also a legislative process to get there. And
2  depending on which party's in power, that --
3  you know, things get pulled in one direction
4  or another.
5      Q.   Would knowing how sizable a
6  percentage of the electorate does not have
7  confidence in our elections inform where that
8  sweet spot is?
9      A.   To a degree, yes.
10     Q.   To what do you attribute the
11 slight dip in voter confidence in New
12 Hampshire?
13     A.   I think it is a lot of the
14 national rhetoric that we see from our
15 national leaders and leaders in both parties.
16 And -- and how elections are perceived by
17 voters in other state and with the -- you
18 know, with the presence of social media today
19 and the ability to convey information, receive
20 information in real time regardless of state
21 boundaries that -- that conversation, that
22 messaging impacts voters in New Hampshire
23 as -- as much as it does in with voters in
24 other states.
25     Q.   Do you recall the results of the

443

1 2020 presidential election?
2    **A.  Yes.**
3    Q.  Did the candidate who lost the
4 presidential election in 2020 run a long and
5 coordinated campaign attempting to discredit
6 the legitimacy of that election?
7    **A.  There were a lot of statements**
8 **that were made about the -- the integrity of**
9 **that election.**
10    Q.  By a major presidential
11 candidate?
12    **A.  Yes.**
13    Q.  Do you think that was the prime
14 driver of the decrease in voter confidence in
15 New Hampshire?
16       MR. BROADHEAD:  Objection to
17 form.
18       THE WITNESS:  I think
19 conversations like that from national leaders
20 certainly impact how voters view the process.
21 BY MR. KLEMENTOWICZ:
22    Q.  What training or education do
23 you have in assessing voter confidence?
24    **A.  Just my experience in my role in**
25 **the Secretary of State's Office.**

444

1    Q.  But you are not a statistician?
2    **A.  No.**
3    Q.  Does your office have a
4 statistician in the elections unit?
5    **A.  No.**
6    Q.  Do you attribute the decrease in
7 voter confidence that you mentioned in New
8 Hampshire to any particular law or change in
9 law in New Hampshire?
10    **A.  No.**
11    Q.  Are there other reasons that
12 voter confidence can decrease?
13    **A.  Well, the -- the biggest way it**
14 **could decrease is if a state messes up its**
15 **election. Something that New Hampshire has**
16 **not had happened to them as far back as I can**
17 **remember.**
18       MR. BROADHEAD:  Better knock on
19 wood.
20    Q.  Suppose a thousand people tried
21 to -- a thousand eligible people at the next
22 state general election tried to register but
23 were unable to because they did not have
24 documentary proof of citizenship -- would that
25 be an acceptable trade-off from your

445

1 perspective for any increase in voter
2 confidence that might be due to HB 1569?
3    **A.  Yeah. I don't want to put a**
4 **number on -- on where that would be.  From my**
5 **perspective, I don't want to see any qualified**
6 **voters turned away from the polling place.**
7 **And so the -- the initiatives that we are**
8 **undertaking to implement 1569 are going to be**
9 **designed to make sure that we get the word out**
10 **so that voters know what the law is and that**
11 **we provide the resources that will be helpful**
12 **to those voters that need to obtain that**
13 **documentation.**
14    Q.  There will be, as a matter of
15 statistical fact, voters turned away at the
16 next state general election because they don't
17 have documentation; is that right?
18    **A.  I would expect that that would**
19 **be the case.**
20    Q.  Will that have been worth it?
21       MR. BROADHEAD:  Objection to
22 form.
23       THE WITNESS:  I think it will
24 have been worth it if we have done everything
25 that we can do to create an opportunity for

446

1 that voter that gets turned away to have had
2 the opportunity to register a vote.
3 BY MR. KLEMENTOWICZ:
4    Q.  Has HB 1569 led to an increase
5 in voter confidence in New Hampshire?
6    **A.  I think it's too early to tell.**
7    Q.  When will it be time to tell?
8    **A.  I think after the next round of**
9 **state elections.**
10    Q.  And how will you tell?
11    **A.  I -- I think that we will get**
12 **feedback from voters on how successful or**
13 **problematic that election was.**
14    Q.  Will you undertake -- you being
15 the office, undertake any surveys or polling
16 on that?
17    **A.  There are no plans at the moment**
18 **to -- to do that.**
19    Q.  In 2012 -- in 2022, you said to
20 Granite Memo -- I don't know.  You know what?
21 I'm going to withdraw this.
22       MR. KLEMENTOWICZ:  Gill, may I
23 please have tab 22?
24      (Scanlan Exhibit 15, Granite
25 Memo Article, marked for identification.)

447

1 BY MR. KLEMENTOWICZ:
2     Q.   You have in front of you what
3 has been marked as Scanlan 15; is that right?
4     A.   Yes.
5     Q.   What is that?
6     A.   It looks like a -- an article
7 from Granite Memo titled what David Scanlan
8 said about shoring up voter confidence.
9     Q.   And if I draw your attention to
10 the top, it's dated October 11, 2022?
11     A.   Yes.
12     Q.   If you could turn to the page
13 with a picture of Steven Porter at the bottom.
14 I think it's the second to last page.
15     A.   Okay.
16     Q.   I'm going to read:  what's
17 missing from the report, Scanlan said, is any
18 recognition of the balance New Hampshire had
19 struck with voting security.  What's more, he
20 said, polls show Granite Staters
21 overwhelmingly believe it's easy to vote and
22 have confidence in the outcome.  Quote, New
23 Hampshire, I think, has a really good balance.
24 Can we improve things?  Of course we can, he
25 said, but the proof is in the pudding.  Did I

448

1 read that right?
2     A.   Yes.
3     Q.   In 2022, you said that New
4 Hampshire had a good balance on the scale
5 between voter confidence and ease of voting?
6     A.   I -- I think when I said we have
7 struck a balance with ease of voting and
8 voting security.
9     Q.   A really good balance is what
10 you said.
11     A.   Yes.
12     Q.   That was before HB 1569?
13     A.   Yes.
14     Q.   HB 1569 moved the pendulum in
15 one direction.  Would you agree?
16     A.   Yes.
17     Q.   Is it still a really good
18 balance?
19     A.   I think that will be determined
20 after the next round of elections.
21     Q.   Okay.  Do you remember in 2020
22 or 2021, a bill in Congress called H.R. 1?
23     A.   I believe For the People Act.
24     Q.   Yes.  Do you remember saying in
25 response to that effort to NHPR, I think, that

449

1 it's important that significant voting
2 legislation be bipartisan?
3     A.   Yes.
4     Q.   Was HB 1569 bipartisan?
5     A.   It was passed in a Republican
6 legislature.
7     Q.   Were any of the sponsors
8 Democrats?
9     A.   I don't believe so.
10     Q.   Do you know if any Democrats
11 voted for it?
12     A.   I -- I don't know that, but I --
13 I'd be surprised if they did.
14         MR. KLEMENTOWICZ:  Okay.  Gill,
15 could we have tab 30, please?
16         MR. BISSONNETTE:  Sure.
17         (Scanlan Exhibit 16, Granite
18 State Poll, marked for identification.)
19         MR. KLEMENTOWICZ:  And Matt,
20 just so you know, this is my last big topic on
21 the 30(b)(6).  I have a small one I'll have
22 questions to.
23         MR. BROADHEAD:  Okay.
24         MR. KLEMENTOWICZ:  But we are
25 going faster than I anticipated.

450

1         THE WITNESS:  That's fine with
2 me.
3         MR. KLEMENTOWICZ:  Good news for
4 everybody.
5 BY MR. KLEMENTOWICZ:
6     Q.   Could you turn to -- you've been
7 handed what's been marked as Scanlan 16; is
8 that right?
9     A.   Yes.
10     Q.   Do you recognize this?
11     A.   This looks like one of Andy
12 Smith's polls.
13     Q.   That you had mentioned before as
14 something you rely on?
15     A.   Yes.
16     Q.   Could you turn to page 4,
17 please?
18     A.   This one that says voter fraud
19 on the top.
20     Q.   Perceived seriousness of voter
21 fraud.
22     A.   Okay.  Yes.
23     Q.   In June of 2022, it looks like
24 73 percent of Granite Staters thought that
25 voter fraud was not too serious or not at all

451

1 serious. Is that consistent with your
2 understanding?
3    **A.  Yes.**
4    Q. And, in fact, that's a general
5 increase over time, at least since 2017?
6    **A.  Yes.**
7    Q. So instead of a dip in
8 confidence, it's actually an increase,
9 according to this poll?
10    **A.  Yes. I mean, this -- this is**
11 **dealing with the specific issue of voter**
12 **fraud.**
13    Q. Yes.
14    **A.  Which is a part of the**
15 **confidence discussion. Yes.**
16    Q. Okay. Do you think that --
17 well, I -- I just want to pull at that, if I
18 may.
19    What are the other parts of the voter
20 confidence discussion?
21    **A.  Administration, how well**
22 **checklists are maintained. Physical security**
23 **of the election process. Chain of custody**
24 **issues.**
25    Q. Does 1569 address any of those

452

1 things?
2    **A.  No.**
3    Q. So to the extent that it is
4 going to have an effect on voter confidence,
5 it would be related to the voter fraud
6 contributor to voter confidence; is that
7 right?
8    **A.  To a degree. 1569 is designed**
9 **to make sure that those voters that are**
10 **participating in the election process are, in**
11 **fact, qualified.**
12    Q. Okay. The second chart on the
13 same page shows perceived seriousness of voter
14 fraud in the United States, right?
15    **A.  Yes.**
16    Q. And in 2022, 52 percent of New
17 Hampshire respondents said not at all serious
18 or not too serious; is that right?
19    **A.  Yes.**
20    Q. Summing up the --
21    **A.  Yes. Yeah, I just want to make**
22 **sure these were the New Hampshire respondents,**
23 **but, of course, they were.**
24    Q. In other words, people in New
25 Hampshire are more concerned about voter fraud

453

1 nationally than they are in New Hampshire?
2    **A.  Yes.**
3    Q. Okay. Have you considered
4 whether HB 1569 will actually reduce voter
5 confidence?
6    **A.  I have not considered that.**
7    Q. Is it possible that people will
8 feel -- let me try that again.
9    If large numbers of people are unable
10 to vote because they present at a polling
11 place without the requisite documentation,
12 could that lead to a decrease in voter
13 confidence?
14    **A.  If there are legitimate voters**
15 **that are turned away from a polling place,**
16 **yes. That -- that could have that effect.**
17    Q. Will it have that effect?
18    **A.  I -- I think that's to be**
19 **determined.**
20    Q. Is it more likely, in your view,
21 that the documentary proof of citizenship
22 requirement will increase voter confidence due
23 to the more stringent requirement for
24 citizenship or decrease voter confidence due
25 to people being turned away?

454

1    **A.  Based on the experience that we**
2 **had with the voter ID law, I think -- I think**
3 **it will improve voter confidence.**
4    Q. Voter ID is different, though,
5 because the ID that people can use, most
6 people have a driver's license in their pocket
7 at almost all times, so the burden is much
8 smaller than presenting proof of citizenship.
9 Would you agree?
10    **A.  I -- I would agree. Although at**
11 **the time that that law was implemented, there**
12 **were concerns about the size of the people**
13 **that would be impacted by that law. And I**
14 **think the percentage that was thrown out**
15 **during the -- the public testimony, that was**
16 **11 percent voters would not have the required**
17 **documentation. The reality was that after the**
18 **bill passed and went into effect the first**
19 **year, that number was around one percent. And**
20 **today that requirement is generally accepted.**
21 **And the number of voters that show up at the**
22 **polling place without an acceptable form of ID**
23 **is just a fraction of one percent.**
24    Q. But more people are going to
25 show up without documentary proof of

455

1 citizenship?
2   A.   At least -- at least getting
3 started, I would expect that there will be a
4 similar pattern.
5   Q.   Turning to the Special Committee
6 on Voter Confidence.  You appointed that
7 committee, right?
8   A.   Yes.
9   Q.   And you gave them their charge?
10   A.   Yes.
11   Q.   And you selected the members?
12   A.   Yes.
13   Q.   And as you said, they held many
14 public hearings?
15   A.   Yes.
16   Q.   Hours?
17   A.   Yes.
18   Q.   I testified at that.  Did you
19 know that?
20   A.   I believe you did.
21   Q.   I did, in Nashua.  Did you think
22 that the recommendation -- let me withdraw
23 that.
24        It was an almost unanimous report; is
25 that right?

456

1   A.   Yes.
2   Q.   Everyone but one person signed
3 on to the final report?
4   A.   Yes.
5   Q.   Did you agree with all the
6 recommendations in the report?
7   A.   I -- I believe -- I believe that
8 I did, yes.
9   Q.   Did you think any were missing?
10   A.   I thought that they did a pretty
11 thorough job.  I -- I don't recall any that I
12 thought were lacking.
13   Q.   They did not recommend removal
14 of the qualified voter affidavit, correct?
15   A.   They did not.
16   Q.   And they did not recommend
17 removal of the challenge voter affidavit,
18 correct?
19   A.   Correct.
20   Q.   Fair to say that the people who
21 heard the most direct testimony from Granite
22 Staters on voter confidence did not think that
23 removal of the qualified voter affidavit was a
24 good solution to the problem of declining
25 voter confidence?

457

1   A.   They did not identify it as --
2 as an issue.
3   Q.   And they -- okay.  I think I
4 made that point.  Just to button this up, are
5 there any other state interests that HB 1569
6 advances that you have not discussed?
7   A.   No.
8   Q.   And is there any analysis that
9 you've done on how 1569 will advance any of
10 the interests that we have not discussed?
11   A.   No.
12   Q.   Okay.  Turning to burdens.  What
13 kind of burdens could 1569 impose on voters?
14   A.   I think the -- the -- we've
15 already covered it, but it's -- it is the
16 potential and -- and the likelihood that there
17 will be voters that show up on Election Day
18 that do not have the documentation that they
19 need to register to vote.
20   Q.   And I think I've asked you if
21 you know how much a passport costs?
22   A.   Yes.
23   Q.   Do you know how much a
24 naturalization certificate costs?
25   A.   No.

458

1   Q.   Do you know how long it takes?
2   A.   How long it takes to -- to
3 obtain a certificate?
4   Q.   Yes.
5   A.   A naturalized citizen needs a
6 replacement?
7   Q.   Yes.
8   A.   I don't know.
9   Q.   Do you know if that process has
10 been delayed by the federal lapse in
11 appropriations?
12   A.   I don't know if it has or not.
13   Q.   If a voter realizes a few days
14 before the election that they will need to get
15 a US passport or a naturalization certificate,
16 will they be able to do that in time?
17   A.   I don't know the answer to that.
18   Q.   What groups of New Hampshire
19 residents do you anticipate would be most
20 likely to be impacted by the elimination of
21 the qualified voter affidavit, despite being
22 US citizens?
23   A.   I -- I don't know that -- that
24 there's a particular one that stands out.
25   Q.   How about people whose last

459

1  names have recently changed due to marriage,
2  divorce, or adoption?
3  **A.     That's a group that will have to**
4  **show additional documentation.**
5  Q.    Students whose documents are
6  with their parents?
7  **A.     I mean, possible. I believe**
8  **that we have been allowing dig- -- digital**
9  **images of those documents presented on a cell**
10 **phone or whatever, to be an acceptable**
11 **presentation of that document.**
12 Q.    What about older people who have
13 recently moved and may have downsized and
14 thrown away documents?
15 **A.     It's -- it's possible.**
16 Q.    People who can't afford a US
17 passport or naturalization certificate?
18 **A.     Again, possible.**
19 Q.    People with disabilities who
20 have difficulty making multiple trips to and
21 fro?
22 **A.     It's possible.**
23        MR. KLEMENTOWICZ:  Gill, 32,
24 please.
25        MR. BISSONNETTE:  Sure.

460

1        (Scanlan Exhibit 17, Email
2  Thread Subject RE:  Registering to Vote
3  Question, marked for identification.)
4  BY MR. KLEMENTOWICZ:
5  Q.    Do you recognize this document,
6  which is Scanlan Exhibit 17?
7  **A.     I -- I don't specifically recall**
8  **this one, but I just read it.**
9  Q.    Does it appear to be an email
10 exchange involving you?
11 **A.     Yes.**
12 Q.    And my read of this document is
13 that there is a voter, I guess, who reached
14 out to you who had an issue with his adopted
15 son who could not get a certificate of
16 citizenship; is that right?
17 **A.     Yes.**
18 Q.    And you advised this person to
19 sign the qualified voter affidavit to approve
20 citizenship?
21 **A.     Yes.**
22 Q.    How would this person prove
23 citizenship now?
24 **A.     This individual I mean, let's**
25 **say a -- is the individual. Hopefully, this**

461

1  **person has -- had their issue addressed,**
2  **and -- and they're now a voter in the state of**
3  **New Hampshire. But if somebody that was**
4  **similarly situated was aware of a potential**
5  **issue like this, I would hope that they would**
6  **reach out to my office, and we would utilize**
7  **the resources that we're trying to put**
8  **together to help that person work through this**
9  **issue. Obviously, it would have to be done in**
10 **advance of -- of Election Day.**
11 Q.    How would you help this person
12 walk through this issue?
13 **A.     Part of the effort that we're**
14 **undertaking is, you know, trying to identify**
15 **the resources such as databases that might be**
16 **available, contacts that might be able to help**
17 **us work through issues like this. This is**
18 **pretty unique, but these are the types of**
19 **situations that we want to be helpful with**
20 **moving forward.**
21 Q.    Not disputing at all that your
22 office wants to be helpful, there's not very
23 much you can do, right?  Your office can't
24 create a certificate of citizenship or create
25 other proof of citizenship and can't advise

462

1  signing the qualified voter affidavit. So
2  beyond putting this person in touch with the
3  senators, is there anything that your office
4  could do, even if you wanted to?
5        MR. BROADHEAD:  Objection to
6  form. Go ahead.
7        THE WITNESS:  I -- we want to be
8  able to come up with methods where we can
9  verify citizenship.
10 BY MR. KLEMENTOWICZ:
11 Q.    There are not yet any such
12 methods?
13 **A.     They're not currently, no.**
14 Q.    Okay. I want to talk a little
15 bit about the challenge voter affidavit.
16        Can you walk me through your
17 understanding of how a voter challenge is
18 processed in New Hampshire?
19 **A.     We're talking about a real**
20 **challenge?**
21 Q.    Yes.
22 **A.     Yeah. If there is a voter in a**
23 **polling place or an official challenger that's**
24 **appointed by a political party, the moderator**
25 **can be notified by those individuals, and a**

463

1 challenge to the qualifications of a voter can
2 be made by filling out a challenge voter form
3 and having either documentation or direct
4 knowledge on how a particular voter is not
5 qualified.
6     Q.    And a voter is not notified in
7 advance that they're going to be challenged
8 typically?
9     A.    No, they don't have to be.  No.
10     Q.    So they may not bring supporting
11 documentation with them to go vote; is that
12 right?
13     A.    That's quite possible, yup.
14     Q.    So for example, if I go to vote
15 and someone challenges me on the basis that
16 I'm not a citizen, that's -- first, is that a
17 statutory basis for a challenge?
18     A.    Yes.
19     Q.    Because I didn't know in advance
20 I may not have brought documentary proof of
21 citizenship with me; is that right?
22     A.    Yes.
23     Q.    The challenge voter does not
24 have an attorney appointed; is that right?
25     A.    That's correct.

464

1     Q.    And the moderator judges whether
2 it is more likely than not that the challenge
3 is valid; is that right?
4     A.    Yes.
5     Q.    So the moderator could take the
6 word of the voter challenger -- I'm sorry.
7       The moderator could determine that the
8 challenger is more credible than the
9 prospective voter, right?
10     A.    So the -- a few things at play.
11 Number one is the -- the documentation or the
12 firsthand knowledge that would make it more
13 likely than not.  That's true if -- if it is
14 an issue related to citizenship or domicile,
15 the supervisors of the checklist would have an
16 opportunity to weigh in on the qualifications
17 issue.  And then based on that information,
18 the moderator would have to make a decision on
19 whether the -- the challenge was well-grounded
20 or not.
21     Q.    And then, under 1569, the voter
22 can appeal to superior court?
23     A.    Yes.
24     Q.    And they have to pay a filing
25 fee?

465

1     A.    I'm not sure what that process
2 would be.
3     Q.    Do the voter and the moderator
4 then leave the polling place to go to court?
5     A.    I'm not sure how that process
6 would work.
7     Q.    Okay.  What state interests are
8 advanced by the removal of the challenge voter
9 affidavit in this context?
10     A.    I -- I cannot think of one.
11     Q.    Okay.  Do you believe that the
12 existence of the challenge voter affidavit for
13 voter challenges has been a contributing
14 factor to any declining voter confidence in
15 New Hampshire?
16     A.    Not specifically, no.
17     Q.    Okay.  There are communities
18 that do midnight voting in New Hampshire,
19 right?
20     A.    I would just say that again.  I
21 didn't hear you.
22     Q.    There are communities that do
23 midnight voting in New Hampshire?
24     A.    There are -- yes.
25     Q.    And I can never remember.  It's

466

1 Dixville and Hart's Location?
2     A.    Dixville, Hart's Location and
3 Millsfield.
4     Q.    How would a voter challenge --
5 how would a voter appeal -- a challenge
6 determination at midnight?
7     A.    Well, I think that if -- if
8 you're talking about how -- communicating with
9 the court.
10     Q.    Yeah.
11     A.    I don't know how the court
12 would -- would accommodate that.  You know,
13 the midnight voting is such that it is very,
14 very, very early on the day of the election.
15 So timing, you know, timing would be on the
16 side of, you know, waiting to the following
17 day when the -- when the courts are open.
18 Same day, but later in the, you know.
19     Q.    Just if you'll indulge me.  So
20 theoretically, what I understand you're saying
21 is polls open at midnight in Dixville.  Voter
22 is challenged at 12:03.  The challenge is
23 deemed well-grounded.  The election is
24 suspended until the court's open?
25     A.    I'm not exactly sure how that

467

1  would play out.  You know, I haven't thought
2  about that specific scenario, but it's
3  possible.
4      Q.    That would require at least some
5  of the election officials to just stay there,
6  though, with the ballots during the entirety
7  of that court process, right?
8      A.    Again, I -- you know, I don't
9  know exactly how it would play out in that
10  instance.
11      Q.    People who are incarcerated in
12  the county jails can vote in New Hampshire; is
13  that right?
14      A.    Yeah.  As long as they're not in
15  the county jail for a felony, yes.
16      Q.    Fair enough.  I think in my
17  head, they'd be at the state prison for that.
18  And there is a procedure to register by mail
19  in New Hampshire?
20      A.    Yes.
21      Q.    And if you were registering to
22  vote from jail, you would register by mail,
23  presumably?
24      A.    Yes.
25      Q.    Do you know if people at the

468

1  county jails are allowed to keep a passport or
2  birth certificate in their possession?
3      A.    I don't know.
4      Q.    Fair to say that an incarcerated
5  person's ability to gather documents is
6  restricted?
7      A.    Certainly by that individual.
8      Q.    Well, and there are limits on
9  phone calls, and you have to pay for that.
10      A.    Right.  Yeah.  You know, I mean,
11  it's possible they could have the assistance
12  of a family member.
13      Q.    Possible they couldn't?
14      A.    That's possible, too.
15      Q.    Prior to HB 1569, if a voter
16  possessed proof of citizenship, but did not
17  have it on them, local election officials were
18  not instructed to send that voter home,
19  correct?
20      A.    Correct.
21      Q.    They're instructed to have them
22  fill out the qualified voter affidavit?
23      A.    Yes.
24      Q.    Why?
25      A.    At the time, the statute deemed

469

1  that was adequate proof of citizenship,
2  filling out the affidavit.
3      Q.    But why was it best practice to
4  have them fill out the affidavit instead of go
5  home for the qualified -- for the documentary
6  proof?
7      A.    Why was it?
8      Q.    Yes.
9      A.    Just repeat the question again.
10      MR. KLEMENTOWICZ:  Okay.  I'm
11  going to do it this way.  Tab 20.  Did we
12  already do that?  This is the -- I think we
13  did.  This is the voter manual, which is
14  exhibit --
15      MR. BROADHEAD:  The Election
16  Procedure Manual?
17      MR. KLEMENTOWICZ:  Yes.  I'm
18  sorry.
19      MR. BROADHEAD:  Thirteen.
20      MR. KLEMENTOWICZ:  Exhibit 13.
21      Q.    If you turn to Bates stamp page
22  SOS 482461.
23      A.    Okay.  I'm there.
24      Q.    I'm not.  Okay.  Are you?
25      MR. FOX:  No.  What is that --

470

1      MR. KLEMENTOWICZ:  461.
2      THE WITNESS:  It's like the
3  third page in.
4      MR. KLEMENTOWICZ:  Okay.  Thank
5  you.
6  BY MR. KLEMENTOWICZ:
7      Q.    Okay.  The second full paragraph
8  on the right-hand column, it starts by saying,
9  best practice is to have all applicants who do
10  not have proof of citizenship complete a
11  qualified voter affidavit.  Did I read that
12  right?
13      A.    Yes.
14      Q.    Why is it best practice to have
15  applicants complete the qualified voter
16  affidavit rather than returning home for proof
17  of citizenship?
18      A.    Well, I would say con- --
19  convenience of the voter.  It -- and not --
20  not requiring them to leave the polling place
21  once there -- already there when this method
22  of proving that qualification is available to
23  them.
24      Q.    And is that because if they
25  leave to go home and get the documents, they

471

1  may not come back?
2      **A.    That's a possibility.**
3      Q.    Okay. A few quick topics about
4  the timing of constraints.
5          In the event that the court enjoined HB
6  1569 and the documentary proof of citizenship
7  requirement, could your department revert to
8  the prior voter registration scheme?
9          MR. BROADHEAD: Objection. Is
10 that a question about the legal possibility or
11 just implementing if that was to be the order?
12 Like --
13         MR. KLEMENTOWICZ: Implementing.
14         MR. BROADHEAD: Okay. You can
15 answer that.
16         THE WITNESS: I think it depends
17 on what would be involved with enjoining, but
18 we would make every effort to comply with
19 whatever the judge ruled.
20 BY MR. KLEMENTOWICZ:
21     Q.    What would be involved in doing
22 that?
23     **A.    Well, number one, we're -- we've**
24 **done a lot of training on compliance with**
25 **1569. That would have to be reversed. We**

472

1  **would have to make sure that there was a**
2  **supply of the affidavits that had been used in**
3  **the past. There may be some reversal in the**
4  **SVRS that would have to take place.**
5      Q.    Less training would be needed
6  for local election officials to revert to an
7  old process. Like, before 1569 then to
8  install a new process?
9      **A.    It -- it would -- I -- I don't**
10 **-- I wouldn't say necessarily there would be**
11 **less training involved, because the election**
12 **officials have had a couple of elections,**
13 **local elections, with the -- with 1569 in**
14 **place. So it -- it would require a -- a**
15 **significant amount of training along the lines**
16 **of what we normally do before an election.**
17     Q.    You said a couple of elections.
18 Just one, though, right? It's just the town
19 elections?
20     **A.    Town elections, round of city**
21 **elections that are underway now.**
22     Q.    Yeah.
23     **A.    Some of the cities have already**
24 **had primaries.**
25     Q.    Primaries.

473

1      **A.    And then there have been a**
2  **couple of special state elections.**
3      Q.    How long would it take for you
4  to implement an injunction order if one
5  issued?
6      **A.    I mean, depending on -- again,**
7  **it depends on what the judge orders, but the**
8  **closer we get to an actual election,**
9  **obviously, the more difficult that would be.**
10 **That would become if -- if it was something**
11 **that was ordered between now and the end of**
12 **the year. I'm not sure that we could easily**
13 **do it for the 2026 election cycle.**
14     Q.    What if the order came in June?
15     **A.    That would be more problematic.**
16 **You know, filing period has already taken**
17 **place in June. There would have been a**
18 **critical session of the supervisors of the**
19 **checklist that takes place before the filing**
20 **period opens at the beginning of June. Once**
21 **the filing period takes place, we're in ballot**
22 **production mode. So a lot of our resources**
23 **are geared towards all the preparatory**
24 **materials. But again, it depends on what the**
25 **judge orders.**

474

1      Q.    When is the latest if the -- if
2  the judge issued an order saying the state
3  must use qualified voter affidavits for proof
4  of citizenship and/or reinstated the challenge
5  voter affidavit for voter challenges, what
6  would be the latest that you could get that
7  order and feel confident that you could
8  implement it?
9      **A.    Probably early July.**
10     Q.    Early July. Okay.
11         MR. KLEMENTOWICZ: I might be
12 done with this portion. We're going to
13 caucus, if that's okay. Then Mr. Fox will
14 have some questions for you.
15         MR. BROADHEAD: Continuing the
16 30(b)(6)?
17         MR. KLEMENTOWICZ: Continuing
18 the 30(b)(6).
19         MR. BROADHEAD: Thank you.
20         THE REPORTER: Off the record.
21         (Off the record 10:52 a.m.)
22         (On the record 11:05 a.m.)
23         THE REPORTER: We're back on the
24 record.
25         EXAMINATION

475

BY MR. FOX:

1  BY MR. FOX:
2      Q.  Good morning, Secretary Scanlan.
3      A.  Good morning.
4      Q.  I'm David Fox.  I'm counsel for
5  the other plaintiff in the other consolidated
6  case, which is New Hampshire Youth Movement.
7  I just have a few questions for you.  Henry
8  was very thorough, which is great.
9      First, you were asked about some
10 communications with the legislature and the
11 governor about 1569, right?
12     A.  Yes.
13     Q.  Do you recall that House Bill
14 1569 passed the legislature on July 2nd, 2024,
15 or thereabouts.  It was enrolled, I believe,
16 on July 2nd, 2024?
17     A.  I don't -- I don't recall the
18 exact date that it was -- you say enrolled.
19 Yeah.  I just don't know that.  I mean, the
20 legislature would have passed it before that
21 date.
22     Q.  Yep.
23     A.  So, you know, the enrolling
24 process and the subsequent signature by the
25 governor would've been after that.

476

1      Q.  Do you recall that the governor
2  did not sign it until --
3          THE REPORTER:  Move your
4  microphone higher.
5      Q.  Do you recall that it was not
6  signed by the governor until September 17th of
7  2024?
8      A.  Yes.
9      Q.  And that meant that it didn't
10 take effect until after the November 2024
11 election, right?
12     A.  Yes.
13     Q.  Did you have any communications
14 with the legislature about that timing aspect
15 of things?
16     A.  No.
17     Q.  Did you have any communications
18 with the governor about that timing aspect of
19 things?
20     A.  No.
21     Q.  Do you know why the law was not
22 signed until such time as it would not take
23 effect until after the November 2024 election?
24     A.  I -- I don't have direct
25 knowledge why.

477

1      Q.  Do you have indirect knowledge?
2      A.  I don't have indirect knowledge.
3  I mean, I can -- you know, I -- I can
4  speculate.  Maybe I shouldn't speculate.  But,
5  yeah, the law was signed so that it would be
6  effective after the date of the -- of the
7  general election.
8      Q.  Was that a relief for you as
9  Secretary of State?
10     A.  It certainly made my job easier.
11     Q.  Did you have concerns about what
12 would have happened in the November 2024
13 election if the law had gone into effect
14 before that?
15     A.  No.  We would've done, you know,
16 what would have been necessary to put that law
17 into effect.
18     Q.  Have you had any communications
19 with the legislature or anyone in the
20 legislature about HB 464?
21     A.  I'm sure that I did.  I'm not
22 recalling any specific ones.
23     Q.  Do you know with whom you
24 would've communicated about HB 464?
25     A.  Probably would've been the --

478

1  probably would've been Senator Gray.
2      Q.  I --
3      A.  Who's chair of the Senate
4  election law committee.
5      Q.  How many times do you think you
6  communicated with Senator Gray about HB 464?
7      A.  I don't have a number, other
8  than to say that Senator Gray and I
9  communicate on a regular basis about bills
10 that are going through his committee.
11     Q.  Do you know if you had any
12 written, emailed, or otherwise communications
13 with Senator Gray about HB 464?
14     A.  I'm -- I'm not recalling any.
15     Q.  And what was the substance of
16 your communications with Senator Gray about HB
17 464?
18     A.  As I recall, 464 was -- had
19 provisions in there about implementation,
20 basically of 1569.  And we may have had
21 discussions on the resources necessary to make
22 that happen.
23     Q.  Anything you recall beyond that
24 about what -- what resources you would have
25 referenced or what you would have discussed

479

1  about the --
2      A.  No.
3      Q.  -- resources necessary?
4      A.  No.
5      Q.  Whose idea was HB 464?
6      A.  I believe it was Senator Gray.
7  Let me qualify that by saying that I don't
8  believe Senator Gray was one of the sponsors
9  of the -- of the original bill, but it became
10 a vehicle for him to address some of the
11 follow-up issues related to 1569.
12     Q.  And I know we've seen emails and
13 you've talked about meetings.  Do you ever
14 text with Senator Gray or other members of the
15 legislature?
16     A.  I don't text.  I mean, with
17 Senator Gray, it is -- I don't -- I don't text
18 with Senator Gray.  And when we communicate,
19 it is usually in person, but our offices are
20 very close by, and so we usually stop in.
21     Q.  Yesterday, some of the other
22 folks from your office suggested that there is
23 difficulty -- that if there's difficulty with
24 a local election official's ability to access
25 SVRS on Election Day to verify a voter's

480

1  information, that officials could just call
2  your office for help with that.
3      A.  Yes.
4      Q.  If you got thousands of calls --
5  or if your office got thousands of calls on
6  Election Day with that request, would your
7  office be able to handle that?
8      A.  Thousands of calls would be
9  problematic.
10         MR. KLEMENTOWICZ:  Participant
11 waiting to join.  Thanks.
12 BY MR. FOX:
13     Q.  How many people in your office
14 are available to answer the phone on Election
15 Day to help with that kind of problem?
16     A.  At any given time on the day of
17 the election, we probably have six to ten.
18     Q.  You testified yesterday about
19 how some qualified voter affidavit use in
20 prior elections before 1569 may have been
21 individuals who had the document, but they
22 just didn't have it with them.  Do you recall
23 that?
24     A.  Yes.
25     Q.  You agree with me people are

481

1  busy often, right?
2      A.  People are generally busy, yes.
3      Q.  And voters have to make time in
4  their schedule to vote, right?
5      A.  Sure.
6      Q.  And it's not always everyone's
7  highest priority, right?
8      A.  I think -- certainly I think
9  voters place a high priority when they go to
10 vote on Election Day, but I'm sure that it's
11 not everybody's top priority.
12     Q.  People have to go to work.
13     A.  Of course.
14     Q.  They have to drop off their kids
15 at school if they have kids in school.
16     A.  Life goes on.
17     Q.  They have to take care of their
18 families, if they have a family.  If you make
19 voting harder, some people may not vote,
20 right?
21         MR. BROADHEAD:  Objection to
22 form.
23         THE WITNESS:  Yes.  I mean,
24 if -- if -- if -- if you make it harder, it
25 may put a burden on some individuals.

482

1  BY MR. FOX:
2      Q.  If lines are too long, some
3  people might leave, right?
4      A.  That's possible.
5      Q.  And that's actually why your
6  office monitors line lengths and tries to make
7  sure that they don't get too long, right?
8      A.  Yes.
9      Q.  If people need to leave and go
10 home to get more documents, they might not
11 come back, right?
12     A.  That's possible.
13     Q.  If people need to make some
14 special trip to somewhere else to get
15 documents, they might not make that trip,
16 right?
17     A.  That's possible.
18     Q.  If voting seems too complicated,
19 people might decide it's not worth it, right?
20     A.  That's possible.
21     Q.  In the spring local elections
22 under HB 1569, you've testified that you think
23 most people who needed more documents returned
24 with them, right?
25     A.  Yes.

483

```
 1    Q.   Some people did not, right?
 2    A.   Some did not.
 3    Q.   You agree with me, local
 4  elections have lower turnout than state and
 5  federal elections, right?
 6    A.   Generally speaking, it obviously
 7  depends on what's on the ballot.  But
 8  generally, local elections have a lower
 9  turnout than state elections.
10    Q.   And the voters who vote in local
11  elections tend to be more engaged and
12  consistent voters, right?
13    A.   Yes.
14    Q.   Were you surprised by the effect
15  of HB 1569 in local elections?
16    A.   No.
17    Q.   You testified yesterday, and
18  there's a guidance document from your office,
19  that Global Entry cards are not accepted as
20  proof of citizenship.  Do you recall that?
21    A.   Yes.
22    Q.   Do you have a Global Entry card?
23    A.   No.
24    Q.   I do and oddly, I'm going to
25  mark it as an exhibit.  Although we will
```

484

```
 1  designate it confidential under the protective
 2  order, and I'll just take a picture and send
 3  it to your office rather than put a stamp on a
 4  Global Entry card.
 5        Have you ever seen a Global Entry card,
 6  Secretary Scanlan?
 7    A.   No.
 8        THE REPORTER:  So that's Exhibit
 9   18, right?
10        MR. FOX:  Yes.
11        THE REPORTER:  Thank you.
12        MR. FOX:  And I'll send -- if
13  you give me an email later, I will send you a
14  picture of it.
15        THE REPORTER:  Thank you.
16        (CONFIDENTIAL Scanlan Exhibit
17  18, Global Entry Card, marked for
18  identification.)
19  BY MR. FOX:
20    Q.   I will represent to you that
21  that is my Global Entry card.  Do you see
22  there's a reference on there to citizenship?
23    A.   Yes.
24    Q.   And it says USA for me, right?
25    A.   Yes.
```

485

```
 1    Q.   Do you agree with me that should
 2  be accepted as a reasonable documentation of
 3  citizenship?
 4    A.   Not being familiar with this
 5  card and the circumstances which it's used,
 6  you know, I'd want to know more about that.
 7    Q.   If it's a federal identification
 8  card that indicates that someone is a US
 9  citizen on the face of the card, if that turns
10  out to be true, would you agree that it should
11  be accepted as a reasonable documentation of
12  citizenship?
13    A.   If it's a government issued
14  card, yes.
15    Q.   Do you think that's something
16  that you'll need to take another look at in
17  your guidance?
18    A.   Are you referring to me
19  personally or the legislation that mentions
20  the, you know, the documentation that would
21  prove citizenship?
22    Q.   Well, the legislation includes
23  other reasonable proof of --
24    A.   Yeah.
25    Q.   -- citizenship, right?
```

486

```
 1    A.   Yeah.
 2    Q.   So I guess I'm referring to your
 3  office and you personally, do you think you
 4  should take another look at whether Global
 5  Entry cards could be proof --
 6    A.   Yes.
 7    Q.   -- of citizenship?
 8    A.   Yeah.
 9    Q.   If it turns out that your office
10  got this wrong, does that suggest that local
11  officials also may struggle with understanding
12  what is and is not reasonable documentation of
13  citizenship?
14        MR. BROADHEAD:  Objection to
15  form.
16        THE WITNESS:  The local offi- --
17  officials rely on the guidance that we provide
18  on, you know, what documentation would be
19  appropriate.
20  BY MR. FOX:
21    Q.   So if your office got it wrong,
22  it might suggest that local officials may get
23  it wrong?
24    A.   It's possible, yeah.
25        MR. BROADHEAD:  Objection to
```

487

1  form.
2  BY MR. FOX:
3      Q.    Has your office provided
4  comprehensive documentation of what
5  constitutes other reasonable documentation of
6  citizenship?
7      A.    If you're referring to some
8  exhaustive list of what, you know, would
9  qualify, the answer's no.
10     Q.    Do local efficients -- officials
11 have discretion to assess what constitutes
12 reasonable documentation of citizenship?
13     A.    Yes.
14     Q.    And I think you said that they
15 should assess that under a more likely than
16 not standard; is that right?
17     A.    Yes.
18     Q.    How should a local official go
19 about deciding whether a given thing is
20 evidence, more likely than not, that someone
21 is a US citizen?
22     A.    I -- they have to take a look at
23 the documentation that is provided to them and
24 based on knowledge or other resources, be able
25 to make that determination.  But as part of

488

1  that determination process, we train and give
2  guidance that, you know, if there's any
3  question before they deny a potential voter
4  the opportunity to vote, that they check with
5  my office or the attorney general's office
6  just to make sure that there's a, you know, a
7  second set of review.
8      Q.    Do you agree with me that before
9  HB 1569, the overwhelming majority of people
10 who proved their citizenship using a qualified
11 voter affidavit were telling the truth, and in
12 fact, they were citizens?
13         MR. BROADHEAD:  Objection to
14 form.
15         THE WITNESS:  I can only say
16 that that those voters that used qualified
17 voter affidavit to prove their citizenship
18 were exercising a statutory process that was
19 available to them.
20 BY MR. FOX:
21     Q.    But you don't think that most of
22 them were falsely affirming their citizenship,
23 do you?
24     A.    I think -- I think most of them
25 -- hopefully, all of them were United States

489

1  citizens.
2      Q.    So do you think that a sworn
3  statement from someone saying that they are a
4  citizen is more likely than not, evidence that
5  they are more likely than not, a citizen?
6      A.    I think that the legislature has
7  decided that actually showing documentation of
8  that proof is a public policy that they want
9  to pursue.
10     Q.    But why couldn't a sworn
11 statement from someone be reasonable
12 documentation of their citizenship?
13     A.    Because fewer people are -- are
14 not willing to accept that simply a person's
15 word for it, they want to see the
16 documentation.
17     Q.    But if a local official looks at
18 a sworn statement offered by a voter and
19 concludes that it's more likely than not that
20 person is telling the truth, should they have
21 discretion to accept that even under 1569?
22     A.    Because that's a statutory --
23 that -- that was a statutory process that was
24 available to a voter at the time.  And if the
25 -- if the local election official had no

490

1  reason not to believe that the information
2  that was on that affidavit was not true, then
3  they would accept that as proof.
4      Q.    But I --
5          MR. BROADHEAD:  I'll just pause
6  for a second.  We're going to have a copy made
7  for Exhibit 18.  If you can make four copies.
8  Thank you.
9  BY MR. FOX:
10     Q.    But I guess what I'm trying to
11 understand is you said that the standard for
12 what constitutes other reasonable
13 documentation is whether it makes it more
14 likely than not that someone is a cit- -- a
15 citizen, right?
16     A.    Yes.
17     Q.    What about a sworn statement
18 affirming citizenship doesn't meet that test?
19     A.    The legislature's desire not to
20 accept affidavits.
21     Q.    Even though the legislature
22 accepted other reasonable documentation of
23 citizenship?
24     A.    I think they made it pretty
25 clear they did not want affidavits to be used

491

1  as a part of that process.
2      Q.   What about if -- do you still
3  have in front of you Scanlan Exhibit 17?  If
4  you could take a look at that.  It was an
5  email.
6      **A.   I'm sure it's here somewhere.**
7  **If I could just find it.  Okay.**
8      Q.   Scanlan Exhibit 17 is an email
9  from a voter's father explaining the
10 circumstances of his adoption from Cambodia.
11 Do you see that?
12     **A.   Yes.**
13     Q.   Is Scanlan Exhibit 17 reasonable
14 documentation of citizenship?
15     **A.   I would say, no.**
16     Q.   Why not?
17     **A.   Because the -- the citizenship**
18 **is asserted in this email, but there is not a**
19 **document that is provided that shows and**
20 **verifies that citizenship.**
21     Q.   Well, the email is a document,
22 right?
23     **A.   The email is a communication,**
24 **yes.**
25     Q.   But your view is that doesn't

492

1  suffice?
2      **A.   That would be my view.**
3      Q.   Is it your view that more likely
4  than not, the person described in this email
5  is not a citizen?
6      **A.   I can't say that.**
7      Q.   What if instead of this email,
8  the father filled out a declaration under
9  penalty of perjury saying the same thing.
10 Would that suffice?
11     **A.   I don't believe it would.  I**
12 **think that what 1569 is requesting is an**
13 **actual document from a governmental authority**
14 **that shows US citizenship.**
15     Q.   What about if you had that email
16 and some adoption paperwork showing that, in
17 fact, it was true that this person was adopted
18 from Cambodia as described in the email.
19 Would that suffice?
20     **A.   I think I would want to have**
21 **that reviewed by a -- a legal authority that**
22 **would show that adoption by US parents of a --**
23 **you know, of an individual of a certain age**
24 **would automatically constitute citizenship.  I**
25 **don't know that personally.**

493

1      Q.   So if this -- the voter
2  described in this email shows up at a polling
3  place on Election Day, they have this email
4  with this explanation, and they have their
5  certificate of adoption, what should the local
6  election official do?
7      **A.   I think the local election**
8  **official would deny it.**
9      Q.   And that voter wouldn't be able
10 to vote?
11     **A.   That would be the case on**
12 **Election Day, yes.**
13     Q.   Even though you're actually not
14 sure if that might be sufficient proof of
15 citizenship or not?
16     **A.   Which is why we're encouraging**
17 **individuals in this situation not to wait**
18 **until Election Day to -- to resolve it.  And**
19 **it would be the desire of my office to be able**
20 **to help that individual obtain the**
21 **documentation that they need using resources**
22 **that may be available to us.**
23     Q.   But a lot of voters in New
24 Hampshire show up.  A lot of first-time voters
25 in New Hampshire show up to vote and register

494

1  on Election Day; isn't that right?
2      **A.   That's true.**
3          MR. BROADHEAD:  Can we pause
4  there to mark 18?
5          MR. FOX:  Absolutely.
6          THE REPORTER:  We are naming
7  that confidential.  I'm sorry.  I didn't hear
8  you.
9          MR. FOX:  Yes, we are naming
10 Exhibit 18 confidential.
11         MR. BROADHEAD:  We're preserving
12 our rights to object to it under the terms of
13 the protective order.
14         MR. FOX:  Do you think it's not
15 confidential?
16         MR. BROADHEAD:  Not in its
17 entirety.
18         MR. FOX:  I'm happy to have a
19 discussion about redacting it if you prefer to
20 redact it.
21         MR. BROADHEAD:  It's an exhibit
22 to a transcript -- deposition testimony now.
23 So it's subject to our rules and the
24 protective order.
25         MR. FOX:  This concludes my

495

1 questions in the 30(b)(6) section of this
2 deposition.
3      MR. BROADHEAD: Okay. I have
4 just some questions. Can I?
5      MR. KLEMENTOWICZ: Please.
6      EXAMINATION
7 BY MR. BROADHEAD:
8    Q.   Okay. You testified today on
9 behalf of the Secretary of State's Office as a
10 30(b)(6) witness, correct?
11   A.   Yes.
12   Q.   And we -- do you recall having a
13 discussion about state interests being
14 advanced by HB 1569?
15   A.   Yes.
16   Q.   And are -- do you -- are you
17 aware that the Attorney General's Office is
18 named as a defendant in this lawsuit?
19   A.   Yes.
20   Q.   Is it possible that the Attorney
21 General's Office may have state interests that
22 are advanced by HB 1569 that you did not
23 testify to today?
24   A.   Yes.
25      MR. BROADHEAD: Okay. That's

496

1 it. Thank you.
2      THE REPORTER: I'll take us off
3 the record.
4      (Off the record 11:25 a.m.)
5      (On the record 11:27 a.m.)
6      THE REPORTER: We're back on the
7 record.
8      CONTINUED EXAMINATION
9 BY MR. KLEMENTOWICZ:
10   Q.   All right. Mr. Scanlan, from
11 here on out, unless I specify, I'm going to be
12 asking questions of you in your personal
13 capacity/as a designated expert. So by you,
14 I'm going to mean Dave Scanlan and not the
15 Department of State. Okay?
16   Are you aware that you have been
17 noticed as an expert witness in this case?
18   A.   Yes.
19   Q.   Are you aware that the Open
20 Democracy plaintiffs have retained experts of
21 their own?
22   A.   Yes.
23   Q.   One of whom is named
24 Dr. Lorraine Minnite?
25   A.   I'm not aware of that person

497

1 specifically.
2      MR. KLEMENTOWICZ: Okay. Gill,
3 six, please.
4      (Scanlan Exhibit 19, Expert
5 Report by Lorraine Minnite, marked for
6 identification.)
7 BY MR. KLEMENTOWICZ:
8    Q.   Handing you Scanlan Exhibit 19,
9 which I can represent is the expert report
10 authored by Dr. Minnite in this case.
11   A.   Okay.
12   Q.   Have you reviewed this document?
13   A.   No.
14   Q.   Have you had an opportunity to
15 review it?
16   A.   No.
17   Q.   Did you know it was sent to your
18 attorneys in July?
19   A.   No.
20   Q.   Do you plan to offer any
21 testimony in response to her report?
22   A.   I guess I would want to read it
23 before I make that decision.
24   Q.   Okay. Well, the rules of civil
25 procedure require expert opinions to be

498

1 disclosed in advance of trial, and this is our
2 opportunity to probe your expert opinions.
3 And so sitting here today, do you plan on
4 reviewing this document and testifying in
5 response to her document?
6    A.   I certainly plan on reviewing
7 the document.
8    Q.   So I think I know the answer to
9 this. But is there anything in her report
10 that you dispute?
11   A.   I don't know.
12   Q.   Okay. Is there any reason that
13 you didn't review this advent- -- this report
14 in advance of your deposition?
15   A.   This is the first time I've seen
16 it.
17   Q.   Okay.
18      MR. BROADHEAD: I can save you a
19 lot of trouble. He's not planning on offering
20 any sort of opinion on this report, so...
21      MR. KLEMENTOWICZ: Okay.
22      MR. BROADHEAD: Yeah.
23      MR. KLEMENTOWICZ: That does
24 save me a lot of trouble. Thank you. Tab 38,
25 please. We're just going to do the same thing

499

1 with Dr. Minnite. Was that -- I'd like 38 and
2 39.
3     MR. BISSONNETTE: Oh, sure.
4     MR. KLEMENTOWICZ: Thank you.
5     (Scanlan Exhibit 20,
6 Supplemental Expert Report, marked for
7 identification.)
8 BY MR. KLEMENTOWICZ:
9     Q.   Document 20 is the supplemental
10 expert report of Dr. Mayer.  Is that --
11     **A.   Yes.**
12     Q.   Have you reviewed this document?
13     **A.   No.**
14     Q.   Are you planning on testifying
15 in response to this document?
16     **A.   No.**
17     Q.   Okay.
18     MR. BISSONNETTE: Should it be
19 37?
20     MR. KLEMENTOWICZ: It says 38
21 and 39. Should be Dr. Mayer's initial report.
22     MR. BISSONNETTE: Which is this
23 one.
24     MR. KLEMENTOWICZ: Okay. Unless
25 you want to stipulate that he has not reviewed

500

1 and is not going to respond to Dr. Mayer's
2 initial report.
3     MR. BROADHEAD: So stipulated.
4     MR. KLEMENTOWICZ: Okay.
5     THE REPORTER: Are we still
6 marking it?
7     MR. KLEMENTOWICZ: No, you don't
8 have to mark it. Thank you. Okay. Gill,
9 tabs 2 and 3, please. Gill?
10     MR. BISSONNETTE: Yup.
11     MR. KLEMENTOWICZ: Two and
12 three, please.
13     (Scanlan Exhibit 21, Defendant's
14 Expert Disclosure, marked for identification.)
15 BY MR. KLEMENTOWICZ:
16     Q.   So that is Exhibit 21, which is
17 the defendant's expert disclosures.
18     **A.   Yes.**
19     Q.   Have you seen this document
20 before?
21     **A.   I believe this is the first time**
22 **I've seen this.**
23     MR. KLEMENTOWICZ: Okay.  And
24 Document 22, is that just marked.  Should be
25 the supplemental reports.

501

1     (Scanlan Exhibit 22, Defendant
2 Supplemental, marked for identification.)
3     MR. BISSONNETTE: Did I not give
4 you one?
5     MR. KLEMENTOWICZ: I have one.
6     MR. BROADHEAD: I need a copy,
7 too.
8 BY MR. KLEMENTOWICZ:
9     Q.   Document 22 is defendant's
10 supplemental expert disclosures.  Have you
11 seen this document before?
12     **A.   I believe this is the first time**
13 **I've seen this, as well.**
14     Q.   Okay.  Can you do me a favor,
15 please, and read documents 21 and 22 as they
16 relate to you?
17     **A.   Sure.**
18     Q.   Thank you.
19     **A.   Okay.  I've read it.**
20     Q.   As an initial matter, do you
21 plan on offering any expert opinions outside
22 of what is disclosed in those two documents?
23     **A.   No.**
24     Q.   Okay.  In your initial
25 disclosures, which is Document 21, you

502

1 indicate that you will testify that every
2 voter should know who was participating in
3 each election and that every voter should have
4 confidence that each ballot was -- counted was
5 validly cast.  What testimony do you intend to
6 offer on that subject?
7     MR. BROADHEAD: I'm just going
8 to object as to basically asked and answered
9 and I'm going to just explain.  The scope of
10 his testimony has been extensively questioned
11 over the course of the 30(b)(6) because
12 they're -- the topics are one and the same.
13 So I expect that his expert testimony would be
14 that what he's already testified to today and
15 if you want him to repeat that, that's fine,
16 but that's our position.
17     MR. KLEMENTOWICZ: Okay.  I
18 don't think the asked and answered is an
19 appropriate objection at a deposition, but I
20 do want you to summarize your testimony on
21 that subject, please.
22     THE WITNESS: So I -- it -- it
23 will be consistent with the testimony that I
24 gave earlier that -- that voters having the
25 opportunity to know that those that are

503

1  participating in the election process are
2  qualified to participate.
3  BY MR. KLEMENTOWICZ:
4      Q.   Is it your expert opinion that
5  voters did not previously have that ability
6  prior to the passage of 1569?
7      A.   I -- I believe that the way the
8  process worked before that, created an
9  opportunity for some voters to doubt the
10 qualifications of those participants.
11     Q.   Is it your testimony that voters
12 should not have confidence in New Hampshire
13 elections that occurred prior to -- to HB
14 1569?
15     A.   No.
16     Q.   Is it your testimony that
17 without HB 1569, voters would not have
18 confidence in New Hampshire election results?
19     A.   No.
20     Q.   In your supplemental
21 disclosures, which are 22, it indicated that
22 you will testify regarding mechanisms and
23 processes that advance those interests and
24 strengthen public confidence in the validity
25 of election results.  What testimony do you

504

1  intend to offer on that subject?
2      A.   Just that the -- the procedures
3  that we have been implementing are designed
4  for transparency and better education and the
5  opportunity for all voters to know that the
6  participants are qualified.
7      Q.   How are you defining or
8  measuring voter confidence?
9      A.   Again, we rely on polling of
10 UNH, Andy Smith, and the trends that's
11 conveyed over time.  But more than that, it is
12 -- it is a conversation with the different
13 constituency groups in New Hampshire, voters
14 themselves, election officials that kind of
15 deliver the pulse of how the election process
16 is running.
17     Q.   Beyond the public polling that
18 you indicated from Andy Smith, are you relying
19 on any other quantifiable data in forming your
20 opinions?
21     A.   No.
22     Q.   What methodology are you
23 applying to determine whether there is a
24 casual relationship between actual or
25 unsubstantiated voter fraud and voter

505

1  confidence?
2      A.   Can you just repeat that
3  question again?
4      Q.   What methodology are you
5  applying to determine whether there is a
6  casual -- causal, not casual.  Causal
7  relationship between actual or unsubstantiated
8  voter fraud and voter confidence?
9      A.   I don't know that we have a
10 specific methodology that we're using to -- to
11 determine that.
12     Q.   Have you studied what strategies
13 are effective for combatting unsubstantiated
14 rumors of voter fraud?
15     A.   No.
16     Q.   Have you -- has HB 1569's
17 passage boosted voter confidence?
18     A.   I think that's yet to be
19 determined.
20     Q.   And how will it be determined?
21     A.   The outcome of the next round of
22 state elections.  How well that goes, how the
23 public perceives it, how the election
24 officials react to the new procedures.
25     Q.   And how will you quantify that,

506

1  if at all?
2      A.   I -- I don't know that we have a
3  specific -- specific program for
4  quantification other than just communicating
5  with the participants how the process worked.
6      Q.   Have you tried to estimate or
7  quantify the impact of HB 1569's passage on
8  voter confidence?
9      A.   No.
10     Q.   Do you intend to?
11     A.   I mean, at some point, we will
12 do a review of the process after the next
13 round of elections.
14     Q.   Is it possible that HB 1569 will
15 reduce voter confidence because people who are
16 eligible will have been turned away?
17     A.   I think that's yet to be
18 determined.
19     Q.   Is it possible?
20     A.   I suppose it's possible.
21     Q.   Your initial expert disclosures,
22 which are 21, say that you will testify that,
23 quote, self certification of voter eligibility
24 poses a significant risk to our system of
25 government.  What testimony do you intend to

507

1 offer on that subject?
2      A.    That documentation, proven
3 qualifications is a better alternative to
4 affidavits where we're basically taking a
5 person's word for their qualifications.
6      Q.    What is the factual basis for
7 your opinion that it is a significant risk?
8      A.    Other than just antidotal
9 information and -- and conversation and
10 understanding, I don't have a, you know, a
11 factual basis.
12      Q.    Is there any quantifiable data
13 about the risk to our system of government
14 that self-certification of voter eligibility
15 poses?
16      A.    There -- there may be something
17 that I will be reviewing.
18      Q.    Okay.  How long had New
19 Hampshire relied on the use of qualified or
20 challenge voter affidavits prior to 1569?
21      A.    New Hampshire's relied on
22 affidavits for as long as I've been in the
23 Secretary of State's Office.  However, the
24 form of those affidavits have changed over
25 time.  The qualified voter affidavit has been

508

1 around for maybe a dozen years, give or take.
2 Before that, there were specific affidavits
3 for the different qualifications, whether it'd
4 be domicile or citizenship.
5      Q.    Is it your testimony that during
6 all that period of New Hampshire history,
7 there was a significant risk to our system of
8 government posed by those affidavits?
9      A.    That's -- that's not my belief.
10      Q.    Just now it's a significant risk
11 of -- to our system of government?
12      A.    Things have changed over the
13 last few years.  And where you mentioned H.R.
14 1 in my prior testimony, created a huge
15 opportunity for unqualified individuals to be
16 able to get on the voter checklist.  The law
17 did not pass.  So, you know, that concern was
18 alleviated.  But over the last -- over the
19 course of the last administration, there was a
20 tremendous influx of migrants, noncitizens
21 flooding across the US border.  That has
22 changed circumstances quite a bit.  President
23 Biden issued an executive order that would
24 have made it easier for noncitizens to end up
25 on checklists in some states.  Because of the

509

1 way New Hampshire operates it was not as great
2 a threat here.  But the nature of elections
3 has changed pretty dramatically over the last
4 two decades.
5      Q.    What, if any, training,
6 experience, or expertise do you have in the
7 area of migration?
8      A.    I don't have any training in
9 migration.
10      Q.    Do you have any training in
11 demographics?
12      A.    No.
13      Q.    Do you know what percentage of
14 New Hampshire's population is undocumented?
15      A.    I do not know.
16      Q.    Do you know what percentage of
17 New Hampshire's population are immigrants?
18      A.    I do not know.
19      Q.    Do you know how any of those
20 numbers have changed over time?
21      A.    No, I don't have --
22      Q.    What was the executive order
23 that President Biden issued that, in your
24 estimation, made it easier for noncitizens to
25 end up on voting roles?

510

1      A.    He -- he -- his executive order
2 included some of the provisions of H.R. 1,
3 which would have directed federal agencies to
4 identify potential voters and -- and try and
5 get those voters on the checklist.  New
6 Hampshire does not feel that directly
7 because -- because we have the exemption from
8 the National Voter Registration Act, we don't
9 use outside agencies as voter registration
10 agencies.  What his executive order did,
11 though, was identify potential voters who use
12 the services of government, whether it's
13 health and human services or education or
14 whatever, and using those agencies as
15 opportunities to identify potential voters and
16 get them on the checklist.
17      If you look at the provisions of H.R.
18 1, which that executive order was based upon,
19 the system was designed in a way where those
20 potential voters would be contacted.  If there
21 was no response to the contact, the names
22 would be entered onto the checklist, or
23 whatever state that was in.  It would have
24 made it difficult to remove noncitizen voters
25 that ended up on the checklist without a

511

1  process.  And, you know, it's those types of
2  things that are changing the nature of
3  elections to the point that, you know, there
4  should be concerns about voters'
5  qualifications.
6      Q.  H.R. 1 did not pass.
7      A.  Did not pass.
8      Q.  And the executive order you
9  mentioned did not affect New Hampshire?
10     A.  Not directly.
11     Q.  But it's your testimony that
12 those two things have led to -- have made it
13 so that self-certification of a voter's
14 eligibility poses a significant risk to our
15 system of government?
16     A.  It is definitely a concern, yes.
17     Q.  Prior to HB 1569, what did the
18 Department of State do to investigate the
19 registration affidavits, if anything?
20     A.  So we're talking about the
21 affidavits that were used to register.
22 Whether the qualified voter affidavit or the
23 domicile affidavit.  There was a review of
24 those affidavits after the election was over.
25 In the first instance, we worked with local

512

1  election officials to verify the -- the
2  qualifications of the voter that filled out an
3  affidavit.  And the balance that were left
4  over where, you know, the information could
5  not be verified, were collected by my office
6  and submitted to the Attorney General's Office
7  for further review.
8      Q.  Do you have any training or
9  experience in conducting criminal
10 investigations?
11     A.  No.
12     Q.  Does anyone in your office?
13     A.  No.  Not related to elections.
14     Q.  Related to what?
15     A.  In our securities bureau has
16 attorneys that -- that do take enforcement
17 actions.
18     Q.  Do you have any training or
19 experience in the study of criminology?
20     A.  No.
21     Q.  Or what causes people to commit
22 crimes?
23     A.  No.
24     Q.  And you're not a political
25 scientist?

513

1      A.  No.
2      Q.  Or a social scientist?
3      A.  No.
4      Q.  Or a social psychologist?
5      A.  No.
6      Q.  Your initial disclosures --
7  initial expert disclosures, again, 21,
8  indicate that you will testify about how 1569,
9  quote, will prevent fraudulent and mistaken
10 voting, end quote.  What testimony do you
11 intend to offer on that subject?
12     A.  That documentation showing proof
13 of qualifications takes the -- the guesswork
14 and the abstractness out of -- for
15 qualifications.
16     Q.  Beyond the eight cases that
17 we've identified in the last nine years of
18 noncitizen voting, do you have any evidence
19 you intend to testify about regarding
20 noncitizens voting in New Hampshire?
21     A.  No.
22     Q.  Do you agree that a small number
23 of mistakes is an inherent part of election
24 administration?
25     A.  Yes.

514

1      Q.  Has the enactment of 1569 led to
2  mistakes in election administration?
3      A.  I'm not aware that 1569 has
4  directly led to mistakes in the
5  administration.  Generally speaking, the
6  administration of elections is a very human
7  process that involves a lot of individuals,
8  and because of that, mistakes are made.
9      Q.  Are you aware of instances in
10 Stratham in which newly naturalized citizens
11 presented US passports to register to vote but
12 were sent home to go get their naturalization
13 papers?
14     A.  I'm not aware of that.
15     Q.  That would be a mistake if it
16 happened?
17     A.  That would be a mistake, yes.
18     Q.  And you agree that some
19 percentage of eligible citizens in New
20 Hampshire do not have immediate access to
21 documentation proving their citizenship,
22 correct?
23     A.  Yes.
24     Q.  And do you know what percentage
25 of people don't have access to those

515

1  documents?
2      A.    I don't know.
3      Q.    Your initial disclosures, again,
4  Document 21, indicate that Secretary Scanlan
5  will testify about the purpose of HB 1569.
6  What is the purpose of HB 1569?
7      A.    To give confidence that the
8  voters that are participating in the election
9  process are, in fact, qualified.
10     Q.    How do you know what the purpose
11 of HB 1569 is?
12     A.    Just on the discussions that I
13 heard before the legislature.
14     Q.    Those were the discussions with
15 Representative Lynn and Senator Gray?
16     A.    And -- and listening to the
17 accounts of the public testimony during public
18 hearings.
19     Q.    Outside of the public hearings
20 and your communications with Representative
21 Lynn and Senator Gray, do you have any other
22 base of knowledge to allow you to discern the
23 purpose of HB 1569?
24     A.    Not beyond what I just
25 mentioned.

516

1      Q.    Have you spoken to a majority of
2  members of the general court about why they
3  voted for it?
4      A.    No.
5      Q.    Did you or other election
6  officials ask the legislature to pass a law
7  like HB 1569?
8      A.    No.
9      Q.    Are there other purposes behind
10 HB 1569?
11     A.    It could make the process more
12 streamlined and -- and cost effective where --
13 where the requirement is placed on the voter
14 of showing that they're qualified as opposed
15 to having to do a lot of follow up after the
16 election verifying the -- the affidavits that
17 have been used in the past.
18     Q.    Could HB 1569 have been passed
19 for the purpose of creating partisan advantage
20 for a political party?
21     A.    Partisan advantage?
22     Q.    Yes.
23     A.    I don't believe so.
24     Q.    What's that based on?
25     A.    Well, it's based on the way the

517

1  law is written.  It applies to every voter
2  equally, regardless of party affiliation.
3      Q.    Sure.  But some voters are going
4  to have more difficulty coming up with
5  documents than other voters, right?
6      A.    Yeah, I would agree with that.
7      Q.    And those categories of voters
8  may be disproportionally of one party, right?
9      A.    I don't know that.
10     Q.    Have you undertaken any analysis
11 of the partisan implications of HB 1569?
12     A.    No.  My concern has been the
13 administration.
14     Q.    Has anyone told you that it
15 wasn't passed for partisan gain?
16     A.    No.  And no one has told me that
17 it was either.
18     Q.    You don't know what was in the
19 mind of the legislators when they voted for
20 it?
21     A.    No.
22     Q.    You've talked about, in this
23 deposition and elsewhere, the need to balance
24 voter confidence against ensuring that every
25 eligible voter is able to cast a ballot,

518

1  right?
2      A.    Yes.
3      Q.    That is, from my perspective,
4  one of your strongest beliefs about an
5  election administration; is that fair?
6      A.    Yes.
7      Q.    What metric or standard do you
8  use to determine if HB 1569 has struck the
9  right balance?
10     A.    I don't know that 1569 has
11 struck the right balance.  That is the work
12 product that has come out of the legislature.
13 But it is addressing a concern that is out
14 there about, you know, that -- that part of
15 the -- the balance beam of making sure that
16 voters are qualified.  And I think it is
17 helping to head in the right direction of
18 finding that sweet spot between the two.  The
19 problem is that, you know, there's a
20 legislative process that is involved in
21 reaching that sweet spot, and there is no
22 direct line in getting there.  So, you know,
23 depending on which party's in power, that, you
24 know, that, you know, that rope is getting
25 pulled in one direction or the other.  And

519

1  hopefully, over time, you know, we get to the
2  right place.
3      Q.   Do you believe that HB 1569 has
4  gotten us to that sweet spot?
5      A.   I believe it is moving it in
6  that direction.
7      Q.   Is that a, no, we're not in the
8  sweet spot?
9      A.   I will be able to answer that
10 better after the next election.
11     Q.   So sitting here today, you do
12 not have an opinion as to whether we're in
13 that sweet spot; is that right?
14     A.   I can't tell you exactly where
15 that sweet spot is.
16     Q.   What methodology or standard --
17 sorry.  What metric or standard, if any, will
18 you use to determine that?
19     A.   Unfortunately, it is an after
20 the fact determination where just like the
21 voter ID law that passed, we have general
22 acceptance of, you know, of that procedure,
23 and it seems to work well on voters.  Have
24 confidence we will know after the fact whether
25 a particular piece of legislation has been

520

1  successful in, you know, reaching that place
2  that I think is important.
3      Q.   Is it a subjective determination
4  whether we're in that sweet spot?
5      A.   I think there is some
6  subjectivity to it, yes.
7      Q.   What is objective about it?  In
8  other words, let me try it this way.
9          Do you agree with me that human beings
10 are fallible?
11     A.   Yes.
12     Q.   Okay.  Good.  Is it possible
13 that you could get it wrong about whether we
14 are in the sweet spot?
15     A.   Yes.  I'd say it's possible.
16     Q.   How would another person go
17 about checking your work as to whether we're
18 in the sweet spot?
19     A.   That will be a determination
20 that will be made by, you know, by the
21 legislature.  Everybody's view of where that
22 sweet spot might be is -- is probably
23 different, and there's probably a range.  And
24 it is that public policy discussion and vote
25 that determines where it is at -- at any given

521

1  time.
2          My concern, both on behalf of the
3  department and personally is that we reach a
4  point where people on both sides of that
5  spectrum are comfortable with where that place
6  is.  They may not all be happy with where it
7  is, but, you know, they should be comfortable
8  with it.  And there's just not a magical way
9  to get there.  And this is all part of that
10 process.
11     Q.   And I -- I get that, and I
12 understand your view of the legislative
13 process, but you've been offered to give an
14 expert opinion on whether we're in that sweet
15 spot or not.  And in typical cases when that
16 happens, experts will point to their
17 methodology and say, this is what I did.  This
18 is how I determined whether we're in the sweet
19 spot.  This is the commonly accepted metric in
20 my field.  And I don't think we've heard that
21 yet.
22          MR. BROADHEAD:  Objection.
23          MR. KLEMENTOWICZ:  Okay.  You're
24 right.  It's not a question.  That was a
25 speech.

522

1          MR. BROADHEAD:  I just want to
2  turn it back to the -- to the disclosures.
3  He's offering an opinion as to why it's
4  important to strike a balance, not that the
5  balance had been reached, but go ahead.
6  BY MR. KLEMENTOWICZ:
7      Q.   Okay.  Do other -- do other
8  secretaries of state share your view that
9  there's a balance to be struck between voter
10 confidence and ensuring that other voter --
11 every eligible voter is able to cast a ballot?
12     A.   I'm sure that there are some,
13 but other secretaries of state's role is
14 different than mine, in that many of them,
15 most of them, are elected on a general
16 election ballot with a deponent from the other
17 political party.  And their view of these
18 things may be a little more political than
19 mine is.  I too am subject to an election,
20 and -- and the party in power has a major say
21 in, you know, whether I get reelected or not.
22 But my objective and goal has been to run the
23 best elections that we can, regardless of, you
24 know, the -- the political component.  And so,
25 you know, what I can tell you, based on my

523

1  experience, has been how our processes have
2  worked, what the views are of the voting
3  population of where the concerns are, what's
4  the angst that is causing concern about
5  confidence. And based on that, I can try and
6  find, you know, ways to find that balance
7  point. I don't control the election process,
8  but I do control the administration of how
9  that works.
10      Q.   Absolutely. If turn -- if 10
11  voters are turned away for every case of
12  noncitizen voting that's prevented 10 eligible
13  voters, have we struck the right balance?
14      A.   I can't put a number on -- on
15  where that is. You know, I believe that any
16  voter that gets turned away is one too many.
17      Q.   Okay.
18      A.   I should say a qualified voter
19  that gets turned away is one voter too many.
20      Q.   Let's assume that you are right
21  about the purpose behind 1569 and it's not
22  partisan advantage, but it's creating voter
23  confidence. Are there other things that the
24  legislature could have done to increase voter
25  confidence without imposing such a burden on

524

1  the voters?
2      A.   I -- I believe there are other
3  things that could have been done. I mean,
4  they -- they could have implemented a document
5  -- a documentation requirement to prove
6  qualifications, but they could have considered
7  other safety valves in the event that there
8  are voters that have trouble finding that
9  documentation. I mean, they've done that to a
10  degree now with Senate Bill 464, House Bill.
11      Q.   House bill.
12      A.   And there were different
13  degrees, you know, in the future of, you know,
14  creating those types of avenues. You know,
15  1569 is the version that passed.
16      Q.   A rough first draft, maybe?
17      A.   Of a first draft?
18      Q.   Yeah.
19      A.   Well, I mean, you know, the
20  political process is always a work in
21  progress, right? And the bill passes. It may
22  not be perfect on the first run. Sometimes
23  things get addressed down the road.
24      Q.   Was this bill perfect on the
25  first run?

525

1          MR. BROADHEAD: Objection.
2          THE WITNESS: I don't think any
3  bill is perfect on the first --
4          MR. BROADHEAD: Objection to
5  form, but you can answer. Is the record clear
6  on his answer? Sorry.
7          THE REPORTER: Repeat the
8  answer, please.
9          THE WITNESS: I don't believe
10  any bill is perfect on the first run.
11  BY MR. KLEMENTOWICZ:
12      Q.   Including this one?
13      A.   Including this one. Sure.
14      Q.   Okay. Your initial disclosures
15  indicated that you will testify about how HB
16  1569 has been and will be implemented and how
17  the law function during the March 2025 local
18  elections. How did the law function during
19  the March 2025 local elections?
20      A.   I believe for the first
21  go-around, it went pretty well. Yeah. We do
22  know that there were individuals that showed
23  up at the polling place without documentation.
24  Those individuals were turned away. I believe
25  that most of them came back based on the

526

1  reports that I heard, and were able to follow
2  through to register to vote. There were some
3  that did not.
4      Q.   How many people were turned away
5  in the March elections?
6      A.   I don't know how many were
7  turned away.
8      Q.   Would it surprise you to hear
9  that we -- that -- let me try that again.
10      We've heard reporting that it was over
11  a hundred people. Would that surprise you?
12      A.   I heard that reporting, too.
13      Q.   Do you think that's accurate?
14      A.   I -- I don't know.
15      Q.   If a hundred people were turned
16  away, did the law function well during the
17  local elections?
18      A.   The law clearly worked, but it
19  shows the work that needs to be done to make
20  sure that the voters understand what they need
21  if they're going to register to vote on the
22  day of the election.
23      Q.   Okay. Your office estimates
24  voter turnout for state elections?
25      A.   I -- I typically make a

527

1 prediction as secretary of state. It's not an
2 office function, but it's just kind of a fun
3 thing that we do.
4     Q.    The head of the office does it
5 for fun?
6     A.    Yeah.
7     Q.    Okay.
8     A.    Pretty much.
9     Q.    When you make that determination
10 in 2026, will you consider the effects of this
11 law?
12     A.    Of course. Yes.
13     Q.    And how do you think that the
14 effects of this law will affect your
15 prediction?
16     A.    I don't know that it's going to
17 have a significant impact on the actual
18 turnout number. Be predicting those numbers
19 is -- is based on looking at past elections
20 under similar circumstances and looking at
21 unique variables to that specific election
22 and, you know, coming up with a number. I --
23 I don't think that that number is going to
24 change dramatically based on the
25 implementation of 1569.

528

1     Q.    Okay. Sorry. I'm looking for
2 my phone. Sorry. The people on Zoom are
3 texting me about your deposition, so I'm just
4 going to read what they actually said. Oh,
5 this is just sort of cleanup.
6         You testified earlier that New
7 Hampshire selection procedure is an intimate
8 process where the voters and election
9 officials often know each other. Yes? You
10 have to say, yes, for the record.
11     A.    Yes.
12     Q.    Yes. Do you think that those
13 election officials would have noticed if there
14 were migrants coming across the border from
15 Mexico voting in New Hampshire?
16     A.    I think that they would
17 certainly realize if something was out of
18 place.
19     Q.    Did that happen?
20     A.    I'm not aware that it did.
21     Q.    Would you have been aware if it
22 did?
23     A.    I don't know that I would have
24 because I don't get a report on every single,
25 you know, registration issue or denial that,

529

1 you know, occurs in a local election.
2     Q.    If statistically significant
3 numbers of migrants were coming from Mexico to
4 vote in New Hampshire, do you think someone
5 would have told you?
6     A.    Yes.
7     Q.    Okay, and they didn't?
8     A.    No.
9     Q.    Okay. If eligible voters had
10 stayed home rather than coming out and being
11 turned away, if they had stayed home because
12 they didn't have eligible voters, would you
13 know about that?
14     A.    No.
15         MR. BROADHEAD: Objection.
16 Form. You said eligible voters?
17         MR. KLEMENTOWICZ: I'm going to
18 ask that again.
19         MR. BROADHEAD: Yeah. Sorry.
20         MR. KLEMENTOWICZ: Thank you.
21 BY MR. KLEMENTOWICZ:
22     Q.    If people who were qualified to
23 vote but did not have documents to prove them
24 stayed home in the March elections, would you
25 know?

530

1     A.    Not necessarily.
2     Q.    That's not tracked by anyone?
3     A.    That's not tracked.
4     Q.    So it could be that there were
5 people who were -- did not vote beyond the
6 hundred that we know about who were turned
7 away because of the documentary proof of
8 citizenship law?
9     A.    We just don't know if a voter
10 did not show up -- a potential voter did not
11 show up at the polls because they lack
12 documentation.
13     Q.    Okay. Your supplemental
14 disclosures, which are Exhibit 22, we're --
15 we're almost done. Indicate that you will
16 testify, quote, regarding the strengths and
17 weaknesses of election integrity strategies
18 and tactics, the importance of safeguarding
19 critical election infrastructure, the
20 difficulties in detecting mistaken and
21 fraudulent voter registration and ballot
22 casting, and the importance of preventing and
23 deterring voter fraud. On this topic, what
24 testimony do you intend to offer that you have
25 not already disclosed?

531

1      A.   I could talk about the efforts
2  that we have taken to secure the elections,
3  make them more transparent, and educate in a
4  way that will help build voter confidence.  So
5  we've done a trend- -- a tremendous amount of
6  work in the cybersecurity arena.  Ballot
7  counting devices have been approved or
8  have, you know, technological capabilities
9  allowing them to record images of balance that
10  open up, you know, a wide ray of opportunities
11  for post election audits, a balance, things
12  like that.  That was one of the things that we
13  heard out of the voter confidence committee.
14  Ballot counting machines were concerned
15  because people couldn't see the inter workings
16  of, you know, how those devices operate.  And
17  so we are creating the opportunity to be able
18  to kinda open that process up so that voters
19  can see that the ballots were actually being
20  properly counted.  You know, education efforts
21  to trying to help the general public of voters
22  understand the checks and balances that are at
23  play in the individual polling places so that
24  they can have confidence in that process and
25  not speculate about how things could be going

532

1  wrong.
2      So there -- there are -- there's a lot
3  of work being done in areas outside of 1569
4  that are designed to build that confidence in
5  the election process.
6      Q.   Anything else on that that you
7  intend to testify as about?
8      A.   Yeah.  I mean, generally,
9  that's -- that's it.
10      Q.   As between allocating more
11  resources to law enforcement to investigate
12  and deter voter fraud versus removal of
13  qualified voter affidavits, does the public
14  interest favor one or the other?
15      A.   I think the public interest
16  deserves efficient use of resources.  And to
17  the extent that we can get voters to help us
18  on the front end when they're registering to
19  vote, it frees up those other resources for
20  equally important things related to elections.
21      Q.   But for example, I mean, your
22  office is spending money implementing this
23  law, the attorney, right?
24      A.   Yes.
25      Q.   The Attorney General's Office is

533

1  spending a lot of time and money defending
2  this law, right?  Could that money have
3  instead been spent to another state trooper in
4  the Election Law Unit to deter noncitizen
5  voting?
6          MR. BROADHEAD:  Objection.  If
7  you can answer that, you go ahead.
8          THE WITNESS:  Yeah.  I mean,
9  those -- the -- the -- the available resources
10  get pushed towards the, you know, the priority
11  issues and, you know, if it's defending a -- a
12  lawsuit on -- you know, for the AG's office, I
13  mean, that's what they have to do.  But both
14  of our offices spend a lot of resources post
15  election on verification of affidavits and
16  follow up.  And so there are -- you know,
17  there are trade offs.
18          MR. KLEMENTOWICZ:  So, Matt, the
19  disclosure says that he's going to testify
20  regarding the difficulties in detecting
21  mistaken and fraudulent voter registration.
22  So my question I think is a fair one.
23          MR. BROADHEAD:  No, I'm
24  objecting as if it's a choice to have to
25  defend the law and that there's a -- it's our

534

1  statutory oath to uphold the law, so, you
2  know, that's my objection to the form of the
3  question.
4  BY MR. KLEMENTOWICZ:
5      Q.   Could you or the Attorney
6  General's Office have used more resources to
7  investigate voter fraud in New Hampshire?
8      A.   I -- I think that's a better
9  question for the Attorney General's Office.  I
10  mean, we, you know, we do what we need to do,
11  working with the local election officials, the
12  clerks, and supervisors of the checklist for
13  follow-up.  Those are local resources that are
14  used more than resources of -- of my office.
15      Q.   Okay.  What has been the
16  physical impact of HB 1569 in your office?
17      A.   Training, but not out of the
18  ordinary.  We have a training budget,
19  obviously.  And -- and training on 1569 is
20  incorporated into that.  There may have been
21  some costs involved with accommodating SVRS,
22  you know, to the new changes.
23      Q.   How much staff time has your
24  office expended on implementing 1569?
25      A.   I would say not an additional

535

1  amount of staff time, but, you know, again,
2  the staff is already involved with putting on
3  training programs based on everything that the
4  legislature passes. So 1569 is incorporated
5  into that.
6      Q.   How much money has your office
7  expended implementing 1569?
8      A.   Again, I don't know that I could
9  put a dollar amount on it because it is
10 incorporated into the budget that we have for
11 that type of communication and training. So,
12 you know, we've had a -- we've done a lot on
13 social medias, I mentioned before, related to
14 that. I mean, that's -- that's some staff
15 time actually putting those items up on -- so
16 it's available on the internet or whatever is,
17 you know, there really isn't a cost involved
18 with that.
19     Q.   Does your office do paid posts
20 to promote the posts?
21     A.   We're probably going to on this,
22 especially close to the elections, but, again,
23 it's part of our, I'll say, our communication
24 budget.
25     Q.   The supplemental disclosures

536

1  indicate that you're expected to conclude that
2  preventing voter fraud before it happens is
3  more efficient and cost effective than
4  expending resources to detect, investigate,
5  and prosecute voter fraud after the fact.
6  What testimony do you intend to offer on that
7  subject that you've not already disclosed?
8      A.   Well, I -- I -- I mentioned
9  that. That, you know, having the voters help
10 us address those issues on the front end will
11 sa- --- save the resources on the back end that
12 we can use for other important areas.
13     Q.   And -- well, that testimony is
14 that -- paraphrased is that voter fraud
15 prevented means voter fraud you don't have to
16 investigate. But your disclosure says that
17 it's going to be more efficient and cost
18 effective to prevent voter fraud than it is to
19 investigate. What's the basis for that
20 statement?
21     A.   Just the voters coming in on the
22 front end with the appropriate documentation
23 that takes the guesswork out of whether an
24 affidavit was accurately submitted or not.
25     Q.   Okay. I think this is -- this

537

1  is it. Your initial disclosures, which is 21,
2  indicate that you will, quote, describe New
3  Hampshire's electoral landscape and
4  demographics. What testimony do you intend to
5  offer on that subject?
6      A.   Just general knowledge of
7  turnout trends. You know, a number of
8  registrations that take place at any given
9  election.
10     Q.   What about demographics? What
11 testimony are you going to give about
12 demographics of New Hampshire?
13     A.   At this point, I'm not sure that
14 I'll be talking about, you know, demographic
15 issues, but certainly, we'll be prepared to
16 talk about them to the extent that that's
17 necessary.
18         MR. KLEMENTOWICZ: Okay. Can we
19 take a quick break? I think I might be done.
20         (Off the record 12:25 p.m.)
21         (On the record 12:31 p.m.)
22         THE REPORTER: Back on the
23 record.
24         MR. KLEMENTOWICZ: That
25 concludes my questions. Mr. Secretary, thank

538

1  you. Mr. Fox is going to have some.
2          CONTINUED EXAMINATION
3  BY MR. FOX:
4      Q.   Thank you, Secretary Scanlan.
5  And just, I think, relatively few from me. I
6  think I know the answer to this based on your
7  exchange with my co-counsel here, but did you
8  review reports from a Dr. Michael Herron in
9  this case?
10     A.   No.
11     Q.   Do you intend to offer any
12 response to the expert opinions offered by
13 Dr. Michael Herron in this case?
14     A.   Probably not.
15         MR. BROADHEAD: I think we
16 stipulated to that.
17 BY MR. FOX:
18     Q.   Okay. Do you intend to offer
19 any opinions on the -- are you familiar with
20 the political science concept of the cost of
21 voting?
22     A.   Not specifically.
23     Q.   Do you intend to offer any
24 opinions in this case on the political science
25 concept known as the cost of voting?

539

1  A.  No.
2  Q.  Do you intend to offer any
3  opinions on the frequency of qualified voter
4  affidavit use in past elections in New
5  Hampshire?
6  A.  Maybe.  You know, I -- I -- you
7  know, that's something that I can review
8  and -- and be -- be aware of.  But at this
9  moment, I'm not aware that's something that I
10  will specifically be commenting on.
11  Q.  Is that something you have
12  reviewed for purposes of this case so far?
13  A.  No.
14  Q.  And as you sit here today, do
15  you have an opinion on how frequently
16  qualified voter affidavits were used to prove
17  citizenship in prior New Hampshire elections?
18  A.  I generally know the numbers
19  are -- are fairly low, but I haven't studied
20  them.
21  Q.  Do you know how many voters used
22  qualified voter affidavits to prove
23  citizenship in November 2024?
24  A.  I -- I don't know the exact
25  number, but I can look that up.

540

1  Q.  Do you intend to offer any
2  opinions on the rates at which New Hampshire
3  residents possess various forms of proof of
4  citizenship documents?
5  A.  No.
6  Q.  So no opinion that you're going
7  to offer on how many New Hampshire residents
8  possess passports?
9  A.  No.
10  Q.  No opinion that you're going to
11  offer on how many New Hampshire residents
12  possess birth certificate copies?
13  A.  No.
14  Q.  No opinion you're going to offer
15  on how many New Hampshire residents have
16  undergone name changes?
17  A.  No.
18  Q.  Secretary Scanlan, you have a
19  lot of experience in New Hampshire elections,
20  I think we agree?
21  A.  I believe so.  Yes.
22  Q.  You don't have any experience
23  with elections in other states, correct?
24  A.  No.
25  Q.  Have you done any study of how

541

1  other states handle issues similar to the
2  issues that you say are addressed by 1569?
3  A.  No.
4  Q.  And so I assume you're not
5  planning to offer any opinion on sort of a
6  comparative analysis of the way this issue has
7  been handled in New Hampshire versus other
8  states?
9  A.  No.
10  MR. BROADHEAD:  That's correct.
11  So that we're not going to be having him
12  testify about any sort of comparative.
13  BY MR. FOX:
14  Q.  You testified that HB 1569 went
15  pretty well for the first implementation just
16  a few minutes ago.  Do you recall that?
17  A.  Yes.
18  Q.  What is that opinion based on?
19  A.  Based on it, I was not made
20  aware of any major issues related to that
21  election.
22  Q.  I think you said that your
23  office did not make an effort to track how
24  many voters were turned away as a result of
25  1569 in those elections; is that right?

542

1  A.  That's true.
2  Q.  And so you don't actually know
3  exactly how many voters initially arrived
4  without documentation in that election?
5  A.  I don't know.
6  Q.  And you don't know how many
7  voters never returned with appropriate
8  documentation in that election?
9  A.  I don't know.
10  Q.  So your opinion that it went
11  pretty well is just based on you haven't heard
12  any serious problems?
13  A.  It's based on how the election
14  ran, generally, and the fact that there were,
15  you know, very few issues that I was made
16  aware of related to the conduct of those
17  elections.
18  Q.  But you didn't make any effort
19  to specifically figure out how 1569 went on a
20  voter-by-voter basis or a town-by-town basis?
21  A.  No. No.  Generally speaking,
22  the elections ran pretty well.
23  Q.  You said as well that you think
24  House Bill 1569 will improve voter confidence
25  overall; is that right?

543

1    A.    Yes.
2    Q.    And I think you said that you
3 think the improvements to confidence from the
4 stricter documentation requirements will
5 outweigh any harm to confidence from more
6 voters being turned away; is that right?
7    A.    I said that the -- that
8 requiring the documentation will give
9 confidence to those individuals that are
10 concerned about knowing who's participating in
11 the election process and they're qualified,
12 and that, you know, it is -- it will be very
13 unfortunate if there are any voters that don't
14 have the opportunity to register even though
15 they are qualified, and that we're going to
16 make every effort that we can to make sure
17 that -- that does not happen.
18    Q.    How do you weigh the -- what you
19 think is a benefit to confidence from the
20 stricter requirements, from what I think
21 you've acknowledged could be a drawback to
22 confidence from eligible voters being unable
23 to vote? How do you weigh those two?
24    MR. BROADHEAD: Objection to
25 form. Go ahead, if you can answer.

544

1    THE WITNESS: How well the
2 process works on the day of the election and
3 that the, you know, number of voters that are
4 negatively affected by the new law is kept to
5 an absolute minimum.
6 BY MR. FOX:
7    Q.    Do you have a methodology for,
8 you know, a two-percentage-point increase in
9 voter confidence on a polling survey versus a
10 hundred voters turned away from local
11 elections, and how you decide which of those
12 is more important for voter confidence?
13    A.    No. I think it's -- it's just
14 it's a matter of following through with the
15 implementation and, you know, seeing what the
16 final outcome was, and based on what that
17 outcome was, finding ways to address it moving
18 forward.
19    Q.    You referred to some polling by
20 Andy Smith. That's part of your analysis
21 here; is that right?
22    A.    I -- I review Andy Smith's work
23 on a regular basis.
24    Q.    And is that part of the basis
25 for your analysis of the election confidence

545

1 piece of your opinion in this case?
2    A.    Looking at the trends over time
3 is important, I believe.
4    Q.    Do you have copies of the
5 polling that you've reviewed for that purpose?
6 Is that something that you have
7 electronically?
8    A.    Yes, I have access to those.
9    Q.    Do you know if they've been
10 produced to us in this case?
11    A.    I'm sorry?
12    Q.    Do you know if they've been
13 produced to the plaintiffs in this case?
14    MR. BROADHEAD: Objection. Not
15 something that he would really know, but go
16 ahead.
17    THE WITNESS: Yeah. I mean, I
18 don't know if they have or not.
19    MR. FOX: I don't believe they
20 have, and we would like them. I can follow up
21 with you after.
22 BY MR. FOX:
23    Q.    I think you referred to a trend
24 of a drop in voter confidence. Do you recall
25 that?

546

1    A.    Yes.
2    Q.    And you said it was smaller than
3 in other states?
4    A.    Yes.
5    Q.    And then you said it leveled
6 off?
7    A.    Yes.
8    Q.    What was the timing of each of
9 the sort of hot -- so I take it that means at
10 some point, confidence was a little bit
11 higher, and now it's a bit lower?
12    A.    Yes.
13    Q.    And then it stayed steady for
14 some period of time?
15    A.    The -- based on Andy Smith's
16 polling on confidence levels and ease of
17 voting in New Hampshire.
18    MR. BROADHEAD: It's an exhibit
19 in this. So if -- I mean, if you need to
20 inspect the exhibit, you can.
21    THE WITNESS: Okay.
22 Consistently high in New Hampshire. In -- in
23 recent elections, we noticed a -- a slight
24 drop, and then -- and then a leveling off.
25 And that's -- that has all occurred within the

547

1 last, I'll say, 10 years.
2 BY MR. FOX:
3     Q.    Do you have particular expertise
4 in interpreting polling data?
5     A.    No.
6     Q.    Do you know as a matter of
7 social science, whether polling on this type
8 of issue would be expected to have momentum
9 such that it makes sense to talk about trends?
10    A.    No.
11    Q.    I think you also referred to
12 conversations with others in the state as a
13 basis for your opinions about election
14 confidence.  Do you recall this?
15    A.    Yes.
16    Q.    What form did those
17 conversations take?
18    **A.    They take -- they take several**
19 **forms.  You know, I have my voter confidence**
20 **committee that was in effect.  I still**
21 **communicate with the individuals that served**
22 **on that.  I hear from local election officials**
23 **at a wide range of meetings that I attend.**
24 **Nothing formal.**
25    Q.    Do you have a comprehensive list

548

1 of the conversations with whom you've had --
2 like, the conversations you've had that are a
3 basis for your opinion on voter confidence in
4 this case?
5     A.    No.
6     Q.    Have you done anything to
7 determine whether those conversations are
8 with -- were they a fair sample of the New
9 Hampshire population?
10    A.    No.
11    Q.    Do you have any -- have you done
12 anything to determine whether they're a
13 representative sample of the New Hampshire
14 population?
15    A.    No.
16    Q.    Is there an accepted methodology
17 in your field for assessing voter confidence?
18    **A.    Not in my field, no.**
19    Q.    You also gave some opinions
20 about legislative purpose.  Do you recall
21 that?
22    **A.    Yep.**
23    Q.    Is there an accepted methodology
24 in your field for assessing legislative
25 purpose?

549

1     **A.    When you say my field, what are**
2 **you referring to?**
3     Q.    Well, let me ask you, what do
4 you consider yourself to be an expert in?
5     **A.    Well, I -- I consider myself to**
6 **be an expert in the administration of the**
7 **elections in the state of New Hampshire.**
8     Q.    So in the field of administering
9 elections in the state of New Hampshire, is
10 there an accepted methodology for assessing
11 legislative purpose?
12    **A.    No.**
13    Q.    I believe you said a little
14 while ago that you think each HB 1569 takes
15 the abstractness out of assessing voter
16 qualifications.  Do you recall that?
17    **A.    Yes.**
18    Q.    Do you still think that's true
19 after our discussion earlier this morning
20 about what counts as other reasonable
21 documentation of citizenship?
22    **A.    I still believe that's true.**
23    Q.    House Bill 464 is follow-up
24 legislation that you believe makes 1569 less
25 rigid; is that right?

550

1     **A.    Yes.**
2     Q.    For people born in New
3 Hampshire, you're hoping to have a system to
4 check New Hampshire vital records for birth
5 information?
6     **A.    Yes.**
7     Q.    That won't help people born
8 outside of New Hampshire, correct?
9     **A.    That's correct.**
10    Q.    For people married or divorced
11 in New Hampshire, you're hoping to have a
12 system to check marriage and divorce records?
13    **A.    Sure.  Yes.**
14    Q.    That won't help people married
15 or divorced outside New Hampshire, correct?
16    **A.    That's true.**
17    Q.    For people with New Hampshire
18 driver's licenses or ID cards, you're hoping
19 to have a system to check New Hampshire
20 Department of Transportation records?
21    **A.    Yes.**
22    Q.    That won't help people without a
23 New Hampshire driver's license or ID card,
24 correct?
25    **A.    To the extent that there may be**

551

1 out of -- out-of-state driver's license
2 records in that database, it may be helpful.
3     Q.    Are there out-of-state driver's
4 license records in the database that you're
5 planning to use?
6     A.    I believe that they -- they
7 collect records related to that.
8     Q.    Including citizenship
9 information?
10     A.    They do collect some citizenship
11 information when they issue REAL IDs.
12     Q.    Have you studied the type of
13 citizenship information that is available in
14 states, other than New Hampshire's departments
15 of transportation and driver's license
16 records?
17     A.    No.  Some of my staff have been
18 reviewing citizenship databases that might be
19 available at the federal level, but we have
20 not entered into any agreements to utilize
21 that data.
22     Q.    So far, no agreement or concrete
23 plan to use the federal citizenship data; is
24 that right?
25     A.    Not yet.

552

1     Q.    And as for the state -- other
2 states' citizenship data, you have not studied
3 exactly what citizenship data is available in
4 other states' department of transportation or
5 driver's license databases; is that right?
6     A.    That's -- that's correct.
7     Q.    Do you know if the available
8 information and its accuracy and currentness
9 varies by state?
10     A.    Well, I would say it does vary
11 by state.
12     Q.    I think one last line of
13 questions.  So we're getting there.
14     You said yesterday you don't have a
15 REAL ID; is that right?
16     A.    I do not have a REAL ID.
17     Q.    Why not?
18     A.    Every time I go to get one, I
19 seem to forget one document that I need.
20     Q.    You do carry a passport card; is
21 that right?
22     A.    I do.
23     Q.    You recently lost it, I think
24 you said?
25     A.    But I found it, but yes.

553

1     Q.    For some period of time you were
2 without it?
3     A.    For a few hours.
4     Q.    And was that during a trip, you
5 said, to Washington?
6     A.    Yes.
7     Q.    Now, you knew you needed that
8 passport card to get on a plane, right?
9     A.    Yes.
10     Q.    But you went to the airport
11 without it anyway for a period of time; is
12 that right?
13     A.    Yes.
14     Q.    And that's because you just
15 didn't have it available to you, correct?
16     A.    I -- I had not located it at
17 that point.
18     Q.    And you were still able to get
19 on a plane, right?
20     A.    Yes.
21     Q.    If a voter who was a first time
22 New Hampshire voter showed up to the polls in
23 New Hampshire to register and vote without the
24 documentation that 1569 requires, they could
25 not register to vote; isn't that right?

554

1     A.    In isolation, if they did not
2 have the documentation at the polling place
3 needed to register, that would be true.  We
4 are working on opportunities and resources to
5 try and help a voter like that shows up at the
6 polls to be able to follow through with that
7 process if they're qualified.
8     Q.    And as you sit here today, you
9 can't say that process that you're working on
10 will be comprehensive, right?
11     A.    No.  We're going to make it as
12 comprehensive as we can, but -- but I can't
13 say for certain that it will be all -- all
14 comprehensive.
15     Q.    Your office doesn't have a
16 comprehensive database of citizens, right?
17     A.    We do not.
18     MR. FOX:  Thank you very much,
19 Secretary Scanlan.  As with prior deponents
20 from the Secretary's Office, I think we are
21 going to formerly hold this open because of
22 the HB 464 uncertainty.  But subject to that,
23 we don't have any further questions, Secretary
24 Scanlan.
25     MR. BROADHEAD:  Okay.  Thank

555

1  you.
2       THE REPORTER:  Just to get
3  everything from yesterday all summarized,
4  we're having all witnesses read and sign?
5       MR. KLEMENTOWICZ:  Yes.
6       MR. BROADHEAD:  Yes.
7       THE REPORTER:  And can I have
8  orders for each witness, including today, from
9  Elias Law Group, Ropes & Gray, the Department
10 of Justice and nothing for the ACL Union.
11      MR. KLEMENTOWICZ:  That's fine.
12      THE REPORTER:  I'll take us off
13 the record.
14      (Concluded 12:47 p.m.)
15
16
17
18
19
20
21
22
23
24
25

557

1       CERTIFICATE OF COURT REPORTER
2       I, Raechel Meyerowich, the officer
3  before whom the foregoing proceedings were
4  taken, do hereby certify that any witness(es)
5  in the foregoing proceedings were fully sworn;
6  that the proceedings were recorded by me and
7  thereafter reduced to typewriting by a
8  qualified transcriptionist; that said digital
9  audio recording of said proceedings are a true
10 and accurate record to the best of my
11 knowledge, skills, and ability; and that I am
12 neither counsel for, related to, nor employed
13 by any of the parties to this case and have no
14 interest, financial or otherwise, in its
15 outcome.
16
17
18       *Raechel Meyerowich*
19 _____
20 RAECHEL MEYEROWICH, COURT REPORTER
21
22
23
24
25

556

1       CERTIFICATE OF TRANSCRIBER
2
3       I, Cynthia Bauerle, do hereby certify
4  that this transcript was prepared from the
5  digital audio recording of the foregoing
6  proceeding; that said transcript is a true and
7  accurate record of the proceedings to the best
8  of my knowledge, skills, and ability; and that
9  I am neither counsel for, related to, nor
10 employed by any of the parties to the case and
11 have no interest, financial or otherwise, in
12 its outcome.
13
14
15
16 _____
17 CYNTHIA BAUERLE, CSR
18 10/28/25
19
20
21
22
23
24
25

558

1       CERTIFICATE OF NOTARY PUBLIC
2       I, LAURA YOUNG, the officer
3  Before whom the foregoing proceedings were
4  Taken, do hereby certify that any witness(es)
5  in the foregoing proceedings were fully sworn;
6  and that I am neither counsel for, related to,
7  nor employed by any of the parties to this
8  case and have no interest, financial or
9  otherwise, in its outcome.
10
11      *Laura Young*
12 _____
13 LAURA YOUNG, ESQUIRE, NOTARY PUBLIC
14 FOR THE STATE OF FLORIDA
15 10/22/25
16
17
18
19
20
21
22
23
24
25

**A**

**abbreviated**
410:18
**ability**
442:19, 468:5,
479:24, 503:5,
556:8, 557:11
**able**
416:9, 416:22,
421:10, 439:10,
439:24, 458:16,
461:16, 462:8,
480:7, 487:24,
493:9, 493:19,
508:16, 517:25,
519:9, 522:11,
526:1, 531:17,
553:18, 554:6
**about**
408:9, 408:10,
409:1, 414:25,
415:15, 415:18,
415:21, 415:25,
416:5, 417:16,
418:16, 421:21,
430:8, 433:6,
433:22, 435:6,
439:11, 439:22,
440:8, 440:23,
441:19, 443:8,
447:8, 452:25,
454:12, 458:25,
459:12, 462:15,
462:19, 466:8,
467:2, 471:3,
471:10, 475:9,
475:11, 476:14,
476:18, 477:11,
477:20, 477:24,
478:6, 478:9,
478:13, 478:16,
478:19, 478:24,
479:1, 479:13,
480:18, 485:6,
487:19, 490:17,
491:2, 492:15,
494:19, 495:13,

507:13, 511:4,
511:20, 513:8,
513:19, 515:5,
516:2, 517:22,
518:4, 518:14,
520:7, 520:13,
520:17, 523:4,
523:21, 525:15,
528:3, 529:13,
530:6, 531:1,
531:25, 532:7,
537:10, 537:11,
537:14, 537:16,
541:12, 543:10,
547:9, 547:13,
548:20, 549:20
**above**
417:5, 417:9
**absolute**
426:14, 544:5
**absolutely**
494:5, 523:10
**abstractness**
513:14, 549:15
**academics**
439:4
**accept**
489:14, 489:21,
490:3, 490:20
**acceptable**
444:25, 454:22,
459:10
**acceptance**
519:22
**accepted**
454:20, 483:19,
485:2, 485:11,
490:22, 521:19,
548:16, 548:23,
549:10
**access**
479:24, 514:20,
514:25, 545:8
**accommodate**
466:12
**accommodating**
402:14, 534:21
**according**
451:9

**accounts**
515:17
**accuracy**
552:8
**accurate**
438:8, 526:13,
556:7, 557:10
**accurately**
536:24
**acknowledged**
543:21
**acl**
555:10
**aclu**
400:3, 400:4,
400:5, 400:9
**across**
508:21, 528:14
**act**
414:7, 435:11,
448:23, 510:8
**actions**
512:17
**active**
415:8
**actively**
417:24
**activity**
427:3
**actual**
402:16, 418:17,
420:10, 424:12,
473:8, 492:13,
504:24, 505:7,
527:17
**actually**
427:5, 451:8,
453:4, 482:5,
489:7, 493:13,
528:4, 531:19,
535:15, 542:2
**addition**
416:14
**additional**
459:4, 534:25
**address**
409:12, 431:22,
451:25, 479:10,

536:10, 544:17
**addressed**
409:10, 416:18,
440:16, 441:14,
441:16, 461:1,
524:23, 541:2
**addressing**
518:13
**adequate**
469:1
**administered**
406:22
**administering**
549:8
**administration**
451:21, 508:19,
513:24, 514:2,
514:5, 514:6,
517:13, 518:5,
523:8, 549:6
**adopted**
460:14, 492:17
**adoption**
459:2, 491:10,
492:16, 492:22,
493:5
**advance**
417:16, 436:6,
457:9, 461:10,
463:7, 463:19,
498:1, 498:14,
503:23
**advanced**
435:19, 435:20,
465:8, 495:14,
495:22
**advances**
457:6
**advantage**
516:19, 516:21,
523:22
**advent**
498:13
**advise**
461:25
**advised**
460:18
**affect**
511:9, 527:14

**affected**
544:4
**affidavit**
406:20, 408:17,
408:21, 410:2,
411:24, 412:2,
412:5, 418:20,
418:25, 419:24,
421:19, 456:14,
456:17, 456:23,
458:21, 460:19,
462:1, 462:15,
465:9, 465:12,
468:22, 469:2,
469:4, 470:11,
470:16, 474:5,
480:19, 488:11,
488:17, 490:2,
507:25, 511:22,
511:23, 512:3,
536:24, 539:4
**affidavits**
409:21, 409:23,
411:4, 411:15,
411:22, 412:14,
412:17, 418:18,
472:2, 474:3,
490:20, 490:25,
507:4, 507:20,
507:22, 507:24,
508:2, 508:8,
511:19, 511:21,
511:24, 516:16,
532:13, 533:15,
539:16, 539:22
**affiliation**
517:2
**affirm**
411:6
**affirmative**
413:1
**affirming**
488:22, 490:18
**afford**
459:16
**after**
404:15, 437:12,
439:6, 446:8,

448:20, 454:17,
475:25, 476:10,
476:23, 477:6,
506:12, 511:24,
516:15, 519:10,
519:19, 519:24,
536:5, 545:21,
549:19
**ag's**
533:12
**again**
415:19, 419:1,
420:12, 420:13,
426:5, 429:15,
432:15, 453:8,
459:18, 465:20,
467:8, 469:9,
473:6, 473:24,
504:9, 505:3,
513:7, 515:3,
526:9, 529:18,
535:1, 535:8,
535:22
**against**
406:23, 441:21,
517:24
**age**
492:23
**agencies**
510:3, 510:9,
510:10, 510:14
**ago**
541:16, 549:14
**agree**
402:19, 448:15,
454:9, 454:10,
456:5, 480:25,
483:3, 485:1,
485:10, 488:8,
513:22, 514:18,
517:6, 520:9,
540:20
**agreement**
397:8, 551:22
**agreements**
551:20
**ahead**
462:6, 522:5,

533:7, 543:25,
545:16
**airport**
553:10
**al**
396:3
**alert**
416:11
**alexander**
398:6, 399:5
**all**
429:8, 429:13,
429:22, 439:20,
450:25, 452:17,
454:7, 456:5,
461:21, 470:9,
473:23, 488:25,
496:10, 504:5,
506:1, 508:6,
521:6, 521:9,
546:25, 554:13,
555:3, 555:4
**alleged**
402:16, 412:3
**alleging**
404:16
**alleviate**
433:12
**alleviated**
508:18
**allocating**
532:10
**allow**
420:14, 515:22
**allowed**
468:1
**allowing**
459:8, 531:9
**almost**
454:7, 455:24,
530:15
**along**
472:15
**already**
406:4, 425:18,
457:15, 469:12,
470:21, 472:23,
473:16, 502:14,

530:25, 535:2,
536:7
**also**
415:6, 426:15,
435:8, 442:1,
486:11, 547:11,
548:19
**alternative**
507:3
**although**
454:10, 483:25
**always**
481:6, 524:20
**amended**
401:11, 403:21,
404:5
**america**
414:6, 435:11
**american**
399:10
**among**
438:17
**amount**
420:10, 472:15,
531:5, 535:1,
535:9
**analysis**
457:8, 517:10,
541:6, 544:20,
544:25
**andy**
437:5, 437:22,
450:11, 504:10,
504:18, 544:20,
544:22, 546:15
**anecdotal**
429:24, 429:25
**angst**
523:4
**another**
442:4, 485:16,
486:4, 520:16,
533:3
**answer**
407:18, 458:17,
471:15, 480:14,
498:8, 519:9,
525:5, 525:6,

525:8, 533:7,
538:6, 543:25
**answer's**
487:9
**answered**
434:19, 502:8,
502:18
**anticipate**
458:19
**anticipated**
418:17, 449:25
**antidotal**
427:2, 429:15,
507:8
**antidotally**
432:20
**any**
404:16, 407:5,
413:5, 413:7,
414:16, 427:4,
432:7, 432:25,
436:2, 444:8,
445:1, 445:5,
446:15, 447:17,
449:7, 449:10,
451:25, 456:9,
456:11, 457:5,
457:8, 457:9,
462:11, 465:14,
476:13, 476:17,
477:18, 477:22,
478:11, 478:14,
480:16, 488:2,
497:20, 498:12,
498:20, 501:21,
504:19, 507:12,
509:5, 509:8,
509:10, 509:19,
512:8, 512:18,
513:18, 515:21,
517:10, 519:17,
520:25, 523:15,
525:2, 525:10,
537:8, 538:11,
538:19, 538:23,
539:2, 540:1,
540:22, 540:25,
541:5, 541:12,

541:20, 542:12,
542:18, 543:5,
543:13, 548:11,
551:20, 554:23,
556:10, 557:4,
557:13, 558:4,
558:7
**anybody**
432:22
**anyone**
477:19, 512:12,
517:14, 530:2
**anything**
408:2, 430:11,
430:20, 462:3,
478:23, 498:9,
511:19, 532:6,
548:6, 548:12
**anyway**
553:11
**apologies**
413:11
**appeal**
464:22, 466:5
**appear**
460:9
**appearances**
398:1
**applicant**
411:5
**applicants**
470:9, 470:15
**applies**
517:1
**applying**
504:23, 505:5
**appointed**
455:6, 462:24,
463:24
**appropriate**
486:19, 502:19,
536:22, 542:7
**appropriations**
458:11
**approve**
460:19
**approved**
531:7

**approving**
420:18
**area**
441:14, 509:7
**areas**
409:25, 532:3,
536:12
**arena**
531:6
**around**
416:3, 438:24,
454:19, 508:1
**arrived**
542:3
**article**
401:16, 446:25,
447:6
**asked**
421:6, 457:20,
475:9, 502:8,
502:18
**asking**
427:14, 496:12
**aspect**
476:14, 476:18
**asserted**
491:18
**assess**
433:18, 487:11,
487:15
**assessing**
443:23, 548:17,
548:24, 549:10,
549:15
**assistance**
401:14, 428:23,
468:11
**assume**
523:20, 541:4
**assuming**
422:10
**atkins**
400:6
**attempt**
411:18, 433:11
**attempting**
443:5
**attend**
547:23

**attention**
447:9
**attesting**
413:3
**attitudes**
437:7
**attorney**
396:11, 403:8,
404:9, 404:13,
414:17, 433:10,
434:11, 436:25,
463:24, 488:5,
495:17, 495:20,
512:6, 532:23,
532:25, 534:5,
534:9
**attorneys**
497:18, 512:16
**attribute**
442:10, 444:6
**audio**
395:13, 556:5,
557:9
**audits**
531:11
**authored**
497:10
**authority**
492:13, 492:21
**automatically**
492:24
**available**
461:16, 470:22,
480:14, 488:19,
489:24, 493:22,
533:9, 535:16,
551:13, 551:19,
552:3, 552:7,
553:15
**avenue**
398:20, 399:12
**avenues**
524:14
**aware**
413:5, 413:9,
414:15, 415:24,
419:18, 427:24,
428:4, 428:6,

431:8, 432:9,
432:21, 433:8,
461:4, 495:17,
496:16, 496:19,
496:25, 514:3,
514:9, 514:14,
528:20, 528:21,
539:8, 539:9,
541:20, 542:16

**away**
426:6, 426:20,
427:17, 430:7,
445:6, 445:15,
446:1, 453:15,
453:25, 459:14,
506:16, 523:11,
523:16, 523:19,
525:24, 526:4,
526:7, 526:16,
529:11, 530:7,
541:24, 543:6,
544:10

**B**

**b) (6**
402:16, 413:12,
449:21, 474:16,
474:18, 495:1,
495:10, 502:11

**b) 6**
395:15

**back**
402:9, 417:1,
419:14, 428:17,
444:16, 471:1,
474:23, 482:11,
496:6, 522:2,
525:25, 536:11,
537:22

**balance**
439:21, 440:5,
447:18, 447:23,
448:4, 448:7,
448:9, 448:18,
512:3, 517:23,
518:9, 518:11,
518:15, 522:4,
522:5, 522:9,

523:6, 523:13,
531:9, 531:11

**balanced**
441:21

**balances**
531:22

**ballot**
473:21, 483:7,
502:4, 517:25,
522:11, 522:16,
530:21, 531:6,
531:14

**ballots**
436:23, 467:6,
531:19

**base**
515:22

**based**
454:1, 464:17,
487:24, 510:18,
516:24, 516:25,
522:25, 523:5,
525:25, 527:19,
527:24, 535:3,
538:6, 541:18,
541:19, 542:11,
542:13, 544:16,
546:15

**basically**
435:10, 478:20,
502:8, 507:4

**basis**
463:15, 463:17,
478:9, 507:6,
507:11, 536:19,
542:20, 544:23,
544:24, 547:13,
548:3

**bates**
410:21, 469:21

**bauerle**
395:23, 556:3,
556:17

**beam**
518:15

**became**
438:21, 479:9

**because**
405:21, 412:25,

416:6, 421:8,
422:2, 426:20,
427:17, 432:19,
432:22, 438:23,
444:23, 445:16,
453:10, 454:5,
463:19, 470:24,
472:11, 489:13,
489:22, 491:17,
502:11, 506:15,
508:25, 510:7,
514:8, 528:24,
529:11, 530:7,
530:11, 531:15,
535:9, 553:14,
554:21

**become**
415:3, 433:8,
473:10

**becoming**
433:9

**been**
403:12, 403:14,
406:10, 406:12,
407:12, 410:11,
415:8, 415:11,
418:7, 418:12,
418:13, 423:13,
424:13, 425:18,
426:2, 427:20,
429:1, 430:2,
430:7, 430:15,
430:24, 437:4,
437:5, 437:6,
437:11, 437:16,
438:16, 439:3,
439:19, 440:6,
445:20, 445:24,
447:3, 450:6,
450:7, 458:10,
459:8, 465:13,
472:2, 473:1,
473:17, 475:25,
477:16, 477:25,
478:1, 480:20,
496:16, 502:10,
504:3, 506:16,
507:22, 507:25,

516:17, 516:18,
517:12, 519:25,
521:13, 522:5,
522:22, 523:1,
524:3, 525:16,
528:21, 531:7,
533:3, 534:15,
534:20, 541:7,
545:9, 545:12,
551:17

**before**
397:8, 414:11,
416:16, 432:5,
436:15, 448:12,
450:13, 458:14,
472:7, 472:16,
473:19, 475:20,
477:14, 480:20,
488:3, 488:8,
497:23, 500:20,
501:11, 503:8,
508:2, 515:13,
535:13, 536:2,
557:3, 558:3

**began**
438:25

**beginning**
473:20

**behalf**
398:2, 398:15,
399:1, 399:18,
408:25, 495:9,
521:2

**behind**
516:9, 523:21

**being**
411:23, 437:9,
440:15, 446:14,
453:25, 458:21,
485:4, 495:13,
529:10, 531:19,
532:3, 543:6,
543:22

**beings**
520:9

**belief**
508:9

**beliefs**
518:4

**believe**
404:25, 410:12,
416:3, 417:11,
422:7, 423:22,
424:21, 428:8,
430:18, 431:5,
433:4, 437:11,
437:13, 438:8,
439:20, 447:21,
448:23, 449:9,
455:20, 456:7,
459:7, 465:11,
475:15, 479:6,
479:8, 490:1,
492:11, 500:21,
501:12, 503:7,
516:23, 519:3,
519:5, 523:15,
524:2, 525:9,
525:20, 525:24,
540:21, 545:3,
545:19, 549:13,
549:22, 549:24,
551:6
**believing**
409:8
**benefit**
543:19
**best**
469:3, 470:9,
470:14, 522:23,
556:7, 557:10
**better**
428:2, 444:18,
504:4, 507:3,
519:10, 534:8
**between**
406:2, 406:14,
407:10, 448:5,
473:11, 504:24,
505:7, 518:18,
522:9, 532:10
**beyond**
406:18, 417:5,
417:10, 462:2,
478:23, 504:17,
513:16, 515:24,
530:5

**biden**
508:23, 509:23
**big**
436:3, 436:5,
449:20
**biggest**
444:13
**bill**
414:12, 440:14,
448:22, 454:18,
475:13, 479:9,
524:10, 524:11,
524:21, 524:24,
525:3, 525:10,
542:24, 549:23
**bills**
478:9
**bipartisan**
449:2, 449:4
**birth**
421:1, 468:2,
540:12, 550:4
**bishop**
398:17
**bissonnette**
399:9, 403:19,
410:5, 449:16,
459:25, 499:3,
499:18, 499:22,
500:10, 501:3
**bit**
408:10, 462:15,
508:22, 546:10,
546:11
**bogs**
431:20
**boosted**
505:17
**border**
508:21, 528:14
**born**
419:21, 420:3,
420:7, 420:16,
421:6, 421:9,
422:3, 422:12,
550:2, 550:7
**borne**
398:5, 399:4

**boston**
398:13
**both**
434:25, 442:15,
521:2, 521:4,
533:13
**bottom**
410:20, 410:23,
411:1, 447:13
**boundaries**
442:21
**boylston**
398:12
**brand**
409:17
**break**
428:12, 440:18,
537:19
**breaking**
441:3
**brief**
428:12
**bring**
416:21, 421:1,
424:18, 424:23,
425:4, 435:2,
463:10
**broadhead**
399:19, 401:6,
403:23, 413:14,
413:16, 418:9,
418:14, 422:16,
425:2, 436:12,
438:14, 443:16,
444:18, 445:21,
449:23, 462:5,
469:15, 469:19,
471:9, 471:14,
474:15, 474:19,
481:21, 486:14,
486:25, 488:13,
490:5, 494:3,
494:11, 494:16,
494:21, 495:3,
495:7, 495:25,
498:18, 498:22,
500:3, 501:6,
502:7, 521:22,

522:1, 525:1,
525:4, 529:15,
529:19, 533:6,
533:23, 538:15,
541:10, 543:24,
545:14, 546:18,
554:25, 555:6
**broadhead@doj**
399:24
**brought**
463:20
**budget**
435:7, 534:18,
535:10, 535:24
**build**
435:21, 531:4,
532:4
**burden**
454:7, 481:25,
523:25
**burdens**
435:18, 441:22,
457:12, 457:13
**bureau**
512:15
**busy**
481:1, 481:2
**button**
457:4

**C**

**call**
423:12, 434:4,
434:7, 434:15,
434:21, 435:1,
480:1
**called**
405:9, 410:21,
419:15, 448:22
**calls**
434:6, 434:9,
434:10, 434:18,
468:9, 480:4,
480:5, 480:8
**cambodia**
491:10, 492:18
**came**
430:12, 473:14,

525:25
**campaign**
443:5
**can't**
459:16, 461:23,
461:25, 492:6,
519:14, 523:14,
554:9, 554:12
**candidate**
443:3, 443:11
**cannot**
465:10
**capabilities**
531:8
**capacity**
395:8, 396:7,
396:10, 496:13
**caption**
404:3
**capture**
420:6
**card**
401:20, 405:23,
483:22, 484:4,
484:5, 484:17,
484:21, 485:5,
485:8, 485:9,
485:14, 550:23,
552:20, 553:8
**cards**
405:20, 483:19,
486:5, 550:18
**care**
481:17
**carry**
552:20
**case**
395:5, 396:3,
412:8, 420:20,
422:10, 422:19,
445:19, 475:6,
493:11, 496:17,
497:10, 523:11,
538:9, 538:13,
538:24, 539:12,
545:1, 545:10,
545:13, 548:4,
556:10, 557:13,

558:8
**cases**
406:3, 406:8,
406:10, 408:23,
413:6, 436:20,
513:16, 521:15
**cast**
405:13, 407:6,
436:23, 502:5,
517:25, 522:11
**casting**
413:6, 530:22
**casual**
504:24, 505:6
**categories**
517:7
**caucus**
474:13
**causal**
505:6
**cause**
431:15
**caused**
431:6
**causes**
512:21
**causing**
523:4
**cell**
459:9
**center**
434:4, 434:7,
434:15, 434:21,
435:1
**certain**
430:2, 430:8,
492:23, 554:13
**certainly**
409:11, 427:25,
443:20, 468:7,
477:10, 481:8,
498:6, 528:17,
537:15
**certificate**
421:2, 457:24,
458:3, 458:15,
459:17, 460:15,
461:24, 468:2,

493:5, 540:12,
556:1, 557:1,
558:1
**certification**
506:23
**certify**
556:3, 557:4,
558:4
**chain**
451:23
**chair**
478:3
**challenge**
418:20, 456:17,
462:15, 462:17,
462:20, 463:1,
463:2, 463:17,
463:23, 464:2,
464:19, 465:8,
465:12, 466:4,
466:5, 466:22,
474:4, 507:20
**challenged**
408:21, 463:7,
466:22
**challenger**
462:23, 464:6,
464:8
**challenges**
414:2, 463:15,
465:13, 474:5
**change**
414:12, 444:8,
527:24
**changed**
459:1, 507:24,
508:12, 508:22,
509:3, 509:20
**changes**
414:2, 414:8,
415:1, 534:22,
540:16
**changing**
511:2
**charge**
455:9
**charged**
403:8

**chart**
452:12
**check**
406:23, 418:9,
488:4, 550:4,
550:12, 550:19
**checking**
520:17
**checklist**
406:17, 423:8,
423:12, 423:17,
424:22, 464:15,
473:19, 508:16,
510:5, 510:16,
510:22, 510:25,
534:12
**checklists**
451:22, 508:25
**checks**
531:22
**cheung**
400:3
**choice**
533:24
**choke**
433:19
**circumstances**
424:10, 485:5,
491:10, 508:22,
527:20
**cit**
490:14
**cities**
472:23
**citizen**
402:17, 458:5,
463:16, 485:9,
487:21, 489:4,
489:5, 490:15,
492:5
**citizens**
403:11, 404:20,
458:22, 488:12,
489:1, 514:10,
514:19, 554:16
**citizenship**
406:19, 408:1,
408:18, 409:14,

412:10, 412:19,
414:2, 419:24,
420:7, 420:11,
420:15, 420:18,
421:3, 421:11,
421:17, 422:2,
422:5, 422:12,
424:19, 426:8,
426:21, 436:21,
444:24, 453:21,
453:24, 454:8,
455:1, 460:16,
460:20, 460:23,
461:24, 461:25,
462:9, 463:21,
464:14, 468:16,
469:1, 470:10,
470:17, 471:6,
474:4, 483:20,
484:22, 485:3,
485:12, 485:21,
485:25, 486:7,
486:13, 487:6,
487:12, 488:10,
488:17, 488:22,
489:12, 490:18,
490:23, 491:14,
491:17, 491:20,
492:14, 492:24,
493:15, 508:4,
514:21, 530:8,
539:17, 539:23,
540:4, 549:21,
551:8, 551:10,
551:13, 551:18,
551:23, 552:2,
552:3

**city**
417:25, 472:20
**civic**
415:7
**civil**
399:10, 497:24
**clarified**
440:13
**clarify**
425:3
**clayton**
400:9

**cleaned**
440:12
**cleanup**
528:5
**clear**
490:25, 525:5
**clearly**
526:18
**clerks**
534:12
**close**
439:2, 479:20,
535:22
**closer**
417:13, 473:8
**co-counsel**
538:7
**coalition**
396:2, 398:2,
399:1
**collect**
551:7, 551:10
**collected**
512:5
**column**
411:2, 470:8
**combatting**
505:13
**come**
417:4, 434:19,
462:8, 471:1,
482:11, 518:12
**comfortable**
521:5, 521:7
**coming**
417:25, 517:4,
527:22, 528:14,
529:3, 529:10,
536:21
**commenting**
539:10
**commit**
512:21
**committee**
435:14, 438:22,
438:24, 439:17,
455:5, 455:7,
478:4, 478:10,

531:13, 547:20
**common**
407:15
**commonly**
521:19
**communicate**
433:9, 478:9,
479:18, 547:21
**communicated**
477:24, 478:6
**communicating**
466:8, 506:4
**communication**
491:23, 535:11,
535:23
**communications**
415:5, 475:10,
476:13, 476:17,
477:18, 478:12,
478:16, 515:20
**communities**
406:22, 429:16,
465:17, 465:22
**community**
415:14
**comparative**
541:6, 541:12
**complaints**
404:16
**complete**
423:15, 470:10,
470:15
**compliance**
471:24
**complicated**
482:18
**comply**
415:16, 471:18
**component**
522:24
**comprehensive**
487:4, 547:25,
554:10, 554:12,
554:14, 554:16
**con**
470:18
**concept**
538:20, 538:25

**concern**
421:20, 508:17,
511:16, 517:12,
518:13, 521:2,
523:4
**concerned**
452:25, 531:14,
543:10
**concerns**
438:17, 439:12,
440:23, 441:15,
454:12, 477:11,
511:4, 523:3
**conclude**
536:1
**concluded**
555:14
**concludes**
489:19, 494:25,
537:25
**concord**
397:5, 399:13,
399:22
**concrete**
551:22
**conduct**
542:16
**conducting**
435:8, 512:9
**confidence**
411:21, 435:21,
437:2, 437:8,
437:17, 438:1,
438:5, 438:11,
438:13, 438:22,
440:2, 441:17,
441:20, 442:7,
442:11, 443:14,
443:23, 444:7,
444:12, 445:2,
446:5, 447:8,
447:22, 448:5,
451:8, 451:15,
451:20, 452:4,
452:6, 453:5,
453:13, 453:22,
453:24, 454:3,
455:6, 456:22,

456:25, 465:14,
502:4, 503:12,
503:18, 503:24,
504:8, 505:1,
505:8, 505:17,
506:8, 506:15,
515:7, 517:24,
519:24, 522:10,
523:5, 523:23,
523:25, 531:4,
531:13, 531:24,
532:4, 542:24,
543:3, 543:5,
543:9, 543:19,
543:22, 544:9,
544:12, 544:25,
545:24, 546:10,
546:16, 547:14,
547:19, 548:3,
548:17
**confident**
474:7
**confidential**
401:20, 484:1,
484:16, 494:7,
494:10, 494:15
**confirmed**
403:12, 404:18,
404:25
**confusion**
440:8
**congress**
448:22
**consider**
527:10, 549:4,
549:5
**considered**
453:3, 453:6,
524:6
**considering**
434:3
**consistent**
405:4, 451:1,
483:12, 502:23
**consistently**
437:10, 546:22
**consolidated**
475:5

**constant**
409:19
**constituency**
504:13
**constitute**
492:24
**constitutes**
487:5, 487:11,
490:12
**constraints**
471:4
**contact**
510:21
**contacted**
510:20
**contacts**
461:16
**context**
465:9
**continuation**
413:12
**continued**
396:1, 496:8,
538:2
**continuing**
474:15, 474:17
**contributing**
465:13
**contributor**
452:6
**control**
523:7, 523:8
**convenience**
470:19
**conversation**
433:15, 442:21,
504:12, 507:9
**conversations**
443:19, 547:12,
547:17, 548:1,
548:2, 548:7
**convey**
442:19
**conveyed**
504:11
**coordinated**
443:5
**copies**
490:7, 540:12,

545:4
**copy**
490:6, 501:6
**corner**
410:20, 437:24
**correct**
423:25, 429:20,
456:14, 456:18,
456:19, 463:25,
468:19, 468:20,
495:10, 514:22,
540:23, 541:10,
550:8, 550:9,
550:15, 550:24,
552:6, 553:15
**correctly**
429:10
**cost**
516:12, 535:17,
536:3, 536:17,
538:20, 538:25
**costs**
457:21, 457:24,
534:21
**could**
404:2, 404:7,
408:24, 409:5,
409:9, 410:20,
410:22, 422:4,
422:11, 422:23,
422:25, 424:1,
424:13, 428:9,
428:20, 429:4,
430:2, 430:7,
431:15, 433:17,
435:11, 436:8,
440:8, 444:14,
447:12, 449:15,
450:6, 450:16,
453:12, 453:16,
457:13, 460:15,
462:4, 464:5,
464:7, 468:11,
471:7, 473:12,
474:6, 474:7,
480:1, 486:5,
491:4, 491:7,
512:4, 516:11,

516:18, 520:13,
523:24, 524:3,
524:4, 524:6,
530:4, 531:1,
531:25, 533:2,
534:5, 535:8,
543:21, 553:24
**couldn't**
420:6, 468:13,
489:10, 531:15
**counsel**
475:4, 556:9,
557:12, 558:6
**counted**
437:9, 502:4,
531:20
**counting**
531:7, 531:14
**counts**
549:20
**county**
467:12, 467:15,
468:1
**couple**
417:25, 434:1,
438:2, 472:12,
472:17, 473:2
**course**
428:13, 447:24,
452:23, 481:13,
502:11, 508:19,
527:12
**court**
395:1, 395:24,
440:12, 440:13,
464:22, 465:4,
466:9, 466:11,
467:7, 471:5,
516:2, 557:1,
557:20
**court's**
466:24
**courts**
466:17
**coverage**
429:6
**covered**
457:15

create
445:25, 461:24
created
409:21, 409:24,
438:21, 503:8,
508:14
creating
516:19, 523:22,
524:14, 531:17
credible
464:8
crimes
512:22
criminal
512:9
criminology
512:19
critical
473:18, 530:19
csr
395:23, 556:17
currently
462:13
currentness
552:8
custody
451:23
cuts
406:15
cva
419:4
cybersecurity
531:6
cycle
414:11, 416:8,
473:13
cycles
423:16
cynthia
395:23, 556:3,
556:17

**D**

data
420:8, 504:19,
507:12, 547:4,
551:21, 551:23,
552:2, 552:3

database
408:14, 419:10,
551:2, 551:4,
554:16
databases
461:15, 551:18,
552:5
date
475:18, 475:21,
477:6
dated
447:10
dave
496:14
david
395:7, 395:14,
396:6, 397:1,
398:18, 399:18,
401:3, 402:3,
447:7, 475:4
day
416:16, 424:14,
424:22, 431:19,
432:6, 433:10,
434:4, 434:10,
457:17, 461:10,
466:14, 466:17,
466:18, 479:25,
480:6, 480:15,
480:16, 481:10,
493:3, 493:12,
493:18, 494:1,
526:22, 544:2
days
458:13
dealing
451:11
deals
408:4
debebe
400:4
decades
509:4
december
404:13
decide
482:19, 544:11
decided
489:7

decides
408:6, 408:7
deciding
413:6, 487:19
decision
464:18, 497:23
declaration
492:8
declining
456:24, 465:14
decrease
437:25, 443:14,
444:6, 444:12,
444:14, 453:12,
453:24
deemed
466:23, 468:25
def
411:16
defend
533:25
defendant
395:10, 399:18,
401:24, 495:18,
501:1
defendant's
401:10, 401:23,
403:20, 404:4,
500:13, 500:17,
501:9
defendants
396:12
defending
533:1, 533:11
deferred
434:1
defining
504:7
definitely
511:16
definition
440:10
degree
442:9, 452:8,
524:10
degrees
524:13
delayed
458:10

deliver
504:15
democracy
396:2, 398:3,
399:2, 496:20
democrats
449:8, 449:10
demographic
537:14
demographics
509:11, 537:4,
537:10, 537:12
denial
528:25
deny
488:3, 493:8
department
399:20, 400:1,
427:22, 471:7,
496:15, 511:18,
521:3, 550:20,
552:4, 555:9
departments
551:14
depend
412:6
depending
442:2, 473:6,
518:23
depends
471:16, 473:7,
473:24, 483:7
deponent
522:16
deponents
554:19
deposition
395:13, 397:1,
413:13, 422:9,
433:22, 439:23,
494:22, 495:2,
498:14, 502:19,
517:23, 528:3
describe
537:2
described
492:4, 492:18,
493:2

description
401:9
deserves
532:16
designate
484:1
designated
433:25, 496:13
designed
445:9, 452:8,
504:3, 510:19,
532:4
desire
490:19, 493:19
desiree
400:7
despite
429:6, 458:21
detect
536:4
detecting
530:20, 533:20
deter
409:22, 411:2,
411:16, 412:3,
532:12, 533:4
determination
466:6, 487:25,
488:1, 519:20,
520:3, 520:19,
527:9
determine
433:19, 464:7,
504:23, 505:5,
505:11, 518:8,
519:18, 548:7,
548:12
determined
448:19, 453:19,
505:19, 505:20,
506:18, 521:18
determines
520:25
deterring
530:23
devices
531:7, 531:16
different
408:8, 454:4,

504:12, 508:3,
520:23, 522:14,
524:12
difficult
473:9, 510:24
difficulties
530:20, 533:20
difficulty
459:20, 479:23,
517:4
dig
459:8
digital
459:8, 556:5,
557:8
dip
442:11, 451:7
direct
406:2, 456:21,
463:3, 476:24,
518:22
directed
510:3
direction
442:3, 448:15,
518:17, 518:25,
519:6
directly
510:6, 511:10,
514:4
disabilities
459:19
disabled
415:14
discern
515:22
disclosed
498:1, 501:22,
530:25, 536:7
disclosure
401:23, 500:14,
533:19, 536:16
disclosures
500:17, 501:10,
501:25, 503:21,
506:21, 513:6,
513:7, 515:3,
522:2, 525:14,

530:14, 535:25,
537:1
discovered
406:12
discredit
443:5
discretion
487:11, 489:21
discussed
433:23, 457:6,
457:10, 478:25
discussion
433:21, 451:15,
451:20, 494:19,
495:13, 520:24,
549:19
discussions
478:21, 515:12,
515:14
disproportionate-
ly
517:8
dispute
498:10
disputing
461:21
district
395:1, 395:2
divorce
459:2, 550:12
divorced
550:10, 550:15
dixville
466:1, 466:2,
466:21
document
410:15, 459:11,
460:5, 460:12,
480:21, 483:18,
491:19, 491:21,
492:13, 497:12,
498:4, 498:5,
498:7, 499:9,
499:12, 499:15,
500:19, 500:24,
501:9, 501:11,
501:25, 515:4,
524:4, 552:19

documentary
406:19, 407:25,
409:13, 412:9,
412:18, 414:1,
424:18, 426:7,
426:21, 444:24,
453:21, 454:25,
463:20, 469:5,
471:6, 530:7
documentation
409:25, 412:22,
413:2, 416:13,
421:17, 424:24,
425:3, 426:11,
429:7, 429:9,
429:14, 429:23,
431:18, 432:1,
445:13, 445:17,
453:11, 454:17,
457:18, 459:4,
463:3, 463:11,
464:11, 485:2,
485:11, 485:20,
486:12, 486:18,
487:4, 487:5,
487:12, 487:23,
489:7, 489:12,
489:16, 490:13,
490:22, 491:14,
493:21, 507:2,
513:12, 514:21,
524:5, 524:9,
525:23, 530:12,
536:22, 542:4,
542:8, 543:4,
543:8, 549:21,
553:24, 554:2
documents
416:21, 427:18,
459:5, 459:9,
459:14, 468:5,
470:25, 482:10,
482:15, 482:23,
501:15, 501:22,
515:1, 517:5,
529:23, 540:4
doing
415:12, 418:2,

427:21, 430:23,
432:3, 471:21
**dollar**
535:9
**domicile**
440:10, 440:14,
464:14, 508:4,
511:23
**done**
411:20, 413:20,
413:22, 415:2,
416:1, 426:24,
427:4, 430:10,
432:5, 432:7,
433:7, 437:5,
439:6, 440:6,
445:24, 457:9,
461:9, 471:24,
474:12, 477:15,
523:24, 524:3,
524:9, 526:19,
530:15, 531:5,
532:3, 535:12,
537:19, 540:25,
548:6, 548:11
**double**
407:16, 407:21,
408:2
**doubt**
503:9
**down**
406:15, 431:20,
441:3, 524:23
**downsized**
459:13
**dozen**
508:1
**dr**
496:24, 497:10,
499:1, 499:10,
499:21, 500:1,
538:8, 538:13
**draft**
524:16, 524:17
**dramatically**
509:3, 527:24
**draw**
447:9

**drawback**
543:21
**driver**
443:14
**driver's**
454:6, 550:18,
550:23, 551:1,
551:3, 551:15,
552:5
**drop**
437:16, 437:17,
437:19, 481:14,
545:24, 546:24
**dropped**
423:16
**due**
431:22, 445:2,
453:22, 453:24,
459:1
**during**
419:18, 420:22,
422:13, 423:1,
430:19, 454:15,
467:6, 508:5,
515:17, 525:17,
525:18, 526:16,
553:4

### E

**each**
406:9, 502:3,
502:4, 528:9,
546:8, 549:14,
555:8
**earlier**
418:5, 433:22,
502:24, 528:6,
549:19
**early**
446:6, 466:14,
474:9, 474:10
**ease**
440:6, 448:5,
448:7, 546:16
**easier**
412:23, 477:10,
508:24, 509:24
**easily**
439:25, 473:12

**easy**
437:7, 447:21
**educate**
416:4, 417:15,
431:24, 439:15,
531:3
**education**
401:14, 413:19,
413:24, 415:7,
417:5, 417:6,
417:10, 417:20,
427:21, 427:24,
428:23, 432:17,
443:22, 504:4,
510:13, 531:20
**effect**
430:11, 430:12,
430:13, 430:21,
452:4, 453:16,
453:17, 454:18,
476:10, 476:23,
477:13, 477:17,
483:14, 547:20
**effective**
477:6, 505:13,
516:12, 536:3,
536:18
**effects**
527:10, 527:14
**efficient**
532:16, 536:3,
536:17
**efficients**
487:10
**effort**
405:12, 411:2,
411:15, 412:15,
413:25, 417:13,
417:24, 427:25,
432:17, 448:25,
461:13, 471:18,
541:23, 542:18,
543:16
**efforts**
413:19, 413:24,
414:25, 531:1,
531:20
**eight**
404:18, 404:25,

406:25, 408:15,
436:20, 513:16
**either**
408:25, 424:9,
427:13, 463:3,
517:17
**elected**
522:15
**electionnet**
419:16, 419:19,
419:21, 420:9,
420:14, 421:8,
421:24, 422:11,
422:14, 423:2
**elections**
405:3, 406:21,
417:13, 417:17,
417:25, 425:1,
425:9, 425:13,
425:15, 425:16,
425:20, 426:2,
426:19, 427:3,
427:7, 427:9,
430:19, 431:13,
431:16, 435:8,
438:6, 438:12,
438:18, 439:16,
441:18, 442:7,
442:16, 444:4,
446:9, 448:20,
472:12, 472:13,
472:17, 472:19,
472:20, 472:21,
473:2, 480:20,
482:21, 483:4,
483:5, 483:8,
483:9, 483:11,
483:15, 503:13,
505:22, 506:13,
509:2, 511:3,
512:13, 514:6,
522:23, 525:18,
525:19, 526:5,
526:17, 526:24,
527:19, 529:24,
531:2, 532:20,
535:22, 539:4,
539:17, 540:19,

540:23, 541:25,
542:17, 542:22,
544:11, 546:23,
549:7, 549:9
**electoral**
537:3
**electorate**
407:3, 425:13,
425:14, 426:16,
432:8, 440:22,
441:20, 442:6
**electronically**
545:7
**elias**
398:19, 555:9
**eligibility**
409:2, 506:23,
507:14, 511:14
**eligible**
409:9, 444:21,
506:16, 514:19,
517:25, 522:11,
523:12, 529:9,
529:12, 529:16,
543:22
**elimination**
418:18, 419:4,
458:20
**else**
482:14, 532:6
**elsewhere**
517:23
**email**
401:18, 460:1,
460:9, 484:13,
491:5, 491:8,
491:18, 491:21,
491:23, 492:4,
492:7, 492:15,
492:18, 493:2,
493:3
**emailed**
478:12
**emails**
479:12
**employed**
556:10, 557:12,
558:7

**enactment**
514:1
**encourage**
432:3
**encouraging**
416:14, 493:16
**end**
417:14, 473:11,
508:24, 509:25,
513:10, 532:18,
536:10, 536:11,
536:22
**ended**
510:25
**enforcement**
512:16, 532:11
**engage**
414:1, 432:16,
433:6
**engaged**
413:25, 425:14,
425:17, 483:11
**enjoined**
471:5
**enjoining**
471:17
**enough**
431:2, 441:13,
467:16
**enrolled**
475:15, 475:18
**enrolling**
475:23
**ensuring**
517:24, 522:10
**entered**
419:9, 421:7,
510:22, 551:20
**entirety**
467:6, 494:17
**entry**
401:20, 483:19,
483:22, 484:4,
484:5, 484:17,
484:21, 486:5
**equally**
517:2, 532:20
**equation**
440:15

**erroneously**
424:5, 424:10
**especially**
437:12, 535:22
**esquire**
398:9, 398:17,
398:18, 399:8,
399:9, 399:19,
400:3, 400:7,
400:9, 558:13
**esquire-ropes**
400:6
**esquire-with**
400:1
**established**
436:20
**estimate**
506:6
**estimates**
526:23
**estimation**
509:24
**et**
396:3
**even**
422:1, 441:14,
462:4, 489:21,
490:21, 493:13,
543:14
**event**
417:1, 471:5,
524:7
**ever**
424:5, 479:13,
484:5
**every**
403:3, 403:7,
423:13, 423:23,
471:18, 502:1,
502:3, 517:1,
517:24, 522:11,
523:11, 528:24,
543:16, 552:18
**everybody**
423:23, 450:4
**everybody's**
440:5, 481:11,
520:21

**everyone**
456:2
**everyone's**
481:6
**everything**
432:3, 434:17,
445:24, 535:3,
555:3
**evidence**
487:20, 489:4,
513:18
**exact**
403:16, 419:1,
475:18, 539:24
**exactly**
418:22, 439:16,
466:25, 467:9,
519:14, 542:3,
552:3
**examination**
401:4, 401:5,
401:6, 402:5,
474:25, 495:6,
496:8, 538:2
**example**
421:25, 432:23,
463:14, 532:21
**excerpt**
410:13
**excessively**
433:9
**exchange**
460:10, 538:7
**executed**
421:2
**executive**
508:23, 509:22,
510:1, 510:10,
510:18, 511:8
**exemption**
510:7
**exercise**
416:9, 438:23,
439:24
**exercising**
417:24, 488:18
**exhaustive**
487:8

**exhibit**
401:9, 401:10,
401:13, 401:14,
401:16, 401:17,
401:18, 401:20,
401:21, 401:22,
401:23, 401:24,
403:20, 404:1,
410:8, 410:12,
428:22, 429:2,
446:24, 449:17,
460:1, 460:6,
469:14, 469:20,
483:25, 484:8,
484:16, 490:7,
491:3, 491:8,
491:13, 494:10,
494:21, 497:4,
497:8, 499:5,
500:13, 500:16,
501:1, 530:14,
546:18, 546:20
**existence**
421:16, 465:12
**expect**
424:18, 426:4,
426:10, 427:10,
434:6, 434:13,
445:18, 455:3,
502:13
**expected**
536:1, 547:8
**expecting**
435:13
**expeditiously**
434:19
**expended**
534:24, 535:7
**expending**
536:4
**experience**
443:24, 454:1,
509:6, 512:9,
512:19, 523:1,
540:19, 540:22
**experienced**
402:20, 431:14
**expert**
401:21, 401:22,

401:23, 496:13,
496:17, 497:4,
497:9, 497:25,
498:2, 499:6,
499:10, 500:14,
500:17, 501:10,
501:21, 502:13,
503:4, 506:21,
513:7, 521:14,
538:12, 549:4,
549:6
**expertise**
509:6, 547:3
**experts**
496:20, 521:16
**explain**
502:9
**explaining**
491:9
**explanation**
493:4
**explicitly**
411:5
**extensively**
502:10
**extent**
452:3, 532:17,
537:16, 550:25

---

**F**

**fa**
411:4
**face**
485:9
**facebook**
415:23
**fact**
416:11, 436:1,
440:3, 445:15,
451:4, 452:11,
488:12, 492:17,
515:9, 519:20,
519:24, 536:5,
542:14
**factor**
465:14
**factual**
507:6, 507:11

**fair**
411:14, 416:20,
417:19, 417:23,
425:10, 425:12,
426:17, 456:20,
467:16, 468:4,
518:5, 533:22,
548:8
**fairly**
539:19
**fallible**
520:10
**falsely**
488:22
**familiar**
410:14, 410:16,
425:22, 425:25,
485:4, 538:19
**families**
481:18
**family**
468:12, 481:18
**far**
431:14, 444:16,
539:12, 551:22
**faster**
449:25
**father**
491:9, 492:8
**favor**
501:14, 532:14
**feasible**
411:4, 411:17,
412:16, 412:20
**federal**
435:10, 458:10,
483:5, 485:7,
510:3, 551:19,
551:23
**fee**
464:25
**feedback**
446:12
**feel**
428:1, 428:5,
441:5, 453:8,
474:7, 510:6
**felony**
467:15

**few**
438:25, 439:18,
440:19, 458:13,
464:10, 471:3,
475:7, 508:13,
538:5, 541:16,
542:15, 553:3
**fewer**
489:13
**field**
521:20, 548:17,
548:18, 548:24,
549:1, 549:8
**figure**
542:19
**filing**
464:24, 473:16,
473:19, 473:21
**fill**
468:22, 469:4
**filled**
421:18, 492:8,
512:2
**filling**
463:2, 469:2
**final**
456:3, 544:16
**financial**
556:11, 557:14,
558:8
**find**
433:16, 439:21,
440:4, 441:25,
491:7, 523:6
**finding**
518:18, 524:8,
544:17
**fine**
450:1, 502:15,
555:11
**first**
411:1, 412:11,
454:18, 463:16,
475:9, 498:15,
500:21, 501:12,
511:25, 524:16,
524:17, 524:22,
524:25, 525:3,

525:10, 525:20,
541:15, 553:21
**first-time**
493:24
**firsthand**
464:12
**fiscal**
435:14
**five**
402:15
**flip**
404:7
**flooding**
508:21
**floor**
397:4
**florida**
558:14
**focus**
414:13, 430:15,
430:24
**folks**
479:22
**follow**
516:15, 526:1,
533:16, 545:20,
554:6
**follow-up**
479:11, 534:13,
549:23
**following**
439:19, 466:16,
544:14
**fontes**
405:8
**foregoing**
556:5, 557:3,
557:5, 558:3,
558:5
**forget**
552:19
**form**
422:17, 436:13,
438:15, 443:17,
445:22, 454:22,
462:6, 463:2,
481:22, 486:15,
487:1, 488:14,

507:24, 525:5,
529:16, 534:2,
543:25, 547:16
**formal**
547:24
**formella**
396:9
**formerly**
554:21
**forming**
504:19
**forms**
540:3, 547:19
**forward**
398:4, 399:3,
461:20, 544:18
**found**
552:25
**foundation**
398:4, 399:3
**four**
423:16, 434:23,
490:7
**fox**
398:18, 401:5,
469:25, 474:13,
475:1, 475:4,
480:12, 482:1,
484:10, 484:12,
484:19, 486:20,
487:2, 488:20,
490:9, 494:5,
494:9, 494:14,
494:18, 494:25,
538:1, 538:3,
538:17, 541:13,
544:6, 545:19,
545:22, 547:2,
554:18
**fraction**
454:23
**frame**
433:4
**fraud**
402:21, 406:11,
406:23, 409:22,
411:3, 411:4,
411:16, 411:17,

412:3, 412:16,
412:20, 412:23,
436:7, 436:9,
450:18, 450:21,
450:25, 451:12,
452:5, 452:14,
452:25, 504:25,
505:8, 505:14,
530:23, 532:12,
534:7, 536:2,
536:5, 536:14,
536:15, 536:18
**fraudulent**
513:9, 530:21,
533:21
**frees**
532:19
**frequency**
539:3
**frequent**
423:14
**frequently**
539:15
**friend**
398:5, 398:6,
398:8, 399:4,
399:5, 399:7
**fro**
459:21
**front**
411:7, 447:2,
491:3, 532:18,
536:10, 536:22
**full**
439:8, 470:7
**fully**
557:5, 558:5
**fun**
527:2, 527:5
**function**
525:17, 525:18,
526:16, 527:2
**fund**
435:9
**funds**
435:3, 435:5,
435:9, 435:10,
435:15

**further**
512:7, 554:23
**future**
524:13

**G**

**gain**
517:15
**gather**
468:5
**gathered**
420:8
**gauging**
437:7
**gave**
421:25, 440:13,
455:9, 502:24,
548:19
**geared**
473:23
**general**
396:11, 407:11,
414:17, 439:8,
444:22, 445:16,
451:4, 477:7,
516:2, 519:21,
522:15, 531:21,
537:6
**general's**
403:9, 404:9,
404:14, 433:10,
434:11, 436:25,
488:5, 495:17,
495:21, 512:6,
532:25, 534:6,
534:9
**generally**
414:8, 415:9,
425:11, 454:20,
481:2, 483:6,
483:8, 514:5,
532:8, 539:18,
542:14, 542:21
**generate**
419:11
**generous**
435:7
**geoffrey**
400:6

**getting**
430:25, 435:6, 455:2, 518:22, 518:24, 552:13

**gill**
403:17, 446:22, 449:14, 459:23, 497:2, 500:8, 500:9

**gilles**
399:9

**gilles@aclu-nh**
399:16

**give**
409:24, 438:9, 441:16, 484:13, 488:1, 501:3, 508:1, 515:7, 521:13, 537:11, 543:8

**given**
406:7, 408:12, 480:16, 487:19, 520:25, 537:8

**global**
401:20, 483:19, 483:22, 484:4, 484:5, 484:17, 484:21, 486:4

**go**
417:5, 424:20, 435:6, 435:14, 462:6, 463:11, 463:14, 465:4, 469:4, 470:25, 481:9, 481:12, 482:9, 487:18, 514:12, 520:16, 522:5, 533:7, 543:25, 545:15, 552:18

**go-around**
525:21

**goal**
522:22

**goes**
481:16, 505:22

**going**
402:13, 402:15,

408:2, 409:6, 413:18, 416:12, 416:25, 417:3, 419:14, 420:9, 422:15, 423:18, 426:3, 426:6, 427:8, 429:5, 430:18, 433:18, 434:2, 436:6, 445:8, 446:21, 447:16, 449:25, 452:4, 454:24, 463:7, 469:11, 474:12, 478:10, 483:24, 490:6, 496:11, 496:14, 498:25, 500:1, 502:7, 502:9, 517:3, 526:21, 527:16, 527:23, 528:4, 529:17, 531:25, 533:19, 535:21, 536:17, 537:11, 538:1, 540:6, 540:10, 540:14, 541:11, 543:15, 554:11, 554:21

**gone**
403:24, 417:9, 477:13

**good**
402:7, 402:8, 427:21, 429:6, 439:5, 447:23, 448:4, 448:9, 448:17, 450:3, 456:24, 475:2, 475:3, 520:12

**gotten**
405:20, 519:4

**gov**
399:24

**government**
485:13, 506:25, 507:13, 508:8, 508:11, 510:12, 511:15

**governmental**
492:13

**governor**
475:11, 475:25, 476:1, 476:6, 476:18

**granite**
397:3, 399:21, 401:16, 401:17, 446:20, 446:24, 447:7, 447:20, 449:17, 450:24, 456:21

**gray**
398:10, 400:6, 400:8, 478:1, 478:6, 478:8, 478:13, 478:16, 479:6, 479:8, 479:14, 479:17, 479:18, 515:15, 515:21, 555:9

**great**
441:25, 475:8, 509:1

**greater**
437:19

**green**
405:20

**group**
398:19, 441:8, 459:3, 555:9

**groups**
415:12, 415:13, 418:4, 458:18, 504:13

**guess**
405:1, 424:23, 460:13, 486:2, 490:10, 497:22

**guesswork**
513:13, 536:23

**guidance**
414:16, 433:7, 483:18, 485:17, 486:17, 488:2

**H**

**half**
410:23, 411:1,

439:6

**hampshire**
395:2, 395:4, 395:8, 396:7, 396:10, 398:4, 398:15, 399:3, 399:11, 402:19, 403:13, 404:21, 405:2, 405:14, 406:5, 407:1, 407:3, 407:6, 407:16, 410:13, 413:8, 415:13, 420:3, 423:6, 423:11, 432:8, 433:2, 436:9, 436:22, 437:9, 437:22, 438:4, 438:6, 438:11, 438:12, 442:12, 442:22, 443:15, 444:8, 444:9, 444:15, 446:5, 447:18, 447:23, 448:4, 452:17, 452:22, 452:25, 453:1, 458:18, 461:3, 462:18, 465:15, 465:18, 465:23, 467:12, 467:19, 475:6, 493:24, 493:25, 503:12, 503:18, 504:13, 507:19, 508:6, 509:1, 510:6, 511:9, 513:20, 514:20, 528:7, 528:15, 529:4, 534:7, 537:12, 539:5, 539:17, 540:2, 540:7, 540:11, 540:15, 540:19, 541:7, 546:17, 546:22, 548:9, 548:13, 549:7, 549:9, 550:3, 550:4, 550:8,

550:11, 550:15,
550:17, 550:19,
550:23, 553:22,
553:23
**hampshire's**
406:21, 507:21,
509:14, 509:17,
537:3, 551:14
**handed**
410:11, 429:1,
450:7
**handing**
497:8
**handle**
428:2, 480:7,
541:1
**handled**
541:7
**happen**
408:6, 423:19,
478:22, 528:19,
543:17
**happened**
431:8, 444:16,
477:12, 514:16
**happens**
521:16, 536:2
**happy**
494:18, 521:6
**harder**
412:2, 412:19,
481:19, 481:24
**harm**
543:5
**hart's**
466:1, 466:2
**hb**
408:1, 414:3,
430:11, 430:21,
431:6, 431:15,
431:22, 435:19,
435:20, 436:5,
438:12, 445:2,
446:4, 448:12,
448:14, 449:4,
453:4, 457:5,
468:15, 471:5,
477:20, 477:24,

478:6, 478:13,
478:16, 479:5,
482:22, 483:15,
488:9, 495:14,
495:22, 503:13,
503:17, 505:16,
506:7, 506:14,
511:17, 515:5,
515:6, 515:11,
515:23, 516:7,
516:10, 516:18,
517:11, 518:8,
519:3, 525:15,
534:16, 541:14,
549:14, 554:22
**head**
467:17, 518:17,
527:4
**health**
510:13
**hear**
430:4, 465:21,
494:7, 526:8,
547:22
**heard**
427:2, 432:20,
439:11, 456:21,
515:13, 521:20,
526:1, 526:10,
526:12, 531:13,
542:11
**hearing**
439:7
**hearings**
438:25, 455:14,
515:18, 515:19
**held**
397:2, 438:24,
455:13
**help**
414:6, 417:3,
430:17, 435:11,
435:21, 461:8,
461:11, 461:16,
480:2, 480:15,
493:20, 531:4,
531:21, 532:17,
536:9, 550:7,

550:14, 550:22,
554:5
**helpful**
427:20, 445:11,
461:19, 461:22,
551:2
**helping**
518:17
**henry**
399:8, 475:7
**henry@aclu-nh**
399:15
**here**
491:6, 496:11,
498:3, 509:2,
519:11, 538:7,
539:14, 544:21,
554:8
**hereby**
556:3, 557:4,
558:4
**herron**
538:8, 538:13
**high**
437:10, 437:17,
481:9, 546:22
**higher**
426:15, 476:4,
546:11
**highest**
481:7
**hired**
415:4, 415:6
**history**
413:7, 508:6
**hold**
554:21
**home**
468:18, 469:5,
470:16, 470:25,
482:10, 514:12,
529:10, 529:11,
529:24
**hope**
461:5
**hopefully**
437:23, 460:25,
488:25, 519:1

**hoping**
550:3, 550:11,
550:18
**hosted**
405:8
**hot**
546:9
**hours**
455:16, 553:3
**house**
414:12, 475:13,
524:10, 524:11,
542:24, 549:23
**however**
507:23
**huge**
508:14
**human**
510:13, 514:6,
520:9
**hundred**
526:11, 526:15,
530:6, 544:10
**hypothetically**
422:1

---
I
---

**id**
454:2, 454:4,
454:5, 454:22,
519:21, 550:18,
550:23, 552:15,
552:16
**idea**
407:5, 434:8,
479:5
**ideally**
441:24
**identification**
403:22, 410:9,
428:24, 446:25,
449:18, 460:3,
484:18, 485:7,
497:6, 499:7,
500:14, 501:2
**identified**
513:17
**identify**
457:1, 461:14,

510:4, 510:11,
510:15
**ids**
551:11
**if-**
441:11
**images**
459:9, 531:9
**immediate**
514:20
**immigrants**
509:17
**impact**
443:20, 506:7,
527:17, 534:16
**impacted**
454:13, 458:20
**impacts**
418:17, 442:22
**implement**
431:3, 445:8,
473:4, 474:8
**implementation**
414:13, 414:18,
430:16, 430:25,
433:22, 478:19,
527:25, 541:15,
544:15
**implemented**
454:11, 524:4,
525:16
**implementing**
434:3, 471:11,
471:13, 504:3,
532:22, 534:24,
535:7
**implications**
517:11
**importance**
530:18, 530:22
**important**
416:4, 439:24,
449:1, 520:2,
522:4, 532:20,
536:12, 544:12,
545:3
**impose**
457:13

**imposed**
435:18
**imposing**
523:25
**improve**
447:24, 454:3,
542:24
**improvements**
543:3
**inactivity**
423:10
**inappropriate**
402:22
**incarcerated**
467:11, 468:4
**included**
510:2
**includes**
415:9, 485:22
**including**
525:12, 525:13,
551:8, 555:8
**incorporated**
534:20, 535:4,
535:10
**increase**
417:14, 438:13,
445:1, 446:4,
451:5, 451:8,
453:22, 523:24,
544:8
**increased**
431:22
**index**
401:1
**indicate**
502:1, 513:8,
515:4, 530:15,
536:1, 537:2
**indicated**
419:20, 503:21,
504:18, 525:15
**indicates**
485:8
**indirect**
477:1, 477:2
**individual**
405:22, 408:7,

415:6, 433:17,
460:24, 460:25,
468:7, 492:23,
493:20, 531:23
**individually**
395:15
**individuals**
403:6, 405:19,
415:8, 432:4,
435:3, 439:1,
462:25, 480:21,
481:25, 493:17,
508:15, 514:7,
525:22, 525:24,
543:9, 547:21
**indulge**
466:19
**ineligible**
405:13
**influx**
508:20
**inform**
414:25, 442:7
**information**
408:13, 415:10,
421:8, 427:15,
429:24, 429:25,
430:17, 442:19,
442:20, 464:17,
480:1, 490:1,
507:9, 512:4,
550:5, 551:9,
551:11, 551:13,
552:8
**infrastructure**
530:19
**infrequent**
402:25
**inherent**
513:23
**initial**
499:21, 500:2,
501:20, 501:24,
506:21, 513:6,
513:7, 515:3,
525:14, 537:1
**initially**
542:3

**initiatives**
445:7
**injunction**
473:4
**inquired**
431:10, 431:11
**inquiring**
421:21
**inspect**
546:20
**instagram**
415:23
**install**
472:8
**instance**
467:10, 511:25
**instances**
402:20, 403:12,
404:19, 405:1,
436:15, 514:9
**instead**
451:7, 469:4,
492:7, 533:3
**instructed**
468:18, 468:21
**integrity**
440:24, 441:20,
443:8, 530:17
**intend**
432:12, 502:5,
504:1, 506:10,
506:25, 513:11,
513:19, 530:24,
532:7, 536:6,
537:4, 538:11,
538:18, 538:23,
539:2, 540:1
**intent**
409:3
**inter**
531:15
**interaction**
406:14
**interest**
436:6, 532:14,
532:15, 556:11,
557:14, 558:8
**interesting**
438:23

**interests**
435:19, 435:20,
436:2, 457:5,
457:10, 465:7,
495:13, 495:21,
503:23
**internet**
535:16
**interpreting**
547:4
**interrogatories**
404:6
**interrogatory**
404:8
**intimate**
406:1, 406:8,
406:13, 528:7
**investigate**
511:18, 532:11,
534:7, 536:4,
536:16, 536:19
**investigations**
404:18, 512:10
**investigatory**
404:15
**involved**
471:17, 471:21,
472:11, 518:20,
534:21, 535:2,
535:17
**involves**
414:8, 514:7
**involving**
460:10
**isolated**
402:20, 403:1,
403:2, 403:4,
436:15
**isolation**
554:1
**iss**
438:19
**issue**
409:7, 409:13,
433:25, 451:11,
457:2, 460:14,
461:1, 461:5,
461:9, 461:12,

464:14, 464:17,
528:25, 541:6,
547:8, 551:11
**issued**
473:5, 474:2,
485:13, 508:23,
509:23
**issues**
416:17, 427:24,
428:5, 428:7,
431:12, 433:16,
438:19, 451:24,
461:17, 479:11,
533:11, 536:10,
537:15, 541:1,
541:2, 541:20,
542:15
**it'd**
508:3
**items**
535:15
**itself**
406:23, 412:5

**J**

**jail**
467:15, 467:22
**jails**
467:12, 468:1
**jill**
400:10
**job**
395:21, 409:18,
427:21, 432:5,
456:11, 477:10
**john**
396:8, 398:9
**join**
403:24, 480:11
**judge**
471:19, 473:7,
473:25, 474:2
**judges**
464:1
**july**
474:9, 474:10,
475:14, 475:16,
497:18

**jump**
402:14
**june**
450:23, 473:14,
473:17, 473:20
**justice**
399:20, 400:2,
555:10

**K**

**keep**
427:15, 468:1
**kept**
544:4
**kids**
481:14, 481:15
**kind**
437:16, 457:13,
480:15, 504:14,
527:2
**kinda**
437:22, 531:18
**klementowicz**
399:8, 401:4,
402:6, 403:17,
403:25, 410:3,
410:7, 410:10,
413:10, 413:15,
413:17, 418:6,
418:11, 418:15,
422:20, 425:7,
425:8, 428:9,
428:13, 428:19,
428:25, 436:18,
440:17, 443:21,
446:3, 446:22,
447:1, 449:14,
449:19, 449:24,
450:3, 450:5,
459:23, 460:4,
462:10, 469:10,
469:17, 469:20,
470:1, 470:4,
470:6, 471:13,
471:20, 474:11,
474:17, 480:10,
495:5, 496:9,
497:2, 497:7,

498:21, 498:23,
499:4, 499:8,
499:20, 499:24,
500:4, 500:7,
500:11, 500:15,
500:23, 501:5,
501:8, 502:17,
503:3, 521:23,
522:6, 525:11,
529:17, 529:20,
529:21, 533:18,
534:4, 537:18,
537:24, 555:5,
555:11
**knew**
553:7
**knock**
444:18
**knowing**
438:20, 442:5,
543:10
**knowledge**
424:12, 463:4,
464:12, 476:25,
477:1, 477:2,
487:24, 515:22,
537:6, 556:8,
557:11
**known**
538:25

**L**

**lack**
429:7, 530:11
**lacking**
456:12
**lag**
408:12
**landscape**
537:3
**lapse**
458:10
**large**
453:9
**last**
405:1, 414:9,
433:4, 436:21,
437:15, 437:21,

447:14, 449:20,
458:25, 508:13,
508:18, 508:19,
509:3, 513:17,
547:1, 552:12
**later**
466:18, 484:13
**latest**
474:1, 474:6
**laura**
400:1, 558:2,
558:13
**law**
398:19, 398:24,
403:6, 404:14,
414:3, 414:8,
414:14, 414:15,
415:15, 417:7,
425:23, 425:25,
433:24, 444:8,
444:9, 445:10,
454:2, 454:11,
454:13, 476:21,
477:5, 477:13,
477:16, 478:4,
508:16, 516:6,
517:1, 519:21,
525:17, 525:18,
526:16, 526:18,
527:11, 527:14,
530:8, 532:11,
532:23, 533:2,
533:4, 533:25,
534:1, 544:4,
555:9
**lawsuit**
495:18, 533:12
**lead**
453:12
**leaders**
419:13, 439:3,
442:15, 443:19
**league**
398:3, 399:2
**least**
451:5, 455:2,
467:4
**leave**
465:4, 470:20,

470:25, 482:3,
482:9
**led**
446:4, 511:12,
514:1, 514:4
**left**
512:3
**legal**
471:10, 492:21
**legislation**
449:2, 485:19,
485:22, 519:25,
549:24
**legislative**
419:13, 442:1,
518:20, 521:12,
548:20, 548:24,
549:11
**legislators**
517:19
**legislature**
418:23, 422:25,
423:4, 440:11,
440:16, 449:6,
475:10, 475:14,
475:20, 476:14,
477:19, 477:20,
479:15, 489:6,
490:21, 515:13,
516:6, 518:12,
520:21, 523:24,
535:4
**legislature's**
490:19
**legitimacy**
443:6
**legitimate**
453:14
**length**
433:2
**lengths**
482:6
**less**
412:19, 472:5,
472:11, 549:24
**let's**
460:24, 523:20
**level**
428:2, 551:19

**leveled**
437:23, 546:5
**leveling**
546:24
**levels**
402:23, 402:24,
546:16
**liberties**
399:10
**license**
454:6, 550:23,
551:1, 551:4,
551:15, 552:5
**licenses**
550:18
**life**
481:16
**likelihood**
457:16
**likely**
416:21, 425:18,
425:22, 425:25,
426:1, 453:20,
458:20, 464:2,
464:13, 487:15,
487:20, 489:4,
489:5, 489:19,
490:14, 492:3
**lila**
398:7, 399:6
**limits**
468:8
**line**
432:22, 433:2,
433:7, 434:14,
482:6, 518:22,
552:12
**lines**
431:7, 431:12,
431:15, 431:22,
432:19, 433:8,
472:15, 482:2
**link**
403:23
**list**
487:8, 547:25
**listening**
515:16

**little**
408:10, 462:14,
522:18, 546:10,
549:13
**live**
403:24
**llp**
398:10, 398:19
**local**
406:2, 406:14,
409:16, 414:14,
419:9, 419:22,
422:3, 426:13,
427:3, 427:7,
427:14, 428:2,
429:16, 431:13,
468:17, 472:6,
472:13, 479:24,
482:21, 483:3,
483:8, 483:10,
483:15, 486:10,
486:16, 486:22,
487:10, 487:18,
489:17, 489:25,
493:5, 493:7,
511:25, 525:17,
525:19, 526:17,
529:1, 534:11,
534:13, 544:10,
547:22
**locally**
406:21
**located**
553:16
**location**
466:1, 466:2
**locations**
408:8
**log**
422:11
**long**
432:19, 432:23,
433:9, 443:4,
458:1, 458:2,
467:14, 473:3,
482:2, 482:7,
507:18, 507:22
**longer**
431:6, 431:15

look
438:7, 485:16,
486:4, 487:22,
491:4, 510:17,
539:25
looked
437:18
looking
527:19, 527:20,
528:1, 545:2
looks
447:6, 450:11,
450:23, 489:17
loosen
433:20
lorraine
401:21, 496:24,
497:5
lost
443:3, 552:23
lot
415:10, 415:12,
439:12, 440:6,
442:13, 443:7,
471:24, 473:22,
493:23, 493:24,
498:19, 498:24,
514:7, 516:15,
532:2, 533:1,
533:14, 535:12,
540:19
low
399:12, 402:23,
402:24, 403:15,
425:10, 436:16,
539:19
lower
483:4, 483:8,
546:11
lynn
515:15, 515:21

**M**

ma
398:13
machines
531:14
made
439:17, 443:8,

457:4, 463:2,
477:10, 490:6,
490:24, 508:24,
509:24, 510:24,
511:12, 514:8,
520:20, 541:19,
542:15
magical
521:8
magnitude
428:6
mail
423:21, 423:24,
467:18, 467:22
maintained
451:22
major
432:16, 441:4,
443:10, 522:20,
541:20
majority
488:9, 516:1
make
411:3, 411:16,
411:19, 412:2,
412:15, 412:19,
412:22, 417:21,
427:13, 434:18,
439:14, 445:9,
452:9, 452:21,
464:12, 464:18,
471:18, 472:1,
478:21, 481:3,
481:18, 481:24,
482:6, 482:13,
482:15, 487:25,
488:6, 490:7,
497:23, 516:11,
526:19, 526:25,
527:9, 531:3,
541:23, 542:18,
543:16, 554:11
makes
490:13, 547:9,
549:24
making
414:14, 430:16,
459:20, 518:15

malicious
409:3
manage
434:25
management
433:7
mandatory
414:20, 414:22
manual
401:13, 410:9,
410:14, 410:17,
411:12, 411:14,
412:13, 469:13,
469:16
many
403:11, 406:3,
406:8, 407:6,
408:16, 408:20,
415:25, 418:19,
418:24, 426:18,
434:6, 434:9,
434:10, 434:20,
455:13, 478:5,
480:13, 522:14,
523:16, 523:19,
526:4, 526:6,
539:21, 540:7,
540:11, 540:15,
541:24, 542:3,
542:6
march
525:17, 525:19,
526:5, 529:24
mark
483:25, 494:4,
500:8
marked
403:22, 410:9,
428:21, 428:23,
446:25, 447:3,
449:18, 450:7,
460:3, 484:17,
497:5, 499:6,
500:14, 500:24,
501:2
marking
410:5, 500:6
marks
437:10

marriage
459:1, 550:12
married
550:10, 550:14
massachusetts
397:10
materials
473:24
matt
449:19, 533:18
matter
445:14, 501:20,
544:14, 547:6
matters
404:15
matthew
399:19, 399:24
maximum
433:1
maybe
477:4, 508:1,
524:16, 539:6
mayer
499:10
mayer's
499:21, 500:1
mean
407:19, 407:22,
421:15, 432:20,
434:16, 436:8,
441:11, 451:10,
459:7, 460:24,
468:10, 473:6,
475:19, 477:3,
479:16, 481:23,
496:14, 506:11,
524:3, 524:9,
524:19, 532:8,
532:21, 533:8,
533:13, 534:10,
535:14, 545:17,
546:19
means
405:23, 422:13,
440:14, 536:15,
546:9
meant
476:9

measure
430:11, 430:13,
437:1
measurement
437:3
measures
433:11, 433:13,
435:23
measuring
430:21, 504:8
mechanisms
503:22
media
415:9, 415:17,
415:20, 416:3,
418:3, 418:4,
418:7, 429:6,
442:18
medias
535:13
meet
490:18
meetings
479:13, 547:23
member
468:12
members
455:11, 479:14,
516:2
memo
401:16, 446:20,
446:25, 447:7
mentioned
418:5, 444:7,
450:13, 508:13,
511:9, 515:25,
535:13, 536:8
mentions
485:19
messaging
431:1, 431:4,
442:22
messes
444:14
method
470:21
methodology
504:22, 505:4,

505:10, 519:16,
521:17, 544:7,
548:16, 548:23,
549:10
methods
462:8, 462:12
metric
518:7, 519:17,
521:19
mexico
528:15, 529:3
meyerowich
395:24, 397:9,
557:2, 557:20
michael
538:8, 538:13
microphone
476:4
midnight
465:18, 465:23,
466:6, 466:13,
466:21
might
428:3, 445:2,
461:15, 461:16,
474:11, 482:3,
482:10, 482:15,
482:19, 486:22,
493:14, 520:22,
537:19, 551:18
migrants
508:20, 528:14,
529:3
migration
509:7, 509:9
miles
398:4, 399:3
million
407:12
millions
436:22
millsfield
466:3
mind
439:11, 517:19
mine
522:14, 522:19
ming
400:3

minimum
544:5
miniscule
407:4, 407:5,
436:10
minnite
401:21, 496:24,
497:5, 497:10,
499:1
minorities
415:15
minutes
433:6, 541:16
missing
447:17, 456:9
mistake
514:15, 514:17
mistaken
513:9, 530:20,
533:21
mistakenly
409:8
mistakes
513:23, 514:2,
514:4, 514:8
misunderstanding
408:25
mode
473:22
moderator
433:16, 462:24,
464:1, 464:5,
464:7, 464:18,
465:3
moment
440:16, 446:17,
539:9
momentum
547:8
money
434:25, 532:22,
533:1, 533:2,
535:6
monitors
482:6
montgomery
398:9
more
407:15, 408:10,

409:2, 409:10,
411:4, 411:17,
412:16, 416:20,
417:20, 423:14,
425:14, 425:18,
425:22, 425:24,
426:1, 426:6,
426:10, 426:14,
435:5, 435:15,
447:19, 452:25,
453:20, 453:23,
454:24, 464:2,
464:8, 464:12,
473:9, 473:15,
482:10, 482:23,
483:11, 485:6,
487:15, 487:20,
489:4, 489:5,
489:19, 490:13,
492:3, 504:11,
516:11, 517:4,
522:18, 531:3,
532:10, 534:6,
534:14, 536:3,
536:17, 543:5,
544:12
morning
402:7, 402:8,
475:2, 475:3,
549:19
most
420:2, 429:7,
429:12, 429:22,
438:3, 454:5,
456:21, 458:19,
482:23, 488:21,
488:24, 522:15,
525:25
move
402:15, 413:18,
476:3
moved
448:14, 459:13
movement
395:4, 398:16,
475:6
moving
461:20, 519:5,

544:17
**much**
437:19, 442:23,
454:7, 457:21,
457:23, 461:23,
527:8, 534:23,
535:6, 554:18
**muirhead**
398:6, 398:7,
398:8, 399:5,
399:6, 399:7
**multiple**
459:20
**must**
474:3
**myself**
549:5

**N**

**name**
423:16, 540:16
**named**
495:18, 496:23
**names**
459:1, 510:21
**naming**
494:6, 494:9
**nashua**
455:21
**national**
437:18, 442:14,
442:15, 443:19,
510:8
**nationally**
453:1
**naturalization**
457:24, 458:15,
459:17, 514:12
**naturalized**
458:5, 514:10
**nature**
509:2, 511:2
**necessarily**
472:10, 530:1
**necessary**
435:4, 438:12,
477:16, 478:21,
479:3, 537:17

**need**
416:12, 416:21,
417:3, 427:25,
428:1, 430:18,
432:1, 435:5,
445:12, 457:19,
458:14, 482:9,
482:13, 485:16,
493:21, 501:6,
517:23, 526:20,
534:10, 546:19,
552:19
**needed**
472:5, 482:23,
553:7, 554:3
**needing**
429:7
**needs**
441:14, 441:16,
441:21, 441:23,
458:5, 526:19
**negatively**
544:4
**neither**
556:9, 557:12,
558:6
**never**
465:25, 542:7
**newly**
514:10
**news**
450:3
**next**
398:5, 398:6,
398:7, 399:4,
399:5, 399:6,
416:8, 430:19,
444:21, 445:16,
446:8, 448:20,
505:21, 506:12,
519:10
**nh**
397:5, 399:13,
399:22, 399:24
**nhpr**
448:25
**nile**
400:4

**nine**
405:1, 436:22,
513:17
**non-us**
403:11
**noncitizen**
402:17, 407:16,
413:6, 510:24,
513:18, 523:12,
533:4
**noncitizens**
405:2, 405:13,
406:11, 406:16,
406:25, 408:15,
408:24, 409:2,
409:9, 436:21,
508:20, 508:24,
509:24, 513:20
**normally**
472:16
**notary**
397:9, 400:2,
558:1, 558:13
**nothing**
430:22, 547:24,
555:10
**notice**
402:16
**noticed**
496:17, 528:13,
546:23
**notified**
423:18, 462:25,
463:6
**november**
476:10, 476:23,
477:12, 539:23
**number**
403:15, 403:16,
410:22, 416:10,
417:4, 418:21,
419:2, 426:4,
426:22, 427:17,
428:3, 433:15,
437:6, 438:8,
445:4, 454:19,
454:21, 464:11,
471:23, 478:7,

**nine**
513:22, 523:14,
527:18, 527:22,
527:23, 537:7,
539:25, 544:3
**numbers**
421:22, 427:5,
453:9, 509:20,
527:18, 529:3,
539:18

**O**

**oath**
402:10, 534:1
**oaths**
411:8
**object**
494:12, 502:8
**objecting**
533:24
**objection**
422:16, 436:12,
438:14, 443:16,
445:21, 462:5,
471:9, 481:21,
486:14, 486:25,
488:13, 502:19,
521:22, 525:1,
525:4, 529:15,
533:6, 534:2,
543:24, 545:14
**objections**
401:12, 403:22,
404:6
**objective**
520:7, 522:22
**obtain**
445:12, 458:3,
493:20
**obviously**
461:9, 473:9,
483:6, 534:19
**occur**
403:3
**occurred**
414:9, 503:13,
546:25
**occurs**
402:22, 529:1

**october**
395:20, 447:10
**oddly**
483:24
**offer**
497:20, 502:6,
504:1, 507:1,
513:11, 530:24,
536:6, 537:5,
538:11, 538:18,
538:23, 539:2,
540:1, 540:7,
540:11, 540:14,
541:5
**offered**
489:18, 521:13,
538:12
**offering**
498:19, 501:21,
522:3
**offi**
486:16
**office**
403:9, 404:9,
404:14, 411:11,
413:25, 415:1,
415:5, 415:18,
415:21, 416:1,
417:9, 417:15,
417:20, 419:5,
419:15, 426:24,
427:16, 427:20,
428:6, 429:18,
430:3, 430:6,
430:10, 431:2,
431:21, 432:7,
432:25, 433:10,
434:3, 434:12,
434:24, 436:25,
443:25, 444:3,
446:15, 461:6,
461:22, 461:23,
462:3, 479:22,
480:2, 480:5,
480:7, 480:13,
482:6, 483:18,
484:3, 486:3,
486:9, 486:21,

487:3, 488:5,
493:19, 495:9,
495:17, 495:21,
507:23, 512:5,
512:6, 512:12,
526:23, 527:2,
527:4, 532:22,
532:25, 533:12,
534:6, 534:9,
534:14, 534:16,
534:24, 535:6,
535:19, 541:23,
554:15, 554:20
**office's**
421:21
**officer**
411:7, 557:2,
558:2
**offices**
479:19, 533:14
**official**
395:7, 396:6,
396:9, 405:21,
406:3, 406:9,
406:15, 409:1,
411:8, 414:5,
421:5, 462:23,
487:18, 489:17,
489:25, 493:6,
493:8
**official's**
479:24
**officials**
409:8, 409:16,
414:15, 419:9,
419:22, 422:4,
427:14, 467:5,
468:17, 472:6,
472:12, 480:1,
486:11, 486:17,
486:22, 487:10,
504:14, 505:24,
512:1, 516:6,
528:9, 528:13,
534:11, 547:22
**offs**
533:17
**often**
481:1, 528:9

**oh**
499:3, 528:4
**okay**
402:13, 403:10,
404:11, 405:6,
407:15, 408:15,
413:5, 413:15,
418:16, 420:21,
421:23, 422:7,
422:24, 424:25,
426:18, 428:8,
430:10, 431:6,
435:17, 440:20,
447:15, 448:21,
449:14, 449:23,
450:22, 451:16,
452:12, 453:3,
457:3, 457:12,
462:14, 465:7,
465:11, 465:17,
469:10, 469:23,
469:24, 470:4,
470:7, 471:3,
471:14, 474:10,
474:13, 491:7,
495:3, 495:8,
495:25, 496:15,
497:2, 497:11,
497:24, 498:12,
498:17, 498:21,
499:17, 499:24,
500:4, 500:8,
500:23, 501:14,
501:19, 501:24,
502:17, 507:18,
520:12, 521:23,
522:7, 523:17,
525:14, 526:23,
527:7, 528:1,
529:7, 529:9,
530:13, 534:15,
536:25, 537:18,
538:18, 546:21,
554:25
**old**
472:7
**older**
459:12

**once**
470:21, 473:20
**one**
411:22, 416:10,
417:4, 423:9,
426:13, 433:15,
434:2, 436:4,
436:5, 442:3,
448:15, 449:21,
450:11, 450:18,
454:19, 454:23,
456:2, 458:24,
460:8, 464:11,
465:10, 471:23,
472:18, 473:4,
479:8, 496:23,
499:23, 501:4,
501:5, 502:12,
517:8, 517:16,
518:4, 518:25,
523:16, 523:19,
525:12, 525:13,
531:12, 532:14,
533:22, 552:12,
552:18, 552:19
**ones**
477:22
**ongoing**
414:5
**only**
402:20, 408:5,
423:7, 423:8,
441:15, 488:15
**open**
396:2, 398:2,
399:1, 466:17,
466:21, 466:24,
496:19, 531:10,
531:18, 554:21
**opened**
404:14, 439:7
**opens**
473:20
**operate**
531:16
**operates**
509:1
**operative**
419:19, 422:14

opinion
439:21, 441:13,
498:20, 503:4,
507:7, 519:12,
521:14, 522:3,
539:15, 540:6,
540:10, 540:14,
541:5, 541:18,
542:10, 545:1,
548:3
opinions
497:25, 498:2,
501:21, 504:20,
538:12, 538:19,
538:24, 539:3,
540:2, 547:13,
548:19
opportunities
510:15, 531:10,
554:4
opportunity
406:16, 410:1,
445:25, 446:2,
464:16, 488:4,
497:14, 498:2,
502:25, 503:9,
504:5, 508:15,
531:17, 543:14
opposed
413:3, 516:14
order
471:11, 473:4,
473:14, 474:2,
474:7, 484:2,
494:13, 494:24,
508:23, 509:22,
510:1, 510:10,
510:18, 511:8
ordered
473:11
orders
473:7, 473:25,
555:8
ordinary
534:18
org
399:15, 399:16
organization
405:8

organized
405:12, 415:12,
436:17, 436:19
original
479:9
other
406:9, 406:10,
406:18, 411:8,
430:23, 432:2,
436:2, 437:20,
440:15, 442:17,
442:24, 444:11,
451:19, 452:24,
457:5, 461:25,
475:5, 478:7,
479:14, 479:21,
485:23, 487:5,
487:24, 490:12,
490:22, 504:19,
506:4, 507:8,
515:21, 516:5,
516:9, 517:5,
518:25, 520:8,
522:7, 522:10,
522:13, 522:16,
523:23, 524:2,
524:7, 528:9,
532:14, 532:19,
536:12, 540:23,
541:1, 541:7,
546:3, 549:20,
551:14, 552:1,
552:4
others
415:24, 547:12
otherwise
478:12, 556:11,
557:14, 558:9
out
417:2, 421:19,
430:17, 431:1,
431:4, 433:16,
433:17, 436:22,
439:12, 445:9,
454:14, 458:24,
460:14, 461:6,
463:2, 467:1,
467:9, 468:22,

469:2, 469:4,
485:10, 486:9,
492:8, 496:11,
512:2, 513:14,
518:12, 518:13,
528:17, 529:10,
531:13, 534:17,
536:23, 542:19,
549:15, 551:1
out-of-state
551:1, 551:3
outcome
447:22, 505:21,
544:16, 544:17,
556:12, 557:15,
558:9
outreach
415:7, 415:12
outside
501:21, 510:9,
515:19, 532:3,
550:8, 550:15
outweigh
543:5
over
407:12, 437:13,
437:15, 451:5,
502:11, 504:11,
507:24, 508:12,
508:18, 509:3,
509:20, 511:24,
512:4, 519:1,
526:10, 545:2
overall
542:25
overwhelming
488:9
overwhelmingly
447:21
own
427:4, 496:21

**P**

page
401:2, 401:9,
404:7, 410:23,
447:12, 447:14,
450:16, 452:13,

469:21, 470:3
pages
395:22
paid
535:19
panel
405:7
papers
514:13
paperwork
492:16
par
407:20
paragraph
470:7
paraphrased
536:14
paraphrasing
412:14, 440:23
parents
459:6, 492:22
part
411:15, 412:13,
412:15, 429:16,
432:2, 438:17,
451:14, 461:13,
487:25, 491:1,
513:23, 518:14,
521:9, 535:23,
544:20, 544:24
part-time
435:3
participant
480:10
participants
425:16, 426:2,
503:10, 504:6,
506:5
participate
416:8, 416:15,
440:9, 503:2
participated
423:15
participating
435:25, 440:3,
452:10, 502:2,
503:1, 515:8,
543:10

particular
444:8, 458:24,
463:4, 519:25,
547:3
parties
439:4, 442:15,
556:10, 557:13,
558:7
partisan
516:19, 516:21,
517:11, 517:15,
523:22
parts
451:19
party
441:3, 462:24,
516:20, 517:2,
517:8, 522:17,
522:20
party's
442:2, 518:23
pass
508:17, 511:6,
511:7, 516:6
passage
503:6, 505:17,
506:7
passed
414:7, 449:5,
454:18, 475:14,
475:20, 516:18,
517:15, 519:21,
524:15
passes
524:21, 535:4
passport
421:1, 457:21,
458:15, 459:17,
468:1, 552:20,
553:8
passports
514:11, 540:8
past
433:8, 472:3,
516:17, 527:19,
539:4
pattern
455:4

pause
490:5, 494:3
pay
464:24, 468:9
pelletier
400:7
penalty
492:9
pendulum
448:14
people
403:24, 404:19,
418:19, 418:24,
420:2, 420:7,
420:16, 422:12,
423:5, 424:1,
424:5, 424:17,
425:19, 426:4,
426:6, 426:10,
426:14, 426:18,
427:17, 430:6,
432:18, 432:21,
434:13, 434:21,
439:24, 440:2,
444:20, 444:21,
448:23, 452:24,
453:7, 453:9,
453:25, 454:5,
454:6, 454:12,
454:24, 456:20,
458:25, 459:12,
459:16, 459:19,
467:11, 467:25,
480:13, 480:25,
481:2, 481:12,
481:19, 482:3,
482:9, 482:13,
482:19, 482:23,
483:1, 488:9,
489:13, 506:15,
512:21, 514:25,
521:4, 526:4,
526:11, 526:15,
528:2, 529:22,
530:5, 531:15,
550:2, 550:7,
550:10, 550:14,
550:17, 550:22

perceived
442:16, 450:20,
452:13
perceives
505:23
percent
438:9, 438:10,
450:24, 452:16,
454:16, 454:19,
454:23
percentage
407:2, 426:15,
432:9, 438:2,
438:4, 441:5,
442:6, 454:14,
509:13, 509:16,
514:19, 514:24
percentile
437:12
perceptions
441:15
perfect
524:22, 524:24,
525:3, 525:10
perhaps
426:15
period
419:19, 420:23,
422:14, 423:2,
437:15, 473:16,
473:20, 473:21,
508:6, 546:14,
553:1, 553:11
perjury
492:9
person
407:22, 415:5,
424:10, 424:11,
434:14, 456:2,
460:18, 460:22,
461:1, 461:8,
461:11, 462:2,
479:19, 489:20,
492:4, 492:17,
496:25, 520:16
person's
468:5, 489:14,
507:5

personal
496:12
personally
431:11, 485:19,
486:3, 492:25,
521:3
personnel
434:25
persons
435:24
perspective
445:1, 445:5,
518:3
philosophies
439:10
phone
459:10, 468:9,
480:14, 528:2
physical
451:22, 534:16
picture
447:13, 484:2,
484:14
piece
423:23, 519:25,
545:1
pieces
440:19
piecuch
422:8
pierce
400:9
place
397:3, 399:21,
414:10, 414:18,
427:13, 429:8,
429:13, 429:23,
433:12, 433:18,
435:23, 445:6,
453:11, 453:15,
454:22, 462:23,
465:4, 470:20,
472:4, 472:14,
473:17, 473:19,
473:21, 481:9,
493:3, 519:2,
520:1, 521:5,
525:23, 528:18,

537:8, 554:2
**placed**
441:22, 516:13
**places**
431:7, 531:23
**plaintiff**
395:5, 398:15,
475:5
**plaintiff's**
404:6
**plaintiffs**
396:4, 398:2,
399:1, 496:20,
545:13
**plan**
431:21, 497:20,
498:3, 498:6,
501:21, 551:23
**plane**
553:8, 553:19
**planned**
413:25
**planning**
415:2, 498:19,
499:14, 541:5,
551:5
**plans**
446:17
**platforms**
415:17, 415:20
**play**
464:10, 467:1,
467:9, 531:23
**please**
403:18, 404:7,
410:4, 410:7,
428:10, 429:5,
446:23, 449:15,
450:17, 459:24,
495:5, 497:3,
498:25, 500:9,
500:12, 501:15,
502:21, 525:8
**pocket**
454:6
**point**
432:24, 434:16,
440:5, 440:7,

457:4, 506:11,
511:3, 521:4,
521:16, 523:7,
537:13, 546:10,
553:17
**points**
433:19, 438:2
**policy**
489:8, 520:24
**political**
439:3, 462:24,
512:24, 516:20,
522:17, 522:18,
522:24, 524:20,
538:20, 538:24
**poll**
401:17, 438:4,
449:18, 451:9
**polling**
429:8, 429:13,
429:23, 431:7,
432:7, 433:18,
437:5, 437:21,
438:7, 445:6,
446:15, 453:10,
453:15, 454:22,
462:23, 465:4,
470:20, 493:2,
504:9, 504:17,
525:23, 531:23,
544:9, 544:19,
545:9, 546:16,
547:4, 547:7,
554:2
**polls**
437:19, 447:20,
450:12, 466:21,
530:11, 553:22,
554:6
**pollsters**
439:4
**population**
417:2, 435:23,
438:18, 439:16,
509:14, 509:17,
523:3, 548:9,
548:14
**porter**
447:13

**portion**
413:12, 429:5,
440:22, 441:6,
441:8, 474:12
**posed**
508:8
**poses**
506:24, 507:15,
511:14
**position**
502:16
**possess**
540:3, 540:8,
540:12
**possessed**
468:16
**possession**
468:2
**possibility**
424:8, 471:2,
471:10
**possible**
408:11, 409:22,
416:24, 424:4,
429:21, 431:17,
439:15, 439:25,
453:7, 459:7,
459:15, 459:18,
459:22, 463:13,
467:3, 468:11,
468:13, 468:14,
482:4, 482:12,
482:17, 482:20,
486:24, 495:20,
506:14, 506:19,
506:20, 520:12,
520:15
**post**
531:11, 533:14
**posted**
415:18, 415:21
**posts**
415:25, 416:3,
418:7, 535:19,
535:20
**potential**
404:17, 408:12,
412:25, 457:16,

461:4, 488:3,
510:4, 510:11,
510:15, 510:20,
530:10
**potentially**
416:7
**power**
442:2, 518:23,
522:20
**practice**
469:3, 470:9,
470:14
**pre-hb**
410:2
**predicting**
527:18
**prediction**
527:1, 527:15
**prefer**
494:19
**preparatory**
473:23
**prepared**
537:15, 556:4
**presence**
442:18
**present**
400:1, 453:10
**presentation**
439:1, 459:11
**presentations**
439:5
**presented**
427:18, 459:9,
514:11
**presenting**
454:8
**preserving**
494:11
**president**
508:22, 509:23
**presidential**
443:1, 443:4,
443:10
**presumably**
467:23
**pretty**
414:4, 456:10,

461:18, 490:24,
509:3, 525:21,
527:8, 541:15,
542:11, 542:22
**prevent**
430:22, 513:9,
536:18
**prevented**
523:12, 536:15
**preventing**
430:20, 530:22,
536:2
**previously**
402:4, 503:5
**primaries**
472:24, 472:25
**primary**
407:10
**prime**
443:13
**prior**
417:24, 419:3,
419:14, 468:15,
471:8, 480:20,
503:6, 503:13,
507:20, 508:14,
511:17, 539:17,
554:19
**priority**
481:7, 481:9,
481:11, 533:10
**prison**
467:17
**probably**
407:20, 474:9,
477:25, 478:1,
480:17, 520:22,
520:23, 535:21,
538:14
**probe**
498:2
**problem**
456:24, 480:15,
518:19
**problematic**
446:13, 473:15,
480:9
**problems**
542:12

**procedure**
401:13, 410:9,
410:14, 410:17,
467:18, 469:16,
497:25, 519:22,
528:7
**procedures**
504:2, 505:24
**proceeding**
556:6
**proceedings**
556:7, 557:3,
557:5, 557:6,
557:9, 558:3,
558:5
**process**
406:1, 406:7,
409:19, 411:20,
416:16, 417:6,
417:10, 417:12,
429:17, 431:18,
435:25, 437:21,
438:20, 439:2,
439:14, 440:3,
440:24, 441:21,
442:1, 443:20,
451:23, 452:10,
458:9, 465:1,
465:5, 467:7,
472:7, 472:8,
475:24, 488:1,
488:18, 489:23,
491:1, 503:1,
503:8, 504:15,
506:5, 506:12,
511:1, 514:7,
515:9, 516:11,
518:20, 521:10,
521:13, 523:7,
524:20, 528:8,
531:18, 531:24,
532:5, 543:11,
544:2, 554:7,
554:9
**processed**
462:18
**processes**
503:23, 523:1

**produced**
418:7, 418:8,
545:10, 545:13
**product**
518:12
**production**
473:22
**program**
414:5, 427:12,
506:3
**programs**
535:3
**progress**
417:12, 524:21
**promote**
535:20
**proof**
406:19, 407:25,
409:13, 412:9,
412:18, 414:1,
424:18, 426:7,
426:21, 444:24,
447:25, 453:21,
454:8, 454:25,
461:25, 463:20,
468:16, 469:1,
469:6, 470:10,
470:16, 471:6,
474:3, 483:20,
485:23, 486:5,
489:8, 490:3,
493:14, 513:12,
530:7, 540:3
**proper**
430:25, 431:3
**properly**
437:9, 441:18,
531:20
**prosecute**
412:3, 412:20,
412:23, 536:5
**prosecuted**
436:24
**prosecution**
411:3, 411:17,
412:15
**prospective**
464:9

**protective**
484:1, 494:13,
494:24
**prove**
408:17, 410:1,
416:13, 420:10,
421:10, 422:2,
422:5, 425:5,
426:11, 427:19,
432:4, 460:22,
485:21, 488:17,
524:5, 529:23,
539:16, 539:22
**proved**
488:10
**proven**
507:2
**provide**
418:23, 440:1,
445:11, 486:17
**provided**
419:12, 487:3,
487:23, 491:19
**providing**
431:18
**proving**
470:22, 514:21
**provisions**
478:19, 510:2,
510:17
**prudential**
398:11
**psychologist**
513:4
**public**
397:9, 415:1,
416:5, 439:8,
454:15, 455:14,
489:8, 503:24,
504:17, 505:23,
515:17, 515:19,
520:24, 531:21,
532:13, 532:15,
558:1, 558:13
**publishes**
411:11
**pudding**
447:25

pull
451:17
pulled
442:3, 518:25
pulse
504:15
purpose
435:8, 515:5,
515:6, 515:10,
515:23, 516:19,
523:21, 545:5,
548:20, 548:25,
549:11
purposes
516:9, 539:12
pursuant
397:8
pursue
489:9
pushed
533:10
put
408:13, 427:12,
433:11, 445:3,
461:7, 477:16,
481:25, 484:3,
523:14, 535:9
putting
462:2, 535:2,
535:15

**Q**

qualification
470:22
qualifications
410:1, 413:2,
413:4, 416:13,
421:18, 425:6,
426:12, 427:19,
431:19, 432:5,
463:1, 464:16,
503:10, 507:3,
507:5, 508:3,
511:5, 512:2,
513:13, 513:15,
524:6, 549:16
qualified
406:20, 408:17,

409:21, 409:23,
411:8, 411:21,
411:24, 412:2,
412:5, 412:13,
416:10, 418:25,
419:23, 421:19,
436:1, 440:4,
445:5, 452:11,
456:14, 456:23,
458:21, 460:19,
462:1, 463:5,
468:22, 469:5,
470:11, 470:15,
474:3, 480:19,
488:10, 488:16,
503:2, 504:6,
507:19, 507:25,
511:22, 515:9,
516:14, 518:16,
523:18, 529:22,
532:13, 539:3,
539:16, 539:22,
543:11, 543:15,
554:7, 557:8
qualify
479:7, 487:9
quantifiable
504:19, 507:12
quantification
506:4
quantify
505:25, 506:7
question
401:19, 412:11,
420:12, 421:14,
430:5, 440:11,
460:3, 469:9,
471:10, 488:3,
505:3, 521:24,
533:22, 534:3,
534:9
questioned
502:10
questions
434:1, 449:22,
474:14, 475:7,
495:1, 495:4,
496:12, 537:25,

552:13, 554:23
quick
471:3, 537:19
quite
416:24, 438:25,
439:5, 439:18,
463:13, 508:22
quote
411:2, 417:1,
447:22, 506:23,
513:9, 513:10,
530:16, 537:2
qva
419:5, 420:6,
420:15, 420:17,
421:3, 421:10,
421:15, 422:2,
422:4, 422:11,
422:15, 423:1
qvas
420:10, 421:22

**R**

raechel
395:24, 397:8,
557:2, 557:20
ramp
414:10
ran
542:14, 542:22
range
520:23, 547:23
rates
540:2
rather
470:16, 484:3,
529:10
ray
531:10
reach
434:14, 461:6,
521:3
reached
460:13, 522:5
reaching
518:21, 520:1
react
505:24

read
404:3, 404:21,
411:9, 429:5,
429:9, 447:16,
448:1, 460:8,
460:12, 470:11,
497:22, 501:15,
501:19, 528:4,
555:4
reads
411:2, 423:23
real
437:4, 442:20,
462:19, 551:11,
552:15, 552:16
reality
454:17
realize
528:17
realizes
458:13
really
414:10, 434:8,
437:10, 438:23,
447:23, 448:9,
448:17, 535:17,
545:15
reason
423:8, 490:1,
498:12
reasonable
433:5, 485:2,
485:11, 485:23,
486:12, 487:5,
487:12, 489:11,
490:12, 490:22,
491:13, 549:20
reasons
423:9, 444:11
recall
405:6, 418:21,
423:3, 442:25,
456:11, 460:7,
475:13, 475:17,
476:1, 476:5,
478:18, 478:23,
480:22, 483:20,
495:12, 541:16,

545:24, 547:14,
548:20, 549:16
**recalling**
477:22, 478:14
**receive**
442:19
**receiving**
404:16
**recent**
438:3, 546:23
**recently**
459:1, 459:13,
552:23
**recognition**
447:18
**recognize**
429:2, 450:10,
460:5
**recommend**
456:13, 456:16
**recommendation**
455:22
**recommendations**
439:18, 456:6
**record**
402:2, 402:9,
419:23, 421:10,
422:4, 428:15,
428:16, 428:18,
474:20, 474:21,
474:22, 474:24,
496:3, 496:4,
496:5, 496:7,
525:5, 528:10,
531:9, 537:20,
537:21, 537:23,
555:13, 556:7,
557:10
**recorded**
395:13, 557:6
**recording**
420:15, 556:5,
557:9
**records**
550:4, 550:12,
550:20, 551:2,
551:4, 551:7,
551:16

**redact**
494:20
**redacting**
494:19
**reduce**
408:2, 453:4,
506:15
**reduced**
557:7
**reducing**
436:6
**reelected**
522:21
**reference**
484:22
**referenced**
478:25
**referred**
411:23, 544:19,
545:23, 547:11
**referring**
485:18, 486:2,
487:7, 549:2
**regard**
437:11
**regarding**
414:1, 503:22,
513:19, 530:16,
533:20
**regardless**
442:20, 517:2,
522:23
**regis**
424:19
**register**
408:8, 416:12,
416:22, 420:2,
425:6, 426:19,
429:7, 432:2,
444:22, 446:2,
457:19, 467:18,
467:22, 493:25,
511:21, 514:11,
526:2, 526:21,
543:14, 553:23,
553:25, 554:3
**registered**
407:1, 420:22,

420:25, 424:15,
425:19
**registering**
401:19, 404:20,
405:21, 421:25,
460:2, 467:21,
532:18
**registrant**
419:20
**registrants**
416:19
**registration**
402:17, 402:18,
406:1, 408:5,
408:14, 411:19,
416:15, 419:10,
427:3, 471:8,
510:8, 510:9,
511:19, 528:25,
530:21, 533:21
**registrations**
537:8
**regular**
426:2, 478:9,
544:23
**reinstated**
474:4
**relate**
501:16
**related**
402:16, 415:10,
452:5, 464:14,
479:11, 512:13,
512:14, 532:20,
535:13, 541:20,
542:16, 551:7,
556:9, 557:12,
558:6
**relationship**
504:24, 505:7
**relatively**
538:5
**relied**
507:19, 507:21
**relief**
477:8
**rely**
450:14, 486:17,

504:9
**relying**
504:18
**remember**
405:11, 405:18,
405:25, 416:25,
422:24, 444:17,
448:21, 448:24,
465:25
**remotely**
403:24
**removal**
412:1, 412:4,
412:12, 412:17,
456:13, 456:17,
456:23, 465:8,
532:12
**remove**
510:24
**removed**
412:9, 423:5,
424:2, 424:6,
424:10, 424:11,
424:13
**renata**
400:5
**repeat**
412:11, 420:12,
469:9, 502:15,
505:2, 525:7
**replaced**
412:7, 412:9
**replacement**
412:18, 458:6
**report**
401:21, 401:22,
419:11, 447:17,
455:24, 456:3,
456:6, 497:5,
497:9, 497:21,
498:9, 498:13,
498:20, 499:6,
499:10, 499:21,
500:2, 528:24
**reporter**
395:24, 402:1,
428:17, 474:20,
474:23, 476:3,

484:8, 484:11,
484:15, 494:6,
496:2, 496:6,
500:5, 525:7,
537:22, 555:2,
555:7, 555:12,
557:1, 557:20
**reporting**
526:10, 526:12
**reports**
418:22, 419:8,
427:2, 429:15,
500:25, 526:1,
538:8
**represent**
422:8, 484:20,
497:9
**representative**
515:15, 515:20,
548:13
**represents**
407:3
**republican**
441:5, 449:5
**request**
480:6
**requesting**
492:12
**require**
411:5, 467:4,
472:14, 497:25
**required**
412:22, 419:12,
423:13, 454:16
**requirement**
408:1, 412:19,
414:6, 453:22,
453:23, 454:20,
471:7, 516:13,
524:5
**requirements**
412:6, 415:22,
416:2, 416:20,
417:16, 417:22,
425:23, 426:1,
431:25, 432:10,
543:4, 543:20
**requires**
414:15, 553:24

**requiring**
470:20, 543:8
**requisite**
427:18, 453:11
**residents**
458:19, 540:3,
540:7, 540:11,
540:15
**resolve**
493:18
**resources**
430:17, 430:23,
431:3, 432:16,
434:25, 445:11,
461:7, 461:15,
473:22, 478:21,
478:24, 479:3,
487:24, 493:21,
532:11, 532:16,
532:19, 533:9,
533:14, 534:6,
534:13, 534:14,
536:4, 536:11,
554:4
**respond**
500:1
**respondents**
438:4, 452:17,
452:22
**response**
404:10, 448:25,
497:21, 498:5,
499:15, 510:21,
538:12
**responses**
401:11, 403:21,
404:5
**responsible**
415:6
**restricted**
468:6
**result**
414:3, 431:9,
541:24
**resulted**
404:18
**results**
442:25, 503:18,

503:25
**retained**
496:20
**return**
429:8, 429:13
**returned**
429:22, 430:8,
482:23, 542:7
**returning**
470:16
**reversal**
472:3
**reversed**
471:25
**revert**
471:7, 472:6
**review**
488:7, 497:15,
498:13, 506:12,
511:23, 512:7,
538:8, 539:7,
544:22
**reviewed**
492:21, 497:12,
499:12, 499:25,
539:12, 545:5
**reviewing**
498:4, 498:6,
507:17, 551:18
**rhetoric**
442:14
**right**
404:22, 407:17,
407:24, 409:4,
411:9, 411:12,
411:24, 416:9,
419:16, 420:4,
420:11, 420:18,
423:6, 423:19,
423:24, 424:15,
430:1, 431:23,
434:4, 434:22,
437:1, 439:25,
440:24, 441:22,
445:17, 447:3,
448:1, 450:8,
452:7, 452:14,
452:18, 455:7,

455:25, 460:16,
461:23, 463:12,
463:21, 463:24,
464:3, 464:9,
465:19, 467:7,
467:13, 468:10,
470:12, 472:18,
475:11, 476:11,
481:1, 481:4,
481:7, 481:20,
482:3, 482:7,
482:11, 482:16,
482:19, 482:24,
483:1, 483:5,
483:12, 484:9,
484:24, 485:25,
487:16, 490:15,
491:22, 494:1,
496:10, 517:5,
517:8, 518:1,
518:9, 518:11,
518:17, 519:2,
519:13, 521:24,
523:13, 523:20,
524:21, 532:23,
533:2, 541:25,
542:25, 543:6,
544:21, 549:25,
551:24, 552:5,
552:15, 552:21,
553:8, 553:12,
553:19, 553:25,
554:10, 554:16
**right-hand**
470:8
**rights**
494:12
**rigid**
549:25
**risk**
506:24, 507:7,
507:13, 508:7,
508:10, 511:14
**road**
524:23
**robust**
414:4
**role**
443:24, 522:13

roles
509:25
rolls
405:20, 423:6,
424:2, 424:6,
424:11, 424:12
rope
518:24
ropes
398:10, 400:8,
555:9
rough
524:16
round
414:9, 430:19,
437:21, 446:8,
448:20, 472:20,
505:21, 506:13
ruled
471:19
rules
494:23, 497:24
ruling
440:13
rumors
505:14
run
437:14, 439:17,
443:4, 522:22,
524:22, 524:25,
525:10
running
441:18, 504:16
russell
398:6, 398:8,
399:5, 399:7

S

s
505:16, 506:7
sa
536:11
safeguarding
530:18
safety
524:7
said
403:5, 405:15,

413:11, 421:7,
428:4, 436:10,
436:14, 438:5,
440:21, 446:19,
447:8, 447:17,
447:20, 447:25,
448:3, 448:6,
448:10, 452:17,
455:13, 472:17,
487:14, 490:11,
528:4, 529:16,
541:22, 542:23,
543:2, 543:7,
546:2, 546:5,
549:13, 552:14,
552:24, 553:5,
556:6, 557:8,
557:9
same
407:13, 407:23,
408:9, 440:1,
452:13, 466:18,
492:9, 498:25,
502:12
sample
548:8, 548:13
satisfied
440:5
save
410:19, 498:18,
498:24, 536:11
say
407:19, 407:22,
411:14, 416:20,
417:19, 424:7,
425:10, 425:12,
432:21, 434:22,
441:4, 456:20,
460:25, 465:20,
468:4, 470:18,
472:10, 475:18,
478:8, 488:15,
491:15, 492:6,
506:22, 520:15,
521:17, 522:20,
523:18, 528:10,
534:25, 535:23,
541:2, 547:1,

549:1, 552:10,
554:9, 554:13
saying
405:11, 405:18,
405:25, 416:25,
418:12, 423:3,
448:24, 466:20,
470:8, 474:2,
479:7, 489:3,
492:9
says
404:9, 404:12,
411:14, 429:6,
450:18, 484:24,
499:20, 533:19,
536:16
scale
448:4
scanlan
395:7, 395:14,
396:6, 397:1,
399:18, 401:3,
401:9, 402:3,
403:20, 404:1,
410:8, 410:12,
428:22, 429:1,
446:24, 447:3,
447:7, 447:17,
449:17, 450:7,
460:1, 460:6,
475:2, 484:6,
484:16, 491:3,
491:8, 491:13,
496:10, 496:14,
497:4, 497:8,
499:5, 500:13,
501:1, 515:4,
538:4, 540:18,
554:19, 554:24
scenario
467:2
schedule
481:4
scheme
471:8
school
481:15
science
538:20, 538:24,

547:7
scientist
512:25, 513:2
scope
502:9
seattle
398:22
second
439:6, 447:14,
452:12, 470:7,
488:7, 490:6
secretaries
522:8, 522:13
secretary
395:9, 396:8,
402:7, 404:24,
405:7, 414:16,
415:4, 438:21,
443:25, 475:2,
477:9, 484:6,
495:9, 507:23,
515:4, 527:1,
537:25, 538:4,
540:18, 554:19,
554:23
secretary's
554:20
section
411:23, 413:20,
413:22, 495:1
secure
531:2
securities
512:15
security
447:19, 448:8,
451:22
see
404:8, 432:9,
437:19, 442:14,
445:5, 484:21,
489:15, 491:11,
531:15, 531:19
seeing
544:15
seem
552:19
seems
482:18, 519:23

seen
479:12, 484:5,
498:15, 500:19,
500:22, 501:11,
501:13
segment
435:22
selected
455:11
selection
528:7
self
506:23
self-certificati-
on
507:14, 511:13
senate
478:3, 524:10
senator
478:1, 478:6,
478:8, 478:13,
478:16, 479:6,
479:8, 479:14,
479:17, 479:18,
515:15, 515:21
senators
462:3
send
468:18, 484:2,
484:12, 484:13
sending
433:17
seniors
415:14
sense
426:15, 434:20,
547:9
sent
497:17, 514:12
september
404:12, 476:6
serious
450:25, 451:1,
452:17, 452:18,
542:12
seriousness
450:20, 452:13
served
547:21

services
510:12, 510:13
session
473:18
sessions
438:25
set
406:21, 488:7
seven
429:4
several
409:16, 547:18
shammonad
400:5
share
522:8
shoring
447:8
short
409:13
should
407:21, 413:10,
414:18, 421:18,
433:2, 485:1,
485:10, 486:4,
487:15, 487:18,
489:20, 493:5,
499:18, 499:21,
500:24, 502:2,
502:3, 503:12,
511:4, 521:7,
523:18
shouldn't
477:4
show
413:1, 424:13,
426:11, 432:1,
435:24, 447:20,
454:21, 454:25,
457:17, 459:4,
492:22, 493:24,
493:25, 530:10,
530:11
showed
525:22, 553:22
showing
489:7, 492:16,
513:12, 516:14

shows
452:13, 491:19,
492:14, 493:2,
526:19, 554:5
side
440:15, 466:16
sides
521:4
sign
460:19, 476:2,
555:4
signature
475:24
signature-1apgj
557:18
signature-k9lvk
558:11
signed
456:2, 476:6,
476:22, 477:5
significant
414:12, 422:21,
423:1, 449:1,
472:15, 506:24,
507:7, 508:7,
508:10, 511:14,
527:17, 529:2
signing
462:1
similar
455:4, 527:20,
541:1
similarly
461:4
simply
413:3, 489:14
since
414:9, 415:3,
430:12, 451:5
single
528:24
sit
539:14, 554:8
sitting
498:3, 519:11
situated
461:4
situation
493:17

situations
461:19
six
402:15, 480:17,
497:3
sizable
435:22, 438:17,
440:22, 441:1,
441:6, 441:8,
441:9, 441:10,
441:12, 442:5
size
454:12
skills
556:8, 557:11
slide
429:4
slides
401:15, 428:23
slight
437:16, 437:25,
442:11, 546:23
slipping
437:18
small
406:22, 449:21,
513:22
smaller
454:8, 546:2
smith
437:5, 437:22,
504:10, 504:18,
544:20
smith's
450:12, 544:22,
546:15
social
415:9, 415:17,
415:20, 416:3,
418:3, 418:7,
442:18, 513:2,
513:4, 535:13,
547:7
solution
456:24
some
403:15, 408:23,
409:17, 417:3,

429:6, 432:21,
433:21, 435:2,
440:7, 440:11,
467:4, 472:3,
472:23, 474:14,
475:9, 479:10,
479:21, 480:19,
481:19, 481:25,
482:2, 482:13,
483:1, 483:2,
487:7, 492:16,
495:4, 503:9,
506:11, 508:25,
510:2, 514:18,
517:3, 520:5,
522:12, 526:2,
534:21, 535:14,
538:1, 544:19,
546:10, 546:14,
548:19, 551:10,
551:17, 553:1

**somebody**
461:3

**someone**
463:15, 485:8,
487:20, 489:3,
489:11, 490:14,
529:4

**something**
435:12, 441:16,
444:15, 450:14,
473:10, 485:15,
507:16, 528:17,
539:7, 539:9,
539:11, 545:6,
545:15

**sometimes**
406:22, 432:18,
524:22

**somewhere**
482:14, 491:6

**son**
460:15

**sorry**
415:18, 430:4,
464:6, 469:18,
494:7, 519:17,
525:6, 528:1,

528:2, 529:19,
545:11

**sort**
498:20, 528:5,
541:5, 541:12,
546:9

**sos**
410:22, 410:23,
469:22

**south**
397:4

**speak**
433:25, 439:10

**speaking**
405:7, 483:6,
514:5, 542:21

**special**
455:5, 473:2,
482:14

**specific**
451:11, 467:2,
477:22, 505:10,
506:3, 508:2,
527:21

**specifically**
415:11, 460:7,
465:16, 497:1,
538:22, 539:10,
542:19

**specify**
496:11

**spectrum**
439:9, 521:5

**speculate**
477:4, 531:25

**speculative**
434:17

**speech**
521:25

**spend**
533:14

**spending**
532:22, 533:1

**spent**
533:3

**spoken**
516:1

**sponsors**
449:7, 479:8

**spot**
441:24, 441:25,
442:8, 518:18,
518:21, 519:4,
519:8, 519:13,
519:15, 520:4,
520:14, 520:18,
520:22, 521:15,
521:19

**spring**
417:17, 424:25,
425:9, 482:21

**staff**
434:21, 534:23,
535:1, 535:2,
535:14, 551:17

**stamp**
410:21, 469:21,
484:3

**standard**
487:16, 490:11,
518:7, 519:16,
519:17

**stands**
458:24

**started**
439:22, 455:3

**starts**
410:22, 470:8

**state**
395:9, 396:8,
401:17, 404:24,
404:25, 405:8,
407:11, 414:16,
415:4, 417:13,
425:14, 425:20,
426:8, 426:12,
427:9, 430:19,
431:16, 435:18,
435:20, 436:2,
436:6, 438:21,
438:24, 442:17,
442:20, 444:14,
444:22, 445:16,
446:9, 449:18,
457:5, 461:2,
465:7, 467:17,
473:2, 474:2,

**spot**
477:9, 483:4,
483:9, 495:13,
495:21, 496:15,
505:22, 510:23,
511:18, 522:8,
526:24, 527:1,
533:3, 547:12,
549:7, 549:9,
552:1, 552:9,
552:11, 558:14

**state's**
443:25, 495:9,
507:23, 522:13

**statement**
429:22, 489:3,
489:11, 489:18,
490:17, 536:20

**statements**
411:7, 443:7

**staters**
447:20, 450:24,
456:22

**states**
395:1, 404:19,
412:13, 419:21,
420:4, 420:8,
420:16, 421:9,
422:3, 422:13,
437:20, 442:24,
452:14, 488:25,
508:25, 540:23,
541:1, 541:8,
546:3, 551:14,
552:2, 552:4

**statewide**
419:10

**statistical**
445:15

**statistically**
529:2

**statistician**
444:1, 444:4

**statute**
419:12, 423:13,
468:25

**statutory**
463:17, 488:18,
489:22, 489:23,

534:1
**stay**
467:5
**stayed**
529:10, 529:11,
529:24, 546:13
**steady**
546:13
**steven**
398:5, 399:4,
447:13
**still**
402:10, 413:21,
417:12, 417:20,
424:15, 437:17,
441:15, 448:17,
491:2, 500:5,
547:20, 549:18,
549:22, 553:18
**stipulate**
499:25
**stipulated**
500:3, 538:16
**stop**
479:20
**strategies**
505:12, 530:17
**stratham**
514:10
**streamlined**
516:12
**street**
398:12
**strengthen**
503:24
**strengths**
530:16
**stricter**
543:4, 543:20
**strike**
522:4
**stringent**
453:23
**strongest**
518:4
**struck**
447:19, 448:7,
518:8, 518:11,

522:9, 523:13
**struggle**
486:11
**struggling**
421:13
**students**
459:5
**studied**
505:12, 539:19,
551:12, 552:2
**study**
512:19, 540:25
**subject**
401:18, 460:2,
494:23, 502:6,
502:21, 504:1,
507:1, 513:11,
522:19, 536:7,
537:5, 554:22
**subjective**
520:3
**subjectivity**
520:6
**submitted**
512:6, 536:24
**subsequent**
475:24
**substance**
478:15
**successful**
446:12, 520:1
**suffice**
492:1, 492:10,
492:19
**sufficient**
434:24, 493:14
**suggest**
433:5, 486:10,
486:22
**suggested**
433:5, 479:22
**suggestions**
433:1
**suite**
398:21
**summarize**
502:20
**summarized**
555:3

**summing**
452:20
**superior**
464:22
**supervisors**
423:7, 464:15,
473:18, 534:12
**supplemental**
401:10, 401:22,
401:24, 403:21,
404:5, 499:6,
499:9, 500:25,
501:2, 501:10,
503:20, 530:13,
535:25
**supply**
472:2
**supporting**
463:10
**suppose**
444:20, 506:20
**supreme**
440:12
**sure**
404:4, 411:19,
417:21, 427:13,
430:9, 430:16,
434:18, 445:9,
449:16, 452:9,
452:22, 459:25,
465:1, 465:5,
466:25, 472:1,
473:12, 477:21,
481:5, 481:10,
482:7, 488:6,
491:6, 493:14,
499:3, 501:17,
517:3, 518:15,
522:12, 525:13,
526:20, 537:13,
543:16, 550:13
**surprise**
526:8, 526:11
**surprised**
420:1, 449:13,
483:14
**survey**
544:9

**surveying**
432:8
**surveys**
446:15
**suspended**
466:24
**svrs**
419:15, 427:14,
472:4, 479:25,
534:21
**swear**
411:5
**sweet**
441:24, 441:25,
442:8, 518:18,
518:21, 519:4,
519:8, 519:13,
519:15, 520:4,
520:14, 520:18,
520:22, 521:14,
521:18
**sworn**
402:4, 489:2,
489:10, 489:18,
490:17, 557:5,
558:5
**system**
419:15, 419:20,
506:24, 507:13,
508:7, 508:11,
510:19, 511:15,
550:3, 550:12,
550:19

|        T        |
| :-: |

**tab**
403:18, 410:4,
428:10, 428:20,
446:23, 449:15,
469:11, 498:24
**tabs**
500:9
**tactics**
530:18
**take**
411:8, 414:18,
428:11, 438:9,
464:5, 472:4,

473:3, 476:10,
476:22, 481:17,
484:2, 485:16,
486:4, 487:22,
491:4, 496:2,
508:1, 512:16,
537:8, 537:19,
546:9, 547:17,
547:18, 555:12
**takeaway**
439:13
**taken**
473:16, 531:2,
557:4, 558:4
**takes**
458:1, 458:2,
473:19, 473:21,
513:13, 536:23,
549:14
**taking**
507:4
**talk**
418:16, 462:14,
531:1, 537:16,
547:9
**talked**
439:22, 441:19,
479:13, 517:22
**talking**
462:19, 466:8,
511:20, 537:14
**tbishop@elias**
398:24
**technological**
531:8
**tekin-assistant**
400:10
**tell**
446:6, 446:7,
446:10, 519:14,
522:25
**telling**
422:24, 488:11,
489:20
**ten**
480:17
**tend**
425:17, 483:11

**tends**
425:13
**terms**
437:4, 440:9,
494:12
**test**
490:18
**testified**
422:9, 455:18,
480:18, 482:22,
483:17, 495:8,
502:14, 528:6,
541:14
**testify**
495:23, 502:1,
503:22, 506:22,
513:8, 513:19,
515:5, 525:15,
530:16, 532:7,
533:19, 541:12
**testifying**
498:4, 499:14
**testimony**
395:14, 397:1,
454:15, 456:21,
494:22, 497:21,
502:5, 502:10,
502:13, 502:20,
502:23, 503:11,
503:16, 503:25,
506:25, 508:5,
508:14, 511:11,
513:10, 515:17,
530:24, 536:6,
536:13, 537:4,
537:11
**text**
479:14, 479:16,
479:17
**texting**
528:3
**th**
476:6
**thank**
402:14, 413:16,
413:23, 418:11,
425:7, 428:19,
428:21, 470:4,

474:19, 484:11,
484:15, 490:8,
496:1, 498:24,
499:4, 500:8,
501:18, 529:20,
537:25, 538:4,
554:18, 554:25
**thanks**
480:11
**themselves**
504:14
**theoretically**
466:20
**thereabouts**
475:15
**thereafter**
557:7
**therefore**
416:22
**they'd**
467:17
**thing**
407:13, 487:19,
492:9, 498:25,
527:3
**things**
434:2, 442:3,
447:24, 452:1,
464:10, 476:15,
476:19, 508:12,
511:2, 511:12,
522:18, 523:23,
524:3, 524:23,
531:11, 531:12,
531:25, 532:20
**think**
406:10, 406:13,
408:9, 408:10,
412:21, 417:19,
423:25, 426:17,
427:23, 436:10,
436:19, 437:18,
437:21, 439:18,
440:10, 440:22,
442:13, 443:13,
443:18, 445:23,
446:6, 446:8,
446:11, 447:14,

447:23, 448:6,
448:19, 448:25,
451:16, 453:18,
454:2, 454:14,
455:21, 456:9,
456:22, 457:3,
457:14, 457:20,
465:10, 466:7,
467:16, 469:12,
471:16, 478:5,
481:8, 482:22,
485:15, 486:3,
487:14, 488:21,
488:24, 489:2,
489:6, 490:24,
492:12, 492:20,
493:7, 494:14,
498:8, 502:18,
505:18, 506:17,
518:16, 520:2,
520:5, 521:20,
525:2, 526:13,
527:13, 527:23,
528:12, 528:16,
529:4, 532:15,
533:22, 534:8,
536:25, 537:19,
538:5, 538:6,
538:15, 540:20,
541:22, 542:23,
543:2, 543:3,
543:19, 543:20,
544:13, 545:23,
547:11, 549:14,
549:18, 552:12,
552:23, 554:20
**thinking**
424:14
**third**
401:10, 403:21,
404:4, 470:3
**thirteen**
469:19
**thorough**
456:11, 475:8
**thought**
450:24, 456:10,
456:12, 467:1

**thousand**
409:16, 444:20,
444:21
**thousands**
480:4, 480:5,
480:8
**thread**
401:18, 460:2
**threat**
509:2
**three**
403:6, 409:25,
434:22, 500:12
**through**
404:13, 418:3,
427:13, 439:19,
461:8, 461:12,
461:17, 462:16,
478:10, 526:2,
544:14, 554:6
**thrown**
454:14, 459:14
**time**
419:19, 420:23,
433:4, 440:1,
440:11, 442:20,
446:7, 451:5,
454:11, 458:16,
468:25, 476:22,
480:16, 481:3,
489:24, 498:15,
500:21, 501:12,
504:11, 507:25,
509:20, 519:1,
521:1, 533:1,
534:23, 535:1,
535:15, 545:2,
546:14, 552:18,
553:1, 553:11,
553:21
**times**
408:12, 454:7,
478:5
**timing**
466:15, 471:4,
476:14, 476:18,
546:8
**titled**
447:7

**today**
442:18, 454:20,
495:8, 495:23,
498:3, 502:14,
519:11, 539:14,
554:8, 555:8
**together**
461:8
**told**
517:14, 517:16,
529:5
**took**
414:9
**top**
447:10, 450:19,
481:11
**topic**
418:18, 435:17,
449:20, 530:23
**topics**
402:15, 471:3,
502:12
**total**
407:9, 420:17
**touch**
462:2
**towards**
473:23, 533:10
**tower**
398:11
**town**
417:17, 424:25,
425:9, 425:13,
425:16, 426:9,
426:19, 472:18,
472:20
**town-by-town**
542:20
**track**
426:25, 427:15,
428:1, 429:18,
541:23
**tracked**
419:5, 427:1,
427:16, 430:3,
430:6, 530:2,
530:3
**tracking**
421:21, 427:4,

427:9
**trade**
533:17
**trade-off**
444:25
**traditional**
418:4
**train**
488:1
**training**
409:10, 409:18,
414:5, 414:7,
414:9, 433:6,
443:22, 471:24,
472:5, 472:11,
472:15, 509:5,
509:8, 509:10,
512:8, 512:18,
534:17, 534:18,
534:19, 535:3,
535:11
**trainings**
414:10, 414:19,
414:23
**transcribed**
395:23
**transcriber**
556:1
**transcript**
494:22, 556:4,
556:6
**transcription**
395:13
**transcriptionist**
557:8
**transparency**
504:4
**transparent**
439:14, 531:3
**transportation**
550:20, 551:15,
552:4
**trees**
410:19
**tremendous**
508:20, 531:5
**trend**
531:5, 545:23

**trending**
437:16
**trends**
504:10, 537:7,
545:2, 547:9
**trial**
498:1
**tricia**
422:8
**trick**
440:4
**tried**
444:20, 444:22,
506:6
**tries**
482:6
**trip**
482:14, 482:15,
553:4
**trips**
459:20
**trooper**
533:3
**trouble**
498:19, 498:24,
524:8
**true**
405:16, 406:5,
422:19, 464:13,
485:10, 490:2,
492:17, 494:2,
542:1, 549:18,
549:22, 550:16,
554:3, 556:6,
557:9
**truth**
411:6, 488:11,
489:20
**try**
408:7, 415:19,
420:13, 426:5,
453:8, 510:4,
520:8, 523:5,
526:9, 554:5
**trying**
410:19, 416:11,
420:19, 431:24,
433:19, 461:7,

461:14, 490:10,
531:21
**turn**
410:20, 410:23,
429:4, 447:12,
450:6, 450:16,
469:21, 522:2,
523:10
**turned**
426:6, 426:20,
427:17, 430:7,
437:24, 445:6,
445:15, 446:1,
453:15, 453:25,
506:16, 523:11,
523:16, 523:19,
525:24, 526:4,
526:7, 526:15,
529:11, 530:6,
541:24, 543:6,
544:10
**turning**
435:17, 455:5,
457:12
**turnout**
425:10, 483:4,
483:9, 526:24,
527:18, 537:7
**turns**
485:9, 486:9
**twice**
407:22
**two**
403:6, 408:8,
415:8, 417:4,
423:15, 500:11,
501:22, 509:4,
511:12, 518:18,
543:23
**two-percentage-p-
oint**
544:8
**tyler**
398:17
**type**
404:16, 433:13,
535:11, 547:7,
551:12

**types**
461:18, 511:1,
524:14
**typewriting**
557:7
**typical**
521:15
**typically**
431:12, 434:9,
463:8, 526:25

**U**

**unable**
444:23, 453:9,
543:22
**unanimous**
455:24
**unaware**
416:19
**uncertainty**
554:22
**undeclared**
441:7
**under**
402:10, 414:6,
420:8, 421:24,
464:21, 482:22,
484:1, 487:15,
489:21, 492:8,
494:12, 527:20
**undercount**
420:9, 420:17,
422:15, 422:22,
423:1
**undergone**
540:16
**underlined**
404:3
**understand**
402:10, 405:22,
417:7, 417:21,
420:19, 421:13,
466:20, 490:11,
521:12, 526:20,
531:22
**understanding**
403:7, 405:5,
409:20, 451:2,

462:17, 486:11,
507:10
**undertake**
427:25, 446:14,
446:15
**undertaken**
517:10
**undertaking**
445:8, 461:14
**underway**
472:21
**undocumented**
509:14
**unfortunate**
543:13
**unfortunately**
519:19
**unh**
437:6, 504:10
**union**
399:10, 555:10
**unique**
461:18, 527:21
**unit**
404:14, 444:4,
533:4
**united**
395:1, 404:19,
419:21, 420:3,
420:8, 420:16,
421:9, 422:3,
422:13, 452:14,
488:25
**unlawful**
403:10
**unless**
496:11, 499:24
**unqualified**
508:15
**unsubstantiated**
504:25, 505:7,
505:13
**until**
466:24, 476:2,
476:6, 476:10,
476:22, 476:23,
493:18
**uphold**
534:1

**usa**
484:24
**usage**
419:4, 420:7,
420:15, 420:17,
422:11, 422:15,
423:1
**use**
454:5, 474:3,
480:19, 507:19,
510:9, 510:11,
518:8, 519:18,
532:16, 536:12,
539:4, 551:5,
551:23
**using**
415:8, 437:4,
488:10, 493:21,
505:10, 510:14
**usually**
403:5, 479:19,
479:20
**utilize**
461:6, 551:20
**utilized**
435:11
**utilizing**
432:15

**V**

**valid**
423:8, 464:3
**validity**
503:24
**validly**
502:5
**valves**
524:7
**variables**
527:21
**varies**
552:9
**various**
540:3
**vary**
552:10
**vehicle**
479:10

**verification**
423:12, 533:15

**verified**
512:5

**verifies**
491:20

**verify**
462:9, 479:25,
512:1

**verifying**
516:16

**version**
410:18, 524:15

**versus**
532:12, 541:7,
544:9

**veterans**
409:18, 415:14

**view**
437:20, 443:20,
453:20, 491:25,
492:2, 492:3,
520:21, 521:12,
522:8, 522:17

**views**
523:2

**violate**
403:6

**vital**
550:4

**volume**
395:15

**voluntary**
414:20, 414:21,
414:22

**vote**
401:19, 404:20,
407:1, 409:2,
409:3, 409:9,
413:7, 414:7,
416:23, 420:2,
420:22, 420:25,
421:25, 424:14,
424:20, 425:6,
425:19, 426:19,
432:18, 432:22,
435:11, 437:7,
437:8, 439:25,

446:2, 447:21,
453:10, 457:19,
460:2, 463:11,
463:14, 467:12,
467:22, 481:4,
481:10, 481:19,
483:10, 488:4,
493:10, 493:25,
514:11, 520:24,
526:2, 526:21,
529:4, 529:23,
530:5, 532:19,
543:23, 553:23,
553:25

**votebeat**
405:9, 417:1

**voted**
407:1, 408:16,
449:11, 516:3,
517:19

**voter's**
479:25, 491:9,
511:13

**voter-by-voter**
542:20

**voters**
398:3, 399:2,
409:24, 411:21,
416:6, 416:7,
416:11, 417:15,
417:21, 423:14,
429:6, 430:18,
431:24, 437:12,
437:20, 438:11,
439:9, 440:2,
441:5, 441:7,
441:17, 441:22,
442:17, 442:22,
442:23, 443:20,
445:6, 445:10,
445:12, 445:15,
446:12, 452:9,
453:14, 454:16,
454:21, 457:13,
457:17, 481:3,
481:9, 483:10,
483:12, 488:16,
493:23, 493:24,

502:24, 503:5,
503:9, 503:11,
503:17, 504:5,
504:13, 510:4,
510:5, 510:11,
510:15, 510:20,
510:24, 511:4,
515:8, 517:3,
517:5, 517:7,
518:16, 519:23,
523:11, 523:13,
524:1, 524:8,
526:20, 528:8,
529:9, 529:12,
529:16, 531:18,
531:21, 532:17,
536:9, 536:21,
539:21, 541:24,
542:3, 542:7,
543:6, 543:13,
543:22, 544:3,
544:10

**votes**
405:13, 407:6

**voting**
402:18, 402:21,
402:22, 403:10,
404:15, 404:17,
404:20, 405:2,
407:16, 407:17,
407:21, 407:22,
408:2, 408:24,
411:3, 411:16,
412:16, 425:19,
435:22, 436:15,
436:21, 438:17,
439:9, 439:15,
440:7, 447:19,
448:5, 448:7,
448:8, 449:1,
465:18, 465:23,
466:13, 481:19,
482:18, 509:25,
513:10, 513:18,
513:20, 523:2,
523:12, 528:15,
533:5, 538:21,
538:25, 546:17

| W |
| --- |

**wa**
398:22

**wait**
434:14, 493:17

**waiting**
466:16, 480:11

**walk**
461:12, 462:16

**want**
408:7, 408:9,
416:6, 416:7,
418:16, 426:18,
445:3, 445:5,
451:17, 452:21,
461:19, 462:7,
462:14, 485:6,
489:8, 489:15,
490:25, 492:20,
497:22, 499:25,
502:15, 502:20,
522:1

**wanted**
462:4

**wants**
461:22

**washington**
553:5

**way**
406:20, 408:5,
409:22, 411:20,
417:5, 417:9,
439:21, 441:6,
444:13, 469:11,
503:7, 509:1,
510:19, 516:25,
520:8, 521:8,
531:4, 541:6

**ways**
409:12, 417:4,
523:6, 544:17

**we'll**
427:12, 537:15

**we're**
402:16, 416:14,
417:23, 432:3,
441:2, 461:7,

461:13, 462:19,
471:23, 473:21,
474:12, 474:23,
490:6, 493:16,
494:11, 496:6,
498:25, 505:10,
507:4, 511:20,
519:7, 519:12,
520:4, 520:17,
521:14, 521:18,
530:14, 530:15,
535:21, 541:11,
543:15, 552:13,
554:11, 555:4

**we've**
415:5, 431:13,
433:7, 433:23,
437:23, 457:14,
471:23, 479:12,
513:17, 521:20,
526:10, 531:5,
535:12

**weaknesses**
530:17

**weeks**
418:1

**weigh**
464:16, 543:18,
543:23

**well-grounded**
464:19, 466:23

**went**
426:19, 429:17,
438:24, 454:18,
525:21, 541:14,
542:10, 542:19,
553:10

**whatever**
459:10, 471:19,
510:14, 510:23,
535:16

**whether**
408:11, 415:13,
427:20, 430:8,
453:4, 464:1,
464:19, 486:4,
487:19, 490:13,
504:23, 505:5,

508:3, 510:12,
511:22, 519:12,
519:24, 520:4,
520:13, 520:17,
521:14, 521:18,
522:21, 536:23,
547:7, 548:7,
548:12

**wide**
531:10, 547:23

**widespread**
405:12, 436:16

**willing**
489:14

**withdraw**
409:7, 446:21,
455:22

**within**
546:25

**without**
424:12, 426:11,
427:18, 453:11,
454:22, 454:25,
503:17, 510:25,
523:25, 525:23,
542:4, 550:22,
553:2, 553:11,
553:23

**witness**
401:2, 422:18,
425:5, 428:11,
436:14, 438:16,
443:18, 445:23,
450:1, 462:7,
470:2, 471:16,
481:23, 486:16,
488:15, 495:10,
496:17, 502:22,
525:2, 525:9,
533:8, 544:1,
545:17, 546:21,
555:8

**witness(es**
557:4, 558:4

**witnesses**
555:4

**women**
398:3, 399:2

**wood**
444:19

**word**
445:9, 464:6,
489:15, 507:5

**words**
406:18, 452:24,
520:8

**work**
461:8, 461:17,
465:6, 481:12,
518:11, 519:23,
520:17, 524:20,
526:19, 531:6,
532:3, 544:22

**worked**
503:8, 506:5,
511:25, 523:2,
526:18

**working**
418:4, 431:23,
534:11, 554:4,
554:9

**workings**
531:15

**works**
523:9, 544:2

**worth**
445:20, 445:24,
482:19

**would've**
475:25, 477:15,
477:24, 477:25,
478:1

**wouldn't**
425:3, 472:10,
493:9

**written**
411:6, 478:12,
517:1

**wrong**
429:24, 430:1,
486:10, 486:21,
486:23, 520:13,
532:1

**wrongful**
402:21, 404:15,
404:17

**wrongfully**
409:3

_____
**Y**
_____

**yeah**
403:2, 403:3,
407:13, 408:4,
409:15, 410:17,
411:18, 418:14,
420:13, 420:24,
427:13, 428:8,
430:9, 441:11,
441:23, 445:3,
452:21, 462:22,
466:10, 467:14,
468:10, 472:22,
475:19, 477:5,
485:24, 486:1,
486:8, 486:24,
498:22, 517:6,
524:18, 525:21,
527:6, 529:19,
532:8, 533:8,
545:17

**year**
403:7, 433:24,
437:15, 454:19,
473:12

**years**
405:2, 423:14,
423:16, 436:22,
437:6, 508:1,
508:13, 513:17,
547:1

**yep**
403:19, 475:22,
548:22

**yesterday**
422:9, 479:21,
480:18, 483:17,
552:14, 555:3

**york**
421:7

**young**
400:1, 558:2,
558:13

**yourself**
549:4

youth
395:4, 398:15,
475:6
yup
463:13, 500:10

**z**

zoom
528:2

**0**

00291
395:6
00312
396:4
02199
398:13
03
466:22
03301
397:5, 399:13,
399:22
05
474:22
0628
398:23
09
395:20

**1**

10
418:19, 423:13,
437:15, 474:21,
523:10, 523:12,
547:1, 556:18,
558:15
100
416:3
11
404:8, 447:10,
454:16, 474:22,
496:4, 496:5
12
401:10, 403:20,
404:1, 466:22,
537:20, 537:21,
555:14
13
401:13, 410:8,

410:12, 435:17,
469:20
14
401:14, 428:22,
429:2
15
401:16, 446:24,
447:3
1569
408:1, 408:4,
410:2, 414:3,
414:12, 415:11,
415:21, 416:2,
416:5, 430:11,
430:21, 431:3,
431:6, 431:9,
431:15, 431:22,
435:19, 435:20,
436:5, 438:12,
439:20, 440:14,
445:2, 445:8,
446:4, 448:12,
448:14, 449:4,
451:25, 452:8,
453:4, 457:5,
457:9, 457:13,
464:21, 468:15,
471:6, 471:25,
472:7, 472:13,
475:11, 475:14,
478:20, 479:11,
480:20, 482:22,
483:15, 488:9,
489:21, 492:12,
495:14, 495:22,
503:6, 503:14,
503:17, 505:16,
506:7, 506:14,
507:20, 511:17,
513:8, 514:1,
514:3, 515:5,
515:6, 515:11,
515:23, 516:7,
516:10, 516:18,
517:11, 518:8,
518:10, 519:3,
523:21, 524:15,
525:16, 527:25,

532:3, 534:16,
534:19, 534:24,
535:4, 535:7,
541:2, 541:14,
541:25, 542:19,
542:24, 549:14,
549:24, 553:24
16
401:17, 449:17,
450:7
17
401:18, 460:1,
460:6, 476:6,
491:3, 491:8,
491:13
1700
398:20
18
399:12, 401:20,
484:9, 484:17,
490:7, 494:4,
494:10
19
401:21, 497:4,
497:8
1:-cv--se-tsm
395:6, 396:4

**2**

20
401:22, 410:4,
433:6, 469:11,
499:5, 499:9
2002
414:7
2012
446:19
2016
404:12, 407:13
2017
451:5
202
398:23
2020
420:21, 421:16,
422:1, 443:1,
443:4, 448:21
2021
448:22

2022
446:19, 447:10,
448:3, 450:23,
452:16
2024
404:13, 407:7,
418:20, 418:25,
475:14, 475:16,
476:7, 476:10,
476:23, 477:12,
539:23
2025
395:20, 405:7,
525:17, 525:19
2026
473:13, 527:10
205
404:14
21
401:23, 500:13,
500:16, 501:15,
501:25, 506:22,
513:7, 515:4,
537:1
2100
398:21
22
395:20, 401:24,
446:23, 500:24,
501:1, 501:9,
501:15, 503:21,
530:14, 558:15
227
399:14
24
395:6, 396:4
25
496:4, 537:20,
556:18, 558:15
2521
399:23
26
428:10, 428:20
27
428:20, 496:5
271
397:6, 399:23
28
556:18

**2nd**
475:14, 475:16

**3**

**30**
395:15, 402:16,
413:12, 449:15,
449:21, 474:16,
474:18, 495:1,
495:10, 502:11
**31**
404:13, 537:21
**32**
459:23
**3658**
397:6
**37**
499:19
**38**
498:24, 499:1,
499:20
**39**
499:2, 499:21
**395**
395:22

**4**

**402**
401:4
**403**
401:12
**410**
401:13
**42**
428:15
**428**
401:15
**446**
401:16
**449**
401:17
**460**
401:19
**461**
470:1
**464**
433:23, 435:19,
477:20, 477:24,

478:6, 478:13,
478:17, 478:18,
479:5, 524:10,
549:23, 554:22
**47**
555:14
**475**
401:5
**482461**
469:22
**482613**
410:23
**484**
401:20
**49**
428:16
**495**
401:6
**496**
401:4
**497**
401:21
**499**
401:22
**4th**
397:4

**5**

**500**
401:23
**501**
401:24
**52**
452:16, 474:21
**538**
401:5
**558**
395:22

**6**

**603**
397:6, 399:14,
399:23
**605849**
395:21
**617**
398:14
**6678**
399:14

**7**

**7000**
398:14
**73**
450:24
**7th**
398:20

**8**

**800**
398:12

**9**

**9**
395:20, 428:15,
428:16
**90**
437:11, 438:9,
438:10
**951**
398:14
**98101**
398:22
**985**
398:23