UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

New Hampshire Youth Movement

       v.

David M. Scanlan, in his official capacity
as New Hampshire Secretary of State

Case No. 24-cv-291-SE
Opinion No. 2026 DNH 012

_____

Coalition for Open Democracy et al.

       v.

David Scanlan in his official capacity
as New Hampshire Secretary of State et al.

O R D E R

In this consolidated action, several organizations and individuals bring suit against the New Hampshire Secretary of State and the New Hampshire Attorney General seeking a declaratory judgment that certain provisions of 2024 New Hampshire House Bill 1569 (HB 1569) violate the United States Constitution. The plaintiffs also request injunctive relief barring state officials from implementing those provisions.

Before the court consolidated the cases, the defendants separately moved to dismiss both actions. They argued, among other things, that none of the plaintiffs had standing to pursue any of their claims. The court largely denied both motions, though it concluded that certain plaintiffs lacked standing to pursue one or more claims. See Coal. for Open Democracy v. Scanlan, 794 F. Supp. 3d 28 (D.N.H. 2025); New Hampshire Youth Movement v. Scanlan, No. 24-cv-291-SE, 2025 WL 2336868 (D.N.H. Aug. 13, 2025).[1]

_____

[1] The plaintiff in the first action was New Hampshire Youth Movement (Youth Movement). After the court held that certain plaintiffs in the second action did not have standing

The defendants now move for summary judgment, renewing their arguments that none of the remaining plaintiffs has standing to pursue any claims in light of the record evidence. Doc. no. 88. They also argue that the court should grant them judgment on certain counts because the underlying claims are speculative. After considering the record evidence, the court denies the defendants' motion.

Standard of Review

Granting summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "carries with it the potential to affect the outcome of the suit." French v. Merrill, 15 F.4th 116, 123 (1st Cir. 2021) (quotation omitted). A material fact is in genuine dispute if "a reasonable jury could resolve the point in the favor of the non-moving party." Id. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018). The court may consider materials cited in the motion and other materials in the record. Fed. R. Civ. P. 56(c)(1)(3).

Background

On September 12, 2024, then-New Hampshire Governor Chris Sununu signed into law HB 1569, which went into effect on November 11, 2024. HB 1569 made several changes to New Hampshire's requirements relating to voter registration and identification.

---

to pursue their claims, the plaintiffs remaining in that case were Coalition for Open Democracy (Open Democracy), League of Women Voters of New Hampshire (League of Women Voters), the Forward Foundation, Miles Borne, by his next friend Steven Borne; Alexander Muirhead, by his next friend Russell Muirhead; and Lila Muirhead, by her next friend Russell Muirhead. When necessary and for ease of reference, the court will refer to the plaintiffs from the second action as the "Open Democracy Plaintiffs."

Before HB 1569 became effective, a prospective voter could register to vote by establishing her citizenship, identity, and age, either by presenting documentary evidence, including "any other reasonable documentation," or, if she did not possess the necessary documentation, by executing a Qualified Voter Affidavit. Voters who submitted the Qualified Voter Affidavit attested to their qualifications under the penalties of voter fraud and perjury. HB 1569 eliminated the Qualified Voter Affidavit. A prospective voter now must present documentary evidence, including "any other reasonable documentation," that establishes her citizenship, identity, and age.[2] <u>See</u> New Hampshire Revised Statute Annotated (RSA) § 654:12, I. If a prospective voter is unable to present such documentation, she will not be able to register to vote.

HB 1569 also changed the procedures related to voter-qualification challenges. Under New Hampshire law, if a voter challenges the qualifications of any other voter registered in the town or ward in which the election is held, <u>see</u> RSA 666:4, the moderator must determine if it is "more likely than not" that the challenge to the voter's qualifications is "well grounded," RSA 659:27. Before HB 1569 became effective, if the moderator determined that the challenge was more likely than not well grounded, the prospective voter could still cast an eligible ballot by using a Challenged Voter Affidavit, sworn under the penalties of voter fraud and perjury. HB 1569 eliminated the right to vote by Challenged Voter Affidavit. Instead, if the moderator deems the challenge more likely than not well grounded, the prospective voter must seek immediate relief in the New Hampshire Superior Court and can only cast a vote if the court overturns the moderator's decision prior to the close of the polls. RSA 654:12, V.

---

[2] The statute does not define "reasonable documentation."

On August 1, 2025, after this litigation began, Governor Kelly Ayotte signed into law 2025 House Bill 464 (HB 464). HB 464 amended or modified certain of HB 1569's provisions. For example, supervisors and clerks may now accept "proof that the applicant was previously or is currently registered to vote in a different town or ward in New Hampshire" to establish the applicant's citizenship. RSA 654:12, I(a). In addition, HB 464 authorizes local election officials' access to certain databases, including the Statewide Voter Registration System, Department of Motor Vehicles, and New Hampshire Vital Records, "to assist voters in providing proof of citizenship, age, domicile, and identity to the city and town clerks." Id. at VI. It further provides that "[t]he secretary of state shall work with the city and town clerks to ensure access [to these resources] on election day at the polling location." Id.

Four organizations and three individuals remain as plaintiffs in this case. The four organizations (together, the Organizational Plaintiffs) are Open Democracy, League of Women Voters, the Forward Foundation, and Youth Movement. The court explores more details about each Organizational Plaintiff's activities when addressing the defendants' standing arguments. Broadly speaking, however, the Organizational Plaintiffs are all non-profit organizations that are interested in encouraging active civic participation and assisting individuals in exercising their right to vote.

The three individuals are Miles Borne, Alexander Muirhead, and Lila Muirhead (together, the Individual Plaintiffs). At the time of the Open Democracy Plaintiffs' complaint, the Individual Plaintiffs were each minor U.S. citizens who lived in New Hampshire. The Open Democracy Plaintiffs' complaint alleged that they will each turn 18 before the end of 2026 and intend to register to vote as soon as they do so. As discussed further below, Borne has since turned 18 and has registered to vote.

4

The plaintiffs challenge the constitutionality of some of HB 1569's provisions.[3] Specifically, all plaintiffs allege that HB 1569's elimination of the Qualified Voter Affidavit constitutes an unjustifiable burden on the right to vote in violation of the First and Fourteenth Amendments (Count I). Open Democracy alleges that HB 1569's elimination of the Challenged Voter Affidavit also constitutes an unjustifiable burden on the right to vote (Count II) and violates voters' rights to procedural due process (Count III).[4]

<u>Discussion</u>

The defendants move for summary judgment, arguing that none of the plaintiffs has standing to pursue any of the remaining claims in this case. They further argue that even if Open Democracy has standing to bring its claims with regard to HB 1569's elimination of the Challenged Voter Affidavit, those claims are too speculative to continue. The plaintiffs, of course, disagree. "[B]ecause standing is a prerequisite to a federal court's subject matter jurisdiction and [it] must assure [itself] of [its] jurisdiction under the federal Constitution before [it] proceed[s] to the merits of a case," the court begins by addressing the defendants' standing arguments. Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc., 958 F.3d 38, 46 (1st Cir. 2020) (quotations and citation omitted).

---

[3] As discussed further below, some plaintiffs either do not assert, or the court has previously ruled that they do not have standing to assert, certain claims remaining in this case.

[4] The court previously held that only Open Democracy has standing to challenge HB 1569's elimination of the Challenged Voter Affidavit and that no plaintiff has standing to assert Count IV, an equal protection challenge to the elimination of the Challenged Voter Affidavit. See Coal. for Open Democracy, 794 F. Supp. 3d at 43-48.

I.    Standing

"Standing doctrine assures respect for the Constitution's limitation of '[t]he judicial

Power' to 'Cases' and 'Controversies.'" Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st

Cir. 2016) (quoting U.S. Const. art. III, § 2, cl. 1). "For there to be a case or controversy under

Article III, the [plaintiffs] must have a personal stake in the case—in other words, standing."

Town of Milton v. Fed. Aviation Admin., 87 F.4th 91, 95 (1st Cir. 2023) (quoting TransUnion

LLC v. Ramirez, 594 U.S. 413, 423 (2021) (further quotations omitted)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is

concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the

defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion, 594

U.S. at 423. A showing "of future injury may suffice if the threatened injury is 'certainly

impending,' or [if] there is a 'substantial risk' that the harm will occur." Reddy v. Foster, 845

F.3d 493, 500 (1st Cir. 2017) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158

(2014) (further quotations omitted)); see Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 414

n.5 (2013). "Plaintiffs 'must demonstrate standing for each claim that they press and for each

form of relief that they seek.'" Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 372 (1st

Cir. 2023) (quoting TransUnion LLC, 594 U.S. at 431).

"[T]he absence of standing may be raised at any stage of a case." Hochendoner, 823 F.3d

at 730. "Each element of standing 'must be supported in the same way as any other matter on

which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence

required at the successive stages of the litigation.'" Id. (quoting Lujan v. Defs. of Wildlife, 504

U.S. 555, 561 (1992)). Thus, in "response to a summary judgment motion, the party invoking

federal jurisdiction cannot rely on mere allegations, but must set forth by affidavit or other

evidence specific facts, supporting the elements of standing, which for purposes of the summary

judgment motion will be taken to be true." Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 86 (1st Cir. 2025) (quoting Lujan, 504 U.S. at 561) (quotations omitted).

At the outset, the plaintiffs argue that if the court finds that there are material disputes of fact as to whether any plaintiff has standing to assert a claim, the court can and should deny the defendants' motion without needing to analyze the remaining plaintiffs' standing as to that claim. As a general matter, at this stage of the litigation, the plaintiffs' argument has support. See, e.g., Davis v. Grimes, 9 F. Supp. 3d 12, 24 n.12 (D. Mass. 2014) (noting at the summary judgment stage that although one plaintiff "may no longer have standing," it was "not an issue" because "the finding that one has standing to sue renders it superfluous to adjudicate the other plaintiffs' standing" (quoting Montalvo–Huertas v. Rivera–Cruz, 885 F.2d 971, 976 (1st Cir. 1989) (quotations omitted))). But, where the scope of the defendants' liability could change depending on the prevailing plaintiff, then the court should examine the standing for each plaintiff. See, e.g., Women's Med. Ctr. of Providence, Inc. v. Roberts, 512 F. Supp. 316, 319-20 (D.R.I. 1981).

The defendants argue that the court should analyze each plaintiff's standing because the defendants' "ultimate liability changes depending on number and circumstances of Plaintiffs who could proceed to trial." Doc. no. 108 at 9. But the defendants do not explain in their summary judgment papers how that is the case here, where the plaintiffs all seek the same relief.

Nevertheless, the Open Democracy Plaintiffs and Youth Movement are represented by different attorneys. Because all of the plaintiffs seek attorneys' fees, there is at least some support for the notion that the defendants' liability may depend on whether either Youth Movement or any of the Open Democracy Plaintiffs remains in the case.[5] See Roberts, 512 F.

_____

[5] The court fails to see how the defendants' liability for attorneys' fees could differ depending on whether any particular Open Democracy Plaintiff remains in the case. For the sake of completeness, however, the court will address each Open Democracy Plaintiff's standing, even if only briefly.

Supp. 316 at 319-20 (deciding to address each plaintiff's standing because the defendant likely was liable for attorneys' fees if the plaintiffs prevailed and therefore "the number of parties present and the issues each is allowed to litigate could have a direct and real bearing on the [defendant's] ultimate liability in this action"). Out of an abundance of caution, the court will consider each plaintiff's standing as to each claim alleged.

Although each plaintiff's standing is an individual inquiry and dependent on specific facts relative to that plaintiff, the defendants often make nearly identical arguments as to each Organizational Plaintiff and each Individual Plaintiff. Therefore, the court limits its analysis where appropriate for the sake of efficiency.

### A.    The Organizational Plaintiffs

"When an organization . . . seeks to establish Article III standing, it may proceed in one of two ways: it may show that it has 'organizational standing' to sue on its own behalf, or it may demonstrate that it has 'associational standing' to sue on behalf of its members." Mayor & City Council of Baltimore v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 738 F. Supp. 3d 1, 7 (D.D.C. 2024); see Equal Means Equal v. Ferriero, 3 F.4th 24, 29 (1st Cir. 2021). Here, each of the Organizational Plaintiffs relies on organizational standing.[6]

The defendants argue that the evidence in the record shows that the Organizational Plaintiffs cannot satisfy any of the three prongs of the standing analysis for the purpose of organizational standing. As the court explained in its orders on the defendants' motions to dismiss, the Organizational Plaintiffs' theory of standing is derived largely from Havens Realty

---

[6] Youth Movement also relies on associational standing. Because the court determines that Youth Movement has organizational standing to pursue its sole claim, Count I, it need not address Youth Movement's arguments in support of associational standing.

Corporation v. Coleman, 455 U.S. 363 (1982) and clarified by Food & Drug Administration v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024).

In Havens Realty, the defendant (Havens) allegedly engaged in a practice called racial steering, giving prospective home renters and buyers false information to direct them toward housing near others of the same race and away from housing near individuals of other races, thereby maintaining racial housing segregation. 455 U.S. at 366 & n.1. Several plaintiffs, including a housing organization called HOME, which provided housing counseling and referral services to prospective buyers and renters, sued Havens, alleging a violation of the Fair Housing Act. Id. at 367.

The Supreme Court held that HOME had organizational standing to pursue its claim because the complaint alleged that Havens's "steering practices . . . perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." Id. at 379. The Supreme Court stated that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." Id.

Recently, the Supreme Court clarified Havens Realty's holding. In Alliance for Hippocratic Medicine, several anti-abortion medical organizations sought to challenge a Food and Drug Administration action that eased regulations related to mifepristone, a drug used to terminate pregnancies. 602 U.S. at 376-77. The organizations relied on a Havens Realty theory to establish standing, alleging that the FDA had "impaired their ability to provide services and achieve their organizational mission" and that they had to "divert[] [their] resources in response to" the FDA's actions. Id. at 394-95 (quotations omitted). The Supreme Court rejected this argument, re-affirming that mere issue advocacy, even when accompanied by expenditures,

could not alone establish standing. Id. at 395. Distinguishing Havens Realty, the Court

highlighted that HOME "not only was an issue-advocacy organization, but also operated a

housing counseling service." Id. So, "when Havens gave . . . false information about apartment

availability," it "directly affected and interfered with HOME's core business activities" because

it "impaired HOME's ability to provide counseling and referral services . . . ." Id. The Supreme

Court noted that the plaintiffs in Alliance for Hippocratic Medicine did not allege that the FDA's

action "imposed any similar impediment to the [plaintiffs'] advocacy business" and, therefore,

they lacked standing. Id.

　　　With that framework established, the court now turns to the defendants' arguments

regarding each Organizational Plaintiff.

　　　　　1.　　Youth Movement

　　　Because Youth Movement brings only Count I, the relevant question is whether Youth

Movement can establish a legally cognizable injury attributable to HB 1569's elimination of the

Qualified Voter Affidavit. Youth Movement seeks to effectuate political change through civic

action and democratic participation. It runs several programs to help achieve its mission,

including pledge-to-vote, voter-registration, and get-out-the-vote programs.

　　　The defendants argue that Youth Movement cannot show a legally cognizable injury

because the summary judgment record demonstrates that HB 1569 does not perceptibly impair

Youth Movement's ability to provide its core services. They argue that Youth Movement

disclaimed any financial diversion of resources in response to HB 1569. According to the

defendants, Youth Movement provided no documents that reflect staff or volunteer diversion,

and "the mere fact that Youth Movement's staff and volunteers had to ensure its voter outreach

activities accurately reflect current law is not an abnormal operational cost or a deviation from

routine activities." Doc. no. 88-1 at 13-14. The defendants further contend that there is no evidence that shows that HB 1569 makes it more difficult for Youth Movement to run its pledge-to-vote, voter-registration, and get-out-the-vote programs. In short, the defendants argue that the evidence demonstrates that, at most, Youth Movement suffered a setback to its abstract social interests, which is not enough to show an injury-in-fact for standing purposes.

Contrary to the defendants' assertions, the summary judgment record establishes that HB 1569's elimination of the Qualified Voter Affidavit perceptibly impairs Youth Movement's pledge-to-vote, voter-registration, and get-out-the-vote programs, which the defendants do not dispute are critical to Youth Movement's core mission. At best, the defendants have shown that there is a material dispute. Youth Movement is now implementing additional steps in its pledge-to-vote program to ensure that its voters who pledge to vote have the required documentary evidence necessary to register to vote. Doc. no. 88-5 at 27-28. It is also bringing in additional volunteers to register voters in advance of elections and growing its voter-registration program to help voters avoid difficulties satisfying HB 1569's proof-of-citizenship requirement on election day. Id. at 23-24; doc. no. 88-29 at 16-17; doc. no. 101-10. Youth Movement "has already spent staff time and resources preparing to coordinate member participation in [the program] on a large scale for the first time." Doc. no. 88-29 at 17. As for its get-out-the-vote program, Youth Movement must implement new training to ensure that voters are able to complete the registration process without relying on the Qualified Voter Affidavit. Doc. no. 88-5 at 24.

The defendants claim that these impacts on Youth Movement's core activities are insufficient to establish injury. Case law says otherwise. In its order denying the defendants' motion to dismiss Youth Movement's complaint, the court discussed the United States District Court for the District of Columbia's opinion in League of United Latin Am. Citizens (LULAC) v. Exec. Off. of the President, No. CV 25-0946 (CKK), 2025 WL 1187730 (D.D.C. Apr. 24,

2025). In that case, several organizations, including nonpartisan, not-for-profit voting rights organizations (Nonpartisan Plaintiffs), moved for a preliminary injunction to enjoin the implementation of certain provisions of an executive order "purporting to change the rules of federal elections." Id. at *1. Much like HB 1569, one of the challenged provisions directed the Election Assistance Commission to require people registering to vote using a federal form "to submit 'documentary proof of United States citizenship'" instead of permitting registration through attestation alone. Id. at *11. The district court held that the Nonpartisan Plaintiffs likely had organizational standing to challenge the documentary-proof provision "because that provision would directly interfere with their core activities, including providing voter registration services throughout the Nation." Id. at *31.

The district court has since granted the Nonpartisan Plaintiffs summary judgment, determining that the documentary-proof provision's impact on the Nonpartisan Plaintiffs constituted sufficient injury to confer standing. League of United Latin Am. Citizens v. Exec. Off. of President, No. CV 25-0946 (CKK), 2025 WL 3042704 (D.D.C. Oct. 31, 2025) (LULAC II). Those impacts include that the "documentary-proof-of-citizenship requirement would render obsolete several of the online tools that the Nonpartisan Plaintiffs have developed and routinely use to help eligible people register to vote, requiring the organizations to either update or replace those tools." Id. at *15. Further, "adding such a requirement would force the Nonpartisan Plaintiffs to update educational information that they provide to prospective voters, much of which they have translated into multiple languages." Id. The court further held that a "documentary-proof-of-citizenship requirement would also require the Nonpartisan Plaintiffs to invest additional resources in training their staff and volunteers, both to understand the new requirement and to handle the sensitive personal information contained in passports and other documents listed in the Executive Order as acceptable proof of citizenship." Id. The court

concluded that, in light of these impacts, the Nonpartisan Plaintiffs had standing to challenge the executive order's provisions directing the Election Assistance Commission to require people registering to vote using a federal form to submit documentary proof of United States citizenship.

The Nonpartisan Plaintiffs' injuries that the court identified in LULAC II are nearly identical to Youth Movement's injuries here, as shown in the summary judgment record. And other courts have likewise held that similar injuries are sufficient to confer organizational standing in actions challenging voting laws and regulations. See Get Loud Ark. v. Thurston, 748 F. Supp. 3d 630, 653-54 (W.D. Ark. 2024) (plaintiff that provided voter registration services had standing to challenge Election Commission rule changing signature requirement because the rule "'perceptibly impaired' [the plaintiff's] ability to provide voter registration services to Arkansans, as evidenced by the precipitous decline in registrations through [the plaintiff] since the Rule was put into place"); see also Republican Nat'l Comm. v. North Carolina State Bd. of Elections, 120 F.4th 390, 397 (4th Cir. 2024) (state action that inhibited committee's ability to "counsel voters to support Republican candidates" caused injury sufficient to confer standing because it affected and interfered with organizational mission). Drawing all reasonable inferences in Youth Movement's favor, the organization has suffered a legally cognizable injury as a result of HB 1569's elimination of the Qualified Voter Affidavit.

The remaining two prongs of the standing analysis require less discussion. The defendants argue that the record evidence shows that HB 1569's elimination of the Qualified Voter Affidavit is not the cause of Youth Movement's purported injuries because "[t]here cannot be causation where an organization cannot offer demonstrable evidence of injury." Doc. no. 88-1 at 25. Of course, this argument fails, because the evidence in the record establishes that HB 1569

13

has caused Youth Movement to suffer a legally cognizable injury for the reasons discussed above.

The defendants' arguments as to redressability likewise fail.[7] Although the defendants contend that the Organizational Plaintiffs "offer no proof whatsoever that reenacting [Qualified Voter Affidavits] would result in more voter registrations or how that would mitigate their purported resource diversion," doc. no. 88-1 at 28-29, that argument is nonsensical. Certainly, if there is evidence in the record that the elimination of the Qualified Voter Affidavit caused Youth Movement the injuries discussed above, reinstatement of the Qualified Voter Affidavit would redress that harm.

The defendants also argue that neither Youth Movement nor any plaintiff can meet the redressability prong of the standing analysis because they do not seek prospective relief. Rather, the defendants contend, the plaintiffs seek to reinstate a repealed statute "and revive a statutory scheme that is no longer in force."[8] Doc. no. 88-1 at 29. That argument is misplaced. The plaintiffs request that the court declare that certain of HB 1569's provisions violate the United States Constitution and ask that the court issue an injunction prohibiting the defendants from implementing or enforcing those provisions. If the plaintiffs are successful, then HB 1569's challenged provisions are "a nullity" and "the original statute 'must stand as the only valid expression of the legislative intent.'" Lindenbaum v. Realgy, LLC, 13 F.4th 524, 528 n.2 (6th Cir. 2021) (quoting Frost v. Corp. Comm'n, 278 U.S. 515, 526–27 (1929)). Thus, an injunction

---

[7] Although the defendants' arguments on injury and causation are specific to each Organizational Plaintiff, they offer a blanket argument as to redressability.

[8] HB 1569 repealed and then reenacted several New Hampshire statutes, including those governing requirements for prospective voters to register to vote and the challenged-voter framework. See RSA 654:12, 659:27, 659:27-a.

14

prohibiting the enforcement of HB 1569's provisions eliminating the Qualified Voter Affidavit and the Challenged Voter Affidavit would restore the relevant statutes to the versions in effect prior to HB 1569's implementation.[9]

But, even if the court were to accept the defendants' argument as true, the plaintiffs have still satisfied the redressability prong of the standing analysis. The defendants appear to suggest that nullification of HB 1569 would result in the complete absence of any law governing the requirements for prospective voter registration and voter challenges. Although that view is not supported by the law, if correct, the result would be that no proof of eligibility to vote is required and no challenge-process exists until the New Hampshire state legislature enacts a new, constitutional law. Such a result would still redress the harms about which the plaintiffs complain in this case. See M.S. v. Brown, 902 F.3d 1076, 1088 (9th Cir. 2018) (noting that "federal courts undoubtedly have the power to strike down existing laws as unconstitutional, even where doing so would require the enactment of a new law" (citing N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 87–88 (1982) (further citations omitted))).

For these reasons, the evidence in the record is sufficient to support all three prongs of the standing analysis with regard to Youth Movement. It has organizational standing to pursue Count I.

---

[9] Youth Movement challenges only HB 1569's elimination of the Qualified Voter Affidavit. Because the defendants make the same redressability argument about Open Democracy's claims regarding HB 1569's elimination of the Challenged Voter Affidavit in Counts II and III, the court's analysis here is equally applicable. The court need not revisit the argument during its discussion of the Challenged Voter Affidavit.

2.    Open Democracy

The defendants argue that Open Democracy does not have standing to assert Counts I, II, or III because the summary judgment record shows that HB 1569's elimination of the Qualified Voter Affidavit and the Challenged Voter Affidavit does not perceptibly impair Open Democracy's ability to provide its core services and, therefore, does not cause it to suffer any injury. As they were with Youth Movement, the defendants are wrong.

With regard to Count I and the challenge to the elimination of the Qualified Voter Affidavit, the defendants agree that Open Democracy's voter registration drives and educational materials are part of its core services to effectuate its mission of safeguarding political equality for the people of New Hampshire. Doc. no. 88-30 at 23. According to the defendants, evidence in the record shows that Open Democracy's only injuries related to the elimination of the Qualified Voter Affidavit are 56 staff hours devoted to updating its educational materials. Doc. no. 88-1 at 15-16. The defendants argue that these hours are insufficient to establish injury, particularly because Open Democracy must update its educational materials whenever there is a change in the law, as it did in 2020 during the COVID-19 pandemic.

Even if the effort to update the educational materials were insufficient, the defendants understate the evidence of Open Democracy's injuries. Evidence in the record shows that since HB 1569 eliminated the Qualified Voter Affidavit, Open Democracy has been able to help fewer high school students register to vote because the students did not possess qualifying documentary proof of citizenship despite Open Democracy's increased educational efforts. Doc. no. 88-30 at 23. Open Democracy has also been unable to assist many other voters through other voter outreach efforts (e.g. phone banks and community events), such as those who lost or lack access to documentary proof of citizenship. Id. at 24.

Open Democracy has also expended resources to address HB 1569's elimination of the Qualified Voter Affidavit, often at the expense of its other core activities. As the defendants acknowledge, Open Democracy spent about 56 hours of staff time to update its educational materials in response to HB 1569. Doc. no. 88-6 at 13. As a result, Open Democracy has redirected staff time from its other core activities, such as campaign finance reform efforts, to develop those new materials and increase its outreach programs in response to HB 1569's elimination of the Qualified Voter Affidavit. Id. at 18; doc. no. 88-30 at 28.

The defendants argue in their reply to the Open Democracy Plaintiffs' objection that the cited evidence of diversion of resources is insufficient to create a dispute of material fact because it does not identify a specific source of the diverted resources. Doc. no. 108 at 6 n.3. That argument is curious, as Open Democracy specifically pointed to evidence that it diverted resources that would otherwise have been spent on campaign finance reform efforts and securing fair districting maps. Doc. no. 88-6 at 18; doc. no. 88-30 at 28. The defendants acknowledge that those goals are two of Open Democracy's core missions. Doc. no. 88-1 at 21.

So, the defendants may take issue with the magnitude of Open Democracy's injuries from the elimination of the Qualified Voter Affidavit, but that is not relevant to the court's standing analysis. Giving Open Democracy all reasonable inferences, the evidence in the record shows that it has suffered a legally cognizable injury from the elimination of the Qualified Voter Affidavit. See, e.g., LULAC II, 2025 WL 3042704, at *15.

As for Counts II and III, the defendants do not challenge Open Democracy's injuries from the elimination of the Challenged Voter Affidavit. Even if they had done so, it would have been in vain. In its order denying the defendants' motion to dismiss the Open Democracy Plaintiffs' complaint, the court held that Open Democracy had sufficiently alleged an injury from the elimination of the Challenged Voter Affidavit. The court stated:

> [T]he elimination of the Challenged Voter Affidavit interferes with one of Open Democracy's core services—here, recruiting, training, and deploying poll observers and poll workers, some of whom help voters whose eligibility will be challenged at the polls. Without the Challenged Voter Affidavit, Open Democracy will need to recruit more poll observers and enhance their training to counteract the burden to challenged voters (Count II) and the related decline in protective procedures that voters have (Count III), further draining organizational resources. It will also need to shift volunteers who would otherwise serve as poll workers to serve as poll observers. Thus, the elimination of the Challenged Voter Affidavit affects and interferes with Open Democracy's core business activities.

Coal. for Open Democracy, 794 F. Supp. 3d at 41.

Evidence in the record shows that Open Democracy has indeed suffered these exact injuries. Though Open Democracy previously focused on college towns alone, since HB 1569 it has recruited and trained additional poll observers to ensure that there is a trained observer at each polling location in the state. Doc. no. 88-30 at 25, 28. It has further redirected staff time away from other organizational priorities, training and deploying volunteers as poll observers instead of poll workers. Id. at 28. In light of HB 1569's elimination of the Challenged Voter Affidavit, Open Democracy also ran its poll observing program in 2025, even though it typically ran its poll observing program only in even years. Doc. no. 88-6 at 18. Drawing all reasonable inferences in Open Democracy's favor, the organization has suffered an injury from HB 1569's elimination of the Challenged Voter Affidavit.

Similar to the court's analysis of Youth Movement's standing, the causation and redressability prongs as they apply to Open Democracy's claims require little discussion. There is a clear causal nexus between Open Democracy's injuries and HB 1569's elimination of the Qualified Voter Affidavit and Challenged Voter Affidavit. And the court has already addressed and rejected the defendants' arguments regarding redressability.

For these reasons, evidence in the record is sufficient to support all three prongs of the standing analysis with regard to Open Democracy. It has organizational standing to pursue Counts I-III.

### 3.    Remaining Organizational Plaintiffs

The defendants offer similar arguments regarding League of Women Voters and the Forward Foundation's standing to assert Count I. Specifically, they argue that there is no evidence in the record to show that HB 1569's elimination of the Qualified Voter Affidavit perceptibly impairs either plaintiff's core business activity and instead shows only a setback to abstract social interests. Once again, the defendants are wrong.

As the defendants agree, evidence in the record shows that League of Women Voters' core activities consist of "'Voter Services which includes voter information, candidate forums, answering voter's questions via social media, via e-mail, via phone calls or in person.'" Doc. no. 88-1 at 17 (quoting doc. no. 88-7 at 8). Giving the plaintiffs all reasonable inferences, evidence in the record shows that HB 1569 impairs League of Women Voters' ability to provide information to voters effectively. See, e.g., doc. no. 88-31 at 13-14 (discussing League of Women Voters' inability to advise prospective voters who lack access to documentary proof of citizenship as to how they can register to vote considering HB 1569's failure to provide guidance on the definition of "other reasonable documentation"). Evidence also shows that League of Women Voters has been required to redirect its staff and financial resources to increase its educational efforts in response to HB 1569's elimination of the Qualified Voter Affidavit, taking resources from its advocacy and education services related to other priorities. Id. at 20-21.

Evidence in the record establishes that the Forward Foundation has suffered similar injuries. The defendants acknowledge that the Forward Foundation's core activities include:

"voter education around voting rights, running a governance program that educates elected officials, [and] operating a legislative reform program that shares information about the barriers to serving in [New] Hampshire for working age people." Doc. no. 88-1 at 18-19. As with League of Women Voters, evidence in the record shows that HB 1569's elimination of the Qualified Voter Affidavit impairs the Forward Foundation's ability to educate voters. Doc. no. 88-32 at 25, 29-30 (discussing the Forward Foundation's difficulties educating voters for reasons similar to those faced by League of Women Voters). And the evidence in the record shows that, to respond to HB 1569, the Forward Foundation has diverted staff time from other priorities, such as its governance program, toward increasing its educational efforts. Doc. no. 88-8 at 22, 23; doc. no. 88-32 at 26. It also was forced to spend additional financial resources on voter education, outreach, and communications. Doc. no. 88-32 at 20; doc. no. 103-23; doc. no. 103-24.

In short, giving the plaintiffs all reasonable inferences, evidence in the record shows that League of Women Voters and the Forward Foundation have suffered legally cognizable injuries from HB 1569's elimination of the Qualified Voter Affidavit. And, as with the other Organizational Plaintiffs, the defendants' arguments regarding causation and redressability fail for the reasons discussed above.

### B.     The Individual Plaintiffs

The defendants argue that evidence in the record shows that none of the Individual Plaintiffs — Miles Borne, Alexander Muirhead, or Lila Muirhead — has standing to pursue their claim in Count I. Specifically, the defendants argue that evidence in the record shows that the Muirheads have not suffered and will not suffer a legally cognizable injury from HB 1569's elimination of the Qualified Voter Affidavit. They also argue that Borne does not have standing because his claim is moot.

1.    The Muirheads

Alexander and Lila Muirhead are minor citizens who live in New Hampshire. They will

each turn 18 before the end of 2026 and intend to register to vote as soon as they are eligible.

Because the Muirheads' claim is based on a future injury, there must be evidence in the record to

show that the threatened injury is certainly impending or there is a substantial risk that the harm

will occur. Reddy, 845 F.3d at 500.

In its order denying the defendants' motion to dismiss the Open Democracy Plaintiffs'

complaint, the court held that the Individual Plaintiffs had alleged an injury sufficient to confer

standing to assert Count I, which challenges HB 1569's elimination of the Qualified Voter

Affidavit. The court stated:

> Because HB 1569 eliminates the Qualified Voter Affidavit, each of the
> [Individual] Plaintiffs will need to produce documentary proof of citizenship to
> register. The defendants conceded at oral argument that "even just pulling" a
> documentary form of citizenship "out of your back pocket" can create an injury
> sufficient to establish standing. Further, because they intend to register to vote
> when eligible, the [Individual] Plaintiffs' injury is substantially likely to occur.

Coal. for Open Democracy, 794 F. Supp. 3d at 46 (citations omitted).

The defendants point to evidence in the record that the Muirheads know what documents

they need to possess to register to vote and do, in fact, possess those documents. Thus, they

argue, the Muirheads are not likely to suffer any harm from HB 1569's elimination of the

Qualified Voter Affidavit.

The defendants' argument fails because it ignores the court's prior holding denying the

defendants' motion to dismiss. That is, the requirement that the Muirheads must produce

documentary evidence to register to vote itself constitutes an injury sufficient to confer standing.

See Fish v. Schwab, 957 F.3d 1105, 1120 (10th Cir. 2020); Common Cause/Georgia v. Billups,

554 F.3d 1340, 1351-52 (11th Cir. 2009). Indeed, as the court noted, the defendants conceded

this very point at oral argument on their motions to dismiss. Coal. for Open Democracy, 794 F.
Supp. 3d at 46. Because the defendants do not dispute that there is evidence in the record to show
that the Muirheads will register to vote when they are able, the evidence in the record shows that
the Muirheads' injury from the implantation of HB 1569 is "certainly impending." It is sufficient
to confer standing for Count I.

> 2.     Miles Borne

The defendants argue that Borne does not have standing because his claim is moot.[10]
Specifically, evidence in the record shows that Borne has turned 18, registered to vote in 2025
with little difficulty, and does not intend to register to vote anywhere else.

Borne's circumstances "fit comfortably within the established exception to mootness for
disputes capable of repetition, yet evading review," which is routinely "appropriate" "in the
context of election cases." FEC v. Wisconsin Right To Life, Inc., 551 U.S. 449, 462–63 (2007)
(quoting Storer v. Brown, 415 U.S. 724, 737 n.8 (1974)); Lawrence v. Blackwell, 430 F.3d 368,
371 (6th Cir. 2005) ("Challenges to election laws are one of the quintessential categories of cases
which usually" are disputes "capable of repetition, yet evading review."); La Botz v. Fed.
Election Comm'n, 889 F. Supp. 2d 51, 59 (D.D.C. 2012) (noting that "[e]lectoral disputes are . . .
'paradigmatic' examples of cases that cannot be fully litigated before the particular controversy
expires" and that "[i]n the electoral context, many courts have concluded that a plaintiff need
only show that *others similarly situated* might suffer a comparable harm in the future"). Indeed,
courts "have applied the capable of repetition yet evading review exception to hear challenges to

---

[10] Although the defendants characterize their argument as a challenge to Borne's
standing, mootness is a concept distinct from standing. Friends of the Earth, Inc. v. Laidlaw
Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000). The court notes that distinction here for the
sake of clarity.

election laws even when the nature of the law made it clear that the plaintiff would not suffer the same harm in the future." Lawrence, 430 F.3d at 372 (citing cases).

For those reasons, Borne's claim in Count I is not moot, and the defendants are not entitled to summary judgment as to his claim.

II.    Merits

The defendants argue that even if Open Democracy has standing to assert Counts II and III, which allege that HB 1569's elimination of the Challenged Voter Affidavit violates voters' rights under the United States Constitution, the court should dismiss both counts because the claims are "wildly speculative." Doc. no. 88-1 at 38. The defendants point to what they describe as "ample safeguards to ensure no voter is erroneously prevented from voting based on a voter challenge." Id. They assert that the plaintiffs offer no evidence that the elimination of the Challenged Voter Affidavit has caused or will cause harm to any voter. Id. at 39, 40.

The defendants' arguments do not mention or grapple with the frameworks that govern Open Democracy's claims relating to the Challenged Voter Affidavit. Count II, which alleges that HB 1569's elimination of the Qualified Voter Affidavit constitutes an unjustifiable burden on the right to vote, is analyzed under the so-called Anderson-Burdick framework. See Anderson v. Celebrezze, 460 U.S. 780 (1983); Burdick v. Takushi, 504 U.S. 428 (1992). Anderson-Burdick requires the court to "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed.'" Common Cause Rhode Island v. Gorbea, 970 F.3d 11, 14 (1st Cir. 2020) (per curiam) (quoting Anderson, 460 U.S. at 789); see Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 190 (2008).

The defendants appear to argue that the court can skip the <u>Anderson-Burdick</u> analysis entirely, rendering their justification for HB 1569's elimination of the Challenged Voter Affidavit irrelevant. That is so, they argue, because the evidence purportedly shows that HB 1569's elimination of the Challenged Voter Affidavit could not possibly cause even the slightest injury to a single voter's rights, such that the court would be required to weigh the defendants' "precise interests." That contention is not supported by the record. Indeed, the evidence shows that prospective New Hampshire voters, particularly college students, have been challenged several times in the past. Doc. no. 103-8 at 22-23; doc. no. 103-12 at 100. Moreover, the New Hampshire Attorney General's Office acknowledged that the Challenged Voter Affidavit "operated as a safeguard against the erroneous deprivation of [a] voter's voting rights." Doc. no. 103-10 at 78. The defendants do not point to any evidence establishing how many times a moderator has determined that it is more likely than not that a challenge to a voter's qualifications is well grounded, whether or how often voters have used the Challenged Voter Affidavit in the past, or whether only illegitimate voters have availed themselves of the option to submit a Challenged Voter Affidavit.

In short, the defendants ask the court to draw the conclusion that their "ample safeguards" establish that it is impossible for any eligible voter to be deprived of her right to vote due to a challenge at the polls, despite the elimination of the Challenged Voter Affidavit. Particularly considering the defendants' failure to point to any evidence that the "safeguard" of the Challenged Voter Affidavit was unnecessary, the court declines to do so and is unable to do so considering the standard on summary judgment.

The defendants' argument fares no better as to Open Democracy's procedural due process claim in Count III. To prevail on its due process claim, Open Democracy must first "identify a protected liberty or property interest" and second, show that the defendants "deprived

[them] of that interest without constitutionally adequate process."[11] González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (quotation omitted); Swarthout v. Cooke, 562 U.S. 216, 219 (2011). Viewed generously, the defendants' argument appears to be that the evidence in the record conclusively shows that they have offered a constitutionally adequate process for any challenged voter. That is not the case. For largely the reasons discussed in the court's order denying the defendants' motion to dismiss the Open Democracy Plaintiffs' complaint, giving the plaintiffs every reasonable inference, there is a dispute of fact as to whether HB 1569 leaves in place adequate due process protections for voters in spite of the elimination of the Challenged Voter Affidavit. See Coal. for Open Democracy, 794 F. Supp. 3d at 50-51.

Conclusion

For the foregoing reasons, the court denies the defendants' summary judgment motion (doc. no. 88).

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

February 6, 2026

cc: Counsel of Record.

---

[11] The defendants have indicated to the court that they intend to argue at trial that the Anderson-Burdick framework should also govern Open Democracy's procedural due process claim in Count III. See doc. no. 124 at 3 (citing Ariz. Democratic Party v. Hobbs, 18 F.4th 1179, 1195 (9th Cir. 2021)). They do not make that argument in their summary judgment papers, and so the court analyzes the argument under the traditional procedural due process framework. To the extent that the defendants are correct that the court should apply to Count III the Anderson-Burdick framework, summary judgment would still be inappropriate for the reasons already explained.