UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

New Hampshire Youth Movement

    v.

David M. Scanlan, in his official capacity
as New Hampshire Secretary of State

Case No. 24-cv-291-SE
Opinion No. 2026 DNH 062 P

_____

Coalition for Open Democracy et al.

    v.

David Scanlan, in his official capacity
as New Hampshire Secretary of State et al.

## O R D E R

Though this case questions the constitutionality of two facets of New Hampshire's voting

scheme as it was redefined by 2024 New Hampshire House Bill 1569 (HB 1569), it is important

to understand what it does not question. The court is not deciding in this case whether it is

constitutional for New Hampshire to require voters to prove their citizenship in order to register

to vote. For many years, New Hampshire voters have been required to prove their citizenship.

After this order goes into effect, New Hampshire voters will still be required to prove their

citizenship. Instead, this case questions, in part, whether it is constitutional to remove one of the

methods previously available for proving citizenship—an affidavit swearing to the voter's

citizenship under penalties of voter fraud. It may be tempting for some to describe the Qualified

Voter Affidavit as an exception to the proof-of-citizenship requirement, but it is not. A sworn

affidavit capable of exposing an affiant to criminal prosecution is a method of proving

citizenship and not an exception to that requirement. Moreover, the evidence shows that it is the only method of proof available to a significant number of New Hampshire voters. It is not the court's role to decide matters of voting policy, but rather the ultimate issue the law places before the court on this claim is whether the state's precise interests in eliminating the Qualified Voter Affidavit reasonably justify the weight of the burden that decision imposes on voters' rights.

Prior to November 11, 2024, the effective date of HB 1569, it was more difficult to register to vote or to cast a ballot in advance of election day in New Hampshire than it was in most states. But New Hampshire offset those restrictions, to an extent, by offering election day registration, which allowed eligible New Hampshire voters to both register and vote on election day.

When HB 1569 took effect, it left in place New Hampshire's general voting scheme, including its restrictions, but it also made two significant changes that made it even more difficult for eligible voters in New Hampshire to register and cast a ballot. First, it removed the Qualified Voter Affidavit. Second, it eliminated a second affidavit that had acted as a procedural safeguard. The Challenged Voter Affidavit had also allowed voters to attest to their qualifications to vote under the penalties of voter fraud, but in a different circumstance—if their qualifications to vote were "successfully"[1] challenged by other people.

The New Hampshire Secretary of State, David Scanlan, and the office of the New Hampshire Attorney General, John Formella, concede that these changes will disenfranchise certain eligible voters. Nonetheless, lawmakers who supported HB 1569 offered as justification what has become a familiar refrain: the restrictions were necessary to combat voter fraud and

---

[1] A successful challenge means that a local supervisor of the checklist or a moderator has deemed the challenge "more likely than not . . . . well grounded."

ensure election integrity.[2] Those claims were curious, especially because the lawmaker who

sponsored the bill and the governor who signed it into law both said that they did not believe

voter fraud was an issue in the state. Still, and despite local election officials raising concerns

about the anticipated effect of the bill, then-New Hampshire Governor Chris Sununu signed HB

1569 into law. Almost immediately, multiple people and organizations filed cases challenging

the law.

In this consolidated action, several plaintiffs bring suit under 42 U.S.C. § 1983 against

the New Hampshire Secretary of State and the New Hampshire Attorney General seeking a

declaratory judgment that the provisions of HB 1569 eliminating the Qualified Voter Affidavit to

prove citizenship and the Challenged Voter Affidavit to overcome a successful challenge violate

the United States Constitution.[3] The plaintiffs challenging HB 1569's elimination of the

Qualified Voter Affidavit to prove citizenship include four voting rights and advocacy

organizations, Coalition for Open Democracy (Open Democracy), League of Women Voters of

New Hampshire (League of Women Voters-NH), the Forward Foundation, and New Hampshire

Youth Movement (Youth Movement) (together, the Organizational Plaintiffs), and three

individuals, Miles Borne, Alexander Muirhead, and Lila Muirhead (together, the Individual

---

[2] As discussed further below, the defendants offered at trial additional state interests that they claim justify eliminating the Qualified Voter Affidavit and the Challenged Voter Affidavit.

[3] Voters could previously use the Qualified Voter Affidavit for purposes other than to prove citizenship, such as to prove their age or domicile. Similarly, voters could previously use the Challenged Voter Affidavit for purposes other than to overcome a successful challenge, such as to prove identity. Unless otherwise specified, any time the court discusses the elimination of the Qualified Voter Affidavit or the Challenged Voter Affidavit herein, it means only the elimination of the Qualified Voter Affidavit to prove citizenship and the elimination of the Challenged Voter Affidavit to overcome a successful challenge.

Plaintiffs).[4] Open Democracy is the only plaintiff remaining in this case who is challenging HB 1569's elimination of the Challenged Voter Affidavit. The plaintiffs also seek injunctive relief barring state officials from implementing the challenged provisions, as well as fees and costs.

After a nine-day bench trial, the court issues its Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). As explained below, HB 1569's eliminations of the Qualified Voter Affidavit and the Challenged Voter Affidavit significantly burden eligible New Hampshire voters' rights to vote. Eliminating those affidavits does little, if anything, to further the state's interests. Therefore, eliminating the affidavits constitutes an unjustifiable burden on the right to vote in violation of the First and Fourteenth Amendments. Eliminating the Challenged Voter Affidavit further violates voters' rights to procedural due process. Therefore, the provisions of HB 1569 eliminating those affidavits are unconstitutional, and the defendants are permanently enjoined from implementing or enforcing those provisions.

The court also addresses below the plaintiffs' request for sanctions as the result of the defendants' discovery violations.

<u>Findings of Fact</u>

The plaintiffs offered three experts at trial, each of whom authored at least one expert report and testified. The experts were 1) Dr. Kenneth Mayer, who opined on HB 1569's effects on New Hampshire elections, and particularly the effects of the elimination of the citizenship

---

[4] Youth Movement instituted one of the actions. <u>See</u> <u>New Hampshire Youth Movement v. Scanlan</u>, No. 24-CV-291-SE (D.N.H. 2024). The remaining plaintiffs (Open Democracy Plaintiffs) filed the other action. <u>See</u> <u>Coal. for Open Democracy et al. v. Scanlan et al.</u>, No. 24-CV-312-SE (D.N.H. 2024). After ruling on the defendants' motions to dismiss in each case, the court consolidated what remained of the cases.

Qualified Voter Affidavit and the elimination of the Challenged Voter Affidavit to overcome a voter challenge; 2) Dr. Lorraine Minnite, who analyzed the incidence of voter fraud generally and in New Hampshire, the incidence of noncitizen voter fraud in New Hampshire, and whether HB 1569's removal of the affidavits will have a meaningful impact on preventing voter fraud in New Hampshire; and 3) Dr. Michael Herron, who analyzed the burdens that HB 1569's elimination of the Qualified Voter Affidavit imposes on eligible New Hampshire voters.

The defendants moved to exclude each expert's opinion prior to trial. Doc. nos. 92, 93, 94. The court denied each motion without prejudice and the defendants did not renew their motions during or after trial. The court finds the testimony of the plaintiffs' three experts, each of whom has been found qualified as an expert and offered expert testimony in at least 10 election-related cases, highly credible and credits it where appropriate and noted herein.

The court also notes that the defendants disclosed Secretary Scanlan and the Attorney General's office's Chief Investigator, Richard Tracy, as experts in this case. See doc. no. 99-4. However, the defendants ultimately offered at trial only testimony from Secretary Scanlan and Investigator Tracy in their personal capacities. The defendants offered no expert opinion or testimony in this case.

## I.     New Hampshire's Voting Regime Before HB 1569

### A.     Registering to Vote

Prior to November 11, 2024, the effective date of HB 1569, New Hampshire already had one of the strictest voting regimes in the country and, consequently, one of the highest "costs of voting" in the country. Doc. no. 155, Trial Tr. at 96:22-100:20 (explaining the participation and information costs ("costs of voting") that prospective voters balance against instrumental and

expressive benefits ("benefits of voting") when deciding whether to vote); Ex. 15 at 32-33 (discussing 2022-2024 studies finding New Hampshire voting schemes imposed the first, second, fourth, and sixth highest cost of voting in the nation). It was one of four states that did not offer early, in-person voting. Except in special circumstances, it did not allow voters to register by mail or online, the latter of which is available in 42 states and Washington D.C. New Hampshire also did not permit provisional balloting, automatic voter registration, third-party registration or third-party voter registration drives,[5] or voter registration at offices of the state's Division of Motor Vehicles.

Unlike many states, however, New Hampshire did allow prospective voters to register to vote on election day. And voters often took advantage of that opportunity—347,199 New Hampshire voters registered to vote on election day in general elections and 175,856 voters registered on election day in primary elections between 2016 and 2024. Looking more recently, more than two-thirds of registrants between April and November 2024 registered on election day.

It is broadly recognized that offering election day registration decreases the cost of voting. Relying on that benefit, New Hampshire is one of only six states exempt from the requirements of the National Voter Registration Act of 1993. See 52 U.S.C. § 20503(b)(1)-(2) (exempting states that, continuously since August 1, 1994, with respect to an election for Federal office, impose no voter registration requirement for any voter and those that allow election day registration). If it were subject to the NVRA, New Hampshire would be required to make it

---

[5] As discussed further below, certain Organizational Plaintiffs hold or plan to hold high school voter registration drives. These drives are possible only when the organizations bring local election officials to effectuate student registrations.

easier for people to register to vote and maintain their registrations in a number of ways, including by offering the opportunity to: register to vote at the DMV when people apply for or renew a driver's license, id. § 20503(a)(1); register to vote at all offices that provide public assistance or provide state-funded services to people with disabilities, id. § 20506(a)(2)-(3); and register to vote by mail, id. § 20503(a)(2). New Hampshire would also be required to permit provisional ballots from voters who declare that they are registered and eligible to vote, even if their names do not appear on the voting lists or an election official asserts that they are ineligible to vote. See 52 U.S.C. § 21082(a) (The Help America Vote Act requiring states to allow provisional ballots, except states exempt from the NVRA under 52 U.S.C. § 20503(b)).

In addition, New Hampshire removed voters that it deemed inactive from its voter rolls every 10 years, in each year ending in 1. An inactive voter was a registrant who had not voted in the previous four years and did not respond to a written notice within 30 days. New Hampshire removed more than 195,000 voters from its voter rolls in 2021.

A person is qualified to vote in New Hampshire if he is a resident of the state, a United States citizen, 18 years or older on the date of the election, and domiciled in the jurisdiction in which he intends to cast a ballot. Prior to HB 1569, N.H. Rev. Stat. Ann. (RSA) § 654:12 permitted applicants to submit "as proof of citizenship: the applicant's birth certificate, passport, naturalization papers if the applicant is a naturalized citizen, a qualified voter affidavit, a sworn statement on the voter registration form used starting 30 days before an election and on election day, or any other reasonable documentation which indicates the applicant is a United States citizen." Ex. AAA1 at 33 (quoting RSA 654:12, I(a) (effective through Nov. 10, 2024)) (emphasis added). In other words, prior to HB 1569, an individual who sought to register to vote could prove his citizenship by either providing documentary proof of citizenship (DPOC) or

7

completing a Qualified Voter Affidavit (QVA), in which the applicant swore "under the penalties for voting fraud" that he was qualified to vote. Id.

Although New Hampshire's prior voting registration system did not accurately track voters' use of the QVA to prove citizenship, its Statewide Voter Registration System (SVRS) did track such use beginning with its implementation in April 2024. The available data shows that a substantial number of voters used QVAs to prove citizenship between April 29, 2024, and November 10, 2024, the day before HB 1569 went into effect.

Specifically, data from the SVRS shows that 10.2% of all voter registrants in New Hampshire during that time period, 14,737 voters, relied on QVAs to prove their citizenship. Registrants between the ages of 17 and 24 made up 5,956 of those 14,737 voters, which represents 17.18% of all registrants in that age group during that timeframe.

Dr. Mayer concluded that the overwhelming majority of voter registrants who used a QVA to prove citizenship between April 29, 2024, and November 10, 2024—14,306 out of 14,737 voters—were first-time registrants. That number represents 16.8% of first-time registrants during that timeframe.[6]

The majority of the registrants who used QVAs to prove citizenship between those dates did so during election day registration. SVRS data shows that 10,467 of the 14,737 voters who used QVAs to prove their citizenship did so on November 5, 2024, the day of the general

---

[6] There was some confusion during Dr. Mayer's testimony and in certain parties' proposed findings of fact as to whether Dr. Mayer's opinion on this point concerned all voter registrants who used a QVA to prove citizenship between April 29, 2024, and November 10, 2024, or only first-time registrants. Although his initial testimony was somewhat unclear, he later clarified that this portion of his testimony concerned first-time registrants. Doc. no. 150, Trial Tr. at 140:3-143:7. That clarification is consistent with Dr. Mayer's expert report. See Ex. 18 at 22-23 & n.68 (stating that the 16.8% figure "does not include voters who had registered prior to 4/29/2024").

election. That figure represents 11.44% of the voters who registered that day. Another 387 voters used QVAs to prove citizenship on September 10, 2024, the day of the state primary election. That figure represents more than 6% of the voters who registered that day.

In certain towns, those numbers are much higher. For example, according to Ann Shump, a supervisor of the checklist in the town of Durham—New Hampshire's largest college town— more than half of the same-day registrants at state and federal elections there have historically lacked DPOC and relied on QVAs to prove their citizenship for the purpose of registering and voting.

B.      Challenging Registered Voters' Eligibility

RSA 659:27 permits any registered voter of the same town or ward, election official, challenger appointed in writing by a political party committee, or the New Hampshire Attorney General to challenge the right of any voter to cast a ballot in an election. To initiate a challenge, the challenger must complete an "Asserting a Challenge" form, sign it, and swear it under oath and the penalties of perjury.

If the challenge concerns the voters' age, citizenship, domicile, or identity, the supervisors of the checklist determine whether the challenged voter is qualified to vote notwithstanding the challenge.[7] See RSA 659:27-a. The moderator decides challenges based on any other ground. Id.

---

[7] Before HB 1569, RSA 659:27-a provided that the supervisors decided challenges based on age, citizenship, or domicile only. See Ex. AAA1 at 44-45. The operative version of RSA 659:27-a now provides that the supervisors also decide challenges based on identity.

Upon receiving a challenge to a voter's qualification, the supervisors or moderator must determine if it "is more likely than not that the challenge is well grounded." If the supervisors or moderator determines that the challenge is not well grounded, the challenged voter is permitted to cast a ballot.

Prior to HB 1569, if the supervisor or moderator deemed a challenge well grounded, RSA 659:27 permitted the challenged individual to vote if he completed a Challenged Voter Affidavit (CVA), swearing or attesting to his eligibility to vote under penalties of voter fraud. See Ex. AAA1 at 43.

CVAs had other uses as well. Specifically, if a voter arrived at the polling location without valid photo identification, the voter could execute a CVA and obtain a ballot. Absent a religious objection, the moderator or designee would take a photograph of the voter and attach it to the CVA, which allowed the Attorney General's Election Law Unit to verify the voter's identity after the election.

Although voters have used CVAs regularly to overcome New Hampshire's requirement that voters present valid photo identification at the polls, there is no evidence that any voter ever used a CVA to overcome another person's challenge to his eligibility to vote. In fact, there is no evidence that any voter ever formally challenged another voter's eligibility pursuant to RSA 659:27. Instead, there have been incidents of informal challenges to the eligibility of certain groups of voters, mostly in the form of attempted intimidation outside polling places. Such instances include "mass challenges" against voters in the November 2024 election. Doc. no. 161, Trial Tr. at 20:5-8. The Attorney General's office became aware of the challenges ahead of the election and advised local election officials that the challenges were not well grounded. Id. at 20:9-15.

10

C.        State Assistance with Elections

Secretary Scanlan is a constitutional officer and the state's chief elections officer. Attorney General Formella is the state's chief legal officer and is responsible for enforcing New Hampshire law, including the state's election laws. Both before and since HB 1569's effective date, the Secretary's office and the Attorney General's office have provided assistance to local election officials and voters who encountered difficulties with the voter registration and election processes. The Elections Division of the Secretary's office operates an Election Help Desk, which election officials can contact regarding any issues. The Help Desk's regular hours are Monday through Friday, 8:00 to 4:30, but these hours are extended on election days. Additional staff, including attorneys from other divisions within the Secretary's office, assist the Elections Division and answer phones on election day. There are five individuals in the Secretary's office who are trained to conduct the statewide SVRS searches that might be necessary to answer the inquiries.

The Attorney General's Election Law Unit provides support to the general public and election officials through an Election Law Hotline. The Hotline can receive calls anytime. It received 2,087 inquiries between June 2023 and June 2025. Some calls to the Secretary's Help Desk are also referred to the Election Law Unit. On state and federal general election days, the Election Law Unit staffs the Hotline with attorneys and investigators, sometimes up to eight or nine individuals, though only three of them are trained to conduct statewide SVRS searches. The number for the Hotline is listed on signs at every polling location in New Hampshire, publicized on the Election Law Unit's website and press releases, and is included in official election trainings. It is not clear how frequently the Election Law Unit provides trainings to election workers, or whether the trainings it offers are mandatory.

11

II.      HB 1569

Representative Bob Lynn sponsored HB 1569. During comments on the bill, Representative Lynn acknowledged that New Hampshire's then-existing system to verify voter qualifications did not lead to significant, if any, voter fraud. Specifically, he stated, "Do I think there's a huge issue of voter fraud in New Hampshire? No. I don't because I think if there was, we would know about it." Similarly, then-New Hampshire Governor Chris Sununu expressed confidence in New Hampshire's voter verification system, agreeing that it "works very well right now" and stating that he was not looking to make any changes.

Nevertheless, the New Hampshire House of Representatives passed HB 1569 on March 14, 2024. The New Hampshire Senate passed the bill on May 23, 2024. On September 12, 2024, then-Governor Sununu signed HB 1569 into law, and it went into effect on November 11, 2024. HB 1569 either amended, repealed, or repealed and reenacted several laws governing New Hampshire elections. Ex. AAA1.

A.      Elimination of the QVA to Prove Citizenship

HB 1569 repealed and reenacted RSA 654:12, the law that provides the requirements for an applicant registering to vote. Whereas the prior version of RSA 654:12 allowed a registrant to prove his citizenship by providing DPOC or submitting a QVA, the reenacted version of the law removed the QVA from the list of permissible proofs of citizenship. As reenacted, RSA 654:12 permitted registrants to establish citizenship only through "the applicant's birth certificate,

12

passport, naturalization papers if the applicant is a naturalized citizen, or any other reasonable documentation which indicates the applicant is a United States citizen."[8] Ex. AAA1 at 36.

As mentioned, a significant number of voters have used the QVA to prove their citizenship when registering to vote. The court concludes from the evidence at trial that they did so because many New Hampshire voters either do not possess DPOC or do not have quick access to it. Survey data shows that approximately 38% of U.S.-born eligible New Hampshire voters do not possess a passport and approximately 1% of U.S.-born eligible New Hampshire voters do not possess a birth certificate. Another 2% of New Hampshire voters have a birth certificate that does not match their current name and do not have a marriage license that could prove their name change. The plaintiffs' expert, Dr. Michael Herron, offered a conservative estimate that between 5,433 and 31,291 eligible New Hampshire voters do not possess acceptable DPOC at all. That figure rose as high as 59,583 if he assumed that people who report that they "don't know" whether they have DPOC in fact do not possess such documentation. He further estimated that even of those eligible New Hampshire voters who do possess some form of DPOC, between 89,934 and 153,213 cannot retrieve their documents within one day. For example, Kara Montagano, a recent college graduate and former Youth Movement hub coordinator at Keene State College, testified that she saw many students who kept their documentation in their parents' homes and could not access it within a day. Doc. no. 154, Trial Tr. at 15:24-16:10. Other young voters, such as Tess Sumner who testified at trial, keep their DPOC in a safe at their parents' home, and they cannot access those documents without their parents' assistance. Id. at

_____

[8] As discussed below, the legislature subsequently amended RSA 654:12 in 2025 to permit proof of a registrant's prior or current registration in a different town or ward as proof of citizenship. Ex. AAA2 at 12.

31:1-25. Further, an estimated 17,967 to 53,826 eligible voters could not retrieve their DPOC even if allowed multiple days to do so.

Even voters who possess and have ready access to DPOC rarely carry it with them. Survey data shows that only approximately 11% of eligible voters in New Hampshire who possess a passport and approximately 7% of eligible voters in New Hampshire who possess a birth certificate carry those documents with them regularly.

Like its predecessor version, the current version of RSA 654:12 does not define the term "other reasonable documentation." New Hampshire election officials have no consistent understanding of what "other reasonable documentation" of citizenship includes, or even what standard applies to determine what qualifies as "other reasonable documentation." Indeed, the Secretary's office has issued conflicting guidance. Initially, the Secretary's guidance after HB 1569 took effect stated that the standard was whether the documentation established that it "is more likely than not" that the registrant is a citizen. Ex. 209 at 2; Ex. 210 at 2. But the Secretary's later guidance removed the more-likely-than-not standard and provided only that the other reasonable documentation must "indicate[] you are a United States citizen." Ex. 211 at 2. Not only is the standard shifting, but also shifting is its application to known forms of documentation. In response to a question from an election official, the Secretary advised in his initial guidance that Global Entry cards are not acceptable proof of citizenship. Ex. 168 at 11-12. But the Secretary now states that Global Entry cards are acceptable proof of citizenship, though, at the time of trial, his office had not updated its guidance to local election officials to reflect this changed analysis. Doc. no. 164, Trial Tr. at 26:22-27:5.

Also at trial, various election officials offered contradictory responses as to whether they would accept certain documentation as proof of citizenship. They disagreed, for instance, about

14

whether an expired passport constitutes other reasonable documentation of citizenship and, if so, whether its acceptability depends on its date of expiry and what that limit is. The Election Director for the Secretary of State, Patricia Piecuch, testified that she would not know and would need to seek legal advice before answering if a local official asked her on election day what standard he should apply and whether a document not already listed as acceptable constituted other reasonable documentation of citizenship.

Opponents of HB 1569, including many local election officials, had concerns that eliminating the QVA would lead to delays and would prevent certain eligible voters from registering to vote because they could not prove their citizenship. The 2025 elections bore out those concerns. Although the Secretary's office and the Attorney General's office did not attempt to track the effect of eliminating the QVA in those elections, the Secretary's office is aware that several voters were unable to register to vote because they arrived without DPOC, and at least some of them did not return to vote after they were turned away.

The New Hampshire Campaign for Voting Rights (NHCVR), a nonpartisan organization, monitored HB 1569's effect on the March 2025 municipal elections by recruiting observers for as many polling places as possible. Sarah Chouinard, the voting rights manager at NHCVR, testified that the organization tracked at least 49 voters turned away from the March 2025 municipal elections specifically because they lacked DPOC, and an additional 55 voters turned away from those elections for reasons that NHCVR was unable to confirm. NHCVR was further unable to confirm how many of those voters who were turned away were able to return later and vote. NHCVR also sought to track voters turned away from the May 2025 town elections, during which at least seven voters were not allowed to register, and city elections in September through

November 2025, from which at least 90 voters were turned away, "overwhelmingly" because they lacked DPOC. Doc. no. 154, Trial Tr. at 151:2-11.

These voters' circumstances varied. NHCVR tracked several instances of first-time voters seeking to register who did not bring their birth certificates with them and were turned away because they did not have DPOC. NHCVR also tracked four individuals, all women, who during the March 2025 elections were not allowed to register because they did not possess name-change documentation to prove that they were the person reflected on their citizenship documents. Although the NHCVR published its findings, held press conferences with affected voters, and received coverage in various publications, the Secretary's office did not contact the organization regarding its observations.

Ms. Chouinard and former Election Law Unit Chief and current Deputy Secretary of State Brendan O'Donnell offered testimony about Earl Rinker III, an 89-year-old man who had moved from one voting ward in Manchester to another, attempted to vote in the September 2025 primary and was initially turned away because he did not bring proof of domicile. He went home and returned to the polling location with his proof of domicile but was then told that he also needed documents to prove his citizenship. Mr. Rinker explained that he was a former ward clerk in Manchester and had been voting in New Hampshire for over 70 years. He was turned away again. After Mr. Rinker subsequently contacted the Hotline, Investigator Tracy and Deputy O'Donnell were able to confirm his prior registration status. They then reached out to the local election officials who had not allowed Mr. Rinker to vote and told them that they should accept

16

his prior registration status as proof of citizenship if he returned to the polling location to vote. Mr. Rinker did not return.[9]

Local election officials and observers also testified regarding their personal observations of would-be voters who were not allowed to register during the 2025 municipal elections because of HB 1569. Supervisor Shump testified that in Durham, of the six voters who sought to register on the day of the March 2025 municipal election, only two brought DPOC with them. Although three were eventually able to register, one voter—a high school student accompanied by his classmates who were there to observe his registration—was turned away because he did not have DPOC and never returned to vote. Supervisor Shump testified that this was the only time in her 20 years of service that she has ever had to turn away a voter who claimed to be a citizen because the voter did not bring citizenship documentation to the polls.

In the April town meeting in Conway, Olivia Zink, Open Democracy's executive director, personally observed four individuals who were not allowed to register because they did not present DPOC, only two of whom ultimately returned. During the March town elections, Ms. Zink traveled to multiple polling locations to observe, including a location in Andover where there had been reports of six students from Colby Sawyer College who were turned away and not able to register to vote. And in a later election, she observed one voter in Keene who, unable to confirm their past registration status with the Secretary of State's online database and with the assistance of the town clerk after 15 minutes, said they would "try to come back after work."

---

[9] The defendants objected to Ms. Chouinard's testimony concerning Mr. Rinker on hearsay grounds but subsequently offered Deputy O'Donnell's testimony regarding Mr. Rinker's circumstances.

Doc. no. 143, Trial Tr. at 50:7-9. Ms. Zink stayed at the polling location the entire day as an observer, and the voter never returned.

During Bethlehem's March 2025 town meeting, Bethlehem officials were approached by an individual who wanted to register but lacked DPOC. Julie Seely, one of Bethlehem's supervisors of the checklist, observed that when the prospective registrant was told that he must provide DPOC, he stated that he would search for it and return to register. The voter did not return that day.

During Concord's November 2025 election, supervisor of the checklist Katherine Robert observed election officials turn away a recently divorced woman who had changed her name back to her maiden name, and the "voter rolls still had her married name." Doc. no. 145, Trial Tr. at 62:8-20. The election officials asked the voter if she had any documents including "anything electronic on her phone that she could pull up that would have showed that that divorce was final, and the name was changing." Id. at 62:24-63:2. The voter was unable to produce any such documents and was turned away. The voter was encouraged to return to the polling location if she could find the paperwork, but she did not return.

Director Piecuch testified that the Secretary's office instructs election officials to contact the Attorney General's Hotline before they refuse to allow an individual to vote. Despite the evidence of voters who were not permitted to register during the 2025 elections, there was no evidence that any election official contacted the Attorney General's office before turning away any voter.

The record evidence does not represent the full panoply of New Hampshire voters who were unable to register to vote in an election in 2025 because they did not possess DPOC. The state did not track those numbers and the myriad voting organizations gathered incomplete data.

18

For example, NHCVR was able to recruit observers for only approximately 20 polling locations out of more than 100 towns in which elections were held in March 2025, and the number of hours covered by observers varied by polling place. Based on the testimony and evidence presented at trial, the court can reasonably conclude that additional New Hampshire voters were unable to register to vote during the 2025 elections because they did not possess DPOC when they attempted to register.

Many fewer voters turn out or seek to register during municipal elections like those held in 2025 than do so during state and federal elections. To appreciate the difference in scale, one need only review the testimony that six new voters sought to register on election day in the March 2025 Durham municipal election, whereas about 2,500 new voters registered on election day in the November 2024 federal election in that town, more than 1,000 of whom used a QVA to prove their citizenship. Doc. no. 152, Trial Tr. at 61:10-19; doc. no. 155, Trial Tr. at 81:25-82:8. And multiple witnesses acknowledged that voters in state and federal elections generally tend to be less likely to understand or able to navigate the voter registration requirements because voters who participate in municipal and other local elections tend to be more highly motivated and informed.

HB 1569 has not only affected election day registration. Voters have also been turned away from registering in other contexts since HB 1569 took effect. In October 2025, election officials in Bethlehem rejected registration applications from three voters who "were women who used birth certificates with their maiden names." Doc. no. 153, Trial Tr. at 28:12-19. These three women were eventually able to register to vote in January 2026 by providing their birth

19

certificates and marriage licenses.[10] Also in October 2025, SangYeob Kim, a naturalized citizen and attorney, was not allowed to register to vote despite presenting a United States passport to prove his citizenship. The town clerk incorrectly told him that he was required to present his naturalization papers in addition to his passport. Kim's colleague, also an attorney, later contacted Deputy O'Donnell. A few days later, Deputy O'Donnell clarified that Kim was correct and needed nothing more than his United States passport to prove his citizenship. Kim successfully registered to vote months later.

        B.          Elimination of the CVA to Overcome a Successful Challenge

HB 1569 also eliminated the CVA procedure for resolving challenges to a voter's eligibility. The bill repealed the version of RSA 659:27 that permitted a person to vote after a successful challenge if he completed and swore to a CVA. See Ex. AAA1 at 43. HB 1569 reenacted a modified version of 659:27, which now provides that if "the moderator determines that it is more likely than not that the challenge is well grounded, the moderator shall not receive the vote of the person so challenged."

HB 1569 also repealed and reenacted a modified version of RSA 659:27-a, which sets forth the procedures for a challenge to a voter's eligibility. Among other changes, the reenacted version of RSA 659:27-a eliminated the following sentence: "If it is ruled that the voter is not qualified or that the challenge is well grounded, the challenged person may vote only if he or she completes and swears to a challenged voter affidavit." Ex. AAA1 at 45. The revised version of

---

[10] Two of these women were both born and married in Massachusetts, and so Massachusetts issued their birth certificates and marriage licenses. As discussed below, these circumstances are relevant to HB 1569's effect on voters in light of subsequent legislation.

20

RSA 659:27-a replaced that sentence with the following language: "Before ruling on the challenge, the moderator shall give the challenged voter an opportunity to be heard. A person aggrieved by the moderator's decision on a voter challenge may obtain immediate review of the decision in the superior court pursuant to RSA 654:12, V."

Deputy O'Donnell testified that both the Secretary's office and the Election Law Unit have advised election officials that if any voter might be turned away or challenged, officials should reach out to the Attorney General's office before making a determination. That direction is not included in any written guidance, however, and local election officials are responsible for the ultimate decision on any challenge.

Supervisor Shump testified that party-appointed challengers are a common occurrence at the polls in Durham. Ms. Zink testified that since HB 1569 went into effect, Open Democracy has seen social media posts and other efforts to recruit challengers for the polls on election day, including from political party committees. Supervisor Shump also testified that, in her experience, voters who are already registered are unlikely to bring a birth certificate or passport with them when they go to vote, making it more difficult to overcome a challenge now that they cannot complete a CVA.

Regarding a voter's right to seek review in New Hampshire Superior Court, all polling locations in New Hampshire are required to post a "purity of elections" poster that states that a "voter not allowed to vote as a result of the determination of the supervisor of the checklist may take an immediate appeal to the superior court as provided in RSA 654:12, V." Ex. KK5 at 1. With assistance from the Secretary's office or the Attorney General's office, certain superior courts have election-day docket procedures, which may include having a standby judge or a designated WebEx courtroom, in order to facilitate faster disposition of election-related matters.

21

The filing fee for a civil action in superior court is $325. See

https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-

06/filing_fees_superior.pdf. There is no categorical fee waiver for cases involving voter

challenges.

III.    HB 464

On August 1, 2025, after this litigation began, Governor Kelly Ayotte signed into law

2025 House Bill 464 (HB 464). HB 464 amended or modified certain of HB 1569's provisions.

For example, HB 464 amended RSA 654:12 to state that supervisors and clerks may now accept

as proof of the applicant's citizenship "proof that the applicant was previously or is currently

registered to vote in a different town or ward in New Hampshire." RSA 654:12, I(a). HB 464

also added the following language to RSA 654:12:

> The department of state shall provide access to data from centralized voter
> registration records, records from the department of safety, and New Hampshire
> vital records provided in accordance with RSA 654:45 to assist voters in
> providing proof of citizenship, age, domicile, and identity to the city and town
> clerks. The secretary of state shall work with the city and town clerks to ensure
> access on election day at the polling location. If proof of age, citizenship,
> domicile, or identity information of a voter is provided pursuant to this section, it
> shall satisfy that registration requirement for that qualification. Absence of data
> shall not disqualify a person. It shall be the applicant's responsibility to provide
> appropriate additional proof of their qualifications as required by this chapter.

RSA 654:12, VI.

HB 464's amendments to certain New Hampshire statutes became effective at different

times. The amendment to RSA 654:12, I, which allowed proof of citizenship through proof that

an applicant was previously or currently registered to vote in New Hampshire, became effective

22

on September 30, 2025. Ex. AAA2 at 12. RSA 654:12, VI regarding access to a voter's records became effective on February 1, 2026, shortly before the trial commenced in this case. Id.

Practically speaking, HB 464 made two substantial changes to the process by which a registrant seeking to vote could prove his citizenship. First, it established that proof that a voter was currently or had been previously registered to vote in another New Hampshire ward or town constituted proof of citizenship.[11] Second, it sought to give election officials access to various records to allow them to confirm a registrant's citizenship if that registrant does not present DPOC. These records, which local election officials can access through the SVRS, include records from the New Hampshire Division of Vital Records and the New Hampshire Division of Motor Vehicles.

Although not required by HB 464, the Division of Vital Records recently took steps to make it easier for New Hampshire voters to access certain records to prove their citizenship in advance of registering to vote. On October 17, 2025, Kristin Martino, the Director and Registrar for the Division, issued a memorandum to town and city clerks informing them that "town and city clerks can now issue free certified copies of New Hampshire vital records for voter registration purposes only." Ex. PP at 1. These vital records include records of birth, marriage, divorce, civil union, and dissolution, and they can be obtained from any New Hampshire town or city clerk's office, or from the Division of Vital Records. Id. As of February 18, 2026, 21 free certified copies of vital records had been issued for voting purposes.

---

[11] Notably, the category of voters who were previously or are currently registered to vote in another New Hampshire ward or town includes voters who had proven their citizenship using the QVA.

A.    Secretary's Guidance Regarding HB 464's Changes

In guidance issued to local election officials on January 5, 2026, the Secretary stated that, under the new process authorized by HB 464, the SVRS "can now be used to verify certain citizenship, age, name change, and death information for voter registration," and provided an "overview" of how a new SVRS search process is intended to function. Ex. UU at 1.

To run a search under this new system, the local election official must require the voter to execute, in addition to a voter registration form, an "Application for Confidential Verification of a New Hampshire Vital Record or DMV Record Search for the Purpose of New Hampshire Voter Registration." Ex. 176. Although the form provides no clear instructions, depending on which record the voter seeks to use to confirm his citizenship, the form asks the voter to supply various categories of "highly sensitive" information, Ex. UU at 2, if they are "looking to verify [records] for voter registration purposes ONLY," Ex. 176 at 1. For example, if a voter is authorizing the election official to search for his birth certificate, the form asks the voter to provide his name as it appears on his birth certificate, the town or city of his birth, and his parents' first and last names. Although the form suggests that the voter needs to supply each piece of requested information for the election official to be able to conduct the search, Director Piecuch testified that the only information necessary to conduct a search is the voter's name and date of birth. The additional information that the voter fills out assists the election official with the search but does not affect whether the official will be able to find the requested record.[12]

---

[12] As explained in a later section of this order, the Open Democracy Plaintiffs filed a post-trial motion for sanctions against the defendants. Doc. no. 167. The motion requests that the court find "less credible" the testimony of any defense witness that appears to conflict with Secretary Scanlan's deposition testimony on issues related to HB 464's implementation and give "lesser weight" to undisclosed testimony regarding HB 464's processes. Id. at 13. Director Piecuch's testimony concerning the information necessary for an SVRS search is part of the

To complete the search, local election officials must then use their login credentials to access the SVRS search portal and enter the voters' information in a series of search fields corresponding to the Application form. Ex. VV at 1-2. The SVRS instructions state that "if the entered search criteria does not match what is listed in the Vital Records or the DMV Records data exactly, or the record has not been provided or could be incomplete by the applicable department, [the local official] may receive a warning message that states, 'No Records matching the entered search criteria found.'" Id. at 2.

The instructions further provide: "Before ANY search can be completed within the Vital Records or DMV inquiries, **the voter shall be present in front of you with a completed Application for Confidential Verification of a New Hampshire Vital Record or DMV Records form** (found in SVRS/Help Instructions) **AND photo identification**." Id. at 1. The instructions also repeatedly warn: "**Should you perform searches without the voter present or a completed form, your SVRS credentials could be suspended or revoked, and you could be subject to criminal penalties**." Id. at 1, 4, 7, 10, 13, 16, 19, 22.

Despite these written instructions, testimony indicated that certain state officials, such as authorized employees in the Secretary's office or the Attorney General's office, can perform voter queries through the SVRS without a voter present. So, if election officials have difficulties with searches, they may call the Hotline or the Help Desk for assistance.[13] Further, these state

testimony addressed by the motion. For the reasons explained below, the court agrees with the Open Democracy Plaintiffs that the defendants violated their discovery obligations. However, the testimony that is the subject of the motion for sanctions does not change the court's conclusions of law in this case. Therefore, the court does not impose any sanctions on the defendants and its credibility determinations are based solely on the evidence presented at trial.

[13] Deputy O'Donnell testified that local election officials are also permitted to station an employee at the town clerk's office to run election-day queries, without contacting the Hotline or

users have additional tools that offer them broader search capabilities than those available to

local election officials, including the ability to run partial-name searches.[14]

### B.    HB 464's Limitations

The Secretary's guidance recognizes certain limitations in the use of SVRS searches to

prove a registrant's citizenship. Specifically, the January 5, 2026 guidance provides:

> It is important to note that this process is not guaranteed to prove a person's
> citizenship in all cases. It may confirm citizenship for registrants: (i) who were
> previously registered to vote in New Hampshire; (ii) who were born in New
> Hampshire; (iii) who previously provided proof of citizenship when obtaining a
> New Hampshire driver's license; or (iv) whose name change is reflected in a New
> Hampshire vital record or DMV record.

Ex. UU at 2. The guidance further states that the "SVRS will not be able to prove the citizenship

of other registrants, who will need to provide documentary proof of citizenship when registering

to vote." Id. It adds that it "is possible that vital records or DMV information may be incomplete

---

Help Desk, if the officials need assistance. Director Piecuch appeared to agree that such an
arrangement is permissible. The court does not credit that testimony insofar as it suggests that
local election officials will seek or town clerks will provide such assistance. The Secretary's
instructions to town clerks and local election officials explicitly state that an official may search
within vital records or DMV records only if the voter is "present in front of you," and threatens
criminal penalties for local officials who run searches without the voter in front of them. Further,
Secretary Scanlan testified that a local election official is permitted to run an SVRS search only
if a voter is in front of him.

[14] The court notes that both Deputy O'Donnell and Director Piecuch testified at trial
about the state users' ability to run partial-name searches. This testimony directly contradicts the
Secretary's designated Rule 30(b)(6) witness's deposition testimony, offered mere days before
trial, and appears to be at odds with guidance and instructions provided to election officials.
Because state users' ability to perform partial-name searches in the SVRS does not change the
court's conclusions in this case, the court credits Deputy O'Donnell's and Director Piecuch's
testimony. However, had this fact changed the court's analysis, the court likely would have given
the testimony less weight in light of the defendants' discovery violations. Nonetheless, the court
credits it.

or absent. In such cases, individuals must prove their qualification (citizenship, domicile, name change, etc.) with documentation." Id. at 3.

The examples of "other registrants" for whom the SVRS will not be able to prove citizenship are plentiful. For example, an SVRS search will not locate a birth certificate for the approximately 60% of New Hampshire residents who were born in another state. And records suggest voters born in a state other than New Hampshire or outside of the United States represent a significant percentage of voters who lack DPOC and previously relied on QVAs to prove their citizenship. Analysis of citizenship QVAs from four New Hampshire municipalities between June 1, 2024, and November 10, 2024, show that more than 72% of them—829 out of 1146— were executed by voters born outside of New Hampshire, either in other states or overseas.[15] Many of these voters born in other states incorrectly believe they can obtain their birth certificates from the Division of Vital Records, as Director Martino testified.

In addition, an SVRS search will not locate marriage records pertaining to marriages that occurred in other states, or divorce records pertaining to divorces that occurred in other states. This limitation particularly impacts married or divorced women who changed their names, as a

---

[15] These totals come from a summary exhibit that the plaintiffs offered, Ex. 356, which summarizes the 1146 QVAs executed in the four municipalities during that time period, Ex. 219-222. In their proposed findings of fact, the defendants take issue with the summary because it relies on certain QVAs that purportedly "reflect[] numerous vagaries on the[ir] face." Doc. no. 168, ¶ 83. The defendants' criticisms are largely inconsequential, such as complaining that certain affiants failed to note the locations of their naturalizations. At most, the defendants potentially call into question seven of the affidavits, in which the affiants neglected to indicate whether they were relying on the QVA to attest to citizenship, rather than to identity or age. Considering that each of these affiants stated that they were born in a foreign country, the court finds that their QVAs were almost certainly executed to prove citizenship. Even if not, however, removing those affidavits from the calculation would still mean that more than 72% of the aforementioned citizenship affidavits were executed by voters born outside of New Hampshire, either in other states or other countries.

2023 survey by the Pew Research Center estimated that over 80% of women in opposite-sex marriages took their husband's last name or hyphenated their surnames when they married. The inability to search for out-of-state marriage licenses or divorce records affects women more than men by a 15:1 margin.

Almost no birth certificates for births before 1935 are available for searching in the SVRS. Nor are certain additional birth certificates from 1949 to 1950 or "delayed" birth certificates (those filed six months or more after birth).

An SVRS search will not return marriage records for marriages that occurred before 1960. Records of marriages occurring up to 2015 only reflect the names of the couple before marriage and searches for the couple's current names will not be successful. An SVRS search will not produce divorce records before 1979 and within the last six months. People in New Hampshire can also obtain name changes in probate and family court, and an SVRS search will not generally reflect those changes.

DMV records that are searchable within the SVRS will show whether some individuals are listed in DMV records as United States citizens. But that data is not comprehensive or guaranteed to be accurate. First, the DMV records that are searchable under HB 464 include only New Hampshire drivers' licenses and non-driver identification cards. They do not include out-of-state drivers' licenses or non-driver identification cards. State records show that more than 43,000 active New Hampshire voters used out-of-state licenses or identification cards to register. Another approximately 118,000 active New Hampshire voters do not have a New Hampshire driver's license or identification card number associated with their registration.

Second, the DMV database will not accurately report the citizenship status of naturalized citizens who applied for a license before they became citizens unless they first update their status

with the DMV. Indeed, the plaintiffs' expert, Dr. Kenneth Mayer, found that this exact issue was widespread when he did work for "the U.S. Department of Justice in 2012 to analyze claims that were being made by the state of Florida that there were noncitizens registered to vote based on data in driver's license files." Doc. no. 150, Trial Tr. at 80:1-4. When analyzing noncitizenship flags by the state of Florida based on DMV data, Dr. Mayer found that "99.9 percent of those noncitizenship flags were incorrect, that the person was actually a U.S. citizen and had naturalized after first obtaining a driver's license or ID." Id. at 138:5-7. The SVRS instructions state that a registrant who is listed in DMV records as a Permanent Resident or Temporary Registrant "is **not** a US citizen and **cannot** register to vote." Ex. VV at 22. The instructions later qualify that statement in smaller text on a different page, acknowledging that the "voter applicant could have received citizenship after they received their identification which may result in the DMV not being updated at the time of the applicant registering to vote." Id. at 24.

Finally, the reliability of the DMV citizenship data is questionable. In an April 25, 2025 letter to DMV Director John Morasco, the Secretary requested information "showing how the licensee reported their United States Citizenship status when obtaining a license or non-driver ID from your office," and in doing so stated that he "underst[oo]d that this is only a record of what the applicant self-reported. The data point is as provided by the applicant, it has not been vetted nor verified for purposes of determining United States citizenship . . . ." Ex. 145A at 1. There is no evidence that the citizenship data provided to the DMV has been verified and the defendants admit that they have not investigated the accuracy or completeness of the DMV data.

Thus, even if HB 464's additional processes to confirm a registrant's citizenship using prior registration, DMV, or vital records worked flawlessly—and as discussed below, they will

not—there would remain a significant number of registrants whose records would be missing or inaccurate. Those registrants will still be unable to vote unless they provide DPOC.

The cost to obtain DPOC may be substantial. For example, it costs at least $65 to obtain a passport card and $165 to obtain a passport book, with an additional cost for expedited service. Renewing an expired passport costs $130. The cost to obtain a birth certificate from another state varies. A birth certificate from Massachusetts costs $20 when obtained in person, $32 when obtained via a request by mail, and $54 when ordered online or by phone. The cost of a birth certificate in other states ranges from $10 in Florida to $34 in Michigan and may increase depending on the method of ordering. A Certificate of Citizenship (referenced in the New Hampshire Election Procedure Manual) costs $1,335 if the voter uses an online application and $1,385 if he uses a paper application. A replacement certificate of naturalization (form N-565) costs $505 via an online application and $555 via a paper application. A Consular Report of Birth Abroad is $50, and the application must be notarized.

Even in the most optimistic scenario, the processes available to election officials to confirm a registrant's citizenship under HB 464 will not work perfectly. That is particularly true on federal and state general election days when the number of voters seeking to register will be higher.

Only a small number of election officials at each polling location have access to the SVRS, and certain polling locations have no officials with SVRS access. For example, no one in Concord's polling locations in any of its 10 wards has access to the SVRS. Nashua has nine polling locations but only six individuals have access to the SVRS. Local election officials with SVRS access often deal with many priorities on election day, are not always available to run searches, and are not permitted to share their credentials with anyone else. Thus, even if local

30

officials could run SVRS searches accurately and quickly, voters seeking to register on election day would still almost certainly encounter delays because of the limited number of available officials with SVRS access.

Even those local officials with the authority to run SVRS searches will not always be able to run them accurately and quickly. Not all election officials have laptops to use to access the SVRS, as state offices are not responsible for providing them. Moreover, many polling locations do not have access to reliable internet. The Secretary acknowledged this problem in his initial guidance on HB 1569, which included as one of the "Frequently Asked Questions," "We often have difficulty with wireless connectivity at our polling place. Without having access to SVRS we may be unable to establish whether someone was previously registered in New Hampshire, and therefore not required to prove citizenship, what should we do?" Ex. 168 at 12. The answer provided was, "If you do not have access to the statewide voter registration system and have no way of verifying the voter's registration status, the voter will need to provide you with proof of citizenship." Id.

A June 2025 survey of polling places conducted by the Secretary's office concluded that 84.18% of polling places have internet, 10.75% do not have internet, and about 5% are not sure. Ex. 76. The survey also found that about 76% of polling places have good cellular access, around 15% do not, and around 7.5% are not sure. Id. It further found that about 28% of those polling places without a landline or good cellular service do not have internet. Id. At least 4 polling places have no telephone or internet access. Id. The purpose of this survey was to identify which specific polling places do not have the ability to access the SVRS on election day to perform the searches authorized by HB 464.

31

Even with reliable internet, it is unclear how long it will take for an SVRS query to produce a result. While certain witnesses testified that an official should be able to complete an SVRS search within one or two minutes, others testified that it takes longer. One observer saw it take up to 10 or 15 minutes for an SVRS search to return prior registration information for a voter in the November 2025 election in Keene.

Further, as the SVRS instructions note, the SVRS available to election workers uses an exact match methodology, meaning that responsive records will be returned only if they perfectly match a local election official's name-and-birthdate search query. Thus, if there is a minor typographical error, and nearly all witnesses acknowledged that mistakes by election officials are common, or if a voter provides anything other than his given first name, the election official will not find the voter's record during the SVRS search.

Even if the SVRS returns a match, there may still be confusion or delays in registering a voter. Although the court credits Director Piecuch's testimony that only a voter's name and date of birth are actually necessary to perform a search in the SVRS, the vital record application form asks voters to supply several other pieces of information to help election officials verify the search results. That additional information may not match the voter's record in the SVRS, which could cause an election worker to doubt the search results. For example, when requesting a search for a birth certificate, registrants are asked to provide the city or town where they were born, which is typically the location of a hospital rather than the location of their home. It is possible that certain voters do not know the location of the hospital in which they were born, or may assume, for example, that Dartmouth-Hitchcock Medical Center is in Hanover (the location of Dartmouth College), though it is actually located in Lebanon, an adjacent town.

32

A local election official may also get "locked out" of SVRS for engaging in too many searches too quickly or for making too many mistakes when searching because the system may deem the activity "suspicious." Doc. no. 164, Trial Tr. at 111:4-17. If that occurs, the local official must contact the Secretary's office to restore access.

As noted, voters and election officials call either the Attorney General's Hotline or the Secretary's Help Desk to resolve voter-registration issues. The frequency of those calls will undoubtedly increase on federal and state election days. Neither the Help Desk nor the Hotline is equipped to handle large numbers of requests for assistance with SVRS searches on election day. There are only five individuals in the Secretary's office and three individuals in the Attorney General's office trained to conduct statewide SVRS searches. As the Secretary acknowledged, his office could not handle thousands of calls to confirm voter eligibility on election day. Given the substantial number of New Hampshire voters who register on election day and the significant number of them who relied on the QVA to prove citizenship in the last general election, it is certain that calls to the Hotline and Help Desk will increase markedly in future elections and cause further delays in the registration process. Considering that long lines to register were common in various towns even before HB 1569 and HB 464 went into effect, and that both the plaintiffs' and the defendants' witnesses testified that some people will abandon efforts to register and vote when lines are long, the court concludes that the additional time needed to register to vote due to the elimination of the QVA will deter certain voters from registering and voting entirely.

IV.    State Interests

The defendants offered three state interests that they assert justify any burden on voters' rights to vote imposed by HB 1569: 1) ensuring election integrity and preventing wrongful voting; 2) increasing voter confidence; and 3) protecting the public fisc.

A.    Election Integrity

Wrongful voting, meaning unqualified voters <u>intentionally or unintentionally</u> casting ballots, is extremely rare in New Hampshire. Between 1998 and 2024, voters cast roughly 8.3 million votes in 14 federal and state general elections. Dr. Lorraine Minnite, the plaintiffs' expert on the subject of voter fraud, found only 47 instances of wrongful voting in New Hampshire during that 26-year period, including in local elections.

If wrongful voting is rare in New Hampshire, wrongful voting by noncitizens is essentially non-existent. Between 1998 to 2024, only eight identified noncitizens may have unlawfully cast a ballot. Those eight noncitizens cast, at most, 26 ballots in New Hampshire. Thus, at a maximum, instances of wrongful voting by noncitizens represented 0.00031% of votes cast in federal and state general elections in New Hampshire between 1998 and 2024.[16]

Voter fraud, meaning unqualified voters <u>intentionally</u> casting ballots while knowing that they are not entitled to vote, is even rarer in New Hampshire. The defendants agree that instances of voter fraud are "miniscule" and virtually non-existent in the state. Doc. no. 165, Trial Tr. at 53:3-8. Of the eight instances of noncitizen registration in New Hampshire from 1998 and 2024,

---

[16] That figure may even overestimate the rate, as the 8.3 million figure omits ballots cast in local elections, whereas the 26 ballots include those cast by noncitizens in any type of election.

34

only one is alleged to have involved intentional fraud, and that voter's criminal prosecution remains ongoing. Further, at most, three of the eight noncitizens who registered to vote or voted in New Hampshire used a QVA to prove citizenship. Indeed, five of the eight noncitizens who cast ballots did not prove citizenship at all but were allowed to register and vote due to poll-worker error.

HB 1569 did not reduce reports of wrongful voting. The number of wrongful voting cases reported to the Attorney General's office in 2023 is "fairly close" to the number reported in the 2025 local elections. Doc. no. 162, Trial Tr. at 60:14-23. Those years are used for comparison because they involve only municipal and local elections.

### B.  Voter Confidence

New Hampshire residents have a high degree of confidence in the state's elections. Surveys show that approximately 90% of people in New Hampshire had confidence in New Hampshire elections before HB 1569. To the extent that voter confidence in New Hampshire has declined in recent years, voters are more concerned with the way elections are conducted outside of the state than within the state.

The Secretary created a Special Committee on Voter Confidence (Special Committee) in 2022. The Special Committee was made up of "a very diverse group of knowledgeable individuals" hand-chosen by the Secretary to ensure "that the whole political spectrum was represented." Doc. no. 165, Trial Tr. at 6:1-11. The Special Committee traveled around the state of New Hampshire, taking approximately 47 hours of public testimony from approximately 400 voters regarding their confidence in New Hampshire elections. Although it concluded that the majority of "New Hampshire voters have confidence in our elections," that "New Hampshire

elections are accurate," and that "New Hampshire is well served by local election officials," Ex. R at 4 (cleaned up), the Special Committee recommended ways to improve voter confidence. These included improved recruitment and training of local election officials, expanded voter education, use of new ballot counting machines that use paper ballots, expanding the use of random audits, improved access for public observation of the electoral process, changes to the process for updating voter checklists, increased auditing of election results, and legislation "to make it easier for citizens to obtain appropriate voter information." Id. at 8.

The Special Committee did not recommend any changes to New Hampshire's proof-of-citizenship laws. It did not recommend eliminating the QVA. It did not recommend eliminating the CVA.

Neither the Secretary's office nor the Attorney General's office has taken any steps to measure the effect of HB 1569 on voter confidence. Dr. Mayer testified that there is no evidence that HB 1569 will improve voter confidence. He referred to literature on which he relies in his research that shows "clearly that voter confidence in election integrity has actually nothing to do with the actual integrity of the electoral process. Voter opinions are affected by whether their preferred candidate won the most recent election, their partisanship, their experience when they voted, elite signaling, and false claims of electoral irregularities." Doc. no. 150, Trial Tr. at 108:21-109:2. He also testified that "survey data show that most voters aren't even remotely aware of the things that election officials do to protect the integrity of elections, so there's just simply no evidence that 1569 and laws like that will do anything to enhance voter confidence." Id. at 109:2-6. To the contrary, as the Secretary acknowledged, it is possible that HB 1569's elimination of the QVA could lead to a decrease in voter confidence if large numbers of voters are unable to vote because they lack DPOC. Doc. no. 165, Trial Tr. at 57:3-7. Dr. Mayer agreed

36

with the Secretary's concerns. Doc. no. 150, Trial Tr. at 109:6-10 ("If anything, [HB 1569] will do the reverse because the academic literature also shows that voters who have a frustrating experience at the polls, people who try to vote and can't, that they are less -- they are more likely to report low confidence in election outcomes.").

### C.      Protecting the State's Resources

The Attorney General's Election Law Unit is responsible for investigating instances of alleged wrongful voting. Their investigations most commonly involve voters' domicile and, to a lesser extent, their identity. Investigations into voters' citizenship are the least common of those three. Investigator Tracy testified that, in part because New Hampshire law did not require investigations into citizenship affidavits, the state has "never systematically investigated" QVAs for citizenship. Doc. no. 162, Trial Tr. at 99:12-17.

 Investigations into noncitizen voting constitute approximately 2% of the Election Law Unit's work, and Deputy O'Donnell testified that the Unit had sufficient staffing to handle those investigations. Most of the investigations into noncitizen voting did not involve the use of a QVA. Instead, they arose largely from election-worker errors.

The cost to implement HB 464's procedures was and continues to be substantial. The state paid a vendor more than $167,000 to update the SVRS to comply with HB 464. Doc. no. 165, Trial Tr. at 59:5-7. The state also spent a "significant" amount of staff time negotiating a memorandum of understanding with the Department of Safety and taking other steps necessary to implement HB 464. Id. at 58:18-59:4. More spending will follow: both the Secretary's office and the Department of Safety will have to continue to devote staff time to provide data for the SVRS and support the mechanisms to transmit that data, to train local and state officials in

running the necessary searches, and to actually run searches to confirm voter citizenship. The Secretary also agreed that he will have to go "above and beyond in order to educate the public" about the requirement to bring DPOC to register. Id. at 58:9-12.

V.      The Plaintiffs' Injuries From HB 1569

Each of the plaintiffs has suffered or is substantially likely to suffer an injury from HB 1569.

A.      Youth Movement

Youth Movement is a nonprofit membership organization that effectuates political change by "building the power and influence of young people" in New Hampshire. Doc. no. 150, Trial Tr. at 9:5-15. All of Youth Movement's core organizational goals involve motivating younger voters to get to the polls and ensuring that they are able to vote. Specifically, Youth Movement's executive director, Sayles Kasten, testified that the organization's goals include increasing turnout margins in key college towns, collecting pledges to vote from young people so that it "can effectively turn them out to the polls," growing its "core volunteer base," mobilizing young voters on election day, including through canvassing, phones, digital media, in-person events, and rides to the polls, and passing progressive legislation supported by young people. Id. at 16:3-11.

To effectuate its goals, Youth Movement runs several "staple programs." Id. at 24:3. These include its pledge-to-vote and get-out-the-vote programs. Youth Movement also runs a digital program that supports these services by providing education about, among other things, how to complete the voting process.

38

At bottom, these programs involve trying to ensure that as many eligible young voters as possible cast ballots on election day. In its pledge-to-vote program, Youth Movement engages with young people to encourage them to vote through conversations and "Pledge to Vote cards." Id. at 24:3-5. The program is a critical means for Youth Movement to improve voter registration in the state, as groups like Youth Movement are not permitted to register voters directly. Through its get-out-the-vote program, Youth Movement tries to make sure that eligible voters are able to cast their vote on election day by providing them with information regarding their polling location and giving them rides to the polls.

By eliminating the QVA, HB 1569 has decreased the effectiveness of each of these programs. Prior to HB 1569, these programs relied on the availability of the QVA for new registrants to prove citizenship. An individual who pledged to vote was at no risk of being denied the right to register because he lacked DPOC. Youth Movement could ensure that its get-out-the-vote program was effective because all of the eligible voters it transported to the polls on election day would be able to vote regardless of whether they possessed DPOC. That is no longer the case.

Youth Movement has spent resources, including money and staff time, to respond to HB 1569. Beginning with the March 2025 elections, local elections in which Youth Movement would not typically heavily invest, Youth Movement spent its resources, including at least eight to 10 hours of staff time, messaging and creating public-facing materials regarding voter registration. Youth Movement has since spent at least 10 to 20 additional hours drafting messaging for its digital program for voters to help them comply with the new requirements to register because effective messaging is "critical to [its] work." Id. at 58:13-59:14.

39

Youth Movement has also already spent staff time developing a potential "documents chase program," which would be a new program for the organization focused on making sure that the people who pledge to vote actually gather the documents they will need to register. Id. at 55:16-56:1, 64:14-25. It has developed a new program to focus on recruiting effective allies, including college officials and city and town officials, to help ensure that more programs are being offered to help students register to vote.

Youth Movement has also expended significant staff time and other resources developing changes to its core programs in response to HB 1569 ahead of the 2026 mid-term election. With respect to its get-out-the-vote program, for example, Youth Movement is adding an "intake process to make sure that [it does not] accidentally send someone to the polls and waste their time without the documents they need or, conversely, turn away someone who would be able to vote should they have gone." Id. at 63:21-64:10. Youth Movement has already spent approximately 40 to 50 hours of staff time developing and drafting changes to the program, and it continues to expend staff time preparing and refining new materials and trainings that it will conduct for its members and volunteers who carry out the program.

While Youth Movement did not focus on voter registration events in the past given its reliance on pledges to vote, it will now dedicate either one-half or one-third of a staff member's time exclusively to making sure more students are able to register in advance at registration events. Youth Movement will support these voter registration events in several locations throughout the state and send staff members or volunteers to assist with the events.

40

B.        Open Democracy

Open Democracy is a voting rights organization whose mission is "political equality for all." Doc. no. 143, Trial Tr. at 10:10-11. To accomplish this mission, Open Democracy engages in several core activities, including, but not limited to, "campaign finance research, training, [and] advocacy"; implementation of a "high school voter registration program"; "poll observer[] and poll worker recruitment"; and "general voter education." Id. at 10:20-11:10. Open Democracy operates throughout the State of New Hampshire, conducting voter registration activities and recruiting poll observers across the state.

1.        Injury from the elimination of the QVA

Through its high school voter registration program, Open Democracy seeks to have "all 18-year-olds in the state of New Hampshire . . . register to vote," regardless of their party affiliation. Id. at 11:14-16. To facilitate voter registration for 18-year-olds, Open Democracy began hosting high school registration drives in 2022 and hired a high school voter registration coordinator, Samuel Cassin.

In order to help high schools promote and run registration drives, Open Democracy created a "tool kit," which contains a "whole host of resources" such as "sample letters to parents, sample letters to the supervisor of the checklist or town clerk," and promotional materials like "social media posts." Id. at 14:5-18. The tool kit is available on Open Democracy's website.

Ms. Zink, Open Democracy's executive director, testified that, following the enactment of HB 1569, Open Democracy spent resources updating its educational materials, engaging in "an intensive document review and edits" that were not necessary for any prior changes in New

41

Hampshire's election laws. Id. at 89:21-90:4. Its staff had to review "every single document in [its] tool kit" and remove "any reference[s] to an affidavit being available." Id. at 15:1-11. Staff also had to update the sample letters to parents, social media posts, and posters. Updating the materials in the tool kit took Open Democracy's staff approximately 52 hours.

Open Democracy also needed to add additional documents to the tool kit and had to "recycle[]" any "printed materials" and "print new materials and new stickers" in response to HB 1569. Id. at 22:6-9. These efforts came at the expense of other priorities.

Despite updates to the toolkit and other efforts, Open Democracy has been able to help fewer high school students register to vote since HB 1569 eliminated the QVA option because students did not possess the necessary DPOC. Fewer students registered in 2025 than in 2023 despite the fact that Open Democracy had a full-time staff member dedicated to high school registration drives in 2025 that it did not have in 2023, and despite the fact that Open Democracy updated the tool kit materials to emphasize the documents needed to register to vote. Indeed, according to Mr. Cassin, "[m]ore students were turned away . . . than actually registered to vote" during Open Democracy's drive at Manchester High School Central in 2025. Doc. no. 154, Trial Tr. at 60:2-8. That is especially notable because Open Democracy helped at least 650 high school students register in 2024, and Mr. Cassin did not recall seeing any applicants turned away. That is likely because "the vast majority" of students used a QVA to prove their citizenship when registering to vote during the registration drives held in 2024. Id. at 57:15-19.

Open Democracy also expanded its poll observer program to cover municipal elections in addition to general elections and updated the materials it uses in connection with poll observer trainings following HB 1569's elimination of the QVA. To do so, Open Democracy had to divert

resources that otherwise would have been spent on other of its core activities, such as campaign finance research.

### 2.      Injury from the elimination of the CVA

Open Democracy's efforts regarding its poll observer program also stemmed from HB 1569's elimination of the CVA. It has updated its poll observer training deck to account for the CVA's removal with new instructions on how to handle voter challenges and deploys poll workers at municipal elections as mentioned above to watch out for potential challenges. Again, these efforts came at the expense of other core activities.

### C.      League of Women Voters-NH

The League of Women Voters is a member, voting rights organization. The League of Women Voters-NH is the state league for New Hampshire, and it carries out its mission throughout the state. That mission is to "empower voters and to defend democracy," which it effectuates by educating voters regarding how they can participate in the representative-democracy process. Doc. no. 152, Trial Tr. at 12:7-19.

The League of Women Voters-NH's core programs to achieve its organizational mission include engaging in activities to inform prospective voters. Among other activities, this involves hosting candidate forums, tabling at community events, and giving presentations to groups that request the League of Women Voters-NH to discuss issues of voting, particularly new election laws. The League of Women Voters-NH also creates informational handouts to inform potential voters, which can be printed and distributed at events.

The organization also publishes information on voting on its website and social media and includes information about registration, upcoming elections, and changes to the law in its regular newsletters and legislative alerts. The League of Women Voters-NH's president, Elizabeth Tentarelli, manages the Facebook page and website for the organization.

Following the passage of HB 1569, the League of Women Voters-NH spent resources to inform potential voters about the registration requirements and the new law. For example, Ms. Tentarelli testified that she significantly increased the League of Women Voters-NH's Facebook activity to address concerns relating to HB 1569 and spent about $440 "boosting" Facebook posts related to the bill in 2025. Id. at 16:11-17:21. The League of Women Voters-NH has given numerous presentations to groups over the past year about HB 1569's changes to New Hampshire's voting requirements, and the number of these presentations exceeds the typical number of talks that League of Women Voters-NH gives each year regarding elections generally. Following the enactment of HB 1569, the League of Women Voters-NH had to update its tabling materials to explain to potential voters how to prove their citizenship when registering to vote in light of the elimination of the QVA.

Further, HB 1569 has forced the League of Women Voters-NH to redirect time towards trying to explain the intricacies of the law rather than towards empowering voters to participate in the democratic process. Audience members at presentations, Facebook commentators to which the League of Women Voters-NH must respond, and potential voters have expressed concern about HB 1569's elimination of the QVA and confusion about what may constitute "other reasonable documentation" to prove citizenship. In short, HB 1569 makes the League of Women Voters-NH's efforts to fulfill its organizational mission less effective.

44

D.      The Forward Foundation

The Forward Foundation is a nonpartisan organization founded in 2022 that aims "to get more working-aged people to be civically engaged in New Hampshire." Doc. no. 156, Trial Tr. at 25:1-3. The Forward Foundation "primarily focus[es] on engaging people who are under the age of 50 in New Hampshire" along with other people "less represented in our democracy" such as those with "diverse lived experiences, people who have recently moved here, [and] people who might have English as their second language." Id. at 25:23-26:9. The organization carries out its mission throughout New Hampshire, including by conducting voter registration and education activities and recruiting poll workers across the state. Its core programs to achieve its mission include programs focused on voter education, governance, and legislative reform.

Julianne Gadoury is the executive director of the Forward Foundation. She testified regarding the effect that HB 1569 has had on the organization. HB 1569 required the Forward Foundation to alter its mailers significantly. The Forward Foundation changed the goal of its mailers and the populations it targeted, shifting from targeting low-propensity voters to unregistered voters, and making the mailers more detailed and complicated to ensure that people were aware of the documents required to register. The organization had to change its vendor for sending out these mailers after HB 1569 to one that was more familiar with voter education and better able to target unregistered voters. Refining the mailers drained staff time and energy, particularly because there is no clear guidance from the Secretary's office on required documentation, including "other reasonable documentation." After HB 1569, the Forward Foundation has also added "multiple text chases" to its previous efforts in order to reinforce the new registration information. Id. at 54:21-55:6. Many of its text and mailer campaigns are handled by an outside vendor that the Forward Foundation pays.

45

HB 1569 has forced the Forward Foundation to "reallocate[] [its] resources" and has impacted its "ability to [] carry out different aspects of [its] program and mission." Id. at 39:4-11. This has included "spend[ing] a lot more staff time and resources dedicated to voter education and voting rights" as a result of HB 1569. Id. Specifically, the Forward Foundation had one staff member working on voter education before HB 1569, including through its partnership with the NHCVR. Now, the Forward Foundation has dedicated four staff members of its eight-person staff to voter education and voting rights. The Forward Foundation's budget for voter education in 2024 was $84,000; it ultimately spent over $131,000 in preparation for and in response to HB 1569's enactment. This shift has forced the organization to scale back on its governance work and legislative reform program.

E.      The Muirheads

Both Alexander Muirhead and Lila Muirhead were born in 2008 in Austin, Texas and are currently 17 years old. Both Alexander and Lila will turn 18 in 2026, months before the state primary and election. They live in Hanover, New Hampshire with their mother and father (next friend, Russell Muirhead).

Alexander plans to register to vote in person in New Hampshire when he turns 18, but he has not thought about where he will register. He does not presently have a plan to register to vote, but he expects to make a plan when he turns 18.

Lila plans to register to vote primarily to enable her to vote in the federal elections. She plans to register in Hanover in "late spring or early summer," before the fall national election in 2026. Doc. no. 132, ¶ 39.

46

F.      Miles Borne

Miles Borne was born in 2007 in Portsmouth, New Hampshire. He graduated from high school on June 6, 2025, and now attends Middlebury College in Vermont. He lives at his parents' house in Rye, New Hampshire.

Borne currently possesses both a U.S. passport and a birth certificate. He registered to vote in 2025, on the day of his 18th birthday. Although Borne testified that he does not know what the future will hold, he plans to vote in future elections, including by absentee ballot in the November 2026 election in New Hampshire.

Rulings of Law

I.      The Plaintiffs Have Standing To Assert Their Claims

The defendants have challenged the plaintiffs' standing to assert their claims in both cases at every stage of the respective litigations. The court has addressed in detail and rejected those challenges to the remaining plaintiffs' claims at each turn.[17] See Coal. for Open Democracy, 794 F. Supp. 3d 28 (granting in part and denying in part the defendants' motion to dismiss based on standing); New Hampshire Youth Movement v. Scanlan, No. 24-CV-291-SE, 2025 WL 2336868 (D.N.H. Aug. 13, 2025) (denying motion to dismiss); New Hampshire Youth Movement v. Scanlan, No. 24-CV-291-SE, 2026 WL 323171 (D.N.H. Feb. 6, 2026) (denying motion for summary judgment). Although the defendants declined to address the plaintiffs' standing in their post-trial briefing, the court briefly discusses the issue here.

_____

[17] The court previously held that certain plaintiffs did not have standing to pursue their claims and dismissed them from the case. See Coal. for Open Democracy v. Scanlan, 794 F. Supp. 3d 28, 44-47 (D.N.H. 2025).

"Standing doctrine assures respect for the Constitution's limitation of '[t]he judicial Power' to 'Cases' and 'Controversies.'" Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016) (quoting U.S. Const. art. III, § 2, cl. 1). "For there to be a case or controversy under Article III, the [plaintiffs] must have a 'personal stake' in the case—in other words, standing." Town of Milton v. Fed. Aviation Admin., 87 F.4th 91, 95 (1st Cir. 2023) (quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (further quotations omitted)).

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion, 594 U.S. at 423. A showing "of future injury may suffice if the threatened injury is 'certainly impending,' or [if] there is a 'substantial risk' that the harm will occur." Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (further quotations omitted)); see Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409, 414 n.5 (2013). "Plaintiffs 'must demonstrate standing for each claim that they press and for each form of relief that they seek.'" Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 372 (1st Cir. 2023) (quoting TransUnion LLC, 594 U.S. at 431).

A.    Organizational Plaintiffs

"When an organization . . . seeks to establish Article III standing, it may proceed in one of two ways: it may show that it has 'organizational standing' to sue on its own behalf, or it may demonstrate that it has 'associational standing' to sue on behalf of its members." Mayor & City Council of Baltimore v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 738 F. Supp. 3d 1,

7 (D.D.C. 2024); see Equal Means Equal v. Ferriero, 3 F.4th 24, 29 (1st Cir. 2021). Here, each of the Organizational Plaintiffs has organizational standing, and the court therefore begins there.

As the court explained in its earlier orders, the Organizational Plaintiffs' theory of standing is derived largely from Havens Realty Corporation v. Coleman, 455 U.S. 363 (1982) and clarified by Food & Drug Administration v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024). In Havens Realty, the defendant (Havens) allegedly engaged in a practice called racial steering, giving prospective home renters and buyers false information to direct them toward housing near others of the same race and away from housing near individuals of other races, thereby maintaining racial housing segregation. 455 U.S. at 366 & n.1. Several plaintiffs, including a housing organization called HOME, which provided housing counseling and referral services to prospective buyers and renters, sued Havens, alleging a violation of the Fair Housing Act. Id. at 367.

The Supreme Court held that HOME had organizational standing to pursue its claim because the complaint alleged that Havens's "steering practices . . . perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers." Id. at 379. The Supreme Court stated that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." Id.

Recently, the Supreme Court clarified Havens Realty's holding. In Alliance for Hippocratic Medicine, several anti-abortion medical organizations sought to challenge a Food and Drug Administration action that eased regulations related to mifepristone, a drug used to terminate pregnancies. 602 U.S. at 376-77. The organizations relied on a Havens Realty theory to

49

establish standing, alleging that the FDA had "impaired their ability to provide services and achieve their organizational mission" and that they had to "divert[] [their] resources in response to" the FDA's actions. Id. at 394-95 (quotations omitted). The Supreme Court rejected this argument, re-affirming that mere issue advocacy, even when accompanied by expenditures, could not alone establish standing. Id. at 395. Distinguishing Havens Realty, the Court highlighted that HOME "not only was an issue-advocacy organization, but also operated a housing counseling service." Id. So, "when Havens gave . . . false information about apartment availability," it "directly affected and interfered with HOME's core business activities" because it "impaired HOME's ability to provide counseling and referral services . . . ." Id. The Supreme Court noted that the plaintiffs in Alliance for Hippocratic Medicine did not allege that the FDA's action "imposed any similar impediment to the [plaintiffs'] advocacy business" and, therefore, they lacked standing. Id.

       1.     <u>Open Democracy</u>

As does each plaintiff, Open Democracy asserts Count I, which alleges that HB 1569's elimination of the QVA to prove citizenship constitutes an unjustifiable burden on the right to vote. Unlike the other plaintiffs, Open Democracy also asserts Counts II and III, which allege that HB 1569's elimination of the CVA constitutes an unjustifiable burden on the right to vote (Count II) and violates voters' procedural due process rights (Count III). Open Democracy has organizational standing to assert all three counts.

HB 1569's eliminations of the QVA and CVA perceptibly impair Open Democracy's ability to provide its core services and cause it to suffer an injury. The organization spent money and devoted staff time to updating and creating new materials to help high schools promote and

run their registration drives to account for HB 1569's elimination of the QVA. Since HB 1569 eliminated the QVA option to prove citizenship, Open Democracy has been able to help fewer high school students register to vote, because students did not possess the necessary DPOC. Further, Open Democracy has needed to expand its poll observer program and update its materials related to the program after HB 1569's enactment to account for both the elimination of the QVA and the CVA. These changes have forced Open Democracy to divert resources that it would otherwise have spent on its other core activities, such as campaign finance research, to address the consequences of HB 1569. Therefore, Open Democracy has suffered a legally cognizable injury from HB 1569's eliminations of the QVA and CVA. See League of United Latin Am. Citizens v. Exec. Off. of President, 808 F. Supp. 3d 29, 57-58 (D.D.C. 2025) (LULAC II) (holding that nonpartisan, not-for-profit voting rights organizations had organizational standing to challenge an executive order's DPOC requirement where it "require[ed] the organizations to either update or replace" online tools that helped people register to vote, "force the [plaintiffs] to update educational information that they provide to prospective voters," and "invest additional resources in training their staff and volunteers"); Get Loud Ark. v. Thurston, 748 F. Supp. 3d 630, 653-54 (W.D. Ark. 2024) (plaintiff that provided voter registration services had standing to challenge Election Commission rule changing signature requirement because the rule "'perceptibly impaired' [the plaintiff's] ability to provide voter registration services to Arkansans, as evidenced by the precipitous decline in registrations through [the plaintiff] since the Rule was put into place"); see also Republican Nat'l Comm. v. North Carolina State Bd. of Elections, 120 F.4th 390, 397 (4th Cir. 2024) (state action that inhibited committee's ability to "counsel voters to support Republican candidates" caused injury sufficient to confer standing because it affected and interfered with organizational mission); League of United Latin Am.

Citizens v. Exec. Off. of the President, 780 F. Supp. 3d 135, 188 (D.D.C. 2025) (LULAC); see

generally E.Q. v. United States Dep't of Homeland Sec., No. 25-CV-791 (CRC), 2026 WL

946181, at *13 (D.D.C. Apr. 8, 2026).

Further, there can be no dispute that Open Democracy's injuries were caused by HB

1569's eliminations of the QVA and CVA. Moreover, the injuries that Open Democracy has

suffered and will continue to suffer would be redressed by the court's declaration that the

provisions of HB 1569 that eliminated the QVA and the CVA violate the United States

Constitution and an injunction prohibiting the defendants from implementing or enforcing those

provisions.[18] Therefore, Open Democracy has organizational standing to pursue Counts I-III.

Where, as here, "coplaintiffs have a shared stake in the litigation—close identity of

interests and a joint objective—the finding that one has standing to sue renders it superfluous to

adjudicate the other plaintiffs' standing." Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 976

(1st Cir. 1989) (citing Watt v. Energy Action Educ. Found., 454 U.S. 151, 160 (1981)) (further

citation omitted)). However, the court analyzes Youth Movement's standing to pursue its claim

because Youth Movement and Open Democracy are plaintiffs in separate cases. And the court

briefly explains its conclusion that the remaining Open Democracy Plaintiffs have standing to

pursue Count I for the sake of completeness.

---

[18] The defendants argued in their summary judgment motion that none of the plaintiffs
can meet the redressability prong of the standing analysis because they do not seek prospective
relief. Rather, the defendants contended, the plaintiffs seek to reinstate a repealed statute and
revive a statutory scheme that they contend is no longer in force. To the extent that the
defendants intended to continue to pursue that argument, the court rejects it for the reasons
discussed in its order denying the defendants' summary judgment motion. See New Hampshire
Youth Movement, 2026 WL 323171, at *7.

2.     Youth Movement

Youth Movement brings only Count I, which alleges that HB 1569's elimination of the QVA to prove citizenship constitutes an unjustifiable burden on the right to vote. Therefore, the court considers Youth Movement's standing as it pertains to the elimination of the QVA for citizenship purposes.

The record establishes that HB 1569's elimination of the QVA perceptibly impairs Youth Movement's mission-critical programs, including its pledge-to-vote and get-out-the-vote programs. The pledge-to-vote program is impaired by the elimination of the citizenship QVA because the requirement forces Youth Movement to take additional steps that it did not have to take before to ensure that the voters it assists ultimately vote. Youth Movement's get-out-the-vote program is also impaired by the elimination of the QVA because some of the voters Youth Movement has assisted in the past, absent intervention, would be unable to vote. Youth Movement has been forced to augment its programs since HB 1569's passage, including by changing its materials and messaging, and adding new processes and programs. The organization has been required to devote staff time toward these efforts, and will continue to do so in the future, particularly by sending additional staff members to voter registration events, which had not been as much of a focus for Youth Movement in the past because the QVA made it relatively likely that qualified voters would be able to register. These harms satisfy the injury component of standing. See, e.g., LULAC II, 808 F. Supp. 3d at 57-58; LULAC, 780 F. Supp. 3d at 188. Youth Movement has suffered a legally cognizable injury from HB 1569's elimination of the QVA.

Because the analysis is similar to the court's analysis of Open Democracy's standing, the causation and redressability prongs as they apply to Youth Movement's claim require little discussion. There is a clear causal nexus between Youth Movement's injuries and HB 1569's

53

elimination of the QVA. And the court has already addressed and rejected the defendants' arguments regarding redressability.

For these reasons, the evidence in the record is sufficient to support all three prongs of the standing analysis with regard to Youth Movement. It has organizational standing to pursue Count I.[19]

### 3.    Remaining Organizational Plaintiffs

The League of Women Voters-NH spent time and money creating and expanding the reach of social media posts relating to HB 1569's elimination of the QVA and creating new educational materials. The organization did several presentations to various groups regarding HB 1569's changes to New Hampshire's election law. Further, the League of Women Voters-NH is now unable to explain adequately to voters how they can register to vote if they lack DPOC because it is not aware of an acceptable definition of "other reasonable documentation."

The Forward Foundation has been forced to update its mailers to address HB 1569's changes to the proof-of-citizenship requirements and spent money expanding its text and mailer campaigns. It has also reallocated its resources, such as staff time, to work on registration education at the expense of its other activities.

These impacts on the League of Women Voters-NH and the Forward Foundation demonstrate that both organizations have suffered legally cognizable injuries from HB 1569's elimination of the QVA. And, for the reasons discussed above, both organizations can satisfy the

---

[19] Because the court concludes that Youth Movement has organizational standing to pursue Count I, it does not address Youth Movement's argument in its post-trial briefing that it also has associational standing to pursue its claim.

causation and redressability prongs of the standing analysis. Therefore, the League of Women Voters-NH and the Forward Foundation have standing to pursue Count I.

### B. The Individual Plaintiffs

The only relevant inquiry in the standing analysis with regard to the Individual Plaintiffs is whether they have suffered or will suffer a cognizable injury from HB 1569's elimination of the QVA. For the reasons discussed concerning the Organizational Plaintiffs, any injury meets the causation and redressability requirements.

### 1. The Muirheads

As mentioned, Alexander and Lila are minor citizens who live in New Hampshire. They will each turn 18 before the end of 2026 and intend to register to vote as soon as they are eligible. Because the Muirheads' claim is based on a future injury, the relevant question is whether they have a threatened injury that is certainly impending or there is a substantial risk that the harm will occur. Reddy, 845 F.3d at 500.

Prior to HB 1569, the Muirheads would have been able to register to vote by submitting a QVA to prove their citizenship. Now, they are required to produce DPOC. The requirement that the Muirheads must produce documentary evidence to register to vote itself constitutes an injury sufficient to confer standing. See Fish v. Schwab, 957 F.3d 1105, 1120 (10th Cir. 2020); Common Cause/Georgia v. Billups, 554 F.3d 1340, 1351-52 (11th Cir. 2009). Because the Muirheads will register to vote when they are able, their injury from the implementation of HB 1569 is "certainly impending."

2.    Miles Borne

When the Open Democracy Plaintiffs filed their complaint, Borne was a minor citizen who lived in New Hampshire. At the time of trial, Borne has turned 18, registered to vote in 2025 using DPOC, and plans to vote in the November 2026 election in New Hampshire by absentee ballot.

The standing inquiry is "focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008). At the time the Open Democracy Plaintiffs filed their complaint, like the Muirheads, Borne was a minor citizen who lived in New Hampshire and who intended to register to vote when he turned 18. The requirement that he produce DPOC to register to vote is a sufficient injury to confer standing.

Although mootness is a concept distinct from standing, Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000), the court briefly addresses here the defendants' argument in their post-trial brief that Borne's claim is moot because he has already registered to vote using DPOC and plans to vote in New Hampshire by absentee ballot in the November 2026 election. As the defendants acknowledge, there is an "established exception to mootness for disputes capable of repetition, yet evading review," which is routinely "appropriate" "in the context of election cases." FEC v. Wisconsin Right To Life, Inc., 551 U.S. 449, 462–63 (2007) (quoting Storer v. Brown, 415 U.S. 724, 737 n.8 (1974)); Lawrence v. Blackwell, 430 F.3d 368, 371 (6th Cir. 2005) ("Challenges to election laws are one of the quintessential categories of cases which usually" are disputes "capable of repetition, yet evading review."). "The Supreme Court has placed on the party asserting that a case is not moot the burden of showing '(1) the challenged action is in its duration too short to be fully litigated prior

56

to cessation or expiration; and (2) there is a reasonable expectation or a demonstrated probability that the same complaining party will be subject to the same action again.'" Libertarian Party of New Hampshire v. Gardner, 638 F.3d 6, 12 (1st Cir. 2011) (quoting FEC, 551 U.S. at 462).

The Open Democracy Plaintiffs have met their burden with respect to Borne. With regard to the first prong, "the time frame presented by electoral disputes rarely allows for resolution through litigation." La Botz v. Fed. Election Comm'n, 889 F. Supp. 2d 51, 59 (D.D.C. 2012) (noting that "[e]lectoral disputes are . . . 'paradigmatic' examples of cases that cannot be fully litigated before the particular controversy expires" (quoting Moore v. Hosemann, 591 F.3d 741, 744 (5th Cir. 2009))); see also Merle v. United States, 351 F.3d 92, 95 (3d Cir. 2003). The defendants do not meaningfully dispute that the Open Democracy Plaintiffs have met their burden with regard to the first prong in light of the nature of this case.

The defendants instead focus on the second prong, arguing that there is no evidence that Borne could be subject to HB 1569's provisions in the future because he has already registered to vote. Even if the court could infer that Borne would remain living with his parents or eventually become domiciled on his own in Rye, New Hampshire and thus not need to re-register to vote, the Open Democracy Plaintiffs have still carried their burden with regard to the second prong. The second prong of the mootness analysis is "somewhat relaxed in election cases." Lawrence, 430 F.3d at 372. "In the electoral context, many courts have concluded that a plaintiff need only show that *others similarly situated* might suffer a comparable harm in the future." La Botz, 889 F.2d at 59 (citing cases). Indeed, courts "have applied the capable of repetition yet evading review exception to hear challenges to election laws even when the nature of the law made it clear that the plaintiff would not suffer the same harm in the future." Lawrence, 430 F.3d at 372 (citing cases). Here, even if the court could conclude that Borne himself would not again suffer

57

the same harm —and, given that Borne is just 18 years old, lives with his parents, and does not

know what his future holds, that conclusion is dubious—Borne's claim in Count I would not be

moot given the nature of the dispute.

II.    Unjustifiable Burden On The Right To Vote

The right to vote is "'a fundamental political right, . . . preservative of all rights.'" Dunn

v. Blumstein, 405 U.S. 330, 336 (1972) (quoting Reynolds v. Sims, 377 U.S. 533, 562 (1964));

see also Evans v. Cornman, 398 U.S. 419, 422 (1970) ("[T]he right to vote ... is protective of all

fundamental rights and privileges."). "No right is more precious in a free country than that of

having a voice in the election of those who make the laws under which . . . we must live."

Wesberry v. Sanders, 376 U.S. 1, 17 (1964). Yet, "the Constitution grants to the States a broad

power to prescribe the 'Times, Places and Manner of holding Elections for Senators and

Representatives,' which power is matched by state control over the election process for state

offices." Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217 (1986) (quoting U.S.

Const. art. I, § 4, cl. 1). The resulting state regulations will "invariably impose some burden upon

individual voters." Burdick v. Takushi, 504 U.S. 428, 433 (1992). Accordingly, the "First and

Fourteenth Amendments prohibit states from placing burdens on citizens' rights to vote that are

not reasonably justified by states' important regulatory interests." Common Cause R.I. v.

Gorbea, 970 F.3d 11, 14 (1st Cir. 2020) (per curiam) (quotations omitted) (quoting Anderson v.

Celebrezze, 460 U.S. 780, 788-89 (1983) and citing Burdick, 504 U.S. at 430).

The parties agree that Counts I and II, the plaintiffs' challenge to HB 1569's elimination

of the QVA to prove citizenship and Open Democracy's challenge to HB 1569's elimination of

the CVA to overcome a voter challenge, are governed by the so-called Anderson-Burdick

framework. Anderson-Burdick requires the court to "weigh the 'character and magnitude of the asserted injury to' the voters' rights against the 'precise interests put forward by the State as justifications for the burden imposed.'" Gorbea, 970 F.3d at 14 (quoting Anderson, 460 U.S. at 789). The court must examine the burden of the challenged provisions in the context of New Hampshire's election laws as a whole and not in isolation. See Burdick, 504 U.S. at 434-37 (considering the burdens imposed by Hawaii's entire electoral scheme rather than those imposed by isolated sections of the code); see also Wood v. Meadows, 207 F.3d 708, 711 (4th Cir. 2000) ("When determining whether a given state's filing deadline unconstitutionally burdens candidates' and voters' rights, a court must examine that state's ballot access scheme in its entirety."); Luft v. Evers, 963 F.3d 665, 671–72 (7th Cir. 2020) ("Courts weigh these burdens against the state's interests by looking at the whole electoral system.").

It is a "flexible standard." Burdick, 504 U.S. at 434. The "rigorousness" of a court's "inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." Id. "There is no 'litmus test' to separate valid from invalid voting regulations . . . ." Obama for Am. v. Husted, 697 F.3d 423, 429 (6th Cir. 2012) (quoting Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 190 (2008) (plurality opinion)). Rather, "the scrutiny [courts] apply will wax and wane with the severity of the burden imposed on the right to vote . . .; heavier burdens will require closer scrutiny, lighter burdens will be approved more easily." Fish, 957 F.3d at 1124; see Burdick, 504 U.S. at 434.

The court must determine whether the burden imposed by HB 1569 is "severe" or something less than severe. Burdick, 504 U.S. at 434. To determine the burden, the court must consider both the statute's broad application to all voters and its heavier burden on subsets of voters. Fish, 957 F.3d at 1126–27; Crawford, 553 U.S. at 198–99. After determining the burden,

59

the court must "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Anderson, 460 U.S. at 789. Restrictions that impose a "severe" burden on the right to vote are subject to "strict scrutiny," and survive only if the defendants prove that they are "'narrowly drawn to advance a state interest of compelling importance.'" Burdick, 504 U.S. at 433–34 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)); see also McClure v. Galvin, 386 F.3d 36, 41 (1st Cir. 2004) (same). Typically, "severe" burdens are "invidiously" discriminatory on the basis that they are "irrelevant to the voter's qualifications." Crawford, 553 at 189 (citing Harper v. Va. Bd. of Elections, 383 U.S. 663, 666–67 (1966)). Alternatively, "'evenhanded restrictions that protect the integrity and reliability of the electoral process itself' are not [invidious]." Id. at 189-90 (quoting Anderson, 460 U.S. at 788 n.9). But evenhanded restrictions imposing "slight" burdens must still "be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" Crawford, 553 U.S. at 191 (quoting Norman, 502 U.S. at 288–89). In making that assessment, the court must consider "the extent to which [state] interests make it necessary to burden the plaintiff[s'] rights."[20] Anderson, 460 U.S. at 789.

---

[20] The defendants' request for rulings of law (doc. 169) references the standard applicable to facial challenges and asks the court in conclusory fashion to find that the plaintiffs have failed to satisfy it here. The court necessarily agrees that a "facial challenge must fail where the statute has a plainly legitimate sweep." Crawford, 533 U.S. at 202. To the extent that the defendants' unsupported request requires a response, the court concludes that HB 1569's eliminations of the QVA and CVA do not have a "plainly legitimate sweep" even when the court considers only their "broad application to all [New Hampshire] voters." See id. This is especially so because, even under the most exacting standard for facial challenges, which requires the plaintiffs to establish that the eliminations of the QVA and CVA are "unconstitutional in all of [their] applications," the "proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." City of L.A. v. Patel, 576 U.S. 409, 418 (2015) (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 894 (1992)).

A.    HB 1569's Elimination of the QVA to Prove Citizenship is Unconstitutional

By eliminating the QVA to prove citizenship, HB 1569 will significantly burden New Hampshire voters. It already prevented eligible voters from casting ballots in the 2025 municipal and local elections, in part because New Hampshire voters do not have ready access to DPOC and New Hampshire exceedingly relies on election day registration while prohibiting provisional balloting. The number of voters who are unable to vote without the safety valve of the QVA to prove citizenship will grow exponentially in future federal and state general and primary elections when turnout is much higher. HB 1569's elimination of the QVA to prove citizenship will have a particularly detrimental impact on young residents and married women. And although HB 464 will help certain voters register even though they do not possess DPOC, its effect will not meaningfully mitigate the significant burden HB 1569 places on voters. New Hampshire's asserted interests in eliminating the QVA do not justify the resulting burdens.

1.    Burden on the right to vote from elimination of citizenship QVA

Between April 29, 2024, and November 10, 2024—the day before HB 1569 took effect— 14,737 registrants relied on QVAs to prove their citizenship. That was more than 10% of all registrants in that period. In addition, approximately 16.8% of first-time registrants used QVAs to prove citizenship during that timeframe. More than 10,000 of the 14,737 citizenship QVAs were signed as part of election day registration on the day of the November 2024 general election.

Young people aged 17 to 24 relied on QVAs to prove citizenship at higher rates than other groups. More than 1,000 voters signed QVAs to prove citizenship to register on the day of

61

the November 2024 general election in the town of Durham alone, which is New Hampshire's largest college town.

The defendants' proposed findings of fact and rulings of law take pains to describe these voters as simply "choos[ing] to prove . . . citizenship by executing a [QVA]." Doc. no. 169 at 6; see id. at 14 (arguing that the court should not give any weight to the inference that "registrant[s] *relied* on a QVA rather than simply *preferred* a QVA"). In other words, the defendants attempt to paint a picture of a voting population that possesses but consciously chooses to forego bringing DPOC with them to register on election day and opts instead to submit a QVA to prove citizenship for the sake of convenience. It is true that the court cannot and does not conclude that every voter who used a QVA to establish citizenship could not otherwise have established citizenship with DPOC. But even with that limitation, the significant number of voters who relied on QVAs to prove citizenship between April 29, 2024, and November 10, 2024, corroborates other testimony, such as Dr. Herron's opinion that many New Hampshire voters do not have access to DPOC. See Fish, 957 F.3d at 1130-31. And, viewing the evidence as a whole, the court can draw the reasonable inference that a significant portion of the people who established citizenship by using a QVA (16.8% of first-time registrants) did so not because they preferred to do so, but because they fell into the group of people who did not possess or could not easily retrieve DPOC.

For many New Hampshire voters, it is difficult or time-consuming to access their citizenship documents. As Dr. Herron testified, even of those eligible New Hampshire voters who do possess some form of DPOC, between 89,934 and 153,213 cannot retrieve their documents within one day. Some, for example, are students domiciled in New Hampshire and their documentation is stored in their parents' homes, rather than with the students at school.

Some voters keep their citizenship documents in a safe, to which they may not personally have ready access.

Other voters have misplaced their proof-of-citizenship-documents—they believe they have them somewhere but do not know where. Dr. Herron estimated that between 17,967 and 53,826 eligible New Hampshire voters fall into this category, believing that they have citizenship documents but that they could not retrieve them even if allowed multiple days to do so.

Finally, some eligible voters do not possess citizenship documents at all. Dr. Herron testified that between 5,433 and 31,291 eligible New Hampshire voters do not possess acceptable DPOC—a conservative estimate that assumes that voters who do not know whether they possess acceptable documents do in fact possess them. The estimate rises as far as 59,583 if Dr. Herron assumes that voters who do not know whether they have the required documents do not possess them. The defendants argue that this evidence is of limited value because it establishes only how many voters do not possess DPOC and not how many voters cannot obtain DPOC before the next election. The court finds Dr. Herron's testimony is useful in weighing the burden imposed by HB 1569. This is especially so in the context of the other evidence showing that many voters who arrive at the polls to register on election day are not aware of the registration requirements. It is not necessary for the plaintiffs to show that voters would not be able to present DPOC under any circumstances.

Even voters who possess and have access to DPOC often do not carry it with them. Few voters—only approximately 11% of eligible voters in New Hampshire who possess a passport and approximately 7% of eligible voters in New Hampshire who possess a birth certificate— carry those documents with them regularly. Even would-be voters who possess the documents they need therefore have to go out of their way to bring them or make a second trip to the polls if

63

they do not bring them to register to vote—the testimony includes multiple examples of voters who possess DPOC, but who have nonetheless shown up to register without it since HB 1569's enactment.

The burden of providing DPOC to register is more obviously significant for those who do not possess or have ready access to it. But the burden on all voters, including those who possess DPOC, is heightened when looking at New Hampshire's voting scheme as a whole, as the court must. As discussed above, even prior to the enactment of HB 1569, New Hampshire had one of the highest "costs of voting" in the country. It did not permit early, in-person voting, registration by mail or online except in special circumstances, provisional balloting, automatic voter registration, third-party registration, or third-party voter registration drives. On the sole basis of its history of offering election day registration, New Hampshire escapes many of the obligations imposed upon states through federal legislation intended to increase voter registration and access to the polls. See 52 U.S.C. § 20501(b) (stating that the purposes of the NVRA include "establish[ing] procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" and "ensur[ing] that accurate and current voter registration rolls are maintained"); Common Cause Georgia v. Kemp, 347 F. Supp. 3d 1270, 1292 (N.D. Ga. 2018) ("Congress sought to protect the right to vote by adopting the provisional voting section of HAVA."). New Hampshire is exempt from the provisions of the NVRA and HAVA that require states to provide opportunities to register to vote at the Division of Motor Vehicles and certain public assistance offices, register to vote by mail, and submit provisional ballots even if voters' names do not appear on the voting lists or an election official asserts that they are ineligible to vote.

The effect of New Hampshire's exemptions from these requirements on the basis of its election day registration is two-fold. First, qualified voters are less likely to register prior to election day. Thus, the defendants' arguments that voters can avoid the burden imposed by HB 1569 by registering prior to election day falls flat in a state designed to rely intensely on election day registration. Second, it is more important that election day registration is readily available and a law that delays registration, even by one day or a few hours, is more likely to deprive qualified voters access to the ballot.

Two-thirds of QVAs submitted to prove citizenship in the months before HB 1569 took effect were signed on election day. Voters who do not have DPOC with them on election day may not have the time or ability to retrieve their documentation and return in time to cast a vote. Because New Hampshire does not offer provisional ballots or provide a "day after" election day on which an eligible voter can register and still vote in that election, there is no "safety valve" to allow voters who arrive at the polls without DPOC to register to vote. Such a "safety valve" might have otherwise lowered the burden on voters. See Fish, 957 F.3d at 1129 ("[U]nlike the Indiana law in Crawford, an eligible Kansas applicant on the suspense or cancellation list does not have the option to fill out a provisional ballot, produce DPOC after the election, and have their ballot counted." (quotations omitted)); cf. Crawford, 553 U.S. at 199 (holding that the "severity of th[e] burden is, of course, mitigated by the fact that, if eligible, voters [impacted by the challenged law] may cast provisional ballots that will ultimately be counted").

Various municipal and local elections in 2025 demonstrated the burden that HB 1569 places on voters by eliminating the QVA. Although these elections have a much lower turnout than federal and state elections and see far fewer new voters seeking to register, many voters were prevented from registering because of the elimination of the QVA. NHCVR, a voter

65

advocacy group, identified hundreds of voters turned away during these elections at just a small handful of the polling locations in the state. The group was able to confirm that many were turned away specifically because of HB 1569's elimination of the QVA. Some of the voters turned away were unable or did not return. This testimony was corroborated by the testimony of local election officials—some of whom personally turned away voters during the March 2025 elections due to HB 1569's elimination of the QVA and voters' inability to prove their citizenship. Indeed, Supervisor Shump of Durham, who turned away at least one voter in that election, testified that this was the only time that she has ever had to turn away a voter who claimed to be an eligible citizen because the voter did not bring citizenship documentation to the polls. This evidence of actual harm to voters is powerful proof that HB 1569 imposes a significant burden. See Fish, 957 F.3d at 1127–28; cf. Ayers-Schaffner v. DiStefano, 37 F.3d 726, 728 & n.5 (1st Cir. 1994).

The burden on voters from the elimination of the QVA is compounded by the effects of election-worker error. Misunderstandings by election workers over what constitutes adequate proof of citizenship are not uncommon. For example, in October 2025, Mr. Kim, a naturalized citizen, was not allowed to register to vote despite presenting a passport, which constitutes DPOC.

The risk of election-worker error after HB 1569 is particularly acute because of missing or conflicting guidance from the Secretary's office on what constitutes "other reasonable documentation" of citizenship. For example, the Secretary's office advised in its initial HB 1569 guidance that Global Entry cards were not acceptable. The Secretary's office acknowledged in this litigation that this guidance was wrong, but also that it still has not corrected this mistake in its communications to local election officials—even as voters continue to register. The

Secretary's office has also failed to provide any standard by which local officials should assess whether a given document constitutes "other reasonable documentation." Even Director Piecuch testified that she would need to seek legal advice if a local official sought her opinion regarding a particular document on election day. Unsurprisingly, given the dearth of guidance, the record is replete with contradictions and uncertainty over what is and is not acceptable proof of citizenship. This risk of election-worker error adds to the burden placed on New Hampshire voters from the elimination of the QVA. See, e.g., Fish, 957 F.3d at 1129 n.7; Ne. Ohio Coal. for Homeless v. Husted, 696 F.3d 580, 591–95 (6th Cir. 2012) (considering burden imposed on the right to vote by "poll-worker error"); Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1319 (11th Cir. 2019) (emphasizing burdens flowing from "problems [that] occur because of the way in which Florida implements the scheme," and "deficiencies [in its] very nature").

Although HB 1569's elimination of the QVA to prove citizenship impacts voters as a whole, it places an especially heavy burden on certain groups of voters. Here, the record establishes that it places a more significant burden on young voters and married women.

Young voters are particularly burdened by the elimination of the citizenship QVA. They are obviously far more likely to be new voters, and thus more likely to be required to produce DPOC to register than are older voters who may have registered before HB 1569 took effect. Further, young voters disproportionately relied on QVAs to prove citizenship before HB 1569 took effect.

Married women are disproportionately burdened because the names on their DPOC often do not exactly match their current names. Because women more often change their names when they marry (more than 80% of women in opposite-sex marriages took their husbands' last names according to a 2023 Pew Research Center Survey), the requirement that a voter's DPOC matches

67

her current name affects women more than men at a 15:1 ratio. The record confirms that women have already been turned away from registering for this reason. Laws such as HB 1569 "that 'place[] a particular burden on an identifiable segment' of voters are more likely to raise constitutional concerns." Ariz. Democratic Party v. Hobbs, 18 F.4th 1179, 1190 (9th Cir. 2021) (citing Anderson, 460 U.S. at 792).

2.      HB 464 only slightly mitigates the burdens imposed by the elimination of the QVA

The defendants argue that HB 464 and other measures, such as the Division of Vital Records offering free copies of birth certificates for voting purposes, effectively remove any burden HB 1569 imposes on voters by eliminating the QVA. That is not so. Although these measures slightly alleviate the burdens that the elimination of the QVA imposes on voters, they do far too little to change the court's analysis in any meaningful way. First, the court acknowledges that, in some cases, states have remediated burdens imposed by voter identification laws by offering free identification to eligible voters, but in those cases, the state was capable of issuing the necessary identification to all eligible voters. See e.g., Crawford, 533 U.S. at 198. Here, the evidence shows that the state could only possess the necessary documentation, proof of citizenship, for 40% of the population because the other 60% were born outside of New Hampshire. Second, for the same and other reasons, there are large gaps in the databases that HB 464 makes available in the SVRS to confirm voters' citizenship. Third, there are practical problems with the procedures that HB 464 creates to undertake such SVRS confirmations on election day and otherwise.

As the Secretary's guidance states, HB 464 can only help a subset of registrants—those who were previously registered to vote in New Hampshire, those who were born in New Hampshire, those who provided proof of citizenship when they obtained a New Hampshire driver's license, and those who possess a birth certificate in a different name, where the name change occurred as part of a New Hampshire marriage or divorce. These limitations mean that the procedures that HB 464 implements will not help a large number of voters prove their citizenship.

An SVRS search will not be able to locate birth certificates for the more than 60% of New Hampshire residents who were born outside the state. Analysis of citizenship QVAs from four New Hampshire municipalities in the months before HB 1569 took effect confirms that more than 72% of them—829 out of 1146—were executed by voters born outside of New Hampshire, either in other states or overseas.

Many New Hampshire residents get married or divorced outside the state. For such residents, vital record searches will not be able to confirm a name change that might be needed to match a current name to a document proving citizenship containing a former name. Indeed, HB 464 could not help two of the three Bethlehem women who were unable to register in October 2025 because their current names did not match their birth certificates. They were born and married in Massachusetts.

Similarly, DMV records available pursuant to HB 464 include only New Hampshire drivers' licenses and identification cards. New Hampshire law allows voters to register using out-of-state identification, and many do so—state records show that more than 43,000 active New Hampshire voters used an out-of-state license or identification card to register. Another 118,000 active New Hampshire voters do not have a New Hampshire driver's license or identification

69

card number associated with their registration, suggesting that they, too, may lack such identification.

Further, the DMV database will not accurately report the citizenship status of naturalized citizens who applied for a license before they became citizens, unless they have since voluntarily updated their status with the DMV. Yet the Secretary's search instructions wrongly specify that a registrant shown in DMV records as a noncitizen "is **not** a US citizen and **cannot** register to vote," before later qualifying that statement in smaller text on a different page. Ex. VV at 22, 24. As for other voters, the record simply does not reveal how often DMV records might prove citizenship, where that information comes from, or how accurate it is. The record suggests that some of the DMV citizenship data is self-reported by the registrant, and it is unclear whether citizenship can be confirmed under HB 464 based on that self-reported data.

Even for those who would expect their records to be included in the SVRS because they were born and raised in New Hampshire, the searchable records in the SVRS suffer from various gaps. Nearly all pre-1935 birth certificates are unavailable and some from 1949 and 1950 are also missing. Any birth certificate that was issued on a "delayed" basis is missing, as are marriage records from before 1960. Divorce records from before 1979 and those from within the six months prior to the search, when the court may infer a voter will be most likely to have had a recent name change that is not yet reflected on the voter rolls, are also unavailable. Other name change records from family court and probate court are generally excluded from the searchable records.

Many of the voters whose records will be unavailable in a SVRS search will erroneously believe that a search will be able to confirm their citizenship. Some will unknowingly have a New Hampshire record that falls into one of the gaps outlined above. Others will expect the HB

70

464 searches to be more comprehensive than they are, such as wrongfully assuming that the SVRS will have access to out-of-state records. These eligible voters will not be able to rely on HB 464 or the QVA to prove their citizenship and enable them to cast a ballot.

Even ignoring the fact that SVRS searches pursuant to HB 464 would not help a large swath of those seeking to register, there are several other reasons why HB 464 will not meaningfully lessen the burden on New Hampshire voters. For example, SVRS access requires a computing device and internet access, which many New Hampshire polling places do not possess. The survey of polling places conducted by the Secretary's office found that 10.75% of polling places do not have internet, and around 5% are not sure. The survey also found that around 15% of polling places do not have good cellular service, and around 7.5% are not sure. At least 4 polling places have no telephone or internet access. And state offices are not required to, and do not, provide election workers with laptops to access the SVRS on election day.

Also, only a small number of election officials at each polling location have access to the SVRS. In certain polling locations, none have access. Further, these election officials, who cannot share their SVRS credentials with anyone else, do not and cannot devote the entirety of their time on election day to running SVRS searches. They often juggle many priorities and supervise several volunteers. The SVRS also tracks search activity and will log users out—and lock them out of their accounts—if they run too many searches too quickly.

The defendants attempt to downplay these issues by noting that election officials may and are encouraged to call the Secretary's Help Desk and the Attorney General's Hotline if they have difficulty registering voters. But even if election workers follow that direction—and as was demonstrated during the 2025 elections, many will not—those options will not make a meaningful difference. Only eight people, combined, between the Help Desk and the Hotline are

trained to run an SVRS search. The Secretary acknowledged that his office would not be able to handle thousands of calls on election day. Considering the hundreds of thousands of New Hampshire voters who registered to vote on general and primary election days between 2016 and 2024, and that more than 10,000 voters signed citizenship QVAs on election day in the last federal election, voters seeking to register are certain to encounter lengthy delays. Many will be disenfranchised entirely.

Finally, the instructions governing the search procedures will lead to false negatives. The instructions to local officials state that responsive records will be returned only if the record perfectly matches the search query of the citizen's name and birth date. Thus, if a voter fills out anything other than his given name exactly (e.g. a nickname, a middle name used as a first name, etc.), or if a local election official makes an error when inputting the information, the search will return a false negative.

In short, the procedures authorized by HB 464 will not meaningfully reduce the burden HB 1569 placed on voters by eliminating the QVA to prove citizenship. The burden on voters remains significant. Thus, HB 1569's elimination of the QVA can survive only if the defendants have introduced "sufficiently weighty evidence" to show that the state's "interests make it necessary to burden" the plaintiffs' rights in this case. Fish, 957 F.3d at 1133-34.

### 3.    Asserted state interests

The defendants put forward three state interests as justifications for the burdens imposed by HB 1569's elimination of the QVA: 1) election integrity; 2) safeguarding voter confidence; and 3) protecting the public fisc. The court agrees with the defendants "that each of these interests is legitimate in the abstract." Fish, 957 F.3d at 1132. The court also acknowledges that

abstract interests have, at times, been sufficient to ward off constitutional challenges to election laws. See, e.g. Crawford, 553 U.S. at 194–97 (finding that preventing voter fraud and safeguarding voter confidence were legitimate state interests even though the record contained no evidence of voter fraud or resultant threats to voter confidence in the state). But courts that do not require evidence that claimed interests are at risk to justify legislation imposing on the right to vote do so because the burden on voters from the legislation is limited or is mitigated by some sort of safety valve. See, e.g., Brnovich v. Democratic Nat'l Comm., 594 U.S. 647, 678–86 (2021) (describing the relevant burdens as "modest," "small," and "unremarkable" when concluding that a state "may take action to prevent election fraud without waiting for it to occur and be detected within its own borders"); Crawford, 553 U.S. at 194–98 (accepting state's justifications for photo-ID law without requiring evidence of voter fraud because the plaintiffs had "not introduced evidence of a single, individual Indiana resident who will be unable to vote as a result of [the challenged law] or who will have his or her right to vote unduly burdened by its requirements" and the availability of provisional ballots mitigated any burden imposed except as to a very small group of people).

Where, as here, there are sufficient facts to find that an election law imposes a significant burden on a large group of people, the sliding scale requires more than an abstract interest. The court must look at the "incremental interest[s] in the specific regulation at issue." Gorbea, 970 F.3d at 15. It must "determine the legitimacy and strength of each." Anderson, 460 U.S. at 789. The defendants "point[] to no concrete evidence that 'those interests make it necessary to burden the plaintiff[s'] rights' in this case." Fish, 957 F.3d at 1132 (quoting Burdick, 504 U.S. at 434); Anderson, 460 U.S. at 789. Therefore, the court concludes that the state's interests do not justify the burdens HB 1569 imposes on the right to vote by eliminating the QVA.

a.    Election integrity

The defendants argue at the outset that election integrity is such a vital state interest that the defendants "need not prove that actual voter fraud existed in New Hampshire prior to HB 1569" or "that any contributor to election integrity existed before passing" HB 1569. Doc. no. 169 at 19-20.

Again, in a case such as this, in which the court has already found that the elimination of the QVA imposes a significant burden on the right to vote, the court "must look at more than whether the proffered interests are legitimate in the abstract." Fish, 957 F.3d at 1133 and 1135-36 (distinguishing Crawford because the burden on voters' rights was "limited" and "further mitigated by the possibility of casting provisional ballots"). The court must look at whether there is evidence that New Hampshire's interest in election integrity outweighs the significant burden on voters' rights. It does not.

Dr. Minnite, the plaintiffs' expert on the subject of voter fraud, found 47 instances of wrongful voting (which includes unintentional voting by unqualified voters) in New Hampshire from 1998 to 2024, including in local elections. Only eight people identified as noncitizens may have cast a ballot during those 26 years, accounting for 26 ballots, at most. Only three of those voters may have registered using QVAs to prove their citizenship. Only one person over those 26 years is alleged to have committed voter fraud (intentional voting while knowing that he was not qualified to do so) and he has been criminally prosecuted. His prosecution remains ongoing. Such miniscule numbers strongly undercut any legitimate concern about election integrity vis-à-vis noncitizen voting and, consequently, the state's interest in addressing it. See Fish, 957 F.3d at 1134 (stating that the district court's finding that "at most, 67 noncitizens registered or attempted to register in Kansas over the last 19 years" and "[a]t most, 39 noncitizens have found their way

74

onto the Kansas voter rolls in the last 19 years" represented "incredibly slight evidence that Kansas's interest in counting only the votes of eligible voters is under threat"). Both the Secretary and Deputy O'Donnell testified that noncitizen voting is essentially non-existent in New Hampshire. Even in cases involving "a minimal burden," "*one* bizarre instance" suggesting that the challenged law could serve a state interest "cannot justify [a] burden" imposed on "*thousands*" of voters every election. Eakin v. Adams Cnty. Bd. of Elections, 149 F.4th 291, 317 (3d Cir. 2025), petition for cert. filed, No. 25-967 (U.S. Feb. 17, 2026). Here, HB 1569's elimination of the QVA to prove citizenship represents far more than a minimal burden.

New Hampshire's interest in election integrity cannot justify the burden on New Hampshire voters based on the evidence in this case.

b.    Safeguarding voter confidence

The defendants argue that eliminating the QVA increases public confidence in New Hampshire's elections. Once again, there is no doubt that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006). Thus, New Hampshire has a legitimate interest in safeguarding voter confidence. But there is no evidence that HB 1569 has improved or will improve voter confidence by eliminating the QVA to prove citizenship.

The Secretary acknowledged that the surveys on which he relies to understand voter confidence show that "about 90% of people in New Hampshire have confidence in" the state's elections, and that this is a "high level of confidence." Doc. no. 165, Trial Tr. at 54:22-55:3. He also thinks that voters are more concerned about the way that elections are conducted outside of the state than within the state. The Special Committee on Voter Confidence reported that the

75

majority of New Hampshire voters have confidence in the state's elections. Although the Special Committee recommended certain changes to election laws to improve voter confidence, such as improved recruitment and training of local election officials and expanded voter education, it did not recommend that the state eliminate the QVA to prove citizenship. Nor did it recommend any other changes to New Hampshire's proof-of-citizenship laws.

Tellingly, the defendants do not even attempt to explain how eliminating the citizenship QVA furthers the state's interest in improving voter confidence. Nor have either of the defendants' offices taken any steps to measure HB 1569's effects on voter confidence. Instead, the defendants merely note the relationship between election integrity and voter confidence. But, as mentioned, eliminating the QVA does almost nothing to further the state's interest in election integrity and so, this relationship between election integrity and voter confidence does not bolster the defendants' argument. Moreover, as Dr. Mayer testified, legislation such as HB 1569 does nothing to affect voters' opinions about election integrity and will not enhance voter confidence.

HB 1569's elimination of the QVA to prove citizenship does not further the state's interest in safeguarding voter confidence. And, as the Secretary and Dr. Mayer agree, it may have precisely the opposite effect. If large swaths of voters are prevented from voting because they lack DPOC, as the evidence shows will happen in upcoming elections, it "also may have the inadvertent effect of eroding, instead of maintaining, confidence in the electoral system." Fish v. Kobach, 309 F. Supp. 3d 1048, 1113 (D. Kan. 2018).

c.      Protecting the public fisc

Finally, the defendants argue that the state's interest in protecting the public fisc and conserving state resources justifies HB 1569's provision eliminating the QVA to prove

76

citizenship. They point to testimony regarding the costs associated with the Secretary's office's follow-up efforts after each election to confirm the identity of voters who used a QVA. These efforts included checking that the number of affidavits entered into the SVRS matched the number of physical affidavits retained by election officials, and sending letters to voters who used a QVA to ensure that they actually voted.

HB 1569's elimination of citizenship QVAs does nothing to conserve the state resources expended on these efforts. New Hampshire law required the investigation of domicile and identity affidavits, but not citizenship affidavits. Investigator Tracy testified that the state has never systematically investigated QVAs for citizenship. Investigations into alleged noncitizen voting take up less than 2% of the Election Law Unit's time, and the majority of those investigations have not involved the use of a QVA to prove citizenship. Deputy O'Donnell testified that the Election Law Unit had sufficient staffing and funding to handle those investigations. Therefore, eliminating the QVA to prove citizenship will not meaningfully reduce the time necessary for the Attorney General's office to investigate noncitizen voting, which was already minimal.

In contrast, HB 1569's elimination of the QVA has already resulted in substantial costs to New Hampshire. As the Secretary agreed, "HB 464 would not have been necessary if HB 1569 had not become law." Doc. no. 165, Trial Tr. at 59:2-4. The state paid a vendor more than $167,000 to update the SVRS to comply with the provisions of HB 464. The Secretary's office has spent a significant amount of staff time taking various steps necessary to implement the system, and will continue to do so in the future, including efforts to exchange data with the Department of Safety and support the mechanisms to transmit that data, to train local and state

officials how to run the necessary searches, to actually run the searches to confirm voter citizenship, and to educate the public about the need to bring DPOC to register.

4.    Burden of the elimination of the QVA to prove citizenship versus state interests

The burden on New Hampshire voters from HB 1569's elimination of the QVA is not justified by the state interests put forward by the defendants. Although these interests are legitimate in the abstract, they are not meaningfully served by HB 1569's elimination of the QVA. Further, the evidence suggests that eliminating the QVA may have actually harmed the state's proffered interests. Because the burden on New Hampshire voters from HB 1569's elimination of the QVA is significant and greatly outweighs the state's interests in this case, HB 1569's elimination of the QVA to prove citizenship is an unjustifiable burden on the right to vote in violation of the First and Fourteenth Amendments.

B.    Elimination of the CVA Constitutes an Unjustifiable Burden on the Right to Vote

HB 1569's elimination of the CVA as an acceptable response to voter challenges will also burden New Hampshire voters, though not as clearly or significantly as the elimination of the citizenship QVA. Nevertheless, eliminating the CVA does not further the state's interests. Therefore, the burdens on voters from the elimination outweigh the state's interests offered as justification. HB 1569's elimination of the CVA for voter challenges thus constitutes an unjustifiable burden on the right to vote.

1.      Burden on the right to vote from elimination of CVA

The record shows that HB 1569's elimination of the CVA will likely deny certain eligible voters the right to vote.

Although there is no record of anyone previously making a formal challenge to a voter's qualifications as permitted by New Hampshire law, the previous availability of the CVA to overcome any such challenge renders that fact of limited importance. New Hampshire's voting scheme allows myriad people to challenge voters' qualifications, potentially preventing voters from casting ballots. These permitted challengers are not limited to election workers or to registered voters from the same town or ward who might have personal knowledge supporting a challenge. Instead, the law also permits challengers appointed by political parties. The supervisors of the checklist must determine whether any challenge based on age, citizenship, domicile, or identity is well grounded. Moderators decide challenges lodged on other grounds. Before HB 1569, even if a supervisor or moderator found the challenge well grounded, a voter would be allowed to vote if he simply submitted a sworn CVA attesting to his eligibility. So, there was little incentive to lodge a challenge, especially if it was not ironclad. After HB 1569, a voter who is successfully challenged does not have the benefit of the procedural safeguard of the CVA and can vote only if he secures an order from a state court. Thus, HB 1569 has increased the practical effect of a challenge and, potentially, the incentive to initiate one. Particularly in today's political environment and under the statutory scheme as it now exists, eligibility challenges are likely to become more common. Indeed, Ms. Zink testified that Open Democracy has already seen efforts from political party committees to recruit election-day challengers since HB 1569 went into effect.

79

The threat of challenges, including baseless challenges, is supported by the evidence that groups attempted to lodge "mass challenges" against voters in the November 2024 election. Doc. no. 161, Trial Tr. at 20:5-8. In that instance, the Attorney General's office was able to issue pre-election guidance directing election officials to rule the challenges not well grounded. But the statute contemplates moderators and supervisors deciding these issues. The likelihood that a challenge will erroneously deny an eligible voter the right to vote is heightened by the fact that the law provides no guidance for election officials with respect to determining whether it is more likely than not that a challenge is well grounded. Cf. Saucedo v. Gardner, 335 F. Supp. 3d 202, 218 (D.N.H. 2018) (noting that the "absence of functional standards" and the fact that "the ultimate determination is left to the sole discretion of the" election official "entails tangible risks"). And challenged voters, who are already registered, will have no advanced notice that they will be challenged and are unlikely to have documents which might help them rebut a challenge, such as a birth certificate or passport.

The processes that HB 464 affords will not mitigate the burden that eliminating the CVA imposes on voters. First, the gaps and practical limitations concerning SVRS searches discussed above limit HB 464's utility in assisting challenged voters. More importantly, however, there is no evidence that election officials are permitted to search the SVRS to assist voters in rebutting a challenge. The Secretary's January 5, 2026 guidance regarding SVRS searches states that such searches "can now be used to verify certain citizenship, age, name change, and death information for voter registration." Ex. UU at 1 (emphasis added). And the Application requesting a search of the SVRS states that it is "for the Purpose of New Hampshire Voter Registration" and further warns the applicant to look to verify records "for voter registration purposes ONLY." Ex. 176 at 1. Particularly in light of the Secretary's guidance warning election officials of the consequences

80

of performing unauthorized SVRS searches, including criminal penalties, it is unlikely that HB 464's processes will benefit a challenged voter in any way.

After HB 1569's elimination of the CVA, the only option for a successfully challenged voter is to appeal the election official's decision to the superior court. That is not a viable safeguard against deprivation. First, even if the process to obtain judicial relief were quick, simple, and free, many challenged voters simply would not have time or the ability to pursue that course of action. Election days are not holidays, and voters often have work or other obligations. Many voters choose to vote toward the end of the day, leaving them little time to be able to pursue relief in superior court if they are successfully challenged, even if they had the means to do so.

But the process to obtain judicial relief in superior court to overcome a voter challenge is not quick, simple, or free. Although the defendants' offices have taken steps to facilitate faster disposition of election-related matters on election day, a voter must either find and pay an attorney to institute a case within a matter of hours (at most) or must be able to navigate the procedural hurdles inherent in any legal action on a pro se basis. Further, a voter pursuing relief in superior court pro se will still incur costs, as the current filing fee for a civil action in superior court is $325. Given the many impediments to obtaining relief from the superior court on election day, that process will provide little benefit to challenged voters.

Thus, HB 1569's elimination of the CVA imposes a considerable burden on eligible New Hampshire voters by removing the procedural safeguard that allows them to overcome a challenge to their qualifications, especially because New Hampshire does not permit provisional ballots. That burden is lower than the one placed on New Hampshire voters from HB 1569's elimination of the QVA to prove citizenship. Nevertheless, it is "at least somewhere in between

81

the two poles" of "'severe' and 'nonsevere,'" Fish, 957 F.3d at 1128 n.6, and "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" Crawford, 553 U.S. at 191 (quoting Norman, 502 U.S. at 288-89).

### 2.    State's interests

At the outset, it is worth noting that Secretary Scanlan testified that he could not think of a single state interest advanced by the elimination of the CVA in the context of a voter challenge. Doc. no. 165, Trial Tr. at 44:24-45:2. In their post-trial briefing, however, the defendants rely on the same three state interests that they offered to justify the elimination of the QVA: 1) election integrity; 2) safeguarding voter confidence; and 3) protecting the public fisc. As the court concluded above, these interests were only minimally furthered, at best, by HB 1569's elimination of the citizenship QVA. They are not advanced at all by the removal of the CVA for voter challenges.

As discussed, there is no evidence of any fraud or any other misuse involving a CVA in the context of a voter challenge. And although the defendants attempt to cast doubt on the legitimacy of using a CVA to overcome a successful challenge, that effort is bewildering. After all, the challenge process begins when a challenger completes a sworn affidavit. The defendants offer no explanation as to why the state should trust a sworn affidavit used to initiate a challenge more than a sworn CVA used to overcome a challenge. As Investigator Tracy, testified, such a system "doesn't make sense." Doc. no. 162, Trial Tr. at 87:18-20.

With regard to safeguarding voter confidence, the defendants state simply that ensuring election integrity bolsters public confidence in elections. Of course, Secretary Scanlan himself disagreed, testifying that the CVA's existence to overcome voter challenges is not a contributing

factor to declining voter confidence in New Hampshire. Doc. no. 165, Trial Tr. at 45:15-18.

Regardless, as mentioned above in the context of the QVA, New Hampshire voters' confidence

in the state's elections is notably high, and elimination of the CVA does nothing to further the

state's interest in election integrity, which could arguably increase voter confidence.

Finally, the defendants point to voters' use of the CVA to prove identity outside of the

challenged-voter process and assert that use of CVAs for that purpose was the source of a

substantial burden on state resources. These resources, as Director Piecuch testified, included

follow-up efforts after an election to verify that voters who used CVAs actually voted and any

actions taken by the Attorney General's office to track down unverified affiants. But even if the

defendants had shown that the elimination of the CVA meaningfully saved the state money and

other resources—which they have not done—that is not the issue in this case. Open Democracy

challenges the provisions of HB 1569 that eliminated the CVA for use in voter challenges. The

state has expended no resources investigating CVAs used to overcome voter challenges, and the

defendants do not contend that they would have done so in the future absent HB 1569's

provisions.

### 3.    Burden of elimination of CVA versus state interests

The burden on New Hampshire voters from HB 1569's elimination of the CVA for voter

challenges is considerable. The state interests that the defendants put forth to justify that burden

are not in any way served by HB 1569. Unmistakably, therefore, they are not "relevant and

legitimate state interests 'sufficiently weighty to justify the limitation.'" Crawford, 553 U.S. at

191 (quoting Norman, 502 U.S. at 288-89). HB 1569's elimination of the CVA is an

unjustifiable burden on the right to vote in violation of the First and Fourteenth Amendments.

III.     Elimination Of The CVA Violates Voters' Procedural Due Process Rights (Count III)

"To establish a procedural due process violation, [a] plaintiff must identify a protected

liberty or property interest and allege that the defendants, acting under color of state law,

deprived [him] of that interest without constitutionally adequate process." González-Droz v.

González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (quotations omitted). "The basic guarantee of

procedural due process is that, before a significant deprivation of liberty or property takes place

at the state's hands, the affected individual must be forewarned and afforded an opportunity to be

heard at a meaningful time and in a meaningful manner." Id. (quotations omitted). This means

affording the individual facing deprivation "a reasonable time" to appear and contest that denial.

A.A.R.P. v. Trump, 605 U.S. 91, 94–95 (2025).

Open Democracy's procedural due process claim is governed by the three-part

framework from Mathews v. Eldridge, 424 U.S. 319 (1976).[21] To determine the sufficiency of

the process afforded, the court must balance three factors:

> First, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and
> probable value, if any, of additional or substitute procedural safeguards; and

---

[21] The defendants suggest in passing that the court should not apply the Mathews test because the availability to seek appellate review of a successful challenge in superior court is "orthodox due process, and it cannot be reasonably disputed." Doc. no. 169 at 30. For the reasons explained, the option to seek relief in superior court is far from a sufficient procedural safeguard to satisfy the Fourteenth Amendment.

Further, the defendants stated in their pretrial statement that they intended to argue that "Open Democracy's procedural due process claim is intertwined with Counts I and II and similarly fails the scrutiny of that framework." Doc. no. 124, ¶ 4 (citing Ariz. Democratic Party, 18 F.4th at 1195). The defendants did not make that argument in their post-trial briefing.

finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 335; Collins v. Univ. of New Hampshire, 664 F.3d 8, 17 (1st Cir. 2011). As the parties agree, much of the discussion regarding the three Mathews factors overlaps with the court's analysis of Open Democracy's claim in Count II.

A.      Protected Interest

The defendants concede that "[v]oters have an interest in their rights to cast ballots," doc. no. 169 at 31, and so they address only the second and third Mathews factors. To be clear, "[i]t is beyond dispute that '[t]he right to vote is of the most fundamental significance under our constitutional structure.'" Saucedo, 335 F. Supp. 3d at 217 (quoting Ayers-Schaffner, 37 F.3d at 727). Thus, this interest merits "significant weight." Id.

B.      Risk of Erroneous Deprivation

The elimination of the CVA creates a risk that eligible voters will be denied the right to vote because of the challenged-voter process. The court noted above many factors that heighten the risk of disenfranchisement, including that New Hampshire allows individuals who are appointed by political party committees to initiate challenges, Ms. Zink's testimony that Open Democracy has seen efforts from political party committees to recruit election-day challengers after HB 1569 went into effect, prior efforts to lodge mass challenges against groups of people, the absence of official guidance for supervisors and moderators about resolving a challenge, the likelihood that challenged voters will not have documents on them that could otherwise prove their eligibility, the ineffectiveness or unavailability of HB 464's procedures to protect

challenged voters' rights, and the inadequate processes available for review of a successful challenge.

The defendants argue that voters do not face a risk of erroneous deprivation of their rights from the elimination of the CVA for two reasons. First, they argue that challenged voters receive constitutionally "adequate notice" because a moderator must give the challenged voter an opportunity to be heard before ruling on a challenge. That requirement does not significantly lessen the erroneous risk of deprivation of the right to vote. As mentioned, a challenged voter has no prior notice that he will be challenged and so has no opportunity to gather documents or otherwise devote time to preparing a response that might help him rebut the challenge. Thus, the fact that a moderator must inform a voter of a challenge and ask him for an immediate response hardly meets the "fundamental requirement of due process [of] the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews, 424 U.S. at 333 (quotations omitted).

Second, the defendants argue that the availability of an appeal to the superior court satisfies due process. But, for the reasons discussed above, the appeal available is not the type of "meaningful judicial review" that satisfies the Fourteenth Amendment's guarantee of due process. Chongris v. Bd. of Appeals of Town of Andover, 811 F.2d 36, 40 (1st Cir. 1987). It is clear that the Attorney General's office, and in particular Deputy O'Donnell when he was chief of the Election Law Unit, endeavored to make the process to obtain judicial review of a successful challenge easier for the challenged voter. But those efforts could not render those procedures consistent with due process without the safety valve of the CVA. Again, it is simply not feasible for most challenged voters who go to the polls on election day without notice that they will be challenged to a) learn of and understand the process to appeal the moderator's or supervisor's decision, b) file a case pro se or find an attorney to initiate an action, c) pursue a

court order, and, if successful, d) return to the polls to cast a ballot. That option is particularly illusory given that hiring an attorney or paying a filing fee is expensive, and that voters will have at most a matter of hours to pursue this relief, and some only a matter of minutes.

Thus, there is a considerable risk of erroneous deprivation of voters' rights to vote because HB 1569 eliminated the CVA for voter challenges. See, e.g., Panzella v. Sposato, 863 F.3d 210, 218 (2d Cir. 2017), as amended (July 18, 2017) (finding a significant risk of erroneous deprivation of rights even though the plaintiff could initiate proceedings in New York Supreme Court because that option required a person to "give up not only time, but also money to initiate a lawsuit and [usually] retain an attorney" (quotations omitted)). There is far more than mere "probable value" that the CVA "would provide a tangible benefit" as a procedural safeguard against that erroneous deprivation, as it provides a guarantee that a wrongfully challenged voter will not be denied the right to vote. Saucedo, 335 F. Supp. 3d at 219.

C.    Government Interest

The defendants assert that elimination of the CVA for challenge purposes advances New Hampshire's "interest in preventing the risk and suspicion of fraud, election misadministration, voter confusion, voter registration inaccuracies, and other threats to the electoral process." Doc. no. 169 at 33. The court has already explained above in its discussion of Count II that the elimination of the CVA for voter challenges does not further those of these interests raised in defense of that claim. The defendants make no coherent effort to explain how the additional interests they raise here, such as voter confusion or voter registration inaccuracies, could possibly implicate the elimination of the CVA for voter challenges. And the defendants do not

contend that the reinstatement of the CVA to overcome a voter challenge puts any burden on the state.

### D.     Balancing the Mathews Factors

HB 1569's elimination of the CVA to overcome a voter challenge implicates one of the most important and fundamental rights in our country—the right to vote. The CVA functioned for years as a procedural safeguard against the erroneous deprivation of that right as a result of the voter-challenge process. HB 1569's removal of the CVA, and the corresponding absence of adequate procedural protections for a wrongfully-challenged voter, fails to guarantee voters basic fairness. Particularly because the CVA's elimination does not further the state's proffered interests and there is a simple procedural fix that would eliminate the risk of disenfranchisement—the reinstatement of the CVA—HB 1569's provisions removing the CVA for challenge purposes deprives voters of due process.

Therefore, Open Democracy is entitled to judgment on its procedural due process claim in Count III.

### IV.     Motion For Sanctions

During the trial, the Open Democracy Plaintiffs sought to exclude several portions of witnesses' testimony regarding the implementation of HB 464, the SVRS generally, and Department of State policy. The Open Democracy Plaintiffs argued that such testimony relied on information that the defendants refused to produce during discovery and which contradicted Secretary Scanlan's Rule 30(b)(6) witness deposition testimony, which was taken just three business days before trial began.

The court and parties agreed that the court would permit the defendants to offer the witnesses' testimony and that the Open Democracy Plaintiffs could file a post-trial motion for sanctions. They did so. In it, they request that the court issue the following forms of relief:

> First, where a defense witness's testimony conflicts with that of Secretary Scanlan (or seeks to cure his averred lack of knowledge) on issues regarding the implementation of HB 464, the Open Democracy Plaintiffs seek a reasonable inference that the other witness is less credible on those subject matters, especially matters of Department of State policy—as would be reasonably expected given the Secretary's leadership role and his 30(b)(6) designation. Second, the Open Democracy Plaintiffs request that, in light of Defendants' failure to supplement and Plaintiffs' resultant inability to more fully probe the evident inadequacies of the HB 464 system, the Court give appropriate, lesser weight to testimony which was based on undisclosed responsive information.

Doc. no. 167 at 3. The defendants object, arguing that they committed no discovery violations. Doc. no. 174.

This is hardly the first discovery dispute regarding the defendants' production of information related to the SVRS and HB 464's implementation. The court granted the Open Democracy Plaintiffs' motion to compel the production of a copy of the SVRS over the defendants' objection. See Coal. for Open Democracy v. Scanlan, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025). Subsequently, after the defendants refused to produce any discovery related to HB 464 on the ground that it was irrelevant and then relied heavily on HB 464's provisions in their summary judgment motion, the plaintiffs moved to compel the defendants to produce discovery related to HB 464's implementation. The court granted the motion in part, ordering that "the defendants shall search for, collect, and produce documents generated after June 1, 2025, concerning HB 464 and its implementation and which are responsive to the plaintiffs' discovery requests." Dec. 2, 2025 End. Or.

The court later granted the plaintiffs' request to take a new deposition under Rule 30(b)(6) on the limited topic of HB 464 and the documents produced in response to the order on the motion to compel. New Hampshire Youth Movement v. Scanlan, No. 24-CV-291-SE, 2026 WL 122779, at *7 (D.N.H. Jan. 15, 2026). The defendants designated Secretary Scanlan as the Rule 30(b)(6) witness, and the deposition took place on February 4, 2026.

At trial, Dr. Mayer testified as an expert for the plaintiffs regarding several issues, including his understanding of the deficiencies of the processes authorized by HB 464 and HB 464's effect on voters' ability to register. After Dr. Mayer's testimony concluded and he left the state of New Hampshire, the defendants elicited testimony from witnesses regarding HB 464's implementation and users' SVRS search capabilities that contradicted Secretary Scanlan's Rule 30(b)(6) testimony and undermined the facts upon which Dr. Mayer relied. Such contradictory testimony includes Deputy O'Donnell's and Director Piecuch's statements that state-level users can perform partial name searches of the SVRS and perform remote SVRS searches by phone on behalf of local election officials even though the voter would not be present in front of the state-level user. In addition, the defendants elicited testimony that they never disclosed to the plaintiffs during discovery, including testimony regarding the purported nature of the DMV data integrated into the SVRS and testimony about the effect on search results of incorrect information entered into optional search fields during a search.

The Open Democracy Plaintiffs argue that the defendants violated Federal Rule of Civil Procedure 26(e) because they failed to supplement their discovery responses with information concerning HB 464's implementation. Specifically, they contend that the defendants' "responses to Plaintiffs' interrogatories and requests for the production of documents, as well as the testimony of Defendants' Rule 30(b)(6) designee, omitted key information about the

90

implementation HB 464 and its resulting changes to the SVRS, information Defendants ambushed Plaintiffs with at trial." Doc. no. 167 at 10. They request the relief noted above, specifically that the court give testimony on undisclosed matters "lesser weight" and that it deem testimony that conflicts with Secretary Scanlan's Rule 30(b)(6) testimony "less credible."

Under Federal Rule of Civil Procedure 26(e), a party who has responded to an interrogatory or request for production "must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e). Under Rule 37(c), "[i]f a party fails to provide information" required by Rule 26(e), and the failure was not "substantially justified" or "harmless," the court may order sanctions. Fed. R. Civ. P. 37(c).

The Open Democracy Plaintiffs' complaints about the defendants' behavior fall into two categories: 1) testimony regarding information that the defendants never disclosed to the plaintiffs and 2) testimony that conflicts with Secretary Scanlan's Rule 30(b)(6) testimony. The former category implicates Rule 26(e). There is no doubt that the defendants violated their duty to supplement their discovery responses under that rule. An "important object" of the Federal Rules governing discovery and supplementation "is to avoid trial by ambush." Macaulay v. Anas, 321 F.3d 45, 50 (1st Cir. 2003); Colon-Millin v. Sears Roebuck De Puerto Rico, Inc., 455 F.3d 30, 37-38 (1st Cir. 2006). Here, the defendants offered testimony at trial regarding HB 464's implementation that they never disclosed to the plaintiffs despite repeated requests and an order from this court. Moreover, they offered this testimony after the plaintiffs' expert witness

91

had concluded his testimony regarding the effects of HB 464's procedures based on the discovery the defendants had provided to that point.[22]

The defendants' failure to supplement their discovery responses was not substantially justified or harmless. Indeed, the plaintiffs and the court had specifically raised concerns about this type of "trial by surprise" during the parties' several discovery disputes. The defendants' dereliction of their discovery obligations deprived the plaintiffs of the opportunity to test the veracity of witnesses' testimony regarding the functionality of HB 464's procedures or prepare their own expert witness to offer an opinion based on accurate information. As such, the defendants' violation subjects them to sanctions under Rule 37.

As for Secretary Scanlan's testimony, "an organization that is served with a Federal Rule of Civil Procedure 30(b)(6) deposition notice is obligated to produce a witness knowledgeable about the subjects described in the notice and prepare the witness to testify not simply to his or her own knowledge, but the corporation's knowledge." Dow Corning Corp. v. Weather Shield Mfg., Inc., No. 09-10429, 2011 WL 4506167, at *4 (E.D. Mich. Sept. 29, 2011). Rule 30(b)(6) "aims to prevent a corporate defendant from thwarting inquiries during discovery, then staging an ambush during a later phase of the case." Rainey v. Am. Forest & Paper Ass'n, Inc., 26 F. Supp. 2d 82, 95 (D.D.C. 1998). "[T]he testimony of the representative designated to speak for the corporation are admissible against it. But as with any other party statement, they are not 'binding' in the sense that the corporate party is forbidden to call the same or another witness to

_____

[22] The timing of the trial was a point of contention throughout the litigation due to the specter of the Purcell principle and the defendants' repeated requests to delay trial. Thus, the parties were restricted to a limited timeline. The plaintiffs reasonably declined as unfeasible the court's offer to recall Dr. Mayer after he had finished testifying and left the state so that he could respond to the previously undisclosed information regarding HB 464.

offer different testimony at trial." United States ex rel. Landis v. Tailwind Sports Corp., 292 F. Supp. 3d 211, 217 (D.D.C. 2017) (quoting 8A Charles Alan Wight & Arthur R. Miller, Federal Practice and Procedure § 2103 (3d ed. 2017) (quotations omitted)); see W.R. Grace & Co. v. Viskase Corp., No. 90 C 5383, 1991 WL 211647, at *2 (N.D. Ill. Oct. 15, 1991) (allowing corporate party to offer at trial evidence contrary to its corporate representative's Rule 30(b)(6) deposition testimony). Nevertheless, "[t]here may be some circumstances . . . in which it may be appropriate to sanction an organization for failing to comply with its Rule 30(b)(6) obligations and such sanctions can include precluding trial testimony on certain matters, or testimony that is inconsistent with deposition testimony." Mass Engineered Design, Inc. v. Planar Sys., Inc., No. 3:16-CV-1510-SI, 2017 WL 11820360, at *9 n.1 (D. Or. Aug. 31, 2017). Such sanctions are appropriate only to enforce the purpose of the rule, which is to prevent a defendant "from thwarting inquiries during discovery, then staging an ambush during a later phase of the case." Rainey, 26 F. Supp. 2d at 95.

Here, the circumstances surrounding Secretary Scanlan's Rule 30(b)(6) testimony regarding HB 464 warrant sanctions. The defendants fought against producing any information relating to HB 464's implementation. The court ordered them to produce a Rule 30(b)(6) witness for deposition on that topic. They offered Secretary Scanlan as that witness mere days before trial. Witnesses offered by the defense after the plaintiffs' witnesses had already testified directly contradicted Secretary Scanlan's testimony that users are not able to run partial searches in the SVRS or perform searches remotely for election officials. This is precisely the type of "ambush" at trial that Rule 30(b)(6) is designed to avoid. As such, sanctions are warranted.

Nevertheless, although sanctions are warranted and those sanctions that the Open Democracy Plaintiffs request—giving certain testimony "lesser weight" or finding it "less

93

credible"—are reasonable, the court declines to impose sanctions. The court does so only because it ultimately finds in the plaintiffs' favor on every claim in this case even accepting the disputed testimony into evidence and resolving the credibility of that testimony in the normal course. Had the disputed testimony affected the court's ultimate determination in this case, the court would have imposed sanctions upon the defendants.

V.    Remedy

The plaintiffs ask the court to render judgment declaring that the portions of HB 1569 that 1) repealed the use of QVAs to prove citizenship when registering to vote in New Hampshire and 2) repealed the use of CVAs to overcome voter challenges are unconstitutional. They further request a statewide injunction barring the defendants from enforcing those portions of HB 1569.[23]

Courts "have broad authority to fashion equitable relief" once they find a constitutional violation. Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos., 89 F.4th 46, 56 (1st Cir. 2023). When crafting a remedy, the court "must undertake an equitable weighing process to select a fitting remedy for the legal violations it has identified, taking account of what is necessary, what is fair, and what is workable." North Carolina v. Covington, 581 U.S. 486, 488 (2017) (cleaned up).

---

[23] The relevant portions of HB 1569 that eliminated the QVA for proving citizenship when registering are the repeal of RSA 654:12 and 654:7 (effective Nov. 11, 2024). The relevant portions of HB 1569 that eliminated the CVA for responding to a voter challenge are the repeal of RSA 659:27, RSA 659:27-a, RSA 659:30, RSA 659:31, and RSA 659:32 (effective Nov. 11, 2024). See Ex. AAA1 at 33–48 (identifying changes enacted by HB 1569).

The defendants argue standing, mootness, and the merits of the plaintiffs' substantive claims, but do not argue that the equitable relief the plaintiffs request is beyond the court's authority or more expansive than is necessary to provide complete relief to the plaintiffs. See Trump v. CASA, Inc., 606 U.S. 831 (2025). Citing Purcell v. Gonzalez, the defendants do "request that the Court consider the scope of its final order, the demands the adverse order will likely place on Defendants and third parties out of Defendants' direct control (including vendors and non-party local election officials), and [] the proximity of the next election, when setting deadlines for compliance." Doc. no. 169 at 38 (citing Purcell, 549 U.S. at 4-5). Under Purcell, "federal courts should ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm. v. Democratic Nat'l Comm., 589 U.S. 423, 424 (2020). "Only under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress is Purcell implicated." Am. Encore v. Fontes, 152 F.4th 1097, 1121 (9th Cir. 2025) (quotations omitted).

Purcell does not constrain relief in this case. First, the court set the schedule in this case based on the parties' joint discovery plan and the defendants' representations that an order issued 90–120 days before the election would suffice "to implement the changes necessary so that no one would be disenfranchised and the public would not be confused and so on." See, e.g., doc. no. 52 at 18:21–20:13. A defendant may not rely on Purcell after making a specific representation on which the court relied in developing the schedule for the case. See Rose v. Raffensperger, 143 S. Ct. 58, 59 (2022) (rejecting application of Purcell when the respondent made "previous representations to the district court that the schedule on which the district court proceeded was sufficient to enable effectual relief as to the November elections should applicants win at trial"); Jacksonville Branch of NAACP v. City of Jacksonville, No. 22-13544,

2022 WL 16754389, at *2 (11th Cir. Nov. 7, 2022) (holding that the Purcell principle was not applicable where the defendants had agreed that they "would be able to conduct the March 2023 elections" if maps were in place by a certain date and "the entire schedule on which the district court proceeded was developed" on that basis). Even absent those representations, Secretary Scanlan testified that an order issued as late as early July would still leave sufficient time to implement the requested relief before the 2026 election.[24]

Moreover, "Purcell's heightened standard is not appropriate [where] . . . the primary reason for applying that standard—risk of voter confusion—[is] lacking." Jacksonville Branch of NAACP, 2022 WL 16754389, at *3; Purcell, 549 U.S. at 4-5 (counseling against issuing orders that "themselves result in voter confusion and [a] consequent incentive to remain away from the polls"). Here, there is no risk of confusion from an order reinstating QVAs to prove citizenship and CVAs to respond to voter challenges. Voters who are not sure whether they may use a QVA to register can still register using DPOC. New Hampshire voters have relied extensively on QVAs to prove citizenship in the past, and election officials already know how to administer them. Further, the court cannot identify any possible risk of voter confusion with respect to legitimate activities resulting from the reinstatement of the CVA for voter-challenge purposes.

For these reasons, the plaintiffs are entitled to declaratory and statewide injunctive relief as follows:

---

[24] Director Piecuch initially estimated that it would take "four to six months" to "reimplement qualified voter affidavits for citizenship." Doc. no. 164, Trial Tr. at 54:14-17. But that estimate was based on her understanding that the defendants would need to make changes within the SVRS to reinstitute the QVA. She subsequently acknowledged that the defendants could effectuate relief without making changes to the SVRS. Doc. no. 163, Trial Tr. at 95:23-96:19. The defendants do not reference Director Piecuch's testimony or acknowledge Secretary Scanlan's testimony in their discussion of the Purcell principle.

1) HB 1569's repeal of the provisions of RSA 654:12 and RSA 654:7 permitting registrants to use the Qualified Voter Affidavit to establish citizenship violates the First and Fourteenth Amendments to the U.S. Constitution;

2) HB 1569's repeal of the provisions of RSA 659:27, RSA 659:27-a, RSA 659:30, RSA 659:31, and RSA 659:32 permitting voters to use the Challenged Voter Affidavit to respond to a successful challenge violates the First and Fourteenth Amendments to the U.S. Constitution;

3) HB 1569's repeal of the provisions of RSA 659:27, RSA 659:27-a, RSA 659:30, RSA 659:31, and RSA 659:32 permitting voters to use the Challenged Voter Affidavit to respond to a successful challenge constitutes a denial of procedural due process in violation of the Fourteenth Amendment to the U.S. Constitution;

4) The defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with them, are permanently enjoined from giving effect to or enforcing HB 1569 to the extent that it repealed the provisions of RSA 654:12 and RSA 654:7 permitting registrants to use the Qualified Voter Affidavit to establish citizenship;

5) The defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with them, are permanently enjoined from giving effect to or enforcing HB 1569 to the extent that it repealed the provisions of RSA 659:27, RSA 659:27-a, RSA 659:30, RSA 659:31, and RSA 659:32 permitting voters to use the Challenged Voter Affidavit to respond to a successful challenge.

Conclusion

The plaintiffs' requests for declaratory and injunctive relief are granted as provided in this order. The Open Democracy Plaintiffs' motion for sanctions (doc. no. 167) is granted in part and denied in part as explained herein.

The plaintiffs' amended complaints request an award of attorneys' fees. Within 30 days of the date of this order, the plaintiffs shall file motions supporting an award of attorneys' fees. The defendants shall have 30 days from the date of filing to submit a response.

SO ORDERED.

_____
Samantha D. Elliott
United States District Judge

May 28, 2026

cc:  Counsel of Record.

98