**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| New Hampshire Youth Movement, | |
| *Plaintiff*, | |
| v. | Consolidated Cases |
| David M. Scanlan, in his official capacity as New Hampshire Secretary of State, | Case No. 1:24-cv-291-SE-TSM |
| *Defendant*. | |

| | |
|---|---|
| Coalition for Open Democracy, *et al.*, | |
| *Plaintiffs*, | |
| v. | |
| David M. Scanlan, in his official capacity as New Hampshire Secretary of State, *et al.*, | Case No. 1:24-cv-312-SE-TSM |
| *Defendants*. | |

**OPEN DEMOCRACY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

**INTRODUCTION**

To obtain a stay, Defendants must show a strong likelihood of prevailing on appeal—they cannot. Following a nine-day bench trial, this Court found that House Bill ("HB") 1569 unlawfully eliminated the Qualified Voter Affidavit ("QVA") for proving citizenship and the Challenged Voter Affidavit ("CVA") for voters who are the subject of a well-founded challenge. This Court's nearly 100-page ruling rests on detailed factual findings and settled legal principles. Defendants' motion ignores large swaths of evidence, rehashes standing and other flawed arguments that this Court has repeatedly rejected, and does not identify any reversible error.

Equitable considerations also strongly disfavor a stay. Since this Court issued its ruling on May 28, 2026, Secretary Scanlan—and his Office—have repeatedly advised the public and election officials that affidavits have been restored for elections this year. Indeed, Open Democracy has successfully helped voters register using the QVA for citizenship after this Court's ruling. A stay at this juncture will cause voter confusion by rescinding affidavits that Defendant Scanlan has publicly promised will be available. Moreover, any claims of urgency are belied by Defendants' own actions, as they waited over three weeks to file this motion without seeking expedited briefing. And as this Court found at trial, the elimination of those affidavits significantly burdens New Hampshire voters' right to vote without meaningfully furthering any state interest.

**BACKGROUND**

Because this Court is familiar with the history of this case, Plaintiffs recount only the factual developments occurring after this Court's May 28 Order, Dkt. 176 ("Op." or "Order").

Since the Court's Order, Secretary Scanlan and his office have publicly assured New Hampshire residents that they will be able to register and vote using affidavits for elections this year, including in the upcoming November 2026 Midterms. When asked about the September and November elections this year, Secretary Scanlan stated, "[W]e will be conducting the registration

process at state elections the way we have done in the past, which means a voter can come into the polling place and use an affidavit to prove certain qualifications."[1] The interviewer then sought to confirm, for "the state primary and then the general election in November, we're back to the way it was essentially in 2024?" and the Secretary responded, "Yes."[2] The Secretary's Office then officially confirmed that "[u]ntil further notice, the Secretary of State's Office will reimplement the use of the qualified voter affidavit solely for a registrant to prove citizenship" and that "voters may now prove citizenship using an affidavit,"[3] a statement that itself garnered news coverage.[4]

The Secretary has provided similar guidance to local election officials. On May 29, 2026, Elections Director Piecuch advised all clerks and supervisors that "an updated qualified voter affidavit form can be found in SVRS Help Instructions . . . . If a person seeking to register to vote does not have proof of citizenship, until further notice you must allow the voter to complete the updated qualified voter affidavit form." Ex. A, May 29, 2026 email (recipient email address redacted for privacy). On June 19, 2026, Deputy Secretary of State O'Donnell reiterated that, "If a person seeking to register to vote does not have proof of citizenship, you must continue to allow the voter to complete the updated qualified voter affidavit form." Ex. B, June 19, 2026 email (recipient email address redacted for privacy).

---

[1] Adam Sexton, *Federal Judge Overturns Election Law, Drawing Reaction from Sec. David Scanlan*, WMUR (updated June 1, 2026), https://www.wmur.com/article/david-scanlan-reacts-election-law-ruling-closeup/71455058.

[2] *Id.*

[3] N.H. Sec'y of State, *Secretary of State David Scanlan Issues Statement Following District Court's Ruling on HB 1569* (May 29, 2026), https://mm.nh.gov/files/uploads/sos/docs/5-29-26-secretary-of-state-issues-statement-on-hb-1569.pdf.

[4] Ethan Dewitt, *After Court Ruling, Here's What Granite Staters Need to Register to Vote*, N.H. Bulletin (June 9, 2026), https://newhampshirebulletin.com/2026/06/09/after-court-ruling-heres-what-granite-staters-need-to-register-to-vote/.

On June 19, 2026, more than three weeks after the Court's Order, Defendants filed the instant motion to stay the Order pending appeal. Dkt. 182. Defendants did not request an expedited briefing schedule for the motion and have not yet filed any motion to expedite the pending appeal.

## ARGUMENT

Defendants bear the burden of justifying a stay pending appeal and cannot satisfy any of the four stay factors. *See Nken v. Holder*, 556 U.S. 418, 433–34 (2009).

### I.       Defendants Are Unlikely to Succeed on Appeal.

Defendants face the heavy burden of showing that this Court's ruling constitutes an abuse of discretion. *Calandro v. Sedgwick Claims Mgmt. Servs., Inc.*, 919 F.3d 26, 31 (1st Cir. 2019); *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007). Appeals courts must "accept the [trial] court's factual findings, including reasonable inferences drawn from raw facts, unless those findings are clearly erroneous." *Calandro*, 919 F.3d at 33. "[A]n appellate court may not reverse even if it is convinced that it would have weighed the evidence differently." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021).

Defendants do not have a "strong" likelihood of prevailing on any of their arguments on appeal. *See Nken*, 556 U.S. at 434 ("[M]ore than a mere 'possibility' of relief is required." (citation omitted)). First, Defendants once more press their misguided view of standing. They again fail to engage with the mountain of precedent holding that voter assistance organizations like Plaintiffs face irreparable harm from laws that interfere with their core work. Second, Defendants cite little law in their discussion of individual standing, instead taking issue with this Court's well-supported assessment of the facts. Third, Defendants cannot identify any legal error in this Court's application of the *Anderson-Burdick* test, pinning their hopes on a concurring opinion from *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), that does not reflect binding precedent. Fourth, Defendants attempt to couch their disagreement with this Court's weighing of

3

voter burdens and state interests—factual questions entitled to deference—as a legal error, but the trial record supports Plaintiffs even under Defendants' incorrect standard.[5] Finally, Defendants claim that the Court's injunction is broader than necessary, but do not grapple with Plaintiffs' showing that such a remedy is necessary to fully address the harm experienced by Plaintiffs, who include organizations operating statewide.

### A. Defendants' arguments against organizational standing are unlikely to prevail.

Defendants once again re-up their failed theories of organizational standing. *See Coal. for Open Democracy v. Scanlan*, 794 F. Supp. 3d 28, 39–44 (D.N.H. 2025) (motion to dismiss); *N.H. Youth Movement v. Scanlan*, No. 24-cv-291, 2026 WL 323171, at *4–10 (D.N.H. Feb. 6, 2026) (summary judgment). Their stay motion cherry-picks facts to frame Plaintiffs as mere issue advocacy outfits, while ignoring that Plaintiffs have long provided services and assistance to eligible voters. *See* Defs.' Mem. of Law in Supp. of a Stay Pending Appeal ("Mot."), Dkt. 182-1. In so doing, they fail to grapple with this Court's factual findings, the voluminous trial record, and the extensive legal precedent supporting Plaintiffs' organizational standing.

As this Court found at trial, "HB 1569's eliminations of the QVA and CVA . . . impair[ed] Open Democracy's ability to provide its core services" and caused it to expend resources. Op. at 50–51. Far from mere "issue advocacy," Open Democracy's core business activities include assisting with registration and voting, such as hosting high school voter registration drives and deploying poll observers across the state. *See, e.g.*, Op. at 41–43. HB 1569 has made assisting with student registrations much more difficult, while forcing Open Democracy to expend resources to update materials and expand poll observing efforts. Op. at 50–51. The other *Open Democracy*

---

[5] As to the removal of the CVA, Defendants agreed that the *Matthews v. Eldridge* test applies to Count III. *E.g.*, Feb. 20, 2026 Trial Tr. 120:3–25. The motion makes no argument whatsoever that this Court erred in its application of the *Matthews* test. Accordingly, Defendants cannot show a likelihood of success of prevailing on the merits of this claim.

organizational plaintiffs have experienced similar harms. Op. at 54–55. Thus, Defendants' contention that Plaintiffs' work "continues" unaffected is simply wrong. *See* Mot. at 8.

Defendants fail to engage with the litany of decisions from courts across the country holding that voter engagement organizations such as Plaintiffs here have organizational standing to challenge laws that impair their existing core business activities and cause consequent resource diversion.[6] *See* Op. at 51–52. Those courts have reached that conclusion even after the Supreme Court's ruling in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024).[7]

**B.  Defendants' arguments against individual standing have no merit.**

As this Court has repeatedly explained, the individual Plaintiffs (Miles Borne and Alexander and Lila Muirhead) have standing to challenge a law that requires them to "produce documentary evidence to register to vote." Op. at 55 (collecting cases). Defendants continue to conflate standing with the merits, contending that individual voters only have standing if they cannot produce the required document and "need" to rely on the QVA—citing no legal authority for that position. Mot. at 10.

Defendants also quibble with the Court's weighing of the evidence, suggesting that signing a QVA is somehow not any "less burdensome than retrieving their passports or birth certificates." Mot. at 10–11. That argument, entirely unsupported by legal authority, has no bearing on standing.

---

[6] Defendants (Mot. at 9) rely on *National Treasury Employee Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996), but that case helps *Plaintiffs*. There, the D.C. Circuit reiterated that an abstract disagreement is insufficient but that an organization may sue when "a defendant's conduct has made the organization's *activities* more difficult." *Id.* at 1430. Plaintiffs have proven that here.

[7] *E.g. Get Loud Ark. v. Jester*, 171 F.4th 1058, 1064 (8th Cir. 2026), *pet. for reh'g en banc denied*, No. 24-2810, 2026 WL 1459895 (8th Cir. May 22, 2026); *Va. Coal. for Immigrant Rts. v. Beals*, 803 F. Supp. 3d 454, 465 (E.D. Va. 2025); *Voice of the Experienced v. Ardoin*, 813 F. Supp. 3d 600, 640–41 (M.D. La. 2025); *Democracy N.C. v. Hirsch*, 2025 WL 4033053, at *2 (M.D.N.C. July 21, 2025); *League of Women Voters of N.H. v. Kramer*, 2025 WL 919897, at *9–10 (D.N.H. Mar. 26, 2025); *League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 707 n.3 (N.D. Ohio 2024); *Caicedo v. DeSantis*, No. 23-CV-2303, 2024 WL 4729160, at *5 (M.D. Fla. Nov. 8, 2024).

As this Court previously explained, "[t]his argument conflates standing with the merits of the claim" because "the magnitude of the burden HB 1569 imposes . . . is more properly analyzed in the context of a challenge to the merits of the plaintiffs' claims." *Coal. for Open Democracy*, 794 F. Supp. 3d at 46 (citing cases); *see also N.H. Youth Movement*, 2026 WL 323171, at *11. In any event, this Court's factual findings are reviewed for clear error, and the only reasonable inference is that having to locate and retrieve a seldom-used document—that most voters typically do not carry—is more burdensome than signing a form already at the polls. *See* Op. at 63.

Defendants also argue for the first time in their stay motion that the individual Plaintiffs "could not validly execute a QVA" because a voter may only use a QVA if they are not in possession of required documents. Mot. at 10 (citing Election Procedure Manual, Defs.' Ex. 48 SS at 315). But Defendants have already conceded in this litigation that HB 1569's requirement for Plaintiffs to produce documentary proof of citizenship ("DPOC") causes injury sufficient for standing. *See Coal. for Open Democracy*, 794 F. Supp. 3d at 46 ("The defendants conceded at oral argument that 'even just pulling' a documentary form of citizenship 'out of your back pocket' can create an injury sufficient to establish standing." (citation omitted)). Moreover, Defendants contradict their own Election Procedure Manual regarding QVA use. According to the Manual, an "applicant is entitled to use an affidavit to prove qualifications" "[i]n the event an applicant does not have proof documents *with him or her when registering*." Defs.' Ex. 48 SS at 185 (SOS-482613) (emphasis added). Thus, the individual Plaintiffs may execute a QVA as long as the citizenship documentation is not in their *immediate* possession—whether they are theoretically able to access and retrieve those documents from elsewhere is irrelevant.

As to Mr. Borne specifically, Defendants continue to press mootness by disputing this Court's view of the facts. Mot. at 11–12. They contend that Mr. Borne will never have to re-

register, because future election officials can rely on his having been previously registered, but they fail to acknowledge this Court's finding that such searches are frequently inaccessible to election officials. Op. at 71. Finally, Defendants make an unusual and circular argument that the mootness exception does not apply to Mr. Borne because persons identical (rather than similarly situated) to him would not have standing. Mot. at 11. Because this Court correctly held that Mr. Borne has standing, that argument fails as well.

Defendants' latest attacks on individual Plaintiffs' standing are wrong on the law and the facts and are unlikely to prevail on appeal.

### C. Defendants cannot show that this Court misapplied the *Anderson-Burdick* framework.

Defendants' argument that this Court misapplied *Crawford* and the *Anderson-Burdick* framework rests on legal and factual errors. First, Defendants mischaracterize *Crawford* to argue it held that "where a law has broad application to all voters, 'it imposes only a limited burden on voters' rights.'" Mot. at 13 (quoting *Crawford*, 553 U.S. at 202–03). But that was not a statement of general principle—it was the Court's characterization of the particular facts in *Crawford*: The Court merely said that when it "consider[ed] only the statute's broad application to all Indiana voters," that particular law imposed a limited burden, not the nonsensical position that *any* statute with broad application imposed a limited burden. *Crawford*, 553 U.S. at 202–03. Defendants accompany that misstatement with a reliance on non-controlling statements from Justice Scalia's concurring opinion, Mot. at 14–18 (citing *Crawford*, 553 U.S. at 206 (Scalia, J., concurring)), which the remaining *six justices* rejected. The very paragraph they misconstrue above contains the controlling opinion's conclusion that the Indiana law did not impose excessive burdens on "any class of voters," not just voters as a whole. *Crawford*, 553 U.S. at 202. If Defendants intend to argue that *Crawford* should be overruled or that the concurrence is controlling, they have never

7

made that argument to this Court, *see* Op. at 58–59, and it cannot be raised for the first time on appeal. *See infra* Section I.E. (Waiver).

Second, even if an appellate court were to adopt Defendants' erroneous standard, Defendants remain unlikely to prevail given this Court's extensive factual findings, which detail the scale and severity of the disparate burdens created by New Hampshire's DPOC scheme. Defendants' repeated mischaracterization of this Court's opinion as relying on "imaginary," "hypothetical," or "a small subset of" voters who are burdened by HB 1569 ignores the record and fails to show how the Court's decision is erroneous. *See, e.g.*, Mot. at 2, 13.

> 1. *This Court correctly applied controlling law when considering HB 1569's burdens on certain groups of voters.*

Federal courts have consistently recognized that Justice Stevens's opinion in *Crawford* (joined by Chief Justice Roberts and Justice Kennedy) represents the "controlling" decision because "it is the narrowest majority position." *Fish v. Schwab*, 957 F.3d 1105, 1123 (10th Cir. 2020) (citation omitted).[8] That opinion found it appropriate to analyze both the burdens on all voters without acceptable identification and on certain "classes of voters" including "elderly persons born out of State," people with "economic or other personal limitations, . . . homeless persons; and persons with a religious objection to being photographed." *Crawford*, 553 U.S. at 199. In the end, it found that even for these classes of voters, the "severity of that burden" was "mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted." *Id.* The *Crawford* controlling opinion thus concluded, as

---

[8] *See, e.g.*, *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1319 n.31 (11th Cir. 2021) ("We join our sister circuits in recognizing Justice Stevens' plurality opinion as controlling."); *Brakebill v. Jaeger*, 932 F.3d 671, 688 n.2 (8th Cir. 2019) ("Justice Stevens' opinion rests on narrower grounds than Justice Scalia's, thus it is the controlling opinion."); *Feldman v. Ariz. Sec'y of State's Off.*, 843 F.3d 366, 387 (9th Cir. 2016) (similar).

did this Court, that the "relevant" burdens are those faced by the subset of voters "who are eligible to vote but do not possess" the required documentation. *Crawford*, 553 U.S. at 198 (plurality); *see* Op. at 60 n.20. Notably, the *Crawford* plurality explained that "[t]he fact that most voters already possess a . . . form of acceptable identification, would not save the statute . . . if the State required voters to pay a tax or a fee to obtain a new photo identification." 553 U.S. at 198.

Here, the Court properly performed both an analysis regarding voters as a whole as well as certain classes of voters likely to be disproportionately burdened. It correctly relied on *Crawford*, recognizing the evidence of far greater burdens imposed by HB 1569 than Indiana's photo ID law. Unlike in *Crawford*, New Hampshire has failed to provide a free means of obtaining DPOC to all voters and has also eliminated the affidavit-based safety valve that was the QVA. *See, e.g.*, *Fish*, 957 F.3d at 1129 (distinguishing *Crawford* and finding DPOC requirement unconstitutional because state "offered no similar safety valve"); Op. at 65.

Defendants try to avoid these findings by relying on Justice Scalia's non-controlling concurrence to contend that courts may only consider the burdens imposed "on **voters generally**," rather than impacts on particular groups. Mot. at 15, 17 (quoting *Crawford*, 553 U.S. at 205–06 (Scalia, J., concurring)). But all six remaining justices disagreed with that approach. *See United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006) ("[L]ower courts should examine the plurality, concurring and dissenting opinions to extract the principles that a majority has embraced."). In addition to the three justices in the plurality, Justices Souter and Ginsburg opined that "[p]oor, old, and disabled voters who do not drive a car" may find obtaining voter ID "prohibitive," and that voters who live far from a DMV office may face a "serious" burden applying for one. *Crawford*, 553 U.S. at 212–14 (Souter, J., dissenting). Those two justices concluded that "in the *Burdick* analysis it matters that both the travel costs and the fees [related to obtaining

9

documents needed for state-issued ID] are disproportionately heavy for, and thus disproportionately likely to deter, the poor, the old, and the immobile." *Id.* at 216. Likewise, Justice Breyer, who wrote a separate dissent, found the voter ID law "unconstitutional because it imposes a disproportionate burden" on "voters who lack a . . . valid form of photo ID." *Crawford*, 553 U.S. at 237 (Breyer, J., dissenting); *id.* at 238–39 ("For one thing, an Indiana nondriver, most likely to be poor, elderly, or disabled, will find it difficult and expensive to travel to the Bureau of Motor Vehicles, particularly if he or she resides in one of the many Indiana counties lacking a public transportation system."). Thus, a total of six justices in *Crawford*—three in the controlling plurality and three dissenting—endorsed this Court's approach to the burden analysis.

Consistent with the *Crawford* plurality, other courts applying the *Anderson-Burdick* framework have assessed whether laws disproportionately burden certain classes of voters; Defendants ignore all of those cases. In *Fish*, for instance, the Tenth Circuit held that courts may "specifically consider the 'limited number of persons' on whom '[t]he burdens that are relevant to the issue before us' will be 'somewhat heavier.'" 957 F.3d at 1127 (quoting *Crawford*, 553 U.S. at 198–99). The First Circuit has adopted a similar approach. In *Common Cause Rhode Island v. Gorbea*, that court considered the fact that a witness requirement during the pandemic would disproportionately burden "senior voters" who "fac[e] a higher risk of COVID-19 complications." 970 F.3d 11, 14 n.1 (1st Cir. 2020); *see also Common Cause R.I. v. Gorbea*, No. 20-cv-00318, 2020 WL 4365608, at *2 (D.R.I. July 30, 2020) (noting "particularly vulnerable demographics"). Other courts have similarly analyzed whether a subset of voters experience a heavier burden. *E.g.*, *Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 309 (3d Cir. 2025); *Count US IN v. Morales*, No. 25-cv-00864, 2026 WL 1009067, at *12 (S.D. Ind. Apr. 14, 2026).

Thus, numerous courts have held that the *Anderson-Burdick* framework may turn on whether any identifiable groups of voters are likely to be more severely burdened by the challenged law and whether those burdens are mitigated by a safety valve, such as provisional balloting and voter affidavits. Defendants' position that a burden cannot be severe simply because it is "widespread" and facially "nondiscriminatory," Mot. at 15, runs contrary to those and other longstanding precedents. *See Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983) (finding suspect any "burden that falls unequally" or "limits political participation" based on "economic status"); *Bullock v. Carter*, 405 U.S. 134, 144 (1972) (invalidating filing fee requirement that "would fall more heavily on the less affluent segment of the community"). Indeed, the implication of Defendants' argument is that even a poll tax would be constitutional because every voter would technically have to pay. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) (invalidating poll tax on basis of burden). Defendants' position ignores the reality that a law's burdensome effects, even if they could be borne by most voters, could nonetheless disenfranchise other classes of voters—*that* would be legal error.

2. *Defendants mischaracterize this Court's factual findings and are unlikely to prevail even under their preferred legal standard.*

Even if a court were to adopt Justice Scalia's concurrence as the applicable standard, Defendants are unlikely to prevail on this trial record and this Court's extensive factual findings. The stay motion repeatedly accuses this Court of relying on "hypothetical," "imaginary," "idiosyncratic," or "individualized burdens." Mot. at 2, 12, 16–18. But in reality, this Court found, based on undisputed historical facts, empirical analyses, and known cases of disenfranchisement after HB 1569 took effect—including several confirmed by Defendants' own witnesses—that significant numbers of New Hampshire voters rely on affidavits and would be disenfranchised by the law. Op. at 67–69. The Court further found that the State's DPOC regime imposes a heavier

11

burden on particular classes of voters, including young voters, married women, and those born outside of New Hampshire. *Id.* As designed, HB 1569 and HB 464 make DPOC freely available only to those voters who have previously been registered in New Hampshire (even if they did so without providing DPOC) and those born in the state. This system of unequal burdens and preferential treatment would be unconstitutional even under Justice Scalia's concurrence.

Contrary to Defendants' suggestions, this Court did not "[s]peculat[e] that hypothetical people exist somewhere in some small amount who will experience some burden." *See* Mot. at 2. Rather, this Court "conducted a general assessment of the burden," *see Crawford*, 553 U.S. at 207 (Scalia, J., concurring), and found that, typically, "more than 10% of all registrants" in New Hampshire rely on the QVA to prove citizenship. Op. at 61. That percentage is even higher (16.8%) for first-time registrants. *Id.* While Defendants argued that some of the more than 10,000 voters relying on the QVA for citizenship in each election could provide DPOC if required, the Court drew a reasonable inference that "a significant portion" of voters in New Hampshire have relied on QVAs because they either "did not possess or could not easily retrieve DPOC." *Id.* at 62. That inference is well-supported by undisputed expert testimony confirming that "between 89,934 and 153,213 [eligible voters in New Hampshire] cannot retrieve their documents within one day." *Id.* Another "17,967 and 53,826 eligible New Hampshire voters" do not know where their DPOC is located. *Id.* at 63. And "between 5,433 and 31,291 eligible New Hampshire voters do not possess acceptable DPOC" at all. *Id.* Thus, as many as 238,330 eligible voters would have difficulty producing DPOC—in a state that totaled only 814,011 votes in the 2024 presidential election.[9] That conclusion is further bolstered by the undisputed fact that hundreds of prospective voters

---

[9] *See* N.H. Sec'y of State, 2024 General Elections Results, President of the United States, https://www.sos.nh.gov/sites/g/files/ehbemt561/files/inline-documents/sonh/2024-ge-president_3.xls (last visited June 28, 2026).

were turned away in low-turnout, local elections in 2025 after HB 1569 took effect.[10] Op. at 65–66. Far from "hypothetical" or "speculative," that systemic evidence is corroborated by election officials and others who testified about voters who have been disenfranchised under HB 1569. Op. at 16–20, 66. Defendants might wish to characterize these figures as "small"—though they are orders of magnitude greater than the instances of unlawful voting that the State claims an interest in preventing—but their disagreement with this Court's factfinding is not grounds for reversal.

Defendants also contend that the Court impermissibly "discounted New Hampshire's important regulatory interests" on the other end of the balancing test, Mot. at 19, but they identify no errors in this Court's finding that HB 1569 does not advance the State's purported interests. Indeed, as to the CVA, Defendants *cannot* contest this Court's findings, because even Secretary Scanlan testified that its elimination advanced no conceivable state interest, while Deputy O'Donnell confirmed that it had operated as a "safeguard" against meritless attacks on voters' eligibility. Op. at 81–83; Feb. 18, 2026 Tr. 20:5–19. Defendants instead cite cases for the general proposition that election integrity is a legitimate state interest. Mot. at 19–20. But this Court's opinion already recognized as much. Op. at 72–75.

When this Court's factual findings are accurately characterized, New Hampshire's DPOC law is unconstitutional even under the principles articulated in Justice Scalia's concurrence in *Crawford*. Justice Scalia found Indiana's voter ID law constitutional for two key reasons: The burden of obtaining "a free photo identification is simply not severe," and the requirement of a

---

[10] As to the CVA, the Court also relied on testimony from Defendants' witnesses confirming that it was an important safeguard against erroneous disenfranchisement, particularly when voters have faced frivolous challenges lodged en masse in New Hampshire, and that the alternative scheme of requiring costly appeals to superior court is too burdensome and infeasible for virtually all voters—not just some—to navigate. Op. at 79–82.

photo ID was "universally applicable." *Crawford*, 553 U.S. at 209 (Scalia, J., concurring). The scheme that New Hampshire has erected violates both principles.

Rather than make DPOC available at no cost to all eligible voters, New Hampshire's statutory scheme—if it functions as designed[11]—selectively benefits a subset of voters who will have free access to DPOC or are otherwise exempt from providing a birth certificate or a passport, while others must pay. Unlike the free ID in *Crawford*, obtaining DPOC is costly. Op. at 30. And New Hampshire is offering free birth certificates for only "40% of the population because the other 60% were born outside of New Hampshire." Op. at 68–69. Similarly, for citizens (overwhelmingly women) who change their name due to marriage or divorce, the required name-change documentation—on top of the citizenship documentation—is available free-of-charge only to those who got married or divorced *in* New Hampshire. *Id.* And voters who were registered in New Hampshire prior to HB 1569 do not have to provide documentation, even when they move and need to re-register, because election officials may rely on the voter's prior registration instead. Op. at 22–23. As a result, older and longtime residents of New Hampshire would be exempt, while younger voters and newer arrivals to the state have to obtain and provide expensive citizenship documents. Thus, the undisputed facts show that New Hampshire recognized that its DPOC requirement is burdensome—and then decided to relieve that burden for some voters but not others, along dimensions irrelevant to voter qualifications. *See also Harper*, 383 U.S. at 667–68 (finding voting requirement to be "invidious" discrimination when it is irrelevant to eligibility).

The ability to comply with New Hampshire's DPOC requirement is neither "universal" nor "free," and Defendants are unlikely to prevail even under Justice Scalia's concurrence.

---

[11] As this Court found, Defendants' implementation is riddled with various structural limitations and inaccuracies, including arbitrary gaps in the relevant data. Op. at 68–72.

14

**D. Defendants' argument that this Court's injunction is broader than necessary ignores both fact and law.**

This Court issued appropriate relief that respects traditional equitable principles and is no broader than necessary to provide complete relief to Plaintiffs. It did so by merely enjoining the portions of the law successfully challenged by Plaintiffs—i.e., the provisions in HB 1569 that eliminated the ability of voters to use the QVA to establish citizenship and the CVA to respond to a citizenship-based challenge—and declaring them unconstitutional. Op. at 97. This remedy is necessary to afford complete relief to Plaintiffs, who assist with voter registration and work to increase voter participation throughout New Hampshire, *see* Op. at 41–46, and who are injured by the challenged provisions, which harm their ability to help carry out their missions and require them to expend resources to try to mitigate those harms and help voters comply with these burdensome provisions. *See* Op. at 50–52, 54–55. Because they help register and educate voters throughout New Hampshire, it is "impossible for [the Court] to craft relief that is complete *and* benefits only the named plaintiffs." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 n.12 (2025).

Defendants offer two arguments against the scope of relief, one concerning the statewide nature of the injunction and the other concerning the portions of the law this Court enjoined. Neither has any merit.

First, Defendants appear to contest the statewide reach of the injunction because, in their view, none of the *individual* Plaintiffs need a QVA to register or a CVA to vote. Mot. at 21. Even if this argument were not waived, *see infra* Section I.E., Defendants still do not address how the Court could afford complete relief to the *organizational* Plaintiffs without a statewide injunction. Indeed, allowing voters to register or vote under different standards across the state would raise constitutional concerns, *cf. Bush v. Gore*, 531 U.S. 98, 104–05 (2000), as citizens have the "right

15

to participate in elections on an equal basis with other citizens in the jurisdiction," *N.E. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) (citation omitted).

Second, although Defendants do not dispute this Court's authority to issue injunctive relief that requires "state actors to refrain from violating federal law," Mot. at 20, they argue that the Court improperly "resurrects" the use of QVAs and CVAs eliminated in HB 1569, *id.* at 22, rather than "surgically excise portions of a law that the Court found constitutionally infirm and issue targeted prospective injunctive relief," *id.* at 3. But this argument both misstates the nature of the Order and misconstrues the role of federal courts in providing relief. This Court did not affirmatively impose specific extra-statutory duties on Defendants or election officials. It simply enjoined the challenged provisions, and those provisions only. *See* Op. at 97. In doing so, the Court followed the Supreme Court's longstanding guidance that when a legislature adds "an unconstitutional amendment to a prior law," the court treats "the original, pre-amendment statute as the 'valid expression of the legislative intent.'" *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 630 (2020) (quoting *Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 526–27 (1929)). In other words, the court excises the unconstitutional provisions "'introduced by amendment,' so that 'the original law stands,'" returning to the status quo ante. *Id.* (citation omitted).

Defendants offer little suggestion of appropriate alternatives. They offhandedly state that "[p]erhaps the Court could order the Defendants to accept registrants who bring notarized sworn affidavits as proof of citizenship or proof that a challenged voter's ballot is valid," without explaining why notarization (which also costs money) is a narrower or more appropriate remedy. Mot. at 22. In any case, those alternatives appear nowhere in any version of the relevant laws, and "[c]ourts do not change statutes." *Lindenbaum v. Realgy, LLC*, 13 F.4th 524, 528 (6th Cir. 2021); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 509–10 (2010).

16

The Court should reject Defendants' motion to stay based on the scope of the remedy.

### E.  Defendants are unlikely to succeed on the merits of waived arguments.

"[I]t is a virtually ironclad rule that a party may not advance for the first time on appeal either a new argument or an old argument that depends on a new factual predicate." *McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 775 F.3d 109, 126 (1st Cir. 2014) (citation omitted). "To preserve a point for appeal, some developed argumentation must be put forward in the nisi prius court—and a veiled reference to a legal theory is not enough to satisfy this requirement." *Mullane v. DOJ*, 113 F.4th 123, 132 (1st Cir. 2024). Notably, this Court directed Defendants to identify, prior to trial, all of their legal defenses, and the Court further confirmed (and re-confirmed), after trial, the arguments that each party wished to pursue. *See* Feb. 20, 2026 Tr. 95:4–108:18, 117:20–121:6; Min. Order (Jan. 20, 2026).

Defendants' stay motion now references several arguments that were omitted from their Brief Statement of Legal Defenses, Dkt. 124, and the extended post-trial colloquy with this Court—including arguments that Defendants failed to raise at any point in this case.

First, Defendants have not previously argued that the individual Plaintiffs lack standing because they are ineligible to use a QVA. Mot. at 10–11. Second, Defendants claim that this Court "exceeded its authority" by restoring the use of affidavits, Mot. at 20, but they abandoned that argument at trial by failing to brief why this Court lacks authority to grant such relief, *see generally* Dkt. 124; Defs.' Req. for Rulings of Law, Dkt. 169; Op. at 95 (noting that Defendants "do not argue that the equitable relief the plaintiffs request is beyond the court's authority"); *see* Feb. 20, 2026 Tr. 111:3–17 (reminding Defendants that summary-judgment arguments are not preserved if not raised after trial).

Most importantly for their merits position, Defendants have waived any argument that this Court misapplied *Anderson-Burdick*, including that Justice Scalia's concurrence in *Crawford*

represents controlling law or that *Crawford* should be overruled. *See* Mot. at 14–18, 21. Defendants have never previously argued or briefed such arguments. *See* Op. at 58–59 (noting parties' agreement that *Anderson-Burdick* is correct test). Indeed, in their statement of legal defenses, Defendants exclusively cited the *Crawford* plurality and Justice Souter's dissent, with no mention of the concurrence. *See* Dkt. 124 at 1–3. Defendants' post-trial filing did contain a footnote indicating that they intend to "reserve the right" to argue (but do not in fact argue to this Court) "that the Supreme Court should adopt the approach articulated by the concurrence in *Crawford*, *should such an argument be relevant to any appeal*." Dkt. 169 at 5 n.3 (emphasis added). Such a half-hearted statement, with no analysis and the trial record already closed, merely confirms that this is an argument that Defendants have never raised, and it is not sufficient to preserve the issue for appeal. *See Mullane*, 113 F.4th at 132.

For the reasons discussed herein, none of these arguments have merit; they are doubly unlikely to succeed on appeal because Defendants waived them.

## II.     Remaining Equitable Factors Weigh Against a Stay.

### A. Defendants cannot show irreparable harm.

Defendants cannot demonstrate any irreparable harm entitling them to a stay. This Court found that regardless of the importance of the State's asserted interests of election integrity, voter confidence, and the public fisc, the challenged provisions fail to *advance* any of those interests. Op. at 34–38. Defendants offer no response to any of those detailed factual findings. *See* Mot. at 22–23. While Defendants claim that an injunction against "a duly enacted state law" constitutes irreparable harm, the government has "no legitimate interest" in enforcing an unconstitutional law. *See New Jersey v. Trump*, 131 F.4th 27, 34 (1st Cir. 2025). Defendants' actions since this Court's ruling only confirm the lack of any harm to the State.

18

Defendants' "leisurely approach" in seeking a stay leaves no doubt that it is not suffering irreparable harm. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004). Defendants waited more than three weeks to file their motion and did not seek to expedite the briefing schedule. As a result, any ruling on their motion would come needlessly close to the State Primary Election, scheduled for September 8, 2026.[12] Defendants' delay also ensures that any reviewing court considering a stay request will operate on an unnecessarily compressed timeline, and that voters and those who educate the public on voting requirements (including Plaintiffs) will lack certainty about voting rules until quite close to the voting period itself.

In the meantime, the State has restored the ability for voters to use the QVA for citizenship during voter registration and the CVA for voter challenges. The morning after this Court issued its Order, Secretary Scanlan confirmed to the public that the affidavits will be available for the foreseeable future, including for the September and November elections. *See supra* Background. Thus, consistent with the Secretary's previous representations to this Court, implementation of the Court's Order was administratively feasible before July 2026 and indeed has already been achieved. *See* Feb. 20 Tr. 65:20–66:1; Scanlan Dep., Dkt. 103-11, at 474:1–10 (Oct. 22, 2025). Given Defendants' own representations to the Court on the schedule needed to enable effectual relief for this year's elections, *see Rose v. Raffensperger*, 143 S. Ct. 58, 59 (2022), their belated attempt to stay that relief is improper and would be inequitable if granted. In sum, Defendants cannot demonstrate an injury, much less an irreparable one.

### B. The balance of the equities and public interest factors disfavor a stay.

The balance of the equities favors Plaintiffs, who would suffer irreparable harm if this injunction were stayed, and the public interest favors protecting the fundamental right to vote.

---

[12] N.H. Sec'y of State, 2026-2027 Political Calendar, https://www.sos.nh.gov/elections/2026-2027-political-calendar (last accessed June 29, 2026).

19

*Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *League of Women Voters of N. H. v. Kramer*, No. 24-cv-73, 2025 WL 3260024, at *5 (D.N.H. Oct. 17, 2025), *R. & R. adopted* 2025 WL 3257189 (D.N.H. Nov. 20, 2025).

The Court has detailed the harms inflicted on Plaintiffs by HB 1569. *E.g.*, Op. at 50–51, 54–58. Since this Court's injunction, Open Democracy has resumed helping students use the QVA to register to vote.[13] A stay would once again deny Plaintiffs the ability to help register as many eligible voters as possible ahead of upcoming elections. That loss of opportunity "is irreparable because after the registration deadlines . . . pass, 'there can be no do over and no redress.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (citation omitted).

The public interest also favors allowing eligible voters to participate in elections. HB 1569 has the effect of disenfranchising a significant number of voters who rely on affidavits, Op. at 71–72, and the risk of disenfranchisement is even greater now. A stay at this juncture—after the Secretary has publicly advised that the QVA will be available this year—will confuse voters and harm Granite Staters relying on official guidance. Defendants argue that "the public expresses its interests in the laws its representatives enact." Mot. at 24. But the law in question has been adjudged unconstitutional, and "the public interest is harmed by the enforcement of laws repugnant to the United States Constitution." *Tirrell v. Edelblut*, 747 F. Supp. 3d 310, 318 (D.N.H. 2024) (citation omitted).

## CONCLUSION

For the foregoing reasons, Defendants' motion for a stay pending appeal should be denied.

---

[13] *See* Jonathan Shorman, *When Teens Drive Less, They Don't Register to Vote. Here's How Civic Groups Are Adapting*, N.H. Bulletin (June 29, 2026), https://newhampshirebulletin.com/2026/06/29/repub/when-teens-drive-less-they-dont-register-to-vote-heres-how-civic-groups-are-adapting/?emci=dde509bc-e272-f111-ac9c-000d3a54bed0&emdi=b18956ae-a973-f111-ac9c-000d3a54bed0&ceid=14987.

Respectfully submitted on this July 6, 2026,

<div style="margin-left:45%;">

COALITION FOR OPEN DEMOCRACY, LEAGUE OF WOMEN VOTERS OF NEW HAMPSHIRE, THE FORWARD FOUNDATION, MILES BORNE, ALEXANDER MUIRHEAD, BY HIS NEXT FRIEND RUSSELL MUIRHEAD, AND LILA MUIRHEAD, BY HER NEXT FRIEND RUSSELL MUIRHEAD

By and through their attorneys,

*/s/ Henry Klementowicz*
Gilles R. Bissonnette (N.H. Bar No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
Maria D. Savarese (N.H. Bar No. 273285)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE FOUNDATION
18 Low Avenue
 Concord, NH 03301
(603) 333-2201
henry@aclu-nh.org
gilles@aclu-nh.org
maria@aclu-nh.org

Jacob van Leer*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, D.C. 20005
(202) 715-0815
jvanleer@aclu.org

Ming Cheung*
Clayton Pierce*
Ethan Herenstein*
Davin Rosborough*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York, NY 10004
(212) 549-2500
mcheung@aclu.org
cpierce@aclu.org
eherenstein@aclu.org

</div>

21

drosborough@aclu.org
slakin@aclu.org

Geoffrey M. Atkins*
John T. Montgomery*
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
Geoffrey.Atkins@ropesgray.com
John.Montgomery@ropesgray.com

Alex H. DiLalla*
ROPES & GRAY LLP
191 N Wacker Dr, 32nd Floor
Chicago, IL 60606
(312) 845-1200
Alex.DiLalla@ropesgray.com


*Admitted Pro Hac Vice

22

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, a copy of the foregoing document was served upon counsel for defendants via the Court's electronic filing system.


*/s/ Henry Klementowicz*
Henry R. Klementowicz

1